```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   Shay Horse, et al.,              )
                                      ) Civil Action
 4                  Plaintiffs,       ) No. 17-cv-1216
                                      )
 5   vs.                              )
                                      )
 6   District of Columbia, et al.,    )
                                      )
 7                  Defendants.       )
     ----------------------------       STATUS CONFERENCE
 8                                    )
     Jessee P. Schultz, III, et al., )  Civil Action
 9                                    )  No. 18-cv-120
                    Plaintiffs,       )
10                                    )
     vs.                              )
11                                    )
     District of Columbia, et al.,    )
12                                    )
                    Defendants.       )
13   _____

14
                           Washington, DC
15                       September 27, 2019
                         Time:  1:30 p.m.
16

17                TRANSCRIPT OF STATUS CONFERENCE
                          HELD BEFORE
18           THE HONORABLE JUDGE AMY BERMAN JACKSON
                   UNITED STATES DISTRICT JUDGE
19   _____

20                   A P P E A R A N C E S

21   For Plaintiffs
       In Horse Case:        Arthur B. Spitzer
22                           Scott Michelman
                             American Civil Liberties Union
23                           915 15th Street, NW
                             Second Floor
24                           Washington, DC  20005
                             (202) 601-4266
25                           Email:  Artspitzer@gmail.com
                             Email:  Smichelman@acludc.org
```

```
 1    For Plaintiffs
        In Schultz Case      Jeffrey Louis Light
 2                           Law Office of Jeffrey L. Light
                             1712 Eye Street, NW
 3                           Suite 915
                             Washington, DC  20006
 4                           (202) 277-6213
                             Email:
 5                              Jeffrey@lawofficeofjeffreylight.com

 6    For Defendants:        Matthew Robert Blecher
                             Scott Patrick Kennedy
 7                           Office of the Attorney General
                             441 Fourth Street, NW
 8                           Suite 600 South
                             Washington, DC  20001
 9                           (202) 442-9774
                             Email:  Matthew.blecher@dc.gov
10                           Email:  Scott.kennedy@dc.gov

11    For Defendant John Doe: Joseph A. Gonzalez
                             Schertler & Onorato, L.L.P.
12                           901 New York Avenue, NW
                             Suite 500
13                           Washington, DC  20001
                             (202)628-4199
14                           Email:  Jgonzalez@schertlerlaw.com

15

16    _____

      Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
17                           Official Court Reporter
                             United States Courthouse, Room 6523
18                           333 Constitution Avenue, NW
                             Washington, DC  20001
19                           202-354-3267

20

21

22

23

24

25
```

```
1              THE COURTROOM DEPUTY:  Good afternoon, Your Honor.
2    This afternoon we have civil action numbers 17-1216, Shay
3    Horse, et al. versus the District of Columbia, et al., and
4    civil action number 18-120, Jesse P. Schultz, III versus the
5    District of Columbia, et al.
6              Will counsel for the parties please approach the
7    lectern, identify yourself for the record, and name the party
8    or parties you represent, please.
9              MR. MICHELMAN:  Good afternoon, Your Honor.  My name
10   is Scott Michelman, from the American Civil Liberties Union of
11   D.C., I represent the Horse plaintiffs.  With me at counsel
12   table are Arthur Spitzer, Michael Perloff, and two of my
13   clients, Elizabeth Lagasse and Judah Ariel.
14             THE COURT:  All right.  Thank you.
15             MR. LIGHT:  Good afternoon, Your Honor.  I represent
16   the plaintiffs in the Schultz case.
17             THE COURT:  Good morning -- afternoon.
18             MR. BLECHER:  Good afternoon, Your Honor.  I'm
19   Matthew Blecher.  I represent the District and all the
20   individually named defendants except for John Doe.  My
21   colleague is Scott Michael -- excuse me, Scott Kennedy.  Scott
22   entered his appearance this morning.
23             THE COURT:  All right.
24             MR. BLECHER:  Thank you.
25             MR. GONZALEZ:  Good afternoon, Your Honor.  Joseph
```

1    Gonzalez, Schertler & Onorato.  I represent Officer John Doe.

2              THE COURT:  Okay.  Good afternoon.  Let me confer

3    with Mr. Haley on one matter.

4              (Pause.)

5              THE COURT:  As I hope Mr. Haley informed you, that

6    the purpose of the hearing this afternoon is not to argue the

7    motion to dismiss, but, rather, to have me give you my ruling

8    on the motion to dismiss.

9              In cases where a large portion of the case is going

10   to survive the motion to dismiss, there is no point in going

11   through all the extra bells and whistles that are necessary to

12   turn an opinion into a docketed, written, appealable opinion.

13   And both of these cases are going to go forward in large

14   measure, although there are some claims that will not go

15   forward.

16             Therefore, I am going to give you the benefit of my

17   ruling from the bench right now, and so I encourage everyone to

18   get comfortable.  There are a lot of counts here.  You should

19   feel free to get your pens and pads out and take lots of notes,

20   or prepare to order a transcript because there will not be a

21   written memorandum opinion.  This is my ruling.

22             And I've had this situation come up in the past where

23   I spoke for a considerable period of time and counsel just sat

24   there and then at the end stood up and said, So, are you going

25   to issue a written opinion?  I said, No, that was it.  So I

1    want to let you know up front that this is going to be it.

2          Also, because of the substantial overlap between the

3    legal theories underlying the claims in the two complaints,

4    what I'm going to do is go through the facts of the Horse

5    complaint and then quickly add -- shift gears and do the facts

6    of the Schultz complaint, and then what I'm going to do is go

7    through all of the claims in the Horse complaint, and then I'll

8    take up the claims in the Schultz complaint.  But to the extent

9    they are the same claims, I am simply going to say they're

10   denied or granted for the same reasons that I just set forth in

11   the Horse case.

12          So if you hear a claim coming up in the Horse case

13   that's something that you've also alleged, that's probably

14   going to be the same reasoning applied to you.  Where there's a

15   difference, I will address those things separately after I'm

16   finished with all the claims in the Horse complaint.

17          And I appreciate everyone's patience with this

18   exercise.  I confess that sometimes when I do this even I get

19   tired of the sound of my voice.  But it seems like the most

20   efficient way to let you all know what's in and what's out, so

21   we can start to move forward with these cases.

22          And I also want to say, you know, I appreciate the

23   quality of all the briefing on both sides.  Everybody has made

24   it crystal clear what the issues are, what facts are at issue,

25   what the legal standards are, and that's always greatly

1     appreciated.

2           On the date of President Donald J. Trump's

3     inauguration, January 20th, 2017, hundreds of individuals

4     across the country assembled in the District of Columbia to

5     express their disapproval of his policies.  That's in the

6     amended complaint, which is Docket 29.  And from now I'm going

7     to be quoting from the Horse complaint, this amended complaint,

8     at page 2, paragraph 15.

9           Plaintiffs are six individuals who participated in or

10     observed the demonstration.  The amended complaint alleges that

11     when an identifiable minority of those demonstrating started to

12     become violent, D.C. police officers indiscriminately used

13     chemical irritants and detained and arrested hundreds of

14     people, most of whom were peaceful and did not commit any

15     crimes.  That's in the complaint, paragraph 2.

16           Three of the plaintiffs were among those who were

17     detain and arrested.  The other three were allegedly pepper

18     sprayed and/or assaulted.

19           Plaintiffs have filed this lawsuit bringing multiple

20     constitutional claims, alleging violations of the First,

21     Fourth, and Fifth Amendments, including other tort claims;

22     unlawful arrest, excessive force, unlawful conditions of

23     confinement, various tort claims including assault and battery,

24     and intentional infliction of emotional distress, and claims

25     arising out of alleged violations of the District's First

1   Amendment Assemblies Act, which I'll be referring to as the

2   FAAA, or maybe the F-Tripple-A.

3              The defendants are the District of Columbia, Chief of

4   Police Peter Newsham, and 28 Metropolitan Police Department

5   officers.

6              Defendants have moved to dismiss all the claims under

7   Rule 12(b)(6), Docket 38; plaintiffs' opposition, Docket 45;

8   defendants replied at Docket 47.

9              For the reasons that I'm going to set forth in

10  detail, I'm going to dismiss Claims 2, 4, 5, 8, 9, 10, 13, and

11  14.  And Claims 1, 3, 6, 7, 11, 12, 15, and 16 will move

12  forward.

13             Plaintiff Shay Horse is a resident of New York and a

14  free-lance photojournalist who attended the demonstration to

15  photograph it; paragraph 3.  Plaintiff Judah Ariel is a

16  resident of the District of Columbia and a licensed attorney

17  who served as a legal observer to document any violations of

18  rights that may occur; in paragraph 4.

19             Plaintiff Elizabeth Lagesse is a resident of D.C. who

20  participated in the protest.  Milo Gonzales is a resident of

21  New York who participated in the protest.  And finally,

22  plaintiffs Gwen Frisbie-Fulton and her minor son, A.S., are

23  residents of North Carolina who traveled to D.C. to participate

24  in the protest.

25             Paragraphs 17 and 18 allege that between 10 a.m. and

1    11 a.m. on January 20th, 2017 hundreds of demonstrators, taking

2    up two to three blocks, walked on 13th Street Northwest from

3    Logan Circle towards the National Mall.  Paragraph 24, there

4    were approximately 100 police officers present, along with

5    approximately ten police vans and five or six additional police

6    vehicles.

7         During this time period some individuals engaged in

8    acts of vandalism on 13th Street between Logan Circle and

9    Franklin Square.  Plaintiffs allege, in paragraphs 21 and 22,

10   that those committing the vandalism were identifiable because

11   they were all wearing black -- they were wearing all black and

12   masks.

13        When the few individuals committed the acts of

14   vandalism, the complaint alleges, in paragraphs 32 and 34, that

15   Commander Deville declared that the march was a riot, even

16   though, plaintiffs allege, he knew that not all of the

17   individuals marching were committing vandalism and that some

18   people were either journalists documenting the march or legal

19   observers.

20        While the vandalism was happening, people joined and

21   left the march freely, and not all individuals marching knew

22   that the acts of vandalism had occurred, including Lagesse, who

23   had joined the march 30 minutes after it began.

24        Commander Deville ordered MPD officers to stop people

25   from continuing the march further south; paragraphs 32, 35, 53,

1   and 55.  The complaint alleges, in paragraphs 38, 39, 42 and

2   43, that the officers did not order the marchers to disperse.

3   Instead, it alleges the officers started to deploy pepper

4   spray, sting balls -- which shoot out rubber pellets and

5   chemical irritants -- and noise-emitting crowd control devices.

6   And it's alleged that the officers used these devices

7   indiscriminately, without regard to whether they were necessary

8   to prevent unlawful conduct or to subdue those resisting

9   arrest.  Plaintiffs Horse, Lagesse, and Gonzalez were hit with

10  pepper spray.

11          During the confrontation, many demonstrators ran away

12  from the police.  The police officers blocked off numerous

13  egress routes to force the protesters to one location.  That's

14  at paragraph 60, 61.  The officers, including, allegedly,

15  Officers Howden, Rock, Thau, Washington, and Sergeant Alioto

16  established a blockade.  More than 200 individuals were

17  detained in this area, which the parties refer to as the

18  kettle, which was cordoned off.  Among those detained were

19  plaintiffs Horse, Lagesse, and Gonzalez.

20          The individuals remained in the kettle for hours.

21  Commander Deville declared that all detainees were under arrest

22  and that no one could leave the kettle.  By 11:30 a.m., within

23  30 minutes of the formation of the kettle, the MPD was ready to

24  begin processing the detainees.  But, the complaint alleges,

25  that handcuffing and moving the detainees to the transport

1     vehicle took until after sunset.  And that's set out in

2     paragraph 77, 78, 97, and 98.

3            According to the complaint at paragraph 79 to 80,

4     while individuals were detained, the officers used pepper spray

5     against the people inside the kettle without warning and even

6     where there was no threat to the officers or public safety.

7     Complaint also alleges that individuals in the kettle requested

8     food, water, and access to bathrooms but their requests were

9     denied.

10            At around 1 to 1:30 p.m. plaintiffs Frisbie-Fulton,

11     A.S., and Ariel were present at the intersection of 12th and

12     L Street Northwest, although they were outside of the kettle.

13     Their story is set out beginning at paragraphs 108 and 114 to

14     -15 of the complaint.  Many of those who were outside demanded

15     the rel ease of those being detained.

16            At about 1:45 p.m., according to the complaint,

17     without warning or dispersal order, police officers began to

18     pepper spray those outside the kettle, despite no threat to

19     safety.  Ariel was hit with the pepper spray.

20            Frisbie-Fulton, seeing what was happening, told her

21     son that they had to leave.  A.S. was then knocked to the

22     ground by a line of police officers.  Frisbie-Fulton attempted

23     to protect her son, but they became entangled in a group of

24     protesters and police officers.  They managed to break free and

25     started to run, although they inhaled pepper spray while doing

1    so.

2          When plaintiffs Horse and Lagesse were formally

3    arrested, they were handcuffed using zip ties.  According to

4    the complaint at paragraphs 146 and 149, the zip ties were

5    applied so tightly that they cut Lagesse's wrists and Horse

6    lost feeling in his finger.

7          Horse alleges, in paragraphs 153 through 159, that he

8    was not given food or water for 10 to 11 hours.  Lagesse

9    alleges that she was not given access to a toilet for seven to

10   eight hours, water for 11 to 12 hours, and food for 13 to 16

11   hours.  Gonzalez alleges that he went nine to ten hours without

12   a bathroom in paragraph 161, and wasn't given food or drink for

13   10 or 11 more hours, paragraph 164.

14         After Horse and Gonzalez were arrested, they were

15   detained at the Metropolitan Police Academy.  According to

16   them, Officer John Doe patted them both down, and plaintiffs

17   assert that while doing so he inserted his finger into each of

18   their rectums and fondled Gonzalez's testicles.

19         The plaintiffs have brought 16 claims of

20   constitutional, tort, and statutory violations.  They all claim

21   that they suffered injuries from the alleged violations that

22   occurred that day.  Defendants moved to dismiss all claims for

23   failure to state a claim under Federal Rule of Civil Procedure

24   12(b)(6), and Officer John Doe has brought a separate motion to

25   dismiss and for summary judgment.

1 As everyone knows, to survive a Rule 12(b)(6) motion

2 to dismiss a complaint must contain sufficient factual matter,

3 accepted as true, to state a claim to relief that is plausible

4 on its face.  So I will be applying the *Ashcroft versus Iqbal*

5 standard, 556 U.S. 662, which is based on *Bell Atlantic*

6 *Corporation versus Twombly*, 550 U.S. 544.

7 A pleading must offer more than labels or conclusions

8 or a formulaic recitation of the elements of a cause of action,

9 and threadbare recitals of the elements of a cause of action,

10 supported by merely conclusory statements, will not suffice

11 according to those precedents.

12 Importantly for today, though, in evaluating a motion

13 to dismiss under 12(b)(6), I must treat the complainant's

14 factual allegations as true and must grant the plaintiff the

15 benefit of all inferences that can be derived from the facts.

16 *Sparrow versus United Airlines, Inc.*, 216 F.3d 1111, D.C.

17 Circuit 2000.  Therefore, when considering a motion to dismiss

18 I must construe a complaint liberally in the plaintiffs' favor.

19 *Kowal versus MCI Communications Corporation*, 16 F.3d 1271.

20 Nevertheless, I don't need to accept inferences drawn by the

21 plaintiff if they're not supported by the facts alleged in the

22 complaint, nor must I accept the plaintiffs' legal conclusions.

23 In ruling on a motion, I may ordinarily consider only

24 the facts alleged in the complaint, documents attached as

25 exhibits or incorporated by reference in the complaint, and

1    matters about which I can take judicial notice.

2              So let's start with Claim No. 1, the Fourth Amendment

3    violation, arrest without probable cause.  Plaintiffs Horse and

4    Lagesse -- is it Lagesse or Lagesse?  Am I pronouncing it

5    correctly?

6              PLAINTIFF LAGESSE:  Lagesse, Your Honor.

7              THE COURT:  All right.  I didn't want to sit here

8    with you there and pronounce your name wrong all morning --

9    afternoon.

10             They assert that they were arrested without probable

11   cause in violation of the Fourth Amendment.  They bring this

12   claim against the District's Chief of Police Newsham, Commander

13   Deville, Officers Green, Howden, Rock, Thau, Alioto,

14   Washington, Bogardus, and Hinostroza under 42 U.S.C. § 1983.

15             Defendants move to dismiss the complaint on three

16   bases:  One, they say the facts in plaintiffs' complaint show

17   that there was probable cause to arrest them, so there's no

18   Fourth Amendment violation.  Second, they say the individual

19   defendants are untitled to qualified immunity because it was

20   not clearly established that the arrests of Horse and Lagesse

21   lacked probable cause.  And, three, they say plaintiffs have

22   failed to state a claim of unlawful arrest against Officers

23   Howden, Rock, Thau, Washington, and Alioto because they fail to

24   allege that those defendants were actually involved in the

25   arrest.

1          I'm not going to dismiss this claim at this stage of

2     the proceeding.  Taking all the facts in the complaint as true

3     and drawing all inferences in favor of the plaintiffs, which

4     I'm required to do at this stage, plaintiffs have stated a

5     clearly established right and a Fourth Amendment violation.

6     The complaint, therefore, meets the test to be applied at this

7     stage and alleges sufficient facts to establish that the

8     defendants are not entitled to qualified immunity.

9          To determine whether qualified immunity should be

10    afforded to an official is a two-step inquiry.  First, the

11    threshold question is, taken in the light most favorable to the

12    party asserting the injury, do the facts alleged show the

13    officer's conduct violated a constitutional right?  That's

14    *Saucier versus Katz*, 533 U.S. 194, page 201, from 2001.

15         Second, the Court must determine whether the right

16    was clearly established.  That's set out in the same case, also

17    page 201, and also *Lederman versus United States*, 291 F.3d 36,

18    at page 46, D.C. Circuit 2002.  These steps don't necessarily

19    have to be analyzed in that order.

20         The question of whether a right is clearly

21    established involves an analysis of whether the Supreme Court

22    of the District of Columbia Circuit, and to the extent that

23    there is a consensus, other circuits have spoken clearly on the

24    lawfulness of the conduct at issue.  *Butera versus District of*

25    *Columbia*, 235 F.3d 637, D.C. Circuit 2001.

1          Additionally, the contours of the right must be

2     sufficiently clear that a reasonable officer would understand

3     that what he is going violates that right.  *Anderson versus*

4     *Creighton*, 483 U.S. 635.  If it would be clear to a reasonable

5     officer that his conduct was unlawful in the situation he

6     confronted, the right is considered clearly established.  *Groh*

7     *versus Ramirez*, 540 U.S. 551, at 563, quoting *Saucier* at 202.

8          Although this Court's case law does not require a

9     case directly on point for a right to be clearly established,

10    the Supreme Court has explained existing precedent must have

11    placed the statutory or constitutional question beyond debate.

12    That's *Kisela versus Hughes*, 138 S.Ct. 1148, quoting *White*

13    *versus Pauly*, 237 S.Ct. 548.

14         Four cases from the D.C. Circuit I think are relevant

15    in determining the contours of the constitutionality of a mass

16    arrest in the context of a protest:  There's *Washington*

17    *Mobilization Committee versus Cullinane*, 566 F.2d 107, which

18    found that the tenor of a demonstration as a whole determines

19    whether police may intervene.  And if it is substantially

20    infected with violence or obstruction, the police may act to

21    control it as a unit.  *Dellums versus Powell*, 566 F.2nd 167,

22    the D.C. Circuit found that it was the chief of police's burden

23    to show that he honestly believed that the plaintiff as a group

24    were violating the law and that this belief was reasonable in

25    light of the facts available to him at the scene of the all

1      arrests.

2              Finally, *Barhum versus Ramsey* -- not finally -- 434

3      F.3d 565, D.C. Circuit 2006.  The Court found that where the

4      record indicated that the demonstrators never operated as a

5      cohesive unit and that the demonstration was a dynamic and

6      diverse situation, the chief of police was not entitled to

7      qualified immunity.  And that in *Carr versus District of*

8      *Columbia*, 578 F.3d 401, the Circuit found that if the officers

9      have grounds to believe that all of the arrested persons were

10     part of the unit observed violating the law, then they were

11     entitled to qualified immunity.

12             Thus, in order to conduct a constitutional mass

13     arrest, the officers at the scene must have had probable cause

14     to believe that the group was acting as a cohesive unit in its

15     lawbreaking and violence.  The Court, therefore, finds that the

16     right to be free from unlawful arrest in the context of a mass

17     protest is clearly established.  Furthermore, plaintiffs allege

18     facts that if taken as true show that a constitutional

19     violation occurred.

20             Plaintiffs allege, in paragraphs 16, 71, 73, that a

21     majority of the demonstrators were peaceful and that they did

22     not participate in any unlawful activity or encourage anyone to

23     break the law.  Plaintiffs have pled that those that were

24     committing the acts of violence that ultimately led to the

25     police officers declaring the scene a riot were a minority and

were easily distinguishable from the peaceful protesters given

what they were wearing; paragraphs 21 and 22.  Plaintiffs also

allege that the group was large, took up almost two city

blocks, and the protesters left and joined while it was

happening, making it a dynamic situation, as the one in *Carr*;

paragraphs 18, 35, and 52.

     For example, the complaint alleges that Horse walked

alongside the march to take photos and Lagesse joined the

protest 30 minutes after it began, in paragraphs 19 and 53.

     Defendants say the case is similar to *Carr*, so

they're entitled to qualified immunity.  They say, like in

*Carr*, plaintiffs allege that they were with a large group, that

members of the group engaged in acts of vandalism, and that

they remained with the group at least 15 minutes after the

vandalism began, as the group continued to travel together

through the District.

     But in *Carr*, there was evidence that the group

started together at a D.C. church where bandanas and vinegar

were handed out and torches were lit and they traveled down

Pennsylvania Avenue together as a unit.  Police officers

observed the group acting in unison and cheering on those

individuals breaking windows.  Thus, there was evidence that

the group as a whole was violating the law.

     Here, the complaint does not allege that the group of

demonstrators were a finite and delineated group, or that it

1    was one group that traveled together.  Rather, the complaint

2    alleges that the demonstration consisted of a mass of people

3    that organized in a fluid manner as people left and entered

4    continuously; paragraph 35.

5            Nor have plaintiffs pled facts supporting a finding

6    at this stage that the crowd exhibited behavior as a unit that

7    would allow an officer to reasonably believe that everyone

8    present had committed a crime, particularly within the kettle

9    that was within the officers' observation.

10           Therefore, plaintiffs have alleged, for purposes of

11   overcoming a motion to dismiss, that the officers did not have

12   probable cause to arrest them.  Whether the crowd was acting

13   cohesively, whether the officers had probable cause, or whether

14   that probable cause was reasonable are highly fact dependent

15   questions, which will be assessed again at the summary judgment

16   stage.  But accepting the truth of the plaintiffs' allegations,

17   the Court finds that the complaint states a claim for Fourth

18   Amendment violation and it will not be dismissed on qualified

19   immunity grounds.

20           Defendants also argue that Claim 1 should be

21   dismissed as to Officers Howden and Rock, Thau, Washington, and

22   Sergeant Alioto because they did not actually arrest plaintiffs

23   Horse and Lagesse.  But one who directs or assists an unlawful

24   arrest may be liable.  That's *Wesby versus District of*

25   *Columbia*, 841 F.Supp.2d 20, which was affirmed at 765 F.3d 13,

1    although it was reversed on other grounds.  And it cites *Gordon*

2    *versus Degelmann*, 29 F.3d 295, 298, from the Seventh Circuit.

3            Plaintiffs have sufficiently alleged that these

4    defendants established the kettle in which the plaintiffs were

5    detained, and they allege that another officer had declared

6    those within the kettle under arrest.  Therefore, the complaint

7    states that the officers directed or assisted an unlawful

8    arrest and that they may be held liable for that assistance.

9            Again, these are very fact dependent allegations.

10   They're just allegations at this point, they will need to be

11   proved.

12           Count 2, Claim 2, alleges a First Amendment violation

13   arrest for protected speech.  Plaintiffs Horse and Lagesse

14   assert that they were arrested because of their protected

15   speech, in violation of the First Amendment.  They bring this

16   claim against the District, Chief Newsham, Commander Deville

17   and Officers, Green, Howden, Rock, Thau, Alioto, Washington,

18   Borgardus, and Hinostroza under § 1983.

19           Defendants say they're protected by qualified

20   immunity because the arrests were conducted based on probable

21   cause.  They also argue the plaintiffs have failed to state a

22   claim because they don't allege a causal link between their

23   arrests and the exercise of their First Amendment rights.  To

24   establish a claim for retaliation under the First Amendment an

25   individual must prove:  One, that he engaged in protective

1  conduct; two, that the government took some retaliatory action

2  sufficient to deter a person of ordinary firmness in

3  plaintiff's position from speaking again; and, three, that

4  there exists a causal link between the exercise of the

5  constitutional right and the adverse action taken against him.

6  It's *Doe versus District of Columbia*, 796 F.3d 96, D.C. Circuit

7  2015.

8          The Court said in that case that to satisfy the

9  causation link the plaintiff must allege that his or her

10  constitutional speech was the but-for cause of the defendant's

11  retaliatory action.  Plaintiffs have a clearly established

12  First Amendment right to be free from arrest without probable

13  cause based on their speech.  And plaintiffs have asserted

14  enough facts to show that the arrest itself was not based on

15  probable cause, as I've already stated.  Thus, plaintiffs are

16  not entitled to qualified immunity at this stage.

17          But, I do find that plaintiffs have not sufficiently

18  alleged the -- the Horse plaintiffs have not sufficiently

19  alleged a causal link between their arrests and the exercise of

20  their First Amendment rights.  They allege that they were

21  detained, quote, merely because they were exercising their

22  First Amendment rights, close quote; paragraphs 72 and 74.

23          Plaintiffs contend that because the arrest was not

24  based on probable cause and they allege they were in fact

25  exercising their First Amendment rights, then the inference

1    that their First Amendment activity was the reason for their

2    arrest is highly plausible.  I find the allegations to be

3    highly conclusory.  Plaintiffs merely state that a causal link

4    exists, without any other facts to support it.

5          Since the allegations are bare legal conclusions, the

6    Horse plaintiffs have failed to state a claim for First

7    Amendment retaliation.  Therefore, Claim 2 in the Horse

8    complaint will be dismissed without prejudice for failure to

9    state a claim.

10          Claim 3, common law false arrest and false

11    imprisonment.  Plaintiffs Horse and Lagesse assert common law

12    false arrest and false imprisonment claims against the

13    District, Chief Newsham, Commander Deville and Officer Green,

14    Howden, Rock, Thau, Alioto, Washington, Bogardus, and

15    Hinostroza.  Defendants argue that plaintiffs fail to state a

16    claim because they were arrested based on probable cause and

17    the defendants acted in good faith.  As I've already explained

18    in my qualified immunity analysis above, if we take the facts

19    asserted in the complaint as true, there was no probable cause

20    to arrest the plaintiffs.

21          Furthermore, at this stage a good faith defense is

22    inappropriate.  It is the defendants' burden to prove good

23    faith.  Plaintiffs are not required to plead that the officer

24    acted in bad faith to survive a motion to dismiss.  See *Scales*

25    *versus District of Columbia*, 973 A.2d 722, the D.C. Court of

 1    Appeals in 2009, *Marshall versus District of Columbia*, 391 A.2d

 2    1374.

 3          So Claim 3 will not be dismissed at this time.

 4          Which brings me to Claims 4, 5, 8, 13, and 14, the

 5    violations of the D.C. First Amendment Assemblies Act.  The Act

 6    is a subchapter of Title 5 of the D.C. Code, devoted to police,

 7    firefighters, medical examiners, and forensic scientists.  It

 8    sets out standards for the police to follow when handling

 9    demonstrations, rallies, marches or other gatherings, quote,

10    conducted for the purpose of expressing political, social or

11    religious views, close quote.  That's in the definition

12    section, the D.C. Code § 5-331.02(1).  It does not contain any

13    express provision that creates a private cause of action

14    towards violations, though.

15          Plaintiffs allege violations of five provisions of

16    the Act.

17          Claim 4 alleges a violation of § 5-331.08, which

18    addresses the use of police lines.

19          Claim 5 alleges a violation of § 5-331.07(e)(1),

20    which addresses police handling in response to First Amendment

21    assemblies.

22          Claim 8 alleges a violation of § 5-331.16(b), which

23    addresses violations of provisions on use of riot gear and riot

24    tactics.

25          Claims 13 and 14 allege violations of

§ 5-331.12(b)(2) and (a)(1), respectively, which address the prompt release of persons arrested in connection with the First Amendment assembly.

For each plaintiffs assert two alternative theories of liability.

You can understand why this opinion is so long.

First, plaintiffs argue that defendants' conduct is directly redressable under the Act because there is an implied private right of action under the statute. Defendants have said this wasn't actually clear from the face of the complaint, so plaintiffs shouldn't be permitted to amend their complaint now through a pleading. But, since I'm going to find that there is no private right of action, I don't really need to address that argument.

Plaintiffs also argue that even if there isn't an implied private right of action under the statute, the conduct in violation of the statute would constitute negligence per se. Defendants say there is no implied private right of action under the statute and the plaintiffs cannot predicate a negligence per se claim under these provisions of this statute.

I agree with the defendants, there is no implied right of action within the statute and plaintiffs cannot support a negligence per se claim with respect to the provisions of the Act that they are relying on.

Let's first talk about the first theory of liability,

1    the private right of action.  Where there is no express right

2    of action within a statute, the Court examines the following

3    factors to determine whether there's an implied right of

4    action:

5           First, whether the plaintiff is one of the class for

6    which special benefit the statute was enacted.  Second, whether

7    there is any indication of legislative intent, explicit or

8    implicit, either to create such a remedy or to deny one.

9    Third, whether it's consistent with the underlying purposes of

10   the legislative scheme to imply such a remedy for the

11   plaintiff.  *Robert Siegel, Inc., versus District of Columbia*,

12   892 A.2d 387 at 392.

13          The ultimate issue is whether the legislature

14   intended to create a particular cause of action, because unless

15   legislative intent can be inferred from the language of the

16   statute, the statutory structure or some other source, the

17   essential predicate for implication of a private remedy simply

18   doesn't exist.  D.C. Court of Appeals said that in *Coates*

19   *versus Elzie*, 768 A.2d 997 in 2001, citing the Supreme Court in

20   *Karahalios versus National Federation of Federal Employees*, 489

21   U.S. 527.

22          Both plaintiffs and the defendants point to the same

23   provision of the Act, which states:  The provisions of this

24   chapter are intended to protect persons who are exercising

25   First Amendment rights in the District of Columbia.  And the

1    standards for police conduct set forth in the subchapter may be

2    relied upon by such persons in any action alleging violations

3    of statutory or common law rights.  That's D.C. Code

4    § 5-331.17.

5          Plaintiffs say this means that the D.C. Council

6    intended the Act to be privately enforceable.  But the

7    reference to, quote, any action alleging violations of

8    statutory or common law rights, close quote, seems to suggest

9    that the standards are merely relevant to claims brought under

10    some other theory.  So the plain text is not determinative.

11          The legislative history of the law indicates that the

12    D.C. Council heard various arguments for and against creating a

13    private right of action.  There is a council committee on the

14    judiciary report on bill No. 15-968, dated December 1st, 2004,

15    which is an exhibit to the defendants' reply.  And that was

16    attached at Docket 47-1.

17          Drafts of a provision creating an explicit private

18    right of action were heard and ultimately rejected, which

19    suggests that the council did not intend to make the act

20    privately enforceable.  One Court in this District considered,

21    in passing, whether the law encompassed a private right of

22    action.  In *Mahoney versus District of Columbia*, 662 F.Supp.2d

23    74 in 2009, the Court in this district refused to recognize an

24    implied right of action, in a footnote, because the D.C.

25    Council had considered including a private right of action but

1    ultimately rejected it.

2         The Court also considered that a private right of

3    action appeared to be inconsistent with a statutory scheme,

4    which provides for direct administrative review of the MPD's

5    denials of and modifications to assembly plan proposals.

6         Plaintiffs argue that *Mahoney* didn't consider why the

7    council decided against the private right of action.  And they

8    say that the council thought the Act would already be privately

9    enforceable and, therefore, the council intended to make it

10   enforceable.  For that argument the plaintiffs cite to the

11   committee's summary of the testimony of George Valentine from

12   the D.C. Office of the Attorney General, which states that

13   first he, referring to Valentine, addressed the private right

14   of action, stating that it is not needed because anytime the

15   District enacts a statute it can be enforced without such an

16   explicit right being created.

17        Moreover, he pointed out that there are already

18   federal and civil rights remedies available to demonstrators.

19   He said that common law would dictate if the statute was

20   violated, it would constitute negligence per se and the

21   department would have to defend its conduct.  And that's the

22   committee report at page 26, summarizing what Mr. Valentine had

23   to say.

24        Now, first of all, it is a summary and it's not a

25   transcript or a quotation.  But, assuming this is what he said,

1    it's true that the first sentence of the testimony seems to

2    support plaintiffs' position, but the thrust of the paragraph

3    as a whole favors the defendants' position.  It indicates that

4    a private right of action is unnecessary because the provisions

5    would be enforceable through other statutes, such as § 1983, or

6    through tort remedies like negligence per se.

7            And this reading of the testimony is supported by the

8    official written comments on the bill submitted by the attorney

9    general, which said, at the committee report at pages 183 to

10   -84, there are a number of adequate remedies at common law

11   under federal civil rights statutes currently available to

12   someone claiming to be aggrieved by the District of Columbia in

13   the context of mass protests and demonstrations.

14           For example, putative plaintiffs have a common law

15   remedy of negligence, false arrest, false imprisonment,

16   malicious prosecution, excessive use of force, assault and

17   battery, or the negligent or intentional inflection of mental

18   or emotional distress which can be the basis for damages

19   against the District and individual police officers.

20           Likewise, in cases where the police officer's conduct

21   violates federal civil rights, there's also a remedy in place

22   for a civil rights lawsuit for damages and injunctive relief

23   against the District and the individual officer for damages and

24   reasonable attorney's fees.  Those federal claims can already

25   be filed in either federal or superior court.

1      So, I agree with the Court in *Mahoney* and find that

2  the legislative intent to create a cause of action cannot be

3  inferred from the language of the statute, the statutory

4  structure, or some other source, and that there is no implied

5  private right of action under the FAAA.

6      But there's another theory of liability under the

7  statute, negligence per se, and plaintiffs invoke that as well.

8      The general rule in this jurisdiction is that where a

9  particular statutory or regulatory standard is enacted to

10  protect persons in the plaintiffs' position or to prevent the

11  type of accident that occurred, and the plaintiff can establish

12  his relationship to the statute, an unexplained violation of

13  that standard renders the defendant negligent as a matter of

14  law.  *Ceco Corporation versus Coleman*, 441 A.2d 940, D.C. 1982,

15  quoting *Richardson versus Gregory*, 281 F.2d 626, and

16  *Sibert-Dean versus WMATA*, 721 F.3d 699, from the Circuit in

17  2013.

18      Therefore, where a party violates a statute and the

19  violation is the proximate cause of an injury which the statute

20  was designed to prevent, there is a rebuttable presumption of

21  negligence on the part of the violator.  *Robinson versus*

22  *District of Columbia*, 580 A.2d 1255, D.C. Court of Appeals

23  1990, citing *Lewis versus WMATA*, 463 A.2d 666, 1983.

24      But, a violation of a statute or regulation may

25  constitute negligence per se only if the statute is meant to

1    promote safety, if the plaintiff is a member of the class to be

2    protected by the statute, and if the defendant is a person upon

3    whom the statute imposes specific duties.  It's *Night & Day*

4    *Management, LLC versus Butler*, 101 A.3d 1033, D.C. 2014.

5            An exception to the rule of negligence per se,

6    though, is that the statute at issue, quote, must not merely

7    repeat the common law duty of reasonable care, but must set

8    forth specific guidelines to govern behavior.  That's *McNeil*

9    *Pharmacy versus Hawkins*, 686 A.2d 567 at 579, D.C. 1996.  And

10   also the *Sibert-Dean* case again, 721 F.3d at 703.

11           So, to determine whether the exception to negligence

12   per se applies, the key question is not whether the regulation

13   contains certain words or phrases, but whether it allows a

14   factfinder to determine whether it has been violated without

15   resorting to a common law reasonable care analysis.  That's

16   *Sibert-Dean*, again, at 704, quoting *Chadbourne versus Kappaz*,

17   779 A.2d 293, D.C. 2001.

18           The Court in *Sibert-Dean* analyzed two traffic

19   regulations and it found that one regulation which required --

20   or, there were two regulations in question, 18 D.C.M.R.

21   § 2213.4, which requires that an operator shall, when operating

22   a vehicle, give full time and attention to the operation of the

23   vehicle, and 18 D.C.M.R. § 2206.1, which states that no person

24   shall start a vehicle which is stopped, standing, or parked

25   unless and until the movement can be made with reasonable

1    safety.

2         It found that the first regulation could support a

3    negligence per se theory, but the second could not because the

4    first required more than just reasonable or due attention, it

5    required full-time attention.  But the second regulation

6    included a reasonableness evaluation to determine whether it

7    had been violated.

8         It said that the important point is not just the

9    presence of the word, however, but how it affects the operation

10   of the regulation as a practical matter.  It's not possible to

11   tell whether a person has violated the standard in the

12   regulation they were talking about without evaluating his or

13   her actions against a common sense and common law baseline of

14   reasonable behavior.  And the same analysis was applied in *Joy*

15   *versus Bell Helicopter Textron, Inc.*, 999 F.2d 549, D.C.

16   Circuit 1993.  And again in *Chadbourne versus Kappaz*, 779 A.2d

17   293, D.C. Court of Appeals in 2001, which dealt with a leash

18   law.

19        And there are many other D.C. decisions that hold

20   that when a statute is too general, negligence per se is

21   inappropriate.  *Thoma versus Kettler*, 632 A.2d 725, *District of*

22   *Columbia versus Mitchell*, 533 A.2d 629, *Lewis versus WMATA*, 463

23   A.2d 666.

24        So what we have to do is go through each of these

25   provisions one by one.

1    Plaintiffs say that the Act is enforceable under the

2    negligence per se doctrine because the statute is a public

3    safety measure, plaintiffs are in the class intended to be

4    protected by it, and the law imposes duties upon MPD that are

5    specific and directive and not simply a common law duty of

6    reasonable care.

7    Certainly, the second factor is not in dispute.

8    § 5-331.17 of the Act states:  The provisions of this

9    subchapter are intended to protect persons who are exercising

10   First Amendment rights in the District of Columbia, and the

11   standards set forth in this subchapter may be relied upon by

12   such person in any action alleging violations of statutory or

13   common law rights.

14   But the defendants say that specific provisions

15   relied upon don't include sufficiently specific guidelines.

16   And they also say that some of the provisions aren't the

17   provisions that are about public safety.

18   I have found that each provision of the Act that

19   plaintiffs cite turns on a common law reasonable care analysis.

20   And, therefore, the exception to the negligence per se doctrine

21   is going to apply.

22   Claim 4 alleges a violation of D.C. Code § 5-331.08,

23   which states that no emergency area or zone will be established

24   by using a police line to encircle or substantially encircle

25   demonstration, rally, parade, march or similar assembly

1    conducted for the purpose of persons expressing their

2    political, social, or religious views, except where there's

3    probable cause to believe that a significant number or

4    percentage of the persons located in the area have committed

5    unlawful acts and the police have the ability to identify those

6    individuals and have decided to arrest them, provided that the

7    section doesn't prohibit the use of a police line to encircle

8    an assembly for the safety of the demonstrators.

9          This position is similar to the ones in *Joy*,

10   *Chadbourne*, and the second regulation in *Silbert-Dean*.  It sets

11   forth general guidelines that rely on resorting to a

12   reasonableness standard.  When the statute uses the phrases

13   "probable cause to believe," "significant number," "ability to

14   identify," "have decided to arrest," they are all general terms

15   and don't provide clear rules that govern the officer's

16   conduct.  Whether the officers believe that a significant

17   number or percentage of the people in the area committed

18   unlawful acts turns on the inquiry regarding the reasonableness

19   of their belief and actions and what a reasonable person

20   considers to be a significant number.

21         Thus, the law doesn't set out the kind of specific

22   guidelines that would allow one to determine whether the

23   statute has been violated without resorting to a common law

24   reasonable care analysis, which is what the Court said in

25   *Chadbourne* at 297.

1      So Claim 4 will be dismissed.

2      Claim 5 alleges a violation of § 5-331.07(e)(1),

3  which states:  If and when MPD determines that a First

4  Amendment assembly, or part thereof, should be dispersed, MPD

5  shall issue at least one clearly audible and understandable

6  order to disperse using an amplification system or device, and

7  shall provide the participants a reasonable and adequate time

8  to disperse, make clear and safe route for dispersal.

9      The first phrase, if and when MPD determines that a

10 First Amendment assembly should be dispersed, is necessarily

11 dependent upon the reasonable determination.  And then it sets

12 forth that the police shall provide participants a reasonable

13 and adequate time to disperse, which, again, requires an

14 analysis of what is a reasonable time.  The statute doesn't set

15 forth the specific guidelines that would enable a fact finder

16 to decide whether the statute has been violated without

17 resorting to a reasonable care analysis.  Thus, this claim

18 fails as a basis for negligence per say as well.

19     Claim 8 alleges a violation of D.C. Code

20 § 5-331.16(b), which states:  Large scale canisters of chemical

21 irritant shall not be used at First Amendment assemblies absent

22 the approval of a commanding officer at the scene, and the

23 chemical irritant is reasonable and necessary to protect

24 officers or others from physical harm or to arrest actively

25 resisting subjects.

1    It also says, paragraph 2:  Chemical irritant shall

2  not be used by officers to disperse a First Amendment assembly

3  unless the participants or others are committing acts of public

4  disobedience endangering public safety and security.  And,

5  finally, there's a requirement that the commanding officer who

6  makes the determination specified in the first paragraph has to

7  file a written report with the chief of police within a certain

8  period of time.

9    There are certainly aspects of this provision that

10  are sufficiently precise, such as the requirement of approval

11  of a commanding officer in paragraph 1 and the report in

12  paragraph 3.  But those are not the provisions that the

13  complaint has alleged were violated.  The amended complaint

14  alleges that the chemical irritants were not reasonable and

15  necessary to protect officers or others from physical harm, or

16  to arrest actively resisting suspects -- subjects, and that

17  they were used when people were not committing acts of public

18  disobedience; paragraph 230 of the amended complaint.

19    Those portions of the provision, again, turn on an

20  analysis of what is reasonable and necessary to protect

21  officers or others.  So again, as in *Sibert-Dean*, it's not

22  possible to tell whether the officers violated this standard

23  without evaluating their actions against a common law baseline

24  of reasonable behavior.  I'm going to dismiss that claim.

25    Claim No. 13 alleges a violation of D.C. Code

1    § 5-331.12(b)(2), which addresses the delay in providing food

2    to arrestees and states:  MPD shall provide to any person not

3    released within a reasonable time of arrest food appropriate to

4    the person's health.

5         Thus, this claim fails again because it rests upon an

6    analysis of the common law reasonableness standard when it

7    states that the MPD shall provide food to any person not

8    released within a reasonable time and appropriate to the

9    person's health and doesn't set forth sufficient guidelines.

10   Obviously, it's not part of my ruling here that these

11   regulations were necessarily complied with, I'm just saying

12   that they're not the kind of regulations that had the

13   specificity that would permit a negligence per se claim based

14   on those specific regulations.

15        Finally, Claim 14 alleges a violation of D.C. Code

16   § 5-331.12(a)(1), which states:  The MPD shall promptly process

17   any person arrested in connection with the First Amendment

18   assembly to determine whether the person is eligible for

19   immediate release pursuant to a lawful release option, and

20   shall promptly release any person so eligible who opts for

21   release.

22        In addition to arguing that this provision turns on

23   discretionary decisions and merely repeats the general

24   reasonableness standards, defendants argue that this provision

25   was not designed to promote public safety because it has to do

1    with processing of persons arrested.  And because it doesn't

2    promote public safety, it's not the basis of a negligence

3    per se action.

4         I agree that while it could have some limited bearing

5    on public safety, it really has little to do with public

6    safety.  While it may have safety implications, the purpose of

7    the provision is to ensure an arrestee's Fourth Amendment

8    interest in brought before a neutral magistrate for prompt

9    determination of probable cause.

10        The legislative history states that this section

11   reflects the standards contained in *Lively versus Cullilane*,

12   451 F.Supp. 1000.  In that case the Court recognized the

13   consequences of prolonged detention, such as an interruption of

14   income sources and impaired relationships and identified the

15   liberty interest at stake, such as freedom of movement and

16   reputation.  These are very important constitutional concerns,

17   but they are not what one thinks of when identifying public

18   safety concerns.

19        Moreover, given the discretionary aspect of the

20   provision it is not necessary to rule on that basis.  What

21   constitutes prompt processing is a general position that turns

22   on a reasonableness analysis and, therefore, does not set forth

23   specific guidelines to govern behavior and can't be the basis

24   of a negligence per se action.

25        Thus, because the particular provisions of the Act

1    identified can't support plaintiffs' negligence per se claims,

2    those claims will be dismissed.  It's important to emphasize,

3    though, that the standards as the council intended are relevant

4    to other statutory and tort claims.

5          Claim 6 alleges a Fourth Amendment violation, and

6    that is excessive force through the overuse of chemical

7    irritants.  All plaintiffs allege that in using chemical

8    irritants against peaceful demonstrators the District and

9    defendants Rock, Thau, Washington, Murphy, Whiteside, Hill,

10   Baldwich, Flash, Steffes, Roccato, Baskerville, Brooks,

11   Vongkeo, Dennis, Parker, and Williams violated the Fourth

12   Amendment.

13         Defendants raised four arguments in support of their

14   motions to dismiss this claim.  They say that plaintiffs

15   Frisbie-Fulton, A.S., and Ariel don't sufficiently plead that

16   they were seized.  They say that plaintiff Horse doesn't assert

17   that he was seized specifically by Officer Murphy, and so the

18   claim against Murphy should be dismissed.  And they also say

19   that plaintiffs Horse, Lagesse, and Gonzalez failed to

20   sufficiently plead that defendants Washington, Rock, and Thau's

21   use of force was unreasonable.

22         Finally, they say the officers are entitled to

23   qualified immunity.

24         I'm not going to dismiss this claim.  First of all,

25   the officers are not entitled to qualified immunity on the

1    excessive force claims at this point.  An officer's use of

2    force is excessive and can violate the Fourth Amendment if it's

3    not reasonable.  That is, if the nature and quality of the

4    intrusion on the individual's Fourth Amendment interests is

5    weightier than the countervailing government interests at

6    stake.  It's *Graham versus Connor*, 490 U.S. 386.

7         To be sure, the D.C. Circuit said:  Not every push or

8    shove, even if it may later seem unnecessary in the peace of a

9    judge's chambers, violates the Constitution.  Still, a police

10   officer must have some justification for the quantum of force

11   he uses.  The Circuit said that in *Rudder versus Williams*, 666

12   F.3d 790, quoting *Johnson versus D.C.*, 528 F.3d 969, from the

13   Circuit in 2008.

14        In this Circuit it is a clearly established rule

15   that, quote, An officer's act of violence violates the Fourth

16   Amendment's prohibition against unreasonable seizures if it

17   furthers no governmental interest.  That's *Johnson* at 528 F.3d

18   at 976 and *Rudder*, 666 F.3d at 795.

19        While there is no precedent in this Circuit

20   specifically holding that using chemical irritants alone may

21   qualify as excessive force, the Court may look to outside

22   circuits to determine whether there is a consensus of cases of

23   persuasive authority to determine whether the right is clearly

24   established.  Supreme Court said that in *Ashcroft versus

25   al-Kidd*, 563 U.S. 731.

1          Other courts have found that the use of pepper spray

2    or chemical agents can constitute a significant degree of force

3    and can form the basis of an excessive force claim.  The Second

4    Circuit said so in *Tracy versus Freshwater*, 623 F.3d 90.

5    There's the First Circuit in *Asociacion de Periodistas de*

6    *Puerto Rico versus Mueller*, 529 F.3d 52, *Fogarty versus*

7    *Gallegos*, 523 F.3d 1147, out the Tenth Circuit.

8          *Henderson versus Munn*, 439 F.3d 497, the Eighth

9    Circuit.  *Vinyard versus Wilson*, 311 F.3d 1340, the Eleventh

10   Circuit.  *Headwaters Forest* -- I'm not sure what DEF stands for

11   there.  Defense? -- *versus County of Humboldt*, 276 F.3d 1125,

12   Ninth Circuit 2002; *Park versus Shiflett*, 250 F.3d 843, in the

13   Fourth Circuit; *Adams versus Metiva*, 31 F.3d 375, in the Sixth

14   Circuit all involved pepper spray.  All of those involved

15   pepper spray.  Thus, the right to be free from excessive force

16   by police officers using chemical irritants is clearly

17   established if there's no justification for their use.

18          Defendants argue that the complaint does not allege

19   that Officers Washington, Rock, and Thau's use of the pepper

20   spray was unreasonable.  But that's a highly fact-dependent

21   question that cannot be determined at this stage of the

22   proceedings.  And plaintiffs have sufficiently pled facts to

23   support an inference that the excessive use of pepper spray by

24   the officers was not justifiable.  Plaintiffs assert that those

25   who were pepper sprayed were not disobeying any orders, they

1  had not engaged in violence or threatening behavior, and that

2  they had already been detained and were not moving or running

3  away.  That's the amended complaint paragraphs 48, 56, 59, 70,

4  71, 80, 119, 112, and 130.

5         Therefore, the officers are not entitled to qualified

6  immunity at this stage.

7         Also, plaintiffs sufficiently allege that they were

8  seized.  There is no dispute that the plaintiffs in the kettle

9  were seized.  This analysis is necessary only with respect to

10  plaintiffs Ariel, Frisbie-Fulton, and her son A.S.

11         For purposes of the Fourth Amendment, a seizure

12  occurs when physical force is used to restrain movement or when

13  a person submits to an officer's show of authority.  That's

14  *United States versus Brodie*, 742 F.3d 1058, D.C. Circuit 2014,

15  quoting *California versus Hodari*, 499 U.S. 621.  A seizure

16  occurs even when an unintended person or thing is the object of

17  the detention or taking, but the detention or taking itself

18  must be willful, *Brower versus County of Inyo*, 489 U.S. 593.

19         Where police actions do not show an unambiguous

20  intent to restrain or when an individual submission takes the

21  form of passive acquiescence the test for telling when a

22  seizure occurs is whether, in light of all the surrounding

23  circumstances, a reasonable person would have believed he was

24  not free to leave.  That's *Brendlin versus California*, 551 U.S.

25  249, from 2007.

1          The D.C. Circuit has recognized in *Brodie* that even a

2    momentary limitation of a person's freedom of movement could

3    constitute a seizure.  In that case, the Court examined when a

4    suspect was directed to put his hands on a car and he submitted

5    for a moment and then fled the scene.  The Court found that a

6    seizure had occurred, even though the duration of his

7    submission was short.  Later acts of noncompliance do not

8    negate the defendant's initial submission as long as it was

9    authentic, the Court said.

10          The D.C. Circuit hasn't yet touched upon the issue of

11   whether the use of pepper spray itself can constitute an

12   unlawful seizure, but other courts have.  In *Bettencourt versus*

13   *Arruda*, 2012 WL 5398475, District Court in Massachusetts, found

14   that the evidence showed a seizure where plaintiff was

15   subjected to physical force that was applied by the officer for

16   the purpose of restraining his movement when the officer pulled

17   him by the arm and sprayed him, even though it didn't stop him

18   and the plaintiff was able to drive away.

19          The Third Circuit, *McCracken versus Freed*, 243

20   F. App'x 702, said the plaintiff was seized when law

21   enforcement threw pepper spray canisters into her house with

22   the intent of temporarily debilitating any persons occupying

23   the home.  *Logan versus City of Pullman*, 392 F.Supp.2d 1246,

24   Eastern District of Washington.  Plaintiffs were seized when

25   they were pepper sprayed.  This isn't a house situation because

1    the defendant officers dispersed pepper spray in an attempt to

2    gain physical control over the individuals.  Also, a case out

3    of the Middle District of Alabama, *Yelverton versus Vargo*, 386

4    F.Supp.2d 1224.  And in *Brower County -- Brower versus County*

5    *of Inyo*, 489 U.S. 593, the Supreme Court emphasized what a

6    seizure is when it examined a road block which resulted in a

7    stopped car.  It held that that could be a seizure because the

8    roadblock is not just a significant show of authority to induce

9    a voluntary stop, but it is designed to produce a stop by

10   physical impact if voluntary compliance doesn't occur.

11   Similarly, the use of pepper spray can be a show of authority

12   that's meant to stop a person from moving, even temporarily.

13          So while it can constitute a seizure under the Fourth

14   Amendment, the question is whether there are allegations

15   that support the inference with respect to the particular

16   plaintiffs in question.

17          Here, the complaint alleges that the officers

18   intentionally deployed the pepper spray at the individuals

19   gathered at 12th and L Streets outside the kettle.  That's

20   paragraph 120.  Resolving all inferences in favor of the

21   plaintiffs, Frisbie-Fulton and A.S. sufficiently allege that

22   they were seized when Frisbie-Fulton inhaled paper spray, and

23   A.S. asserts that the spray landed on his head as well.

24   Frisbie-Fulton alleges that she began to cough and choke and

25   that because of the pepper spray she wasn't able to hold on to

1    her son anymore.  A.S. alleges that he felt his throat get

2    clogged up and he began to cough uncontrollably.  That's in the

3    complaint at paragraphs 139 to -42.

4           Thus, they have pled enough facts at this stage to

5    raise the inference that the officers attempted to gain

6    physical control over them and their movement was stopped, even

7    if only temporarily.  Plaintiff Ariel also sufficiently pleads

8    that he was seized because he alleges that the officers pepper

9    sprayed him with no justification and he felt his lungs and

10   eyes burning, began to choke, and was on the verge of passing

11   out.  While he was not ultimately incapacitated and he did

12   flee, he's alleged enough facts to raise the inference that he

13   was temporarily incapacitated, in paragraphs 120, 121, 125, and

14   126.

15          Thus the plaintiffs have alleged sufficient facts to

16   allege an unconstitutional seizure at this stage.  The ultimate

17   determination will turn upon a fuller evaluation of the facts.

18          Finally, contrary to defendants' argument, plaintiff

19   Horse does assert that Officer Murphy seized him.  He pleads

20   that Officer Murphy pepper prayed him while he was restrained

21   in the kettle without warning or justification, in paragraphs

22   46 through 49.  So this claim will not be dismissed at this

23   time.

24          That brings us to Count 7, assault and battery.  All

25   six plaintiffs bring an assault and battery claim arising out

1    of the use of the chemical irritants against the defendants the

2    District of Columbia, Chief Newsham, Commander Deville, and

3    Officers Green, Rock, Thau, Washington, Murphy, Whiteside, Hill

4    Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo,

5    Dennis, Parker, and Williams.

6         Under D.C. law an assault is an intentional and

7    unlawful attempt or threat, either by words or acts, to do

8    physical harm to the victim.  See *Evans-Reid versus District of*

9    *Columbia*, 930 A.2d at 937.

10        To prove an assault a plaintiff must show that he

11   suffered apprehension of harmful or offensive contact and that

12   a reasonable person in his position would have experienced such

13   apprehension.  An essential element of the ancient tort of

14   assault is the intentional putting another in apprehension of

15   immediate and harmful or offensive conduct -- immediate and

16   harmful or offensive conduct, *Madden versus D.C. Transit*

17   *System, Inc.*, 307 A.2d 756, D.C. Court of Appeals 1973.

18        A battery is an intentional act that causes harmful

19   or offensive bodily contact.  That's *Halcomb Versus Woods*, 767

20   F.Supp.2d 123, quoting *Evans-Reid*, 930 A.2d at 937.

21        To prove a battery a plaintiff must show that he

22   suffered harmful or offensive bodily contact from defendant's

23   intentional act.  *Jackson versus D.C.*, 412 A.2d 948, the

24   District of Columbia Court of Appeals 1979.  Contrary to

25   defendants' contention, these torts do not require that the

1    officers intended to harm individuals or personally targeted

2    the plaintiffs.  A person need not intend to bring about the

3    harm to a specific person to commit an intentional tort.

4    Rather, a person need only intend the conduct that brought

5    about the harm.  See the *Roger versus Loews L'Enfant Plaza*

6    *Hotel* case, at 526 F.Supp. 523, 529, from the court in this

7    district in 1981, quoting *Prosser, The Law of Torts*, § 10 at 35

8    through 37, the Fourth Edition.

9          As applied here, the officers need to only intend to

10   pull the trigger with the pepper spray.  They don't have to

11   intend that the pepper spray actually hit or harmed a specific

12   target.

13         Thus, in Count 7 all plaintiffs have sufficiently

14   alleged that the officers intentionally discharged the chemical

15   irritants into the crowd.  See amended complaint paragraphs 47

16   to 49, 79 to 86, 120, 123 to -26, 129 to -35, 138 to -42.

17   They've also alleged that these acts caused them injury in

18   paragraphs 49, 84 to 86, 125 to -27, 131 to -34, 140, 142, 144,

19   175, 182 to -83, 188 to -89, 190, 194 to -95.

20         Defendants argue that Claim 7 should be dismissed as

21   to defendants Newsham, Green, Deville, Whiteside, and Hill

22   because they were not personally involved and they only

23   authorized the use of the pepper spray or the sting ball.  But

24   it is enough to plead that the torts were directed by these

25   individuals to state a claim because while *respondeat superior*

1    has no application between a police officer and his

2    subordinates, this exception to that general rule is when the

3    officer directs or countenances the tortious act.

4           In *Eskridge versus Jackson*, 401 A.2d 986, the D.C.

5    Court of Appeals said, and also *King versus Kidd*, 640 A.2d 656:

6    Of course, if a supervisory public officer directs or

7    countenances the tortious act of a subordinate, then that

8    officer is subject to direct, rather than vicarious liability

9    for his own actions.  By pleading these defendants authorized

10   the use of the irritants or ordered the officers to rush

11   forward, it's enough for now to state a tort claim against

12   them.  And that's in amended complaint paragraph 129.

13          With respect to defendants Washington, Rock, Thau,

14   Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato,

15   Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams,

16   defendants say they're covered by the qualified immunity

17   privilege because their use of chemical irritants was

18   reasonable under the circumstances and the authorization came

19   from superiors with a more complete perspective of the events.

20   This is a defense that may well be more fully developed at a

21   later point.  But at this stage plaintiffs have sufficiently

22   pled that the use of the chemical irritants was not reasonable

23   because, plaintiffs assert, among other things, MPD officers

24   pepper sprayed into a large and peaceful crowd of individuals

25   without warning and for no apparent reason, paragraph 3 -- or,

1      page 3.

2              At the time Officer Murphy pepper-sprayed Mr. Horse,

3      Mr. Horse was not engaged in any unlawful or dangerous

4      activity.  He was not disobeying any orders by any police

5      officer; paragraph 48.

6              Paragraph 56 alleges that they deployed pepper spray

7      without warning or as a dispersal order when they faced no

8      threat to themselves or to public safety or any disobedience.

9      Similarly, paragraphs 180, 121, and 123 all allege facts that

10     support the claim and, therefore, the claim will not be

11     dismissed.

12             Okay.  We're up to Claims 9 and 10, which were the

13     claims of assault and battery and excessive force involving

14     plaintiff A.S. in particular.

15             In Claim 9 plaintiff A.S. brings a claim of excessive

16     force against the District and Officers Whiteside, Hill, Masci,

17     and Angulo, alleging that they used excessive force in

18     violation of the Fourth Amendment when he was knocked down by

19     the line of police officers.  In Claim 10 he alleges assault

20     and battery based on the same conduct against the same

21     defendants.

22             Defendants say plaintiffs failed to plead that the

23     actions underlying the claims were intentional because the

24     complaint states that the officers collided with A.S., so the

25     claim -- complaint does not allege that the officers

1    intentionally knocked him down.

2           In full, the complaint says without warning or

3    provocation, a line of police officers, including Officer

4    Joseph Masci and Officer Angulo, rushed forward.  Officer Masci

5    and Angulo collided with A.S., knocking him to the ground.

6    Defendant Lieutenant Michael Whiteside and Sergeant Sean Hill

7    walked behind the line of officers, speaking to them moments

8    before the charge.

9           This conduct, in combination with the coordinated

10    action by multiple officers, reflects that the defendants

11    Whiteside and Hill ordered the charge into nonviolent

12    protesters, despite the absence of a threat to officer or

13    public safety or disobedience of any officer's command.  That's

14    the amended complaint in paragraphs 129 to -30.

15           A violation of the Fourth Amendment requires an

16    intentional acquisition of physical control.  A seizure can

17    occur even when an unintended person or thing is the object of

18    the detention or taking, but the detention or taking itself

19    must be willful.  That's the Supreme Court case I read from

20    earlier, *Brower versus County of Inyo*, 489 U.S. at 595 to -96.

21    And as stated before, both assault and battery require that the

22    plaintiff show he suffered a threat of physical harm or

23    offensive bodily contact that was intentional.

24           I acknowledge, as I stated earlier, that the

25    plaintiff only needs to allege, as was sufficient in Claim 7,

1    that the defendant intended the act that brought about the

2    harm.  But the use of the word "collided" doesn't give rise to

3    an inference of anything other than negligence and it's

4    inconsistent with the intent requirement for both the excessive

5    force and the assault and battery allegations.  It is easily

6    distinguished from intending an act that is inherently harmful

7    and offensive or can likely cause harm, such as spraying a

8    chemical irritant at a group, even if one didn't spray with the

9    intent to harm a particular person.

10          What is absent from these counts is the intent to

11   place plaintiff in apprehension of an immediate and harmful or

12   offensive act or the intent to make contact with him.  Without

13   more, intent can't be inferred from the allegation in the

14   complaint and, therefore, these claims will be dismissed

15   without prejudice for failure to state a claim.

16          Claim 11 is the Fourth Amendment violation alleging

17   excessive force involving the zip ties.  Plaintiffs Horse and

18   Lagesse assert that Officers Hinostroza and Bogardus used

19   excessive force when their zip ties were excessively tight.  In

20   response, defendants admit that there is a clearly established

21   right to be free from injury-inflicting handcuffing when an

22   individual complains about the tightness of the cuffs, but they

23   say here these plaintiffs assert only de minimis injuries.

24   This claim will not be dismissed.

25          While there may not be a D.C. Circuit case on point,

1    a Court in this district has held that tight handcuffing can

2    constitute excessive force where the handcuffing has resulted

3    in injury or where an individual complains about the overly

4    tight cuffing.  That's *Dormu versus D.C.*, 795 F.Supp.2d 7,

5    citing *Howard versus Kansas City Police Department*, 570 F.3d

6    984 from the Eighth Circuit, which found that it clearly

7    established that the Fourth Amendment prohibited officers from

8    unreasonably ignoring complaints that unduly tight handcuffs

9    were causing more than minor injury.

10            In *Dormu* the plaintiff had averred that as a result

11   of the tight handcuffs, he continued to experience pain and

12   numbness in his right wrist, that he received surgery for this

13   problem, and that he has stopped performing surgeries himself

14   that require a certain level of muscle strength.  Other

15   circuits have found where some physical injury is alleged it's

16   enough to sustain an excessive force claim, such as *Lyons*

17   *versus City of Xenia*, 417 F.3d 565, from the Sixth Circuit;

18   *Meredith versus Erath*, 342 F.3d 1057, from the Ninth Circuit;

19   *Kopec versus Tate*, 361 F.3d 772, from the Third Circuit; *Payne*

20   *versus Pauley*, 337 F.3d 767, from the Seventh Circuit; *Mickle*

21   *versus Morin*, 297 F.3d 114, from the Second Circuit.

22            Here, the complaint alleges that Horse's zip ties

23   were so tight that he lost feeling in some of the fingers on

24   both of his hands, paragraph 146.  He alleges in 147 that he

25   complained to Officer Hinostroza that the zip ties were

1    painfully tight, but the officer refused to remove them.  He

2    alleges, in 178, that as a result of the tight zip ties,

3    Horn -- Horse experienced pain in his hands.  Several fingers

4    on his left hand remained numb for more than four months after

5    his arrest.  Because of the numbness, he had difficulty with

6    important daily tasks, such as typing on a keyboard or

7    operating his camera.

8            The complaint alleges that Lagesse's zip ties were so

9    excessively tight that one of her wrists was cut and began to

10    bleed; paragraph 149.  It alleges that they were around her

11    wrist for two it three hours, in 148 and 151.  She also alleges

12    that she complained to Officer Borgardus that the zip ties were

13    painfully tight, but the officer refused to remove it them;

14    paragraph 150.  She also alleges, in paragraph 185, that as a

15    result of the excessively tight zip ties her wrists bled, she

16    experienced pain in his wrist and hand and she still has a scar

17    on her wrist.  Because plaintiffs state an injury, they have

18    stated a claim for excessive force and the claim will not be

19    dismissed on its face.

20            Claim 12 alleges Fourth and Fifth Amendment

21    violations arising out of the conditions of the plaintiffs'

22    confinement.  Plaintiffs Horse, Lagesse, and Gonzales assert

23    that they were subjected to a prolonged period without access

24    to food, water, or toilets, in violation of their Fourth and

25    Fifth Amendment rights.  The claim is brought against the

1    District, Chief of Police Newsham, and Officers Alder, Carroll,

2    and Niepling.

3          Defendants move to dismiss the claim on two grounds.

4    First, they argue that plaintiffs haven't sufficiently alleged

5    that Newsham, Alder, Carroll, or Niepling deprived them of

6    food, water or toilets because plaintiffs do not allege that

7    Newsham was at the kettle or that the other officers were at

8    the kettle for the duration of the time period in question, or

9    that they knew that plaintiffs were without food, water, or

10   toilets the entire time plaintiffs were confined.

11         Second, defendants contend that plaintiffs do not

12   allege a clearly established Fifth or Fourth Amendment right

13   and, thus, the individual defendants are entitled to qualified

14   immunity.

15         Dismissing the claim on the first basis would be

16   premature.  Accepting all of plaintiffs' assertions as true and

17   drawing all inferences in their favor, plaintiffs have

18   sufficiently pled that MPD officers were communicating with

19   their supervisors, the individual defendants here, regarding

20   the requested accommodations, that plaintiffs specifically

21   requested food, water, and access to a bathroom, or that

22   defendants were aware that there was a need for food, water and

23   rest rooms and defendants refused to provide the accommodations

24   to plaintiffs on purpose.  See paragraph 87 to 93, 96 to 99,

25   153 to -54, 156, 158 to -59, 161 and 164.

1          The D.C. Circuit has held that under § 1983 a

2     supervisor who merely fails to detect and prevent a

3     subordinate's misconduct can't be liable for that misconduct.

4     The supervisor must know about the conduct and facilitate it,

5     approve it, condone it, or turn a blind eye for fear of what

6     they might see.  The Court said that in *International Action*

7     *Center versus U.S.*, 365 F.3d 20, in 2004, quoting *Jones versus*

8     *City of Chicago*, 856 F.2d 985, from the Seventh circuit in

9     1988.  Plaintiffs have alleged that these defendants, as

10    supervisors, directed the officers at the scene to not provide

11    the needed food, water, and bathroom.

12          With respect to the second ground for dismissing

13    Claim 12, the question of whether a right is clearly

14    established, as I said earlier, involves the *Butera* test of

15    whether the Supreme Court, D.C. Circuit, or other circuits in a

16    consensus have clearly spoken on the lawfulness of the conduct

17    at issue.

18          Plaintiffs argue their conditions of confinement

19    contravene both the Fourth and Fifth amendments of the

20    Constitution.  The Supreme Court and the D.C. Circuit have

21    found that pretrial detainees' conditions of confinement are

22    protected under the due process clause of the Fifth Amendment.

23    That's *Bell versus Wolfish*, 441 U.S. 520; *Jones versus Horne*,

24    634 F.3d 588, the D.C. Circuit.  And the Fourth Amendment may

25    also apply in pre-arrest situations, where people are detained

1    and are being processed or transported to be arrested, because

2    of its temporal proximity to the seizure.  Seventh circuit made

3    that point in *Ortiz versus City of Chicago*, 656 F.3d 523;

4    *Chambers versus Pennycook*, the Eighth Circuit, 641 F.3d 898,

5    noting that it's appropriate to use the Fourth Amendment

6    framework to analyze excessive force claims arising out of

7    incidents occurring shortly after arrest because those

8    incidents still occur in the course of a seizure of a free

9    citizen.  These incidents include the transportation, booking

10   and initial detention of recently arrested persons.

11        The Tenth Circuit said something similar in *Austin*

12   *versus Hamilton*, 945 F.2d 1155, 1991.  As plaintiffs point out,

13   courts in this district have used both standards, depending on

14   what the facts were alleged in the complaint.

15        In *Bell versus Wolfish* the Supreme Court instructed

16   that in evaluating the constitutionality of conditions or

17   restrictions of pretrial detention that implicate only the

18   protection against depravation of liberty without due process,

19   the proper inquiry is whether those conditions amount to

20   punishment of the detainee.  So, that is essentially the Fifth

21   Amendment standard.  Punishment is found if actions taken

22   against the detainee are motivated with an intent to punish or

23   that, in the absence of an express intent to punish, the

24   actions are not rationally related to a legitimate nonpunitive

25   governmental purpose or the actions appear excessive in

1    relation to that purpose.  The Supreme Court emphasized that in

2    135 S. Ct. 2466, *Kingsley versus Hendrickson.*

3              While the D.C. Circuit hasn't said whether the

4    question of denying food, water, and bathrooms amounts to

5    punishment, such as to constitute a constitutional violation,

6    other circuits have.  The Eastern District of Virginia in *Smith*

7    *versus Fargo*, 2015 WL 6125709, denied a motion to dismiss a

8    pretrial detainee's due process claim for denial of water and

9    toilets for six hours; the Seventh Circuit, *Davis versus*

10   *Wessel*, 792 F.3d 793, denied qualified immunity on a civil

11   detainee's claim that the guards refused to uncuff him to let

12   him use the toilet, causing him to soil himself while urinating

13   and to refrain from defecating for three hours.

14             Other cases involve *Gobel versus Maricopa County*, 867

15   F.2d 1201, from the Ninth Circuit; *Merritt versus County of Los*

16   *Angeles*, 875 F.2d 765; and *Anela versus City of Wildwood*, 790

17   F.2d 1063; and *Putman versus Gerloff*, 639 F.2d 415, out of the

18   Eighth Circuit, where the Court said a reasonable jury could

19   find a due process violation where defendants chained pretrial

20   detainees overnight for 12 hours so as to deny them toilet

21   access.

22             Courts applying the Fourth Amendment have condemned

23   similar conduct.  In *Heitschmidt versus City of Houston*, 161

24   F.3d 834, out of the Fifth Circuit, the Court reversed the

25   dismissal of a complaint where the plaintiff was physically

1    pushed into the trunk of a car and handcuffed -- onto the trunk

2    of a car and handcuffed in the street and then detained in pain

3    without a restroom break for more than four hours.  The Court

4    there found that on the basis of the pleadings, that the

5    plaintiff had conceivably alleged a violation of his clearly

6    established Fourth Amendment rights and that the officers were

7    not entitled to qualified immunity.

8         The Court similarly denied qualified immunity in a

9    case out of the Northern District of Illinois, *Carroll versus*

10   *Village of Homewood*, 2001 WL 1467708.  And the D.C. Circuit has

11   held that sustenance and sanitation are basic needs, in *Inmates*

12   *of Occoquan versus Barry,* 844 F.2d 828.  Thus, the laws clearly

13   establish that the depravation of food, water, and access to a

14   bathroom can amount to a constitutional violation.  And

15   plaintiffs allege enough facts that if taken as true, rise to

16   an inference of intended punishment, in violation of the due

17   process clause, or in violation of the Fourth Amendment because

18   the conduct could constitute an unreasonable search and

19   seizure.

20        Plaintiffs allege that they asked for food, water,

21   and to use the restroom, but they were refused; paragraph 89.

22   They allege that officers were throwing away food in front of

23   the detainees on purpose to taunt them; paragraph 90.  They

24   were ridiculed, told to defecate themselves and forced to

25   rummage through trash cans; paragraphs 90 to 93.  One officer

1    allegedly told Gonzalez, if you wanted to go to the bathroom,

2    you shouldn't have gotten arrested; paragraph 96.

3         If other facts are developed that demonstrate a

4    legitimate government purpose, that can be the basis for a

5    motion for summary judgment. But at this stage of the

6    proceedings the defendants are not entitled to dismissal of

7    Claim 12 based on qualified immunity.

8         Claim 15, intentional infliction of emotional

9    distress. Plaintiff Gonzalez asserts that he suffered

10   emotional distress when defendants District of Columbia,

11   Officers Newsham, Alder, Carroll, and Niepling denied him

12   access to go to the bathroom for nine to ten hours. Defendants

13   argue that he failed to state a claim because he fails to

14   allege intent or severe emotional distress. They also argue

15   that failure to provide a toilet is not outrageous and reckless

16   conduct.

17        To establish liability under D.C. law for intentional

18   infliction of emotional distress the plaintiff must show, one,

19   extreme and outrageous conduct on the part of the defendant,

20   which, two, either intentionally or recklessly, three, caused

21   the plaintiff severe emotional distress. That's *Larijani*

22   *versus Georgetown University*, 791 A.2d 41, D.C. 2002. The

23   conduct must be so outrageous in character and so extreme in

24   degree as to go beyond all possible bounds of decency and to be

25   regarded as atrocious and utterly intolerable in a civilized

1    community, *Kaiser versus U.S.*, 761 F.Supp. 150 at 156.

2         Plaintiff Gonzalez alleges that he was held without

3    access to a toilet, in pain and anxiety for nine to ten hours

4    for no reason, and was not given privacy to ultimately relieve

5    himself.  That's paragraph 92 to 96, 161 to -63.  He also

6    alleges, in paragraphs 89 and 96, that when he asked for access

7    to a toilet he was mocked.  And he alleges the MPD had the

8    resources to process him faster but chose not to to maximize

9    his discomfort; paragraphs 97 to 99.

10         He further asserts, in paragraph 251, that when

11   Newsham, Alder, Carroll, and Niepling ordered or approved his

12   detention for a prolonged period without access to a toilet, it

13   caused him severe emotional distress.

14         Defendants argue that Gonzalez has failed to plead

15   intent.  But as explained above, plaintiff need only show the

16   intent to do the act that caused the harm.  The intent standard

17   is satisfied when defendants intentionally placed Gonzalez in

18   the kettle and then denied him a toilet when he requested one.

19   And plaintiff has pled that he suffered from severe emotional

20   distress in the form of difficulty sleeping, nightmares, and

21   anxiety around the police; in paragraphs 193 and 251.  And the

22   Court, in *Williams versus District of Columbia*, 268 F.Supp.3d

23   178, in that case another Court in this District did find that

24   such allegations stated a claim of intentional infliction of

25   emotional distress, at least at this stage.

1    Finally, Gonzalez has sufficiently pled extreme and

2    outrageous conduct for the claim to move forward.  He was in

3    pain and he was mocked when he simply asked to relieve himself

4    after being detained for nine to ten hours.

5    The next issue I have to take up is that with respect

6    to Claims 1, 2, 6, and 12, the complaint alleges that the

7    District itself is liable for the alleged constitutional

8    violations set forth.  The arrest without probable cause in

9    Claim 1, the arrest for protected speech in Claim 2, excessive

10   force in using chemical irritants in Claim 6, and the

11   conditions of pretrial confinement in Claim 12, all under

12   § 1983.

13   Defendants maintain the plaintiffs have not alleged a

14   plausible basis to impose municipal liability because they did

15   not allege an express municipal policy that facilitated the

16   conduct at issue; they failed to plead that a custom or policy

17   gave rise to the alleged constitutional violations; they failed

18   to allege the deliberate indifference necessary because

19   plaintiffs don't allege that defendants were on notice of a

20   failure to train or to supervise and that plaintiffs have

21   failed to allege the actions of a final policy maker because

22   the chief of police is not a final policy maker.

23   Plaintiffs predicate their theories of municipal

24   liability on three basis.  As to Claims 1, 2, 6, and 12, they

25   say Chief of Police Peter Newsham was a final policy maker who

1    directed the actions that gave rise to the constitutional

2    violations.  They allege that he acknowledged that the kettling

3    procedure was not a mere happenstance, but part of a

4    coordinated strategy, in paragraph 198; that the chief

5    coordinated the MPD response which included the pepper

6    spraying, assaulting individuals with noise and light-emitting

7    weaponry, and detaining demonstrators, all from the command

8    center, in paragraph 199.  And that the officer on the scene,

9    Commander Deville, was in constant communication with the

10   control center and taking orders from the chief, in paragraph

11   200.

12         Second, with respect to Claims 1, 2, 6, and 12,

13   plaintiffs assert that the chief deliberately failed to

14   supervise and restrain defendants Green and Deville and other

15   officer under his command from violating the rights of

16   plaintiffs and others repeatedly, in paragraph 201, and that he

17   was aware of the large scale MPD actions taken against

18   individuals who marched down 13th Street.

19         Finally, as to Claim 6, plaintiffs allege that the

20   District failed to adequately train its officer in how and when

21   to use pepper spray.  That's paragraph 203.  They point to four

22   other instances during which MPD used excessive force against

23   demonstrators and submit that this shows the District's

24   knowledge of and indifference to the problem; paragraph 202.

25         The law is quite clear, a municipality cannot be held

1    liable solely because it employs a tortfeasor.  Instead, it is

2    when the execution of a government's policy or custom, whether

3    made by its lawmakers or by those whose edicts or acts may

4    fairly be said to represent official policy, inflicts the

5    injury that the government as an entity is responsible under

6    § 1983.  That's what the Supreme Court said in *Monell versus*

7    *Department of Social Services*, 436 U.S. 658.  That's why this

8    is usually referred to as *Monell*, *Monell* test for municipal

9    liability.

10           Municipalities may be held liable under § 1983 only

11   for the acts for which the municipality itself is actually

12   responsible.  That is, acts which the municipality has

13   officially sanctioned or ordered.  Supreme Court said that in

14   *City of St. Louis versus Praprotnik*, 485 U.S. 112, 123, citing

15   *Pembaur versus City of Cincinnati*, 475 U.S. 469, at 480.

16           The decision of a municipal officer who has the

17   authority to make final policy in the area at issue may qualify

18   as official policy under *Monell*.  The Supreme Court said that

19   in *Praprotnik* at page 123.  And even a single decision by a

20   municipal policy maker may give rise to municipal liability

21   according to *Pembaur*, 475 U.S. at 480.  But, quote, municipal

22   liability under § 1983 attaches where, and only where, a

23   deliberate choice to follow a course of action is made from

24   among various alternatives by the official or officials

25   responsible for establishing final policy with respect to the

1      subject matter in question.  That's *Pembaur* again at 483,

2      citing *Oklahoma City versus Tuttle*, 471 U.S. at 822.

3              Municipal liability, therefore, can't be predicated

4      on the actions of every public official, and not even on the

5      decisions made or directions issued by very high-ranking or

6      supervisory officials.

7              Because the official policy requirement was intended

8      to distinguish acts of the municipality from acts of employees

9      of the municipality, the Supreme Court explained in *Pembaur* at

10     479, it can only be satisfied by the action of a policy maker

11     with the government, quote, whose acts or edicts may fairly be

12     said to represent official policy, close quote.  It's *Pembaur*,

13     page 480.

14             While at first blush it would seem logical that the

15     city's top law enforcement officer who is alleged to have been

16     personally supervising the MPD response to the march would

17     qualify, there is binding precedent that I have to follow that

18     compels the conclusion that he was not.  Whether a particular

19     official has final policymaking authority is a question of

20     state law and the challenged action must have been taken

21     pursuant to a policy adopted by the official or officials

22     responsible under state law for making policy in that area of

23     the state's business -- of the city's business.  That's from

24     *Praprotnik*, 485 U.S. at 123.

25             *Pembaur* at 475 U.S. at 481 makes the same point.  It

1      said:  The official must also be responsible for establishing

2      final governmental policy respecting such activity before the

3      municipality can be held liable.  Authority to make municipal

4      policy may be granted directly by legislative enactment or may

5      be delegated by an official who possess such authority.  And

6      there *Pembaur* was citing *Oklahoma City versus Tuttle*, 471 U.S.

7      at 822 to 824.

8             The D.C. Circuit addressed this issue in *Singletary*

9      *versus District of Columbia*, 766 F.3d 66, D.C. Circuit from

10     2014, that I know well.  In that case the question presented

11     was whether a decision by the D.C. Board of Parole, which had

12     already been determined to be unconstitutional by the D.C.

13     Circuit, could be attributed to the District, making the

14     District liable for the plaintiff's undeniably unlawful

15     detention.

16            The D.C. Circuit found that the D.C. Board of

17     Parole's decision to revoke Singletary's parole could not be

18     the basis for municipal liability because the board was not a

19     final policy maker.  The Court found that the mayor possessed

20     rulemaking authority to implement the statutory provisions

21     governing the board's exercise of its powers, subject to

22     disapproval by the D.C. city council.  Since there was no

23     suggestion or allegation that the board acted under direction

24     of any such rule when it revoked Singletary's parole based on

25     unreliable evidence, the Court found there could be no *Monell*

1    liability.

2          The Court recognized that the board had the

3    discretion to revoke parole depending on the fact of each

4    presented -- each case presented to them, but it said, quote,

5    such discretion is insufficient to create municipal liability

6    unless the decision maker had been granted final policymaking

7    authority under D.C. law in the area of parole revocation, and

8    then cited the pages of *Pembaur* that I just read, and found

9    that the parole board didn't have authority to promulgate

10   general rules or policies.  And, therefore, the board was,

11   quote, constrained by policies not of its making, close quote,

12   and its decision to depart from those policies was not an act

13   of the municipality for purposes of § 1983, citing *Praprotnik*.

14         So that's the binding authority that binds my

15   decision in this case.

16         Here, too, Chief of Police Newsham was constrained by

17   policies not of his own making and any decision to depart from

18   those policies was not an act of the municipality.

19         Plaintiffs say, well, the chief of police was the

20   final policy maker and he directed the officers at the scene to

21   take certain actions that led to constitutional violations,

22   including kettling, detaining individuals, arresting

23   individuals who didn't commit any crimes, using chemical

24   irritants on peaceful demonstrators, and more.  But it is the

25   D.C. council and the mayor who are the final policy makers with

1    respect to the relevant subject matter, First Amendment

2    Assemblies.  This is evidence through the First Amendment

3    Assemblies Act which was passed by the council in 2004.

4        The very purpose of the legislation, as the council

5    put it at the time, was to preclude preemptive actions by the

6    police department by requiring a standard of imminent

7    likelihood of law breaking before police can surround or

8    otherwise disrupt an event, and place limits on the use of

9    physical restraints by banning the use of wrist and ankle ties,

10   and created a process of checks and balances for occasions when

11   police investigate the activities of members of political

12   organizations.  And that was in the committee report that I

13   cited earlier at docket 47-1.

14       Further, the council explicitly stated that this

15   legislation is presented as a response to and policy guidance

16   for District of Columbia law enforcement based on the past

17   record and the need for elected officials to clearly articulate

18   the priorities of this jurisdiction.  The council described the

19   legislation precisely as a statement of policy for the District

20   of Columbia, and it is supposed to represent, quote, the best

21   practices, close quote, in law enforcement with regards to

22   First Amendment assemblies.

23       Therefore, this law -- I've never had this much water

24   in a hearing in my eight years on the bench -- or however many

25   years it's been.

1    Therefore, this law, which was promulgated by the

2    D.C. city council, represents the policy regarding the police

3    response to mass demonstrations.  The Act sets forth when to

4    use chemical irritants, riot gear and riot tactics, steps to

5    take when unlawful activity occurs, how detainees shall be

6    treated, and the procedures that the MPD should undertake to

7    promptly process arrests, and more.

8    The act does give MPD certain discretion.  For

9    example, in § 5-331.16(b), it states that chemical irritants

10   may be used if reasonable and necessary to protect officers and

11   that a commanding officer must make that determination.  But

12   the ability to exercise some discretion doesn't mean that the

13   chief of police is a final policy maker.  In *Pembaur* the Court

14   made a point of distinguishing the power to exercise discretion

15   in implementing policy and the power to make policy at 475 U.S.

16   at 483, note 12.

17   Here, as the defendants have noted, whatever policy

18   making authority existed for the chief in policing First

19   Amendment assemblies prior to the passage of the Act is now

20   constrained by the detailed rules and regulations established

21   by that statute.  The chief has discretion over his police

22   force in how to use the force, but he's working within the

23   confines of that Act.  It is the D.C. council that has

24   promulgated the policy through the First Amendment Assemblies

25   Act and, thus, it is the final policy maker in this area.  Even

1     if the chief of police made decisions that were contrary to

2     those policies and the Act and, therefore, acted in an

3     unconstitutional or negligent manner, that doesn't mean that

4     the municipality itself should being liable for his conduct.

5          It is true that some courts in this district have

6     found the chief of police can exercise final policy making

7     authority in making MPD employment decisions.  For instance,

8     *Sanders versus District of Columbia*, 85 F.Supp.3d 523, *Medina*

9     *versus District of Columbia*, 718 F.Supp.2d, or when executing

10    an undercover sting, see *O'Callaghan versus D.C.*, 741 F.Supp.

11    273.

12         These situations are distinguishable, though, because

13    D.C. municipal regulations have delegated the policy making

14    authority from the mayor to the chief of police regarding his

15    department and all functions, resources, officials, and

16    personnel assigned thereto.  That's in D.C.M.R., Chapter 6,

17    § 800.7.  The chief of police has, in municipal regulations,

18    been described as the chief executive officer of the

19    Metropolitan Police Department, see § 800.1.  And those

20    regulations give the chief the authority to plan and prescribe

21    departmental policy in 800.16.

22         These regulations are clear, the chief of police is

23    the final policy maker with regards to internal operations of

24    the MPD and, therefore, it makes sense that the chief is the

25    final policy maker in terms of employment decisions within the

MPD. *O'Callaghan* held that the chief was the final policy

maker regarding a sting operation, and that court reasoned that

the operation was internally planned for months by police

officers, sanctioned by the chief, and was executed by the

officers.

While the same reasoning could arguably be applied to

the march on inauguration day, the 1990 nonbinding decision of

another district court may not be consistent with the more

recent decision in *Singletary* and, therefore, I can't find it

to be instructive or persuasive here.

Thus, the plaintiffs cannot proceed with their § 1983

claims against the District of Columbia on the theory that the

chief acted as a final policy maker that gave rise to

constitutional violations.

This leaves two other theories of municipal

liability:  Failure to supervise and failure to train.

A city's inaction, including its failure to train or

supervise its employees adequately, constitutes a policy or

custom under *Monell* when it can be said that the failure

amounts to deliberate indifference towards the constitutional

rights of persons in its domain.  That's *Daskalea versus D.C.*,

227 F.3d 433, D.C. Circuit 2000, quoting *City of Canton, Ohio

versus Harris*, 489 U.S. 378.

As the Supreme Court explained, in some circumstances

the need for more or different training is so obvious and the

1    inadequacy so likely to result in the violation of

2    constitutional rights, that the policy makers of the city can

3    reasonably be said to have deliberately -- to have been

4    deliberately indifferent to the need.  That's *Canton* at 390.

5           Deliberate indifference, according to the D.C.

6    Circuit in *Warren versus District of Columbia*, 353 F.3d 36,

7    quoting the *Baker* case at 326 F.3d 1306, is determined by

8    analyzing whether the municipality knew or should have known of

9    the risk of constitutional violations but did not act.

10          This is a stringent standard which requires that the

11   municipality have actual or constructive notice of the risk

12   that its employees will violate constitutional rights.  It's

13   *Connick versus Thompson*, 563 U.S. 51, at 61.  *Connick* says a

14   pattern of similar constitutional violations by untrained

15   employees is ordinarily necessary to demonstrate deliberate

16   indifference for purposes of failure to train.

17          On rare occasions, a single unconstitutional incident

18   may suffice to show deliberate indifference if the

19   unconstitutional consequences of failing to train are so highly

20   predictable and patently obvious.  In *Connick* the burden was on

21   the plaintiff to show that the violation was so predictable

22   that failing to train or supervise amounted to conscious

23   disregard of his rights.

24          Plaintiffs allege that the chief failed to supervise

25   MPD officers despite his knowledge that constitutional

1    violations were being committed on January 20th, 2017.  It's in

2    the complaint at paragraphs 200 to 201.  They specifically

3    allege in those paragraphs that the chief was in constant

4    communication with officers at the scene from his post in the

5    command center and thus was aware of the situation and failed

6    to restrain the officers at the scene.

7          While ordinarily one instance doesn't amount to a

8    policy of inaction, it is the functional equivalent of a

9    decision by the city itself to violate the Constitution,

10   according to *Connick* at 563 U.S. at 61.

11         The facts adduced with respect to prior

12   demonstrations bear on both the failure to supervise and the

13   failure to train allegations.  And both theories should move

14   forward to the summary judgment stage, given their substantial

15   overlap.

16         Plaintiffs also allege that the MPD officers'

17   unconstitutional overuse of chemical irritants reflects the

18   district's deliberately indifferent failure to train its

19   officers regarding proper use of pepper spray.  And plaintiffs

20   point to an alleged pattern of constitutional violations by

21   referring to four separate instances between 2000 and 2005 in

22   which lawsuits against MPD led to large settlement payouts to

23   victims of MPD violence.

24         In January 2005, the MPD used excessive force against

25   and unconstitutionally detained demonstrators during the

counter-inaugural demonstrations in Adams Morgan.  The pepper
spraying and arrest of numerous peaceful demonstrators led to
lawsuits resolved by large settlement payments to victims of
MPD violence.

In January of 2005 the MPD also allegedly used
excessive force against demonstrators during counter-inaugural
demonstrations near the White House and other demonstrators
have -- after other demonstrators had removed a portion of
security fencing.  The pepper spraying of law-abiding
demonstrators led to a lawsuit resolved by a large settlement
payment made to victims of MPD violence.

Complaint also alleges, in paragraph 202, that in
September 2002 the MPD used excessive force against and
unconstitutionally detained demonstrators during the World Bank
protests in Pershing Park; the mass arrests and hogtying of
protesters led to lawsuits resolved by large settlement
payments to victims of MPD violence.

And in April 2000 MPD allegedly used excessive force
against and unconstitutionally detained antiglobalization
demonstrators; the kettling, use of pepper spray, and denial of
food and water to detainees led to lawsuits, again resolved by
large settlement payments to victims of MPD violence.

The Court finds the plaintiffs have stated a claim
for municipal liability for failure to supervise and failure to
adequately train its officers in the use of chemical irritants,

1    particularly since at least two examples took place after the

2    First Amendment Assemblies Act was enact in 2004.

3          Giving the benefit to the plaintiff of all

4    inferences, which is what I'm supposed to do right now, the

5    allegations give rise to the inference that the District was on

6    notice of a particular omission in its training program and

7    that it acted with deliberate indifference in failing to train

8    its officers and that the chief was deliberately indifferent to

9    a need for enhanced oversight on the day of the march.

10         The defendants say that these instances are too old

11   to put the District on notice of a particular omission in its

12   training.  But all the cases that it points to for support were

13   resolved at the summary judgment stage and not at the motion to

14   dismiss stage.  For example, *Moore versus D.C.*, 79 F.Supp.3d at

15   121; *Dormu versus D.C.*, 795 F.Supp.2d 7; *Robinson versus D.C.*,

16   403 F.Supp.2d 39; and *Byrd versus District of Columbia*, 297

17   F.Supp.2d 136.

18         Therefore, I find for purposes of the motion to

19   dismiss, that the claim for municipal liability will go forward

20   on those two grounds.

21         I think this is the last claim.

22         Claim 16, the Fourth Amendment violation against John

23   Doe individually.  In Claim 16, plaintiffs Horse and Gonzalez

24   allege that during a pat-down after their arrest Officer John

25   Doe jabbed each of them in the rectum and grabbed Gonzalez's

1    testicles without reasonable suspicion of probable cause, in

2    violation of the Fourth Amendment.  This is set out in the

3    complaint in paragraphs 254 -- the amended complaint, 254 to

4    255.

5        Defendant John Doe has filed his own motion with

6    respect to Claim 16.  He moves to dismiss or, in the

7    alternative, for summary judgment for two reasons.  First of

8    all, he says the Court should strike plaintiffs' allegations

9    because plaintiffs made objectively false representations in

10   the amended complaint, and he argues that he's entitled to

11   qualified immunity because the evidence he has submitted

12   disproves that there was any constitutional violation.  And so

13   here he's moving to dismiss or, in the alternative, for summary

14   judgment at Docket 55.

15       The Court does have some discretion to strike

16   obviously false and sham allegations that have changed from the

17   complaint to the amended complaint.  And the District noted

18   that in *Clay versus Howard University*, 128 F.Supp.2d 22, citing

19   *Bradley versus Chiron Corporation*, 136 F.3d 1317.  It said

20   reconcilable small variations between complaints are

21   acceptable, but direct contradiction is not.

22       When an amendment -- amended complaint falls shy of a

23   180-degree change in the allegations, though, courts have

24   tended to decline to strike the allegations.  See, for example,

25   *CopyWatch, Inc. versus American National Red Cross*, 299

F.Supp.3d 189, or the *Clay* case at 128 F.Supp.3d 27.

In the original complaint Horse and Gonzalez allege that they were subjected to an intrusive search alongside three other detainees.  And that was paragraph 115 of the original complaint, Docket 1.  That Officer Doe pushed his finger into Horse's rectum for several seconds, that Officer Doe reached inside of Gonzalez's underwear when he put his finger inside of his rectum, and that Officer Doe moved down the line and subjected three other detainees to similar treatment.  That's in paragraphs 119 and 120 and 124.

In the amended complaint plaintiffs allege that Officer Doe pushed his finger into Horse through his clothes and Officer Doe reached in Gonzalez's underwear to fondle his testicles and insert the finger.  And that's in paragraphs 168, 171 and 172 of the amended complaint.

The Court finds that some of the changes are troubling and they may bear on the plaintiffs' credibility moving forward, but the factual allegations in the amended complaint fall short of the 180-degree change required to strike them.  The allegations in the amended complaint don't rise to the level of direct contradiction.  Thus, the amended complaint will not be stricken and Doe's motion to dismiss will be denied on that basis.

But Doe has also moved for summary judgment on the grounds that he's entitled to qualified immunity because, one,

1   he didn't commit a constitutional violation and, two, the

2   pat-down searchs he performed were not clearly unreasonable and

3   did not violate a clearly established right.

4       The Fourth Amendment generally establishes that law

5   enforcement have probable cause for conducting a search.

6   That's *U.S. versus Scott*, 987 A.2d 1180, D.C. Court of Appeals

7   2010.  However, a critical exception to this rule are searches

8   conducted incident to arrest.

9       The Supreme Court has explained:  The authority to

10  search a person incident to a lawful custodial arrest, while

11  based upon the need to disarm and to discover evidence, does

12  not depend on what a court may later decide was the probability

13  in a particular arrest situation that weapons or evidence would

14  in fact be found upon the person of the suspect.  A custodial

15  arrest of a suspect based on probable cause is a reasonable

16  intrusion under the Fourth Amendment; that intrusion being

17  lawful, a search incident to arrest requires no additional

18  justification.  It's *United States versus Robinson*, 414 U.S.

19  218.

20      Here, plaintiffs have alleged sufficient facts in the

21  complaint give rise to an inference that plaintiffs Horse and

22  Gonzalez's arrests were not conducted with probable cause, so

23  the searchs incident to those arrests would require additional

24  justification.  Even if there was probable cause to arrest

25  Horse and Gonzalez, though, where a search incident to arrest

1     is unusually intrusive, the search may be deemed unreasonable

2     and, therefore, in violation of the Fourth Amendment.

3               In *Bell versus Wolfish* the Supreme Court established

4     an analytical framework to determine the reasonableness of a

5     sexually intrusive search, holding that courts must balance the

6     scope of the particular intrusion, the manner in which it is

7     conducted, the justification for initiating it, and the place

8     in which it is conducted, that's 441 U.S. 520.  And see also

9     *Bame versus District of Columbia*, 637 F.3d 380 from this

10    Circuit, and *Grissom versus District of Columbia*, 853 F.Supp.2d

11    118, which noted that the unreasonableness inquiry is a

12    particularized one, taking into account the facts and

13    circumstances of the particular case.

14              Courts have also held that manual body cavity

15    searches must be conducted with probable cause.  *Gonzalez*

16    *versus City of Schenectady*, 728 F.3d 149.  The Second Circuit

17    upheld the lawfulness of a manual body cavity search of an

18    arrestee because officers had probable cause to conduct it.   In

19    *Spencer versus Roche*, 659 F.3d 142, the First Circuit said:

20    Applying the *Bell* balancing test, we have upheld digital

21    searches of a vagina and rectum when supported by probable

22    cause and appropriately carried out by medical professionals.

23    See *Evans versus Stephens*, 407 F.3d 1272, says that officers

24    must have at least reasonable suspicion to conduct either strip

25    searches or when a search includes touching genitalia or

1    penetrating anuses.

2              Finally, a court in this district has found that

3    where the plaintiff was arrested for simple assault and a

4    federal protective services officers fondled and manipulated

5    the plaintiff's genitals over his clothes while searching him,

6    the Court denied defendant's motion to dismiss on qualified

7    immunity grounds, holding that no reasonable objective officer

8    would conclude that an extensive exploration of a person could

9    include fondling and sexual assault as alleged in this case.

10   That was the *Dickey* case, 174 F.Supp.3d at 372.

11             Thus, the Court finds that the right to be free from

12   a sexually intrusive search when conducted without probable

13   cause is a clearly established right.

14             Defendant says he has submitted a video of the

15   searches that conclusively demonstrates that no constitutional

16   violation occurred.  It's Exhibit H to Doe's motion and the

17   parties have been referring to it as the Blue Plains Video.

18             Doe points out that the search of Horse only lasts 19

19   seconds and they only pat down Horse's buttocks for one second.

20   And that's at the Blue Plains Video at 5 minutes and 12 seconds

21   to 5:31.  He also points out that Gonzalez's search lasts only

22   35 seconds and that the video shows that he pats down the groin

23   and buttocks area outside of Gonzalez's pants, contrary to

24   Gonzalez's allegation that Doe reached inside his underwear.

25   And for that he points to the video at 8 minutes and 50 seconds

1    to 9 minutes and 25 seconds.

2          But the video evidence submitted is shot from a

3    distance, it's somewhat bury, and there's no sound.  And the

4    D.C. Circuit had problems with a video like that in *Fenwick*

5    *versus Pudimott*, P-U-D-I-M-O-T-T, 778 F.3d 133, where the video

6    was blurry and soundless, the Court had trouble drawing

7    conclusions from the video and it did little to affect the

8    Court's analysis.

9          It is difficult to see exactly where Officer Doe's

10   hands are, although with respect to plaintiff Horse they do

11   generally appear to be outside of his clothes.  The video does

12   not conclusively establish that Officer Doe only searched above

13   Gonzalez's clothes, however, because Doe was standing behind

14   Gonzalez in the video and Gonzalez is facing the camera, so

15   it's difficult to tell what he's doing.

16          Furthermore, at the 5 minute, 20 second point of the

17   video, Officer Doe's hands are near or on Horse's groin and

18   buttocks area.  At both points in the video plaintiff Horse

19   does something that can be characterized as flinching.  Horse

20   has also submitted a sworn declaration stating that Officer

21   John Doe did indeed assert a finger in his anus.  And that's

22   docket 58-4, paragraph 7.

23          At 9 minutes and 8 seconds into the video, Gonzalez

24   is required to stand with his legs further apart.  And in his

25   sworn declaration he attests that it was Doe who asked him to

1    spread his legs.  That's the Gonzalez declaration, Docket 58-3,

2    at paragraph 10.

3          At 9 minutes and 13 seconds into the video Gonzalez

4    also visibly flinches, he turns back and says something to Doe.

5    Furthermore, he avers that Officer Doe touched his testicles

6    and inserted a finger into his anus in the declaration.

7          Summary judgment is appropriate if the movant shows

8    that there was no genuine dispute as to any material fact and

9    the movant is entitled to summary judgment as a matter of law.

10   The party seeking summary judgment bears the initial

11   responsibility of informing the district court of the basis for

12   its motion and identifying those portions of the pleadings,

13   depositions, answers to interrogatories and admissions on file,

14   together with affidavits, if any, which it believes demonstrate

15   the absence of a genuine issue of material fact, which we all

16   know the Supreme Court said in *Celotex Corporation versus*

17   *Catrett*, 477 U.S. 317.

18         In assessing a party's motion, the Court must view

19   the facts and draw reasonable inferences in the light most

20   favorable to the party opposing the summary judgment motion,

21   which is the plaintiff in this instance.

22         The Blue Plains Video is not so conclusive that I can

23   rule as a matter of law at this time that no genuine issue of

24   fact remains for the jury.  And if the body cavity or intrusive

25   search did occur, there are currently not enough facts on the

1     record to determine whether the search is reasonable or

2     conducted with probable cause.  And, therefore, the motion for

3     summary judgment, Count 16, will be denied.

4          However, plaintiffs, especially plaintiff Horse,

5     should carefully evaluate the strength of the evidence on these

6     counts, given the fact that whatever took place, and it took

7     place in an instant, and there's little in the video to support

8     the allegations that the officer placed his hand inside the

9     detainee's clothes, nor does the video support the original

10    description of this event as involving a group of men lined up.

11         So this ruling is without prejudice to the renewal of

12    the motion at the close of discovery.  And even if the claims

13    survive that round of briefing, it is worth considering that it

14    is not clear how concerned a jury will be about these very

15    brief encounters.

16         At this point the Court need not address the

17    admissibility of the supposed 404(b) evidence or the allegedly

18    impermissible hearsay submitted because the Court finds that

19    defendant's motion for summary judgment must be denied even

20    without considering that evidence at all.

21         Therefore, for everything -- all the reasons I've

22    just stated, defendant's motion to dismiss the Horse complaint,

23    at Docket 38, is granted as to Claims 2, 4, 5, 8, 9, 10, 13,

24    and 14.  The motion is denied as to all other claims.  The

25    municipal liability claims under § 1983 cannot proceed against

1    the District on the final policy maker theory, but they may

2    proceed on the failure to train and failure to supervise

3    grounds.  And Docket 55, Defendant John Doe's motion to dismiss

4    and motion for summary judgment, is denied.

5           But, we're not done.  All right.  There's another

6    complaint.  And I don't -- I don't mean by my jocular tone to

7    belittle the seriousness of anything that is in this case,

8    either what's alleged by the defendants or the officers'

9    insistence on the reasonableness of their actions, it's just

10   4 o'clock in the afternoon on a Friday, and that's all my tone

11   reflects.

12          In *Schultz versus District of Columbia*, civil action

13   18-0120, plaintiffs Jesse Schultz, John Baker, Alexander Stokes

14   Contompasis were among those demonstrating against President

15   Trump on January 20th, 2017.  In this case the operative

16   document is the complaint at Docket 1.  Schultz participated in

17   the march as a protester.  Baker attend the demonstration as

18   street medic, Contompasis was a journalist covering the

19   demonstration.  All of the plaintiffs were detained in the

20   kettle and arrested.  And unlike the plaintiffs in Horse, none

21   of these three complain that they were pepper sprayed or

22   assaulted.

23          They've brought a class action lawsuit against the

24   District of Columbia, Chief of Police Peter Newsham, and ten

25   members of the MPD; Lamar Green, Robert Alder, Jeffrey Carrol,

1    Keith Deville, Paul Niepling, Michael Howden, Melvin

2    Washington, Gregory Rock, Daniel Thau, and Anthony Alioto in

3    the complaint's paragraphs 8 to 10.  They allege six claims on

4    behalf of themselves and those similarly situated.

5              Claim 1, violation of the Fourth Amendment for false

6    arrest.  Claim 2, common law false arrest.  Claims 3 and 6,

7    violations of the First Amendment Assemblies Act and negligence

8    per se based on the First Amendment Assemblies Act.  Claim 4 is

9    a violation of the First Amendment.  And 5 is a violation of

10   the Fourth and Fifth Amendments for the conditions of

11   confinement.

12             Schultz and Baker purport to represent the false

13   arrest class in paragraph 5 and -- how do I pronounce his name?

14             MR. LIGHT:  Contompasis.

15             THE COURT:  You added a syllable.

16             MR. LIGHT:  Contompasis.

17             THE COURT:  -- represents the confinement class.

18             Do you need a break?

19             THE COURT REPORTER:  Is it much longer?

20             THE COURT:  It's really not that much longer.  It's,

21   like, nine, ten pages with my big print.

22             THE COURT REPORTER:  Let's finish.

23             THE COURT:  And, really, if you need one, just

24   holler.

25             Defendants move to dismiss all claims under Rule

1    12(b)(6), at docket 12.  For the reasons set forth in *Horse*

2    *versus District of Columbia*, 17-CV-1216, the motions will be

3    denied as to Count 1, arrest without probable cause; Count 2,

4    common law false arrest; and Count 5, violations of the Fourth

5    and Fifth Amendments regarding the conditions of confinement.

6            The municipal liability claims in Counts 1 and 5 will

7    be permitted to proceed on the failure to supervise and failure

8    to train theory, but not on the theory that the chief was a

9    final policy maker.

10           Counts 3, 4, and 6 warrant additional discussion

11   because there the factual allegations vary from the *Horse*

12   factual allegations.

13           With respects to Count 3 and 6, negligence per se

14   arising out of violations of the First Amendment Assemblies

15   Act, they allege violations of six provisions, but the

16   provisions they rely on are not the same as those in *Horse*,

17   although there was some overlap.

18           As stated earlier, with respect to *Horse*, there is no

19   private cause of action under the statute, so plaintiffs can't

20   proceed on that ground.  And plaintiffs cannot proceed on a

21   negligence per se theory because the provisions they rely on

22   are either not meant to promote public safety or they don't set

23   forth specific guidelines that govern behavior under the test

24   set forth in *McNeil Pharmacy versus Hawkins*, 686 A.2d 567.

25           One of the provisions plaintiffs rely on is

1     § 5-331.04(c), which states:  No time, place, or manner

2     restriction regarding a First Amendment assembly shall be based

3     on the content of the beliefs expressed or anticipated to be

4     expressed during the assembly, or on factors such as the attire

5     of appearance of persons participating or expected to

6     participate in an assembly, nor may such restrictions favor

7     non-First Amendment activities over First Amendment activities.

8          Plaintiffs cannot bring a negligence per se claim

9     under this particular provision because it is not a public

10    safety provision.  Rather, this provision, instead of promoting

11    public safety, is meant to ensure that police don't infringe on

12    individual's First Amendment rights.

13         The five other provisions plaintiffs rely on for

14    their negligence per se claims are:  § 5-331.07(c), which says:

15    Where participants in a First Amendment assembly, or other

16    persons engaged in unlawful disorderly conduct, violence

17    towards persons or property, or unlawfully threatened violence,

18    the MPD shall, to the extent reasonably possible, respond by

19    dispersing, controlling, or arresting the persons engaged in

20    such conduct, and not by issuing a general order to disperse.

21         § 5-331.07(b)(1), where participants in a First

22    Amendment assembly fail to comply with reasonable time, place,

23    and manner restrictions, the MPD shall to the extent reasonably

24    possible, first seek to enforce the restrictions through

25    voluntary compliance and then seek, as appropriate, to enforce

1      the restrictions by issuing citations or arresting.

2            § 5-331.07(e)(1), if and when the MPD determines that

3      a First Amendment assembly shall be dispersed, they shall issue

4      at least one clearly audible and understandable order to

5      disperse using an amplification system or device and shall

6      provide the participants a reasonable and adequate time to

7      disperse and a clear and safe route for dispersal.

8            § 5-331.08, no emergency area or zone will be

9      established by using a police line to encircle them, except

10     where there is probable cause to believe that a significant

11     number or percentage of the persons have committed unlawful

12     acts, the police have the ability to identify them, have

13     decided to arrest them.

14           And then § 5-331.12(b)(2), the MPD shall provide to

15     any person not released within a reasonable time of arrest food

16     appropriate to the person's health.

17           All these provisions use non-specific words and

18     phrases such as "reasonably possible," "as appropriate," "if

19     and when the MPD determines," "adequate time," "probable

20     cause," "significant number," "ability to identify,"

21     "reasonable time," and "appropriate."  These statutes give the

22     MPD considerable discretion and it would be difficult to

23     evaluate a negligence claim using these as standards of care

24     without resorting to the general standard of reasonableness

25     required.  And I think I set forth all the cases that require

1     that fully already.  Therefore, these provisions can't serve as

2     a basis for the Schultz plaintiffs' negligence per se claim.

3           Plaintiffs say if they can't allege negligence

4     per se, then they can allege general negligence and should be

5     afforded the opportunity to demonstrate what the applicable

6     standard of care was through expert testimony.

7           But, the plaintiffs haven't pled a general negligence

8     claim in their complaint.  Their negligence claims are framed

9     only as negligence per se.  If you look at the complaint at 29,

10     Count 3, negligence per se, violation of the First Amendment

11     Assembly Act.  Count 6, negligence per se, same thing.  The

12     extent to which they allege general negligence is as follows:

13     To the extent that the violations of the First Amendment

14     Assembly Act were not intentional, they were negligent and

15     constitute negligence per se.  That's a far cry from what is

16     required in a complaint to plead general negligence, in which

17     the complaint must specify a negligent act and characterize a

18     breach of the duty which gives rise to liability.

19           The D.C. Court of Appeals says:  We note that the use

20     of the terms "carelessly and negligently," without more, are

21     conclusory and don't raise a cognizable claim of negligence.

22     *D.C. versus Chinn*, 839 A.2d 701.  The complaint is devoid of

23     any allegation of a duty that the officers owed to plaintiffs

24     or a breach of that duty.

25           In their opposition plaintiffs allege for the first

1    time that their allegation of negligence is based on the theory

2    that the defendants' actions leading up to the actual arrest of

3    Schultz and Baker were negligent.  They state now that the

4    defendants had a duty to take certain steps to separate the

5    lawbreakers from the remainder of the individuals present prior

6    to making arrests and the defendants failed to do so.  They

7    also argue that MPD officers have a common law duty to exercise

8    reasonable care under the circumstances for the protection and

9    safekeeping of arrestees in their custody and control.  But

10   it's well settled that plaintiffs cannot amend their complaint

11   through their opposition.  Thus, they failed to state a claim

12   for negligence or negligence per se, and Counts 3 and 6 are

13   dismissed without prejudice.

14           Count 4 is the First Amendment violation arrest,

15   protected speech.  Plaintiffs Schultz and Baker claim that

16   Defendant Deville violated their First Amendment rights because

17   he targeted individuals for arrest without probable cause based

18   on their actual or perceived anarchist or anti-capitalist

19   ideology or their association with such individuals.

20   Defendants say the officer is entitled to qualified immunity

21   because he acted pursuant to probable cause and plaintiffs fail

22   to allege a violation of their clearly established rights.

23   Unlike in *Horse*, defendants do not argue that plaintiffs have

24   failed to allege causation.

25           As I stated earlier, to establish a claim for

1   retaliation under the First Amendment, an individual must prove

2   that he engaged in protected conduct, the government took some

3   retaliatory action sufficient to deter a person of ordinary

4   firmness in plaintiff's position from speaking and there exists

5   a causal connection between the exercise of a constitutional

6   right and the adverse action taken against him.  That's the *Doe*

7   case from this circuit that I cited earlier.

8          Plaintiffs have a clearly established First Amendment

9   right to be free from arrest without probable cause based on

10  their speech, and plaintiffs have asserted enough facts to

11  show, as in *Horse*, that the arrest itself was not based on

12  probable case.  Furthermore, unlike the First Amendment claim

13  in *Horse*, plaintiffs in the Schultz complaint have alleged that

14  Officer Deville arrested individuals because they were

15  demonstrating.

16          In paragraph 88 of the complaint, plaintiff alleges

17  that he stated that the group was problematic because they were

18  anarchist or anti-capitalist and that he didn't want the

19  protesters to reach New York Avenue and 11th Street because it

20  was, quote, the footprint of capitalism, close quote.  This is

21  enough to raise an inference of causation.

22          Therefore, the First Amendment claim in this

23  complaint will not be dismissed.  An analysis of whether the

24  plaintiffs have come forward with the evidence they need will

25  be more appropriate at the summary judgment stage.  Therefore,

1    defendant's motion to dismiss, Docket 12, is granted as to

2    Claims 3 and 6, and the other claims will move forward.

3          Now, at this point, as we all know, defendants are

4    going to have to answer, they're going to have time to do that,

5    and then the next step is to hold an initial scheduling

6    conference, guided by a meet and confer report that the parties

7    submit, giving me a proposed schedule for further discovery in

8    this case.  And we've already had a lot of discovery, which was

9    helpful in enabling the plaintiffs to name the defendants in

10   the case.

11         But, it does seem reasonable and prudent for the

12   parties to take a really hard look at their respective cases

13   now and for the parties to give serious consideration to the

14   early mediation that the District is not usually prepared to

15   undertake.

16         The criminal case was from inauguration day, which

17   presumably involved individuals who were allegedly more

18   involved in the unrest than these plaintiffs, did not fare well

19   at all.  There's been a lot of public scrutiny of the way the

20   day was managed already.  And from the plaintiffs' perspective,

21   while they may have valid claims that they were wronged, the

22   damages may not be substantial.

23         So I'm going to ask the parties to inform me, in 30

24   days, when the answer is due, whether they would agree to

25   mediation now with a magistrate judge or through the court's

1    mediation program or the circuit mediator herself.

2           So think about it.  I think this is a case that cries

3    out for that sort of result.  And to spend a lot of time and

4    money on discovery in the meantime may not make a lot of sense.

5           Based on what you tell me when the answers are

6    submitted and this notice is provided to me, then I'll either

7    set a schedule for the Rule 16.3 report or I will take,

8    immediately, steps to provide you with the referral that you

9    seek.

10          So, that would make your answers due -- when would 30

11   days from today be?  I think it's still September 26, but it's

12   possible that it could be the next day.

13          THE COURTROOM DEPUTY:  It's Friday, the 27th, Your

14   Honor.

15          THE COURT:  So October 26th is a Saturday.  So how

16   about October 25th for the answers in this case?  Does that

17   give the District enough time?  I realize that we are talking

18   about a lengthy complaint, so I'm willing to hear you, if

19   that's not enough time.

20          MR. BLECHER:  They are --

21          THE COURT:  They are shorter now than they used to be

22   though.

23          MR. BLECHER:  They are.  Thank you for the

24   opportunity to address the Court.  And thank you for the

25   incredible work that you did in working through all the

1    allegations.

2            In terms of answering the complaint, I thought I just

3    understood the Court to say that there was going to be a period

4    of time for the parties to put their heads together and decide

5    what next steps are.  I thought I heard Your Honor say that

6    that was a period of time for, in addition to considering

7    mediation, to propose a date for the answer to the complaint;

8    that would be our position, if we could think about that.  It

9    is going to take a considerable amount of time to wade through.

10   I mean, Your Honor knows it's something like 500 total

11   allegations.

12           THE COURT:  That's fine with me.  If the District --

13   well, I think that would be fine.  But then I don't think -- I

14   don't want to delay things substantially to have you spend

15   other month and come together and say we have no intention of

16   mediating at this phase.

17           MR. BLECHER:  Of course.

18           THE COURT:  And then there's another month to answer

19   and then we get around to the Rule 16.3 report.  So I thought

20   the two things could go on a parallel track.

21           What's the plaintiffs' response?  I mean, if you

22   think that this is the kind of thing that in good faith there's

23   going to be some serious consideration about this, then I would

24   like you to focus on that.  And it's not as if there haven't

25   been -- it hasn't been around for a long time already, for

1    reasons through no fault of anyone, for everybody doing what

2    needs to be done to get this right.

3          But what's the plaintiffs' perspective about whether

4    we can say let's figure this issue out first and then maybe we

5    could do the answer and the Rule 16.3, if we have to, on the

6    same track?

7          MR. MICHELMAN:  Your Honor, having just conferred

8    with counsel for the *Schultz* matter, plaintiffs' position is

9    that the Court's concern about delay is well taken.  It's very

10   important to us.  That said, we're willing to give the District

11   a short amount of time to think about if they're serious about

12   mediation.

13         So we would counter-propose that they get two weeks

14   to see if they are serious about mediation, and then their time

15   to answer would need to start so we can get moving on this

16   case.

17         THE COURT:  All right.  Well, I'm going to split the

18   difference a little bit here because we are talking about an

19   organization and running things up the flagpole and getting a

20   lot of people to think about it, we have some Jewish holidays

21   in the interim.  So I'm going to ask for a status report from

22   the parties on the 18th of October, letting me know if you

23   would like to be referred for mediation.  Obviously, at that

24   point if there's some serious communication still going on and

25   you need some extra time, you'll let me know.  But then, I

```
1    would, at that date, if you're not interested and that's clear,

2    set a date for the answer and probably the Rule 16 report at

3    the same time.  So as soon as the answer lands, we're in court

4    talking about what the schedule will be for further

5    proceedings.

6           Okay.  Is there anything further I need to take up on

7    behalf of the defense right now?

8           MR. BLECHER:  Just a point of clarification, Your

9    Honor.  So in the status report that the parties file on the

10   18th, we should inform the Court whether mediation will be --

11   is an avenue that the parties are willing to pursue, propose a

12   date for an answer.  And would you prefer -- would the Court

13   prefer that we propose a schedule going forward, or is that

14   something the Court is going to set unilaterally after setting

15   the answer date?

16          THE COURT:  Well, if you are agreed as of the 18th

17   that the case is going forward, if you want to propose a

18   schedule for your answer and for when the 16.3 report will be

19   due, that will be fine.  The Rule 16 report usually includes,

20   then, the discovery schedule.  And if you want to put all that

21   in there, that's fine.  But that may be a lot to get done by

22   the 18th.

23          What I would really like to know by the 18th is do

24   you have a desire to be referred for mediation?  And if you do,

25   do you want to go to a magistrate judge?  Do you want to go to
```

1     the court's ADR program, where they tend to bring in a private

2     lawyer who has some experience with the subject matter?  Or to

3     have me go directly to our circuit mediator and say this case

4     is of the magnitude that I would like you to handle it

5     personally?  Or if you have some other suggestion; you would

6     like to go to a senior judge?  I've had some success in that

7     situation.  There are Superior Court judges that occasionally

8     hear cases here because of the overlap between D.C. claims that

9     people have looked to.

10              So, you can be creative.  If you want to bring in an

11    outside mediator, that would, I think, then probably be at the

12    parties' expense.  So, think about it.  If you're serious about

13    it, that's what I need to know on the 18th.  And if you can at

14    that point, tell me when you agree the next things would be

15    due.  If you don't agree, that would be fine, too.

16              MR. BLECHER:  Thank you, Your Honor.  And if I could

17    just state on the record, since we're all here, the time and

18    energy that it's going to take in the next 21 days or whatever

19    it is to confer with everybody and decide whether this is going

20    to happen is not going to give my colleague nor I a ton of time

21    to be working on answering a complaint --

22              THE COURT:  All right.  Well, I understand that and I

23    think it's in everyone's interest to have you devote the time

24    and effort to this, thinking this through in a thorough way

25    that considers both sides' interests.  Often at the end of the

1    day this is the kind of case that's going to end up with a

2    negotiated resolution.  And so if there's a way to have it take

3    less time, that may be beneficial for everybody.

4            MR. BLECHER:  Thank you.  The District appreciates

5    the Court's time.

6            THE COURT:  All right.  Anything further I need to

7    take up for any of the plaintiffs right now?

8            MR. MICHELMAN:  Yes, Your Honor.  The Claim 16 is

9    against a John Doe who has been identified to the Court.  The

10   parties -- with respect to John Doe, the plaintiffs and counsel

11   for Mr. Doe agreed that there would be -- we wouldn't -- we

12   would agree to keep his identity sealed pending Your Honor's

13   ruling.  But I believe the agreement was that his identity

14   would become unsealed should the claim against him proceed.  So

15   I would be asking --

16           THE COURT:  I don't think we need to decide that at

17   this particular moment.  I think, first, you two need to confer

18   among yourselves to find out if you have an agreement or you

19   don't have an agreement and what the nature of that agreement

20   is.  And if there's a dispute about what happens next and when,

21   then you can bring that to my attention when we start talking

22   about the scheduling order and the meet and confer and all

23   that.  But I don't think I have to decide that at this moment.

24           MR. MICHELMAN:  Thank you, Your Honor.

25           THE COURT:  I can't decide anything else today.

```
 1              MR. MICHELMAN:  And plaintiffs, like the District,
 2    appreciate the Court's thoroughness and time devoted to this
 3    incredibly complicated case.
 4              THE COURT:  Yes.
 5              MR. LIGHT:  Your Honor, in the Schultz case we
 6    currently have stayed the deadline for certifying the class.
 7    And I wanted to have that stay extended so the parties can have
 8    the discussions as Your Honor contemplated.
 9              THE COURT:  Absolutely.  That sounds like a good
10    idea.  All right.
11              MR. LIGHT:  Okay.  Perhaps we could stay it until
12    the --
13              THE COURT:  Well, if it's just stayed, it's stayed.
14    It doesn't have to have an end date.
15              MR. LIGHT:  Okay.  Thank you.
16              THE COURT:  And that can be part of the scheduling
17    thinking, if we end up moving forward with a schedule.
18              MR. LIGHT:  I'm not positive, but I seem to recall
19    the stay currently has an end date that's keyed to the
20    resolution of the motion to dismiss.  But if we could just stay
21    it indefinitely for now.
22              THE COURT:  Right now I'll just stay it.  Let's do it
23    until at least October 18th.  We'll see where we're headed from
24    there.  But I think it's still premature to start dealing with
25    the class allegations.
```

1            MR. LIGHT:  Thank you, Your Honor.

2            THE COURT:  All right.  Okay.  Thank you, everybody,

3    for your patience.  Especially Janice, who deserves a round of

4    applause at this point, surviving this afternoon.

5            All right.  Thank you, everybody.

6                         *   *   *

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5    foregoing constitutes a true and accurate transcript of my

6    stenographic notes and is a full, true and complete transcript

7    of the proceedings to the best of my ability.

8                         Dated this 14th day of October 2019

9

10

11                    _____

12                    Janice E. Dickman, CRR, CMR, CCR
                      Official Court Reporter
13                    Room 6523
                      333 Constitution Avenue, N.W.
14                    Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25