**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PAMELA GOODWIN, *et. al.*,

         *Plaintiffs*,

   v.

DISTRICT OF COLUMBIA, *et. al.*,           Case No. 1:21-cv-00806 (BAH)

    *Defendants*.

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................... ii

**BACKGROUND** ........................................................................... 2

**LEGAL STANDARD** ...................................................................... 4

**ARGUMENT** .............................................................................. 5

    **I.**   **PLAINTIFFS HAVE STATED VIABLE CLAIMS FOR MUNICIPAL LIABILITY AGAINST THE DISTRICT** ................................................ 5

        A.  Plaintiffs Have Stated A Claim Pursuant to the Policymaker Theory of *Monell* Liability ........................................................................ 6

            1. Plaintiffs Allege Defendant Newsham Ordered the Actions that Caused Plaintiffs' Injuries ............................................. 7

            2. Plaintiffs Allege Defendant Newsham Ordered Arrests for Simple Curfew Violations Only for Protesters............................. 10

        B.  Plaintiffs Have Stated A Viable *Monell* Claim Pursuant to a Failure to Train Theory of *Monell* Liability................................................. 10

        C.  Plaintiffs' Complaint Alleges Unconstitutional District Policies and Customs .............. 14

    **II.**  **DEFENDANT NEWSHAM IS NOT ENTITLED TO QUALIFIED IMMUNITY** ........ 16

        A.  Plaintiffs Adequately Allege that Defendant Newsham's Actions Violated the Constitution ................................................................ 16

        B.  Defendant Newsham's Actions Violated "Clearly Established" Law .............................. 19

    **III.**  **PLAINTIFFS HAVE ALLEGED A VIABLE FIRST AMENDMENT RETALIATION CLAIM BASED ON CONDITIONS OF CONFINEMENT** ............................................. 20

    **IV.**  **THE FIRST AMENDMENT ASSEMBLIES ACT SUPPORTS PLAINTIFFS' NEGLIGENCE PER SE CLAIM** .............................................................. 24

        A.  The FAAA is a Public Safety Statute Intended to Protect Protesters like Plaintiffs ........................................................................... 25

        B.  The FAAA Sections Defendants Violated Are Adequately Specific and Impose Standards Distinct from the Common Law Duty of Reasonable Care ................. 25

        C.  Plaintiffs Have Adequately Alleged that Defendants Decided to Disperse the Protest............................................................................. 30

**CONCLUSION** ............................................................................ 30

i

# **TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                             <u>Pages</u>

*Alsaada v. City of Columbus*, No. 2:20-cv-3431, 2021 WL 1725554
    (S.D. Oh. Apr. 30, 2021)................................................................... 8, 16

*Amnesty Am. v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004).........................................11

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016)................................................................22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................4, 16

*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) .........................................13, 16

*BEG Invs. v. Alberti*, 144 F. Supp. 3d 16 (D.D.C 2015)................................................24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................4

*Bible Believers v. Wayne Cnty.*, 805 F.3d 228 (6th Cir. 2015)................................................9

*Black Lives Matter D.C. et al. v. Trump et al.*, No. 20-cv-1469 (DLF), 2021 WL 2530722
    (D.D.C Jun. 21, 2021)..................................................................20, 24

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) ........................................................12, 16

*Brookens v. Solis*, 635 F. Supp. 2d 1 (D.D.C. 2009) ........................................................13

*Coclough v. District of Columbia*, C.A. No. 19-2317 (BAH) 2020 WL 5569947
    (D.D.C. Sept. 16, 2020) ..................................................................19

*Connick v. Thompson*, 563 U.S. 51 (2011)....................................................................11

*District of Columbia et al. v. Wesby*, 138 S.Ct. 577 (2018)......................................................19, 20

*District of Columbia v. White*, 442 A.2d 159 (D.C. 1982) ............................................................29

*Hardeman v. Clark*, 593 F. Supp. 1285 (D.D.C. 1984)..........................................................5, 8

*Harlow v. Fitzgerald*, 457 800 (1982) ........................................................................16

*Hartley v. Wilfert et al.*, 918 F. Supp. 2d 45 (D.D.C. 2013)......................................................22

*Hartman v. Moore*, 547 U.S. 250 (2006)........................................................................18

*Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987)..........................................................18

*Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) ...........................19

*Horse v. District of Columbia*, No. 1:17-cv-01216-ABJ (D.D.C. Sept. 27, 2019)...........27, 28, 29

*Hurd v. District of Columbia*, 997 F.3d 332 (D.C. Cir. 2021).............................................................5

*In re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 20-CV-8924
(CM)(GWG), 2021 WL 2894764 (S.D.N.Y. July 9, 2021).........................................13, 15

*Jarrett v. Woodward Bros. Inc.*, 751 A.2d 972 (D.C. 2000)..........................................................24

*Keating et al. v. City of Miami*, 598 F.3d 753 (11th Cir. 2010)....................................................17

*Kelleher v. Dream Catcher*, L.L.C., 263 F. Supp. 3d 322 (D.D.C. 2017)...............................4, 19

*Leary v. Daeschner*, 349 F.3d 888(6th Cir. 2003) ........................................................................17

*Marshall v. D.C. Caribbean Carnival*, No. 02–1298, 2004 WL 3257066,
(D.D.C. Oct. 26, 2004)...........................................................................................................27

*Matthews v. District of Columbia*, 730 F. Supp. 2d 33 (D.D.C. 2010) ..................................12, 13

*McComb v. Ross*, 202 F. Supp. 3d 11 (D.D.C. 2016) ....................................................................10

*McNair v. McMickens*, 115 F.R.D. 196 (S.D.N.Y. 1987)................................................................16

* *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ............................................... *passim*

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) .....................................................................................20

*Norris v. District of Columbia, et al.*, 737 F.2d 1148 (D.C. Cir. 1984)........................................19

*Osterhoudt v. City of New York*, No. 10 CV 3173, 2012 WL 4481927,
(E.D.N.Y.  Sept. 27, 2012)....................................................................................................13

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).................................................................7, 8, 9

*Pinson v. U.S. Dep't of Just. et al.*, 246 F. Supp. 3d 211 (D.D.C. 2017)......................................22

*Randall v. Prince George's Cnty., MD.*, 302 F.3d 188 (4th Cir. 2002)...................................14, 15

*Rong Yao Zhou v. Jennifer Mall Rest., Inc.*, 534 A.2d 1268 (D.C. 1987) .....................................29

*Rudder et al. v. Williams et. Al.*, 666 F.3d 790 (D.C. Cir. 2012)....................................................19

*Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1996) .................................................10, 15

*Scott v. Louisville/Jefferson County Metro Gov't*, 503 F. Supp. 3d 532 (W.D. Ky. 2020) ............8

*Shaw v. District of Columbia*, 944 F. Supp. 2d 43 (D.D.C. 2013) ................................................17

*Sibert-Dean v. Washington Metro. Area Transit Auth,* 721 F.3d 699 (D.C. Cir. 2013) ..........26, 27

*Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338 (D.C. Cir. 2018) ...............................4

*Simms v. City of New York*, 480 F. App'x 627 (2d Cir. 2012) ........................................................11

*Thompson v. District of Columbia*, 967 F.3d 804 (D.C. Cir. 2020) ................................................6

*U.S. States ex rel. Scollick v. Narula*, 2017 WL 3268857 (D.D.C. July 31, 2017) .................5, 19

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ...............................................10, 14

*Whetzel v. Jess Fisher Mgmt. Co.*, 282 F.2d 943 (D.C. Cir. 1960) ...............................................29

*Youngbey v. District of Columbia*, 766 F. Supp. 2d 197 (D.D.C. 2011) .......................................28

Statutes                                                                                                   Pages

42 U.S.C. § 1983 ......................................................................................................................*passim*

First Amendment Assemblies Act, D.C. Code §§ 5-331.01, 5-331.07(e), 5-331.16(b), 5-331.17
................................................................................................................................................*passim*

D.C. Code §§ 23-523(b), 521(f)(5), 522(c)(1)..............................................................................28

Other Authorities                                                                                          Pages

Fed. R. Civ. P. 8 ..............................................................................................................................10

Fed. R. Civ. P. 12(b)(6).....................................................................................................................4

.

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

Plaintiffs Pamela Goodwin, Allison Lane, Jenny Lazo, Sebastian Medina-Tayac, Jesse Pearlmutter, Osea Remick, Priyanka Surio, and Eliana Troper ("Plaintiffs") hereby submit this memorandum of points and authorities in opposition to Defendants District of Columbia ("the District"), Peter Newsham, Robert Glover, Andrew Horos, Carlos Mejia, James Crisman, and Steven Quarles's (collectively "Defendants") Partial Motion to Dismiss ("MTD").

Defendants' Motion largely seeks to dismiss theories of liability as opposed to causes of action, and Defendants do not challenge much of Plaintiffs' Complaint. Defendants seek only to dismiss Plaintiffs': (1) constitutional claims against the District based on two theories of *Monell* liability, ignoring the additional theories of liability in Plaintiffs' Complaint; (2) Section 1983 claims in Counts I and II against Defendant Newsham, leaving Plaintiffs' constitutional claims against the other named Defendants undisturbed; (3) First Amendment retaliation claim to the extent it is based on conditions of confinement, but not Plaintiffs' retaliation claim based on excessive force; and (4) negligence per se claim. As a result, regardless of the outcome of Defendants' Motion, Count III of Plaintiffs' Complaint (for assault and battery against all Defendants) will proceed to discovery; the District will remain a Defendant for the constitutional claims because of Plaintiffs' unchallenged *Monell* theories of municipal liability; and Plaintiffs' First and Fourth Amendment claims against Defendants Glover, Horos, Mejia, Crisman, and Quarles will remain.

With respect to the claims and theories that Defendants do seek to dismiss, Defendants ignore the plausibly pled allegations in Plaintiffs' Complaint, or do not afford them the required presumption of truth, and misapprehend applicable caselaw. First, Plaintiffs sufficiently allege that the District is liable for its agents' unconstitutional actions. Defendant Newsham, a high-

level policymaker responsible for the District's police practices, ordered, authorized, and ratified

the conduct at issue, and the District failed to train and supervise its officers. Second, Defendant

Newsham is not entitled to qualified immunity because the unconstitutional conduct that he

ordered, supervised, and ratified in this case violated Plaintiffs' clearly established rights. Third,

Plaintiffs' Complaint states a viable claim for First Amendment retaliation based on Plaintiffs'

detention and confinement on Swann Street, among other conduct that Defendants do not

challenge. Finally, Plaintiffs' claim for negligence per se, based on Defendants' violation of the

First Amendment Assemblies Act ("FAAA"), should survive because that statute imposes

specific duties upon Defendants that they breached in this case. Accordingly, the Court should

reject Defendants' Motion in its entirety.

## BACKGROUND

On June 1, 2020, Plaintiffs separately convened in Washington, DC to protest police

brutality. First Amended Complaint ("FAC") ¶ 2. Defendants—the District of Columbia, former

Metropolitan Police Department ("MPD") Chief Peter Newsham, and MPD supervisory officials

and officers—responded to Plaintiffs' peaceful protest activities with excessive force and

violence. *Id.* ¶¶ 1-3. Using MPD's controversial "kettling" technique, *id.* ¶¶ 43-45, Defendants

and MPD officers from multiple, specialized units forced Plaintiffs and other protesters onto

Swann Street, surrounded them, and sealed off the alley ways and street exits so that they could

not leave the block. *Id.* ¶¶ 42, 47, 49. Without warning and without giving any orders to disperse,

MPD officers closed in on Plaintiffs, among other protesters. *Id.* ¶¶ 47-49. In unison, officers

wielded shields, batons, and pepper spray; shouted "move back;" and charged toward Plaintiffs

and other protesters on the block. *Id.* ¶¶ 50-51. Even though Plaintiffs had not engaged in any

violent or dangerous behavior and tried to comply with Defendants' orders, officers pushed and

battered them with shields and batons and indiscriminately deployed pepper spray at them. *Id.* ¶¶ 51-54, 57, 61-65. Each Plaintiff was assaulted by Defendants on Swann Street, and each suffered the effects of Defendants' chemical irritants. *Id.* ¶¶ 51-65, 104-105.

After enclosing Plaintiffs in the kettle and assaulting them, Defendants held Plaintiffs, and other protesters, on Swann Street for hours. *Id.* ¶ 72. Many Plaintiffs were physically detained on Swann Street and restrained in tight, painful zip ties. *Id.* ¶¶ 5, 74, 76, 79, 83, 93-94, 96. After being detained for hours on Swann Street, Plaintiffs were then transported, processed, and held overnight at MPD's facility in Blue Plains. *Id.* ¶¶ 72-76, 78, 80, 82-85. While at the MPD facility, Plaintiffs were denied food, water, and access to restrooms before ultimately being released with a citation to appear in court. *Id.* ¶¶ 91, 92-97. Confirming that Plaintiffs had not done, or were not even suspected of doing, anything involving violence or property damage, Defendants only charged Plaintiffs with misdemeanor curfew infractions. *Id.* ¶ 97.

Defendants' disproportionate response in kettling and using pepper spray and other physical force to detain or arrest Plaintiffs for purported, minor curfew violations was in retaliation for Plaintiffs' protected speech. *Id.* ¶ 99. Defendants only enforced the District's curfew against people, like Plaintiffs, who participated in protests on June 1. *Id.* Other people who were outside after the curfew time on June 1, but who had not been participating in protests, were not arrested solely for curfew violations, and were not hit with batons, pepper sprayed, restrained with zip ties, or held for hours. *Id.* ¶¶ 99-101.

Defendants' response to Plaintiffs' protest activities is part and parcel of the District's typical response to demonstrators, particularly those critical of the police. *Id.* ¶¶ 66-69, 100-102. The "kettling" technique is part of MPD's express policies for responding to First Amendment assemblies, and has consistently been used over decades, along with physical force, to trap and

detain protesters, even when those protesters have not engaged in any violent conduct warranting the use of force. *Id.* ¶¶ 44-45, 66-69. It was carried out by officers acting in coordination. *Id.* ¶¶ 47, 50, 66. Defendant Newsham, who was responsible for making policy decisions concerning the District's police processes and tactical responses, *id.* ¶ 19, supervised and directed the actions of MPD's supervisors and officers on the ground, including Defendants Glover, Horos, and Meija ("Supervisory Defendants"). *Id.* ¶¶ 3, 19-24, 32, 34, 40, 46, 51, 66, 69-70, 73, 102, 110-111, 117-118. Defendant Newsham directed, authorized, and supervised the decisions for officers to use the District's kettling technique, deploy pepper spray and other force against non-violent protesters, and detain or arrest Plaintiffs because they had engaged in protected speech activities. *Id.* ¶¶ 40, 46, 51, 66, 69-70, 73. Defendant Newsham subsequently took responsibility for, and defended, MPD's actions as consistent with MPD's official policies. *Id.* ¶ 69.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff is required only to allege "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For a claim to be plausible, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must "accept the plaintiff's factual allegations as true and construe the complaint liberally, granting plaintiff the benefit of all inferences that can reasonably be derived from the facts alleged." *Sickle v. Torres Advanced Enter. Sols, LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018). At the motion to dismiss stage, plaintiffs are permitted to plead with less specificity, including on information and belief, regarding information in defendants' possession to which plaintiffs would not have access prior to full

4

discovery, *see, e.g.*, *Kelleher v. Dream Catcher*, L.L.C., 263 F. Supp. 3d 322, 325–26 (D.D.C.

2017), or where the plaintiff's belief relies on facts that render the allegation plausible, *see, e.g.*,

*United States ex rel. Scollick v. Narula*, 2017 WL 3268857, at *10 (D.D.C. July 31, 2017).

**ARGUMENT**

The Court should deny Defendants' Motion in its entirety. The factual allegations in

Plaintiffs' well-pleaded Complaint support each of their claims and theories of liability against

Defendants. Defendants' arguments to the contrary, addressed in turn below, are without merit.

## I.   PLAINTIFFS HAVE STATED VIABLE CLAIMS FOR MUNICIPAL LIABILITY AGAINST THE DISTRICT

The District is liable for the unconstitutional actions of its officers where, as alleged here,

an "official municipal policy of some nature caused the constitutional tort." *Hurd v. District of*

*Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*,

436 U.S. 658, 691 (1978)). Generally speaking, an "official municipal policy" can be shown in

four ways, any one of which is sufficient to state a claim under Section 1983:

> (1) the municipality adopts a policy that itself violates the Constitution; (2) the
> unconstitutional action was taken by a "policy maker" within the government; (3)
> the employees' unconstitutional actions are so consistent that they have become
> [a] custom of the municipality of which the supervising policymaker must have
> been aware; or (4) the municipality knew or should have known of a risk of
> constitutional violations, but showed "deliberate indifference" to that risk by
> failing to act.

*Hurd*, 997 F.3d at 337 (internal quotations omitted).

Plaintiffs' Complaint includes factual allegations that amply support each of these

theories and establish that the District had a municipal policy, practice, and custom of retaliating

and using excessive force against protesters engaging in protected speech. *See, e.g.*, FAC ¶¶ 33,

34, 44-46, 51, 69, 70 (alleging that officers retaliated and used force against Plaintiffs pursuant to

an official policy); *id.* ¶¶ 19-25, 32, 34, 40, 46, 51, 66, 69, 73, 102 (alleging that a municipal

5

policymaker ordered the retaliation and use of force at issue); *id.* ¶¶ 43, 45-47, 50-51, 54, 61-62, 66-69, 71 (alleging that the retaliation and use of force claimed in the Complaint was MPD's practice and custom, and that the District failed to train or supervise its officers to avoid continued violations). Defendants complain that Plaintiffs have not sufficiently alleged that a policymaker (Defendant Newsham) took any unconstitutional action against Plaintiffs or that the District's failure to train and supervise its employees was the result of any deliberate difference, *see* Dkt. 24, Defendants' Motion to Dismiss ("MTD") at 4-8, but they completely ignore Plaintiffs' allegations concerning the District's policies and practices that gave rise to the constitutional violations at issue. Contrary to Defendants' assertions, Plaintiffs have sufficiently alleged that (1) Defendant Newsham engaged in unconstitutional conduct sufficient to bind the District as a high-level policymaker responsible for the District's police practices; (2) the District, and Defendant Newsham, were sufficiently on notice of MPD officers' repeated constitutional violations against protesters engaged in protected activity, but failed to train, supervise, or otherwise intervene to correct this unconstitutional conduct; and (3) Plaintiffs' constitutional claims against the District must go forward, in any event, because Plaintiffs' *Monell* claims are based on additional theories of liability upon which Defendants have not moved or even considered.

A.  Plaintiffs Have Stated A Claim Pursuant to the Policymaker Theory of *Monell* Liability

Former MPD Police Chief Defendant Newsham had final policymaking authority over the District's police practices and ordered and supervised the unconstitutional retaliation and use of excessive force that resulted in Plaintiffs' injuries. *See, e.g.*, FAC ¶¶ 40, 46, 51, 66, 69-70, 73. His conduct as a policymaker is sufficient to bind the District.

Even a "single action" by a municipal official "can represent municipal policy where the acting official has final policymaking authority over the particular area, or particular issue." *Thompson v. District of Columbia*, 967 F.3d 804, 810 (D.C. Cir. 2020); *see also, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (holding that "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."). Defendants do not dispute that Defendant Newsham, in his capacity as Chief of Police, was a final policymaker on the District's police practices. Instead, Defendants contend that Plaintiffs have somehow failed to allege that Defendant Newsham (1) engaged in any unconstitutional conduct, *see* MTD at 4-6, or (2) made any conscious decision to target those engaged in protected activity for arrest, *see id* at 6. Both arguments fail.

    1. *Plaintiffs Allege Defendant Newsham Ordered the Actions that Caused Plaintiffs' Injuries*

Plaintiffs allege that Defendant Newsham ordered, supervised, ratified, and was thus directly responsible for, MPD officers' use of excessive force and retaliation that caused Plaintiffs' injuries. Defendant Newsham was the head of MPD on June 1. *See, e.g.*, FAC ¶ 19. He was responsible for directing MPD's day-to-day strategic and tactical decisions, which the District's officers are required to obey. *Id.* According to Plaintiffs' Complaint, he ordered, monitored, and supervised the conduct that Plaintiffs challenge. *Id.* ¶¶ 40, 46, 51, 66, 69-70, 73. For example, Plaintiffs allege that he was responsible for ordering and authorizing MPD officers, in riot gear, to kettle Plaintiffs and protesters, who were not violent or creating any public safety risk. *See id.* ¶¶ 19-25, 34, 51, 66, 73. Plaintiffs also allege that Defendant Newsham authorized, and directed supervisors to coordinate on the ground, the use of excessive force against Plaintiffs, including batons, shields, and pepper spray. *Id.* ¶¶ 40, 69. Plaintiffs allege that he directed his subordinates to do so almost immediately, *id.*, even though Plaintiffs had done

nothing to warrant any use of force against them, *id*. ¶¶ 49, 51, 53. Plaintiffs also allege that

Defendant Newsham ordered and authorized Plaintiffs' arrests, *id*. ¶ 102, and supervised and

directed Plaintiffs' off-site processing, *id*. at 73. Further, Plaintiffs also allege that the District is

liable because Defendant Newsham, as a policymaker, subsequently ratified and claimed

responsibility for the responding officers' actions. *Id*. ¶ 69.

These allegations of Defendant Newsham's specific conduct in ordering, authorizing, and

subsequently defending the unconstitutional conduct at issue are sufficient to state a claim for

*Monell* policymaker liability, particularly at this early stage of the proceedings. *See, e.g.,*

*Alsaada v. City of Columbus*, No. 2:20-cv-3431, 2021 WL 1725554, at *43 (S.D. Oh. Apr. 30,

2021) (finding plaintiff alleged sufficient facts to withstand a motion to dismiss against city

where police chief "provided the marching orders" that resulted in plaintiffs' constitutional

injuries); *Scott v. Louisville/Jefferson County Metro Gov't*, 503 F. Supp. 3d 532, 538 (W.D. Ky.

2020) (finding municipality was liable for constitutional violations were policymakers ratified

challenged conduct because the officials "knew that LMPD officers used certain crowd control

methods against protesters who were not exhibiting a threat to officers or to the public and that

the city officials approved of that conduct"); *Hardeman v. Clark*, 593 F. Supp. 1285, 1288

(D.D.C. 1984) (finding claim that police chief's actions resulted in the deprivation of plaintiff's

constitutional rights was actionable against the municipality and not based on *respondeat*

*superior* liability).

Despite Defendants' argument otherwise, there is no requirement in the caselaw that the

policymaker also be present at the scene of the events he set in motion, *see* MTD at 5, or

"specifically order[] and approve[] each action that…officers…tak[e] at every moment," *id*.

Indeed, the Supreme Court has reached the opposite conclusion. In *Pembaur*, for example, the

Supreme Court held that a municipality was liable for constitutional violations arising from a county prosecutor's (determined to be a municipal policymaker) instructions to law enforcement to enter a premises to execute an arrest warrant. *See* 475 U.S. 469. The policymaker providing these instructions was not on the scene of the events (law enforcement officers contacted him by phone, *id*. at 473); nor did the policymaker provide specific instructions as to how to enter the unit (the police decided to use an axe to gain entry, *id*. at 473). Nonetheless, the municipality was liable under *Monell* because a binding policymaker instructed law enforcement to enter the plaintiff's premises, and the instruction caused the violation of plaintiff's constitutional rights. *Id*. at 484. Similarly, here, Plaintiffs allege that Newsham gave specific orders and authorization to use force against and detain protesters that gave rise to Plaintiffs' constitutional injuries, even if he was not on Swann Street and directing the responding officers' every step. FAC ¶¶ 19-25, 34, 40, 51, 66, 69, 73, 102. By virtue of his position, a policymaker as high up on the chain as Newsham would naturally have "high-level involvement" in the events he set in motion. MTD at 7 (claiming that Plaintiffs' policymaker theory is somehow fatal because Plaintiffs' allegations against Defendant Newsham demonstrate "high-level" involvement in the events on Swann Street). But, as discussed above, these allegations are sufficient to withstand a motion to dismiss.

Nor does Defendants' argument that Plaintiffs have not sufficiently alleged policymaker liability because other named Supervisory Defendants also gave orders on the scene hold any water. *See e.g., Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 260 (6th Cir. 2015) (en banc) (finding *Monell* liability where policymaker instructed deputy chiefs of police to take actions that were found to violate the First Amendment). Plaintiffs clearly allege that the Supervisory Defendants were acting based on the directives that they received from Defendant Newsham when they ordered and authorized the challenged actions on Swann Street. *See, e.g.*, FAC ¶¶ 19-

25, 32, 34, 40, 46, 51, 66, 69, 73, 102. Those facts must be taken as true at this stage in the case, and Defendants' arguments should be rejected accordingly.[1]

2. *Plaintiffs Allege Defendant Newsham Ordered Arrests for Simple Curfew Violations Only for Protesters*

Defendants argue that Plaintiffs' Complaint does not establish that Defendant Newsham specifically targeted Plaintiffs, and other protesters, for arrest, *see* MTD at 6, but this argument requires the Court to disregard Plaintiffs' allegations. Plaintiffs allege that Defendant Newsham directed and ordered MPD's treatment of protesters, including their arrests on June 1. *See, e.g.,* FAC ¶¶ 19-25, 73, 102. Plaintiffs further allege that Defendants did not, and had no plan to, kettle, pepper spray, use force against, or arrest and detain individuals who were outside past curfew, but had not engaged in protest activities. *See, e.g., id.* ¶¶ 76, 4, 98-102. Rather, Plaintiffs contend that *only* those protesting were subjected to poor treatment and arrest for simple curfew violations because they engaged in protected activity. *See id.* ¶ 6. These allegations are sufficient to support Plaintiffs' claim that Defendant Newsham targeted protesters for adverse treatment.

B. Plaintiffs Have Stated a Viable *Monell* Claim Pursuant to a Failure to Train Theory of *Monell* Liability

Plaintiffs have plausibly alleged that the District's failure to train or supervise its officers caused their injuries. *See, e.g.,* FAC ¶¶ 18, 71. A "municipality may be liable under §1983 for its deliberately indifferent failure to train or supervise where the municipality knew or should have known of the risk of constitutional violations but adopt[ed] a policy of inaction." *McComb v. Ross*, 202 F. Supp. 3d 11, 17 (D.D.C. 2016) (citing *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (internal quotation marks omitted)). Defendants argue that the Court should

---

[1] Even if there is a contradiction between Plaintiffs' allegations that Newsham gave orders to supervisors and that supervisors gave orders on the scene—and there is not—it is well established that plaintiffs may plead inconsistent theories of liability. *See, e.g., Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996); Fed. R. Civ. P. 8(d).

deny Plaintiffs the opportunity to pursue their failure to train theory of liability at this early stage

because Plaintiffs have purportedly failed to allege facts regarding MPD's training and

supervision or supporting a claim of deliberate indifference. *See* MTD at 6-7. Defendants are

incorrect.

First, the caselaw imposes no requirement that a plaintiff have information about, and

thus plead, facts concerning the full contours of a defendant's training program to survive a

motion to dismiss.  At this stage, it is not the precise content of the District's training that forms

the basis of Plaintiffs' allegations, rather the District's failure to act or intervene despite

Plaintiffs' allegations that its officers have consistently used excessive force and retaliated

against demonstrators. *See, e.g.*, FAC ¶¶ 44-45, 67-68; *see also, e.g., Simms v. City of New York*,

480 F. App'x 627, 631 n.4 (2d Cir. 2012) ("There are a number of ways that plaintiffs can

plausibly allege a § 1983 claim for municipal liability premised on a failure to train theory

without having detailed knowledge of a municipality's training programs. For example, . . . by

alleging facts indicating [a] pattern of similar constitutional violations by untrained [municipal]

employees.") (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotation marks

omitted)).[2]

Here, Plaintiffs have alleged the existence of a widespread practice of retaliating and

using excessive force against protesters that has persisted for decades. *See, e.g.,* FAC ¶¶ 44-45,

67-68. Plaintiffs allege that the District has consistently deployed specialized units that have used

---

[2] To the extent Defendants contend that Plaintiffs are required, prior to discovery, to allege detailed facts about their training regimen, Rule 12(b)(6) requires no such thing where, as here, Plaintiffs have made plausible allegations showing any training to be insufficient. Indeed, courts have recognized that it is not reasonable to expect plaintiffs to have complete information regarding a defendant's training at the outset of a case; that is the purpose of discovery. *See, e.g., Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004) ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation.")

a combination of kettling, chemical agents, and excessive force to detain and arrest non-violent demonstrators, particularly those who have voiced criticism of the police or government. *See* FAC ¶¶ 46, 67-68. While Plaintiffs allege that this practice has occurred repeatedly and consistently in response to protected speech activities, *see, e.g.,* FAC ¶¶ 44-45, 67-68. Plaintiffs' Complaint also provides illustrative examples of several high-profile instances in which the District has used, and been sued for, the challenged tactics at issue here. *Id.* ¶ 68. In these prior instances, MPD officers acted together to kettle, pepper spray, batter, arrest, and detain non-violent demonstrators. *Id.* That is precisely what occurred on June 1 on Swann Street. *See* FAC ¶ *passim*. Plaintiffs' allegations concerning the number of officers and units that have been involved in the District's response to protected speech activity, and the repetition, consistency, and similarity of the unconstitutional conduct, both over the years and on Swann Street, are more than sufficient at this stage to support their theory that these repeated, unconstitutional acts are the result of the District's failure to train or supervise its officers. *See, e.g.*, *Matthews v. District of Columbia*, 730 F. Supp. 2d 33, 38 (D.D.C. 2010) ("Based on the number of instances of alleged unlawful misconduct, and the number of officers involved, it is 'plausible,' that the officers' behavior resulted from the District's failure to train or supervise its employees.") (citation omitted); *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989) (finding that joint actions of an entire portion of a police department created a reasonable inference that "the officers involved were operating under a shared set of rules[,] . . . [and] [a]bsent such a norm, it is highly unlikely such unanimity of action could occur.").

Second, despite Defendants' claim to the contrary, Plaintiffs have adequately alleged that the District's failure to train or supervise its officers was the result of its deliberate indifference to Plaintiffs' constitutional rights. When presented with facts showing that there has been, over

time, a number of instances of unlawful misconduct with large numbers of officers involved, a "[c]ourt can plausibly infer that the [unconstitutional actions] were not the result of rogue officers acting contrary to their training[,]. . . rather . . . the combination of these factors can demonstrate that the District of Columbia was deliberately indifferent to plaintiff's constitutional rights." *Matthews*, 730 F. Supp. 2d at 38 (internal quotation marks omitted). The facts described above make clear that the coordinated use of force by MPD officers on Swann Street closely resembles the unconstitutional tactics MPD officers have used to respond to several other First Amendment assemblies over the years, thus putting the District on adequate notice of its need to train or supervise its agents. *See, e.g., Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996) ("[F]requency of constitutional violations makes the need for further training . . . plainly obvious to the city policymakers.") (internal quotation marks omitted). Moreover, Plaintiffs allege that the District and Defendant Newsham were also on notice of a need to train and supervise MPD officers because of the many lawsuits that protesters have filed against MPD for its prior conduct. *See, e.g.,* FAC ¶ 68; *see also, e.g.*, *Osterhoudt v. City of New York*, No. 10 CV 3173, 2012 WL 4481927, at *1 (E.D.N.Y. Sept. 27, 2012) (finding that references in plaintiffs' lawsuit to other lawsuits based on similar conduct by police department supported *Monell* allegations); *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 2021 WL 2894764, at *8-9 (same).[3] In sum, Plaintiffs' Complaint sufficiently alleges that the District was on notice of MPD's frequent retaliation and excessive use force against protesters, yet failed to act to prevent such unconstitutional actions from continuing to occur, which supports Plaintiffs' *Monell* claim.

---

[3] The Court may take judicial notice of the existence of these lawsuits. *Brookens v. Solis*, 635 F. Supp. 2d 1, 6 (D.D.C. 2009) ("[P]rior lawsuits are matters of public record of which the Court was permitted to take judicial notice.").

C.  Plaintiffs' Complaint Alleges Unconstitutional District Policies and Customs

Finally, Plaintiffs' *Monell* claim must proceed to discovery because Plaintiffs plead additional theories of *Monell* liability that Defendants do not address in their Motion. In addition to alleging that Defendant Newsham (as a District policymaker) ordered the unconstitutional conduct at issue, *see supra* Section I.A, and that the District is liable for failing to train and supervise its officers, *see supra* Section I.B, Plaintiffs' Complaint also alleges that the District's policies, practices, and customs gave rise to the constitutional violations at issue. *See, e.g.,* FAC ¶¶ 44-45, 67-68. Because Defendants did not move on Plaintiffs' policy, practice, or custom theories of *Monell* liability, Counts I and II survive against the District.

Under *Monell*, the District is responsible for its officers' constitutional violations where the officers "acted pursuant to municipal policy or custom." *Warren*, 353 F.3d at 38 (citing *Monell*, 436 U.S. at 694). A policy may be found in a written "policy statement, ordinance, [or] regulation. . ." *Monell*, 436 U.S. at 690, and a custom exists where a practice is "persistent and widespread," even if it has "not received formal approval through the [municipalities'] official decisionmaking channels." *Id.* at 691 (internal quotations and citations omitted). To be a custom, the conduct "at least has been used on several different occasions." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (citation omitted). Plaintiffs have alleged both theories in their Complaint.

First, Plaintiffs have alleged that Defendants' conduct was the result of the District's formal, written policies, which caused Plaintiffs' constitutional violations. For example, Plaintiffs allege that the responding officers, dressed in riot gear, surrounded them, and used excessive force against Plaintiffs, even though Plaintiffs had not engaged in any violent or dangerous conduct, pursuant to specific written policies that the District has adopted for "First

Amendment" assemblies. *See, e.g.,* FAC ¶¶ 33, 44, 45, 51, 69. These policies, on their face and as applied, authorize violent kettling as a responsive tactic to confine peaceful demonstrators engaged in protected speech activities. *See, e.g., id.*

Second, Plaintiffs have also put forward sufficient factual allegations to show that the District has an unconstitutional practice or custom of retaliating and using excessive force against protesters engaging in protected speech, and that the District's custom resulted in Plaintiffs' injuries. As described in Section I.B., Plaintiffs' Complaint alleges that the District has consistently, and at least on "several occasions," *Randall*, 302 F.3d at 206, used the same kind of force and tactics against peaceful protesters in retaliation for their First Amendment activities, and that the District effectively ignored this unconstitutional pattern by failing to do anything to correct MPD officers' behavior. *See, e.g.,*, FAC ¶¶ 43, 45-47, 50-51, 54, 61-62, 66-69, 71; *see also, e.g., In re N.Y.C. Policing During Summer 2020 Demonstrations*, 2021 WL 2894764, at *9 (finding that plaintiffs sufficiently pled a practice of custom where plaintiffs' complaint included allegations of kettling by police department over previous two decades because "[p]laintiffs identif[ied] a number of police practices . . . and pleaded facts from which it could be inferred that this was not some 'one off' instance of misuse of these practices"); *Scott*, 503 F. Supp. 3d at 539-40 ("[M]unicipality's failure to act in the face of obvious constitutional violations is properly treated as the cause of subsequent, similar violations.") Indeed, further supporting Plaintiffs' theory that Defendants' actions in this case were the result of a policy or custom, Plaintiffs allege that Defendants' excessive force, violence, and kettling on June 1, was highly coordinated and involved many officers acting in unison. *See, e.g.,* FAC ¶¶ 51, 69. Courts have routinely found that this degree of coordination suggests that law enforcement's response was not spontaneous, but the result of a policy or custom planned and practiced well in advance.

*See, e.g., Alsaada*, 2021 WL 1725554, at *43 (finding that "the consistency of officers' alleged actions" supported *Monell* liability); *Bordanaro*, 871 F.2d at 1156; *McNair v. McMickens*, 115 F.R.D. 196, 199 (S.D.N.Y. 1987) ("[I]solated acts may be presumed to be aberrant, but a violent act by a group of employees implies a wider understanding that an official policy encouraging or condoning the use of such force exists."). Based on these facts, Plaintiffs have plausibly alleged a custom of violations of the First and Fourth Amendments, which resulted in Plaintiffs' injuries and are sufficient at this stage to proceed to discovery.

## II.    DEFENDANT NEWSHAM IS NOT ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity under Section 1983 is only available to an official if he can demonstrate that (1) the plaintiff has failed to plead facts showing that the official has violated a statutory or constitutional right or (2) such a right was not "clearly established at the time of the challenged conduct." *See*, *e.g.*, *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 800, 818 (1982) (internal quotation marks omitted)). Plaintiffs have alleged that Defendant Newsham violated Plaintiffs' constitutional rights, and applicable caselaw confirms that those rights were clearly established at the time of Newsham's actions. Therefore, Defendant Newsham's assertion of qualified immunity must fail.

### A.    Plaintiffs Adequately Allege that Defendant Newsham's Actions Violated the Constitution

Plaintiffs allege that Defendant Newsham ordered, supervised, and monitored the use of force against, and the detention and arrest of Plaintiffs that give rise to their constitutional claims. *See supra* I.A. Defendants do not contest that Plaintiffs have pleaded facts sufficient to support their claims that MPD officers violated their rights under the First and Fourth Amendments. They allege only that Defendant Newsham cannot be held liable for such

violations because he did not personally inflict these harms on Plaintiffs. *See* MTD at 8-9. That argument not only misconstrues Plaintiffs' claims but is based on a fundamental misunderstanding of applicable caselaw. Plaintiffs have easily met their burden of pleading that Defendant Newsham was personally liable for the alleged constitutional violations as a supervisor who ordered the MPD officers' unconstitutional conduct, and because he set policies that led to the violations or failed to adequately train or supervise the officers who carried out MPD's policies.

Contrary to Defendants' suggestion otherwise, supervisory officials can be liable for constitutional violations even where they do not personally carry out the conduct or inflict the harms in question. Where supervisory officials direct or order their subordinates to commit a constitutional violation, for example, courts have found that they have caused, and are thus liable for, that violation. *See*, *e.g., Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) ("A causal connection [between the actions of a supervisor and the unconstitutional actions of his or her subordinates] can be established by, *inter alia*, facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.") (internal quotations and citations omitted); *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (supervisor liability under §1983 appropriate when "the supervisor encouraged the specific incident of misconduct") (internal quotations and citations omitted). Supervisory officials are also deemed to have caused a constitutional violation where they have established policies that led to the violation or where they have failed to adequately train or supervise subordinates, despite being on notice of the need for such training and supervision.  *See*, *e.g.*, *Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 60-61 (D.D.C. 2013) ("[I]n addition to 'direct participation' in a constitutional violation, a

17

government official may be held liable in damages for constitutional wrongs resulting from 'the establishment of unconstitutional policies' ('Policymaking Liability') or from the 'failure to supervise or train subordinates adequately' ('Supervisory and Training Liability').") (citing *Haynesworth v. Miller*, 820 F.2d 1245, 1259, 1263 (D.C. Cir. 1987) (rev'd on other grounds, *Hartman v. Moore*, 547 U.S. 250 (2006))).

As discussed in Section I.A., Plaintiffs have alleged sufficient facts to plausibly plead Newsham's personal liability under any of the aforementioned standards. First, Plaintiffs pled facts to support their claim that Newsham monitored the protest as it was occurring and directed and authorized the officers to take the actions constituting the violations asserted in Plaintiffs' First Amended Complaint. These unconstitutional actions include ordering the use of pepper spray, batons, and other force against Plaintiffs, even though Plaintiffs had done nothing to warrant any application of physical force against them. *See supra* Section I.A. Plaintiffs also allege that Defendant Newsham singled out Plaintiffs for retaliatory treatment because they were engaged in protest activity. *Id.* Plaintiffs allege not only that Defendant Newsham did not order or authorize the use of chemical irritants, batons, and shields against purported curfew violators who were not engaged in protected activity, but also that he did not similarly order officers to arrest and hold individuals who were out in the District beyond curfew but had not attended the protest. *Id*. Second, Plaintiffs have pleaded facts sufficient to establish that Newsham's decisions as a policymaker for the District's police procedures caused MPD officers to violate Plaintiffs' constitutional rights. *See* Sections I.A. & I.C. Plaintiffs also allege that he failed to adequately train or supervise MPD officers on June 1, 2020, despite being on notice of the need for such training and supervision because of the District's prior pattern of responding to protected speech activities with unconstitutionally excessive force, among other things. *See* Sections I.A., I.B. &

I.C. Far from being "generalities," *see* MTD at 9, these allegations are permissible conclusions of fact that are sufficiently specific at this stage of the case to satisfy Plaintiffs' pleading requirements. *See, e.g., Coclough v. District of Columbia*, Civil Action No. 19-2317 (BAH) 2020 WL 5569947 at *7 (D.D.C. Sept. 16, 2020) (Howell, J.); *Kelleher*, 263 F. Supp. 3d at 325–26; *Scollick*, 2017 WL 3268857, at *10. Accepting these facts as true, as this Court must, Plaintiffs have adequately stated a claim regarding Defendant Newsham's personal responsibility for Plaintiffs' alleged constitutional violations.

   B. Defendant Newsham's Actions Violated "Clearly Established" Law

   A constitutional right is "clearly established" if it has a "sufficiently clear foundation in then-existing precedent" (*i.e.*, it is "settled law") or if the behavior is obviously unconstitutional. *District of Columbia v. Wesby*, 138 S.Ct. 577, 589-90 (2018). Either of those standards is satisfied here, and Chief Newsham is therefore not entitled to qualified immunity.

   First, it is clearly established that the use of force against non-violent and non-resisting arrestees is unconstitutional. *See*, *e.g.*, *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (holding that the trial court committed reversible error for granting a motion to dismiss a Fourth Amendment excessive force claim where officers "unprovoked and without warning" struck plaintiffs with a baton); *Norris v. District of Columbia*, 737 F.2d 1148, 1152 (D.C. Cir. 1984) (reversing grant of summary judgment against plaintiff where defendants "maced, beat, and kicked" plaintiff without cause); *see also Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1129 (9th Cir. 2002) (recognizing that "it would be clear to a reasonable officer that using pepper spray against" peaceful protesters "was excessive under the circumstances" and would violate the Fourth Amendment). Accordingly, Defendant Newsham violated clearly established constitutional rights here when he ordered, authorized, and thus caused, the beating and pepper

spraying of non-violent, non-resisting, and non-fleeing demonstrators on Swann Street. FAC ¶¶ 40, 46, 51, 66, 69-70, 73.

Second, it is also clearly established that Plaintiffs cannot be singled out for retaliatory and differential treatment—including violence and retaliatory arrest—because they engaged in protected protest activity, which is what Plaintiffs allege Defendant Newsham ordered here. *Id.* ¶¶ 40, 46, 51, 66, 69-70, 73. *See, e.g., Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (holding that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech") (internal citations and quotation marks omitted). Indeed, Defendants cannot credibly claim that Defendant Newsham would not have known that it was unconstitutional to order the use of force against Plaintiffs because they engaged in protest activity, as Plaintiffs have alleged. FAC ¶¶ 98-102. As one court aptly recognized, as of June 1, 2020,  "every reasonable officer would have been aware" that "a peaceful protestor has the right to be free from government violence in retaliation for the message of their protest" and, indeed, that "the right to be free from government violence for the peaceful exercise of protected speech is so fundamental to our system of ordered liberty that it is beyond debate" even if existing "case law were insufficient to provide notice." *Black Lives Matter D.C. v. Trump et al.*, No. 20-cv-1469 (DLF), 2021 WL 2530722 at *19 (D.D.C Jun. 21, 2021) (citing *Wesby*, 138 S. Ct. at 589) (internal quotations omitted). Accordingly, the constitutional violations that Plaintiffs allege were clearly established at the time of these events, and Defendant Newsham is not entitled to qualified immunity.

### III.   PLAINTIFFS HAVE ALLEGED A VIABLE FIRST AMENDMENT RETALIATION CLAIM BASED ON CONDITIONS OF CONFINEMENT

In Count II, Plaintiffs allege that Defendants violated Plaintiffs' rights under the First Amendment by subjecting them to excessive force, arrest, and adverse conditions of

confinement, to which individuals who violated the District's curfew but were not engaged in protected speech activity were not subjected, as retribution for Plaintiffs demonstrating against police misconduct. *See, e.g.,* FAC ¶¶ 115-120. Defendants argue that this Court should dismiss only the theory of Plaintiffs' claim that relates to conditions of confinement for the individually named Defendants[4] because those Defendants were "miles away" from where Plaintiffs were ultimately processed, and Plaintiffs therefore failed to allege any causal connection between Defendants' retaliatory animus and Plaintiffs' subsequent conditions of confinement.[5] *See* MTD at 10-11. That argument misunderstands applicable caselaw and is based on either a misstatement or misapprehension of Plaintiffs' claims and factual allegations. Plaintiffs allege that the Supervisory Defendants (Newsham, Glover, Horos, and Mejia) were responsible for the conduct that occurred at the processing facility, *see, e.g.*, FAC ¶ 73, but Plaintiffs' claims are not limited to adverse treatment that occurred "miles away" from where the individually named Defendants seized and detained Plaintiffs. Plaintiffs' retaliation claim also relates to the conditions of detention and confinement to which Plaintiffs were subjected on Swann Street while under the direct control or supervision of the individually named Defendants. *Id.* ¶¶ 19-24,

---

[4] Defendants do not challenge Plaintiffs' claim in Count II that alleges a First Amendment violation based on retaliatory use of excessive force, so this Count stands and would proceed to discovery irrespective of this Court's ruling on Plaintiffs' conditions of confinement theory. Relatedly, Plaintiffs are entitled to discovery on Plaintiffs' conditions of confinement, and any additional individuals responsible, because Plaintiffs allege that as-yet-unidentified John Doe officers are also liable for this conduct. For the reasons discussed herein, this Court should deny Defendants' Motion with respect to Plaintiffs' theory based on retaliatory conditions of confinement, but dismissal is particularly unwarranted at this early stage given that the Count will proceed to discovery in any event, during which additional facts can be developed.

[5] Defendants raise, in a footnote, an apparent, independent challenge to the theory of Plaintiffs' claim alleging a First Amendment violation based on retaliatory arrest. MTD at 10 n.3. The Court should not consider Defendants' argument raised only in a footnote. *See Huntington v. U.S. Dep't of Commerce*, 234 F. Supp. 3d 94, 101 (D.D.C. 2017) (finding argument raised in footnote forfeited and citing cases). Defendants are incorrect that the existence of probable cause to arrest necessarily forecloses the possibility of a retaliatory arrest claim. Indeed, the very case they cite establishes that, while that is a generally true proposition, a person arrested with probable cause can nonetheless establish that the arrest was retaliatory and unconstitutional if they demonstrate that "otherwise similarly situated individuals not engaged in the same sort of protected speech" had not been arrested. *Nieves*, 139 S.Ct. at 1727. Plaintiffs allege precisely that. *See, e.g.*, FAC at ¶¶ 6, 19, 74, 98-102.

34, 40, 51, 52, 58, 65-66, 69-70. Further, Plaintiffs allege that all named Defendants either authorized or executed Plaintiffs' seizures or detentions because they were engaged in protest activities, not because of any purported curfew infraction. *See, e.g.,* FAC ¶102. Accordingly, the causal link between Defendants' animus and their actions against Plaintiffs is clear and the Court should reject Defendants' argument.

To state a claim for First Amendment retaliation under § 1983, a plaintiff must allege that: (1) he or she engaged in conduct protected by the First Amendment; (2) the defendant took retaliatory action sufficient to deter a person of ordinary firmness in the position of the plaintiff from speaking again; and (3) a causal connection exists between the exercise of the constitutional right and the adverse action taken. *See*, *e.g.*, *Pinson v. U.S. Dep't of Just.*, 246 F. Supp. 3d 211, 221 (D.D.C. 2017) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). Plaintiffs clearly allege facts sufficient to satisfy that standard, including the causation element upon which Defendants rest their challenge.

First, Plaintiffs' demonstration is quintessentially conduct protected by the First Amendment. *United States v. Grace,* 461 U.S. 171, 176 (1983). Second, being kettled, held on a street for hours, restrained in painful zip ties, arrested, and subsequently denied access to basic human necessities during processing, as is alleged in this case, *see* FAC ¶¶ 72-96, undoubtedly qualifies as conduct "sufficient to deter a person of ordinary firmness in the position of the plaintiff from speaking again," *Pinson*, 246 F. Supp. 3d at 221. Indeed, courts have found much less conduct—even the mere threat of an arrest—to be sufficiently chilling for a First Amendment retaliation claim. *See*, *e.g.*, *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 52 (D.D.C. 2013) (noting that there is "substantial caselaw" establishing that "the *threat* of an arrest—even in the absence of an actual arrest—is sufficient to chill speech, in violation of the First Amendment"

and holding that a police officer's statement to a protester that she must either leave or submit to detailed inquiry and registration was sufficient to chill speech) (emphasis in original) (internal citations omitted).

As to the third factor, causation, Plaintiffs allege a direct causal link between the exercise of their First Amendment right and Defendants' retaliatory conduct, including conduct related to the conditions of their detention on Swann Street. Plaintiffs allege, among other things, that they were kettled, held for hours, and restrained in painful zip tie restraints on Swann Street, *see*, *e.g.*, FAC ¶¶ 75-76,78-79,82-83, and that they were also formally arrested and processed rather than being released with a citation to appear in Court, as is common practice for people accused of committing similar violations, *see id.* ¶ 101. Each of the named Defendants played a role with respect to at least some of this conduct that occurred on Swann Street. *See id.* ¶¶ 19-24, 34, 40, 51, 52, 58, 65-66, 69-70.  And with respect to additional conduct to which Plaintiffs were subjected at the processing facility, Blue Plains, Plaintiffs specifically allege that the processing officials were acting under the express direction and supervision of the named Supervisory Defendants (Newsham, Glover, Horos, and Mejia), thus connecting these Defendants to Plaintiffs' treatment at that facility. *See, e.g.*, *id.* ¶ 73. Plaintiffs also allege that the individually named Defendants subjected Plaintiffs to this treatment to retaliate against them for demonstrating against police brutality and, indeed, that Defendants did not and would not have subjected similarly-situated, but non-protesting, arrestees to the same negative treatment. *See*, *e.g., id.* ¶¶ 6, 74, 101. Finally, Plaintiffs have alleged that the individually named Defendants were personally involved in violating Plaintiffs' constitutional rights, either as (1) actors who seized, arrested, or helped maintain the conditions of confinement on Swann Street, or (2) supervisors who ordered or authorized such actions, or took part in the decision to formally arrest

Plaintiffs rather than to cite and release them. *See*, *e.g.*, FAC ¶¶ 19-24 32, 34, 40, 46, 49-51, 73, 101, 102, 117.

These allegations are sufficient to establish a causal link, particularly at this stage of proceedings, because of the temporal proximity between Plaintiffs' protected activity and Defendants' adverse treatment. *See*, *e.g.*, *Black Lives Matter DC*, 2021 WL 2530722 at *18 ("Of course, direct evidence of retaliatory animus is not required, especially at this early stage of the proceedings. 'Causation may be inferred—especially at the pleading stage—when the retaliatory act follows closely on the heels of the protected activity.'") (quoting *BEG Invs. v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C 2015)) (internal quotation marks omitted). Plaintiffs have thus alleged sufficient facts to plausibly plead a First Amendment retaliation claim against the individually named Defendants based on adverse conditions of confinement.

## IV.    THE FIRST AMENDMENT ASSEMBLIES ACT SUPPORTS PLAINTIFFS' NEGLIGENCE PER SE CLAIM

Plaintiffs have stated a viable claim for negligence per se based on Defendants' violation of the First Amendment Assemblies Act, D.C. Code §§ 5-331.07(e), 5-331.16(b), 5-331.17 ("FAAA"). Plaintiffs allege that Defendants violated the precise obligations imposed by sections 5-331.07(e) and 5-331.16(b) of the FAAA, respectively, by failing to issue a dispersal order to Plaintiffs, *see e.g.,* FAC ¶ 49, and deploying chemical irritants although there were no ongoing acts of public disobedience that posed any threat to public safety on Swann Street, *see id.* ¶¶ 41, 51, 54, 57, 112, 128.

A claim for negligence per se must meet three requirements: that Plaintiffs are members of the class to be protected by the statute; that the statute has a safety purpose; and that the statute imposes sufficiently specific standards of care. *See e.g., Jarrett v. Woodward Bros., Inc.*, 751 A.2d 972, 980 (D.C. 2000) (internal quotations and citations omitted). Plaintiffs' allegations

amply satisfy these requirements. Defendants' claims that the FAAA (1) merely replicates the common law duty of care and turns solely on the exercise of discretion, and (2) is not implicated because Defendants purportedly made no decision to disperse protesters are unavailing and wrong.

A.   The FAAA is a Public Safety Statute Intended to Protect Protesters like Plaintiffs

The FAAA is both intended to protect individuals like Plaintiffs and has a public safety purpose. Defendants do not contest this. *See* MTD at 11. First, Plaintiffs are protesters who exercised their First Amendment rights on June 1 and are thus the intended beneficiaries of the protections afforded by the FAAA. *See* D.C. Code § 5-331.17 ("The provisions of this subchapter are intended to protect persons who are exercising First Amendment rights in the District of Columbia . . ."). Second, the two provisions at issue*,* sections 5-331.07(e) and 5-331.16(b), unquestionably seek to promote protester safety, as demonstrated by the text of the statute. *See* D.C. Code § 5-331.07(e)(1) (MPD must make "safe" routes for dispersal available); § 5-331.16(b) (prohibiting the use of chemical irritants against protesters except when some other, more pressing danger necessitates it). Accordingly, the FAAA meets the first two elements necessary for Plaintiffs' negligence per se claim.

B.   The FAAA Sections Defendants Violated Are Adequately Specific and Impose Standards Distinct from the Common Law Duty of Reasonable Care

The FAAA also supports Plaintiffs' claim for negligence per se because, contrary to Defendants' contention, MTD at 12, the FAAA sections at issue impose exacting standards that depart from—and do not merely replicate—the common law duty of care. This is evident both from the statute's text and binding Circuit precedent.

The text of the statute is the best evidence of its requisite specificity. The specific provisions at issue speak in terms of what MPD "shall" or "shall not" do. *See* D.C. Code §§ 5-

331.07(e) and 5-331.16(b). For example, section 5-331.07(e) contains precise protocols to guide

MPD's dispersal of a crowd that go beyond a mere "reasonableness" standard. Pursuant to that

section, MPD *must* provide "at least one clearly audible and understandable order to disperse

using an amplification system or device," as well as a "clear and safe route for dispersal" to

protesters. D.C. Code § 5-331.07(e)(1). In certain circumstances, the statute *requires* that MPD

issue "multiple dispersal orders," that come from "multiple locations," and contain information

about "the route or routes by which they may disperse" and the consequences of failing to

comply.  *Id*. at § 5-331.07(e)(2). Section 5-331.16(b) includes similarly specific mandates. It

only allows MPD to use chemical irritants in controlling a crowd when the participants "are

committing acts of public disobedience endangering public safety and security." *Id*. at § 5-

331.16(b)(2). These provisions impart clear and specific instructions to guide MPD's crowd

control practices for First Amendment-protected assemblies and demonstrations.[6]

      D.C. Circuit precedent also compels the conclusion that the provisions at issue impose

obligations on Defendants distinct from, and beyond, the common law duty of care. As the court

recognized in *Sibert-Dean v. Washington Metro. Area Transit Auth.*, a statute does not replicate

the common law duty of care if "[o]ne can readily imagine [the defendant] meeting the [common

---

[6] The specificity embodied in the statute's text aligns with the D.C. Council's intent to create precise restrictions enforceable via negligence per se. For instance, the Committee Report explained that the FAAA provided "a clearer, more specific and functional test for when a dispersal order should be used . . . ." Ex. 1, D.C. Council Comm. on the Judiciary, *Report on Bill No. 15-968* at 12 (Dec. 1, 2004). Law enforcement stakeholders echoed the belief that the bill was highly detailed, even expressing concern that the FAAA would unduly restrict law enforcement discretion in managing assemblies as a result. *Id.* at 24–25 (statements of City Administrator Robert Bobb and Chief of Police Charles Ramsey). Most clearly to the point, the Committee considered a D.C. Attorney General's Office representative's statements that a violation of the FAAA would constitute negligence per se when finalizing the bill. *Id.* at 26 (summarizing representative's testimony on why no private right of action was needed in the bill).

law] standard but not the" statutory one. 721 F.3d 699, 704 (D.C. Cir. 2013). That is the case here. Many reasonable approaches to dispersing crowds exist that do not involve giving verbal warnings. For instance, MPD could post signs, send a mass message to cellphones in the area, or give just one verbal order to disperse as opposed to multiple. D.C. Code § 5-331.07(e)(2). But that is not what the statute requires. Additionally, "clear" routes for dispersal are meaningfully different from "reasonable" routes. As in *Sibert-Dean*, where the statute called for a driver's "full" attention rather than their "reasonable" attention, the difference in language sets the statutory standard apart. *Id.* at 703–04. Finally, that section 5-331.16(b)(2) draws the line for using chemical irritants at protesters "endangering public safety and security" does not necessarily flow from the common law reasonableness analysis, which is more flexible and may justify using such chemicals in less pressing situations.[7]

Defendants' reliance on *Horse v. District of Columbia,* which considered an FAAA negligence per se claim, is misplaced. *See* MTD at 13. The court in *Horse* only addressed the most discretionary portions of the FAAA rather than any alleged violations of the law's most specific provisions that were pled here. The court analyzed the FAAA's requirements regarding MPD's initial decision to disperse a crowd, giving protesters "reasonable and adequate" time to disperse, and using chemical irritants only when "reasonable and necessary" to protect officer and public safety. *See* Dkt. 24-1 at 33–34; *Horse v. District of Columbia*, No. 1:17-cv-01216-ABJ (D.D.C. Sept. 27, 2019). It concluded these standards were inseparable from "the common

---

[7] Of note, a court in this jurisdiction found that another statute that used the term "endangerment" did not merely replicate the common law analysis. *Marshall v. D.C. Caribbean Carnival*, No. 02–1298, 2004 WL 3257066, at *8–9 (D.D.C. Oct. 26, 2004) (violation of a statute requiring that "[n]o person . . . shall be intoxicated and endanger the safety of himself, herself, or any other person or property" constituted negligence per se). The FAAA's prohibition on using chemical irritants absent "acts of public disobedience endangering public safety" thus contains sufficient specificity for negligence per se.

law baseline of reasonable behavior." *Id*. However, the court *did not* address violations of the specific dispersal protocols set out in section 5-331.07(e), which are at issue in this case. *Id.* It also did not consider Section 5-331.16(b)(2), which reads, in its entirety: "Chemical irritants shall not be used by officers to disperse a First Amendment assembly unless the assembly participants or others are committing acts of public disobedience endangering public safety and security." This is a specific and distinct standard of care sufficient to support a claim for negligence per se.

Further, that a statute imposes some duties that mirror the common law reasonableness standard does not exempt violations of the statute's more exacting provisions from negligence per se treatment. For instance, in an analogous case, a court upheld a negligence per se claim based on a statute prohibiting nighttime warrant execution absent permission sought in the warrant application. *Youngbey v. District of Columbia*, 766 F. Supp. 2d 197, 222 (D.D.C. 2011), *rev'd in part on other grounds*, 676 F.3d 1114 (D.C. Cir. 2012). Per the statute, a reviewing judge could grant permission to execute a warrant at night if probable cause existed. D.C. Code §§ 23-523(b), 521(f)(5), 522(c)(1). But the judgment-based decision about whether probable cause existed was entirely distinct from the procedural requirement that permission be sought in the warrant application; violation of the latter supported a negligence per se claim. So too, here, any potential discretionary decision regarding whether dispersal was appropriate, for example, is a separate question from how MPD must go about dispersing once that decision is made. *See also Sibert-Dean*, 721 F.3d at 704 ("The question is not whether the regulation deals with a specific set of circumstances, but what sort of behavior it prescribes for the circumstances that it governs.")

Notably, *Horse* acknowledged that "aspects of [the FAAA] are sufficiently precise," and explained that courts must look to the specific portions of the statute a plaintiff alleges violations of. *See* Dkt. 24-1 at 34. The Plaintiffs' allegations in this case concern the FAAA provisions that impose clear guidelines for MPD's conduct, rather than those imposing highly discretionary standards that *Horse* held operate much like the common law duty of reasonable care. Plaintiffs allege that no dispersal order of any kind was given, that absolutely no time was given to disperse (not just inadequate time), and that no route for dispersal was created (not just an inadequately clear or safe route). FAC ⁋ 49. Plaintiffs also allege that chemical irritants were deployed in the complete absence of risks to public safety. FAC ⁋⁋ 41, 51, 54, 57, 112, 128. Per the reasoning in *Horse* and *Youngbey*, these alleged violations support a negligence per se claim because the corresponding FAAA provisions are far more specific than those at issue in *Horse*.

Defendants also claim that the FAAA cannot support Plaintiffs' negligence per se claim because it "turns on the exercise of discretion," MTD at 14, but they are wrong. To be sure, the FAAA contains some commands that incorporate an element of judgment or discretion. For instance, judgment guides an MPD officer's assessment of whether a dispersal order is loud enough, a dispersal route is safe enough, and whether enough danger is posed to justify using chemical irritants. *See* D.C. Code §§ 5-331.07(e)(1), 5-331.16(b). But statutes employing standards susceptible of judgement calls can nonetheless support a claim for negligence per se so long as "reasonableness" is not the only statutory guidepost available, as a longline of cases have held. *See, e.g.*, *Rong Yao Zhou v. Jennifer Mall Rest., Inc.*, 534 A.2d 1268, 1271–72, 1275 (D.C. 1987) (violation of a statute containing prohibition on continuing to serve "any person who *appears to be* intoxicated" could support negligence per se claim) (emphasis added); *District of Columbia v. White*, 442 A.2d 159, 163–64 (D.C. 1982) (recognizing potential negligence claim

for violation of a statute that included a prohibition on using "unnecessary and wanton severity" in making an arrest); *see also Whetzel v. Jess Fisher Mgmt. Co.*, 282 F.2d 943 (D.C. Cir. 1960) (violation of statute prohibiting renting a dwelling unless it is in a "clean, safe and sanitary condition" gave rise to negligence per se claim). Defendants' argument for dismissal because the FAAA contains provisions that incorporate judgment or discretion should be rejected accordingly.

In sum, as both the text of the statute and applicable case law make clear, the FAAA provisions Plaintiffs challenge are distinct from the common law reasonableness requirement and thus support Plaintiffs' negligence per se claim.

C. Plaintiffs Have Adequately Alleged that Defendants Decided to Disperse the Protest

Finally, Defendants' claim that they did not decide to disperse the Swann Street protesters and thus did not trigger the requirement to issue a dispersal order, *See* MTD at 12-13, is contrary to the allegations in Plaintiffs' Complaint. Plaintiffs have alleged that the Defendants decided to disperse the protesters, a fact which this Court must accept as true at the motion to dismiss stage. Specifically, Plaintiffs allege that a high ranking MPD official directed MPD officers on the scene to disperse the crowd, thus establishing that such a decision was made. *See, e.g.,* FAC ¶ 49. Further, MPD actions prior to the kettling on Swann Street are consistent with Defendants' desire to force protesters out of the area. For example, Defendants confiscated protesters' water, accelerated suddenly in their cruisers following behind the crowds, and used pepper spray and flash grenades to startle and scare the protesters. *See, e.g.,* FAC ¶¶ 35, 38, 39. Given Plaintiffs allegations, the Court should reject Defendants' argument.

## CONCLUSION

For the reasons described herein, Plaintiffs respectfully request the Court deny

Defendants' Partial Motion to Dismiss.

Dated:  August 5, 2021

                                                        Respectfully submitted,

                                                        /s/ Kali Schellenberg
                                                        Gabriel Diaz [DCD Bar ID: 991618]
                                                        Jia Cobb [DCD Bar ID: 503340]
                                                        Tahir Duckett [DCD Bar ID: 242187]
                                                        Kali Schellenberg [DCD Bar ID: 198422]
                                                        RELMAN COLFAX, PLLC
                                                        1225 19th St NW
                                                        Suite 600
                                                        Washington, DC 20036
                                                        Tel: 202-728-1888
                                                        Fax: 202-728-0848
                                                        gdiaz@relmanlaw.com
                                                        jcobb@relmanlaw.com
                                                        tduckett@relmanlaw.com
                                                        kschellenberg@relmanlaw.com

                                                        *Attorneys for Plaintiffs*