## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PAMELA GOODWIN
1212 7 St. NW, Apt. 302,
Washington, DC 20001,

ALLISON LANE
3827 14th St. NW,
Washington, DC 20011,

JENNY LAZO
6413 Hil-Mar Dr. #301,
District Heights, MD 20747,

SEBASTIAN MEDINA-TAYAC
531 Fern Pl. NW,
Washington, DC 20012,

JESSE PEARLMUTTER
1980 Audubon Dr.,
Dresher, PA 19025,

OSEA REMICK
925 19th St. NE #3,
Washington, DC 20002,

PRIYANKA SURIO
1600 S. Joyce St. #1622,
Arlington, VA 22202,

and

ELIANA TROPER
2013 1/2 O St. NW,
Washington, DC 20036,

   Plaintiffs,

  v.

DISTRICT OF COLUMBIA
400 6th Street, NW,
Washington, DC 20001,

Civil Action No. 1:21-cv-00806-BAH

**FIRST AMENDED COMPLAINT AND
JURY DEMAND**

1

PETER NEWSHAM, in his individual
capacity,
c/o 400 6th Street, NW,
Washington, DC 20001,

ROBERT GLOVER, in his individual
capacity,
c/o 400 6th Street, NW,
Washington, DC 20001,

ANDREW HOROS, in his individual
capacity,
c/o 400 6th Street, NW,
Washington, DC 20001,

CARLOS MEJIA, in his individual
capacity,
c/o 400 6th Street, NW,
Washington, DC 20001,

JAMES CRISMAN, in his individual
capacity.
c/o 400 6th Street, NW,
Washington, DC, 20001,

STEVEN QUARLES, in his individual
capacity,
c/o 400 6th Street, NW,
Washington, DC 20001,

and

JOHN DOE OFFICERS 1-50, in their
individual capacities,

                    Defendants.

## INTRODUCTION

1.      Plaintiffs Pamela Goodwin, Allison Lane, Jenny Lazo, Sebastian Medina-Tayac, Jesse Pearlmutter, Osea Remick[1], Priyanka Surio, and Eliana Troper[2] bring this action under 42 U.S.C. § 1983 for violations of the First and Fourth Amendments to the United States Constitution; assault and battery; and negligence per se against Defendants District of Columbia; former Metropolitan Police Department ("MPD") Chief Peter Newsham; MPD Supervisory Officers Inspector Robert Glover, Lieutenant Andrew Horos, and Lieutenant Carlos Mejia (collectively "MPD Supervisory Defendants"); MPD Officers James Crisman and Steven Quarles; and John Doe MPD Officers 1-50 (collectively "Defendants").

2.      On June 1, 2020, Plaintiffs separately convened in Washington, DC to protest police brutality. Plaintiffs marched, chanted, and peacefully demonstrated to express their outrage and grief.

3.      Defendants responded to Plaintiffs' peaceful protest activities with excessive force and violence. Pursuant to the District of Columbia's policies, practices, and customs for handling protests and demonstrations, and Defendant Newsham and the MPD Supervisory Defendants' express directives, MPD Officers, including Lt. Horos, Lt. Mejia, Officer Crisman, Officer Quarles, and the John Doe Officers, "kettled" Plaintiffs and other demonstrators by enclosing the 1400 block of Swann Street NW on either side. Then, Officers, including Defendant Horos and Defendant Crisman, among other Officers on the scene, indiscriminately deployed excessive amounts of pepper spray at demonstrators within Defendants' kettle. Each Plaintiff was assaulted with pepper spray and each suffered its effects.

---

[1] Osea Remick's legal name is Jane Remick.

█

3

4.     Defendants' unlawful force against Plaintiffs and other demonstrators was not limited to chemical agents. Officers unnecessarily used shields, batons, or their hands and feet to push, strike, or beat demonstrators on Swann Street who had done nothing to warrant such a response. For example, Defendant Quarles struck Plaintiff Surio with a police shield, and, separately, another John Doe Officer used his baton to strike her in her chest and abdomen even though she offered no resistance and complied with these Officers' commands. The force these Officers used against Plaintiff Surio caused welts and contusions.

5.     After assaulting and detaining Plaintiffs for hours on Swann Street, Defendants formally arrested Plaintiffs Medina-Tayac, Pearlmutter, Remick, and Surio for purported misdemeanor curfew infractions.  Officers restrained Plaintiffs in tight and painful zip-tie handcuffs; and, pursuant to the District's policies and practices for handling the arrests of individuals participating in demonstrations, transferred them to a pre-designated, off-site facility; crammed them in spaces filled with other detainees; and denied them access to food, water, or restrooms overnight.

6.     Defendants' unlawful conduct was in retaliation for Plaintiffs' participation in protests against police misconduct. Upon information and belief, the only people who Defendants either arrested or subjected to excessive force and prolonged detention on June 1 for misdemeanor curfew infractions were individuals who participated in protest activities. Upon information and belief, Defendants did not, and had no plan to, pepper spray, use force against, or detain individuals who were outside past curfew, but had not engaged in protest activities.

7.     As a result of Defendants' unlawful conduct, Plaintiffs have suffered, and continue to suffer, significant injuries, including the deprivation of their constitutional rights,

physical pain and injury, and emotional distress. They bring this action to seek redress for those injuries.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to Plaintiffs' claims occurred within this District.

## PARTIES

10.     Plaintiff Pamela Goodwin is an adult resident of the District of Columbia. She peacefully participated in the June 1 protest.

11.     Plaintiff Allison Lane is an adult resident of the District of Columbia. She peacefully participated in the June 1 protest.

12.     Plaintiff Jenny Lazo is an adult resident of Maryland. She peacefully participated in the June 1 protest.

13.     Plaintiff Sebastian Medina-Tayac is an adult resident of the District of Columbia. He peacefully participated in the June 1 protest.

14.     Plaintiff Jesse Pearlmutter is an adult resident of Pennsylvania. He peacefully participated in the June 1 Protest.

15.     Plaintiff Osea Remick is an adult resident of the District of Columbia. They peacefully participated in the June 1 Protest, including a vigil honoring Tony McDade.

16.     Plaintiff Priyanka Surio is an adult resident of Virginia. She peacefully participated in the June 1 Protest.

17.     Plaintiff Eliana Troper is an adult resident of the District of Columbia. She peacefully participated in the June 1 Protest, including a vigil honoring Tony McDade.

18.     Defendant District of Columbia is a municipal corporation and the local government of Washington, DC.  It is the governmental entity that maintains the Metropolitan Police Department ("MPD"), the primary law enforcement agency for the District of Columbia. Through its policies, practices, customs – including its failure to train and supervise its officers – and the decisions of its policymakers, Defendant District of Columbia violated Plaintiffs' constitutional rights as alleged herein. Additionally, the District of Columbia acted through its agents and employees, including Defendant Newsham, Defendant Glover, Defendant Horos, Defendant Mejia, Defendant Crisman, Defendant Quarles, and John Doe Officers 1-50.

19.     Defendant Peter Newsham was the Chief of the Metropolitan Police Department at the time of the events at issue. As MPD's Police Chief, Defendant Newsham was the head of the District's police force and had decision-making authority for MPD's day-to-day strategic and tactical decisions. Defendant Newsham also had decision-making authority to establish the policies and rules governing the conduct of MPD officers, who are required to obey his orders pursuant to D.C. Code. Upon information and belief, Defendant Newsham ordered, directed, authorized, supervised, and caused the violations alleged herein. Defendant Newsham did not order, direct, authorize, or supervise the kettling of, use of force against, or arrest of any individuals for curfew violations who were not protesting. Defendant Newsham thus specifically targeted Plaintiffs on the basis of the content of their speech. At all times relevant to Plaintiffs' Complaint, Defendant Newsham acted within the scope of his employment and under color of law of the District of Columbia. He is sued in his individual capacity.

20. Defendant Investigator Robert Glover is, or was at the time of these events, an official in MPD's Special Operations Division. He was a supervisory official on the scene of these events and oversaw MPD's command post. Upon information and belief, Defendant Glover executed the District of Columbia's policies, practices, and customs, as well as Defendant Newsham's directives, for handling Plaintiffs and other Swann Street protesters on June 1. Defendant Glover did so by ordering and facilitating the deployment of multiple MPD tactical units to respond to Swann Street and directing and authorizing the kettling of, use of force against, and/or arrests of Plaintiffs for peacefully protesting. Upon information and belief, Defendant Glover did not order MPD officers to kettle, use force against, or arrest any individuals for curfew violations who were not protesting. Defendant Glover thus specifically targeted Plaintiffs on the basis of the content of their speech. At all times relevant to Plaintiffs' Complaint, Defendant Glover acted within the scope of his employment and under color of law of the District of Columbia, and was carrying out the policies of the District and the directives of Defendant Newsham. He is sued in his individual capacity.

21. Defendant Lieutenant Andrew Horos is, or was at the time of these events, a lieutenant in MPD's Special Operations Division. He was a supervisory official on the scene of these events and was responsible for coordinating and facilitating the kettling of, use of force against, and/or arrests of Plaintiffs. Defendant Horos also used force against protesters on Swann Street, including by pepper spraying Plaintiff Pearlmutter without justification. Upon information and belief, Defendant Horos did not coordinate or facilitate the kettling of, use of force against, or arrest of any individuals for curfew violations who were not protesting. Defendant Horos thus specifically targeted Plaintiffs on the basis of the content of their speech. At all times relevant to Plaintiffs' Complaint, Defendant Horos acted within the scope of his employment and under

color of law of the District of Columbia, and was carrying out the policies of the District and the directives of Defendant Newsham as ordered by Defendant Glover. He is sued in his individual capacity.

22.     Defendant Lieutenant Carlos Mejia is, or was at the time of these events, a lieutenant in MPD's Special Operations Division. He was a supervisory official on the scene of these events and was responsible for coordinating and facilitating the kettling of, use of force against, and/or arrests of Plaintiffs. Upon information and belief, Defendant Mejia did not coordinate or facilitate the kettling of, use of force against, or arrest of any individuals for curfew violations who were not protesting. Defendant Mejia thus specifically targeted Plaintiffs on the basis of the content of their speech. At all times relevant to Plaintiffs' Complaint, Defendant Mejia acted within the scope of his employment and under color of law of the District of Columbia, and was carrying out the policies of the District and the directives of Defendant Newsham as ordered by Defendant Glover. He is sued in his individual capacity.

23.     Defendant James Crisman is, or was at the time of these events, an officer in MPD's Special Operations Division. He was on the scene of the events and participated in the kettling of and use of force against protesters on Swann Street, including Plaintiffs. Upon information and belief, Defendant Crisman pepper sprayed Plaintiffs Pamela Goodwin, Allison Lane, Jenny Lazo, and Eliana Troper without justification. Upon information and belief, Defendant Crisman did not kettle, use force against, or arrest any individuals for curfew violations who were not protesting. Defendant Crisman thus specifically targeted Plaintiffs on the basis of the content of their speech. At all times relevant to Plaintiffs' Complaint, Defendant Crisman acted within the scope of his employment and under color of law of the District of

Columbia, and was carrying out the policies of the District and the directives of Defendant Newsham through the Supervisory Defendants. He is sued in his individual capacity.

24.     Defendant Steven Quarles is, or was at the time of these events, an officer in MPD's Special Operations Division. He was on the scene of the events and participated in the kettling of and use of force against protesters on Swann Street, including Plaintiffs. He used physical force against Plaintiff Surio without justification. Defendant Quarles did not kettle, use force against, or arrest any individuals for curfew violations who were not protesting. Defendant Quarles thus specifically targeted Plaintiffs on the basis of the content of their speech. At all times relevant to Plaintiffs' Complaint, Defendant Quarles acted within the scope of his employment and under color of law of the District of Columbia, and was carrying out the policies of the District and the directives of Defendant Newsham through the Supervisory Defendants. He is sued in his individual capacity.

25.     Defendants John Doe Officers 1-50 are MPD officers who caused Plaintiffs' injuries by committing the violations alleged herein and/or were supervisory officials on the scene who ordered, instructed, or otherwise caused MPD officers to commit such violations. At all times relevant to Plaintiffs' Complaint, John Doe Officers 1-50 were acting within the scope of their employment and under color of law of the District of Columbia, and were carrying out the policies of the District and the directives of Defendant Newsham through the Supervisory Defendants. They are sued in their individual capacities.

## FACTUAL BACKGROUND

26.     On May 25, 2020, a Minneapolis police officer murdered George Floyd, a Black man, by pressing his knee into Mr. Floyd's neck as Mr. Floyd repeatedly gasped that he could

not breathe. Unfortunately, George Floyd is only one name in a long list of Black Americans who have been victims of systemic racism and police-sanctioned violence in the United States.

27. George Floyd's murder sparked worldwide protests. Polls estimate that between 15 million and 26 million people participated in demonstrations in the summer of 2020, making it the largest participatory protest movement in United States history.

28. On June 1, 2020, Plaintiffs, alongside other demonstrators, convened in the District of Columbia to lend their support to this movement. Each Plaintiff participated in at least one of two demonstrations that would later merge into a collective march. The first demonstration began near the White House, and the second was a vigil at Dupont Circle for Tony McDade, a Black transgender man killed by police officers in Florida.

29. Plaintiffs Goodwin, Lane, Lazo, Medina-Tayac, Pearlmutter, and Surio separately participated in the protest near the White House. They assembled peaceably to join other demonstrators in chanting, marching, and expressing their grief and outrage. They did not engage in any violent or destructive behavior at the protest, nor did they witness any such behavior from other demonstrators.

30. Plaintiffs Remick and Troper separately attended Tony McDade's vigil. The vigil was a peaceful gathering to mourn and raise awareness for Mr. McDade, whose death at the hands of a police officer had not been as widely publicized as George Floyd's murder. Plaintiffs Remick and Troper did not engage in any violent or destructive behavior at the vigil, nor did they witness any such behavior from other demonstrators. After attending the vigil, Plaintiffs Remick and Troper separately marched alongside other protesters toward the demonstration near the White House.

31.     Eventually, the demonstration at the White House dispersed. As Plaintiffs left to head to their respective homes or to continue their protest activities, they moved with groups of protesters headed northwest. Plaintiffs, alongside other demonstrators, continued to move toward Thomas Circle, and then north toward 14th Street NW. Plaintiffs remained peaceful and did not engage in or witness any activities that posed a threat to the safety of any person or property.

32.     Defendant Newsham and other District law enforcement officials under his direction, including Defendants Glover, Horos, and Mejia, monitored the demonstrators as the group continued to walk.

33.     The District of Columbia has specific, standard operating procedures for handling First Amendment assemblies and other large-scale demonstrations. Defendants' actions on June 1 were pursuant to the District's policies.

34.     Upon information and belief, Defendant Newsham directed and authorized the actions of Defendants Glover, Horos, Mejia, Crisman, Quarles, and the John Doe Officers with respect to Plaintiffs and other protesters on June 1, consistent with the District's practices, policies, and customs for responding to protest activities. Defendant Glover was responsible for setting up the command post and coordinating the actions of the other Defendants on the ground. Defendants Horos and Mejia facilitated the execution of Defendant Glover's commands.

35.     As Plaintiffs continued to walk alongside other demonstrators toward 14th Street NW, MPD Officers confronted them. The Officers used aggressive intimidation tactics to try to prevent them from engaging in their protest activities. For example, as protesters tried to get bottles of water from stations intended for demonstrators, Officers on foot yelled at the protesters, attempted to snatch the water bottles from some protesters' hands, and destroyed some of the bottles. Additionally, police cars that had been driving behind protesters scared

protesters by suddenly speeding up, moving dangerously toward them, and trying to drive through the group.

36.     As Plaintiffs and other demonstrators approached 14th Street NW and Florida Avenue, MPD Officers in police cars swarmed the area, positioning themselves in front of and behind Plaintiffs and other demonstrators. The Officers surrounded the group without warning and without issuing commands to disperse or return home. Instead, Officers blocked side streets and positioned themselves so that Plaintiffs and other demonstrators could not leave the police perimeter.

37.     Plaintiffs continued to walk peacefully within the police perimeter alongside other protesters. Protesters chanted "Hands Up, Don't Shoot," a slogan adopted by non-violent protesters against police violence, and continued moving on 14th Street NW.

38.     Without warning, MPD Officers detonated flash grenades to frighten the protesters. Flash grenades are devices that produce loud explosive noises and bright lights designed to temporarily disorient a person's senses. The sudden detonation scared Plaintiffs Lane, Lazo, Medina-Tayac, Pearlmutter, and Remick, who had been walking with the group of protesters.

39.     After deploying flash grenades, Plaintiff Lane observed MPD Officers indiscriminately spraying pepper spray at some of the demonstrators.

40.     Upon information and belief, Defendant Newsham directed and authorized the Officers' use of flash grenades, pepper spray, and other force, and was responsible for coordinating the Officers' response on the scene as he monitored the events. Defendant Glover was responsible for implementing the District's policies and Newsham's directives on the scene,

including by directing the actions of Defendants Horos, Mejia, Crisman, Quarles, and the John Doe Officers.

41.     Plaintiffs had not engaged in any violent or destructive behavior prior to MPD Officers detonating flash grenades and spraying demonstrators with pepper spray, nor had they observed any other demonstrator engaging in such behavior.

**Defendants Kettle and Use Excessive Force Against Plaintiffs on Swann Street**

42.     Plaintiffs, along with other demonstrators, continued to move north, past the intersection of 14th Street NW and Florida Avenue. The demonstrators remained peaceful, and none of their actions created any imminent danger of personal injury or damage to any property. Nonetheless, MPD Officers forced the group to turn west down Florida Avenue, south down 15th Street NW, and then onto a side street, Swann Street NW, between 14th and 15th Streets.

43.     After herding the demonstrators onto Swann Street, MPD used its kettling technique to enclose Plaintiffs and other demonstrators so that they could not leave the area.

44.     Kettling is a controversial practice in which officers physically surround a group of people to enclose them in a limited space. Officers will often continue to close in on the group to confine it to an even smaller space, sometimes for many hours. Kettling, also referred to by MPD as "encirclement," is an express policy MPD follows to confine individuals engaged in protected speech activities.

45.      Kettling has been criticized because enclosing large groups of people in tight spaces for prolonged periods of time can lead to chaos, disorientation, and a host of potential injuries. Kettling, as employed by MPD, indiscriminately groups people together, regardless of their individual actions, and forcefully presses them into one another.

46.     Pursuant to the District's kettling policy and/or the directives of Defendant Newsham, Defendant Glover ordered and authorized the kettling and confinement of protesters on Swann Street. He directed Defendants Horos and Mejia to assist in facilitating the deployment of multiple platoons, among other MPD divisions, to the scene. The MPD platoons ordered to respond to Swann Street were part of MPD's specialized unit for handling demonstrations.

47.     To form the kettle, groups of MPD Officers on bicycles and on foot immediately closed behind the protesters after they turned onto Swann Street. Officers formed lines to block the exits onto 14th Street, 15th Street, and the alleyways on Swann Street to trap the group on the block. The kettle restricted the protesters', including Plaintiffs', ability to move. No one trapped within the Officers' kettle could leave the block.

48.     The Officers did not tell Plaintiffs or other protesters why they were being detained, when or if they would be able to leave, or what would happen next. Many protesters, frightened by the significant police presence and the Officers' refusal to provide any information, cried and begged to leave. The protesters broke into chants of "let us leave," hoping that Officers would let them go home. Plaintiff Goodwin, who had called for an Uber to drive her home before the police corralled her on Swann Street, begged an Officer to let her leave, explaining that she had a young child at home. The Officer ignored her and continued to detain her on Swann Street.

49.     Prior to forming the kettle, MPD Officers did not give any orders to disperse. While a high-ranking MPD official directed MPD Officers to disperse the crowd, the Supervisory Defendants on scene did not take any actions to facilitate any such dispersal order. Even though there was no imminent danger of personal injury or significant damage to property before Officers enclosed the block, MPD Officers did not provide Plaintiffs or other

demonstrators time to disperse, indicate a route for dispersal, or inform them that refusal to disperse would subject them to arrest. MPD Officers surrounded the group without warning, such that they could not leave the area.

50. After the first group of MPD Officers kettled the demonstrators on Swann Street, another group of MPD Officers, dressed in riot gear and armed with shields, batons, pepper spray and other weapons, arrived to replace the first set of Officers.

51. Pursuant to the District's policies, practices, and customs for responding to demonstrations, and Defendant Newsham's directives, Defendant Glover authorized Officers on scene to use force to push the protesters to a confined area within the block. Defendants Horos and Mejia both coordinated the Officers' kettling on the ground and participated in pushing Plaintiffs and other protesters within the kettle. Even though the group within the kettle had not been involved in any violent or threatening conduct, the MPD Officers in riot gear almost immediately, and without warning, brandished their shields and batons and began swinging them toward Plaintiffs and other demonstrators. The Officers began yelling "move back," in unison, using their batons to push and batter protesters and enclose them in an increasingly smaller space. The Officers were coordinated in their approach because they were acting in accordance with District policy and the express directives of high-ranking MPD officials, including Defendant Newsham and the Supervisory Defendants on the scene.

52. Defendants Crisman and Quarles were among the Officers who used physical force to kettle protesters on the scene. In doing so, Defendant Quarles struck Plaintiff Surio with his police shield, even though she had done nothing to warrant the physical force that he used against her.

53. Plaintiffs and others on the scene tried to comply with the Officers' orders by moving backwards, but many were unable to do so because they were kettled so closely together and surrounded by the Officers.

54. At the same time, MPD Officers attacked Plaintiffs and others within the kettle by deploying excessive amounts of pepper spray at them. The Officers sprayed those closest to them directly in the face and indiscriminately deployed the chemical agent throughout the rest of the crowd of protesters.

55. Pepper spray is a dangerous chemical that can have severe effects, particularly when it is used within a close range or in excessive amounts, as Defendants used it here. Pepper spray causes eye closure through swelling of the eyelids; immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath; and burning sensations to the mucous membranes, skin, and the nose and mouth.

56. The Officers' use of pepper spray increased the state of panic and confusion among the group of protesters, including Plaintiffs, and physically overwhelmed the demonstrators. Some protesters attempted to shield themselves to prevent further exposure and recover from the adverse effects of Defendants' chemicals, but they could not avoid the spray.

57. At the time that Defendants' attacks began, Plaintiffs Goodwin, Lane, Lazo, Medina-Tayac, Pearlmutter, Remick, Surio, and Troper had each been peaceful, were unarmed, and had not engaged in any behavior that threated the safety of any person, damaged any property, or warranted any use of force. MPD Officers could have effectuated any arrests of Plaintiffs without the use of force, as Plaintiffs did not offer resistance or disobey any Officer's commands. Nevertheless, MPD Officers sprayed pepper spray at each of these Plaintiffs, either in their faces or on or near their bodies. Each Plaintiff came in contact with the pepper spray and

suffered its negative effects, including intense burning sensations in their lungs, eyes, faces, throats, and chests; severe coughing and difficulty breathing; and disorientation.

58. Upon information and belief, Defendant Crisman, among other Officers, was responsible for pepper spraying Plaintiffs Goodwin, Lane, Lazo, and Troper. Defendant Horos, among other Officers, was responsible for pepper spraying Plaintiff Pearlmutter.

59. Residents who lived on Swann Street witnessed Defendants' unprovoked violence against the protesters and invited some protesters into their homes to wash the chemicals from their faces so that they could breathe and recover from their injuries. MPD Officers continued to spray the protesters entering residences on Swann Street, even attempting to spray pepper spray inside some of the homes.

60. Plaintiffs Goodwin, Lane, Lazo, and Troper were among the group of protesters who took shelter in homes on Swann Street to tend to their injuries and limit further exposure. They were confined to the residences until the next day because MPD Officers maintained the perimeter around Swann Street and prevented anyone from leaving the area.

61. The MPD Officers' violence was not limited to the use of chemical agents. MPD Officers also used violent physical force to seize, incapacitate, and effectuate the arrests of Plaintiffs and other protesters who were trapped on Swann Street.

62. As MPD Officers advanced toward demonstrators to confine them to an increasingly small area, Officers hit demonstrators, prodded and shoved them with batons, knocked them to the ground, and pinned them against cars and trees.

63. Plaintiff Medina-Tayac complied with Officers' orders and moved back as directed. He did not offer any resistance to the Officers and had not engaged in any conduct that threatened the safety of any person or damaged any property. Nonetheless, an Officer suddenly

and violently pushed another person into him. As a result, Plaintiff Medina-Tayac was pinned against the hood of a car, fell to the ground, and was stepped on. MPD Officers subsequently arrested Plaintiff Medina-Tayac.

64.     Plaintiff Remick complied with Officers' orders and moved back as directed. They did not offer any resistance to the Officers and had not engaged in any conduct that threatened the safety of any person or damaged any property. MPD Officers cornered Plaintiff Remick by backing them into a tree. Doe Officers repeatedly struck Plaintiff Remick with a baton, landing blows with sufficient force to cause bruising on their arms and back. Another Doe Officer grabbed Plaintiff Remick with both hands and attempted to shove them to the ground, but another protester caught them before they could fall. MPD Officers subsequently arrested Plaintiff Remick.

65.     Plaintiff Surio also complied with the Officers' directives on the scene. She did not offer any resistance to the Officers and had not engaged in any conduct that threatened the safety of any person or damaged any property. Nevertheless, in addition to being struck by Defendant Quarles, another Doe Officer hit her with a baton. The force used against her was so significant that she sustained contusions, welts, and bruising on her upper body. Other Officers also pushed her down in their advance, leaving her in danger of getting trampled. Officers subsequently arrested Plaintiff Surio.

66.     Upon information and belief, the violent actions of the Doe Officers on Swann Street—including trapping Plaintiffs in a kettle, deploying chemical agents at Plaintiffs and others, and otherwise physically assaulting demonstrators—was a planned and coordinated strategy carried out by Officers working together at the direction of Defendant Newsham through the Supervisory Defendants on scene.

67.     The John Doe Officers' excessive response to Plaintiffs and other demonstrators was not merely the result of one-off decisions by individual actors, but pursuant to the District's policies, practices, and customs. For nearly two decades, MPD has routinely used a combination of kettling, chemical agents, and other excessive force to detain and arrest non-violent demonstrators, particularly those who have voiced criticism of the police or government.

68.     The District has consistently used kettling and excessive force to detain or effectuate the arrests of non-violent protesters and has been a party to lawsuits challenging its use of these practices, including lawsuits involving its use of these practices against protesters in Pershing Park in 2000; in Adams Morgan and the White House area in 2005; as well as in connection with demonstrations at the Presidential Inauguration in 2017. These instances represent a few of the more high-profile examples of the District's practice of using kettling and force to effectuate the detention and arrest of non-violent protesters.

69.     Upon information and belief, Defendant Newsham made the decision to dispatch Officers in riot gear, who were armed and prepared to immediately deploy pepper spray and use batons, shields, and other force against Plaintiffs. Upon information and belief, the John Doe Officers were coordinated in their approach because they were acting in accordance with Defendant Newsham's directives and District policies, practices, and customs. Defendant Newsham monitored and directed the Officers' response to protesters on June 1, and subsequently acknowledged responsibility for stopping the demonstrators on Swann Street and for the Officers' conduct. Defendant Glover was responsible for facilitating these directives on the scene and issuing orders, including to Defendants Horos and Mejia, who assisted in coordinating the Officers.

70.     Defendant Glover expressly authorized the use of force against Plaintiffs. Defendant Glover subsequently acknowledged that the actions of the Officers on scene, including the force used, was pursuant to and within department policy.

71.     As evident by the District's consistent use of kettling and excessive force to effectuate the detention and arrest of non-violent demonstrators, and Defendants' unlawful conduct against Plaintiffs on June 1, the District has failed to properly train and supervise its officers on the lawful circumstances under which to use pepper spray or other physical force, despite having notice of its need to do so.

**Defendants Transport Plaintiffs to Off-Site Facilities and Deny Them Access to Food, Water, and Restrooms**

72.     Defendants maintained the kettle and trapped protesters on Swann Street for hours. MPD Officers arrested the protesters who remained on the street, including Plaintiffs Medina-Tayac, Pearlmutter, Remick, and Surio.

73.     Upon information and belief, the MPD Officers responsible for handling the arrests and processing of protesters were acting under the supervision and direction of Defendant Newsham, the Supervisory Defendants, and the John Doe Officers who had supervisory authority on the scene.

74.     In a process that lasted until at least 2:00 in the morning for some protesters, MPD Officers lined up demonstrators on Swann Street, took photographs of them, confiscated their personal belongings, restrained them in unnecessarily tight and painful zip ties, and transported them to police facilities for processing. Although many protesters asked, MPD Officers did not tell the protesters why they were being detained, arrested, or hauled to another location. Upon information and belief, MPD Officers did not arrest, restrain, and detain individuals for curfew

violations unless they were protesting. Therefore, Plaintiffs' arrest, restraint, and detention was punishment for the content of Plaintiffs' protected speech.

75. Defendants kettled and detained Plaintiff Medina-Tayac for at least three hours on Swann Street.

76. MPD Officers took Plaintiff Medina-Tayac's personal belongings from him and restrained him in unnecessarily tight and painful zip ties. MPD Officers then crammed him in a hot van that had no air conditioning and transported him to a police academy facility.

77. Once at the facility, MPD Officers made Plaintiff Medina-Tayac and the other protesters transported with him stand outside for almost six hours before allowing them to come inside. People in the group tried to lay down on the ground because they were exhausted, but MPD Officers forced everyone to continue standing for hours. Temperatures dropped into the 50s. The protesters, who had not planned to be outside overnight, were not dressed for the colder weather. Officers denied them blankets and other means of staying warm and forced them to continue standing outside. The Officers refused to give any reason for taking these punitive measures.

78. Defendants kettled and detained Plaintiff Pearlmutter for more than two hours on Swann Street.

79. MPD Officers took Plaintiff Pearlmutter's personal property from him, including the protective facial buff he was using in place of his pepper-sprayed mask, and restrained him in tight and painful zip ties. MPD Officers crammed him and other protesters in a van that had no air conditioning.

80.     MPD Officers first transported Plaintiff Pearlmutter to the Washington Convention Center, where he was held for additional hours before being ordered on a bus with other vanloads of protesters and transported to the police academy facility.

81.     Once at the academy, MPD Officers made Plaintiff Pearlmutter and other protesters that had been transported with him wait outside for at least six hours before taking them inside.

82.     Defendants kettled and detained Plaintiff Remick for over four hours on Swann Street.

83.     MPD Officers restrained Plaintiff Remick in tight and painful zip ties and transported them to the police academy facility.

84.     Defendants kettled and detained Plaintiff Surio for at least three hours on Swann Street.

85.     MPD Officers first took Plaintiff Surio to the police academy, where she waited for three to four more hours. She was in in extreme physical pain because of the MPD Officers', including Defendant Quarles', assault on Swann Street.

86.     Plaintiff Surio asked to be taken to the hospital, but MPD Officers discouraged her from seeking medical attention. MPD Officers told her and other protesters who needed medical treatment for their officer-inflicted injuries that going to the hospital would prolong their processing and detention. Ultimately, Officers relented and took Plaintiff Surio and some other protesters to a hospital to be treated for their injuries.

87.     After Plaintiff Surio received treatment for her injuries, MPD Officers took her back to the police academy for further processing.

88.     Once inside the police academy, MPD Officers held Plaintiffs Medina-Tayac, Pearlmutter, Remick, and other protesters for many additional hours as they took them through additional rounds of processing and paperwork.

89.     Plaintiff Remick sat in the facility for an additional hour before processing because, as the arresting Officers told them at the station, they did "not know what to do with" a person who is nonbinary. The Officers at the facility also repeatedly misgendered Plaintiff Remick.

90.     Plaintiffs Medina-Tayac, Pearlmutter, and the other protesters were separated in groups by gender and crammed in small rooms with no windows and poor circulation during a global pandemic.

91.     MPD Officers did not provide food appropriate to the detainees' health within a reasonable time of arrest. MPD Officers teased and taunted protesters about their refusal to provide food or water. For example, on one occasion, MPD Officers brought only three small cups of water to a room of approximately forty people.

92.     MPD Officers denied the group of protesters regular bathroom breaks at the academy. At least one of the protesters urinated on herself because Officers refused to allow her to go to the bathroom.

93.     MPD Officers restrained Plaintiff Medina-Tayac in zip ties for more than six hours and failed to provide him bathroom access from the time of his arrest around 10:00 P.M. until his release around 6:00 A.M.

94.     MPD Officers kept Plaintiff Pearlmutter zip-tied from the time of his arrest around 10:00 P.M. until around 6:00 A.M. MPD Officers repeatedly denied Plaintiff

Pearlmutter's requests to adjust his zip ties during this time so that they would not continue to be painful. MPD also failed to provide him access to food, water, or a bathroom.

95.     MPD Officers failed to provide Plaintiff Remick with food, water, and access to a bathroom from the time of their arrest around 2:00 A.M. until their release around 6:00 A.M.

96.     MPD Officers restrained Plaintiff Surio in painful zip-ties and denied her access to food while she was in custody. She was not released until after 10:00 A.M. the following morning.

97.     Prior to their release, MPD Officers gave Plaintiffs citations to appear in court at a date months later. Confirming that Plaintiffs had not done, or were not even suspected of doing, anything involving violence or property damage, Defendants only charged Plaintiffs with misdemeanor curfew infractions.

**Defendants' Conduct Was in Retaliation for Plaintiffs' Protected Speech**

98.     Plaintiffs and other demonstrators on Swann Street had been peaceful and non-violent. Upon information and belief, no one in the kettle, including Plaintiffs, was suspected of any violent or destructive conduct on Swann Street; nor did any of the protesters on Swann Street resist Defendants' arrest. To the contrary, all the Swann Street arrests that Defendants made were for non-violent, misdemeanor violations of the curfew Defendants set in response to demonstrations in the District.

99.     Defendants' disproportionate response in kettling and using pepper spray and other physical force to detain or arrest Plaintiffs for purported, minor curfew infractions was in retaliation for Plaintiffs' protected speech. Upon information and belief, Defendants only enforced the curfew against, and thus arrested for curfew infractions, individuals who participated in the June 1 protest. Upon information and belief, other individuals who were

outside past curfew on June 1, but not participating in protests, were not arrested solely for curfew violations and were also not pepper sprayed or subjected to excessive force to effectuate any arrest.

100.     Upon information and belief, the Defendants do not generally use pepper spray, force, shields, or batons to effectuate arrests for non-resisting, non-violent individuals suspected only of curfew infractions.

101.     Defendants' conduct in transporting Plaintiffs and other demonstrators to off-site facilities; restraining them in tight and painful zip-ties; and denying them access to food, water, and restrooms was also in retaliation for Plaintiffs' protected speech. Upon information and belief, Defendants do not generally arrest and hold individuals overnight where, as here, the only violation at issue is a minor curfew infraction and Defendants intend to issue a citation for the arrestee to come to court at some future date. Upon information and belief, individuals whose only alleged misconduct is a purported curfew infraction and who are not involved in protest activities are not detained in the manner in which Defendants detained Plaintiffs. Defendants detained Plaintiffs in this manner because they had been engaged in protest activities.

102.     Defendants arrested and detained Plaintiffs for misdemeanor curfew infractions pursuant to the District's policies, practices, and customs. MPD has a specialized high-volume arrest system that is specifically employed for arresting individuals involved in protected speech activities. Upon information and belief, Defendant Newsham and the Supervisory Defendants ordered, directed, authorized, and affirmatively caused, and Defendants Crisman and Quarles executed, the targeted kettling of, use of force against, and detentions and arrests of Plaintiffs for misdemeanor curfew infractions because they were engaged in protected speech activity. Other

similarly situated people violating curfew were not kettled, physically abused, detained, or arrested.

## INJURY TO PLAINTIFFS

103.    As a result of Defendants' unlawful conduct, Plaintiffs suffered constitutional injury, physical pain and injury, and emotional distress.

104.    Plaintiffs suffered the short- and long-term physical effects of the chemical agents, excessive force, and violence used by Defendants.

105.    Plaintiffs suffered, and continue to suffer, injury as a result of Defendants' unlawful conduct, including fear, anxiety, and emotional distress.

106.    This incident chilled Plaintiffs' speech. As a result, they are less likely to participate in protest activities in the District out of fear of retaliation from Defendants.

## NOTICE OF CLAIMS

107.    Pursuant to D.C. Code § 12-309, Plaintiffs timely submitted their written notice of claim letters to the District of Columbia before filing suit. The D.C. Office of Risk Management received the notice of claim letters, via certified mail, for Plaintiffs Goodwin, Lane, Medina-Tayac, Pearlmutter, and Troper on November 3, 2020 and subsequently confirmed receipt of the same. The D.C. Office of Risk Management received the notice of claim letters, via certified mail, for Plaintiffs Lazo, Remick, and Surio on November 16, 2020 and subsequently confirmed receipt of the same.

## FIRST CAUSE OF ACTION

### Violation of the Fourth Amendment to the U.S. Constitution, Excessive Force

**42 U.S.C. § 1983**
**(All Plaintiffs v. All Defendants)**

108.    Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1-107 as though fully set forth herein.

109.    Defendant District of Columbia is liable for violating Plaintiffs' Fourth Amendment right to be free from excessive and unreasonable force. The District of Columbia ordered, directed, authorized, and caused the use of excessive force as alleged herein through its policies, practices, and customs – including its failure to train and supervise its officers – and through decisions by individuals with policymaking authority who bind the District of Columbia, including Defendant Newsham.

110.    Defendants Newsham, Glover, Horos, and Mejia are liable for violating Plaintiffs' Fourth Amendment right to be free from excessive and unreasonable force because, acting under color of state law, they ordered, directed, authorized, and affirmatively caused the use of excessive force as alleged herein.

111.    Defendants Horos, Crisman, Quarles, and John Doe Officers 1-50 are liable for violating Plaintiffs' Fourth Amendment right to be free from excessive and unreasonable force because, acting under color of state law, they carried out Defendant District of Columbia's and Defendant Newsham's, along with the remaining Supervisory Defendants', policies, practices, customs, and/or express orders by trapping, deploying pepper spray against, and physically assaulting Plaintiffs; supervising, instructing, and directing other Officers to use excessive and unreasonable force against Plaintiffs; and otherwise affirmatively causing Plaintiffs' constitutional injuries.

112. Defendants' use of force, including but not limited to using pepper spray and other physical force alleged herein, was excessive and objectively unreasonable in light of the facts and circumstances confronting them, as Plaintiffs were non-violent, non-resistant demonstrators who posed no threat to Officers or to anyone else, had not damaged any property, and complied with Officers' orders. Plaintiff Surio alleges that Defendant Quarles used excessive force against her by physically striking her without legal justification; Plaintiff Pearlmutter alleges that Defendant Horos used excessive force against him by pepper spraying him without legal justification; and Plaintiffs Goodwin, Lane, Lazo, and Troper allege that Defendant Crisman used excessive force against them by pepper spraying them without legal justification.

113. Defendants acted intentionally and maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiffs' rights.

114. As a direct and proximate result of Defendants' unlawful actions as alleged herein, Plaintiffs suffered damages, including, but not limited to, physical injury, emotional distress, and deprivation of their constitutional rights.

## SECOND CAUSE OF ACTION

**Violation of the First Amendment to the United States Constitution, Free Speech and Assembly—Retaliation**

**42 U.S.C. § 1983**
**(All Plaintiffs v. All Defendants)**

115. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1-107 as though fully set forth herein.

116. Defendant District of Columbia is liable for violating Plaintiffs' First Amendment right to freedom of speech and assembly. The District deprived Plaintiffs of their First Amendment rights through its official policies, practices, and customs—including its failure to

train and supervise its officers—as well as through decisions made by individuals with policymaking authority who bind the District of Columbia, including Defendant Newsham. To retaliate against Plaintiffs' protected speech, the District ordered, directed, authorized, and affirmatively caused the use of excessive force and conditions of pretrial detention alleged herein. Defendant District of Columbia also adversely affected Plaintiffs' constitutionally protected speech.

117. Defendants Newsham, Glover, Horos, and Mejia are liable for violating Plaintiffs' First Amendment right to freedom of speech and assembly because, acting under color of state law, they ordered, directed, authorized, and caused the excessive force and conditions of pretrial detention alleged herein. Defendants Newsham, Glover, Horos, and Mejia also adversely affected Plaintiffs' constitutional speech. Defendants Newsham, Glover, Horos, and Mejia acted intentionally and maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiffs' rights.

118. Defendants Horos, Crisman, Quarles, and John Doe Officers 1-50 are liable for violating Plaintiffs' First Amendment right to freedom of speech and assembly because, acting under color of state law, they carried out the District of Columbia's and Defendant Newsham's, along with the remaining Supervisory Defendants', directives in retaliating against Plaintiffs for participating in a protest, including by using excessive force and causing the circumstances of Plaintiffs' pretrial detention as alleged herein, and/or directed other Officers to do so. Defendants' actions adversely affected Plaintiffs' constitutionally protected speech. Defendants acted intentionally and maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiffs' rights.

119. Defendants' actions as alleged herein were sufficient to deter a person of ordinary firmness in Plaintiffs' position from exercising their First Amendment rights in the future and had the purpose and effect of chilling Plaintiffs' protected speech.

120. As a direct and proximate result of Defendants' unlawful actions as alleged herein, Plaintiffs suffered damages, including, but not limited to, physical injury, emotional distress, and deprivation of their constitutional rights.

### THIRD CAUSE OF ACTION

**Assault and Battery**
**(All Plaintiffs v. All Defendants)**

121. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1-107as though fully set forth herein.

122. Defendants Horos, Crisman, Quarles, and John Doe Officers 1-50 intentionally and unlawfully attempted by their actions to cause harmful and offensive physical contact with Plaintiffs by, including, but not limited to, deploying pepper spray at Plaintiffs and striking Plaintiffs with shields, batons, or their hands and feet, among the other force alleged herein; or ordered, ratified, or had knowledge of but failed to intervene or correct such conduct of Officers on the scene. Plaintiff Surio alleges that Defendant Quarles used excessive force against her by physically striking her without legal justification; Plaintiff Pearlmutter alleges that Defendant Horos used excessive force against him by pepper spraying him without legal justification; and Plaintiffs Goodwin, Lane, Lazo, and Troper allege that Defendant Crisman used excessive force against them by pepper spraying them without legal justification. Defendants' use of force was in excess of what Defendants reasonably believed was necessary to effectuate any arrests of

Plaintiffs, who were non-violent, non-resistant demonstrators and posed no threat to Officers or to anyone else, had not damaged any property, and complied with Officers' orders.

123.    Upon information and belief, Defendants Newsham, Glover, Horos, and Mejia ordered, ratified, or had knowledge of but failed to intervene or correct the Officers' harmful and offensive physical contact with Plaintiffs as alleged herein that includes, but is not limited to, deploying pepper spray at Plaintiffs and using shields, batons, or other physical force to effectuate Plaintiffs' detention and arrest. The use of force was in excess of what Defendants reasonably believed was necessary to effectuate any arrests of Plaintiffs, who were non-violent, non-resistant demonstrators who posed no threat to Officers or to anyone else, had not damaged any property, and complied with Officers' orders.

124.    Defendant District of Columbia is vicariously liable for the tortious acts of the other Defendants. At the time that Defendants committed assault and battery against Plaintiffs as alleged herein, Defendants were acting as agents of the District and within the scope of their employment as MPD officers.

### FOURTH CAUSE OF ACTION

**Negligence Per Se (violations of the FAAA)**
**(All Plaintiffs v. All Defendants)**

125.    Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1-107 as though fully set forth herein.

126.    Defendants failed to give a "clearly audible and understandable order to disperse using an amplification system or device" or to "provide the [Plaintiffs] a reasonable and adequate time to disperse and a clear and safe route for dispersal," in violation of the First Amendment Assemblies Act ("FAAA"). D.C. Code Ann. § 5-331.07(e)(1).

127.     Defendants failed to "issue multiple dispersal orders . . . from multiple locations," inform Plaintiffs of "the route or routes by which they may disperse," or state that "refusal to disperse will subject them to arrest," in violation of the FAAA. D.C. Code Ann. § 5-331.07(e)(2).

128.     Defendants' use of chemical irritants was not reasonable or necessary to protect officers or others from physical harm, as Plaintiffs were not committing acts of public disobedience endangering public safety and security, in violation of the FAAA. D.C. Code Ann. § 5-331.16(b)(2).

129.     Upon information and belief, Defendants Newsham, Glover, Horos, and Mejia ordered, ratified, or had knowledge of but failed to intervene or correct the Officers' negligent conduct as alleged herein.

130.     Defendant District of Columbia is vicariously liable for the other Defendants' negligence. At the time that Defendants engaged in the negligent conduct alleged herein, they were acting as agents of the District and within the scope of their employment as MPD officers.

131.     Defendants' violations of the FAAA constitute negligence per se, as Defendants breached a legally defined duty of care to Plaintiffs, causing their injuries.

## PRAYER FOR RELIEF

Plaintiffs request that this Court:

132.     Find that Defendants' actions violated Plaintiffs' rights under the First and Fourth Amendments to the United States Constitution, and the law of the District of Columbia;

133.     Award Plaintiffs compensatory damages in an amount to be determined by a jury that would fully compensate Plaintiffs for the injuries caused by Defendants' conduct as alleged therein;

134. Award Plaintiffs punitive damages against all Defendants sued in their individual capacities in an amount to be determined by a jury that would punish these Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

135. Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action as provided in 42 U.S.C. § 1988(b); and

136. Order such further relief as this Court deems just and appropriate.

## JURY DEMAND

137. Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

Dated: May 28, 2021

Respectfully submitted,

/s/ Gabriel Diaz
Gabriel Diaz [DCD Bar ID: 991618]
Jia Cobb [DCD Bar ID: 503340]
Tahir Duckett*
Kali Schellenberg [DCD Bar ID: 198422]
RELMAN COLFAX, PLLC
1225 19th St NW
Suite 600
Washington, DC 20036
Tel: 202-728-1888
Fax: 202-728-0848
jcobb@relmanlaw.com
gdiaz@relmanlaw.com
tduckett@relmanlaw.com
kschellenberg@relmanlaw.com

*Attorneys for Plaintiffs*

*Admission to the District Court of the District of Columbia pending