**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAMELA GOODWIN, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 21-cv-806 (BAH) |
| DISTRICT OF COLUMBIA, *et al.*, | Chief Judge Beryl A. Howell |
| Defendants. | |

**MEMORANDUM OPINION**

Eight individual plaintiffs, who participated in the summer 2020 demonstrations protesting police brutality and misconduct in the District of Columbia ("District") in the wake of George Floyd's murder, have filed the instant lawsuit against the District and officers of the Metropolitan Police Department ("MPD"), including former Chief Peter Newsham, Supervisory Officer Robert Glover, Lieutenants Andrew Horos and Carlos Mejia, Officers James Crisman and Steven Quarles, and fifty yet-to-be-identified John Doe MPD Officers ("Doe Officers"), claiming alleged violations of plaintiffs' First and Fourth Amendment rights, pursuant to 42 U.S.C. § 1983, and common law assault and battery and a statutory claim of negligence *per se* under the D.C. Code.  First Am. Compl. ("Am. Compl.") ¶¶ 1, 26-28, ECF No. 39.  Citing the District's policies, practices, and customs for handling public demonstrations, plaintiffs allege that defendants responded to their peaceful protest activities with excessive force in retaliation for plaintiffs' rallying against police brutality and misconduct.  *Id.* ¶¶ 3, 6.

Defendants now move, under Federal Rule of Civil Procedure 12(b)(6), to dismiss three of the four counts in the amended complaint for failure to state a claim.  *See* Defs.' Mot. for Partial Dismissal Am. Compl. ("Defs.' Mot."), ECF No. 24; Defs.' Mem. Support of Mot. for

Partial Dismissal ("Defs.' Mem.") at 1, ECF No. 24.  For the reasons explained below, defendants' partial motion to dismiss is denied.

## I.       BACKGROUND

The relevant factual background and procedural history is summarized below.

### A.       Factual Background

The facts underlying plaintiffs' claims from the original complaint filed in this case have been previously outlined, *see Goodwin v. District of Columbia*, No. 21-cv-806 (BAH), 2021 WL 1978795 (D.D.C. May 18, 2021), and are summarized again below based on the amended complaint.

#### 1.       *Plaintiffs Join Demonstrations Around the District of Columbia*

On June 1, 2020, plaintiffs separately convened with other demonstrators in different parts of the District peaceably to protest police brutality following the deaths of George Floyd in Minnesota and Tony McDade, a Black transgender man killed by police officers in Florida.  Am. Compl. ¶¶ 26-30.  Six of the plaintiffs—Pamela Goodwin, Allison Lane, Jenny Lazo, Sebastian Medina-Tayac, Jesse Pearlmutter, and Priyanka Surio—joined a demonstration near the White House, *id.* ¶ 29, while plaintiffs Osea Remick and Eliana Troper first attended a vigil at Dupont Circle in memory of Tony McDade, *id.* ¶¶ 28, 30.  After attending the vigil, Remick and Troper headed towards the demonstration near the White House.  *Id.* ¶ 30.  While attending these demonstrations, plaintiffs "did not engage in any violent or destructive behavior . . . nor did they witness any such behavior from other demonstrators," *id.* ¶¶ 29, 30.

Once the demonstration at the White House dissipated, all plaintiffs, along with other protesters, headed northwest to return to "their respective homes or to continue their protest activities." *Id.* ¶ 31.  Plaintiffs allege that "Defendant Newsham and other District law enforcement officials under his direction, including Defendants Glover, Horos, and Mejia,

2

monitored" them and the other demonstrators "as the group continued to walk" following the White House demonstration.  *Id.* ¶ 32.  For the duration of the evening's demonstrations, Supervisory Officer Glover was specifically "responsible for setting up the command post and coordinating the actions of the other Defendants on the ground," whereas Lieutenants Horos and Mejia "facilitated the execution of . . . Glover's commands."  *Id.* ¶ 34.

As they approached 14th Street NW, plaintiffs were first confronted by MPD officers.  *Id.* ¶ 35.  The officers deployed "aggressive intimidation tactics to try to prevent [plaintiffs] from engaging in their protest activities," such as driving police cars behind the protesters during their march to frighten the demonstrators "by suddenly speeding up . . . and trying to drive through the group."  *Id.*

Later, near the intersection of 14th Street with Florida Avenue, MPD officers in police cars surrounded plaintiffs and their fellow protesters "without warning and without issuing commands to disperse or return home," and blocked the nearby side streets, effectively creating a police perimeter blocking plaintiffs and other demonstrators from leaving.  *Id.* ¶ 36.  Chanting "Hands Up, Don't Shoot" alongside other demonstrators, plaintiffs sought peacefully to continue walking up 14th Street within this police perimeter, but allege that MPD officers, again without warning, detonated flash grenades and deployed pepper spray at some protestors.  *Id.* ¶¶ 37-39.  Plaintiffs aver that the officers' use of flash grenades and pepper stray was directed and authorized by then-Chief Newsham, who was responsible for overseeing the officers on scene as he monitored the demonstrations.  *Id.* ¶ 40.  Plaintiffs further allege that they "had not engaged in any violent or destructive behavior prior to MPD Officers detonating flash grenades and spraying demonstrators with pepper spray, nor had they observed any other demonstrator engaging in such behavior."  *Id.*  ¶ 41.

Shortly thereafter, plaintiffs and the larger group were forced by MPD officers "to turn west down Florida Avenue, south down 15th Street NW, and then onto a side street, Swann Street NW, between 14th and 15th Streets." *Id.* ¶ 42.

### 2.   *Defendants' Alleged Use of Kettling and Excessive Force on Swann Street*

Once the demonstrators, including plaintiffs, were herded onto Swann Street, MPD officers, without giving any orders to disperse, physically surrounded and enclosed the group, preventing anyone from leaving. *Id.* ¶¶ 42-44.  This is a "controversial" policing technique, referred to as "kettling," which plaintiffs allege is "an express policy MPD follows to confine individuals engaged in protected speech activities." *Id.* ¶ 44.  The kettling was effectuated by groups of officers on bicycles and on foot from "MPD's specialized unit for handling demonstrations" after being called to the scene by Lieutenants Horos and Mejia upon the instruction of Supervisory Officer Glover. *Id.* ¶ 46.  Restrained from leaving Swann Street and uncertain as to what would occur next, many demonstrators "cried and begged to leave," including plaintiff Goodwin, who unsuccessfully pleaded with an MPD officer to be released from the kettle because she had a young child awaiting at home. *Id.* ¶ 48.  Plaintiffs aver that, in accordance with "the District's kettling policy and/or the directives of Defendant Newsham, Defendant Glover ordered and authorized the kettling and confinement of protestors on Swann Street." *Id.* ¶ 46.

A new group of officers, "dressed in riot gear and armed with shields, batons, pepper spray and other weapons," then arrived on Swann Street to replace the first set of MPD officers responsible for forming the kettle. *Id.* ¶ 50.  "[A]lmost immediately, and without warning," these officers "brandished their shields and batons and began swinging them toward Plaintiffs and other demonstrators[,]" while yelling "move back" in unison and using their batons to enclose

4

plaintiffs and demonstrators "in an increasingly smaller space." *Id.* ¶ 51. At this point, Supervisory Officer Glover authorized the MPD officers on scene to use force "[p]ursuant to the District's policies, practices, and customs for responding to demonstrations, and Newsham's directives." *Id.*

A ruckus ensued. While confined within the kettle, which made any movement difficult for plaintiffs and other demonstrators, *id.* ¶ 53, including any movement to comply with any police dispersal orders had such orders been given, MPD officers "attacked Plaintiffs and others within the kettle by deploying excessive amounts of pepper spray at them," *id.* ¶ 54, in their faces or on or near their bodies, and caused plaintiffs to experience "intense burning sensations in their lungs, eyes, faces, throats, and chests; severe coughing and difficulty breathing; and disorientation," *id.* ¶ 57. The complaint specifically alleges that Officer Crisman, among other officers, pepper sprayed plaintiffs Goodwin, Lane, Lazo, and Troper, and that Lieutenant Horos, among other officers, pepper sprayed plaintiff Pearlmutter. *Id.* ¶ 58.

Plaintiffs further allege that MPD's use of force went beyond the deployment of chemical agents to involve "violent physical force," *id.* ¶ 61, with MPD officers "hit[ting] demonstrators, prodd[ing] and shov[ing] them with batons, knock[ing] them to the ground, and pinn[ing] them against cars and trees," *id.* ¶ 62. For instance, around the same time that plaintiffs were pepper sprayed, Officer Quarles allegedly struck plaintiff Surio with his police shield "even though [plaintiff] had done nothing to warrant the physical force that he used against her." *Id.* ¶ 52. A different officer "suddenly and violently pushed another person" against plaintiff Medina-Tavac, which caused this plaintiff to be "pinned against the hood of a car, f[a]ll to the ground, and [be] stepped on." *Id.* ¶ 63. Doe Officers "repeatedly struck Plaintiff Remick with a baton, landing blows with sufficient force to cause bruising on their arms and back," *id.* ¶ 64, and in addition to

being struck by defendant Quarles, another Doe Officer hit plaintiff Surio with a baton so forcefully "that she sustained contusions, welts, and bruising on her upper body," *id.* ¶ 65. Despite allegedly complying with the officers' directives and otherwise behaving peacefully, plaintiffs Surio, Medina-Tayac, and Remick were each arrested following these incidents. *See id.* ¶¶ 52, 63-65.

The MPD's targeted action against protesters on Swann Street was not, in plaintiffs' view, "merely the result of one-off decisions by individual actors." *Id.* ¶ 67. Instead, plaintiffs contend that "the violent actions of the Doe Officers on Swann Street" were part of "a planned and coordinated strategy carried out by Officers working together at the direction of Defendant Newsham through the Supervisory Defendants on scene," *id.* ¶ 66, and stemming from the District's policies, practices, and customs that, for "nearly two decades," have authorized MPD to use "a combination of kettling, chemical agents, and other excessive force to detain and arrest non-violent demonstrators, particularly those who have voiced criticism of the police or government," *id.* ¶ 67; *see also id.* ¶ 69 ("Defendant Newsham made the decision to dispatch Officers in riot gear."). After monitoring and directing MPD's response to the protest, plaintiffs claim that then-Chief Newsham ultimately "acknowledged responsibility for stopping the demonstrators on Swann Street and for the Officers' conduct," *id.* ¶ 69, and that Supervisory Officer Glover likewise acknowledged that the officers' actions, including their use of force, "was pursuant to and within department policy," *id.* ¶ 70.

Plaintiffs point out that the District has been sued repeatedly for its "consistent use of kettling and excessive force" against non-violent protesters during "high-profile" protests such as those that took place at Pershing Park in 2000, Adams Morgan and the White House area in 2005, and the 2017 Presidential Inauguration. *Id.* ¶¶ 68, 71. These prior incidents and resulting

lawsuits—together with defendants' "unlawful conduct against Plaintiffs" during the June 1, 2020 demonstrations—provided the District with notice of its failure "to properly train and supervise its officers on the lawful circumstances under which to use pepper spray or other physical force." *Id.* ¶ 71.

### 3. *Plaintiffs' Arrest and Detention*

Following their arrests, plaintiffs Medina-Tayac, Pearlmutter, Remick, and Surio were detained on Swann Street between two to four hours without any explanation, *id.* ¶¶ 72, 74, 75, 78, 82, 84, in tight and painful zip ties, *id.* ¶¶ 76, 79, 83, before being transported to a police academy facility, where plaintiffs Medina-Tayac and Pearlmutter were forced to stand outside for almost six additional hours pending processing, *id.* ¶¶ 77, 81. Once processed, plaintiffs Medina-Tayac and Pearlmutter, together with other protesters, were detained "in small rooms with no windows and poor circulation during a global pandemic." *Id.* ¶ 90.

While also awaiting processing at the police facility for about four hours, plaintiff Surio—who was suffering "extreme physical pain" following the injuries she sustained on Swann Street, *see id.* ¶¶ 52, 65—asked to be taken to the hospital, but "MPD Officers discouraged her from seeking medical attention[,]" before ultimately relenting and taking her for treatment. *Id.* ¶¶ 85-86. Meanwhile, plaintiff Remick's processing at the detention facility was delayed for an hour because, as stated by their arresting officers, they did "'not know what to do with' a person who is nonbinary;" plaintiff Remick was also repeatedly misgendered by the officers at the detention facility. *Id.* ¶ 89.

Following their arrests, MPD officers did not provide plaintiffs and the other detained protesters with adequate food; teased and taunted protesters about their refusal to provide food or water, *id.* ¶ 91; and, for eight hours, denied restroom access to plaintiffs Medina-Tayac and Pearlmutter, *id.* ¶¶ 93-94. Plaintiffs were ultimately charged with "misdemeanor curfew

infractions" and, after receiving citations summoning them to appear in court at later dates, were released from the police facility between 6 A.M. and 10 A.M. the following day. *Id.* ¶¶ 93-97. In plaintiffs' view, the fact that they were only charged with curfew infractions "[c]onfirm[s] that [they] had not done, or were not even suspected of doing, anything involving violence or property damage." *Id.* ¶ 97.

Plaintiffs allege, however, that other individuals who were similarly "outside past curfew on June 1, but not participating in protests, were not arrested solely for curfew violations and were also not pepper sprayed or subjected to excessive force to effectuate any arrest." *Id.* ¶ 99. Rather, plaintiffs contend that on June 1, 2020, defendants "*only* enforced the curfew against, and thus arrested for curfew infractions, individuals who participated in the June 1 protest." *Id.* (emphasis added). For this reason, plaintiffs assert that the range of actions defendants took against them that evening—from their kettling and pepper spraying on Swann Street to their arrest for curfew violations and hours-long detention—was "punishment for the content of [their] protected speech" in protest of police brutality. *Id.* ¶ 74; *see also id.* ¶¶ 99-102.

## B.     Procedural Background

Plaintiffs commenced this lawsuit on March 25, 2021. *See* Compl., ECF No. 1. Before defendants filed any responsive pleading, plaintiffs sought, pursuant to Federal Rule of Civil Procedure 26(d)(1), "an order requiring [the District] to provide expedited discovery sufficient to identify the John Doe officers who used forced against Plaintiffs" so that plaintiffs could "preserve their ability to bring any claim for assault and battery against the identified officers by the June 1, 2021 statute of limitations" deadline. Pls.' Mot. to Expedite Discovery at 1, ECF No. 11. This motion was granted on May 18, 2021 and the District ordered to produce, on an expedited basis, (1) use of force reports filed by MPD officers for actions taken on the 1400 block of Swann Street on June 1, 2020, and (2) complaints filed against MPD officers for

excessive force taken on the 1400 block of Swann Street on that same date. *See Goodwin*, 2021 WL 1978795, at *26.

The next day, defendants moved for partial dismissal of plaintiffs' complaint, *see* Defs.' Partial Mot. to Dismiss, ECF No. 17, which motion was denied as moot when plaintiffs filed the operative amended complaint on May 28, 2021, *see* Min. Order (June 28, 2021).  Plaintiffs' amended complaint brings four claims asserting: (1) defendants' use of excessive force, in violation of the Fourth Amendment, Am. Compl. ¶¶ 108-114 (Count I); (2) defendants' retaliation in response to plaintiffs' protected speech, in violation of the First Amendment, *id.* ¶¶ 115-120 (Count II); (3) defendants' assault and battery at common law, *id.* ¶¶ 121-24 (Count III); and (4) defendants' negligence *per se* under the First Amendment Assemblies Act, D.C. Code §§ 5-331.07(e)(1)-(2), 5-331.16(b), *id.* ¶¶ 125-31 (Count IV).  As relief, plaintiffs seek declaratory judgment, compensatory damages, and punitive damages against all defendants sued in their individual capacities, in addition to attorneys' fees and any other relief the Court deems proper. *Id.* ¶¶ 132-36.

Following the parties' requests for extensions of the briefing schedule, *see* Min. Order (July 9, 2021); Min. Order (July 29, 2021), defendants' renewed motion for partial dismissal is now ripe for resolution.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[a] plaintiff need not make 'detailed factual allegations,'" but the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *VoteVets Action Fund v. McDonough*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts that are not "'merely

consistent with' a defendant's liability" but that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). Consequently, "a complaint survives a motion to dismiss even 'if there are two alternative explanations, one advanced by [the] defendant and the other advanced by the plaintiff, both of which are plausible.'" *VoteVets Action Fund*, 992 F.3d at 1104 (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555; *see also Atchley, et al., v. AstraZeneca UK Limited, et al.*, No. 20-7077, 2022 WL 30153, at *2 (D.C. Cir. Jan. 4, 2022). Courts do not, however, "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (alteration in original) (internal citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

## III.   DISCUSSION

Defendants seek complete dismissal of plaintiffs' First and Fourth Amendment claims under § 1983, as pleaded in Counts I and II, and the negligence *per se* claim for violation of the District's First Amendment Assemblies Act, as asserted in Count IV, *see* Defs.' Mot., but to that end present four narrow arguments that, as plaintiffs explain, "largely seek[] to dismiss theories of liability as opposed to causes of action" without "challeng[ing] much of [the] complaint." Pls.' Mem. Opp'n Defs.' Partial Mot. to Dismiss ("Pls.' Opp'n"), at 1, ECF No. 28.[1]  In

---

[1]     Defendants do not challenge the common law assault and battery claim asserted in Count III against all defendants, Am. Compl. ¶¶ 121-24, nor the First and Fourth Amendment claims in Counts I and II against defendants Glover, Horos, Mejia, Crisman, and Quarles. *See* Pls.' Opp'n at 1.

particular, defendants seek dismissal of the constitutional claims in Counts I and II on the grounds that plaintiffs' allegations regarding then-Chief Newsham's actions as a policymaker and the District's purported failure properly to train MPD officers are insufficient to establish municipal liability for § 1983 purposes, *see* Defs.' Mem. at 3-8, and that these claims are barred against then-Chief Newsham due to his qualified immunity, *id.* at 8-9.  Next, defendants contend plaintiffs' First Amendment retaliation claim in Count II cannot survive to the extent this claim is based on plaintiffs' conditions of confinement following their arrest.  *Id.* at 10-11.  Lastly, defendants contend that Count IV should be dismissed because the "First Amendment Assemblies Act . . . does not impose specific duties beyond the common law duty of reasonable care, and therefore it cannot support Plaintiffs' claim of negligence *per se*."  *Id.* at 11.

For the reasons detailed below, each of defendants' arguments is unavailing.

### A.    Plaintiffs Adequately Pleaded Municipality Liability Under § 1983

Defendants contend that plaintiffs' pleading is inadequate to hold the District liable under § 1983 for plaintiffs' asserted violations of their First and Fourth Amendment rights.

Section 1983 provides a remedy for an individual who has been deprived, by a person acting under color of state law, of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  A municipality, like the District, may be held liable pursuant to § 1983 for the acts of its employees, but only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (allowing municipal liability where "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation").

To establish municipal, or *Monell*, liability under § 1983, a plaintiff must first demonstrate an underlying constitutional violation, and second, show that the municipality's policy or custom caused the violation. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Such a policy or custom exists for *Monell* purposes "when (1) the municipality adopts a policy that itself violates the Constitution; (2) the unconstitutional action was taken by a policy maker within the government; (3) the employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware; or (4) the municipality knew or should have known of a risk of constitutional violations, but showed deliberate indifference to that risk by failing to act." *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (citations omitted). A showing under *any* of these four theories suffices to sustain a claim of *Monell* liability against a municipality. *See id.* at 337, 340-42 (reversing grant of summary judgment to the District and remanding for resolution of the factual "nature [,] operation . . . [and] constitutionality" of an adequately asserted policy, although plaintiff had failed to establish *Monell* liability under a custom or deliberate indifference theory).

Here, plaintiffs have adequately alleged two constitutional violations and defendants do not argue otherwise. Specifically, plaintiffs claim that, while they peacefully engaged in protest activities, defendants nevertheless used excessive force against them in violation of the Fourth Amendment, *see* Am. Compl. ¶¶ 108-114, and that such deployment of excessive force and plaintiffs' subsequent arrest and detention violated the First Amendment because these actions were in retaliation for their protected speech in protest of police brutality and misconduct, *see id.* ¶¶ 115-120. Plaintiffs have thus satisfied the first requirement plausibly to plead a *Monell* claim.

Defendants insist, however, that plaintiffs' § 1983 claims against the District must fail at this early stage of the litigation because the amended complaint presents inadequate allegations regarding a District "policy or custom" causing plaintiffs' asserted constitutional violations.  *See* Defs.' Mem. at 4.  According to defendants, plaintiffs "fail[ed] to allege that specific actions of Chief Newsham as policy maker—rather than the individual decisions and actions of MPD officers—were the cause of any injury to Plaintiffs," as needed to support a *Monell* claim based on policymaker liability, *id.* at 5, and averred "no facts at all regarding the training and supervision of the MPD Officers," *id.* at 7, as necessary to establish that the District was deliberately indifferent to the risk of constitutional violations, *see Hurd*, 997 F.3d at 337.  From defendants' perspective, the complaint does not sustain any other theory of *Monell* liability because plaintiffs "have failed to make a *specific* factual allegation . . . of a particular written policy that caused the alleged unconstitutional violations."  Defs.' Reply to Pls.' Opp'n to Defs.' Mot. for Partial Dismissal ("Defs.' Reply"), at 7, ECF No. 29 (emphasis in original).  Defendants' characterization of the amended complaint simply ignores plaintiffs' many well-pleaded allegations supporting their assertion of municipal liability against the District.

To begin, despite defendants' assertion to the contrary, plaintiffs have indeed identified an "official municipal policy of some nature [that] caused the constitutional tort."  *Hurd*, 997 F.3d at 337.  According to plaintiffs, defendants' actions on June 1, 2020 "were pursuant to the District's policies" as effectuated through "specific, standard operating procedures for handling First Amendment assemblies and other large-scale demonstrations."  Am. Compl. ¶ 33. Plaintiffs also allege, for example, that their "kettling" on Swann Street, which the MPD also refers to as "encirclement," resulted from "an express policy MPD follows to confine individuals engaged in protected speech activities."  *Id.* ¶ 44; *see id.* ¶¶ 42-46.  Moreover, the complaint

avers that the "combination of kettling, chemical agents, and other excessive force" plaintiffs experienced was in accordance with District policies authorizing the use of such force "to detain and arrest non-violent demonstrators, particularly those who have voiced criticism of the police or government," *id.* ¶ 67, and that Supervisor Glover "subsequently acknowledged . . . the actions of the Officers on scene, including the force used, was pursuant to and within department policy," *id.* ¶ 70. These allegations thus sufficiently give rise to a plausible inference that policies, written or practiced, reflected in a "policy statement, ordinance, [or] regulation" caused plaintiffs' asserted violations of their First and Fourth Amendment rights. *Monell*, 436 U.S. at 690.

Defendants' argument that *Monell* liability cannot be sustained on a policymaker theory, "[b]ecause Plaintiffs fail to allege any particular action by Chief Newsham . . . that caused their injuries," is similarly unpersuasive. Defs.' Mem. at 5.[2] According to defendants, plaintiffs' allegations regarding the excessive force they experienced in the hands of subordinate MPD officers somehow "belie the assertion that any particular use of force was directly attributable to Chief Newsham rather than [to] an individual officer exercising his or her discretion as to how to respond at any particular moment." *Id.* In so arguing, however, defendants once again disregard plaintiffs' well-pleaded allegations, including that then-Chief Newsham "ordered, supervised, ratified, and was thus directly responsible for, MPD officers' use of excessive force and retaliation that caused Plaintiffs' injuries." Pls.' Opp'n at 7. For example, plaintiffs allege that "Defendant Newsham directed and authorized the Officers' use of flash grenades, pepper spray, and other force, and was responsible for coordinating the Officers' response on the scene as he

---

[2]     Defendants do not dispute that the threshold prerequisite is met for the District to be liable under a policymaker theory of *Monell* liability because then-Chief Newsham, as head of MPD, possessed "final policymaking authority," *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), regarding the District's policing practices. *See* Defs.' Mem. at 6; Pls.' Opp'n at 7.

monitored the events" throughout the evening of June 1, 2020.  Am. Compl. ¶ 40.  The

complaint further alleges that plaintiffs' "kettling and confinement" on Swann Street was

effectuated pursuant to the directives that then-Chief Newsham provided to Supervisory Officer

Glover, *id.* ¶ 46; that then-Chief Newsham "ordered, directed, authorized, and affirmatively

caused . . . the detentions and arrests of Plaintiffs for misdemeanor curfew infractions because

they were engaged in protected speech activity," *id.* ¶ 102; and that then-Chief Newsham

ultimately "acknowledged responsibility for stopping the demonstrators on Swann Street and for

the Officers' conduct," *id.* ¶ 69.[3]  These allegations, certainly taken together, support a

reasonable inference that then-Chief Newsham in effect "wielded final policy making authority

with respect to the allegedly unconstitutional conduct," *Jones v. District of Columbia*, 715 F.

App'x 1, 3 (D.C. Cir. 2018), and suffice to support a policymaker theory of *Monell* liability at

this stage of the litigation.

In sum, plaintiffs have adequately pleaded that a municipal "policy or custom . . .

inflict[ed]" their asserted constitutional injuries and their § 1983 claims against the District may

accordingly proceed to discovery.  *Monell*, 436 U.S. at 694.[4]

---

[3]     Defendants complain that several of plaintiffs' allegations regarding actions taken by then-Chief Newsham on June 1, 2020 "are pleaded 'on information and belief,'" which they suggest must be accompanied—under D.C. Circuit precedent—by a separate "statement of facts upon which the allegations are based."  Defs.' Reply at 4 n.2 (citing *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021)).  That is incorrect and the cited case does not support that proposition.  Rather, *Kareem* simply reiterated the long-settled principle that "pleadings on information and belief are permitted when the necessary information," as in this case, "lies within defendant's control," and that, to survive a motion to dismiss, such pleadings must be sufficiently supported by factual allegations presented in the complaint.  986 F.3d at 866; *see also Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1279 (D.C. Cir. 1994) (same).  As explained above, the plaintiffs have met that burden here, without the benefit of full discovery, by alleging in their complaint sufficient facts supporting the reasonable inference that then-Chief Newsham, as head of MPD, was the municipal policymaker who supervised and directed the actions of subordinate MPD officers who directly inflicted plaintiffs' asserted constitutional injuries.  *See, e.g.,* Am. Compl. ¶¶ 40, 46, 69.

[4]     For a § 1983 action against a municipality to survive the pleading stage, a plaintiff is only required to present plausible allegations supporting at least one of the four pathways available under *Monell* to establish the existence of a "policy or custom."  *See Baker*, 326 F.3d at 1306 (explaining that "[t]here are a number of ways in which a 'policy' can be set by a municipality" for *Monell* purposes, any of which is sufficient "to cause [the municipality] to be liable under section 1983"); *id.* at 1307 ("[I]f a complaint alleging municipal liability under § 1983 may be read in a way that can support a claim for relief, thereby giving the defendant a fair notice of the claim,

**B.     Qualified Immunity Does Not Bar Claims Against Defendant Newsham At This Procedural Juncture**

Next, defendants argue that then-Chief Newsham is entitled to qualified immunity on plaintiffs' First and Fourth Amendment claims under § 1983.  Defs.' Mem. at 8.[5]  The qualified immunity doctrine shields government officials sued in actions under 42 U.S.C. § 1983 "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The defendant bears the burden of pleading and proving the defense of qualified immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982).  Moreover, "[i]n assessing a claim of qualified immunity, the facts must be taken in the light most favorable to the party asserting the injury."  *Daugherty v. Sheer*, 891 F.3d 386, 390 (D.C. Cir. 2018) (citations omitted).  As explained below, the current factual record precludes a determination of the applicability of qualified immunity to then-Chief Newsham for his role in the alleged unconstitutional treatment of plaintiffs on June 1, 2020.

Government officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting

---

that is sufficient.").  As discussed *supra*, plaintiffs aver facts supporting the District's liability under two theories: (1) that the District has explicitly adopted policies to retaliate against those engaged in protected speech activities, and (2) that plaintiffs' constitutional injuries were caused by a policymaker, then-Chief Newsham.  *See Hurd*, 997 F.3d at 337.  Nonetheless, defendants argue that plaintiffs' claims against the District must fail because the complaint did not adequately plead an alternative "failure to train or supervise" theory of *Monell* liability, *see* Defs.' Mem. at 7-8, but this argument ignores the pleading sufficiency as to other theories of liability.  Defendants' critique concerning the pleading sufficiency of this alternative avenue for municipal liability thus need not be further addressed.

[5]     Qualified immunity has not been asserted as a basis to dismiss the constitutional claims in Counts I and II against any other individual defendant.  *See* Defs.' Mem. at 8-9; Pls.' Opp'n at 16.

*Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  A constitutional right is clearly established if,

"at the time of the [official's] conduct, the law was sufficiently clear that every reasonable

official would understand that what he is doing is unlawful."  *Wesby*, 138 S. Ct. at 589.

Defendants assert that qualified immunity bars the constitutional claims against then-

Chief Newsham because plaintiffs "do not identify any particular action that Newsham took [and

which] violated a clearly established constitutional right."  Defs.' Mem. at 9; *see also* Defs.'

Reply at 8 ("Plaintiffs do not identify any particular use of force that Chief Newsham ordered.").

Plaintiffs counter that sufficient facts are pled showing that then-Chief Newsham monitored and

authorized the unjustified use of excessive force against them and that he also "singled [them]

out . . . for retaliatory treatment because they were engaged in protest activity."  Pls.' Opp'n at

18.  Invoking precedent from the Supreme Court and the D.C. Circuit, plaintiffs explain that the

unconstitutionality of "the use of force against non-violent and non-resisting arrestees," and their

"singl[ing] out for retaliatory and differential treatment . . . because they engaged in protected

protest activity," is clearly established.  *Id*. at 19-20; *see id.* at 20 ("Defendants cannot credibly

claim that [Chief] Newsham would not have known that it was unconstitutional to order the use

of force against Plaintiffs because they engaged in protest activity.").

Examining the only facts available at this stage of the proceedings—those alleged in

plaintiffs' amended complaint that must be "grant[ed] [] the benefit of all reasonable

inferences"—plaintiffs have adequately shown a constitutional violation and thus satisfied one of

two requirements to defeat then-Chief Newsham's assertion of qualified immunity.  *Trudeau v.*

*Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations omitted).  As previously

outlined, plaintiffs allege, *inter alia*, that then-Chief Newsham ordered his subordinates to: (1)

"use . . . flash grenades, pepper spray, and other force" against plaintiffs, *see* Am. Compl. ¶ 40;

(2) kettle and confine plaintiffs on Swann Street, *id.* ¶ 46; and (3) arrest and detain plaintiffs on "misdemeanor curfew infractions because they were engaged in protected speech activity," *id.* ¶ 102. According to plaintiffs, these orders from then-Chief Newsham led to the alleged violation of their rights under the First and Fourth Amendments. For this reason, defendants' flat assertion that plaintiffs "offer no facts to show that Chief Newsham had any role in violating those particular rights" plainly misses the mark. Defs.' Reply at 8.

Nevertheless, mindful of its obligation to "resolv[e] immunity questions at the earliest possible stage in litigation," *Pearson*, 555 U.S. at 232, the Court must assess, in determining if the asserted violation has been of a "clearly established" constitutional right, whether the official claiming immunity "acted reasonably in the *particular* circumstances that he or she faced." *Wesby*, 138 S.Ct. at 589 (citations omitted) (emphasis added). Despite carrying the burden of pleading the requirements of the qualified immunity defense, *see Harlow*, 457 U.S. at 812, defendants have only addressed in passing whether then-Chief Newsham's actions violated any clearly established rights. In just a footnote, for example, defendants assert that, following the Supreme Court's recent ruling in *Nieves v. Bartlett*, a viable First Amendment retaliatory arrest claim must generally plead the absence of probable cause for the arrest, which absence plaintiffs do not so allege here. *See* 139 S. Ct. 1715 (2019); Defs.' Mem. at 10 n.3. *Nieves* also recognized, however, that such a pleading requirement does not apply if plaintiffs can demonstrate that "otherwise similarly situated individuals not engaged in the same sort of protected speech had not been" arrested. 139 S. Ct. 1715, 1727 (2019). This is exactly what plaintiffs have alleged here: that defendants "only enforced the curfew against, and thus arrested for curfew infractions, individuals who participated in the June 1 protest." Am. Compl. ¶ 99; *see also id.* ¶¶ 6, 74.

Plaintiffs' First Amendment retaliation claim also extends to the use of excessive force and conditions of confinement, *id.* ¶¶ 6, 116-118, but defendants make no effort to address whether *Nieves* defeats then-Chief Newsham's qualified immunity defense at least as to plaintiff's claim of retaliatory arrest, arguing only instead—and incorrectly—that the complaint does not identify any actions by then-Chief Newsham that led to the alleged constitutional violations. *See, e.g.,* Defs.' Mem. at 9 (arguing, without more, that "Plaintiffs do not identify any particular action that Newsham took that violated a clearly established constitutional right, which is fatal to their claims against him."); Defs.' Reply at 8 ("Plaintiffs next argue Chief Newsham's actions violated their clearly established Fourth and First Amendment rights, but Plaintiffs offer no facts to show that Chief Newsham had any role in violating those particular rights.").

For their part, plaintiffs have plausibly alleged that defendants, including then-Chief Newsham, deployed excessive force against them and retaliated for engaging in protected speech to protest police brutality. To be sure, plaintiffs' assertion of retaliatory arrest is, as noted, viable under *Nieves* at this early stage, but their success on that claim will ultimately depend on "present[ing] objective evidence" that then-Chief Newsham did *not* order, and MPD did *not* arrest, other individuals who also violated the curfew but were not participants in the protests against police brutality on June 1, 2020. *See* 139 S. Ct. 1715, 1727 (2019). The precise mechanisms by which then-Chief Newsham authorized and directed the conduct allegedly causing plaintiffs' well-alleged constitutional injuries and "the particular circumstances that he . . . . faced" to inform his decision-making throughout the evening of June 1, 2020, *Wesby*, 138 S. Ct. at 589, are thus unknown at this stage of the proceedings. *See, e.g.,* Am. Compl. ¶¶ 40, 66, 73, 102. This undeveloped factual record makes premature a ruling on then-Chief Newsham's

qualified immunity claim. *See, e.g., Kartseva v. Dep't of State*, 37 F.3d 1524, 1530 (D.C. Cir. 1994) (noting that "discovery may be appropriate" where "resolution of the threshold question of the existence of a clearly established constitutional right requires information on the nature and effects of the government action that is exclusively within the domain of the government"); *Wood v. District of Columbia*, No. 14-2066 (EGS), 2017 WL 2374346, at *4-7 (D.D.C. May 31, 2017) (not resolving qualified immunity until summary judgment stage); *Kyle v. Bedlion*, No. 12-cv-1572 (KBJ), 2014 WL 12539324, at *1 (D.D.C. Nov. 12, 2014) (declining to dismiss false arrest claim on qualified immunity grounds absent police officer's sworn testimony about events preceding plaintiff's arrest since court "cannot fairly assess the events in question and [officer's] knowledge of them").

Accordingly, determining the applicability of qualified immunity must await further factual development and this defense does not provide a basis for dismissal of the § 1983 claims against then-Chief Newsham at this stage of the litigation.

### C.   Plaintiffs Have Adequately Alleged a First Amendment Retaliation Claim

Defendants seek dismissal of plaintiffs' First Amendment retaliation claim, as averred in Count II of the amended complaint, to the extent it is based on the "conditions of confinement" that plaintiffs experienced on Swann Street and at the police detention facility after their arrest. *See* Defs.' Mem. at 10; Defs.' Reply at 10.[6]   To establish a retaliation claim under the First Amendment, a plaintiff must demonstrate "(1) that he engaged in protected conduct; (2) that the government took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) that there exists a causal link between the

---

[6]   Plaintiffs correctly point out that defendants do not challenge Count II's First Amendment retaliation claim based on excessive force, meaning that those uncontested aspects of Count II will "proceed to discovery irrespective of this Court's ruling on Plaintiffs' conditions of confinement theory." Pls.' Opp'n at 21 n.4.

exercise of a constitutional right and the adverse action taken against him." *Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015) (citations omitted).  Review of the amended complaint's fulsome factual allegations shows that defendants' challenge falls short of warranting partial dismissal of this claim.

At the outset, defendants do not even dispute that the first two elements required to state a retaliation claim—whether plaintiffs engaged in "protected conduct" and the "government took some retaliatory action sufficient to deter" continued exercise of protected speech, *id.*—are sufficiently pleaded here.  Instead, defendants challenge only plaintiffs' showing of a "causal link" between their protected speech and the various alleged retaliatory actions taken by defendants on June 1, 2020.  According to defendants, the "First Amended Complaint . . . offers no causal link between any purported animus of the named Defendants and any harm occurring" at the police detention facility, Defs.' Mem. at 11, or on Swann Street, Defs.' Reply at 10.

Plaintiffs allege that their kettling on Swann Street unfolded pursuant to "an express policy MPD follows to confine individuals engaged in protected speech activities," Am. Compl. ¶ 44, and that after their arrests, they were detained for hours on Swann Street without explanation, *id.* ¶¶ 72, 74, 75, 78, 82, 84, in tight and painful zip ties, *id.* ¶¶ 76, 79, 83, before their transport to a police academy facility.  At this police facility, plaintiffs were then held "in small rooms with no windows and poor circulation during a global pandemic," *id.* ¶ 90, and denied restroom access, *id.* ¶¶ 93-94, adequate food, *id.* ¶ 91, and prompt medical care to address injuries sustained through defendants' use of force on Swann Street, *id.* ¶¶ 85-86.  This alleged MPD conduct occurred after plaintiffs attended demonstrations to protest police brutality, *id.* ¶¶ 26-30, and subsequently marched, chanting "Hands Up, Don't Shoot," while being closely followed by police cars and monitored by defendants and other MPD officers, *id.* ¶¶ 32, 37-39.

Despite behaving peacefully at all times, *see, e.g., id.* ¶¶ 29-30, 41, 52, 63-65, 98, and contrary to MPD's usual practice for handling "minor curfew infractions," like the ones with which plaintiffs were ultimately charged, plaintiffs allege that they were "detained in this manner because they had been engaged in protest activities," *id.* ¶ 101; *see also id.* ¶ 74 (alleging that "MPD Officers did not arrest, restrain, and detain individuals for curfew violations unless they were protesting").

As another Judge on this Court recently concluded in addressing a First Amendment retaliation claim arising from similar protest activity that also took place on June 1, 2020, "direct evidence of retaliatory animus is not required, especially at this early stage of the proceedings [and] '[c]ausation may be inferred . . . when the retaliatory act follows close on the heels of the protected activity." *Black Lives Matter D.C. v. Trump*, No. 20-cv-1469 (DLF), 2021 WL 2530722, at *55 (D.D.C. June 21, 2021) (citing *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015)).  The allegations averred in the amended complaint show such temporal proximity and support the reasonable inference that defendants lacked a non-retaliatory motive to detain plaintiffs under the aforementioned conditions simply for "minor curfew infractions." Plaintiffs have thus adequately stated the "causal link" necessary for their First Amendment retaliation claim to proceed.

### D.    Plaintiffs Have Adequately Alleged A Claim of Negligence *Per Se* Under the District's First Amendment Assemblies Act

Lastly, defendants seek dismissal of plaintiffs' claim in Count IV of the amended complaint, asserting negligence *per se* for violations of three provisions of the District's First Amendment Assemblies Act ("FAAA"), D.C. Code §§ 5-331.07(e)(1)-(2), 5-331.16(b)(2).  *See* Defs.' Mem. at 11-13; Defs.' Reply at 11-16.  The FAAA declares District policy to be that "persons and groups have a right to organize and participate in peaceful First Amendment

assemblies on the streets, sidewalks, and other public ways . . . and to engage in First Amendment assembly near the object of their protest . . . subject to reasonable restrictions designed to protect public safety, persons, and property." *Ochs v. District of Columbia*, 258 A.3d 169, 171 (D.C. 2021) (quoting D.C. Code § 5-331.03); *see also Enten v. District of Columbia*, 675 F. Supp. 2d 42, 49 (D.D.C. 2009) ("[T]he policy underlying the First Amendment Assemblies Act is to permit persons to 'organize' and participate in First Amendment Assemblies 'near the object of their protest.'").  In essence, Count IV alleges that MPD actions against plaintiffs amounted to clear violations of the FAAA and thereby constituted negligence *per se*.

Under District of Columbia law, the "[v]iolation of a statute or regulation may constitute negligence *per se* only" (1) "if the statute is meant to promote safety;" (2) "if the plaintiff is a member of the class to be protected by the statute;" and (3) "if the defendant is a person upon whom the statute imposes specific duties."  *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039-40 (D.C. 2014).  The parties dispute the third prong of this assessment, namely, whether the FAAA "imposes specific duties" on defendants.  *See* Defs.' Mem. at 11; Pls.' Opp'n at 25.

According to defendants, the "provisions of the FAAA relied on by Plaintiffs cannot support a negligence per se claim because they turn on the exercise of discretion," Defs.' Mem. at 12, and do not "impose specific duties beyond the common law duty of reasonable care," *id.* at 11.  Plaintiffs counter that their negligence *per se* claim is viable because "Defendants violated the precise obligations imposed by sections 5-331.07(e) and 5-331.16(b) of the FAAA, respectively, by failing to issue a dispersal order to Plaintiffs . . . and deploying chemical irritants although there were no ongoing acts of public disobedience that posed any threat to public safety

on Swann Street."  Pls.' Opp'n at 24.  Consideration of the relevant statutory language shows

that plaintiffs have the more persuasive argument here.

As support, plaintiffs first invoke FAAA's §§ 5-331.07(e)(1)-(2), which provides in full

that:

> (1) If and when the MPD determines that a First Amendment assembly, or part
> thereof, should be dispersed, the MPD *shall issue* at least one clearly audible and
> understandable order to disperse using an amplification system or device, and
> *shall provide* the participants a reasonable and adequate time to disperse and a
> clear and safe route for dispersal.

> (2) Except where there is imminent danger of personal injury or significant damage to
> property, the MPD *shall issue* multiple dispersal orders and, if appropriate, *shall
> issue* the orders from multiple locations. The orders *shall inform* persons of the
> route or routes by which they may disperse and *shall state* that refusal to disperse
> will subject them to arrest.

D.C. Code §§ 5-331.07(e)(1)-(2) (emphasis added); *see also* Am. Compl. ¶¶ 126-127.

Defendants are correct that this provision "begins with a threshold question of discretion" as to

whether a dispersal order should issue in the first instance, *see* Defs.' Reply at 11, with language

stating that "[i]f and when the MPD determines that a First Amendment assembly…, should be

dispersed," D.C. Code § 5-331.07(e)(1).  Yet, once such a determination is reached, the statute

directs MPD to implement an unambiguous, nondiscretionary protocol, starting with the issuance

of "at least one . . . order to disperse" and providing demonstrators "time to disperse and a . . .

route for dispersal."  *Id*. §§ 5-331.07(e)(1)-(2).  As such, these provisions "impose specific

duties" that MPD must fulfill, *see Butler*, 101 A.3d at 1039-40, and which may properly support

a claim of negligence *per se* under the statute.

Here, plaintiffs allege that, before their hours-long confinement due to the kettling on

Swann Street, "a high-ranking MPD official directed MPD Officers to disperse the crowd," but

"the Supervisory Defendants on scene did not take any actions to facilitate any such dispersal

order" and "did not provide Plaintiffs or other demonstrators time to disperse, indicate a route for dispersal, or inform them that refusal to disperse would subject them to arrest. Am. Compl. ¶ 49. Put differently, plaintiffs do not allege that the measures taken to effectuate the dispersal order were unreasonable, but rather that, after high-ranking MPD officials decided to disperse the demonstration, "*no* dispersal order of any kind was given . . . absolutely *no* time was given to disperse (not just inadequate time), and . . . *no* route for dispersal was created (not just an inadequately clear or safe route)." Pls.' Opp'n at 29 (emphasis added). The Court thus agrees with plaintiffs that these facts, which are accepted as true at this stage of the proceedings, plausibly allege a *per se* violation of the "FAAA provisions . . . impos[ing] clear guidelines for MPD's conduct" following its decision to disperse a public demonstration, as codified at D.C. Code §§ 5-331.07(e)(1)-(2). *Id.*

Defendants' additional challenge to plaintiffs' reliance on § 5-331.16(b)(2) of the FAAA fares no better. In their amended complaint, plaintiffs assert that defendants also violated this provision because the "use of chemical irritants was not reasonable or necessary to protect officers or others from physical harm, as Plaintiffs were not committing acts of public disobedience endangering public safety and security, in violation of the FAAA." Am. Compl. ¶ 128. Defendants mistakenly seize on this allegation to argue that the "statute's use of the term 'reasonable and necessary' makes it impossible to tell whether the officers violated this standard without evaluating their actions against a common law baseline of reasonable behavior." Defs.' Mem. at 13. Although this "reasonable and necessary" qualification does indeed appear in the statutory text, this language is found in § 5-331.16(b)(1)—not § 5-331.16(b)(2), upon which plaintiffs precisely rely to assert their claim for relief.

The relevant § 5-331.16(b)(2) states, in full, that "[c]hemical irritant *shall not be used* by officers to disperse a First Amendment assembly *unless* the assembly participants or others are committing acts of public disobedience endangering public safety and security."  D.C. Code § 5-331.16(b)(2) (emphasis added).  By its plain terms, this provision imposes a specific, baseline duty on MPD with regards to its use of chemical irritants, *see Butler*, 101 A.3d at 1039-40, that is independent from any reasonableness assessment: if public demonstrators are not "endangering public safety and security," MPD is not permitted to use chemical irritants to disperse their assembly, D.C. Code § 5-331.16(b)(2).  Alleging "that chemical irritants were deployed in the *complete absence* of risks to public safety," Pls.' Opp'n at 29 (citing Am. Compl. ¶¶ 41, 51, 54, 57, 112, 128) (emphasis added), plaintiffs have plausibly alleged a *per se* breach of such duty. Accordingly, defendants' effort to dismiss Count IV of the amended complaint must be denied.

## IV.    CONCLUSION

For the reasons outlined above, defendants' partial motion to dismiss is denied and the entirety of plaintiffs' claims may advance to discovery.  An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date:  January 13, 2022

_____
BERYL A. HOWELL
Chief Judge