```
               UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
   * * * * * * * * * * * * * * * *
PAMELA GOODWIN, et al.,            )
                                   )
              Plaintiffs,          )  Civil Action
vs.                                )  No. 21-806
                                   )
DISTRICT OF COLUMBIA, et al.       )  March 20, 2024
                                   )  11:18 a.m.
              Defendants.          )  Washington, D.C.
   * * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES**</u>:

FOR THE PLAINTIFFS:
                  REBECCA JANE LIVENGOOD
                  NICHOLAS J. ABBOTT
                  Relman Colfax PLLC
                  1225 19th Street NW, Suite 600
                  Washington, DC 20036
                  (202) 728-1888
                  Email: rlivengood@relmanlaw.com
                  Email: nabbott@relmanlaw.com

FOR THE DEFENDANTS:
                  RICHARD P. SOBIECKI
                  AMANDA CATHERINE PESCOVITZ
                  GREGORY KETCHAM-COLWILL
                  MARCUS DANIEL IRELAND
                  Office of the Attorney General
                  for the District of Columbia
                  Civil Litigation Division
                  400 Sixth Street NW, Suite 10100
                  Washington, DC 20001
                  (202) 805-7512
                  Email: amanda.pescovitz1@dc.gov
                  Email: richard.sobiecki@dc.gov
                  Email: gregory.ketcham-colwill@dc.gov
                  Email: marcus.ireland@dc.gov

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                       Official Court Reporter

        Proceedings reported by machine shorthand.
     Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

1      THE COURTROOM DEPUTY:  Your Honor, this is Civil

2 Action 21-806, Pamela Goodwin versus District of Columbia,

3 et al.

4      Would the parties please come forward to the

5 lectern and identify yourselves for the record.  We'll start

6 with plaintiffs' counsel first this morning.

7      MS. LIVENGOOD:  Good morning, Your Honor.

8 Rebecca Livengood for the plaintiff.

9      THE COURT:  Rebecca --

10      MS. LIVENGOOD:  Livengood.

11      THE COURT:  Livengood.  Got it.

12      Who is with you at counsel table?

13      MS. LIVENGOOD:  Nicholas Abbott, also for the

14 plaintiffs.

15      THE COURT:  Nicholas Abbott.  Got it.

16      MR. SOBIECKI:  Good morning, Your Honor.

17 Rick Sobiecki for the defendants.  With me is Gregory

18 Ketcham-Colwill, Amanda Pescovitz, and Marcus Ireland.

19      THE COURT:  All right.  Good morning.

20      Sorry to keep you all waiting.  The last

21 conference went a little bit longer than I anticipated.

22      Let's see.  The plaintiffs' email, I guess it was

23 jointly submitted by the parties on March 8, described two

24 disputes.  First, whether defendants' request for access to

1    the mental health records for four of the plaintiffs from

2    June 1, 2018, to the present day should be granted; and

3    second, whether the plaintiffs' request for the disciplinary

4    file of Lieutenant Shane Lamond should be granted.  So I

5    have got these two disputes with discovery requests from

6    both sides.

7              I am going to start with the defendants' request

8    for the mental health records first.

9              Are there any other discovery disputes or issues

10   to resolve today from the plaintiffs?

11             MS. LIVENGOOD:  No, Your Honor.

12             THE COURT:  And from the defense?

13             MR. SOBIECKI:  No, Your Honor.

14             THE COURT:  Okay.  So let's start with the mental

15   health records issue.

16             MR. SOBIECKI:  Good morning, Your Honor.

17             In approaching this, there are two main issues.

18   First, we will get what conduct is at issue; in other words,

19   what caused the injuries.  And then, second, we will get the

20   alleged symptoms, if you will; what are the plaintiffs'

21   experiencing after the fact?

22             THE COURT:  Actually, I don't think those are the

23   issues at all.  There is one single simple issue when you

24   are dealing with a psychotherapist's privilege; and that is,

25   have the plaintiffs' waived the privilege or not?

```
1              That's it.  I don't know where you are going.
2              Let me just say:  You are only seeking the mental
3    health records for four of the seven plaintiffs; is that
4    right?
5              MR. SOBIECKI:  Correct, Your Honor.
6              THE COURT:  Why just those four plaintiffs?
7              It wasn't explained.  I guess it was just an
8    email.  Why those four, and not the other ones?
9              MR. SOBIECKI:  Because their allegations of
10   injuries are far beyond what is garden variety.  The other
11   three plaintiffs have shorter-term, more narrow injuries.
12             THE COURT:  Let me just ask sort of a blunt
13   question.  Is it only these four plaintiffs who sought
14   mental health treatment?
15             MR. SOBIECKI:  Yes.  I believe -- I would have to
16   check their log.  But I know, based on their alleged
17   injuries, they're alleging more than garden variety.  I
18   don't believe the other --
19             THE COURT:  Well, that's your position, that
20   they're alleging more than garden variety.  But, I mean, I
21   thought it was quite probative, and no one told me.
22             Of the seven plaintiffs, you are only asking for
23   the mental health records of four, not all seven.
24             Why these four?  Is it because these four are the
25   only ones who have mental health records?
```

```
1              MR. SOBIECKI:  I believe one other plaintiff saw

2     Mr. Pearlmutter -- saw him for a short time.  I am sure

3     plaintiffs will correct me if I am wrong.

4              These are the four that have seen

5     psychotherapists, other mental health professionals for a

6     significant time.  Three of the plaintiffs are still

7     ongoing, one plaintiff for more than a year.  There are

8     allegations of permanent change in kind of their mental

9     health, Your Honor; and I can go into more specifics.

10             But that is why these four plaintiffs -- the

11    concern is that they would get up at trial and kind of tell

12    this very harrowing experience of symptoms, difficulty

13    sleeping, difficulty focusing.  They don't --

14             THE COURT:  And you think that these descriptions

15    of the symptoms -- just to put it in legal terms, the legal

16    question here, the way these plaintiffs have described their

17    symptoms goes beyond sort of normal emotional distress or

18    objective, you know, any kind of objective reasonable

19    emotional distress from this incident, and that's why they

20    have waived their privilege?

21             MR. SOBIECKI:  Yes, Your Honor.  Absolutely.

22             THE COURT:  Okay.  So there are five factors that

23    I set out in *St. John v. Napolitano*, in 2011, as relevant to

24    determining whether the psychotherapist-patient privilege

25    has been waived.
```

```
 1              Plaintiffs say that it's only the third factor --

 2    and that factor is a claim of unusually severe emotional

 3    distress is at issue here.

 4              Do the defendants agree that that is the only

 5    factor from St. John that is at issue here?

 6              MR. SOBIECKI:  We do, Your Honor.  That's our

 7    basis.

 8              THE COURT:  Okay.  And so it's the defendants'

 9    position here that my task, in resolving this discovery

10    dispute, is to make an evaluation of whether the plaintiffs'

11    claims are of unusually severe emotional distress?

12              MR. SOBIECKI:  That's correct.

13              THE COURT:  In making that evaluation, it's

14    clearly not contested the plaintiffs haven't claimed any

15    intentional or negligent infliction of emotional distress,

16    right?

17              MR. SOBIECKI:  Those claims are not at issue, Your

18    Honor.

19              THE COURT:  And they have disclaimed putting on

20    any mental health expert, right?

21              MR. SOBIECKI:  Correct.

22              THE COURT:  And they themselves are not using any

23    of their mental health treatment records or seeking to

24    present any evidence from their treating mental health

25    professionals, right?
```

```
 1                    MR. SOBIECKI:  That's my understanding, yes.

 2                    THE COURT:  So your basis for saying that their

 3      injuries go beyond garden-variety emotional distress is

 4      based solely on their deposition testimony and their answers

 5      to interrogatories or just their deposition testimony?

 6                    MR. SOBIECKI:  Both interrogatories and deposition

 7      testimony.

 8                    I would just add, in the case of two plaintiffs,

 9      they did testify about prior existing symptoms, so that is

10      also -- they're attributing -- it's unclear how much, if

11      any -- they seem to be attributing it all to June 1, so

12      we're looking to those records to see whether we can explain

13      that these symptoms could have been caused by other events;

14      and that applies to both pre and post June 1.

15                    In these conversations with their

16      psychotherapists, did they say:  In 2022 a family member

17      just died, this is causing me difficulty sleeping,

18      difficulty focusing; without those records, we don't have

19      any way to find that out.

20                    THE COURT:  So let me just go through the

21      deposition testimony of each of the individuals because you

22      agree that this is a plaintiff-by-plaintiff analysis of

23      whether or not each individual plaintiff waived the

24      psychotherapist-patient privilege.

25                    MR. SOBIECKI:  We do -- I would just say:
```

1    Unfortunately, at the time of our submission, we only had

2    one transcript.  We do now have the other three.  I can kind

3    of give Your Honor a flavor; but we are also happy to submit

4    supplemental papers on it.

5            THE COURT:  Okay.  Let's start with Plaintiff

6    Troper.  Am I saying that name correctly?

7            MR. SOBIECKI:  That's correct.

8            THE COURT:  Troper says that she had been

9    prescribed medication --

10           MR. SOBIECKI:  Correct.

11           THE COURT:  -- and that she feared MPD officers

12   were going to hunt her down and murder her.

13           MR. SOBIECKI:  Correct.

14           THE COURT:  And that this is a fear that she

15   attributes -- that she has for all MPD officers now.

16           MR. SOBIECKI:  It's a little more divided.  She

17   had that fear afterwards.  She now admits that fear has

18   diminished, of specific murdering; but she maintains a fear

19   of all MPD officers, yes.

20           THE COURT:  And that she will spiral emotionally

21   when reading the news, with difficulty focusing.

22           MR. SOBIECKI:  Yes.  The example she gave was the

23   individual who lit himself on fire in front of the embassy;

24   that triggered her to spiral emotionally because of what

25   happened on June 1st.

```
 1                    THE COURT:  This is the person protesting the

 2     Israeli war in Gaza?

 3                    MR. SOBIECKI:  Israel, yes.

 4                    And so in her testimony she says a number --

 5     again, she said frequently, several times a week; whether

 6     it's reading the news, in her conversation, something will

 7     come up that because of what happened on June 1 will lead

 8     her to have, I would say, mental stress spiraling,

 9     difficulty focusing, difficulty sleeping today.

10                    THE COURT:  Okay.  You want to get the records for

11     Plaintiff Troper to show that she had some of these feelings

12     before June 1, 2020?

13                    MR. SOBIECKI:  That is part of it.

14                    Also, what else has she been discussing with her

15     therapist that could also be causing these feelings?

16                    Again, I don't think an ordinary person, after

17     nearly four years -- Plaintiff Troper was not arrested;

18     didn't have any physical contact with the police, only

19     alleged injuries of secondary exposure to pepper spray.  So

20     is that secondary exposure to pepper spray, could that be

21     causing -- is that -- a reasonable person, would be causing

22     them difficulty focusing several times a week four weeks

23     later or are there other causes?

24                    Given that she's been seeing mental health

25     professionals through this entire time, yes, we want to get
```

 1    at what else could be causing that -- those symptoms.

 2              THE COURT:  Did you ask her?

 3              MR. SOBIECKI:  Yes.  I mean, she has gone

 4    through -- I mean, wouldn't get into conversations with her

 5    psychotherapist, right.  So we --

 6              THE COURT:  Did you say:  Have you lost anyone in

 7    the last -- you know, since 2020?  Have you suffered any

 8    death?  Have you lost your job?

 9              What other emotional stresses -- I mean, the first

10    place you are looking at are her highly personal, highly

11    privileged records.  And just trying to look at these

12    records to get more evidence for impeachment hasn't --

13    didn't the Supreme Court make it pretty clear in *Jaffee,*

14    saying that that is not what you are supposed to be doing?

15              This is not a particularly persuasive argument to

16    me.  You just want to see what else there might be, what

17    else she might have told her psychotherapist that we can use

18    to impeach her and show that it's not just because of

19    June 1?

20              What have you tried?

21              You could ask her:  What else has been happening

22    in your life that is causing you stress?

23              MR. SOBIECKI:  Your Honor, I think in terms of

24    waiver, I don't know that -- I mean, she is the one that has

25    brought these conditions and put them at issue.  She is

1    alleging unusually severe distress.

2           Now that's gone, so I think we just look at a

3    relevant standard under Rule 26.  I don't know that we need

4    to meet a heightened burden to get this information.  I

5    think the question initially is as Your Honor stated:  Has

6    this privilege been waived?

7           I think based on her alleged injuries, it has.

8           If we're assuming that kind of threshold decision

9    has been made, then she's waived the privilege in terms of

10   getting that information.  I mean, these are kind of similar

11   arguments plaintiffs are making.  And with the Lieutenant

12   Lamond credibility, I think, yes, we are entitled to know.

13   Were those specific questions -- I would have to delve back

14   into the deposition transcript.  I don't think --

15           THE COURT:  For Troper, the plaintiffs are willing

16   to stipulate she doesn't allege that defendants have caused

17   her to suffer any specific mental psychiatric injury or

18   disorder.  So they are just asking for the same kind of

19   objective, reasonable damages for emotional distress that

20   any person encountering these events would have.

21           Isn't that the measure of whether or not there's

22   been a waiver of the privilege?

23           MR. SOBIECKI:  Your Honor, but I guess --

24           THE COURT:  They're willing to make it even

25   clearer by having the stipulation.  Why doesn't that put the

```
 1    issue to bed?

 2              MR. SOBIECKI:  Well, how does that work then, Your

 3    Honor?

 4              She testifies -- they read the stipulation, only

 5    garden variety.  Then she says:  I was fearful that MPD was

 6    going to hunt me down and murder me.  I think it's the

 7    inflammatory nature of --

 8              THE COURT:  We haven't even gotten to the motions

 9    in limine stage of this yet.

10              Isn't that the appropriate subject for a motion

11    in limine, to preclude this witness from saying -- from

12    making such inflammatory remarks that have limited relevance

13    that she's only asking for objectively, you know, reasonable

14    emotional distress damages; she doesn't have a special claim

15    for it; and it's sort of inflammatory?

16              Isn't that like -- I mean, it's like -- rather

17    than using a motion in limine, I would rather just breach

18    her psychotherapist-patient privilege.  Why isn't another

19    way to deal with this -- if you think that those kinds of

20    comments are particularly inflammatory -- making a motion

21    in limine?

22              MR. SOBIECKI:  Again, I don't think we are

23    breaching it.  I think it has been waived.

24              But to your question, I mean, we did propose

25    that --
```

```
1            THE COURT:  You may disagree on that.

2            MR. SOBIECKI:  We did propose, okay, let's just

3    take this testimony off the table; plaintiffs weren't

4    willing to engage on that.

5            And then it seems like that presents unnecessary

6    risk.  We'll see down the road if we can win this motion in

7    limine, which will certainly be opposed and then we lose it,

8    then where are we at?  We don't have the records.

9            So I guess that's my answer to Your Honor's

10    question.  Yes, we would still -- we understand we have

11    pretrial avenues of relief to attempt to limit the testimony

12    of this plaintiff and other plaintiffs.  And if there could

13    be an agreement that there is just sort of some stipulation

14    read; but, Your Honor, these plaintiffs get very emotional

15    when talking about these issues.  These are not just kind of

16    describing symptoms.

17            And I think, again, yes --

18            THE COURT:  So if a witness doesn't say:  I am

19    really fearful; but a witness gets on the stand and says:

20    Based on what happened on June 1, 2020, my view of police

21    officers has been severely damaged and starts crying, is

22    that sufficient demonstration of emotional distress damage

23    to, in your view, to constitute a waiver of the

24    psychotherapist privilege?  Crying?

25            MR. SOBIECKI:  Your Honor, on that, like, limited
```

1  hypothetical.  But they go far beyond this.  I mean, I

2  can't --

3          THE COURT:  Is that enough?

4          Answer my question.

5          Crying on the stand and being very emotionally

6  upset, combined with:  Now I don't trust police officers; is

7  that enough to waive the psychotherapist privilege?

8          MR. SOBIECKI:  It's in a vacuum.  I mean, it's

9  just implying --

10          THE COURT:  Can you answer that question?

11          MR. SOBIECKI:  A few tears, no.

12          Sobbing, perhaps.

13          So I think this is a continuum, and we're not

14  really there yet.  But do I think if a person says:  Because

15  of what happened there I can't hang out with my friends

16  anymore.  Yes, I think that's unusually severe; and that

17  will have waived the privilege, and that is what is alleged

18  here.

19          "I have trouble eating" -- again, just a general

20  fear of all police officers, I think is unusually severe

21  based on what happened here.  There is no challenges to the

22  arrest --

23          THE COURT:  All right.  I could go through each of

24  these -- like, Plaintiff Surio.  The plaintiffs' email

25  indicates that:  Surio began receiving mental health

treatment for injuries from the incident, and that treatment
continues to this day; describes no specific mental health
symptoms or testimony.

So what's the basis for, in the defendants' view,
of Plaintiff Surio's emotional distress being so unusually
severe that it constitutes a waiver of the psychotherapist's
privilege?

MR. SOBIECKI:  I will highlight two points on
that.  Plaintiff Surio is one who had a preexisting -- she
lost a family member prior to June 1 and was experiencing --
again, I don't want to couch it as "significant trauma."  As
I read it, it's seems to be significant trauma.  She
describes a significant amount of anger prior to June 1.

She is also someone who cannot handle certain
discussions anymore, that it triggers stress and trauma in
her for certain topics to come up.  Four years later, yes, I
think that's unusually severe.

She moved out of the District.  I think -- again,
all of those -- let me just consult her interrogatory
response -- again, she has difficulty sleeping; difficulty
concentrating; she moved away from the District; she has
stomach issues --

THE COURT:  Okay.  So the first amended complaint
alleges for all of the plaintiffs that they suffered and
continue to suffer from fear, anxiety, and emotional

```
 1    distress due to defendants' actions.

 2              So fear, anxiety, and emotional distress.  In

 3    defendants' view, does that mean that all of the plaintiffs

 4    put their mental condition at issue because, in addition to

 5    just emotional distress, they talked about their fear and

 6    their anxiety?

 7              MR. SOBIECKI:  No, it's not our position.

 8              Again, it's the tenor and the presentation of

 9    these issues.  It is just:  I have general fear and anxiety.

10              THE COURT:  Because it's going to be very dramatic

11    and possibly persuasive to the jury that they really

12    suffered emotional distress?

13              MR. SOBIECKI:  If it is:  I have such anxiety I

14    can't work; like one of the plaintiffs -- I believe it

15    was -- Plaintiff Remick was not able to bartend anymore.

16    These interactions were causing her panic attacks.

17              I don't think we can just say "fear and anxiety"

18    and say, what's the problem there.

19              Well, if it's fear and anxiety manifesting itself

20    through panic attacks, through the avoidance of certain

21    areas.  So yes, if all the plaintiffs are saying, "I have

22    fear and anxiety from that event," we probably wouldn't be

23    here.

24              For the plaintiffs who have just stayed kind of in

25    that lane, we are not seeking the records.  But for those
```

1    who go far, far beyond it -- again, the fear of murder at

2    the hands of police officers, I think it should be an easy

3    call.  I will say Plaintiff Lane says her demeanor has

4    forever changed.

5              THE COURT:  You misunderstand and misapprehend the

6    burden to breach the psychotherapist privilege altogether if

7    you think it's just -- if it's particularly emotional, if it

8    is particularly -- you know, use of language that

9    is dramatic that breaches the privilege, that doesn't cut it.

10             Thank you.  I am going to turn to the plaintiffs.

11             I am going to take each issue separately.

12             So would you agree that if a plaintiff limits her

13   claim to garden-variety damages, which I think all of the

14   plaintiffs here are doing -- is that correct?

15             MR. ABBOTT:  That's correct.

16             THE COURT:  That the plaintiff may only ask for an

17   objective amount of damages for the emotional distress that

18   any reasonable person would experience if subjected to

19   similar alleged misconduct.

20             MR. ABBOTT:  I think the language from St. John is

21   "what would ordinarily result."

22             THE COURT:  And that is all the plaintiffs here

23   are seeking?

24             MR. ABBOTT:  That's correct.

25             THE COURT:  No matter what words they use, how

 1    much sobbing they may do on the witness stand in front of

 2    the jury, that's all they're seeking?

 3                MR. ABBOTT:  That's correct.

 4                THE COURT:  And that's something that the -- you

 5    have offered to have a stipulation to that point for

 6    Plaintiff Troper.  Why isn't that just the standard

 7    stipulation you would agree to with the defendants as to

 8    each of the plaintiffs?

 9                Why did you just do it for Troper?

10                MR. ABBOTT:  Well, for Plaintiff Troper there was

11    particular deposition testimony about suffering from a

12    mental health condition that had been diagnosed, so we

13    stipulated that evidence of that condition would not be

14    introduced.

15                Defendants mentioned an additional stipulation

16    regarding all plaintiffs.  And their proposed stipulation

17    was that they would not testify to any emotional distress

18    damages, and that's beyond what the plaintiffs could bear.

19    The analogy:  Nothing can grow in the garden at that point.

20                The plaintiffs' view -- all plaintiffs should be

21    able to testify to their emotional distress damages.

22                THE COURT:  Well, they have to if they're going to

23    seek --

24                MR. ABBOTT:  Of course.

25                THE COURT:  -- even any objective damages for

1    emotional distress unless the defendants are willing to say:

2    Hey, we're willing to give you emotional distress damages of

3    X amount.  But I don't think you guys are settling this case

4    because you are here in front of me disputing -- having a

5    discovery dispute.

6            So plaintiffs must prove for each individual

7    plaintiff, his, her, or they -- I know there is one "they"

8    nonbinary person -- that they suffered emotional distress

9    and they have to articulate in their own believable words

10   it's credible to the jury.

11           But in terms of their damages, it could be

12   clear -- no matter how inflammatory the language is they

13   use, no matter how much they cry or don't cry -- that each

14   of them is only seeking an objective amount of damages for

15   emotional distress that a reasonable person would experience

16   subjected to a similar alleged misconduct; is that right?

17           MR. ABBOTT:  That's right.

18           THE COURT:  You could stipulate to that as to

19   every plaintiff; is that right?

20           MR. ABBOTT:  We have specifically discussed this

21   in the context of Plaintiff Troper.

22           THE COURT:  I am just asking:  Yes or no, the

23   plaintiffs would be willing to stipulate to that because

24   that's basically all you are claiming here; is that right?

25           MR. ABBOTT:  That's right.

1          THE COURT:  Okay.  And if you did that, that would

2     avoid having to tally numbers, present proof of specific

3     numbers corresponding to a specific mental or emotional harm

4     that each particular plaintiff specifically suffered, that

5     would require records from therapists, that would require

6     waiver of a privilege, and that is not something you are

7     doing.  So you are just seeking for each plaintiff these

8     subjective damages; is that right?

9          MR. ABBOTT:  That's right.

10          THE COURT:  Okay.  Why isn't that the measure,

11     then, to determine whether a plaintiff's distress is

12     unusually severe?

13          I know that that was a factor in *St. John*, and I

14     think it's been misinterpreted, with all due respect to the

15     defendants, because that basically means you have put your

16     mental condition at issue.  And by doing that, that is an

17     implicit waiver of the privilege.

18          By seeking specific damages for your emotional

19     distress that you have tallied, that you have put in your

20     medical records for, those are -- that's part of what you

21     are seeking damages for.

22          Are the plaintiffs who have seen therapists, are

23     they seeking compensation by putting in records for all of

24     the mental health treatment that they have obtained?

25          MR. ABBOTT:  No, none of them are.

```
 1                THE COURT:  So the plaintiffs have provided to the
 2      defendants for each plaintiff whether or not they have
 3      sought mental health treatment and the dates they have
 4      sought such treatment, and the duration; is that right?
 5                MR. ABBOTT:  That's correct.
 6                THE COURT:  But you are not seeking specific
 7      damages for that mental health treatment?
 8                MR. ABBOTT:  That's correct.
 9                THE COURT:  Okay.  Anything else you would want to
10      add?
11                MR. ABBOTT:  Nothing else I would add, Your Honor.
12      Thank you.
13                THE COURT:  Defendants want to respond?
14                It seems to me like you are looking a gift horse
15      in the mouth.  Why aren't you entering a stipulation?
16                Come on up.
17                MR. SOBIECKI:  I appreciate that -- again, my
18      reading of the case is that the alleged symptoms -- the
19      plaintiffs' experience does figure into the calculus.
20                I appreciate I am of the view that I am off base,
21      so I don't have anything to add.
22                THE COURT:  Thank you.  Good.
23                I am going to issue a ruling on this, and then
24      we're going to turn to the second issue.
25                Okay.  The defendants request the mental health
```

1     records of four of the seven named plaintiffs in this

2     action.  These records are of the utmost sensitivity.

3     That's why the Supreme Court, in 1996, held, "That

4     confidential communications between a licensed

5     psychotherapist and her patients in the course of diagnosis

6     or treatment are protected from compelled disclosure under

7     Rule 501 of the Federal Rules of Evidence, *Jaffee* v.

8     *Redmond,* 518 U.S.C. 1, jump cite 15, 1996.

9          In so holding, the Supreme Court recognized that

10    the psychotherapist-patient privilege "promotes sufficiently

11    important interest to outweigh the need for probative

12    evidence," page 8, and therefore rejected the lower court's

13    balancing of the relative importance of the patient's

14    interest in privacy and the evidentiary need for disclosure

15    since any such balancing would, in the Court's words,

16    "eviscerate the effectiveness of the privilege."  See

17    *Jaffee*, at page 18.

18         "To break this privilege, the patient must waive

19    its protection"; see *Jaffee* at Footnote 14, stating:  Like

20    other testimonial privileges, the plaintiff may of course

21    waive the protection.

22         Thus, when records are requested in discovery, the

23    question -- when such records are requested in discovery,

24    the question is whether the plaintiff has waived the

25    privilege by bringing suit.

1          While the Supreme Court provided little guidance

2     on answering this question, the D.C. Circuit has filled in

3     some blanks by analogy to the operation of other privileges,

4     making clear, "that a plaintiff does not put his mental

5     state in issue merely by acknowledging he suffers from

6     depression for which he is not seeking recompense," *Koch v.*

7     *Cox*, 489 F.3d 384, jump cite 389, D.C. Circuit 2007.

8          Yet, at the same time, even if a plaintiff "makes

9     no claim for recovery based upon injury to his mental or

10    emotional state," he "puts that state in issue and thereby

11    waives the psychotherapist-patient privilege when he does

12    the sort of thing that would waive the attorney-client

13    privilege, such as basing his claim upon the

14    psychotherapist's communications with him or selectively

15    disclosing part of a privileged communication in order to

16    gain an advantage in litigation."

17         See *Koch,* 489 F.3d, at jump cite 391.

18         The D.C. Circuit stressed that "the prohibition

19    against selective disclosure of confidential materials

20    derives from the appropriate concern that parties do not

21    employ privileges both as a sword and as a shield."  See

22    *Koch,* at page 390.

23         This teaching from the D.C. Circuit is distilled

24    in *St. John v. Napolitano*, a D.D.C. case that I issued in

25    2011 to identify at least five factors relevant to

1    determining whether a plaintiff has waived explicitly or

2    implicitly the psychotherapist-patient privilege.

3         These factors are:  One, a cause of action for

4    intentional or negligent infliction of emotional distress;

5    two, an allegation of a specific mental or psychiatric

6    injury or disorder; three, a claim of unusually severe

7    emotional distress; four, plaintiff's offer of expert

8    testimony to support a claim of emotional distress and/or,

9    five, plaintiff's concession that his or her mental

10   condition is in controversy.

11        Based on my analysis, defendants' request for the

12   four plaintiffs' privileged mental health records must be

13   denied because these plaintiffs have not waived any

14   privilege.

15        To start, as to factor one, the plaintiffs have

16   brought no cause of action for intentional or negligent

17   infliction of emotional distress.

18        As to factor two, none of the plaintiffs allege or

19   claim damages for any specific mental or psychiatric injury

20   or disorder.

21        As to factor four, the plaintiffs are not offering

22   expert testimony to support a claim of emotional distress

23   nor planning to introduce any of these records or evidence

24   from the mental health treatment providers.

25        Finally, as to factor five, the plaintiffs have

1    not conceded that their mental condition is in controversy

2    as demonstrated by these other factors.

3         In sum, plaintiffs have taken no overt step to put

4    their mental health at issue in this case either through an

5    explicit claim or in seeking an extraordinary sum of damages

6    for emotional harm.  Nonetheless, defendants argue that in

7    deposition testimony and interrogatory responses, plaintiffs

8    have claimed unusually severe emotional distress amounting

9    to a waiver of the privilege.  Certainly, defendants are not

10   automatically entitled to full disclosure of plaintiffs'

11   privileged mental health records simply because plaintiffs

12   claim some level of emotional distress.

13        The third *St. John* factor, about claiming

14   unusually severe emotional distress, corresponds to the

15   D.C. Circuit's cautions.  First, that a waiver of the

16   psychotherapist-patient privilege may occur when the

17   plaintiff, "selectively discloses part of a privileged

18   communication in order to gain an advantage in litigation

19   or, second, when the plaintiff places his or her mental

20   condition at issue by relying on communications with a

21   therapist, with a therapist's advice or orders to support a

22   claim, defense, or damages.  This type of tactical

23   manipulation of the privilege essentially shields some

24   communication from disclosure while relying on other

25   privileged communications for litigation advantage and can

1    amount to an implicit waiver of the privilege.

2         The case of *Avila v. Lincoln Property Company,*

3    *Inc.*, 2019 Westlaw 3718931, a D.D.C. case from August 7,

4    2019, which is cited by plaintiffs, is instructive in

5    evaluating this third factor.

6         In *Avila,* the court found that the plaintiffs had

7    put their mental health at issue by:  One, seeking, in a

8    discrimination case, $5 million in compensatory and punitive

9    damages for two plaintiffs, suggesting that defendants

10   caused exceptionally severe and, in that case, expensive

11   emotional distress; two, citing doctors' orders, both

12   through testimony about being prescribed medication for

13   specific mental health injuries resulting, allegedly, from

14   defendants' actions, and doctors' orders to require leave

15   from work; and then, three, suffering from mental

16   health-related episodes three times a week for a duration of

17   eight hours each.

18        By putting their mental health injuries squarely

19   at issue and relying on doctors' orders to help show the

20   extent of their mental health injuries, the court found a

21   waiver of psychotherapist-patient privilege.

22        The record in this case is in stark contrast to

23   *Avila*.  Here, the plaintiffs have not requested a large sum

24   in emotional distress damages.  And according to excerpts of

25   testimony included in the parties' discovery-dispute email,

1    the plaintiffs do not state they required leave from work

2    due to their injuries.

3           None of the four plaintiffs whose mental health

4    records are at issue plan to rely on a provider's diagnosis,

5    treatment records, doctors' orders in making their case of

6    being injured mentally through emotional distress by

7    defendants' alleged conduct.

8           Plaintiffs are not understood to be planning to

9    use their mental health records, call their psychotherapist

10   or their other mental health experts to testify.  Plaintiffs

11   will not offer these records into evidence, and defendants

12   will not be harmed by being denied access to them.  See

13   *Kubik v. Central Michigan University Board of Trustees*, 2016

14   U.S. District Lexis 192612, at * 19, Eastern District of

15   Michigan, March 17, 2016.

16          In evaluating waiver, each plaintiff stands alone.

17   As to Plaintiff Surio, defendants have not provided any

18   specific reasoning why that plaintiff has waived the

19   privilege associated with their mental health records,

20   simply because plaintiff sought mental health treatment and

21   continues to receive such treatment.

22          In addition, to the extent that this plaintiff

23   talks about the emotional distress she suffered or continues

24   to suffer, the defendants have already elicited a number of

25   different stressors or issues in Plaintiff Surio's life that

1    may have contributed to her continuing emotional distress

2    that are totally separate from what happened on June 1,

3    2020.

4              As to Plaintiff Lane, as the parties summarized in

5    the email to chambers, she testified she still gets

6    emotional about the event on June 1, 2020, and that she

7    sought mental health treatment for a year after that event.

8    The event forever changed her and her demeanor; she

9    experiences depression and trauma, including memory loss;

10   and that she has some heightened fear and anxiousness which

11   causes her difficulty sleeping, and can be physically

12   debilitating.

13             At the same time she, too, testified she felt some

14   of these same symptoms prior to June 1, 2020, due to the

15   COVID pandemic and even before that.  And she is not --

16   doesn't seem to be attributing all of her mental health

17   diagnoses and symptoms squarely and entirely to the

18   defendants' alleged conduct.

19             This doesn't amount to a selective disclosure of

20   extreme mental health injury or reliance on therapist orders

21   that would amount to a waiver of privilege.

22             Plaintiff Remick testified at their deposition

23   about experiencing anxiety, depression, paranoia,

24   reactiveness, anger, distraction, and repeated some of those

25   in interrogatory responses.

1          Again, the summary provided doesn't indicate that

2    Remick attributed all of these mental health issues to

3    defendants' conduct on June 1, 2020.  It doesn't -- for all

4    of the reasons I've already mentioned, it doesn't amount to

5    a selective disclosure of extreme mental health injury or

6    reliance on therapist orders amounting to a waiver of a

7    privilege.

8          As to Troper, she does attribute directly to the

9    June 1, 2020, alleged conduct of the defendants that she has

10    been prescribed medication and she feared all MPD officers,

11    that they were going to hunt her down and murder her.  She

12    views all MPD officers now with suspicion and fears them,

13    and that she will spiral emotionally when reading the news

14    and have difficulty focusing.

15          The testimony of pointing to such extreme

16    emotional distress directly attributed to the defendants and

17    stating that a therapist prescribed medication comes close

18    to cherry-picking of privileged communications or orders and

19    reliance on a therapist that may amount to a waiver of the

20    privilege.  But to avoid any such waiver, Troper has also

21    offered to stipulate she does not allege that the defendants

22    have caused her to suffer from any specific mental or

23    psychiatric injuries or disorders and that, in any event, to

24    the extent that she is going to testify or plans to testify

25    about murder by MPD officers, that seems to be an

1    appropriate subject for a motion in limine as being far out

2    of bounds, inflammatory, and totally not probative, given

3    the fact that all the plaintiffs here are seeking is

4    garden-variety damages for emotional distress; meaning

5    damages that would be suffered by any person in like

6    circumstances, through evidence admitted to prove that those

7    consequences were actually suffered by each individual

8    plaintiff.

9            Accordingly, defendants' request for the

10   privileged mental health records of Plaintiffs Troper,

11   Surio, Lane, and Remick is denied.

12           Okay.  Now let's turn to the disciplinary file of

13   MPD Lieutenant Shane Lamond.

14           So, first of all, is Lieutenant Lamond still on

15   the force?

16           MS. LIVENGOOD:  He is not.  He is retired from

17   MPD, and his trial date is set for September 30th.

18           THE COURT:  Who is that in front of?

19           MS. LIVENGOOD:  Who is his trial in front of?

20           THE COURT:  If you know.

21           MS. LIVENGOOD:  It's D.C., but I don't know the

22   judge.  I am sorry, Your Honor.

23           THE COURT:  The defense will help you out here.

24           MR. SOBIECKI:  Judge Amy Berman-Jackson.

25           THE COURT:  Okay.  Judge Jackson.

 1          The plaintiffs call Lieutenant Lamond a "key

 2   witness" in this case, and I had to scratch my head.

 3          Are the plaintiffs planning on calling Lieutenant

 4   Lamond?

 5          MS. LIVENGOOD:  It's certainly possible, Your

 6   Honor.

 7          Since we filed the letter to the Court, we have

 8   actually taken Lieutenant Lamond's deposition, so I can

 9   provide a little more context for why his testimony is so --

10          THE COURT:  Okay.

11          MS. LIVENGOOD:  So before the plaintiff --

12          THE COURT:  So you view him as a key witness.

13          I take it from -- even though the defendants had

14   him on the potential witness list, the defendants have

15   denied that he is a key witness at all.  So let me just

16   interrupt you.

17          Are the defendants planning on calling Lieutenant

18   Lamond as a witness?

19          MR. SOBIECKI:  He was on our initial disclosure as

20   someone who has relevant information.

21          THE COURT:  But not as a witness?

22          MR. SOBIECKI:  Correct, Your Honor.

23          In terms of what we call -- "premature."  He is

24   not a key individual.  I mean, that would maybe depend, in

25   part, on plaintiffs' presentation.  But no, I wouldn't see

1    him at the moment as someone -- Commander Glover who was the

2    one who made the decision and Chief Carroll, who was the

3    highest-ranking officer there, are the primary witnesses.

4         THE COURT:  Okay.  So the plaintiffs plan to call

5    Lieutenant Lamond.

6         MS. LIVENGOOD:  It's certainly possible.  Because

7    the fact of Lieutenant Lamond as a key witness doesn't turn

8    exclusively on whether defendants --

9         THE COURT:  Before I turn him over -- you called

10   him a "key witness."  If he is a key witness, I am expecting

11   plaintiffs -- what I couldn't understand is, is Lieutenant

12   Lamond a key witness for the plaintiffs or for the defense?

13        So if he is a key witness -- the defendants say he

14   is not a key witness to their case.  The plaintiffs say he

15   is a key witness to your case.  How can he just be a

16   possible witness in your case as opposed to a definite

17   witness you are calling in your case?

18        MS. LIVENGOOD:  Maybe it would shed some light on

19   that to explain why his testimony would be critical.  So

20   before the plaintiffs were arrested on Swann Street, they

21   and other marchers marched north on 14th Street.

22        Commander Glover, who made the decision to arrest,

23   testified that the conduct of the marchers on 14th Street

24   was critical to the arrest decision.  It was not just the

25   curfew violation, it was also the conduct on 14th Street.

1          Lieutenant Lamond is one of only three MPD

2     officers that any party has identified as being present

3     during that march up 14th Street.

4          So the three officers who were present were

5     Commander Glover, Lieutenant Lamond, and Lieutenant Mejia.

6     None of those three were wearing body-worn cameras.  Excuse

7     me.  Lieutenant Mejia was wearing a body-worn camera that

8     was inactive.  Lieutenant Lamond was undercover, he was not

9     wearing a body-worn camera.  Commander Glover was ranked

10    high enough that he didn't need to be wearing one.

11         Of the body-worn camera footage defendants have

12    produced, none of it shows what happened on that march up

13    14th Street.  The nature of the conduct of the marchers is

14    heavily disputed.

15         Defendants say there was property damage and

16    riotous conduct.  Plaintiffs describe a peaceful,

17    self-regulating protest march.

18         The accounts of the march from Commander Glover

19    and Lieutenant Lamond differ significantly.  So Commander

20    Glover testified in his deposition that he saw things like

21    marchers breaking the glass on bus stops, saw marchers

22    shooting fireworks --

23         THE COURT:  Lieutenant Glover said this?

24         MS. LIVENGOOD:  Commander Glover, exactly,

25    testified --

```
 1              THE COURT:  Lieutenant.

 2              MS. LIVENGOOD:  He was Inspector Glover at the

 3      time.  Those are fine.

 4              He testified to those things.  Lamond testified

 5      that he did not see those things.  Actually, he may have

 6      said he didn't recall, but he was interviewed

 7      contemporaneously; he didn't mention any of those.  In his

 8      deposition he said he couldn't recall seeing that.

 9              Lieutenant Lamond's account and Commander Glover's

10      account of what they saw on 14th Street differs

11      considerably.

12              Because there is no body-camera footage, it is

13      central to the case, what happened on 14th Street, because

14      Commander Glover says he used that conduct as a basis for

15      making the arrest decision.  The credibility of each witness

16      is extremely important because there is nothing to

17      corroborate it by way of body-worn-camera footage.

18              It is particularly important for the plaintiffs'

19      First Amendment claims, both the First Amendment retaliation

20      claim and the proposed First Amendment selective enforcement

21      claim -- as Your Honor knows, they are sort of two main

22      questions:  Were plaintiffs treated differently from other

23      people and were they treated differently because of the

24      First Amendment activity?

25              The argument the defendants have advanced through
```

1   deposition testimony is that to the extent the plaintiffs

2   were treated differently, it wasn't because of the First

3   Amendment activity, it was because of their conduct on 14th

4   Street.  So the nature of that conduct on 14th Street is

5   incredibly important to plaintiffs' claim.

6           In terms of Lieutenant Lamond's disciplinary

7   file --

8           THE COURT:  So for -- the plaintiffs were on 14th

9   Street or they were never on 14th Street?

10          MS. LIVENGOOD:  They were, Your Honor.

11          THE COURT:  They were part of 14th Street.  So you

12   are going to have testimony from the plaintiffs saying what

13   they saw on 14th Street.  You can have anybody in the crowd

14   come in and testify about what they saw on 14th Street.  But

15   you -- the plaintiffs want to use the testimony of a law

16   enforcement officer to say what the law enforcement officer,

17   who was placed there to make observations and report up

18   about those observations as a trained observer -- you want

19   him to testify about that?

20          MS. LIVENGOOD:  Exactly, Your Honor.

21          THE COURT:  When he testified at his deposition,

22   did he -- so based on what you are saying, he saw only

23   peaceful self-regulated -- whatever the term you used --

24   protest, march up 14th Street and saw no damage.  I thought

25   there was a car that was on fire.

1          MS. LIVENGOOD:  There was.

2          Yes, Your Honor.  He didn't testify that it was

3  peaceful.  There were specific instances of misconduct that

4  Commander Glover testified to that Lieutenant Lamond

5  testified he did not see.  What he testified he saw was

6  smashing of a police car and a burning of a police car.

7          There is ample extrinsic evidence including

8  body-worn-camera footage that that police-car fire did not

9  happen while Lieutenant Lamond was on 14th Street, it

10  happened after everybody was encircled on Swan Street.  But

11  that was his testimony to the IAD investigator a month after

12  the event and it was his testimony during his deposition.

13  So it differs -- significantly, it differs from Commander

14  Glover's testimony.

15          THE COURT:  I am still trying to figure out how

16  does Lieutenant Lamond's testimony showing and corroborating

17  Inspector Glover's testimony about violence on 14th Street

18  make Lieutenant Lamond such a key witness for plaintiffs?

19  Because it seems like he is corroborating you-all.

20          Based on what I have seen from this email, are the

21  plaintiffs disputing that Lieutenant Lamond had no direct

22  interactions with the plaintiffs in this case?

23          MS. LIVENGOOD:  Your Honor, I think that point --

24  that was actually -- defendants' assertion about that, I

25  think, is flatly incorrect.  It's also irrelevant.

```
1              So defendants' assertion is -- it is unknowable

2     whether Lieutenant Lamond interacted with the plaintiffs

3     either on 14th Street or on Swan Street.  He was not wearing

4     body-worn camera and he was in plain clothes.  I don't think

5     either Lieutenant Lamond or the plaintiffs are able to say

6     whether they interacted.  There is nothing in the

7     body-worn-camera footage that would demonstrate, one way or

8     the other, whether that happened.  There is nothing in the

9     documents that would demonstrate that one way or the other.

10             It is irrelevant, though, whether he interacted

11    with the plaintiffs individually because the arrest decision

12    was not made on the basis of plaintiffs' individual conduct,

13    it was made on the basis of the alleged conduct of the

14    crowd.  There is no question Lieutenant Lamond interacted

15    with the crowd that plaintiffs were participating in.

16             THE COURT:  I also understand from the email -- so

17    no interaction directly with the plaintiffs.  Lamond is not

18    involved in the arrest decision of the plaintiffs.

19    Certainly -- not only was he not only involved in -- not

20    involved in the arrest decision of the plaintiffs but also

21    not involved in arresting the plaintiffs.

22             Lieutenant Glover says he had no direct

23    communication with Lieutenant Lamond that day, didn't -- to

24    the best of his knowledge, didn't base any of his decisions

25    based on information from Lamond.
```

1          So I am sitting here wondering, like, why do you

2     think Lamond is such a key witness?  Because he marched up

3     14th Street corroborates the fact that there was damage done

4     just on 14th Street by protesters marching up 14th Street

5     just to corroborate Inspector Glover?

6          MS. LIVENGOOD:  So I think there are a couple of

7     things --

8          THE COURT:  Why are we debating this here?

9          MS. LIVENGOOD:  Some of those facts are not

10    accurate.  So Commander Glover did not testify that he

11    didn't take into account anything Lieutenant Lamond said.

12    Lieutenant Lamond was on his radio while he was undercover.

13    He testified that he was there --

14          THE COURT:  So that was an incorrect statement in

15    the email?

16          MS. LIVENGOOD:  Yes, Your Honor.  That is an

17    incorrect statement.

18          Lieutenant Lamond was on the radio.  He testified

19    that the reason he was there and on his radio was to

20    report -- Lieutenant Lamond's deposition has happened since

21    the filing was submitted, it happened last month.  So

22    defendants made those statements without the benefit of

23    Lieutenant Lamond's deposition testimony.

24          Commander Glover testified that he made the

25    decision, in large part, based on what he heard over the

1  radio.  Lieutenant Lamond was the person transmitting that

2  information over the radio.  So there is -- Lieutenant

3  Lamond's information was certainty part --

4          THE COURT:  Hold on just one second.  I want to

5  find where that was said.

6          Plaintiff specifically asked Commander Glover

7  whether he relied on information from Lieutenant Lamond in

8  making his decision to arrest individuals on June 1, and he

9  unequivocally told them that he did not.  So that is

10  incorrect?

11          MS. LIVENGOOD:  I don't believe that's true.  But

12  even if it was the case -- I don't believe that's true.

13  Even if it was the case that plaintiffs asked -- I took

14  Commander Glover's deposition so I don't recall whether I

15  asked him specifically whether he relied on Lieutenant

16  Lamond.  But he did rely -- he testified unequivocally that

17  he did rely on the information that was transmitted over the

18  radio.  And that information was transmitted by Lieutenant

19  Lamond.  Lieutenant Lamond testified to that.

20          And Commander Glover, during his deposition,

21  identified Lieutenant Lamond as one of the people on the

22  radio that he heard.  He recognized him by his call sign.

23  He said yes, that's Lieutenant Lamond.  And that was one of

24  the pieces of information that he relied on.

25          To the point about --

```
1              THE COURT:  At this deposition --

2              MS. LIVENGOOD:  Yes.

3              THE COURT:  He heard -- say that again.

4              MS. LIVENGOOD:  We played the radio-run footage

5      for Commander Glover at his deposition.

6              THE COURT:  So Lieutenant Glover [sic] recognized

7      among the radio transmissions he was listening to that day,

8      Lieutenant Lamond?

9              MS. LIVENGOOD:  Yes, Your Honor.

10             Lieutenant Lamond uses the call sign "Intel-1,"

11     and Commander Glover heard it.

12             I said:  Is that Shane Lamond?  He said yes.

13             I said:  Did you recognize that because of the

14     call sign; and he said yes.

15             I do also want to clarify, Lieutenant Lamond's

16     testimony, as compared to Commander Glover's testimony, is

17     not entirely corroborative.  And it will be important to

18     separate the various acts of property damage that defendants

19     claim took place on 14th Street.  So Commander Glover

20     painted a very dramatic picture of crowded sidewalk cafes

21     into which plaintiffs were firing fireworks, and of

22     plaintiffs smashing bus stations.

23             Lieutenant Lamond said he did not see those

24     things.  So there are aspects of Commander Glover's

25     testimony that Lieutenant Lamond's testimony does not
```

1    corroborate at all; it undermines those.

2         THE COURT:  Well, you say it undermines, that's an

3    argument you will make to the jury.  But given the amount of

4    time -- I mean, things were happening at different times

5    depending on what side of the street he was on, what time he

6    passed, he might not have seen, it doesn't -- I wouldn't put

7    too much weight on undermining the credibility of Inspector

8    Glover with that; there are way too many factors.

9         MS. LIVENGOOD:  Those are all factors --

10        THE COURT:  That is not a reason to put Lieutenant

11   Lamond on the stand.  But go ahead.

12        MS. LIVENGOOD:  It wouldn't be if we had other

13   information from MPD about what happened on 14th Street.

14        Lieutenant Lamond was questioned a month after

15   this event about what happened.  His testimony, in his

16   statement to the IAD investigator, was consistent with his

17   trial testimony; he didn't mention any bus-stop smashing, he

18   didn't mention any fireworks.  He is one of only three MPD

19   officers who anyone has identified as being present on 14th

20   Street.

21        So Commander Glover's account -- if we are not

22   able to call Lieutenant Lamond, there are very few --

23   Lieutenant Mejia, who was the third person, was at the front

24   of the line in an even worse position to see any conduct

25   than Lieutenant Lamond or Commander Glover.

1      There is no body-worn-camera footage.  There is no

2  way to say -- Commander Glover will stand up, and he will

3  say what he said in his deposition, and there will be very

4  little from MPD that we can use to challenge that account.

5      In terms of Lieutenant Lamond's disciplinary file,

6  we -- obviously, in making a determination as to whether to

7  call Lieutenant Lamond, his credibility is very important to

8  that determination.  Defendants know what is in his

9  disciplinary file; we are unable to see that disciplinary

10  file.  And there is ample evidence to suggest that that

11  disciplinary file contains information probative of

12  credibility.

13      So an MPD spokesperson told *Washington City Paper*

14  that there had been an investigation into whether Lieutenant

15  Lamond was submitting false time sheets and that that

16  investigation had been closed.

17      When I deposed Lieutenant Lamond, I asked about

18  disciplinary history and his counsel instructed him to plead

19  the Fifth Amendment and not respond to any questions about

20  his disciplinary history, so there is no other way for us to

21  get this information.

22      THE COURT:  Because he is facing trial on criminal

23  charges.

24      MS. LIVENGOOD:  For making false statements, yes.

25      So this is a potential for the file to contain

1    something that might be dispositive about whether to call

2    him as a trial witness -- is certainly there.  We are unable

3    to make that determination without the file.

4         The last thing I will say is defendants have not

5    identified any burden associated with producing the file

6    and, indeed, have produced many other disciplinary files.

7    They have drawn the line at Lieutenant Lamond on the basis

8    of their assessment that he is not a key witness while

9    maintaining that he's on their initial disclosures.

10        Our position is that, as one of only three

11   witnesses to this conduct that was central to the arrest

12   decision, he is a key witness.

13        THE COURT:  Well, the defendants say that this is

14   just a smear campaign of Lieutenant Lamond and seeking to

15   elevate the importance of Lieutenant Lamond in the hope that

16   the Court and the jury will hear Lieutenant Lamond and Proud

17   Boys in the same sentence since, I guess, Lieutenant Lamond

18   is allegedly a person who was communicating with the Proud

19   Boys that day, right?

20        MS. LIVENGOOD:  Correct, Your Honor.

21        THE COURT:  I have to tell you, I have a lot of

22   concern about that.

23        MS. LIVENGOOD:  Well, I think there are a few

24   things about that.  One is that --

25        THE COURT:  That would also be inappropriate.  If

 1   Lieutenant Lamond is called at all, I would be very, very

 2   interested in a motion in limine to exclude all information

 3   about the Proud Boys in this.  So if that is what you are

 4   thinking about, using Lieutenant Lamond to start bringing in

 5   whatever Lieutenant Lamond's views are or -- a year later

 6   communications with the Proud Boys, think again.

 7             MS. LIVENGOOD:  No.  Absolutely, Your Honor.

 8             I have no doubt that Your Honor would, under

 9   Rule 608 and 609, carefully cabin any testimony --

10             THE COURT:  Oh, I would say Federal Rules of

11   Evidence 403, 402.  Yeah, just go through the federal rules

12   about why that would be highly objectionable with objections

13   sustained based on what I know now; and just the chronology.

14             MS. LIVENGOOD:  I absolutely understood.

15             We certainly understand that, and that's not the

16   intention.  It really is -- especially the disparity between

17   Lieutenant Lamond's account and Commander Glover's account

18   and the very few witnesses or other evidence that would

19   demonstrate behavior on 14th Street that makes Lieutenant

20   Lamond a significant witness.

21             THE COURT:  So are you asking for all of the

22   disciplinary records or disciplinary records up to June 1,

23   2020?

24             MS. LIVENGOOD:  No.  It would be -- any

25   disciplinary records since June 1, 2020, would also be

1    probative of Lieutenant Lamond's character for truthfulness

2    such that if we called Lieutenant Lamond he could be

3    cross-examined on them.  I presume that defendants would not

4    cross-examine him on them having not produced them, but we

5    could have a late production of those records.

6         I think plaintiffs have to have the same

7    information defendants have about Lieutenant Lamond's -- the

8    extent to which Lieutenant Lamond's disciplinary history

9    reveals other acts that demonstrate character for

10   truthfulness or untruthfulness.  So I think we had asked

11   from 2010 to present, which is the same that defendants have

12   provided to other --

13        THE COURT:  I mean, I haven't seen the deposition

14   of Lieutenant Glover, I have no intention of reading it.

15        So what -- the specific instances of violence or

16   criminal activity of some kind, petty or not, that occurred

17   on 14th Street that Lieutenant Glover testified about, is

18   that something that you need testimony about?  The

19   defendants aren't going to just stipulate to that?

20        MS. LIVENGOOD:  No.  I think it's actually a

21   pretty central point because --

22        THE COURT:  Central point of dispute?

23        MS. LIVENGOOD:  It is both a centrally disputed

24   fact and a central point for plaintiffs' First Amendment

25   claims.

1          THE COURT:  So because the plaintiffs say that

2    they personally -- in their deposition -- and I take it that

3    they have already testified that it was peaceful, they

4    didn't see any illegal activity, which is what we hear from

5    every January 6, 2021, defendant:  "We saw nothing wrong, it

6    was all peaceful."  So we're just hearing -- so we have been

7    here before.

8          MS. LIVENGOOD:  I understand.

9          THE COURT:  And the defendants or Lieutenant

10   Glover say, No, no, no, I was getting reports about things

11   that were happening.

12         You haven't found -- there is no other evidence,

13   and the defendants have been unwilling to stipulate to

14   support Lieutenant Glover this happened on this point, this

15   happened at such and such a time, this happened at such and

16   such a time.  It seems like you -- the defendants are going

17   to put on evidence about this; it either happened or it

18   didn't happen.  They have got other evidence to support it,

19   or they don't.

20         Have you all -- but you want to put on Lieutenant

21   Lamond to say these are the things he saw at such and such a

22   time, whether the plaintiffs were there or not at the time

23   that he saw it and that he didn't see other things when he

24   was passing by, even though Lieutenant Glover might have

25   gotten reports of it happening at a time he wasn't there.

1            MS. LIVENGOOD:  Commander Glover actually

2      claims --

3            THE COURT:  So we're going to be telling the jury

4      to do their own time line -- or I am sure you-all will put

5      together a time line that will make everybody's testimony

6      totally reconciled.  Is that where we are at here?

7            You-all can't, like, figure out what the facts

8      are, what happened on 14th Street and when, and stipulate to

9      it?

10           MS. LIVENGOOD:  I think that's right.

11           I would say that Commander Glover doesn't only

12     testify that he was hearing reports.  He testified that he

13     personally was on 14th Street and this is what he was

14     seeing.  What he was seeing -- there are lots of reasons to

15     question the accuracy of that account, among them is

16     Lieutenant Lamond's testimony.

17           This is not totally uncommon with our cases --

18     right? -- where the facts that we're alleging -- this gives

19     rise to an inference of retaliation, of discrimination.  The

20     First Amendment retaliation claim is very much in the

21     heartland of that.

22           We say:  Plaintiffs were treated differently from

23     other people who were violating the curfew, and that was

24     because they were engaged in First Amendment activity.  The

25     defendants say, first, they weren't treated differently.  We

1    think we have ample evidence to disprove that.

2           Second, if they were treated differently, it's

3    because they were engaged in a riot, and they were engaged

4    in a riot for A, B, C, D reasons.  We need to be able to

5    refute the fact that A, B, C, D happened and say those

6    things didn't happen.  And the fact that we can show they

7    didn't happen and yet we know plaintiffs were treated

8    differently gives rise to an inference that it was

9    retaliatory.

10           THE COURT:  All right.  Let me hear from the

11   defendants.

12           Okay.  You did a good job on the email making me

13   think that Lieutenant Lamond was not a key witness.  And to

14   quote you, "Lieutenant Lamond is not a party or a key

15   witness here."  He had nothing to do with -- Lamond had

16   nothing to do -- Lamond didn't report to Glover.

17           But, in fact, Glover was listening to his radio

18   runs?

19           MR. SOBIECKI:  Let me address one line in there.

20   Again, that was written before the benefit of the

21   transcript.  Now that I have gone back and reviewed the

22   transcript, in terms of Commander Glover being asked about

23   Lieutenant Lamond, it's clear -- Commander Glover relied on

24   his own personal observations in making the decision to

25   arrest.  That decision was corroborated by what he heard on

 1    the radio including transmissions made by Lieutenant Lamond,

 2    so having the benefit of that.

 3            But I feel like a lot of this is getting far

 4    afield.  The decision to arrest was made by Commander

 5    Glover.  Commander Glover and Lieutenant Lamond are in

 6    different locations at different times.

 7            THE COURT:  Come on.  This is ridiculous word

 8    slicing.

 9            You just said Lieutenant Glover made the decision

10    to arrest based on what he saw --

11            MR. SOBIECKI:  Correct.

12            THE COURT:  -- and what was being reported to him

13    and what he was listening to and the full context.  Part of

14    that context --

15            MR. SOBIECKI:  Agreed.

16            THE COURT:  -- was what, I guess, Lieutenant

17    Lamond was saying to him.  That's a very different depiction

18    than what was put in this email.

19            And yes, of course, it was Lieutenant Glover's

20    decision whether or not to arrest; no one is saying

21    otherwise.  But it was based on his evaluation of the full

22    context of information he was being given.  And if that also

23    included Lieutenant Lamond -- new to me based on the hearing

24    today -- how can you say that Lieutenant Lamond sort of has

25    nothing to do here, nothing to do with this case?

1          MR. SOBIECKI:  Well, I mean, nothing to do from

2     our perspective.  Again, he wasn't involved in the

3     decision-making structure.  He didn't provide input directly

4     to Commander Glover.

5          THE COURT:  But he did through radio-run reports.

6          MR. SOBIECKI:  He provided information over the

7     radio, correct.

8          THE COURT:  So don't say he didn't provide any

9     information to Lieutenant Glover that contributed to

10    Lieutenant Glover's decision-making.  He was listening to

11    radio runs simultaneously with where he was.

12         So in addition to that, which is news to me at

13    this hearing based on the email description of Lieutenant

14    Lamond's review which is incorrect, what about Lieutenant

15    Lamond saying -- not seeing things that Lieutenant Glover

16    did or did see, says he did see.

17         MR. SOBIECKI:  He doesn't say he didn't see them.

18    He said he did not recall.  It was:  Do you recall seeing

19    this?  He said:  "I don't recall."  It wasn't:  "That did

20    not happen."  Just to be clear on that one.

21         But this is about his disciplinary file and his

22    credibility.  I guess I am not seeing the nexus between the

23    two, Your Honor.

24         Okay.  Commander Glover makes this decision based

25    on the information he possesses, and then we're going to

1    bring in Lieutenant Lamond's disciplinary file because

2    Commander Glover did not have awareness of his disciplinary

3    file, anything in there.  He had no reason to doubt.  In

4    terms of going to the animus -- again, we are in the

5    retaliation context.  It is relevant.  Commander Glover, did

6    he have -- what went into his decision that would relieve

7    his animus, his intent to retaliate against these

8    individuals?  Let's assume everything --

9             THE COURT:  Let me just say, the reason based on

10   this email that you are objecting to turning over the

11   personnel records is because Lieutenant Lamond didn't have

12   basically any relevant evidence to produce here.  He wasn't

13   going to be a key witness for the defendants.  In your view,

14   he wasn't going to be a key witness for the plaintiffs.

15            According to the plaintiffs, he is going to be a

16   key witness.  He was the only person who was marching along

17   with these people who can be used to, both, impeach Glover

18   and also describe what he saw when on 14th Street.

19            So the one reason that you gave for not producing

20   the file for what may be a key witness for the plaintiffs

21   is:  He is not a key witness.  Well, I think based on what I

22   have heard today, he does have relevant evidence and he did

23   report directly to Glover at the time, simultaneously with

24   what he was seeing on 14th Street; so he does have relevant

25   evidence.

1          Their second reason for not producing the

2     personnel file is that this was going to be used as some

3     kind of smear campaign and tie Lieutenant Lamond to what he

4     is standing trial for now having to do -- due to his

5     connection or whatever conduct he engaged in on January 6,

6     2021, or before with the Proud Boys.

7          Well, if I haven't made it clear, I am going to be

8     very skeptical about letting any mention of the Proud Boys

9     come in in this trial.  That can be dealt with in other ways

10    rather than not producing a personnel file which is fairly

11    standard.  I mean, you have produced other personnel files

12    of other officers with relevant evidence in this case.  I am

13    not seeing a reason why this lieutenant should be treated

14    differently than other witnesses on June 1, 2020, than the

15    other witnesses who were also involved that day.

16          MR. SOBIECKI:  Your Honor, the standard that's

17    been applied is not any officer with any relevant

18    information we have turned over their personnel file; it was

19    the defendants'.  Those were the personnel files we turned

20    over.

21          So again -- and apologies for being inaccurate.  I

22    don't think we were in any way intending to say:  Lieutenant

23    Lamond was not relevant in any way to this case.  It was:

24    Is he relevant to the claims at issue?  Not excessive force.

25    He is not alleged to have done anything to plaintiffs, not

1    assault and battery, not the First Amendment Assemblies Act.

2    He wasn't responsible for any of that.

3         It's solely this tangential connection to the

4    retaliation claim which is:  If we assume Lieutenant Lamond

5    saw something different, somehow that relates to Commander

6    Glover's decision to make the arrest which shows animus when

7    Commander Glover has detailed at length his reasons for the

8    arrest, is the totality of circumstances, one violation of

9    the curfew.

10        Lieutenant Lamond's observations have nothing to

11    do with whether they were in violation of the curfew.

12    Commander Glover personally saw the shooting of the

13    fireworks.  There were other -- yes.  So part of the

14    information shared that night was by Lieutenant Lamond.  And

15    if that is what is dispositive, again, we don't dispute

16    that.  But I don't think, again, proportionality under the

17    Rule 26 standard -- I think given that he wasn't involved in

18    decision-making, he was undercover, no direct conversations

19    with Commander Glover.  They weren't, like, talking:  What

20    do you think I should do?  These are just transmissions we

21    are hearing over the radio.  Again, I think it's too

22    tangential to be proportional to the needs of the case.

23        THE COURT:  All right.  For this one I am not

24    going to rule.  I am going to allow the plaintiffs to make

25    any appropriate motion they feel to compel production of

1    this.

2         I will see full briefing now that we have all of

3    the full facts -- and the facts have changed so much since I

4    got the email transmission about what is Lamond's role here

5    and why, unless the parties can work out something about

6    this and avoid Lamond's testimony altogether.

7         All right.  Anything further from the plaintiff

8    today?

9         MS. LIVENGOOD:  No, Your Honor.

10        THE COURT:  From the defense?

11        MR. SOBIECKI:  No, Your Honor.

12        THE COURT:  Okay.  You are all excused.

13        (Whereupon, the proceeding concludes, 12:26 p.m.)

14                        * * * * *

15                     **CERTIFICATE**

16        I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
17   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
18   ability.

19        This certificate shall be considered null and void
     if the transcript is disassembled and/or photocopied in any
20   manner by any party without authorization of the signatory
     below.

21

22   Dated this 4th day of April, 2024.

23   /s/ Elizabeth Saint-Loth, RPR, FCRR
     Official Court Reporter

24

25