**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAMELA GOODWIN, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:21-cv-00806-BAH |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    I.    Unprecedented Rioting Erupts in the District and Mayor Bowser
        Responds. ................................................................................................... 3

    II.    The June 1 Curfew Goes into Effect and Plaintiffs Refuse To Comply. ................. 4

LEGAL STANDARDS ....................................................................................................... 9

    I.    Summary Judgment ....................................................................................... 9

    II.    Expert Admissibility .................................................................................... 10

ARGUMENT .................................................................................................................... 10

    I.    Plaintiffs Cannot Show That Their First Amendment Rights Were
        Violated. .................................................................................................... 10

           A.    Commander Glover Made the Decision To Arrest Plaintiffs. ................. 11

           B.    Plaintiffs Cannot Show That the June 1 Curfew Violated Their
               Speech or Assembly Rights. ................................................................. 12

           C.    Plaintiffs' Retaliation Claim Fails Because Their Arrests Were
               Supported by Probable Cause. ............................................................... 12

           D.    Defendants Did Not Selectively Enforce the June 1 Curfew
               Against Plaintiffs. ............................................................................... 16

           E.    Even Assuming Plaintiffs' First Amendment Rights Were
               Violated, the Individual Defendants Are Entitled to Qualified
               Immunity. ........................................................................................... 18

           F.    Even Assuming Plaintiffs' First Amendment Rights Were
               Violated, a Policy or Custom Was Not the Moving Force Behind
               It. ...................................................................................................... 21

    II.    Plaintiffs Cannot Show That Defendants Violated the District's First
        Amendment Assemblies Act .......................................................................... 26

III.    Plaintiffs Cannot Show That Their Fourth Amendment Rights Were
        Violated.................................................................................................... 29

        A.    The Individual Defendants Did Not Use Excessive Force When
              Arresting Individuals on Swann Street. ..................................... 30

        B.    Even Assuming Plaintiffs' Fourth Amendment Rights Were
              Violated, a Policy or Custom Was Not the Moving Force Behind
              It. ............................................................................................... 37

IV.     Plaintiffs Cannot Prove Assault and Battery Against Any Defendant. ................ 39

V.      The Expert Opinions of Dr. Scott Mourtgos Are Inadmissible and
        Irrelevant. ......................................................................................... 41

CONCLUSION............................................................................................. 45

## INTRODUCTION

On June 1, 2020, Mayor Muriel Bowser implemented a citywide, 7 p.m. curfew that, as the D.C. Circuit recently held, was a content neutral, constitutionally valid time, place, and manner restriction on speech and assembly rights that "barr[ed] virtually everyone from the public streets without distinctions based on their topic or message or, indeed, whether they engaged in any expression at all." *Tinius v. Choi*, 77 F.4th 691, 702 (D.C. Cir. 2023). The D.C. Circuit reached its decision, in part, because the June 1 curfew was an eminently reasonable response to two unprecedented health and safety concerns: the global pandemic and "a sudden rise in rioting, vandalism, arson, and looting." *Id*. at 701–02. Like the plaintiffs in *Tinius*, Plaintiffs here do not dispute that they were in violation of the curfew well past 7 p.m. on June 1 and that the Metropolitan Police Department (MPD) had probable cause to arrest them. Despite those undisputed facts, Plaintiffs allege that their arrests for refusing to comply with the curfew violated their First Amendment rights and their rights under the District's First Amendment Assemblies Act (FAAA). Plaintiffs also allege that Defendants arrested them using excessive force in violation of their Fourth Amendment rights and that the arrests constituted common law assault and battery. After extensive discovery, Plaintiffs have failed to adduce evidence in support of their claims, and as a result, Defendants are entitled to summary judgment.

First, Plaintiffs cannot show that Commander Robert Glover's decision to arrest them was in retaliation for their protected speech, nor can they show that the curfew was selectively enforced against them. Plaintiffs' retaliation claim fails as a matter of law because it is undisputed that their arrests were supported by probable cause. And Plaintiffs' selective enforcement claim fails because they have no evidence that the curfew was enforced differently against similarly situated individuals. Even assuming Plaintiffs had evidence that their First Amendment rights were violated, the Individual Defendants are still entitled to summary

judgment because they are protected by qualified immunity, and the District is still entitled to summary judgment because Plaintiffs have no evidence supporting municipal liability.

Second, Plaintiffs' FAAA claim fails as a matter of law because the FAAA only applies to First Amendment assemblies and, as the D.C. Circuit held in *Tinius*, First Amendment assemblies were prohibited in public places in the District after 7 p.m. on June 1, 2020. Even assuming the FAAA did apply while the June 1 curfew was in effect, Plaintiffs' claim against the Individual Defendants still fails because the FAAA does not provide for individual liability, and their claim against the District still fails because MPD satisfied the FAAA requirements it purportedly did not: MPD provided repeated warnings to individuals in the downtown area that they needed to disperse both before and after 7 p.m., and no MPD officer used oleoresin capsicum spray, *i.e.*, pepper spray, to disperse individuals; pepper spray was only used in response to specific threats to safety.

Third, Plaintiffs cannot show that any Individual Defendant used excessive force on June 1. After the decision was made to arrest a large group of individuals who were refusing to comply with the curfew, MPD officers encircled the group on Swann Street between 14th and 15th Streets, NW. To initiate the arrest process, MPD officers began moving towards the curfew violators at a "half-step," *i.e.*, slowly, while ordering the curfew violators to "move back." The overwhelming number of individuals complied with officers' instructions and were taken into custody without incident. However, as video evidence confirms, a small number of individuals refused to comply with the instruction to move back, and in response, officers used mechanical force to achieve compliance. MPD officers deployed pepper spray on four occasions. But, as video evidence also confirms, those deployments of pepper spray were in response to specific threats and were entirely reasonable under the circumstances. Even assuming the Individual

Defendants used excessive force, they are still entitled to summary judgment because they are protected by qualified immunity, and the District is still entitled to summary judgment because Plaintiffs have no evidence to support municipal liability.

Fourth, Plaintiffs cannot show that any Individual Defendant committed assault and battery for the same reasons they cannot show a violation of their Fourth Amendment rights—there is no evidence that any Individual Defendant used excessive force.

Finally, to the extent Plaintiffs attempt to rely on the expert opinions of Dr. Scott Mourtgos to avoid summary judgment, the Court should disregard Dr. Mourtgos's opinions because they are unreliable and irrelevant.

## BACKGROUND

### I.    <u>Unprecedented Rioting Erupts in the District and Mayor Bowser Responds.</u>

On May 25, 2020, George Floyd died while in the custody of Minneapolis police officers. Statement of Undisputed Material Facts (SUMF) ¶ 1.  His death sparked protests throughout the country, including in the District.  *Id*. ¶ 2.  Those protests began in earnest in the District on May 29, 2020, and continued for the next several days.  *Id*. ¶ 3.  While many individuals protested peacefully, other individuals used the protests as an opportunity to engage in riotous acts, including vandalism, looting, arson, and violent attacks against police officers.  *Id*. ¶¶ 4–6.  The riotous acts primarily occurred at night in the downtown area.  *Id*. ¶ 5.

In response to the rioting, Mayor Muriel Bowser implemented a curfew from 11 p.m. on May 31, 2020, to 6 a.m. on June 1, 2020.  *Id*. ¶ 7.  The District government provided notice of the May 31 curfew and it was covered extensively by the news media.  *Id*. ¶¶ 9–10.  Despite the May 31 curfew, the downtown area was again ravaged by vandalism and looting.  *Id*. ¶ 12. Mayor Bowser implemented another curfew for June 1, but the June 1 curfew began at 7 p.m. *Id*. ¶ 13.  As with the May 31 curfew, the District government provided notice of it to the public

and it was extensively covered by the news media.  SUMF ¶¶ 22–24.  MPD's goal was to achieve voluntary compliance with the curfew.  *Id*. ¶¶ 27–28.

## II.    <u>The June 1 Curfew Goes into Effect and Plaintiffs Refuse To Comply.</u>

On June 1, 2020, as was the case during the prior days, the center of protest activity was at Lafayette Park.  SUMF ¶¶ 3–5.  Then-Inspector Robert Glover was the incident commander for MPD on June 1, meaning that he was responsible for coordinating the tactical movements of MPD officers.[1]  *Id*. ¶¶ 25–26.  The highest-ranking officer in the downtown area on June 1 was Assistant Chief of Police Jeffrey Carroll, who was head of MPD's Homeland Security Bureau at the time.  *Id*. ¶ 218.  At 6:42 p.m., using a long-range acoustic device (LRAD) near 14th and H Streets, NW, MPD began announcing that a curfew was going into effect at 7 p.m., and that those remaining on the streets would be subject to arrest.  *Id*. ¶ 36.  MPD issued additional warnings over the LRAD at 6:53 p.m. and 7 p.m. near Lafayette Park.  *Id*. ¶ 45.  At 7:01 p.m., MPD used the LRAD to announce that the citywide curfew was now in effect and that anyone remaining in the public space was subject to arrest.  *Id*. ¶ 46.  MPD continued to announce near Lafayette Park and down 17th Street, NW, that the curfew was in effect, issuing at least twenty warnings between 7:02 p.m. and 7:20 p.m.  *Id*. ¶ 47.  Additional curfew warnings were issued at the intersection of Vermont Avenue and 15th and K Streets, NW, near the northeast corner of McPherson Square at 8:15 p.m.  *Id*. ¶ 54.  Plaintiff Remick was in the immediate vicinity of the 8:15 p.m. McPherson Square curfew warning prior to Plaintiff Remick's continued march north toward Thomas Circle and 14th Street.  SUMF ¶ 55.  Plaintiff Lane learned of the curfew at McPherson Square and heard police officers there giving orders to disperse.  *Id*. ¶ 56.

---

[1]    Then-Inspector Glover, who has since retired from MPD, was promoted to Commander shortly thereafter.  Defendants will refer to him as Commander.

After the curfew went into effect, when MPD officers encountered individuals on the street, they informed them of the curfew and asked them to disperse. *Id.* ¶ 27. Most individuals complied with the request without incident. *Id.* ¶ 219. MPD's primary goal remained achieving voluntary compliance with the curfew. *Id.* ¶ 28. For example, after MPD learned of a large group of individuals near 16th and Eye Streets, NW, Commander Glover instructed officers to prepare to encircle and arrest the group in the hope that the police movement would cause the group to disperse. *Id.* ¶¶ 49–50. Upon seeing the police movements, the group dispersed. *Id.* ¶ 51.

At the same time, several hundred individuals—perhaps as many as 1,000 at some points—failed to disperse and began marching north on 14th Street, NW towards the commercial area of Columbia Heights. *Id.* ¶ 57. The identity of the group was fluid with people joining and leaving as the night continued. *Id.* ¶ 221. Individuals within that group were vandalizing property and throwing objects at police officers. *Id.* ¶¶ 58–59. One individual in that group was struck by a brick thrown by a fellow protestor. *Id.* ¶ 59. MPD continued to inform the group that the curfew was in effect and that they needed to disperse. *Id.* ¶ 66. Commander Glover was concerned that the group was headed to the area of Target and other businesses in Columbia Heights, where significant vandalism and looting had occurred during the prior nights. *Id.* ¶¶ 4–5, 220. In response, Commander Glover instructed officers to prevent the group from continuing north on 14th Street, NW. *Id.* ¶ 222. Aside from preventing the group from reaching Columbia Heights, MPD did not restrict the movement of individuals in the group and did not prevent individuals from complying with the curfew and leaving the area. *Id.* ¶ 115.

After marching north on 14th Street, the large group turned around and began marching south on 14th Street. *Id.* ¶ 100. A portion of the group broke off and headed west on Florida

Ave., NW, towards 15th Street. SUMF ¶¶ 106–107. After individuals in the group had failed to comply with the curfew for more than an hour, Commander Glover made the decision to initiate the process of arresting the group and began assembling the resources necessary to conduct an encirclement. *Id*. ¶¶ 114–15. His initial preference was to conduct the encirclement on 14th or 15th Streets, but because the group was constantly moving, that was not possible. *Id*. ¶ 224. Ultimately, the group of individuals traveling on 14th Street and those on 15th Street converged on Swann Street. *Id*. ¶ 112. Upon seeing the groups converge on Swann Street, Commander Glover ordered police lines to form at both ends of Swann Street, which is approximately 500-600 feet in length. *Id*. ¶¶ 118–20. The police lines formed at approximately 9 p.m. *Id*. ¶ 120. At that point, all of the individuals on Swann Street were under arrest for violating the curfew. *Id*. ¶ 223.

Once the police lines formed on Swann Street, the curfew violators began trying to avoid arrest by breaking into residences. *Id*. ¶¶ 126–27. MPD officers heard individuals attempting to kick down doors, and several residents of Swann Street called 911 to report attempted break-ins. *Id*. ¶¶ 127–29. Residents of Swann Street also reported hearing MPD officers announcing the curfew. *Id*. ¶ 225. MPD's initial plan was for the line of officers on 14th Street to move towards 15th Street, but in response to efforts of the curfew violators to break into residences, the officers on 15th Street began moving first. *Id*. ¶¶ 124, 126. Lt. Horos, Officer Crisman, and Officer Quarles were on the 15th Street side. *Id*. ¶¶ 146, 166–67. Lt. Mejia was on the 14th Street side. *Id*. ¶ 135. By 9:30 p.m., and before the officers began moving east from 15th Street, Commander Glover had left Swann Street to attend to more pressing matters. *Id*. ¶ 131.

The officers on the 15th Street side began moving east at a "half step" while loudly ordering the curfew violators to "move back." *Id*. ¶ 138. Of the approximately 200 individuals

on Swann Street, a dozen or two refused to comply with the order to move back. SUMF ¶ 139. One of those individuals was Plaintiff Surio. *Id*. ¶ 150. Officer Quarles, who was part of the line on the south side of Swann Street near 15th Street, moved towards Plaintiff Surio and made contact with her with his shield when she refused to comply with orders to move back. *Id*. ¶ 151. Although Plaintiff Surio claimed she sustained injuries from her interactions with MPD officers on Swann Street, most of her bruises were from injuries sustained on May 31, 2020. *Id*. ¶ 231.

Another individual who refused to comply with orders to move back climbed on top of the roof of a car. *Id*. ¶ 167. As the line of officers approached him, he reached down and made contact with an officer's shield. *Id*. ¶ 168. After the individual contacted the officer's shield, Lt. Horos deployed a one-second burst of pepper spray at the individual. *Id*. ¶ 168. Lt. Horos was concerned that this individual posed a threat to officer safety because he occupied higher ground. *Id*. ¶ 169. The individual got down from the car after being pepper sprayed. *Id*. ¶ 168. As the police line continued to move forward, the curfew violators repeatedly threw objects at the officers. *Id*. ¶¶ 141, 170–71. After three objects were thrown in close succession, one of which struck an officer's shield, Lt. Horos deployed a one-second burst of a pepper spray in the direction that the objects were coming from. *Id*. ¶ 172. A few minutes later, an individual clenched his fists and rushed toward an officer, making contact with the officer's shield. *Id*. ¶ 173. Lt. Horos deployed a one-second burst of pepper spray at that individual. *Id*. ¶ 174.

During this same time, Officer Crisman was part of the police line on the west side of Swann Street moving from 15th Street towards 14th Street. *Id*. ¶ 166. Officer Crisman had heard curfew violators attempting to break into residences. *Id*. ¶ 127. As he moved down Swann Street, Officer Crisman observed individuals who he believed were entering a residence illegally as well as individuals on the sidewalk who he believed were also preparing to enter the residence

illegally. *Id.* ¶¶ 177–78.  To prevent additional individuals from entering the residence, Officer

Crisman deployed a one-second burst of pepper spray towards the individuals on the sidewalk

outside of the residence that the curfew violators were entering.  SUMF ¶ 180.  MPD

subsequently learned that the owner of the residence (Rahul Dubey) had allowed the curfew

violators to enter.  *Id.* ¶ 227.  After Officer Crisman's deployment of pepper spray, there were no

additional uses of force and the individuals who remained on the street were taken into custody

without incident.  *Id.* ¶ 228.

Plaintiffs Pearlmutter, Remick, and Surio were taken into custody.  Second Am. Compl.

[77] ¶ 72.  Plaintiffs Lane, Lazo, and Troper entered Mr. Dubey's residence and were not taken

into custody.  SUMF ¶¶ 187, 191, 194.  Plaintiff Goodwin, who was located near the 14th Street

side of Swann Street, entered a different residence and was not taken into custody.  *Id.* ¶ 183.

Given the events of May 30 and May 31, on June 1, MPD had activated its high-volume

prisoner processing center at the Metropolitan Police Academy, located at 4665 Blue Plains

Drive, Washington, D.C.  *Id.* ¶¶ 205, 208.  MPD had determined that the Metropolitan Police

Academy was the site best suited for the high-volume prisoner processing center because it was

secure, offered shelter from the elements, and had adequate facilities to accommodate a large

number of arrestees, including space for overflow if necessary.  *Id.* ¶¶ 202–09.  Commander John

Haines was in charge of the prisoner processing center.  *Id.* ¶ 207.  During processing, arrestees

had access to bathrooms upon request.  *Id.* ¶ 210.  Once in a holding room, food and water were

available for arrestees.  *Id.* ¶ 211.  MPD officers kept logs for intake, food, and restroom use.  *Id.*

¶¶ 210–11.  The MPA Intake Books tracked when arrestees were brought into the intake station

and when they left, as well as basic information like name, sex, charge, and arresting officer.  *Id.*

¶ 211.  The Arrestees Food and Rest Room Logs tracked inmates, the time they were fed or refused food, their allergies, and the times they used the restroom.  *Id*.

Any time someone is subject to arrest by MPD, they are placed in restraints unless there is a physical reason that restraints cannot be reasonably applied.  SUMF ¶ 212.  This policy is based on concerns for officer and arrestee safety.  *Id*. ¶ 212.  For mass arrests, MPD typically uses double loop flex cuffs to restrain arrestees.  *Id*. ¶ 213.  MPD Officers are expected to use a "2 finger test" when assessing how tight to apply flex cuffs to arrestees, meaning that they should be able to just fit 2 fingers between the cuff and the arrestee's wrist.  *Id*. ¶ 214.  When arrestees complain that their flex cuffs are too tight, MPD officers are expected to inspect the cuff and use the 2 finger test to determine whether the cuff should be corrected.  *Id*. ¶ 214.  Those policies were in effect on June 1.  *Id*. ¶ 214.

The curfew violators on Swann Street were not the only persons arrested and taken into custody by MPD for violation of the June 1 curfew order.  Approximately 284 individuals were arrested for curfew violations that night.  *Id*. ¶ 29.  That includes at least 13 individuals who were arrested individually or in small groups and who were not engaged in First Amendment activities prior to their arrest.  *Id*. ¶ 30.

## LEGAL STANDARDS

### I.    <u>Summary Judgment</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive summary judgment, a plaintiff must "go beyond the pleadings" and

"designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks and citation omitted). Summary judgment in the defendant's favor is warranted when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential" to her case. *Id.* at 322.

## II.    <u>Expert Admissibility</u>

"To survive summary judgment the non-moving party must 'produce evidence . . . capable of being converted into admissible evidence.'" *Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen v. DCCC*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)). Accordingly, if expert testimony is "found wanting" for admissibility, the Court can exclude the testimony "from its consideration in ruling on [a summary judgment] motion." *Arsanjani v. United States*, Civil Action No. 19-1746, 2023 WL 3231101, at *3 (D.D.C. May 3, 2023) (Boasberg, C.J.) (internal quotation marks and citation omitted), *appeal docketed*, No. 23-5109 (D.C. Cir. May 15, 2023). Expert testimony is admissible "if the proponent demonstrates to the court that it is more likely than not that the expert's testimony: (1) "will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "is based on sufficient facts or data;" (3) "is the product of reliable principles and methods;" and (4) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

ARGUMENT

## I.    <u>Plaintiffs Cannot Show That Their First Amendment Rights Were Violated.</u>

Plaintiffs allege that their First Amendment rights were violated because (1) Defendants arrested them in retaliation for their protected speech and (2) Defendants did not enforce the curfew against similarly situated individuals. Second Am. Compl. ¶¶ 115–120. Plaintiffs, however, have no evidence to support either claim, and Defendants should be awarded summary judgment on both. Further, even assuming that Plaintiffs' First Amendment rights were violated,

Plaintiffs cannot show that those rights were clearly established at the time, which entitles the Individual Defendants to qualified immunity, and they cannot show that any violation of their First Amendment rights was caused by a municipal policy or custom.

### A.    Commander Glover Made the Decision To Arrest Plaintiffs.

In the Second Amended Complaint, prepared with the benefit of full discovery, *all* Plaintiffs allege that *all* Defendants arrested and deployed excessive police force against them in violation of their First Amendment rights.  Second Am. Compl. at 28.  However, as with any claim that seeks to impose liability on multiple government officials for the same alleged constitutional violation, each plaintiff must show that each defendant, "through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see, e.g.*, *Rodriguez v. Gay*, Civil Action No. 14-02033, 2014 WL 6853639, at *1 (D.D.C. Nov. 25, 2014) (dismissing claim because "Plaintiff has not stated any facts connecting each named defendant to the alleged wrongdoing and, thus, has failed to provide adequate notice of a claim").  It is undisputed that Commander Glover alone made the decision to arrest Plaintiffs.  SUMF ¶ 116.  Therefore, Plaintiffs cannot maintain a First Amendment claim based on their arrests against the other Individual Defendants.

To the extent Plaintiffs are seeking to hold Chief Newsham liable under the supervisory theory of liability, no evidence supports such a finding.  An official may be held liable for the actions of a subordinate if the official was "directly responsible for supervising the wrongdoer." *Muhammad v. District of Columbia*, 584 F. Supp. 2d 134, 137 (D.D.C. 2008).  But supervisory liability requires a plaintiff to establish "a high degree of fault."  *Elkins v. District of Columbia*, 610 F. Supp. 2d 52, 64 (D.D.C. 2009) (subsequent procedural history omitted).  "Mere negligence is not enough."  *Id*.  For example, a supervisor "who merely fails to detect and prevent a subordinate's misconduct . . . cannot be liable for that misconduct."  *Int'l Action Ctr. v.*

*United States*, 365 F.3d 20, 28 (D.C. Cir. 2004). "The supervisor must know about the conduct and facilitate, approve, or condone it, or turn a blind eye for fear of what he might see." *Id*.

While Chief Newsham was generally monitoring the events during the night of June 1, there is no evidence that he was involved in or even aware of the decision to arrest Plaintiffs prior to that decision being made. SUMF ¶ 116. And, given that Chief Newsham was not present during the events in question, *id*. ¶ 229, he could not have facilitated, approved, condoned, or turned a blind eye to it.

> **B.    Plaintiffs Cannot Show That the June 1 Curfew Violated Their Speech or Assembly Rights.**

Plaintiffs allege that "Defendant District of Columbia is liable for violating Plaintiffs' First Amendment right to freedom of speech and assembly." Second Am. Compl. ¶ 116. It is unclear whether Plaintiffs are attempting to assert a claim under the First Amendment that is distinct from their retaliation and selective enforcement claims, especially given that Plaintiffs never allege that the June 1 curfew was unconstitutional. *See generally id*. Regardless, any claim that the enforcement of the June 1 curfew was a violation of Plaintiffs' speech or assembly rights is foreclosed, *see Tinius*, 77 F.4th at 699, and Defendants are entitled to summary judgment on such a claim.

> **C.    Plaintiffs' Retaliation Claim Fails Because Their Arrests Were Supported by Probable Cause.**

To prevail on a First Amendment retaliation claim, "a plaintiff must show: (1) he or she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) there is a casual link between the exercise of the constitutional right and the adverse action taken against him or her." *Ferris, et al. v. District of Columbia*, Civil Action No. 23-481, 2023 WL 8697854, at *5 (D.D.C. Dec. 15, 2023) (internal quotations and citations

omitted).  With regard to the third element, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (emphasis in original).  In other words, "the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Id*. at 399.

Because of the complexities involved in conducting that causation analysis in the context of retaliatory arrest cases, the Supreme Court simplified the matter: "The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest."  *Id*. at 402 (holding that plaintiff's retaliatory arrest claim failed as a matter of law because his arrest was based on probable cause).  The Supreme Court announced a "narrow qualification" to that rule "for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."  *Id*. at 406; *see also Gonzalez v. Trevino*, 144 S.Ct. 1663, 1667 (2024) (characterizing the *Nieves* exception as "slim"); *id*. at 1672 (Alito, J., concurring) (describing the *Nieves* exception as a "very high bar" that requires "powerful evidence"). However, to invoke the exception, a plaintiff must present "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."  *Nieves*, 587 U.S. at 407.[2]  Further, to make out a prima facie case, the plaintiff must show that "the retaliation was a substantial or motivating factor behind the arrest." *Id.* at 404 (brackets omitted).  Even then, the defendant can ultimately escape liability with proof "that the arrest would have been initiated without respect to retaliation."  *Id.*

---

[2]    The Supreme Court cited jaywalking as an illustrative example of the type of offense that rarely results in an arrest such that "it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest."  *Nieves*, 587 U.S. at 407.

Here, Plaintiffs have not pled—nor could they prove—that MPD lacked probable cause to arrest them.  *See* Second Am. Compl. ¶¶ 98–102, 115–120.  Plaintiffs have admitted that they were in a public place within the District after 7 p.m. on June 1, 2020, and that they did not meet any of the exceptions to the June 1 curfew.  SUMF ¶¶ 76–96.  Accordingly, MPD officers had probable cause to arrest Plaintiffs, *see Tinius*, 77 F.4th at 705, and Plaintiffs' retaliation claim fails as a matter of law unless, as an initial matter, they can satisfy the *Nieves* exception.  *See Wilkins v. District of Columbia*, Civil Action No. 17-884, 2020 WL 58116591, at *8 (D.D.C. Sept. 30, 2020) (granting summary judgment to the defendant on retaliation claim where *Nieves* exception not met).  Plaintiffs plainly cannot.

First, given that the June 1 curfew was essentially a one-of-one event, there is no historical record that could support a finding as to what "typical" enforcement looked like.  A temporary measure in response to an unprecedented global pandemic and a surge in riotous behavior does not fit within the *Nieves* exception.  The Court's analysis need go no further.

Second, the record does not include any "objective evidence" concerning MPD's enforcement of the June 1 curfew that could support application of the *Nieves* exception.  MPD arrested approximately 284 individuals for violating the June 1 curfew.  SUMF ¶ 29. Approximately 200 of those individuals were arrested with Plaintiffs as part of the mass arrest on Swann Street.  *Id*. ¶ 226.  Approximately 45 individuals were arrested as a group near the 1600 block of Eye Street, NW.  *Id*. ¶ 51.  Several of the other individuals who were arrested for violating the curfew were clearly not protesting or engaged in any other expressive activity when arrested.  *Id*. ¶ 30.  Many of those arrested refused to comply with orders to disperse.  *Id*. ¶¶ 33, 35, 51, 56, 66.

Third, the *Nieves* exception only applies to similarly situated individuals. *Nieves*, 587 U.S. at 407. Plaintiffs were part of a large group of individuals who were refusing orders to disperse and who were marching around an area of downtown that had experienced significant looting and property damage the prior two nights. SUMF ¶¶ 4, 115. Plaintiffs would therefore need to show that MPD did not enforce the curfew against other large groups of individuals who were refusing orders to disperse and were present in an area that had experienced significant looting and property damage the prior two nights. *See Lund v. City of Rockford, Illinois*, 956 F.3d 938, 945 (7th Cir. 2020) (explaining that, in order to meet the *Nieves* exception, where the plaintiff had been arrested for driving the wrong way down a one-way street he "would have to present objective evidence that the Rockford police rarely, if ever, arrest citizens who drive vehicles or, perhaps more specifically, motorized bicycles the wrong way down one-way streets"). No evidence in the record would support such a finding.

Finally, even if there was a genuine dispute as to whether the *Nieves* exception applies, Plaintiffs have no evidence that retaliation was a substantial or motivating factor behind their arrests. The curfew went into effect at 7 p.m. SUMF ¶ 13. If Plaintiffs' speech played any role in the decision to enforce the curfew against them, then Defendants would have presumably arrested them shortly after the curfew went into effect. But they did not. MPD allowed the group that was ultimately arrested on Swann Street to violate the curfew for more than an hour before making the decision to conduct a mass arrest. SUMF ¶¶ 114–15. The individuals who were arrested on Swann Street had many opportunities to disperse prior to arriving on Swann Street. *Id*. Further, the unrebutted evidence shows that the decision to arrest individuals on Swann Street was not caused by their speech; it was motivated by a desire to enforce the curfew. *Id*. And, while Plaintiffs allege that force used during the arrests and conditions during

subsequent arrestee processing show a retaliatory motive, that claim is specious considering that Commander Glover made the decision to arrest Plaintiffs, and Commander Glover was not involved with either taking Plaintiffs into custody or processing their arrests.  SUMF ¶ 131. Simply put, the record evidence does not support any inference that Plaintiffs' arrests were caused by their speech, and therefore, Defendants are entitled to summary judgment on their First Amendment retaliation claim.  *See Wilkins*, 2020 WL 58116591, at *8.

### D.    Defendants Did Not Selectively Enforce the June 1 Curfew Against Plaintiffs.

"A selective enforcement claim has two elements: a plaintiff must demonstrate (1) he was similarly situated in material respects to other individuals against whom the law was not enforced, and (2) the selective enforcement infringed a constitutional right."  *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023).  Because the "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation," and because "the exercise of such discretion is not generally reviewable by the courts," it has "long been settled that the Judiciary generally lacks authority to second-guess those Executive determinations."  *Id*. at 1136–37.  Accordingly, the standard for a selective enforcement claim is "particularly demanding" and it "will often be difficult to establish."  *Id*. at 1137, 1145.  Plaintiffs' claim fails at step one.

Individuals are similarly situated for purposes of a selective enforcement claim when "their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  *Id*. at 1137.  Those factors include "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan."  *Id*.  In *Frederick Douglass*, the D.C. Circuit found that the plaintiffs—who were part of the "Black Pre-Born Lives Matter" group—had adequately alleged that they were similarly

16

situated to "Black Lives Matter" groups where both groups gathered to address a matter of public concern, both groups sought to disseminate a political message, both groups gathered on public streets and sidewalks, and both groups violated the defacement ordinance. *Id*. at 1138. Despite those similarities, the defacement ordinance was only enforced against the Black Pre-Born Lives Matter group. *Id*. The D.C. Circuit thus found that the allegedly disparate treatment of the groups did not "correspond with the culpability of the two groups or the general deterrence value of enforcement against them." *Id*.

The record in this case bears no resemblance to the facts alleged in *Frederick Douglass*. The goal of the June 1 curfew was in part to "clear the streets at night to curb a sudden rise in rioting, vandalism, arson, and looting." *See Tinius*, 77 F.4th at 700. Plaintiffs were part of a large group of individuals in the downtown area. SUMF ¶¶ 38–44. That group had ample time and opportunity to disperse. *Id*. ¶¶ 114–15. The bulk of the group did not disperse and as a result, individuals in the group were arrested for violating the curfew. *Id*. ¶ 226. The record contains no evidence to support a finding that MPD failed to enforce the curfew against individuals similarly situated to Plaintiffs.

To the extent Plaintiffs attempt to show selective enforcement by arguing that MPD did not enforce the curfew against, literally, every person who was on the street after 7 p.m., that is neither here nor there. The comparator group must be similarly situated "in all relevant respects." *Gilani v. Matthews*, 843 F.3d 342, 348 (8th Cir. 2017). Individuals who were out past curfew by themselves or in small groups would obviously not be similarly situated to Plaintiffs. *See Estate of Airday v. City of New York*, Case No. 22-1081, 2023 WL 4571967, at *2 (2nd Cir. 2023) (affirming grant of judgment as a matter of law on selective enforcement claim where plaintiff was not similarly situated with purported comparators).

### E.   Even Assuming Plaintiffs' First Amendment Rights Were Violated, the Individual Defendants Are Entitled to Qualified Immunity.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (explaining that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions"). Once a defendant asserts qualified immunity as a defense, "the burden of proof [ ] falls to the plaintiff to show that the official is not entitled to qualified immunity." *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 388 (D.D.C. 2016) (Brown-Jackson, J.) (quotations and citations omitted).

To defeat the second, "clearly established" prong of the qualified immunity defense, a plaintiff must show that the hypothetical constitutional infringement violated clearly established statutory rights of which a reasonable person would have known. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). For purposes of this inquiry, law may only be "clearly established" by the Supreme Court, the D.C. Circuit, or a "consensus view" among other federal circuit courts. *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008). Crucially, the "clearly established law" must not be defined "at a high level of generality," and instead must address the particular facts and circumstances of the individual case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also Wesby*, 138 S. Ct. at 590. In sum, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)).

### 1.    It Was Not Clearly Established That the *Nieves* Exception for Retaliation Claims Applied To Arrests for Curfew Violations.

To defeat qualified immunity as to their First Amendment retaliation claim, Plaintiffs must show that it was clearly established on June 1, 2020, that the *Nieves* exception was satisfied where a curfew—which was implemented for the express purpose of clearing the streets to reduce the risk of rioting, vandalism, arson, and looting—was enforced against individuals who were part of large groups and not against individuals or small groups because of a concern, informed by the circumstances, that large groups posed a greater risk of destructive behavior. Plaintiffs cannot make that showing.  Defendants are aware of no Supreme Court or D.C. Circuit precedent that prohibits police officers from accounting for relative threat when enforcing a curfew such that prioritizing enforcement consistent with higher assessed threat could establish retaliation in violation of the First Amendment.

### 2.    It Was Not Clearly Established That Selective Enforcement Was a Viable Claim Under the First Amendment.

On March 8, 2024, Plaintiffs moved for leave to amend their complaint to add a selective enforcement claim under the First Amendment [66-1] (Pls.' Mot. for Leave).  Plaintiffs argued they could not have sought leave earlier than August 2023 because the D.C. Circuit did not recognize a First Amendment selective enforcement claim until then.  *See* Pls.' Mot. for Leave at 3.  According to Plaintiffs, prior to 2023, the position of the D.C. Circuit was that "'[s]elective enforcement' is not, of course a First Amendment cause of action."  *Id.* (quoting *Sanjour v. EPA*, 56 F.3d 85, 92 n.9 (D.C. Cir. 1995) (en banc)).  Plaintiffs expressly argued that "[t]he D.C. Circuit's decision in [*Frederick Douglass* v. *District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023)] marked a change in governing law because it announced that selective enforcement can give rise to a standalone First Amendment claim and that such a claim does not require a showing of discriminatory intent."  Pls.' Reply in Support of Mot. for Leave to Amend [73] at 3.

Taking Plaintiffs at their word, the law as it was pre-*Frederick Douglass* "could not have given fair notice to [the Individual Defendants]" that their actions on June 1, 2020, might give rise to constitutional tort liability. *Plumhoff v. Rickard*, 572 U.S. 765, 770–80 (2014). Indeed, in granting Plaintiffs' relief, the Court expressly relied on Plaintiffs' representation that *Frederick Douglass*, at a minimum, "clarifi[ed]" the law concerning selective enforcement and the First Amendment. *See* Minute Order (May 13, 2024). Given Plaintiffs' prior position, it would be fundamentally unfair to allow Plaintiffs to completely reverse course and argue that it *was* clearly established in the D.C. Circuit as of June 2020 that a selective enforcement claim existed under the First Amendment. *See Ferring Pharms., Inc. v. Azar*, 296 F. Supp. 3d 166, 175 (D.D.C. 2018) ("Under the law-of-the-case doctrine, the same issue presented a second time in the same case in the same court should lead to the same result."). This Court has already held that *Frederick Douglass* "clarified" the law concerning selective enforcement. If the law was clarified in August 2023, as this Court previously held, then the law could not have been clearly established in June 2020.

### 3. It Was Not Clearly Established That Large Groups of People Are Similarly Situated to Individuals and Small Groups When It Comes to Curfew Enforcement.

Even if Plaintiffs and the Court could somehow reconcile *Frederick Douglass* with the idea that it was clearly established in June 2020 that a selective enforcement claim could be brought at all under the First Amendment, it was not clearly established that the facts of this case could support a selective enforcement claim. As explained above, "similarly situated" means similarly situated in *all* material respects to other individuals against whom the law was not enforced. Defendants are aware of no Supreme Court or D.C. Circuit precedent clearly establishing that, in terms of enforcing a curfew to prevent riotous behavior, a group of 200 people is similarly situated to single individuals and small groups.

**F.    Even Assuming Plaintiffs' First Amendment Rights Were Violated, a Policy or Custom Was Not the Moving Force Behind It.**

"Under 42 U.S.C. § 1983, municipalities can be held liable for constitutional violations committed by their employees only if a plaintiff shows that the municipality is the 'moving force' behind the constitutional violation, meaning that an 'official municipal policy of some nature caused a constitutional tort.'" *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978)). The D.C. Circuit has identified four ways such an official policy can be shown: (1) the municipality adopts a policy that violates the Constitution; (2) a "policy maker" within the government takes an unconstitutional action; (3) "the employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware"; or (4) "deliberate indifference" to the risk of constitutional violations. *Hurd*, 997 F.3d at 337 (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

Here, Plaintiffs do not allege that the June 1 curfew itself caused the violation of their First Amendment rights. Rather, Plaintiffs contend that the alleged violation was caused by the District's enforcement of the June 1 curfew as to them. The District purportedly only enforced the curfew against "individuals who participated in the June 1 protest." Second Am. Compl. ¶ 116. Accordingly, Plaintiffs must show that the District had a policy or custom of only enforcing the June 1 curfew against protestors. But no evidence in the record supports municipal liability under any of the four *Baker* prongs.

**1.    Plaintiffs Have No Evidence That an Official Policy Required Enforcement of the Curfew Only Against Protestors.**

Plaintiffs repeatedly assert that the decision to arrest them was made pursuant to an "official policy." *See, e.g.*, Second Am. Compl. ¶ 116. However, establishing the existence of an explicit municipal policy requires Plaintiffs to show that "the action that is alleged to be

21

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Plaintiffs have no evidence that the District adopted an official policy to only enforce the June 1 curfew against protestors. And, even if their theory was that there is an *unwritten* policy, they would still need to show that such a policy rose to the level of custom or practice, which, as explained below, they have not done. *See Arashiba v. City of Minneapolis*, Civil Action No. 20-cv-579, 2021 WL 3276305, at *7 (D. Minn. Jan. 21, 2021) ("Courts thus evaluate allegations of an unwritten policy under the standards used to analyze the sufficiency of a *Monell* custom claim." (citation omitted)).

### 2. Plaintiffs Have No Evidence That a Final Policymaker Caused the June 1 Curfew to be Enforced Only Against Protestors.

Under the second *Baker* prong, "[t]he District can be held liable only if the decision to adopt the relevant course of action was properly made by one of its authorized decisionmakers." *Phillips v. District of Columbia*, Civil Action No. 22-277, 2022 WL 1302818, at *8 (D.D.C. May 2, 2022) (brackets and citations omitted). "The Supreme Court has interpreted the term 'policymaker' narrowly, noting that 'when a subordinate's decision is subject to review by the municipality's authorized policymakers,' those policymakers 'have retained the authority to measure the official's conduct for conformance with *their* policies.'" *Miner v. District of Columbia*, 87 F. Supp. 3d 260, 266 (D.D.C. 2015) (BAH) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis in original)). Courts have "generally held that a final policy maker typically must be at least an agency head or the governing body of an agency." *Phillips*, 2022 WL 1302818, at *8; *Singletary v. District of Columbia*, 766 F.3d 66, 74 (D.C. Cir. 2014) (holding discretion to make final decisions in individual cases "is insufficient to

create municipal liability [for those decisions] unless the decisionmaker [also] had been granted final policymaking authority under D.C. Law in the [relevant] area").

Under District law, all members of the police force, including the Chief of Police, are subordinate to the Mayor and (ultimately) the Council, and thus non-policymakers for purposes of municipal liability. *See Miner*, 87 F. Supp. 3d at 266. These provisions establish that all police officers and command officials, including the Chief, are subordinate to the policymaking authority of the Mayor, as ultimately constrained by the "rules, regulations, and general orders," which are within the Mayor's purview to issue. *See id.* ("Thus, by law, police officers below the level of the Chief of Police—and, arguably, the Chief [himself] . . . are subordinates [under Supreme Court precedent]"); *see also Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011) (holding fire chief and assistant fire chief are not policymakers for municipal liability purposes because the "Mayor and the City Council have expressly reserved supervisory powers to themselves").

Against this backdrop, none of Defendants' involvement in the events here are attributable to the District for municipal liability purposes because Defendants did not have the ability or authority to modify the Mayor's June 1 Curfew Order.

Even if Plaintiffs were to argue that Chief Newsham qualifies as a final policymaker, while Chief Newsham was being generally apprised of what was occurring in the District on the night of June 1, there is no evidence that he ordered, directed, authorized, or affirmatively caused the arrest of Plaintiffs. SUMF ¶ 117. It is undisputed that the decision to arrest Plaintiffs was made by Commander Glover. *Id.* ¶ 116. While Commander Glover was the incident commander on June 1 and had overall tactical responsibility, he was not responsible for setting policies concerning curfew enforcement. *Id.* ¶¶ 13, 26. Further, even if the June 1 Curfew Order

23

provided Chief Newsham with some discretion as to who to arrest for violating the curfew, "the ability to exercise some discretion doesn't mean that the chief of police is a final policy maker." Defs.' Ex. 102, Trans. of Sept. 27, 2019 Status Conf. at 65–68, *Horse v. District of Columbia*, No. 17-cv-1216 (ABJ) and *Schultz v. District of Columbia*, 18-cv-0120 (ABJ) (explaining that Chief of Police was not final policymaker because, even though he has authority to determine how to use his resources, he is operating within the bounds of policy established by the D.C. Council). As a result, Plaintiffs cannot rely on a policymaker theory of liability. *See Miner*, 87 F. Supp. 3d at 267 (finding that plaintiff had failed to submit evidence showing that an MPD Assistant Chief of Police was a policymaker).

### 3. Plaintiffs Have No Evidence That There Was a Widespread Custom of Only Enforcing the June 1 Curfew Against Protestors.

To establish municipal policy arising from custom, a Section 1983 plaintiff must allege "that the municipality's employees engaged in a persistent or regular pattern of conduct that gave rise to the alleged constitutional violations." *Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014) (citation omitted). "To clear this high hurdle, plaintiffs ordinarily couch custom or practice liability on allegations of practices so persistent and widespread as to practically have the force of law." *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013).

As an initial matter, one night of curfew enforcement does not a custom make. That length of time is simply not sufficient to conclude that *any* custom existed with regard to curfew enforcement. Further, as explained above, of the approximately 300 individuals arrested for curfew violations on June 1 and the early hours of June 2, the common thread is not that they were protestors; the common thread is that they were part of large groups when a main purpose of the curfew was to prevent large groups from roaming throughout the downtown area. And, if individuals arrested for curfew violations who were part of large groups are removed from the

equation, the majority of other individuals arrested for curfew violations do not appear to have

been protestors, but rather, those engaged in illegal conduct beyond violating the curfew, *e.g.*,

looting.

> **4.     Plaintiffs Have No Evidence To Show That Enforcement of the June 1
> Curfew Only Against Protestors Was Caused by Deliberate
> Indifference.**

Plaintiffs also cannot demonstrate municipal liability on a "deliberate indifference"

theory.  As the Supreme Court has cautioned, "[a] municipality's culpability for a deprivation of

rights is at its most tenuous where a claim turns on a failure to train." *Connick v Thompson*, 563

U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)).  A

municipality's failure to train must amount to "'deliberate indifference' to the rights of [the

municipality's] inhabitants," such that it can "be properly thought of as a city 'policy or

custom,'" for it to be "actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389

(1989).  Deliberate indifference in this context is a "stringent standard of fault," *Bd. of Cty.

Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997), requiring that city policymakers

"knew or should have known of the risk of constitutional violations, but did not act." *Harvey v.

District of Columbia*, 798 F.3d 1042, 1053 (D.C. Cir. 2015) (quoting *Jones v. Horne*, 634 F.3d

588, 601 (D.C. Cir. 2011); *see also Connick*, 563 U.S. at 61 (notice prong requires "actual or

constructive notice that a particular omission in their training program causes city employees to

violate citizens' constitutional rights"); *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986)

("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to

follow a course of action is made from among various alternatives by [the relevant] officials").

The notice element of a deliberate indifference municipal liability claim "ordinarily"

requires proof of "[a] pattern of similar constitutional violations by untrained employees."

*Connick*, 563 U.S. at 61.  Here, as explained above, Commander Glover made the decision to

arrest Plaintiffs, and there is no evidence that Mayor Bowser or Chief Newsham were on notice of this or any other specific enforcement of the curfew.  Although Chief Newsham was not a final policymaker, even if he was, his  instructions to his officials were that they should focus on achieving voluntary compliance with the curfew, SUMF ¶ 28, and no evidence exists he had any knowledge or awareness that the curfew enforcement would at all depend on whether individuals had participated in First Amendment activity.  *See id*.

Even if Plaintiffs could establish notice, they could not show that the District made a "deliberate choice" not to act, *Pembaur*, 475 U.S. at 483, in response to the prior purported instances of misconduct during curfew enforcement.  It is simply not plausible to conclude that the District remained deliberately indifferent to the risk of constitutional violations during curfew enforcement when, according to the best recollections of those who enforced the June 1 curfew, the last known similar curfew was in the aftermath of September 11, 2001—nearly 20 years prior.  SUMF ¶ 230.

## II.   <u>Plaintiffs Cannot Show That Defendants Violated the District's First Amendment Assemblies Act.</u>

In Count IV, Plaintiffs allege that the District negligently failed to comply with the requirements of the FAAA.  Second Am. Compl. ¶¶ 125–131.  Specifically, Plaintiffs rely upon the FAAA's requirements concerning the issuance of orders to disperse First Amendment assemblies, D.C. Code §§ 5-331.07(e)(1)–(2), and one of its limitations concerning the use of chemical irritants, D.C. Code § 5-331.16(b)(2), which prohibits their use as a means to disperse First Amendment assemblies except where "assembly participants or others are committing acts of public disobedience endangering public safety or security."  Second Am. Compl. ¶¶ 126, 128 The Court has already determined that these provisions are sufficiently specific to support a claim of negligence per se, generally, *see Goodwin v. District of Columbia, et al.*, 579 F. Supp.

3d 159, 175–77 (D.D.C. 2022), and Defendants do not revisit that issue here.  Nevertheless, Plaintiffs' claims fail as a matter of law because the FAAA—and the specific provisions on which they rely—plainly does not apply to the police conduct giving rise to their alleged injuries.

By its plain language, the FAAA only applies to the policing of "First Amendment assemblies."  D.C. Code § 5-331.07(a).  The same is true for the specific provisions Plaintiffs cite in support of their claim:  Both apply to the dispersal of First Amendment assemblies only.  D.C. Code §§ 5-331.07(e)(1)–(2), 5-331.16(b)(2).  However, the June 1 curfew prohibited First Amendment assemblies in public places.  *See Tinius*, 77 F.4th at 699.  It also gave MPD probable cause to arrest curfew violators regardless of whether they were engaged in expressive speech at the time.  *Id*. at 705–06.  In other words, Plaintiffs cannot maintain a negligence claim based on a violation of the FAAA because the June 1 curfew—and Plaintiffs' violation of the curfew's mandate—caused their conduct to fall outside of the FAAA's protections; they were subject to arrest notwithstanding the FAAA; and more to the point, they were not owed a dispersal order or any other warning.

Any attempt to reconcile the FAAA with the June 1 curfew otherwise would lead to nonsensical results.  For example, the FAAA provides that, if certain participants in a First Amendment assembly are engaged in disorderly conduct, then MPD should attempt to arrest those individuals and allow the First Amendment assembly to continue.  D.C. Code § 5-331.07(c).  Yet, as recognized in *Tinius*, if the June 1 curfew allowed for First Amendment assemblies, it would have defeated the entire purpose of the curfew.  77 F.4th at 701.  The FAAA also contemplates MPD having probable cause to arrest some but not necessarily all protestors.  D.C. Code § 5-331.07(b).  But the June 1 curfew already provided MPD with probable cause to arrest *everyone* who was in violation of the curfew, regardless of whether they were engaged in

protected speech.  Finally, the FAAA contemplates MPD making a determination as to whether a First Amendment assembly should be dispersed.  D.C. Code § 5-331.07(e).  But, again, the June 1 curfew already resolved that question:  No First Amendment assemblies—or gathering of any other sort—were permitted on public space once the curfew went into effect.

Even if the FAAA is somehow available to Plaintiffs, the Individual Defendants are entitled to summary judgment on that claim because the FAAA does not, by its terms, apply to them or the conduct in which they are alleged to have engaged.  For one, D.C. Code §§ 5-331.07(e)(1)–(2), the FAAA's standards for dispersal orders, does not impose any specific duties on any specific individual; it extends to "MPD" (arguably, but necessarily, "the District"), not "officers," or a specific subset of them, *contra e.g.*, D.C. Code § 5-331.16(b)(3) (specific reporting requirement for "commanding officer").  And, under District law, a negligence per se claim may only be maintained against "a person upon whom the statute imposes specific duties." *See Night & Day Mgmt.*, 101 A.3d 1033, 1039–40 (D.C. 2014) (citations omitted); *see also McNeil Pharm. v. Hawkins*, 686 A.2d 567 579 (D.C. 1996) ("The statute must also 'impose specific duties on the defendant.'" (quoting *District of Columbia v. White*, 442 A.2d 159, 164 (D.C. 1982)); *Ginsberg v. Granados*, 963 A.2d 1134, 1141 (D.C. 2009) ("Because the FYCA in no way promotes public safety and imposes no duties on opposing counsel, Ginsberg's negligence *per se* claim must also fail.").  So too, on its face, D.C. Code § 5-331.16(b)(2) uses the term "officers," generally, but places no specific duties on any *specific* actor.  Regardless, it prohibits the use of chemical irritants "to disperse a First Amendment assembly," *id.*—Lt. Horos and Officer Crisman were not dispersing Plaintiffs, but responding to specific threats while effecting the arrest of Plaintiffs for violating the June 1 curfew, SUMF ¶¶ 168–180.  And, of course, the provision's carve-out would obviously apply as a matter of law:  The widespread

violations of the June 1 curfew among Plaintiffs and their compatriots were "acts of public disobedience," and Lt. Horos and Officer Crisman were acting in response to specific "acts . . . endangering public safety and security," namely, individuals on top of a vehicle, assaulting a police officers during the course of an arrest, or potentially breaking into a private residence, SUMF ¶¶ 168–180.

As for the District ("MPD," according to the terms of the statute, D.C. Code §§ 5-331.07(e)(1)–(2)), the evidence shows that the District government in fact provided ample warnings and opportunities to disperse at or around 7 p.m. and before Plaintiffs were encircled on Swann Street.  SUMF ¶¶ 22–24, 114–15.  Several such orders were issued *after* 7 p.m.  *Id*. ¶¶ 22–23.  After the curfew took effect, and Plaintiffs were tagged for arrest in violation of the curfew's mandate, there was nothing—no First Amendment assembly—to disperse; and, as explained above, the FAAA's provisions governing dispersal orders simply did not apply to Plaintiffs' circumstances.  In short, although it did not need to, the District fully complied with the FAAA.  And, in any event, any shortcomings are legally irrelevant.  Accordingly, Defendants are entitled to summary judgment as to Plaintiffs' negligence per se claim.

III.    <u>**Plaintiffs Cannot Show That Their Fourth Amendment Rights Were Violated.**</u>

Plaintiffs cannot prevail on their Fourth Amendment claims because the undisputed facts show that the uses of force by Defendants on Swann Street were reasonable under the circumstances.  Even if any use of force violated the Fourth Amendment, the Individual Defendants would be entitled to qualified immunity, and the claim against the District would fail because no evidence supports municipal liability.

A.      **The Individual Defendants Did Not Use Excessive Force When Arresting Individuals on Swann Street.**

Based on the undisputed material facts, no reasonable juror could find that any use of force against any Plaintiff by any Defendant was excessive under the Fourth Amendment. Plaintiffs Goodwin, Lane, Lazo, and Troper allege they were pepper sprayed by Officer Crisman. Second Am. Compl. ¶ 112.  Plaintiff Pearlmutter alleges he was pepper sprayed by Lt. Horos. *Id*.  Plaintiff Surio alleges she was physically struck by Officer Quarles.  *Id*.  Plaintiff Remick alleges they were physically struck by unidentified MPD officers.  *Id*. ¶ 64.  Although they did not allege it in the Complaint, *see, e.g.*, Second Am. Compl. ¶ 112, Plaintiffs Surio and Remick testified they felt the effects of pepper spray, SUMF ¶¶ 152–53, 159.  All Plaintiffs also allege that Chief Newsham, Commander Glover, Lt. Horos, and Lt. Mejia "ordered" the uses of force by Defendants Horos, Crisman, Quarles, and unidentified MPD officers and are liable as supervisors.  Second Am. Compl.  ¶ 110.

"An officer may use some degree of physical coercion or threat to arrest a suspect, even if the force used might appear unnecessary in hindsight." *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 64 (D.D.C. 2018) (citations and quotations omitted).  "Whether a particular use of force is excessive depends on the facts of the case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.  "An officer will only be held liable if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions." *Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir.

1998).[3]  "The use of pepper spray is deemed excessive force only 'in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else.'"  *United States v. Jefferson*, Civil Action No. 09-cv-324, 2010 WL 3927874, at *7 (N.D. Ga. Oct. 4, 2010), aff'd, 451 F. App'x 833 (11th Cir. 2011) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002)) .

As an initial matter, no evidence exists that Chief Newsham, Commander Glover, or Lt. Mejia used *any* force on June 1.  SUMF ¶ 131, 135–37, 229.  Therefore, any claim against them would have to be based on a supervisory theory of liability.  *See* Section I.A.  The challenged uses of force were not premeditated; they were in direct response to actions of the curfew violators, *i.e.*, resisting arrest and threatening public and officer safety.  SUMF ¶ 139–42, 146–51, 167–80.  There is no evidence that Chief Newsham, Commander Glover, or Lt. Mejia were aware of the challenged uses of force let alone condoned them or turned a blind eye.  Accordingly, Chief Newsham, Commander Glover, and Lt. Mejia are entitled to summary judgment on Count 1 as to all Plaintiffs.

Similarly, Plaintiff Pearlmutter is the only Plaintiff to assert an excessive force claim against Lt. Horos, so Lt. Horos is entitled to summary judgment on Count 1 as to the remaining Plaintiffs.  Second Am. Compl. ¶ 112.  Plaintiff Surio is the only Plaintiff to assert an excessive force claim against Officer Quarles, so he is entitled to summary judgment on Count 1 as to the remaining Plaintiffs.  *Id*.  And Officer Crisman is entitled to summary judgment on Count 1 as to

---

[3]    *See, e.g.*, *Oberwetter v. Hilliard*, 639 F.3d at 548, 555 (D.C. Cir. 2011) (finding no excessive force where the officer allegedly shoved the plaintiff against a pillar, and violently twisted her arm); *Rogala*, 161 F.3d at 54–55 (finding no excessive force where the officer allegedly pulled the plaintiff out of a car, bruised her arm, and hit her head against the car); *Martin v. Malhoyt*, 830 F.2d 237 262 (D.C. Cir. 1987) (finding no excessive force where the officer allegedly threw the plaintiff into a car, slammed the door on one of his legs, grabbed his arms and pulled them behind his back, and forced him to sit in a painful position in the case).

Plaintiffs Surio, Remick, and Pearlmutter because they do not allege that he used any force against them.  *Id*.  As for the claims against Lt. Horos (Plaintiff Pearlmutter), Officer Crisman (Plaintiffs Goodwin, Lane, Lazo, and Troper), and Officer Quarles (Plaintiff Surio), those Defendants are entitled to summary judgment because they did not use excessive force, and even if they did, they are entitled to qualified immunity.

> ### 1. Plaintiffs Cannot Show That Lt. Horos Used Excessive Force, and Even if They Could, He is Entitled to Qualified Immunity.

Beginning with Lt. Horos's use of pepper spray, his first deployment was directed at an individual who was standing on the roof of a car while refusing to comply with officers' repeated orders to move back and who reached down off of the roof and intentionally contacted an officer's shield.  SUMF ¶ 169. There is no evidence that Plaintiff Pearlmutter (or any other Plaintiff for that matter) was in the vicinity of Lt. Horos during this time, and if he was, it would have meant that he too had refused to comply with orders to move back.  *Id*. ¶¶ 167–69.  And, given that Lt. Horos was confronting more than a dozen arrestees who were refusing to comply with orders to move back, that arrestees had been repeatedly throwing objects at police officers, and that the individual's elevated position on the vehicle posed a threat to officer safety, SUMF ¶¶ 167–69, his decision to deploy a short burst of pepper spray was entirely reasonable.  *See Laney v. City of St. Louis*, 56 F.4th 1153, 1156 (8th Cir. 2023) (granting summary judgment for police officer and city on plaintiffs' excessive force and First Amendment claims where plaintiff was pepper sprayed after "rapidly approach[ing]" officers and reached towards an officer's bicycle, and noting that "an officer can reasonably use [pepper spray] to drive an unruly protestor away from a police line").  Because Lt. Horos's use of pepper spray against the individual on the car was reasonable, any secondary exposure caused by his deployment was not excessive.  *See Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1105 (8th Cir. 2004) (where officer's use of

pepper spray against driver of car was objectively reasonable, officer did not use excessive force against nonoffending passenger by accidentally hitting passenger with pepper spray, and noting that a rule prohibiting officer from using pepper spray where it would foreseeably affect innocent bystanders "would preclude an officer from protecting himself in dangerous situations").[4]

Even if it was excessive, it was not clearly established by any Supreme Court or D.C. Circuit precedent of which Defendants are aware that his use of pepper spray under those circumstances violated the Fourth Amendment. *See Wilkins*, 2020 WL 5816591, at *12 (granting motion for summary on excessive force claim involving pepper spray where officer was entitled to qualified immunity). In *Wilkins*, which was decided after June 1, 2020, the court acknowledged that "[n]o D.C. Circuit case has held that the use of [pepper] spray on an assaultive, uncuffed suspect is a constitutional violation" such that a reasonable officer would have been on notice that that use of pepper spray was objectively unreasonable. *Id.* The court then surveyed the law in other circuits and concluded that "a governing principle does emerge: the use of pepper spray becomes unreasonable where it is deployed against a restrained and compliant individual." *Id.* (citing *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020); *Henry v. City of Flint, Mich.*, 814 F. App'x 973, 983 (6th Cir. 2020); *Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir. 2001)). The individual who was pepper sprayed on top of the car by

---

[4]    *See also Gutierrez v. City of New York*, Civil Action No. 13-3502, 2015 WL 5559498, at *8 (S.D.N.Y. Sept. 21, 2015) (explaining that "the secondhand inhalation of pepper spray by persons who were not the intended targets of the discharge does not typically give rise to a constitutional claim"); *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 687 (M.D. Pa. 2010) (awarding summary judgment to police officers who used pepper spray inside home to subdue and arrest subject, which resulted in subject's daughters being exposed to pepper spray, because, given "extreme chaos" during course of arrest, use of pepper spray "was a proportionate response" to subject's actions and was "not used against" daughters); *Thomas v. Byrd*, Civil Action No. 0803840, 2009 WL 4546666, at *8 (E.D. Ark. Nov. 30, 2009) (no excessive force violation where defendant officer was defending himself against unruly inmate and did not intend to spray plaintiff in nearby cell).

Lt. Horos was not restrained, was not compliant, and posed a threat to officer safety, therefore, at a minimum, Lt. Horos is entitled to qualified immunity.

Lt. Horos's second deployment of pepper spray came as the police line moved east on Swann Street.  SUMF ¶¶ 170–72.  Once again, there is no evidence that Plaintiff Pearlmutter (or any other Plaintiff for that matter) was in the vicinity of Lt. Horos at this time, and even if he was, it would have meant that he refused to comply with orders to move back.  Further, as video evidence shows, Lt. Horos continued to confront arrestees who refused to comply with orders to move back.  *Id*. ¶¶ 167–75.  Several of those individuals initiated contact with officers.  *Id*. ¶¶ 168, 171, 173.  As video evidence also shows, three objects were thrown at the police line in close succession with the last object striking an officer who was standing next to Lt. Horos.  *Id*. ¶ 171.  In response, Lt. Horos directed a short burst of pepper spray in the direction from which the objects were being thrown.  *Id*. ¶ 172.  While the video shows that the individual who was struck with the pepper spray was not the individual who threw the objects, that does not negate the reasonableness of Lt. Horos's actions.  Again, Lt. Horos was confronting multiple arrestees who were refusing to comply with orders and who were throwing objects at police officers.  *Id*. ¶¶ 167–75.  He did not deploy pepper spray in a haphazard or reckless manner; rather, he deployed a short, targeted burst.  *Id*. ¶ 172.  The fact that the recipient—who was himself refusing to comply with orders to move back—was not the person within the group throwing objects at that time does not render the use of force excessive.  *See Vinyard*, 311 F.3d at 1348 (explaining that "[c]ourts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests").  Even if it did, it was not clearly established that Lt. Horos's use of pepper spray under those circumstances violated the Fourth Amendment.  *See Wilkins*, 2020 WL 5816591, at *12.

Lt. Horos's third deployment of pepper spray was targeted at a curfew violator who clenched his fists, yelled aggressively, and charged at an officer, making contact with his shield. SUMF ¶ 173.[5]  In response, Lt. Horos deployed a short burst of pepper spray at that individual. *Id*. ¶ 174.  There is no evidence that Plaintiff Pearlmutter (or any other Plaintiff for that matter) was in the vicinity of Lt. Horos at this time.  *Id*. ¶¶ 173–74.  That deployment was reasonable under the circumstances.  *Laney*, 56 F.4th at 1156; *Abdul-Khaliq v. City of Newark*, 275 F. App'x 517, 521 (6th Cir. 2008) (police officers did not use excessive force against a man engaging in "angry yelling and cursing at the officers, carrying on a prolonged and heated debate about whether or not he had a gun, and vigorously opening his coat in a gesture toward the police officers" by deploying a short burst of pepper spray at the man, knocking him to the ground, and handcuffing him).  Even if Lt. Horos's deployment of pepper spray at an individual who was under arrest and aggressively charging towards an officer was excessive, it was not clearly established by any mandatory authority that his actions under those circumstances violated the Fourth Amendment.  *See Wilkins*, 2020 WL 5816591, at *12.

### 2. Plaintiffs Cannot Show That Officer Crisman Used Excessive Force, and Even if They Could, He is Entitled to Qualified Immunity.

Prior to the line of police officers on 15th Street moving east, Officer Crisman heard what he knew to be, based on his experience, the sound of individuals attempting to kick down doors. SUMF ¶ 127.  During the same time, multiple residents of Swann Street called 911 to report attempted break-ins, a fact that was broadcast over MPD radio.  *Id*. ¶ 128.  Subsequently, as Officer Crisman moved down Swann Street, he observed several arrestees rushing into a residence, where the front door was at the top of a stoop.  *Id*. ¶ 177.  He reasonably believed that

---

[5]     Tellingly, Plaintiffs' own expert witness does not opine that Lt. Horos's third deployment of pepper spray violated generally accepted police practices.  *See* Section V., *infra*.

the arrestees were entering the residence illegally.  *Id.* ¶ 178.  In addition to the arrestees entering the residence at the top of the stairs, he observed individuals on the sidewalk outside of the residence who he believed were about to also enter the residence illegally.  SUMF ¶ 179.  To prevent additional arrestees from entering the residence, he deployed a short burst of pepper spray.  *Id.* ¶ 180.  It was entirely reasonable under those circumstances for Officer Crisman to deploy a short burst of pepper spray to stop what he perceived to be arrestees illegally entering a residence.  *See Yelverton v. Vargo*, 386 F. Supp. 2d 1224, 1229 (M.D. Ala. 2005) (finding that use of pepper spray was not excessive forced when officer "reasonably suspected that [individual] had committed a crime, and [the individual] refused to stop when ordered not to leave the scene").  Further, even though Officer Crisman's deployment of pepper spray was captured on his body-worn camera, there is no evidence that Plaintiffs Goodwin, Lane, Lazo, and Troper were in the vicinity.  SUMF ¶¶ 182, 185–86, 191–92, 195–96.  In fact, Plaintiff Goodwin's testimony places her near the 14th Street side of Swann Street as opposed to the 15th Street side, which was Officer Crisman was located.  *Id.* ¶ 182.  Even Officer Crisman's deployment of pepper spray at arrestee who were believed to be illegally entering a residence was excessive, it was not clearly established that it was unreasonable for a reasonable officer to use pepper spray to stop individuals who were under arrest from illegally entering a residence. *See Wilkins*, 2020 WL 5816591, at *12.

### 3. Plaintiffs Cannot Show That Officer Quarles Used Excessive Force, and Even if They Could, He is Entitled to Qualified Immunity.

Officer Quarles was part of the police line formed on the 15th Street side of Swann Street.  SUMF ¶ 146.  He was using two hands to carry a shield.  *Id.* ¶ 147.  When directed, he began moving east on Swann Street at a half-step while arrestees were ordered to move back.  *Id.* ¶ 148.  According to Plaintiff Surio, she refused to comply with orders to move back and

attempted to impede the officers' ability to move forward.  *Id*. ¶¶ 149–50.  Based on Officer

Quarles's body-worn camera footage, he appears to make contact with Plaintiff Surio while she

refuses to move back, but given Plaintiff Surio's refusal to comply with orders to move back

(when as video evidence confirms, there was no obstacle to her compliance), SUMF ¶ 151, his

use of force was reasonable and not excessive.  And, even if Officer Quarles's use of mechanical

force was excessive, it was not clearly established that the use of such force was a violation of

the Fourth Amendment under the circumstances.  *See Kyle v. Bedlion*, 177 F. Supp. 3d 380, 385–

86 (D.D.C. 2016) (Brown-Jackson, J.).

### B.  Even Assuming Plaintiffs' Fourth Amendment Rights Were Violated, a Policy or Custom Was Not the Moving Force Behind It.

Plaintiffs cannot show that any Defendant used excessive force on Swann Street.  Even if

they could, they cannot prove that a District policy or custom caused any (hypothetical) Fourth

Amendment violation.  Because no evidence in the record supports municipal liability under any

of the four *Baker* prongs, Plaintiffs cannot prevail on their excessive force claims against the

District.

First, Plaintiffs vaguely assert that the District's "policies" caused their purported Fourth

Amendment violations.  Second Am. Compl. ¶ 109.  But to prove the existence of an explicit

municipal policy, Plaintiffs must do more.  *See Monell*, 436 U.S. at 690.  Here, MPD officers

were arresting more than 100 individuals for violating a citywide curfew under unprecedented

conditions.  The only "policy" guiding their conduct was MPD's general policy concerns the use

of pepper spray and mechanical force and that policy does not dictate specific uses of force in

specific situations.  Instead, MPD officers have discretion based on the circumstances.  SUMF

¶¶ 161–65.  Thus, even where an officer's action is consistent with MPD policy, the policy does

not "cause" the action.  It follows that even where an action that violates the Fourth Amendment

is consistent with MPD policy, the policy does not "cause" the violation.  If that were not the

case, municipalities would effectively be subject to respondeat superior liability for

constitutional violations, a result that the Supreme Court has repeatedly rejected.  *See Bd. of*

*Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).  Because Plaintiffs

cannot show that MPD's written policies concerning the use of pepper spray and mechanical

force during mass arrests caused their alleged Fourth Amendment violations, they cannot prevail

on an official policy theory of municipal liability against the District and cannot avoid summary

judgment on that ground.

Second, as explained above in Section I.F.2, Mayor Bowser was MPD's final

policymaker on June 1, 2020, and the only other even potential policymaker would have been

Chief Newsham.  But there is no evidence that either Mayor Bowser or Chief Newsham gave

any order, direction, or authorization concerning the use of pepper spray or mechanical force

during the mass arrest on Swann Street.  Plaintiffs cannot establish policymaker liability on the

basis of Mayor Bowser's or Chief Newsham's actions and cannot avoid summary judgment on

that ground.

Third, Plaintiffs cannot show that it was the District's custom or practice to use excessive

force through pepper spray and mechanical force during mass arrests of curfew violators.  As

noted above, the last known similar curfew imposed in the District was in the aftermath of

September 11, 2001.  Even if there were evidence of widespread excessive force violations by

MPD on June 1, 2020—and there is not—one night of curfew enforcement cannot constitute a

custom "so engrained that it amounted to a 'standard operating procedure' of which municipal

policymakers must have been aware."  *Hurd v. District of Columbia*, 997 F.3d 332, 338 (D.C.

Cir. 2021) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

Similarly baseless is the theory that the District has a widespread custom of using excessive force through pepper spray and mechanical force during mass arrests generally. Plaintiffs' Complaint points to three lawsuits against the District concerning MPD's response to mass demonstrations in 2000, 2005, and 2017.  Second Am. Compl. ¶ 68.  But Defendants did not use force during a mass demonstration; they used force during a mass arrests.  Therefore, the incidents cited by Plaintiffs cannot establish a custom.  Even if those cited events were relevant, three incidents occurring over a span of 17 years, the most recent of which occurred roughly three years prior to June 1, 2020, cannot support the existence of a custom, *see Moore v. District of Columbia*, 79 F. Supp. 3d 121, 140 (D.D.C. 2015) (BAH) (finding study from 2005 insufficient "for a reasonable jury to conclude that the District was deliberately ignoring a pattern . . . between 2006 and 2011"); *Miner*, 87 F. Supp. at 268 (finding study that was "more than a decade old at the time of the incident" was insufficient for actual or constructive knowledge on deliberate indifference theory), and Plaintiffs cannot avoid summary judgment on that ground.

Fourth, Plaintiffs cannot maintain a deliberate indifference theory of liability.  As explained in Section I.F.4., Plaintiffs need to establish that the District's policymakers were on notice of a custom of unconstitutional uses of pepper spray and mechanical force in the context of mass arrests.  Plaintiffs have no evidence to support such an argument and cannot avoid summary judgment on that ground.

## IV.    <u>Plaintiffs Cannot Prove Assault and Battery Against Any Defendant.</u>

Plaintiffs cannot prevail on their assault and battery claims against any Defendant for many of the same reasons their Fourth Amendment excessive force claims fail.  *See Bowrin v. District of Columbia*, Civil Action No. 23-2421, 2023 WL 9000494, at *4 (D.D.C. Dec. 28, 2023) (BAH) ("The 'parallel common-law claims' to a Fourth Amendment excessive force claim

are assault and battery.") (quoting *Tinius*, 77 F.4th at 706).  As an initial matter, unlike excessive

force claims brought under Section 1983, Plaintiffs cannot rely on bystander or supervisory

theories of liability for their assault and battery claim.  *See Jackson v. District of Columbia*, 327

F. Supp. 3d 52, 68–69 (D.D.C. 2018).  While Plaintiffs could rely on vicarious theories of

liability, *id.*, such as conspiracy or aiding and abetting, they have not pled those theories here.

*See* Second Am. Compl. ¶¶ 121–24.  Therefore, Plaintiffs' assault and battery claims against

Chief Newsham, Commander Glover, and Lt. Mejia fail as a matter of law.

The rest of the Individual Defendants are likewise entitled to summary judgment on this

claim.  "Like federal law, D.C. law grants police officers 'a qualified privilege to use reasonable

force to effect an arrest, provided that the means employed are not in excess of those which the

officer reasonably believes to be necessary.'"  *Bowrin*, 2023 WL 9000494, at *4 (quoting *Tinius*,

77 F.4th at 706)).  "[T]he test for qualified privilege in an assault and battery suit is both

subjective and objective: the officer must subjectively believe that he or she used no more force

than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police

officer placed in the same situation."  *Scales*, 973 A.2d at 730.  The objective prong is "similar to

the excessive force standard applied in the Section 1983 context."  *Rogala*, 161 F.3d at 57

(dismissing assault and battery claim against police officer for "substantially the reasons" the

plaintiff could not state a Section 1983 excessive force claim); *see also Harris v. Dep't of*

*Veterans Affs.*, 776 F.3d 907, 913 (D.C. Cir. 2015) (relying on case law concerning qualified

immunity to analyze qualified privilege).

Lt. Horos, Officer Crisman, and Officer Quarles are protected by the qualified privilege

afforded under D.C. law.  There is no dispute that there was probable cause to arrest all

Plaintiffs.  SUMF ¶ 114; *see also Tinius*, 77 F.4th at 706 (holding that "the officers had legal

justification to arrest Plaintiffs . . . [who were] in violation of the constitutionally valid June 1 Curfew Order"). Nor is there any dispute that Lt. Horos, Officer Crisman, and Officer Quarles subjectively believed their uses of force were necessary and appropriate given that many curfew violators were failing to comply with officers' orders and some were engaging in assaultive or other criminal conduct. SUMF ¶¶ 151, 169, 171–74, 178.

Lt. Horos, Officer Crisman, and Officer Quarles also satisfy the objective prong for qualified privilege because a reasonable police officer placed in the same situation would agree that all uses of force by them were necessary and appropriate. Each of Lt. Horos's three deployments of pepper spray was directed at a curfew violator assaulting or threatening an officer—the individual on a car who initiated contact with an officer's shield; the individual who threw a projectile that hit an officer's shield; and the individual who aggressively approached and contacted an officer's shield. *See* Sections III.A and III.B.1, *supra*. Officer Crisman's deployment of pepper spray was directed at individuals he reasonably believed were about to participate in an ongoing burglary and attempting to evade arrest. *See* Section III.A and III.B.2, *supra*. And Officer Quarles used his shield to push curfew violators resisting officers' orders to move back. *See* Section III.B.3, *supra*. These were all objectively reasonable uses of police force under the circumstances, and Defendants are therefore entitled to summary judgment on Plaintiffs' assault and battery claims.

## V.     **The Expert Opinions of Dr. Scott Mourtgos Are Inadmissible and Irrelevant.**

Dr. Scott Mourtgos offers three opinions in support of Plaintiffs. Ex. 99, Expert Report of Dr. Scott Mourtgos (Mourtgos First Report) at 28 (Mar. 14, 2024). First, he opines that MPD's encirclement of the curfew violators on Swann Street was not in accordance with generally accepted police practices, including MPD's failure to provide the arrestees with additional warnings and opportunities to disperse while they were present on Swann Street. *Id*.

Second, he opines that two of Lt. Horos's deployments of pepper spray—the one against the individual on the car and the one in response to the thrown objects—and Officer Crisman's use of pepper spray were not in accordance with generally accepted police practices. *Id*. Dr. Mourtgos does not opine on Lt. Horos's use of pepper spray against the individual who aggressively charged at an officer with clenched fists, nor does he opine on Officer Quarles's use of mechanical force. *Id*. Third, in what is best characterized as an opinion/non-opinion, Dr. Mourtgos states that if you accept at face value what Plaintiffs allege about the conditions of their detention, then the conditions of their detention deviated from generally accepted police practices. *Id*. None of Mourtgos's opinions are relevant to the claims at issue and none of his opinions would be helpful to the trier of fact; therefore, the Court should disregard them when considering Defendants' motion for summary judgment. *See* Fed. R. Evid. 702.

To start, Dr. Mourtgos does not offer any opinions concerning the June 1 curfew or its enforcement. *See generally* Mourtgos First Report; Ex. 101, Deposition of Dr. Scott Mourtgos (Mourtgos Dep.) at 103:5–14, 126:6–9, 131:15–19 (Apr. 29, 2024). In fact, Dr. Mourtgos agrees that MPD had probable cause to arrests Plaintiffs for violating the curfew. Mourtgos Dep. at 109:3–13, 145:15–146:2. And Dr. Mourgos agrees that curfew violators in the District on June 1 had an opportunity to disperse and comply with the curfew between 7 p.m. and 8:45 p.m. *Id*. at 144:3–145:2. Accordingly, his opinions have no relevance to Plaintiffs' First Amendment claim. He also does not offer any opinions concerning the First Amendment Assemblies Act and whether MPD complied with its requirements. *See* Mourtgos First Report at 28. Therefore, his opinions could only relate, in theory, to Plaintiffs' Fourth Amendment and assault and battery claims, but in reality, they have no bearing on either.

Dr. Mourtgos's first opinion concerns the decision to encircle curfew violators on Swann Street.  Mourtgos First Report at 17–23.  Dr. Mourtgos believes that MPD should not have conducted the encirclement on Swann Street because it was a residential street.  *Id*.  He also believes that, once the curfew violators were encircled on Swann Street, that they should have been given additional opportunities to disperse and should have been formally notified that they were under arrest.  *Id*.  Of course, Dr. Mourtgos testified that he is unfamiliar with that area of the District.  Mourtgos Dep. at 132:20–134:16, 139:8–19.  He also testified that he has no idea whether there *was* a more suitable location than Swann Street to conduct the encirclement.  *Id*. at 137:9–138:12, 140:7–141:12.  He is opining only that Swann Street was not the right choice.  *Id*.  Yet, he conceded that Swann Street *could* have been a reasonable choice if there were no other suitable options.  *Id*. at 142:7–15.  Given that concession, and Dr. Mourtgos's complete failure to actually consider whether there were more suitable options than Swann Street, his first opinion is unreliable, and even if it was reliable, it would not be helpful to the jury because it has nothing to do with Plaintiffs' claims—Plaintiffs do not allege that the encirclement *itself* was an excessive use of force based on its location.  *See* Second Am. Compl. ¶¶ 108–14.

In his second opinion, Dr. Mourtgos's criticizes Lt. Horos's use of pepper spray against the individual on top of the car because, in Dr. Mourtgos's view, that individual "did not demonstrate the ability, opportunity, and intention to pose an imminent threat of harm." Mourtgos First Report at 24.  (Of course, Dr. Mourtgos is not offering *any* opinions as to *any* specific uses of force against Plaintiffs.  Mourtgos Dep. at 100:2–103:4.)  Even though the individual on top of the car (an elevated position vis-à-vis the officers) had *repeatedly* refused to comply with *multiple* orders to move back, SUMF ¶¶ 168–69, Dr. Mourtgos believes that Lt. Horos should have specifically warned the individual that if he did not get off the roof of the car

(and move back, as instructed) he would be pepper sprayed. Mourtgos First Report at 24. That opinion is absurd on its face. In fact, at his deposition, Dr. Mourtgos reluctantly acknowledged that if the individual on top of the car had struck an officer's shield that the officer "certainly would be within policy and within general principles to use force to defend himself," and he also acknowledged that the individual on top of the car did make contact with an officer's shield before being pepper sprayed. Mourtgos Dep. at 230:13–21.

Dr. Mourtgos also criticizes Lt. Horos's next use of pepper spray. Mourtgos First Report at 25. In his report, Dr. Mourtgos does not discuss the fact that multiple objects are thrown at Lt. Horos immediately before he deploys his pepper spray, *id*. at 25, but he acknowledged that fact at his deposition and he also acknowledged that someone throwing objects at an officer poses an imminent threat of harm to the officer, Mourtgos Dep. at 236:7. He also acknowledged seeing video evidence of three objects being thrown at Lt. Horos immediately before he deploys his pepper spray. *Id*. at 237:21–241:9. He also admitted that the individual who was struck with Lt. Horos's deployment of pepper spray had been refusing to comply with officers' order to move back and that that individual was holding a cardboard sign that he held in "extremely close proximity" to an officer's shield despite orders to move back. *Id*. at 241:11–244:21.

Next, Dr. Mourtgos quibbles with Officer Crisman's use of pepper spray on the grounds that (1) Officer Crisman did not provide a specific warning, and (2) Dr. Mourtgos did not believe that the individuals on the sidewalk were intending to illegally enter a residence. Mourtgos First Report at 25–26. However, Dr. Mourtgos ultimately acknowledged that if Officer Crisman did believe that the individuals on the sidewalk intended to illegally enter the residence, he would have been justified in using pepper spray. Mourtgos Dep. at 249:9–251:4. To the extent the point of Dr. Mourtgos's opinion is to speculate what Officer Crisman was seeing and thinking on

Swann Street, his opinion is inadmissible and irrelevant.  The unrebutted testimony from Officer

Crisman is that he believed that the individuals on the sidewalk intended to illegally enter the

residence and, as a result, would have posed a threat to the residents.  SUMF ¶¶ 180–83.

Finally, in his third opinion, Dr. Mourtgos essentially states that if one believes Plaintiffs'

claims then their claims are true.  Mourtgos First Report at 26–27; Ex. 100, Supplemental Report

of Dr. Scott Mourtgos at 8–9 (June 10, 2024).  But he has no idea whether Plaintiffs' claims are

actually true.  *Id.*  Not only would any opinion of his on the conditions of Plaintiffs' detention be

irrelevant to their excessive force claims, but his opinion is entirely unhelpful and unreliable

because it simply parrots Plaintiffs' allegations.  The Court should ignore it.

## CONCLUSION

The Court should grant summary judgment in favor of Defendants.

Date: July 29, 2024.                                       Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTION [1019878]
Assistant Chief, Equity Section

*/s/ Richard P. Sobiecki*
RICHARD P. SOBIECKI [500163]
GREGORY KETCHAM-COLWILL [1632660]
AMANDA C. PESCOVITZ [1735780]
MARCUS D. IRELAND [90005124]
Assistant Attorneys General
Civil Litigation Division

400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 805-7512
Email: richard.sobiecki@dc.gov

*Counsel for Defendants*