# EXHIBIT 11

Crisman, James                                    January 16, 2024

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


PAMELA GOODWIN, et al.,          :

    Plaintiffs,                  :

    v.                           :   Civil Action No. 1:21-cv-00806-BAH

DISTRICT OF COLUMBIA, et al.,:

    Defendants.                  :

_____

Tuesday, January 16, 2024

Held Remotely

Deposition of JAMES CRISMAN, a witness

herein, called for examination by counsel for the

Plaintiffs in the above-entitled matter, pursuant

to notice, the witness being duly sworn by Barbara

J. Moore, a Notary Public in and for the District

of Columbia, taken at the offices of RELMAN COLFAX,

PLLC, 1225 19th Street, N.W., Suite 600,

Washington, D.C., commencing at 10:00 a.m., and the

proceedings being taken down by Stenotype by

BARBARA MOORE, CRR, RMR, and transcribed under her

direction.

Crisman, James                                    January 16, 2024

2

```
 1    APPEARANCES:

 2

 3              On Behalf of the Plaintiffs:

 4                   NICHOLAS ABBOTT, ESQ.

 5                   REBECCA LIVENGOOD, ESQ.

 6                   RELMAN COLFAX, PLLC

 7                   1225 19th Street, N.W., Suite 600

 8                   Washington, D.C.  20036

 9                   nabbott@relmanlaw.com

10                   rlivengood@relmanlaw.com

11

12            On behalf of the Defendants:

13                   RICHARD SOBIECKI, ESQ.

14                   OFFICE OF THE ATTORNEY GENERAL

15                   400 6th Street, N.W.

16                   Washington, D.C.  20001

17                   richard.sobiecki@dc.gov

18

19

20

21

22
```

Crisman, James                                       January 16, 2024

3

```
1                    TABLE OF CONTENTS

2    WITNESS                                    PAGE

3    JAMES ANTHONY CRISMAN

4    By Attorney Abbott                            4

5

6                       EXHIBITS

7    EXHIBIT        DESCRIPTION                  PAGE

8
     Exhibit 54    Memorandum                     31
9
     Exhibit 55    Memorandum                     32
10
     Exhibit 56    Preliminary Report Form -- Use  39
11                 Of Force Incident

12   Exhibit 57    Condensed Investigative Report  48
                   Form
13
     Exhibit 58    Condensed Investigative Report  53
14                 Form

15   Exhibit 59    Training History Report         89

16   Exhibit 60    PowerPoint                     139

17   Exhibit 61    Standard Operating Procedures  158

18   Exhibit 62    Standard Operating Procedures  165

19   Exhibit 63    Email                          201

20   Exhibit 64    Audiotape                      206

21   Exhibit 65    Video                          212

22   Exhibit 66    Condensed Investigative Report  214
```

Crisman, James                                    January 16, 2024

128

1              lieutenant could deploy and give

2              permission to use.

3      BY ATTORNEY ABBOTT:

4          Q.     Any other situations?

5          **A.     I'm sure there is.  I mean, based**

6  **upon you have to -- the circumstances could dictate**

7  **why it would be used.**

8          Q.     For the -- one of the reasons that

9  you could use OC spray would be to prevent escape

10  from an arrest.  And that applies to misdemeanor

11  arrests?

12          **A.     Yes.**

13          Q.     For the justification that an

14  officer or civilian is in harm's way, what do you

15  mean by "harm's way"?

16          **A.     Well, attempting to make the arrest**

17  **of that person, it's possible to take another**

18  **person, push him down, get them out of the way.**

19  **It's the use of force that you could utilize to**

20  **make an arrest.**

21          Q.     Is there any threshold for the level

22  of danger that must be present in order for the use

Crisman, James                                    January 16, 2024

129

1    of that force to be justified?

2                    ATTORNEY SOBIECKI:  Object to

3           form.

4                    THE WITNESS:  You have to --

5      BY ATTORNEY ABBOTT:

6           Q.    I can clarify.

7           What level of danger does there have to be

8    for OC spray to be justified?

9                    ATTORNEY SOBIECKI:  Object to

10          form.

11                   THE WITNESS:  That's up to the

12          officer.  He has to justify his actions

13          why he had to use pepper spray.

14      BY ATTORNEY ABBOTT:

15          Q.    If a water bottle was thrown at an

16   officer, is that a sufficient amount of danger to

17   justify the use of OC spray?

18                   ATTORNEY SOBIECKI:  Object to

19          form.  Calls for speculation.

20                   THE WITNESS:  In my line of work,

21          yes.  Because I don't know what's inside

22          that water bottle.  Throughout the 2020

Crisman, James                                    January 16, 2024

130

1              riots, multiple times they stuck chlorine

2              in there, which looks like water.  It's

3              not normal behavior to throw things at

4              people.

5      BY ATTORNEY ABBOTT:

6              Q.     Did you experience that on June 1,

7      2020?

8              **A.     Maybe not that day, but that**

9      **weekend, yes.**

10             Q.     Prior to June 1, 2020?

11             **A.     And after.**

12             Q.     And is it your understanding -- did

13     you document that at all?

14             **A.     Yes.**

15             Q.     In what form?

16             **A.     Sergeant Thau went to the hospital,**

17     **I believe it's somewhere in that record, but they**

18     **threw chlorine in his eyes.**

19             Q.     Do you know who threw chlorine?

20             **A.     I have no idea.  Just people in the**

21     **crowd.**

22             Q.     And do you recall what date that

Crisman, James                                    January 16, 2024

131

1   incident happened?

2        **A.      That was that week and prior events**

3   **that we've gone to where you could smell it in the**

4   **air.**

5        Q.      And Sergeant Thau?

6        **A.      Yes.**

7        Q.      What's his full name?

8        **A.      Daniel Thau.**

9        Q.      And do you have any reason to

10  believe that the protesters on June 1, 2020, had

11  chlorine?

12       **A.      Yes.**

13       Q.      And what was that based on?

14       **A.      Based upon once you start throwing**

15  **water bottles, I treat a heavy water bottle as a**

16  **hazardous item, that they could hurt somebody.**

17       Q.      Is that how you think of water

18  bottles through the present?

19       **A.      Yes, I always let people know that**

20  **water bottles can contain some form of chemical**

21  **inside of it that can ultimately -- short-term**

22  **blindness.**

Crisman, James                                      January 16, 2024

132

1      Q.      And any other instances aside from

2  one involving Sergeant Thau in which you were

3  familiar with chlorine being used in that way?

4      **A.      Multiple times throughout 2020.**

5      Q.      Anything else?  Did you witness it

6  being used?

7      **A.      You could smell it, yes.  You could**

8  **smell it, absolutely.  You smell chlorine.  It's a**

9  **very distinct odor.**

10      Q.      And you said you don't remember the

11  date of that Sergeant Thau incident; is that right?

12      **A.      No.  I think it was the night prior.**

13  **They are all running, it's all the same.**

14      Q.      The night prior to June 1?

15      **A.      Yes.**

16      Q.      And do you recall any instances of

17  chlorine being used on June 1?

18      **A.      For that day, I think earlier in the**

19  **day, around noontime, I believe.  I think.  Because**

20  **all those days, they're all the same there.**

21      Q.      Do you recall where in the District

22  that happened?

Crisman, James                                    January 16, 2024

133

1          **A.        Downtown, somewhere downtown.**

2          Q.      Do you recall smelling chlorine on

3    June 1?

4          **A.      I can't recall.  Some time during**

5    **that weekend.**

6          Q.      Do you recall smelling chlorine when

7    you were in the vicinity of Swann Street on that

8    day?

9          **A.        Not that I recall that day, no.**

10              ATTORNEY ABBOTT:  So we've been

11          going for -- we can go off the record.

12                  (Discussion held off the

13          record.)

14                  (Recess taken from 12:33

15          p.m. to 1:17 p.m.)

16    BY ATTORNEY ABBOTT:

17          Q.      And before the break we were talking

18    about the permissible justifications for the use of

19    OC spray.  Are you permitted to use OC spray to

20    distract the people?

21              ATTORNEY SOBIECKI:  Object to

22          form.

Crisman, James                                      January 16, 2024

159

1          Q.      Where it says, "MPD deployed OC

2    spray to disperse the crowd," did you deploy OC

3    spray?

4          **A.      I don't know.**

5          Q.      Do you recall deploying OC spray at

6    21st and Constitution at all?

7          **A.      No.**

8          Q.      Do you recall anything about the

9    deployment of OC spray there?

10         **A.      No.  So many, it's hard.**

11         Q.      What do you recall about that?

12         **A.      Not much.  They all run -- if that's**

13   **what it says happened, that's what happened.  Who**

14   **did it, I don't know.**

15         Q.      Do you recall being at 16th and K

16   Street around 9 p.m.?

17         **A.      16th and K, 16th and I.  That's**

18   **all on the 30th?**

19         Q.      I believe so.

20         **A.      I don't know.  I mean, listen, I**

21   **could have been.  I was everywhere throughout the**

22   **city on these days.  So...**

Crisman, James                                    January 16, 2024

160

1          Q.      Do you recall being at 17th and K
2    Street?
3          A.      I would have to look.  Maybe a
4    body-worn camera would be able to show.
5    Definitely, yes, 16th and I, yes.
6          Q.      What do you remember about
7    16th and I?
8          A.      Well, for all this stuff the crowds
9    were definitely throwing objects at the police.
10         Q.      At all of these locations?
11         A.      Yes.
12         Q.      So do you remember crowds throwing
13   objects at the police at 21st and Constitution?
14         A.      I wish I would give you the answer
15   to that, but there's a lot that happened that
16   night.
17         Q.      What do you recall -- what do you
18   recall?
19         A.      It's easier to ask me what I
20   remember.  For that day, the crowd was very violent
21   towards the police.  They were destroying the city,
22   they were breaking windows, throwing bottles.

Crisman, James                                    January 16, 2024

161

1    **Lighting dumpsters on fire.**

2         Q.    And where was that taking place?

3         **A.    Throughout the city.**

4         Q.    Let's break that down a little bit.

5         You mentioned that there were dumpsters on

6    fire.  Do you recall where that was?

7         **A.    Like 16th and I.**

8         Q.    And do you remember that being

9    around 2300?

10        **A.    It was late at night, yeah.**

11        Q.    Do you remember what time your shift

12   started that day?

13        **A.    I didn't really end the shift, nor**

14   **did I start it.  I remained in the city, so the way**

15   **my schedule worked was when we weren't doing**

16   **anything -- because I'm not normal patrol, I'm only**

17   **called out when they need us.  We would have down**

18   **time with sleep.  So for me the shift never ended.**

19   **So I slept in the office or in the car.**

20        Q.    Do you recall about how long that

21   period was where you were sitting in the office?

22        **A.    The only way I could explain it is I**

Crisman, James                                    January 16, 2024

162

1    was like a firefighter.  When you call me, I would

2    come.  Until then I would stay in the car or inside

3    of their office.  But I'm not the normal police

4    officer that stands a beat.

5           Q.    About what time did your day start

6    on the 30th?

7           A.    It never ended.  I was at the office

8    the whole time.  So at the very beginning at the

9    White House, that was like a Thursday night I

10   believe where they tried to get in there, I stayed

11   for the weekend.  I never left.

12          Q.    And what's the first thing that you

13   remember chronologically?

14          A.    Basically the White House.

15          Q.    Did you use force there?

16          A.    I did not.  But we were advisors.

17   We basically gave the munitions or we actually gave

18   the OC spray to Park Police and Secret Service.

19          Q.    And you're authorized to give

20   munitions to organizations outside the MPD?

21          A.    That comes from management.  I'm not

22   authorized.  That's management.  It wasn't Jimmy's

Crisman, James                                        January 16, 2024

189

1    **multiple things.**

2          Q.    What part of the night did that

3    happen?  Was that early on in the evening?

4          **A.    No, that was when the mass arrest**

5    **was made on Swann Street.  So whenever time that**

6    **was.**

7          Q.    I just want to pin down the time

8    that all this happened.

9          So you said you left Swann Street at one

10   point?

11         **A.    I was on my way back to my vehicle.**

12   **I never left Swann Street.  So while walking back,**

13   **all of a sudden we could hear people kicking in**

14   **doors or attempting to.**

15         Q.    And do you recall at what point in

16   the night the police lines moved in?

17         **A.    No.**

18         Q.    Do you recall --

19         **A.    Not on my side.**

20         Q.    Do you recall being part of the

21   police line that moved east on Swann Street?

22         **A.    I was never part of the police line.**

Crisman, James                                    January 16, 2024

190

1          Q.      Do you recall being behind the

2     police line that moved east on Swann Street?

3          **A.      I believe that occurred after they**

4     **started throwing things at the police.**

5          Q.      Let's start with before that police

6     line moved forward.  Did you personally see anyone

7     kicking in doors?

8          **A.      No.  I definitely personally heard**

9     **people trying to kick in doors.**

10         Q.      And how did you know that's what

11    that sound was?

12         **A.      Through many years of experience.  I**

13    **know what a kicked door sounds like.**

14         Q.      Have you personally heard people

15    kicking doors down?

16         **A.      I personally kicked in a lot of**

17    **doors.**

18         Q.      That's what it sounded like to you?

19         **A.      Yes.**

20         Q.      Did you see any doors that were

21    kicked in?

22         **A.      I did not get to look at Swann**

Crisman, James                                              January 16, 2024

191

1    **Street.  Because after I utilized the pepper spray,**

2    **part of it got in my eyes.  So I then needed to be**

3    **helped.  So I did not stick around Swann Street to**

4    **see the aftermath.**

5         Q.    But you did not see any doors kicked

6    in while you were?

7         **A.    I only heard doors being kicked in.**

8         Q.    Do you recall for about how many

9    minutes you heard doors being kicked in before the

10   police line moved forward?

11        **A.    Within minutes.**

12        Q.    And did you report what you heard to

13   anyone?

14        **A.    No.**

15        Q.    Did other people report hearing

16   something similar?

17        **A.    I don't know.**

18        Q.    When you were first stationed behind

19   the police line, had the decision to arrest the

20   protesters already been made?

21        **A.    I believe so, yes.**

22        Q.    And what was your understanding of

Crisman, James                                    January 16, 2024

192

1    the plan to conduct that arrest?

2         **A.    I was not part of the plan, so I**

3    **don't know.**

4         Q.    You said you were there to provide

5    OC spray support; is that right?  Let me strike

6    that.  I don't want to put words in your mouth.

7         What were you there, what sort of --

8         **A.    More or less for munitions if they**

9    **were needed.**

10        Q.    Do you believe that it would be

11   needed?

12                ATTORNEY SOBIECKI:  Object to

13          form.

14                THE WITNESS:  Yes.

15   BY ATTORNEY ABBOTT:

16        Q.    Why was that?

17        **A.    Because throughout the weekend we**

18   **had basically been attacked that whole weekend.**

19        Q.    Was there anything about the

20   behavior of the people who were encircled on Swann

21   Street that they believed the use of OC spray would

22   be necessary?

Crisman, James                                    January 16, 2024

193

1          **A.      Not at the beginning, no.  But,**

2     **again, that's not why we're there.  We're there in**

3     **case there is need.**

4          Q.    But there is nothing specifically

5     that made you believe it was necessary based on

6     their behavior?

7                    ATTORNEY SOBIECKI:  Object to

8          form.  Misstates prior testimony.

9                    THE WITNESS:  I'm sorry, no.

10    BY ATTORNEY ABBOTT:

11         Q.    Who made the decision to move the

12    line forward from 15th and Swann east on Swann

13    Street?

14                    ATTORNEY SOBIECKI:  Object to

15         form.  If you know.

16                    THE WITNESS:  I don't know.

17    BY ATTORNEY ABBOTT:

18         Q.    Was that decision communicated to

19    you?

20         **A.      No.**

21         Q.    What did you do when the line moved

22    forward?

Crisman, James                                                    January 16, 2024

194

1          A.      I followed.

2          Q.      Did you witness the behavior of the

3    crowd change after the police line began to

4    advance?

5          A.      After.  So the crowd started first,

6    then the police line moved in.

7          Q.      When you say "the crowd started

8    first," what do you mean by that?

9          A.      They started kicking the doors,

10   that's when they started throwing rocks.  That's

11   when they started charging the police line.

12         Q.      You said throwing rocks?

13         A.      Yes.

14         Q.      The protesters were throwing rocks

15   before the police line moved forward?

16         A.      The suspects were throwing rocks.

17   At that time they are all arrested.  They are no

18   longer protesters, they were subjects.

19         Q.      Did you witness rocks being thrown?

20         A.      Yes.

21         Q.      And were the protesters notified

22   that they were being placed under arrest?

Crisman, James                                    January 16, 2024

195

1          A.      That part I don't know.

2          Q.      How did you know they were arrested?

3          A.      What do you mean?

4          Q.      Correct me if I'm wrong.  You said

5     that they were arrested at that point.

6          A.      At that point in time we were told

7     that the mass arrest was taking place, yes.

8          Q.      And so they were arrested before the

9     police line moved in?

10         A.      Yes.

11         Q.      Did you witness any notification to

12    the protesters that they were under arrest?

13         A.      I wasn't there for that.  I wasn't

14    on that front line, so...

15         Q.      And did you see the behavior change

16    at all after the police line moved forward?

17         A.      Once again, their actions changed

18    first, then the police line moved forward.

19         Q.      You see anyone entering any homes

20    before the police line moved forward?

21         A.      They were entering the homes before

22    the police line moved forward.

Crisman, James                                    January 16, 2024

196

1          Q.      And you witnessed them entering

2     homes before that?

3          **A.      Yes.**

4          Q.      What was your response to -- or what

5     did you do in response to people entering homes?

6          **A.      Basically I went up to stop and I**

7     **used OC force.**

8          Q.      And was that before or after the

9     police line moved forward?

10         **A.      I used it after the police line**

11    **moved forward, because I jumped in front of the**

12    **police line to stop two individuals from going up**

13    **the stairs.**

14         Q.      And what was your intent -- what did

15    you intend to achieve by using OC spray?

16         **A.      To distract them, disperse them from**

17    **entering that dwelling.**

18         Q.      Were you?

19         **A.      I believe so.  Because at that point**

20    **when I sprayed them it also got in my eyes.**

21         Q.      Were you successful in stopping them

22    from entering the home?

Crisman, James                                              January 16, 2024

197

1          **A.      I don't know.**

2          Q.      And who authorized the use of OC

3     spray on Swann Street?

4          **A.      For me, I used it.**

5          Q.      Did anyone authorize you to use it?

6                   ATTORNEY SOBIECKI:  Object to

7               form.

8                   THE WITNESS:  I had authorization

9               throughout the whole weekend to use it.

10              However, for that moment I used OC spray.

11              With the unit that I'm in, we're given a

12              little bit more leeway for determining

13              without someone dictating whether we can

14              use it.

15     BY ATTORNEY ABBOTT:

16         Q.      What is that understanding based off

17     of?

18         **A.      Just a guidance level through**

19     **Inspector Glover.**

20         Q.      And is that training or a policy

21     document?

22         **A.      No.  Officers can use pepper spray.**

Crisman, James                                    January 16, 2024

198

1         Q.      But you said that you're given

2    leniency?

3         A.      A little bit more leniency than your

4    regular officer.

5         Q.      Is that SOD as a whole?

6         A.      Domestic security operations within

7    the SOD.

8         Q.      Do you know if that's documented

9    anywhere?

10        A.      Well, when you look at the paperwork

11   itself, officers are allowed to use it.  So I used

12   it.

13        Q.      But the DSO had a greater leeway?

14        A.      A little bit more leeway, yes.

15   Yes.

16        Q.      Was it your understanding that you

17   needed to notify someone that you used OC spray?

18        A.      Yes.

19        Q.      And did you notify someone that you

20   used OC spray?

21        A.      Afterwards, yes.

22        Q.      How did you do that?

Crisman, James                                          January 16, 2024

199

1          **A.        I believe I went over the radio.    I**
2    **had Sergeant Thau call it in on the radio for me.**
3          Q.      Prior to using OC spray, did you see
4    people entering homes?
5          **A.      Yes.**
6          Q.      Did you believe -- what did you
7    observe of people entering homes?
8          **A.        Well, I don't know what their intent**
9    **was.   However, they were entering a dwelling.**
10          Q.      What did you believe they were
11    doing?
12          **A.        Basically a burglary, if you look at**
13    **the statute.**
14          Q.      What did you do in response to what
15    you called a burglary?
16          **A.        I attempted to stop them by the use**
17    **of pepper spray.**
18          Q.      Did you see anyone letting the
19    protesters into the home?
20          **A.      I did not.**
21          Q.      And if a homeowner allowed
22    protesters into their home, would that constitute

Crisman, James                                      January 16, 2024

200

1    burglary?

2                    ATTORNEY SOBIECKI:  Object to

3           form.  Calls for a legal conclusion.

4                    THE WITNESS:  If they were placed

5           under arrest and someone allowed them to

6           escape arrest?  I believe something would

7           be done with that homeowner.

8    BY ATTORNEY ABBOTT:

9        Q.    In this instance a homeowner

10   allowing protesters into their home, you said --

11       A.    Is this -- do we know this for sure?

12       Q.    Let's look back.  You said something

13   needed to be done about that.  What do you mean by

14   that?

15       A.    I think the department would look

16   into that.  I'm sure they would investigate it.

17       Q.    Did you think that something should

18   be done about that at the scene?

19       A.    I couldn't.  I was pepper sprayed

20   myself.  At that point in time the officer grabbed

21   me because objects were still being thrown at us,

22   and I was behind a tree trying to figure out if I