# EXHIBIT 38

Carroll, Jeffrey

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

PAMELA GOODWIN, et al.,          :

    Plaintiffs,               :

    v.                        :   Civil Action No.

DISTRICT OF COLUMBIA, et al.,:   1:21-cv-00806-BAH

    Defendants.               :

_____

Friday, March 8, 2024

Washington, D.C.

       30(b)(6) Deposition of JEFFERY CARROLL,

witness herein, called for examination by counsel

for the Plaintiffs in the above-entitled matter,

pursuant to notice, the witness being duly sworn by

Barbara J. Moore, a Notary Public in and for the

District of Columbia, taken at the offices of

RELMAN COLFAX, PLLC, 1225 19th Street, N.W., Suite

600, Washington, D.C., commencing at 1:10 p.m., and

the proceedings being taken down by Stenotype by

BARBARA MOORE, CRR, RMR, and transcribed under her

direction.

Carroll, Jeffrey

2

```
1    APPEARANCES:

2

3            On Behalf of the Plaintiffs:

4                NICHOLAS ABBOTT, ESQ.

5                REBECCA LIVENGOOD, ESQ.

6                GABRIEL DIAZ, ESQ.

7                RELMAN COLFAX, PLLC

8                1225 19th Street, N.W., Suite 600

9                Washington, D.C.  20036

10               nabbott@relmanlaw.com

11               rlivengood@relmanlaw.com

12

13           On behalf of the Defendants:

14               RICHARD SOBIECKI, ESQ.

15               OFFICE OF THE ATTORNEY GENERAL

16               400 6th Street, N.W.

17               Washington, D.C.  20001

18               richard.sobiecki@dc.gov

19

20

21

22
```

Carroll, Jeffrey

3

1                          TABLE OF CONTENTS

2    WITNESS                                      PAGE

3    JEFFERY CARROLL

4    By Attorney Diaz                             4

5

6                            EXHIBITS

7    EXHIBIT         DESCRIPTION                  PAGE

8
     Exhibit 140   Notice to Take (30)(b)(6)      8
9                  Deposition

10   Exhibit 141   Text messages                  71

11   Exhibit 142   Email thread                   183

12

13   (Exhibits retained by counsel)

14

15

16

17

18

19

20

21

22

Carroll, Jeffrey

105

1          A.      Yes, it is.

2          Q.      And when you say there's more than

3    just the First Amendment Rights and Police

4    Standards Act of 2004.  What addition is there?

5          A.      Sure.  It goes through a variety of

6    situations.  It goes to the overall policy, the

7    policy statement of the department.  It goes into

8    the details that we talked about, like the makeup

9    of the civil servants platoons.

10         It goes into all mass demonstrations but

11   like how to operationalize the entire department.

12   So kind of how we talked about before, the SOP is a

13   lot more detailed as you get into kind of the

14   operations related to demonstrations, but also

15   large-scale arrests that need to be made outside of

16   that.  It even talks about forms and other, you

17   know, specific things related to that.

18         Q.      So if I'm understanding correctly,

19   the SOP that we're talking about here applies to

20   more than just First Amendment assemblies.  It

21   applies to sort of how MPD is going to respond to

22   multiple mass demonstrations and events?

Carroll, Jeffrey

106

```
 1         A.     I would say that's definitely part
 2    of it.
 3         Q.     Now, this policy covered the
 4    protests or covered the protests upon which this
 5    lawsuit is based; correct?
 6         A.     They covered protests that occurred
 7    that were First Amendment in nature.  I would argue
 8    that the one that we're talking about specifically
 9    on Swann Street was not a First Amendment
10    demonstration.
11         Q.     Tell me why.
12         A.     Because the individuals that were
13    involved were involved in activity outside of the
14    First Amendment.  They were in violation of the law
15    that we spoke about, the mayor's order of the
16    curfew violation.
17              Outside of that, the group of individuals
18    had multiple warnings, they had police officers
19    that followed them.  They had individuals that
20    observed the group destroying property.  There was
21    communications received related to trying to, I
22    believe it was set a police car on fire in the
```

Carroll, Jeffrey

107

1    area.

2          So that is not peaceful activity.  That's

3    criminal activity that's outside the First

4    Amendment.

5          Q.    Okay.  So as we talked about,

6    however, this policy covers more than just First

7    Amendment activity?

8          A.    It does.

9          Q.    Actually, the policy itself

10   contemplates groups of people actually committing

11   crimes; right?

12                 ATTORNEY SOBIECKI:  Object to

13          form.

14                 THE WITNESS:  It does talk about

15          parts of that, yes.

16    BY ATTORNEY DIAZ:

17          Q.    So the fact that those people are

18   committing crimes would not necessarily put them

19   outside the purview of this policy?

20          A.    Not that alone.

21          Q.    Similarly, when we're talking about

22   a curfew from the mayor, right, that's just --

Carroll, Jeffrey

108

1   that's something that the mayor enacted as part of

2   her -- as part of her -- effectively like a public

3   safety emergency issue; correct?

4                    ATTORNEY SOBIECKI:  Object to

5           form.

6                    THE WITNESS:  I believe the

7           underlying mayor's order does reference a

8           public safety emergency.

9     BY ATTORNEY DIAZ:

10         Q.    And the standard operating procedure

11   similarly contemplates scenarios in which police

12   are operating pursuant to a declared public safety

13   emergency; correct?

14                    ATTORNEY SOBIECKI:  Object to

15          form.

16                    THE WITNESS:  I don't know if it

17          talks about a public safety emergency in

18          this standard operating procedure.  I

19          don't recall that.

20     BY ATTORNEY DIAZ:

21         Q.    Let's look at page 9 of 23 together.

22         **A.    Sure.**

Carroll, Jeffrey

1              **(Discussion held off the**

2              **record.)**

3          Q.    19 of 23.  That's a typo.  So if you

4    look at Paragraph 3, there's a note under there

5    saying, "Dispersal orders may also be given when a

6    public safety emergency has been declared by the

7    mayor and chief of police or his or her designee

8    determines that the emergency is sufficient to

9    require dispersal of assembly."

10         Do you see that?

11         **A.    Yes.**

12         Q.    That's just an example of how the

13   policy contemplates responding in the context of a

14   public safety emergency having been declared;

15   correct?

16         **A.    Yes, it does reference that in**

17   **there.**

18         Q.    Certainly, the policy itself doesn't

19   have an exemption if the curfew is in place?

20         **A.    I don't recall the policy talking**

21   **about curfews at all.**

22         Q.    Okay.  And so by the very terms of

Carroll, Jeffrey

110

1    the policy, it would seem to still apply to the

2    scenario or to the behavior of the people who

3    ultimately were arrested on Swann Street; correct?

4                    ATTORNEY SOBIECKI:  Object to

5            form.

6                    THE WITNESS:  I don't think I can

7            agree with that.  Can you say it again.

8        BY ATTORNEY DIAZ:

9        Q.    So actually, why don't we just take

10   a step back, so you said to me that you don't

11   believe the policy applied because the people that

12   were ultimately arrested on Swann Street were out

13   in violation of curfew and had allegedly committed

14   legal violations.

15                   ATTORNEY SOBIECKI:  I'm going to

16           object.  Misstates prior testimony.

17                   ATTORNEY DIAZ:  Tell me again --

18                   ATTORNEY SOBIECKI:  You asked

19           First Amendment assembly.

20                   THE WITNESS:  I believe the

21           portions of the policy do apply.  I do

22           not believe this is a First Amendment

Carroll, Jeffrey

111

1           assembly.  Just as you highlighted, this

2           policy just talks about other things.  It

3           talks about the makeup of our civil

4           servants.  It actually also references

5           riots, which I think we can all agree is

6           not a First Amendment activity, to engage

7           in a riot.  There's a legal definition of

8           what a riot is.

9                So I believe the parts of this SOP

10          definitely do apply because it does

11          encompass more than just handling First

12          Amendment demonstrations.

13                But to say that what we're

14          discussing is a First Amendment

15          demonstration, I do not agree with that.

16     BY ATTORNEY DIAZ:

17          Q.    So if I'm understanding you

18     correctly, what you're saying is that in your

19     opinion, the conduct of the people who were

20     ultimately arrested on Swann Street is not First

21     Amendment-protected activity?

22                     ATTORNEY SOBIECKI:  Object to

Carroll, Jeffrey

112

1          form.

2                    THE WITNESS:  I believe that the

3          individuals that were arrested on Swann

4          Street were in violation of the curfew

5          act, which is a criminal violation.  Not

6          only were they in violation of the curfew

7          act, it's not like what we talked about

8          earlier, where we just happened upon some

9          individuals.

10                   The group of individuals had been

11         followed by police officers for multiple

12         blocks, had been told to disperse.  They

13         were aware there was a curfew.  They did

14         not, and then they engaged in additional

15         unlawful activity above and beyond the

16         curfew itself, as indicated by reports

17         that came over the radio as far as

18         destruction of property and

19         potentially -- I believe it was setting a

20         police cruiser on fire.

21                   So I think when you take the

22         actions of those individuals that we saw

Carroll, Jeffrey

113

1           in those groups in concert with the

2           curfew, I do not believe that the First

3           Amendment -- it was protected First

4           Amendment activity.

5      BY ATTORNEY DIAZ:

6           Q.    And so my question -- and there

7      might have been confusion between the two of us.

8      My question was not whether the conduct was

9      protected by the First Amendment.  My question was

10     whether the conduct falls within this SOP, whether

11     the SOP -- whether the conduct is of the type of

12     conduct that the SOP is meant to direct officers to

13     respond to.

14               ATTORNEY SOBIECKI:  Object to

15          form.

16               THE WITNESS:  No, it's not as

17          relates to the First Amendment activity.

18          This directive does relate to other

19          parts, like how people should respond to

20          other things, the manual of the CDU.

21               I think we're kind of saying the

22          same thing, but the portions that

Carroll, Jeffrey

114

```
 1              specifically refer to First Amendment

 2              activity of this SOP that we're talking

 3              about I do not believe apply to what

 4              we're talking about occurred on Swann

 5              Street.  However, there are portions of

 6              this that I do believe apply to what

 7              happened on Swann Street.

 8      BY ATTORNEY DIAZ:

 9          Q.      Because, for example, the SOP

10   contemplates that a group might cross over from

11   engaging in protected activity to criminal or

12   riotous activity; correct?

13          A.      We had talked about criminal

14   activity as well.

15          Q.      So why don't we --

16          A.      There's a list of charges in the

17   back, I think, that potentially could be associated

18   as well.

19          Q.      Okay.  So maybe it's easier for you

20   to go through and explain to me which portions of

21   the SOP apply to the actions of the people who were

22   arrested on Swann Street, which ones don't and why.
```

Carroll, Jeffrey

134

1     **came back.**

2          Q.     So it wasn't, for example, just the

3     fact that they were out after curfew that subjected

4     them to arrest in this case; right?

5                    ATTORNEY SOBIECKI:  Object to

6               form.  Misstates prior testimony.

7                    THE WITNESS:  That solely would

8               subject them to arrest based on the

9               executive order, but they were doing way

10              more than that.

11    BY ATTORNEY DIAZ:

12         Q.     So it could subject them to arrest,

13    but what I'm asking you is -- well, it could

14    subject them to arrest, but clearly the executive

15    order contemplates the exercise of discretion?

16         **A.     Yes, we talked about the discretion,**

17    **yes.**

18                   ATTORNEY SOBIECKI:  Object to

19             form.

20         Q.     Not everybody who was out after

21    curfew was arrested; right?

22         **A.     That's correct.**

Carroll, Jeffrey

135

1           ATTORNEY SOBIECKI:  Object to

2       form.

3       Q.    So in this case, just the fact of

4   them being out after curfew would not have been or

5   was not sufficient for -- to support the decision

6   to arrest the group.  It was that plus other

7   things; correct?

8           ATTORNEY SOBIECKI:  Object to

9       form.

10          THE WITNESS:  No, that was

11      sufficient to subject them to arrest.

12      The executive order lays out the

13      exceptions to the law solely -- like I

14      said, you can use discretion, yes, but

15      being out outside past curfew, not having

16      one of those exceptions does subject them

17      to being lawfully arrested.

18  BY ATTORNEY DIAZ:

19      Q.    It made it so that you could have

20  exercised the discretion to arrest them just for

21  being out of a curfew, correct, is what I'm hearing

22  you say.

Carroll, Jeffrey

136

1          A.      No, I think what I'm saying is it

2      met the elements of the law for the curfew

3      violation; the criminal elements were there to

4      establish probable cause to make an arrest for a

5      violation of the curfew.

6          Q.      Okay.

7          A.      Solely based on the fact that they

8      were outside after curfew and they didn't meet one

9      of the exceptions.

10          However, above and beyond that, there were

11      other factors that were also taken into

12      consideration.

13          Q.      So the point that I was trying to

14      make is even before we get to the however; right?

15          A.      Uh-huh.

16          Q.      As we just said, not everybody who

17      was out after curfew was arrested for a curfew

18      violation; correct?

19          A.      That's correct.

20          Q.      Okay.  And so when we're dealing

21      with this group, what you just said is being out

22      after curfew could have subjected anybody to

Carroll, Jeffrey

137

1    arrest; right?

2           **A.      Yes, sir.**

3           Q.     Okay.  So what I'm trying to get at

4    is the reasons why the people on Swann were

5    arrested but people who are not out after curfew --

6    other people who were out after curfew were not

7    arrested.

8           **A.      Yes.**

9           Q.     And what I'm understanding you to be

10   saying is when we're dealing with the people on

11   Swann, it's the fact that they were out after

12   curfew but also all the other stuff, the

13   allegations of violence, the fact that they were

14   being monitored by police, that pushed police over

15   the line from deciding -- that pushed police to

16   exercise that discretion to arrest that they had

17   based on the fact that they were out after curfew.

18                  ATTORNEY SOBIECKI:  Object to

19        form.

20        Q.    Are you with me?

21                  ATTORNEY SOBIECKI:  Object to

22        form.  Asked and answered.

Carroll, Jeffrey

141

1    **Approximately 30 to 35-ish.**

2         Q.    So people that you say were arrested

3    for violation of the curfew were not people who are

4    suspected in having participated in the, what we'll

5    call the insurrection?

6         **A.    I would say that some people would**

7    **say at some point they were engaged in a First**

8    **Amendment demonstration.  Some people would say**

9    **they were engaged in an insurrection.  It's hard to**

10   **characterize that.**

11        Q.    What I mean is the people you

12   referred to on January 6 --

13        **A.    Yes.**

14        Q.    -- they were not arrested because

15   there was also independent suspicion that they had

16   participated in the events at the Capitol?

17        **A.    Yes.  Because of the curfew, yes.**

18        Q.    So do you have any information that

19   anybody, I guess, from let's say May 31 to June 2

20   of 2020, during those days when there was a curfew

21   in place after George Floyd was killed, do you have

22   any information about anybody who was arrested in

Carroll, Jeffrey

142

1    that period of time for just a curfew violation as

2    you sit here today?

3                    ATTORNEY SOBIECKI:  Objection to

4             form.  Exceeds the scope.

5                    You can answer.

6                    THE WITNESS:  As I sit here today,

7             I don't know.

8      BY ATTORNEY DIAZ:

9         Q.    You mentioned that the people who

10   were ultimately arrested on Swann Street were given

11   multiple warnings.  Is that correct?

12        **A.    I think I did say that, yes.**

13        Q.    Can you tell me what your basis is

14   for that and what the warnings you understand that

15   were given.

16        **A.    Sure.  So the direction, what was**

17   **put out was as I mentioned, the group on Swann**

18   **Street there were flanked by police officers as**

19   **they traveled throughout.  We also used PAs**

20   **throughout the districts, cases of what we call an**

21   **LRAD or a long-range acoustical device where**

22   **warnings were given.**

Carroll, Jeffrey

143

1           **The District pushed out wireless emergency**

2    **alerts across the city.  Those are the alerts that**

3    **go to wireless devices and cell phones notifying**

4    **folks of the curfew as well as press conferences**

5    **and information that was pushed out about -- from**

6    **media outlets in relation to the curfews.**

7           Q.    So I want to tease that apart.  What

8    I'm hearing are two different types of

9    notification.  So the one type of notification is a

10   general notification about the existence of a

11   curfew.  That might be your press conference, your

12   phone push notifications, things like that; right?

13        **A.    Yes.**

14                ATTORNEY SOBIECKI:  Object to

15         form.

16           Q.    And that to me is separate from an

17   actual, like, on-the-street warning given to

18   somebody, for example, similar to what we saw in

19   that executive order; right?

20                ATTORNEY SOBIECKI:  Object to

21         form.

22                THE WITNESS:  I think one you

Carroll, Jeffrey

144

1           could characterize, like you said, as a

2           general, and one would be an in-person or

3           in-front-of-you kind of a warning.

4     BY ATTORNEY DIAZ:

5           Q.    And so with respect to the group

6     that was ultimately arrested on Swann Street, what

7     specific information or what information do you

8     have about specific sort of in-person warnings that

9     were given to people that night?

10              ATTORNEY SOBIECKI:  Object to

11           form.

12              THE WITNESS:  So I know that

13           police were with that group as it went up

14           and back, so I know that they visibly had

15           police officers with them.

16           I know that police officers gave

17           warnings over PA systems inside vehicles

18           and long-range acoustical devices in

19           areas where demonstrators were at on that

20           night.

21     BY ATTORNEY DIAZ:

22           Q.    What I'm hearing you say -- and I

Carroll, Jeffrey

145

1   want to make sure I'm hearing you correctly -- is I

2   heard you say that you know officers were flanking

3   the group; right?

4          A.     **Yes, flanking the group.**

5          Q.     But then I also heard you say that

6   you know that warnings were given kind of generally

7   throughout the night.  I want to make sure that I

8   want to see if you're saying specifically that you

9   have information that the officers that were

10  flanking the group that was ultimately arrested on

11  Swann gave them direct warnings, or whether you're

12  saying that you know officers were around the group

13  and also you know that generally throughout the

14  night that at some point somewhere in the city

15  officers were giving warnings.

16                ATTORNEY SOBIECKI:  Object to

17          form.

18                THE WITNESS:  I know that

19          generally there were officers around the

20          group flanking them and with them.  I

21          know that warnings were given over PAs

22          and LRADs to demonstrators across the

Carroll, Jeffrey

156

1   were nonetheless arrested for a curfew violation;

2   correct?

3       **A.**     **Yes.**

4       Q.    Could you help me understand what it

5   is about the people on Swann Street, the factors --

6   you talked about factors -- what are the factors

7   relating to the people who were ultimately arrested

8   on Swann Street that made it such that it was

9   appropriate to not use discretion against them?

10          ATTORNEY SOBIECKI:  Objection.

11       Asked and answered.

12          THE WITNESS:  I don't think there

13       was any requirement to use discretion to

14       not arrest them.  But even with that

15       being said, the group that ultimately was

16       arrested on Swann Street had marched

17       quite a distance.

18         As I mentioned, there was officers

19       that were around them.  They had

20       awareness of the officers around them.

21       They continued with their activities.

22       Their behavior escalated.

Carroll, Jeffrey

157

1           I talked about the damage that we

2       saw as far as destruction of property,

3       the police vehicle they attempted to set

4       on fire.  We also knew from the prior

5       nights that as it got closer, sun going

6       down towards the nighttime hours, we saw

7       an increase in violence by these groups

8       of individuals that were out there.

9           So taking into consideration all

10      those factors that we had and the fact

11      that they were out past curfew, they had

12      awareness that they shouldn't be out past

13      curfew, they were ultimately -- excuse

14      me -- they were ultimately placed under

15      arrest on Swann Street.

16   BY ATTORNEY DIAZ:

17       Q.    What's your basis for saying that

18   the people ultimately arrested on Swann Street had

19   awareness of the fact that they were out after

20   curfew?

21       **A.    They all tried to run away and get**

22   **away from us.  Obviously they were aware.  If you**

Carroll, Jeffrey

158

1    go back to Swann Street -- and I think I talked

2    about this in my deposition the last time, my

3    personal deposition -- the question I come up with,

4    why did you go down Swann Street, it's a

5    residential street and we actually didn't -- the

6    idea was not to arrest them on Swann Street.

7            The ultimate goal was to stop the behavior

8    of the group before it escalated any farther.  I

9    talked about the destruction of property and the

10   vehicle, but I attempted to place them under arrest

11   earlier.  I believe it was up at S or T Street, and

12   the officers couldn't get police lines in place

13   fast enough, so they were able to get away and then

14   go to Swann Street when we attempted to arrest them

15   there.

16           Individuals ran away and ran out of the

17   alleys that were there.  And the question was asked

18   about in my last deposition about that.  And I was

19   shown a video related to police lines and moving

20   them forward.

21           Although individuals were there illegally

22   in violation of the law, we still methodically and

Carroll, Jeffrey

159

1  slowly moved the lines together and effectuated the

2  arrests.  There were some people, just like you

3  talked about, that were on Swann Street that were

4  not arrested.  Obviously the goal -- evaluating all

5  the factors that we had there, we knew the

6  individuals that were arrested on Swann Street,

7  there was probable cause for each and every person

8  to be placed under arrest.

9        And that is a requirement.  You have to

10  ensure that there's individual probable cause of

11  those folks.  We knew that each one of those folks

12  that were there were out past curfew.  They had

13  awareness, they didn't just show up from nowhere.

14  They shouldn't have been out past curfew.

15        There was no indication of any exceptions.

16  They had been given times to disperse.  The actions

17  of the group as far as running away and trying to

18  avoid, the group did not go away.

19        So taking all that into consideration and

20  the escalation of the violence and destruction that

21  we saw from the group prior to the arrests, you

22  know, in my opinion the appropriate action was to

Carroll, Jeffrey

160

1    arrest them for the curfew.

2           So we talked about discretion.  I said

3    earlier it's -- there's a lot of factors that go

4    into it.  It's very difficult to describe what does

5    that look like, but I hope that that explanation

6    gives you an idea what the mindset was and the

7    thought pattern.

8           It's not -- we don't like to arrest

9    anybody.  Arrest avoidance is a tactic that we

10   embrace, but we also have a duty to safeguard the

11   community there in the city.  The neighborhood of

12   Swann Street and the neighborhoods that's in the

13   Third District.  And to effectuate that arrest, we

14   were able to stop that group from conducting any

15   more escalation of their violent behavior, and we

16   knew that there was probable cause for everyone

17   that was arrested.

18          Like I said, there were probably other

19   people I'm sure that could have been arrested that

20   were in that group, but we did not go -- there were

21   some folks, I talked about this last time that I

22   believe went into a residence.  We didn't go in the

Carroll, Jeffrey

161

1    residence and arrest them.  We didn't come back and

2    apply for arrest warrants.  Could we have?  Yes,

3    but we talked about discretion and the

4    reasonableness and the thought behind our actions

5    that we do.

6          Q.    And so going back to your -- to the

7    statement that you believe that the people who were

8    arrested on Swann Street had awareness of the

9    curfew --

10         A.    Yes.

11         Q.    -- your basis for that is the fact

12   that some subset of the group of people had earlier

13   run away from police.  Do I have that right?

14         A.    I don't remember.

15              ATTORNEY SOBIECKI:  Misstates

16         prior testimony.

17         Q.    I want to make sure --

18         A.    I think it's all of those factors

19   that we talked about earlier.  There's the general

20   awareness of the wireless emergency alerts.  There

21   was the press releases that we talked about, the

22   press statements that were made.  There's the

Carroll, Jeffrey

162

1    police officers that were with them.

2         Was it solely the fact that they ran away

3    from the police?  No.  Running away from police in

4    and of itself outside of the curfew is not a

5    criminal offense; right.  It doesn't establish a

6    probable cause.  Is it a factor that could be taken

7    into consideration?  Sure, it could be taken into

8    consideration, but it's not a stand-alone thing.

9         As I've kind of gone through and described

10   all these pieces, it would make -- a reasonable

11   person would believe that they were aware that they

12   were out past curfew.  They had awareness of it.

13   That's why they were trying to avoid when they saw

14   the police, you know, potentially get police lines

15   up to arrest them.

16        Q.    And is it your understanding or is

17   it the department's understanding of the curfew

18   such that somebody is subject to arrest when they

19   are on the street after curfew irrespective of

20   whether they have knowledge of it?  In other words,

21   is knowledge an element as far as the MPD is

22   concerned?