# EXHIBIT 43

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____ :
                                 :
IN THE MATTER OF:                :
                                 :
PAMELA GOODWIN, et al.,          :
                                 :
          Plaintiffs,            :
                                 : Civil Action No.
     v.                          : 1:21-cv-00806-BAH
                                 :
DISTRICT OF COLUMBIA,            :
et al.,                          :
                                 :
          Defendants.            :
                                 :
_____ :

                    Monday,
              December 11, 2023

              Washington, D.C.


DEPOSITION OF:

              ANDREW HOROS

called  for  examination  by  Counsel  for  the
Plaintiffs, pursuant to Notice of Deposition,
in the offices of Relman Colfax, PLLC, located
at 1225 19th Street, N.W., when were present on
behalf  of  the  respective  parties:

APPEARANCES:

On Behalf of Plaintiffs:

REBECCA LIVENGOOD, ESQ.
NICHOLAS ABBOTT, ESQ.
Relman Colfax, PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
202-728-1888
rlivengood@relmanlaw.com
nabbott@relmanlaw.com


On Behalf of Defendants:

RICHARD SOBIECKI, ESQ.
AMANDA PESCOVITZ, ESQ.
D.C. Office of the Attorney General
400 6th Street, N.W.
Washington, D.C. 20001
202-805-7512
richard.sobiecki@dc.gov
amanda.pescovitz1@dc.gov

3

CONTENTS

WITNESS            DIRECT CROSS REDIRECT RECROSS

Andrew Horos        4    267      --         --


EXHIBIT
NO.    DESCRIPTION                          PAGE

20    Training History Report               21
21    Email from Robert Glover 6/12/2020     48
22    CDU UOF presentation                   66
23    1st Amendment assemblies training      89
24    Another training presentation         109
25    General Order Use of Force, 11/2/2017 127
26    GO less lethal weapons 1/1/2022       129
27    SOP: Handling 1st Amendment Assemblies 132
28    Operations Manual                     142
29    Email from Robert Glover 6/1/2020     164
30    BWC footage                           178
31    MPD reportable force report 6/1/2020  222
32    6/1/2020 1st Amendment 2200 sitrep    225
33    IAD ROI Lieutenant Andrew Horos       234
34    First audio recording IAD interview   239
35    Second audio recording IAD interview  242
36    MPD memorandums                       245
37    Video elevation of police line        250

```
1           A     Until --

2           Q     -- on June 1st?

3           A     All  those  days  I  was  there  were

4    early until late.

5           Q     Okay.  Okay.  So on June 1st, you

6    had started sometime in the morning.  And then

7    where  did you -- and  so you  said you  were

8    directing the platoons.  Do you remember on

9    June 1st where you were?  I know you mentioned

10   a couple of different places you could have

11   been.  Do you remember where you were on June

12   1st in the morning?

13          A     I don't.

14          Q     Okay.

15          A     No, I don't remember.

16          Q     Do you remember arriving at 14th and

17   Swann on the evening of June 1st?

18          A     I  was  at  14th  and  Swann  at  some

19   point --

20          Q     Okay.

21          A     -- during the evening.  Yes.

22          Q     Do  you  remember  where  you  were
```

150

1     immediately before you went there?

2          A    I was mobile around -- I believe I

3     was coming from the downtown area.

4          Q    Okay.

5          A    Near the White House area, mobile in

6     my vehicle.

7          Q    Okay.    Had you been in Lafayette

8     Square at all in the couple of hours before you

9     arrived at 14th and Swann?

10         A    Yes, ma'am.

11         Q    What time were you at Lafayette

12    Square?

13         A    It was before 19:00.  I know that.

14    It was somewhere in the timeframe of 4:30 p.m.

15    to 6:30 p.m.

16         Q    Okay.  And in the time that you were

17    at Lafayette Square, did you hear any warnings

18    about the curfew being given?

19         A    Did I while I was in Lafayette

20    Square?

21         Q    Yes.

22         A    I did not.

151

```
 1          Q    Okay.  At any point that day, did
 2     you hear warnings about the curfew being given?
 3          A    Yes.
 4          Q    And at what time did you hear those
 5     warnings?
 6          A    Prior to the curfew, I was on 17th
 7     Street, so there at 17th and H, Henry,
 8     Northwest, and there were consecutive warnings
 9     given out via our LRAD.
10          Q    Okay.  So at 17th and H, you heard
11     between 6:30 and 7:00 you heard consecutive
12     warnings given?
13          A    And then after 7:00, yes, ma'am.
14          Q    Okay.  And that was through the
15     LRAD?
16          A    Yes, ma'am.
17          Q    Okay.  Anywhere other than at 17th
18     and H?
19          A    Yes.
20          Q    Where?
21          A    When we were -- a group, not sure
22     where they started, but when we were heading
```

1    northbound to Swann Street, I could hear either

2    LRAD or the vehicle acoustic loudspeaker giving

3    out warnings.  And, again, I don't know what

4    time these were.

5         Q    And you said --

6         A    It was after 19:00 though.

7         Q    Okay.   And you said this is

8    traveling north.  What street was it traveling

9    north on?

10        A    I'm not sure.  I just know that we

11   came from that downtown area.  I don't know

12   what route we took to get to Swann Street.

13        Q    Okay.

14        A    But it's north, kind of north -- I

15   guess that would be east --

16        Q    Yeah.

17        A    -- of that area.

18        Q    Okay.  So were you traveling in your

19   car --

20        A    Yes.

21        Q    -- from 17th and H up to 14th and

22   Swann?

```
 1            A     Yes, ma'am.

 2            Q     And was that with a group of people

 3      walking?

 4                  MR. SOBIECKI:  Object to form.

 5                  THE WITNESS:  I was usually in the

 6      area of that group.  I wasn't right with them.

 7      But I was in the area of that group.

 8                  BY MS. LIVENGOOD:

 9            Q     And what do you mean you were in the

10      area of the group?

11            A     So if they were north on a street,

12      the group at that time was hostile, so if we

13      got any police vehicles, really any vehicles,

14      but  specifically,  and  especially  police

15      vehicles would get near that group, they would

16      be surrounded, windows would be broken.  We

17      would  have  to  do  what's  called  an  officer

18      rescue, which we had to do multiple times in

19      those days.

20                  We would have to go in and separate

21      that group from the vehicle.  So, obviously, we

22      didn't want to get a vehicle there that would
```

```
1    would not be -- I would not be deploying them

2    or moving them around.

3         Q    Okay.

4         A    That would be up to the individual

5    districts.

6         Q    Okay.

7         A    If   we   needed   more   resources

8    downtown, then, for example, nothing was going

9    down, nothing was occurring at Minnesota Avenue

10   in 6D, one example would be 6D CDU, can you

11   respond from the district to a certain area

12   downtown.    And then it would be under my

13   direction.

14        Q    Okay.  Okay.  And so this is called

15   the patrol district platoon deployment.    Is

16   that right?

17        A    Yes.

18        Q    Was there a name for the category of

19   platoons that you were in charge of assigning?

20        A    So they're all numbered.  There's

21   five in each district.  For example, 1D would

22   be 11, 12, 13, 14, 15.  And depending on which
```

1    ones we pull downtown, those would be the ones

2    that I would be in charge of.

3        Q    Okay.

4        A    So they'd be numerically titled.

5        Q    Okay.   But there wasn't like a

6    catch-all category that you were --

7        A    No, ma'am.

8        Q    -- in charge of?

9        A    Okay.

10       Q    And   you   don't   remember   whether

11   you've read this contemporaneously?

12       A    I don't remember this.

13       Q    Okay.  Do you have an understanding

14   of what Inspector Glover means when he says, If

15   we get large crowd swells into these areas, we

16   will establish lines quickly?

17       A    I do.

18       Q    And what is that?

19       A    The days leading up to this day, the

20   first we had widespread rioting in basically

21   the whole downtown area.  So Georgetown, you

22   know,   all   in   the   areas   where   there's

170

1    businesses, U Street, Georgia Avenue.  There's

2    a Walmart I believe up there.  Ivy City has

3    retail stores, like the Nike and the Target.

4              So  I  believe  that  when  he  says

5    establish lines, it would be have them in an

6    area that they could be deployed to establish a

7    line in front of a business or a place that

8    could be looted or, you know, windows broken.

9         Q    Okay.  So a police line to prevent

10   damage.  Is that right?

11        A    Yes, ma'am.

12        Q    Okay.  And  you  don't  read  it  as

13   referring to encirclement?

14        A    The only part that says encircle is

15   it says, Ideal places to encircle and arrest if

16   we need to.  And that looks like it was 6 and

17   7D on the bridge.

18        Q    Okay.

19        A    That would be the only mention of

20   encirclement.

21        Q    Okay.  As  far  as  you  know,  were

22   there any groups encircled on the bridges -- on

1    either bridge?

2         A    Not that I'm aware of.

3         Q    Okay.  Is that your -- would you

4    have known about it if --

5         A    Yes.

6         Q    -- there were?  And why is that?

7         A    Because it would have been an area -

8    - it would have most likely been an area or a

9    group that would have been coming from the

10   downtown area leaving outbound to one of these

11   groups.

12        Q    Got it.  And so if it was a group

13   coming from the downtown area, you would know

14   about it by virtue of deploying platoons

15   downtown?

16        A    That's correct.

17        Q    I'm sorry.  Okay.  If it wasn't a

18   group coming from downtown area, is there any

19   reason that you would have known about it?

20        A    Yeah.  I would have most likely

21   known about it even if they weren't coming from

22   downtown if we're talking about mass arrests or

184

1    an MK9 and not an MK9 fogger that you took out

2    of the car?

3         A    I would have to see the actual

4    canister because they are identical other than

5    the label.

6         Q    Okay.  So this footage is not going

7    to tell us which one it was?

8         A    That's correct.

9         Q    Okay.  Do you recall whether it was

10   a fogger or not a fogger?

11        A    I don't recall.  Normally in a

12   situation like this, I'd probably use an MK9.

13   But I don't recall which one it was.

14        Q    Okay.  What's the difference between

15   an MK9 and an MK9 fogger?

16        A    An MK9 is more of an extreme, and is

17   more targeted.  And with an MK9, it's more of a

18   mist deployment.  But with an MK -- I'm sorry,

19   with an MK9 fogger, it can easily be picked up

20   with the wind and blown back towards the police

21   line.  So an MK9 is more concentrated in one

22   direction.

185

1      Q    Okay.  What's the difference between

2   an MK9 and an MK-4?

3      A    The  size,  so  the  amount  that's

4   actually in the canister and the distance.

5      Q    Okay.  So when you got to Swann and

6   14th, what was your understanding of why you

7   were there?

8      A    When  we  were  at  14th  and  Swann,

9   police lines were established on both ends of

10  the block, and the allies to prevent that group

11  from  leaving  because  they  were  --  multiple

12  attempts -- when we started, multiple attempts

13  prior to Swann Street.  Commander Glover was

14  directing me to direct police lines to try to

15  stop  those  individuals  prior  to  arriving  at

16  Swann Street to effect an arrest.

17     Q    So you had attempted before they got

18  to Swann Street to set up a police line to

19  effect an arrest?

20     A    Yes, ma'am.

21     Q    Okay.  And why did that not work?

22     A    Because it --

186

1              MR. SOBIECKI:  Object to form.

2              THE WITNESS:  The reason why they

3     were not able to be detained?

4              BY MS. LIVENGOOD:

5        Q    Yes.

6        A    Every time they would see the police

7     start to form a line, they would run before

8     they were able to establish the police line,

9     either through an alley or through a spot where

10    the police weren't yet.

11       Q    So do you know how it ended up that

12    the protesters were on Swann Street with police

13    lines all around them?

14       A    I don't.  Just from the recollection

15    of that night, it makes sense that they made a

16    police line to stop northbound, and they cut

17    through Swann Street to get to another street.

18    But Swann Street is very long, it's a large

19    block.  So I'm assuming they weren't able to

20    make it to the other side --

21       Q    Both of the lines?

22       A    -- whether  they  were  at  14th  or

1    15th.  That is correct.

2        Q    I'm sorry for interrupting.

3        A    No, it's fine.

4        Q    They weren't able to make it to the

5    other side before the line was established?

6        A    That's correct.

7        Q    Okay.   And when you arrived, the

8    police lines had already been established.  Is

9    that right?

10       A    Yes, ma'am.

11       Q    Okay.   Do you know whether a

12   decision to arrest had been made by the time

13   you arrived?

14       A    It was.  There was a decision to

15   make an arrest.

16       Q    Okay.  Did the decision to make an

17   arrest proceed the decision to set up the

18   police line, do you know?

19       A    Yes.

20       Q    Yes.  And why do you know that?

21       A    Because Inspector Glover had stated

22   at that point they weren't dispersing, and they

188

```
1   were still involved in the riotous acts.  And

2   they had to be stopped from creating more

3   destruction and injury.

4        Q    Okay.  I'm sorry?

5        A    Creating more destruction and

6   injury.

7        Q    Okay.  So when you arrived at 14th

8   and Swann, the decision to arrest had already

9   been made.

10        A    Yes, ma'am.

11        Q    Had you been informed of the

12   decision to arrest?

13        A    Yes.

14        Q    And how did you learn of it?

15        A    Inspector Glover.

16        Q    Okay.  And was that by radio?

17        A    I believe it was in person.

18        Q    After you arrived?

19        A    It could have been by radio as well.

20   But, no, prior to my arrival while that group

21   was moving, Commander Glover had stated that to

22   me and that we were going to form police lines
```

189

1    to prevent them from moving.

2         Q    Okay.  And to affect an arrest?

3         A    Correct.

4         Q    Okay.  And do you know what role, if

5    any, you said that -- you said that the concern

6    -- sorry, let me rephrase this.  So you said

7    that the decision to arrest was to prevent

8    further, I think, violence, or looting and

9    injury.  Was that right?

10        A    That's correct.  And destruction of

11   property.

12        Q    Okay.  And so was that based on the

13   destruction of property that had happened on

14   14th Street so far?

15             MR. SOBIECKI:  Object to form.  If

16   you know.

17             THE WITNESS:  That was based on the

18   destruction that occurred from the downtown

19   area in route to this location.

20             BY MS. LIVENGOOD:

21        Q    Okay.  And you don't know which

22   route they took to get there?

```
 1                  THE   WITNESS:     It   looks   like
 2     Assistant Chief Carroll, Jeffery Carroll.
 3                  BY MS. LIVENGOOD:
 4          Q    That's   Assistant   Chief   Carroll
 5     standing there?
 6          A    Yes, ma'am.
 7          Q    Okay.  And then --
 8                  MR. ABBOTT:  8:49.
 9                  MS. LIVENGOOD:  At 8:49?  Okay.  I
10     just had an eye appointment.  Okay.  Can we
11     jump ahead a little bit?  Okay.  And then was
12     this you driving over to 15th and Swann?
13                  THE WITNESS:  Yeah.  I don't know
14     who's   driving   me,   but   that   appears,
15     essentially, I'm moving around.
16                  MS. LIVENGOOD:  Okay.  I'm sorry.
17     Can we pause it for a second?
18                  BY MS. LIVENGOOD:
19          Q    This is at 14:02.  Do you know who
20     the person in the white shirt is there?
21          A    That   appears   to   be   Captain   Dan
22     Harrington.
```

1          Q    Okay.  Can we go back just a tiny

2     bit?  Is that Dan Harrington?

3          A    Yes.

4               MS. LIVENGOOD:  Okay.  And that's at

5     15 -- 13:59?

6               MR. ABBOTT:  Mm-hmm.

7               MS. LIVENGOOD:   Okay.   And  keep

8     going.

9               (Video recording played.)

10              MS. LIVENGOOD:  Can you turn that

11    up?

12              BY MS. LIVENGOOD:

13         Q    Okay.  Could you hear that?

14         A    I could.  I did.

15         Q    Okay.  And so that was from like

16    minute 14:00 to 14:36.  What were you saying

17    there?

18         A    So I believe previously being on the

19    other side, that the plan originally discussed

20    to effect this arrest would be move the police

21    line to 15th Street towards 14th Street because

22    that's eastbound plus one.  And hearing what I

1    just said, after going around and seeing that

2    the crowd was much larger on this side, I

3    believe I advised Inspector Glover that instead

4    of going eastbound, it would be less -- less

5    issues going westbound.

6         Q    And that would be because you'd have

7    to move fewer people?

8         A    Exactly.  Yes, ma'am.

9         Q    Okay.  Up to this point, had there

10   been any discussion of moving both lines in?

11        A    No, ma'am.

12        Q    Okay.

13        A    I don't recall that.

14        Q    Okay.  At some point, was there a

15   decision to move both lines in?

16        A    I don't know how that side ended up

17   moving.  I just know -- I don't know if there

18   was a discussion, or if it was just a decision

19   that was made from the 14th Street side.

20        Q    Okay.  So do you recall either side

21   moving in?

22        A    Yes.

198

1      Q    What do you recall?

2      A    I remember this 15th Street side

3  moving.

4      Q    Got it.  And you -- I thought that I

5  understood you to be saying that when you got

6  to 15th, you decided the 14th Street side

7  should move in?

8      A    That is correct.

9      Q    Okay.  But your recollection is that

10  the 15th side -- the 15th Street side moved in?

11      A    That's correct.

12      Q    And why did that happen?

13      A    When we were on the line, visually

14  see people in the block pounding on doors and

15  attempting to kick in doors on our side.

16      Q    And that was --

17      A    On the 15th Street side.

18      Q    I'm sorry.

19      A    On the 15th Street side.  So I --

20         (Simultaneous speaking.)

21      Q    And that was before any line was --

22      A    That's correct.

199

1          Q     Okay.     And   so   then   what   was   the

2    decision?

3          A     To move in from the 15th Street side

4    to stop that behavior.

5          Q     Okay.  So the line moving in, it

6    allowed MPD to affect the arrest.  Is that

7    right?

8          A     It was more -- decisions more made

9    to stop to prevent any sort of burglaries.  I

10   didn't know -- we didn't know who was in the

11   locations.  We didn't know if there was people

12   in there.  A lot of reasons.  Obviously, you

13   don't want someone kicking in your door in case

14   there's firearms in the house.  And for the

15   safety of the people inside the house and also

16   the people on the outside of the house that

17   were trying to gain entry.

18         Q     Okay.  So --

19         A     Safety concerns.

20         Q     Okay.  So one reason the police line

21   moved was you saw people kicking doors and you

22   were trying to get them to stop?

1          A    Yes, ma'am.

2          Q    Before you made that decision, had

3     there been a decision for the police lines to

4     move to affect an arrest?

5          A    Yes, ma'am.  That was discussed.

6          Q    Okay.

7          A    So --

8          Q    So the moving of the police line

9     served at least those two purposes?

10         A    To affect the arrest, and also

11    prevent any burglaries and any damage.  That is

12    correct.

13         Q    Okay.  We talked about in the

14    decision to arrest that Inspector Glover said

15    it was to prevent further looting and damage.

16    Is that right?

17         A    Yes, ma'am.

18         Q    Did Inspector Glover say anything --

19    any other reason for conducting the mass

20    arrests?

21         A    I don't recall.  It was mostly to

22    stop the riotous behavior.

201

```
1           Q    Okay.  Are you aware of any other
2      reason to conduct the mass arrest?
3                    MR. SOBIECKI:  Object to form.
4                    THE  WITNESS:    I  don't  --  why
5      Commander Glover would have made the decision?
6                    BY MS. LIVENGOOD:
7           Q    Yes.
8           A    I don't know other than to stop that
9      behavior.
10          Q    Okay.  Do you recall any discussion
11     of whether it would be possible to disperse the
12     crowds without arrest?
13                   MR. SOBIECKI:  Objection.  Calls for
14     speculation.
15                   BY MS. LIVENGOOD:
16          Q    Just  do  you  recall  that  being
17     discussed at all?
18          A    It  was  the  original  plan  when  we
19     were downtown was for the group to leave on
20     their own.
21          Q    Okay.  And what was done to affect
22     that?
```

202

1          A    The LRAD giving warnings multiple

2    times, you know, consistently, regularly.  No

3    longer 1st Amendment assembly, it's a riotous

4    act, and then also once 19:00 hit, violation of

5    the curfew order.  So multiple attempts to

6    disperse the crowd prior to any arrests being

7    made.

8          Q    Okay.  Did you hear -- by the time

9    you arrived at Swann, was anyone on Swann

10   Street free to leave?

11         A    When I arrived on Swann, no one was

12   free to leave at that point.

13         Q    Okay.  And you mentioned -- we

14   talked a lot earlier about the distinction

15   between a 1st Amendment assembly and a riot,

16   right?

17         A    Yes, ma'am.

18         Q    Was there a decision made at some

19   point that this group was no longer a 1st

20   Amendment assembly and was, instead, a riotous

21   group?

22              MR. SOBIECKI:  Object to form.

1    THE WITNESS: So, yes, I don't know

2    when that occurred, but that call was made

3    earlier than the -- obviously, the Swann Street

4    incident.

5    BY MS. LIVENGOOD:

6    Q    Okay. Before the police lines were

7    established on Swann Street?

8    A    That's correct.

9    Q    And do you know who made that call?

10   A    I believe it was Inspector Glover.

11   Q    Okay. Did Inspector Glover discuss

12   that with you at all?

13   A    No, ma'am.

14   Q    Okay. And I think I understand this

15   from your last answer that people were not free

16   to leave on Swann, but there was no warning to

17   disperse given on Swann after you arrived. Is

18   that right?

19   A    That's correct.

20   Q    Okay. So I know you explained why

21   it was decided to move the line from 15th east

22   towards 14th on Swann. Were you the person who

1    Q    Okay.  Anyone below lieutenant?  Was

2    anyone below lieutenant empowered to make that

3    decision?

4    A    Not  if  there  was  the  other

5    lieutenants and captains on the scene.

6    Q    Okay.  At the time you decided to

7    move  the  line  from  15th  Street  east,  had

8    officers said anything to the people who you

9    observed kicking on doors?

10           MR. SOBIECKI:  Object to form.  If

11   you know.

12           THE WITNESS:  I don't know.  I mean

13   they were pretty far away.  So I doubt they

14   would have been giving them orders.

15           BY MS. LIVENGOOD:

16   Q    Okay.  Did you see any response by

17   the police to people kicking on doors other

18   than  the  decision  to  move  the  police  line

19   forward?

20   A    Relaying  that  information,  telling

21   the CDU sergeants and officials that they were

22   kicking in doors and causing damage.

1      Q    Got it.  So the police officers who

2    were on the line said what they were observing?

3      A    Yes.

4      Q    Okay.    But  am  I  understanding

5    correctly,  you  didn't  see  any  interaction

6    between the police officers and the people who

7    were kicking on doors before the line moved

8    forward.  Is that right?

9      A    That's correct.

10      Q    Okay.    Okay.    So  at  some  point

11    either you alone or in consultation with other

12    supervisors made the decision to move the line

13    from 15th toward 14th, right?

14      A    Yes, ma'am.

15      Q    And  when  the  line  started  moving,

16    did  you  see  any  change  in  the  behavior  of

17    people in the crowd?

18      A    Yes.

19      Q    And how did the behavior change?

20      A    They became more violent towards the

21    police on the line.

22      Q    How would you describe the behavior

1    before and after?

2          A    Prior to, was screaming and yelling,

3    and  occasional  bottles,  rocks,  bricks  were

4    coming towards the police line.  And then once

5    you start moving, there was people that were

6    throwing more objects at the police line and

7    also running and actually trying to, you know,

8    ram the shields with their bodies.

9          Q    So the situation became more intense

10   after the police line started moving forward?

11         A    That's correct.

12         Q    And you mentioned that you had --

13   that in the summer of 2020, you participated in

14   other  encirclement  --  other  situations  where

15   encirclement was used to effect an arrest.  Is

16   that right?

17         A    Yes, ma'am.

18         Q    In any other situation, did you see

19   the behavior of the crowd change before and

20   after the encirclement?

21         A    Well,  this  crowd  wasn't  encircled

22   until after the push.  Do you mean once the

209

1    police started moving?

2        Q    What do you mean this crowd wasn't

3    encircled till after the push?

4        A    Do    you    mean    like    a    physical

5    encirclement of -- because the way it's taught

6    in   the   orders   that   we   went   through,   the

7    encirclement   is   a   literal   encirclement   of

8    individuals.   Physical   circle   around   them.   So

9    they weren't encircled until both lines were

10   kind of like on them and they couldn't move.

11       Q    Okay.

12       A    Or they couldn't leave.   Even --

13       Q    Okay.

14       A    The   block   was   shortened   so   they

15   couldn't move more.

16       Q    Okay.   So even though before that,

17   there was no means of exit, right?   All the

18   allies were blocked.

19       A    Yeah.

20       Q    The roads were blocked.

21       A    That's correct.

22       Q    But they weren't encircled until the

213

1    maybe waiting for the arrest processing team.

2              MS. LIVENGOOD:  Okay.  Oh, pause.

3    Can you pause for a second?

4              BY MS. LIVENGOOD:

5         Q    And who is that?  Do you know?  I'm

6    sorry.  This is at minute 22:37.  The person in

7    the white shirt with the face mask.  Do you

8    know who that is?

9         A    I do not.

10        Q    Okay.  It's not a test.

11        A    Yeah.

12        Q    So sorry.

13        A    Yeah.

14             (Video recording played.)

15        Q    We won't tell the person.

16        A    Oh, looks like right there I told --

17   I believe to say, hold where they're at, and it

18   sounded like they was filling in the sides, and

19   it looked like the left side was a little short

20   on officers.

21        Q    Okay.

22        A    And it sounds like I was directing

214

1      more people to fill in that left side.

2           Q    Okay.

3                (Video recording played.)

4                MS. LIVENGOOD:  And can you pause it

5      for a second?

6                BY MS. LIVENGOOD:

7           Q    Lieutenant Horos, have you seen this

8      footage before?

9           A    Yes, ma'am.

10          Q    How recently have you seen it?

11          A    It has not been recent.

12          Q    Okay.

13          A    I don't recall.  Maybe shortly after

14     that.  Probably a few years.

15          Q    Okay.

16               (Video recording played.)

17               MS. LIVENGOOD:  Okay.  Can you pause

18     for a second?

19               BY MS. LIVENGOOD:

20          Q    So,  Lieutenant  Horos,  at  about

21     23:30, it sounded like you said push in.  Is

22     that right?

1          A     Yeah.    It   sounded   like   I   advised
2     Inspector   Glover   that   they   were   kicking   in
3     doors.
4          Q     Okay.
5          A     And then we pushed in.
6          Q     And what was that based on?
7          A     What I could see.
8          Q     You   could   see   people   pushing   in
9     doors?
10         A     Kicking in doors.
11         Q     Okay.  Kicking in doors.  Okay.
12               (Video recording played.)
13               MS.  LIVENGOOD:   Okay.   And   then,
14    Nick, can you pause for a sec?
15               BY MS. LIVENGOOD:
16         Q     And, Lieutenant Horos, can you see
17    what's happening with your hand --
18         A     Yep.
19         Q     -- here at what -- Nick, what minute
20    is it?  At 24:19?
21         A     Yeah.  So it looks like I removed my
22    MK9 from the holster.

216

1        Q    And so we had talked about how in --

2    when you were on 14th and Swann, the MK9 was

3    not holstered.  Didn't you holster it at some

4    point  between  14th  and  Swann  and  15th  and

5    Swann?

6        A    No.   I  didn't  say  it  wasn't

7    holstered.  I said it looks like it was in the

8    holster in my hand.

9        Q    Oh, I'm  sorry.   So  you  had  been

10    carrying the holster and the MK9 in your hand

11    the whole time.

12        A    Yes, ma'am.

13        Q    And  then  you  took  it  out  of  the

14    holster?

15        A    Yes, ma'am.

16        Q    Okay.  When it's in the holster, is

17    it possible to use it?

18        A    Yes.  Theoretically you could use it

19    --

20        Q    Okay.

21        A    -- while in a holster.

22        Q    Is there a reason that you took it

217

```
 1    out of the holster?

 2         A    Training.

 3         Q    Okay.  And was there a pin in the

 4    MK9?

 5         A    At one point I'm sure.  Yes.

 6         Q    But not at this point?

 7         A    I don't know.  I didn't see.  I

 8    didn't see if I -- when I removed it or --

 9         Q    Okay.

10         A    So --

11         Q    And you don't have any recollection

12    of when you removed it?

13         A    No.

14         Q    Okay.  All right.  And then do you

15    see the person on the upper left at 24:19 with

16    the mask and the white shirt?

17         A    Yes.

18         Q    And do you have any recollection of

19    any engagement with that person?

20         A    I do.

21         Q    And what do you recall?

22         A    I remember deploying my OC at him or
```

218

1        her.

2            Q    And why did you -- at this point,

3        from what we can see, had you made the decision

4        to deploy the OC spray?

5            A    No.    I  had  not,  not  on  that

6        individual.    I  had  taken  it  out  because  I

7        believe on the right side of that police line,

8        they were fighting and it looked like there was

9        people  trying  to  rip  down  the  shields  and

10       running into the shields.

11           Q    Okay.  So when you first took it

12       out, it was not because of the person in the

13       upper left there?

14           A    Correct.

15           Q    Okay.  And -- okay.  Let's keep --

16               (Video recording played.)

17               MS. LIVENGOOD:  Okay.  Can you pause

18       for a second?

19               BY MS. LIVENGOOD:

20           Q    So at that, at 24:30, what did that

21       just depict?

22           A    Deployed  one  --  probably  half  --

219

1    less than half of -- less than a second burst

2    towards the individual on the vehicle.

3          Q   Okay.  And why did you use OC spray

4    on the individual who was on the car?

5          A   He  wasn't  following  commands.  He

6    wasn't moving back.  He was in an elevates

7    position.  I didn't know what was at his hand

8    -- in his hand at the time.  And we were taking

9    all sorts of projectiles at the police line,

10    and there's also individuals who were refusing

11    to  move  and  were  actively  assaulting  the

12    officers in the front of the line.  And if we

13    were to push past him, and let him remain on

14    the vehicle, he could have, obviously, injured

15    the officers because he would have been behind

16    the police line.

17          Q   Okay.  And so what was -- so were

18    all of those reasons to use the OC spray?

19          A   Yes.

20          Q   Okay.

21          A   All together given the circumstance,

22    yes.

220

1          Q    Okay.  And let's keep watching.

2                (Video recording played.)

3                MS. LIVENGOOD:  Okay.  And then it

4     looks like -- can you pause for a second?

5                BY MS. LIVENGOOD:

6          Q    It  looks  like  the  camera  is  no

7     longer capturing what's going on.  Do you know

8     what know what happened there?

9          A    I can only assume it was knocked off

10    trying to move to the front of the police line

11    or it was brushed off.

12         Q    Okay.

13         A    It was knocked off.

14         Q    Do you recall specifically whether

15    it was knocked off?

16         A    Do I remember the specific incident

17    that it was --

18         Q    Yeah.

19         A    -- the incidence it was knocked off?

20    I do not.

21         Q    Okay.  Has  it  happened  more  than

22    once that your body worn camera has fallen off?

221

1          A    It has happened.  Yes, ma'am.

2          Q    How many times has that happened?

3          A    I would say -- I can't give you an

4    exact number, but many times.  You know, at

5    least  four  five  times  during  this  and  the

6    Capitol, it fell off --

7          Q    Okay.

8          A    -- multiple times.

9          Q    Okay.  Okay.  And so there is no

10   more body worn camera footage while the police

11   line  is  moving  from  you.    Is  that  your

12   understanding?

13         A    Yes.

14              MR. SOBIECKI:  Object to form.

15              BY MS. LIVENGOOD:

16         Q    Okay.  And you mentioned that you

17   used OC spray another -- a time other than the

18   one that we just saw.  Is that right?

19         A    Yes, ma'am.

20         Q    Do you recall when that was?

21         A    I do.

22         Q    Okay.  When was that?

222

1        A    Individuals were running into the

2    shields, and were throwing projectiles, I don't

3    know what it was, whether it was rock or filled

4    water bottles.  But I did on one individual in

5    front of that police line shortly after that.

6        Q    Okay.  And do you recall filling out

7    a use of force report about that night?

8        A    I would not have been the one to

9    complete that use of force form.  It would have

10   been IAD who would have handled that.

11            MS. LIVENGOOD:  Okay.  Okay.  Why

12   don't we take a look at this and you can help

13   me understand this?

14            So this is going to be -- what are

15   we on?  31.  30?

16            MS. PESCOVITZ:  31.

17            MS. LIVENGOOD:  31?

18            (Simultaneous speaking.)

19            MS. PESCOVITZ:  31.

20            MS. LIVENGOOD:  Okay.  So this will

21   be Plaintiff's 31.

22            (Whereupon, the above-referred to

1    document was marked as Plaintiff's Exhibit No.

2    31 for identification.)

3                    BY MS. LIVENGOOD:

4        Q    And it's Tab 9 in your binder.   And

5    it begins with the Bates Stamp ending 6061.

6    Lieutenant Horos, do you see that?

7        A    Yes.

8        Q    Okay.  Do you want to take a minute

9    to look it over?

10       A    Yep.

11       Q    Okay.   And so it looks like you

12   signed the report, right, under reporting

13   official printed name --

14       A    I did.

15       Q    -- Horos, A.  Okay.

16       A    This is a preliminary.  Looks like a

17   -- this is a 901M which is a preliminary use of

18   force for a mass assembly or a mass

19   demonstration.  And this is basically a short

20   narrative with a list of the individuals who

21   used force on that day.

22       Q    Got it.  And would a use of force

1      Q    And  the  document,  it  begins  with

2    Bates Number ending in 346.

3      A    Yes.  It was this, the one that I

4    looked over.

5      Q    Okay.  And do you see on that first

6    page where -- so the first paragraph says Agent

7    Gary Ciapa of the Internal Affairs Division.

8    Do you see that?

9      A    Yes.

10     Q    Okay.   And  then  three  paragraphs

11   down where it says it is also recommended that

12   the use of force by Lieutenant Andrew Horos OC

13   spray against Mr. John Doe Number 1 on June

14   1st,  2020  be  classified  as  justified  within

15   departmental policy.  Do you see that?

16     A    Yes.

17     Q    Okay.  And do you see that the next

18   line  is  also  about  a  use  of  force  by  you

19   involving OC spray against John Doe Number 2,

20   justified within departmental policy?

21     A    Yes.

22     Q    Okay.  And then below that use of

1    force  by  you  against  Mr.  Gregory  Altman

2    justified within departmental policy.  Do you

3    see that?

4          A    Yes.

5          Q    Okay.  And so looking at this, what

6    is your understanding as to how many times you

7    used OC spray on the night of June 1st, 2020?

8          A    Looking at this, it says three.

9          Q    Okay.    Do   you   recall   the

10   circumstances in which you used force again  -

11   so we've talked about two.  Do you recall the

12   third circumstance of OC spray?

13         A    I don't remember.

14         Q    One sec.  Okay.  Can you turn to --

15   it's Page 9 of the report?  It ends in Bates

16   Number 357.

17         A    Yep.

18         Q    Okay.   Can  you  read  to  yourself

19   from,  Lieutenant   Horos   retrieved   his   OC

20   dispenser, at the top of that page?  And then

21   read  those  top  three  paragraphs  ending  with

22   1461 Swann Street Northwest at the bottom of

248

1    the third paragraph?  Do you see that section?

2          A    Yes, ma'am.

3          Q    Okay.  If you can just read that and

4    look up when you're done.

5          A    All right.  Yes.

6          Q    Okay.  And so based on this, is it

7    your understanding that the person on top of

8    the car is the first unidentified male.  That's

9    the first person, right?

10         A    Yes, ma'am.

11         Q    Okay.  And then the person you

12   described as charging towards the police line,

13   does that sound like it's Mr. Altman?

14         A    Yes, ma'am.

15         Q    Okay.  And then the third person

16   that we didn't talk about before is the person

17   who is, holding an undetermined object in his

18   right hand, cocked his arm back and threw an

19   unknown object at MPD members.

20              Is that that one?

21         A    Correct.

22         Q    Okay.  Looking at this now, and it

249

1    says he retreated back into the crowd, do you

2    remember where this individual was?

3         A    I don't -- I mean other than that

4    first recording that you showed me, the other

5    two individuals -- I was focused in the center

6    of the street.  So they were in the street.

7    Wasn't on either sidewalk.  The individuals, to

8    the best of my recollection, were in the middle

9    of the street.

10        Q    And what about the third individual?

11        A    In the street area.

12        Q    Okay.

13        A    Yeah.

14        Q    So you said in the first IAD

15   interview that you did not spray OC spray into

16   a house.  Is that accurate?

17        A    That's correct.

18        Q    Okay.  And you said you didn't spray

19   OC spray onto the steps.  Is that accurate?

20        A    Correct.

21        Q    Did you spray OC spray from the

22   sidewalk in the direction of the houses?

250

1               MR. SOBIECKI:  Object to form.

2               THE WITNESS:  I don't remember where

3       I was when I deployed it.  But I do know I

4       didn't spray into a house.

5               BY MS. LIVENGOOD:

6          Q    Okay.  And you said that all three

7       individuals that you were spraying OC spray at

8       were in the street?

9          A    Well, the one was on the vehicle,

10      which was parked on the street.  And I can kind

11      of remember the one with the bottle being in

12      the middle of the street.  The third individual

13      I'm not entirely sure.

14         Q    Okay.  Okay.  So I am going to show

15      you what will be Plaintiff's 37.

16              (Whereupon,  the  above-referred  to

17      document was marked as Plaintiff's Exhibit No.

18      37 for identification.)

19              MS. LIVENGOOD:  And -- do you know

20      the Bates Number of this one?

21              (Off record comments.)

22              MS.  LIVENGOOD:   So  this  will  be

1    Plaintiff's 37, and it's Bates Number

2    PL_000325.

3              (Video recording played.)

4              MS. LIVENGOOD:  Okay.  Lieutenant

5    Horos, do you see -- can you pause for a sec?

6              BY MS. LIVENGOOD:

7        Q    Do you see yourself in this video?

8        A    I do.

9        Q    Where are you?

10       A    I am -- right now, I'm in that

11   crosswalk, I guess that's 15th Street, the

12   white shirt.

13             MS. LIVENGOOD:  And that is at what

14   time in the video, Nick?

15             MR. ABBOTT:  8 seconds.

16             BY MS. LIVENGOOD:

17       Q    At 8 seconds in.  Okay.  And you're

18   wearing the white shirt surrounded by people

19   wearing dark uniforms.  Is that right?

20       A    And helmets.  Yes.

21       Q    And helmets.  Okay.

22             (Video recording played.)

1        Q    And  that's  the  first  instance  of

2    pepper -- of OC spray, right?

3        A    Yeah.  So it looked like --

4             MS. LIVENGOOD:  Nick, can you pause

5    for minute?

6             (Video recording paused.)

7             THE WITNESS:  -- the individual was

8    trying  --  from  this  angle,  it  appears  that

9    right before I deployed the OC spray, he was

10   trying to rip the shield down from the officer

11   on the front of the line.

12             BY MS. LIVENGOOD:

13       Q    That's the person -- I'm sorry --

14       A    That was on the vehicle.

15       Q    -- in the car, or the person on the

16   -- the second person who was sprayed?

17       A    The first one on the vehicle.

18       Q    Was trying to rip the shield down.

19             MS.  LIVENGOOD:   Can  we  go  back,

20   Nick?

21             BY MS. LIVENGOOD:

22       Q    And we watched this from the angle

1    of your body worn camera footage, right?

2        A    Yes.

3        Q    And you did not mention the shield

4    at that point.  Is that right?

5        A    Correct.  I said I couldn't see what

6    was in his hands.

7        Q    Okay.

8        A    That is correct.

9        Q    And so at the time -- this was not

10   your perspective at the time, right?

11       A    That's correct.

12       Q    And so when you just said that you

13   saw him attempting to pull a shield, did you

14   see that at the time before you deployed the OC

15   spray?

16       A    I don't remember what exactly I saw

17   from that time -- at that time.  I do remember,

18   like I said, there was something in his hand.

19   I can't tell you if I observed him trying to

20   rip the shield from the officer.

21       Q    Okay.

22            (Video recording played.)