# EXHIBIT 100

## Expert Supplemental Report of Scott M. Mourtgos, Ph.D.

Date of supplemental report: June 10, 2024

The plaintiffs engaged me to examine an interaction that took place on June 1, 2020, between Pamela Goodwin et al. and members of the District of Columbia Metropolitan Police Department (MPD). I previously submitted an expert witness report, which detailed my professional qualifications and expert witness compensation. In that report, I noted that it reflected the information available up to that date and that I retained the right to revise, amend, or supplement the report should any additional information emerge. In this supplemental report, I respond to the expert report of Spencer Fomby, dated May 14, 2024.

Contents

1. *Materials* ..................................................................................................................... 3

2. *Summary of Initial Expert Report Opinions* ......................................................... 4

3. *Response to Additional Materials* ........................................................................... 5

   MPD's actions when encircling protesters on Swann Street .................................. 5

   OC Spray .......................................................................................................................... 7

   Detention of Arrestees ................................................................................................. 8

4. *Supplemental Report Opinion Consolidation* ..................................................... 10

5. *Submission* .................................................................................................................. 11

6. *External References* ................................................................................................... 12

7. *Appendix: Materials Provided* ............................................................................... 13

**This space left intentionally blank.**

## 1. Materials

In addition to my previously submitted report and the materials listed within it and its appendices, I have reviewed additional materials provided to me by the retaining attorneys' office. These additional materials are listed in the appendix to this supplemental report.

Mr. Fomby opined that I did not consult all materials relevant to the decision-making process at issue in this lawsuit. Since receiving Mr. Fomby's report, I have reviewed all materials cited in Section IV of his report, in which he identifies documents he believes I should have reviewed. After reviewing those documents, my opinion remains unchanged with respect to encircling (kettling) the crowd of protestors; Lt. Horos' and Officer Crisman's actions of deploying OC spray; and MPD's lack of decontamination for OC spray exposure and reported refusal to adjust overly tight zip tie restraints. My opinion is narrowly changed with respect to MPD's provision of water, bathrooms, and food, an issue I do not understand to be in dispute.

**This space left intentionally blank.**

## 2. Summary of Initial Expert Report Opinions

In my prior report, I provided the following opinions:

1. MPD's actions when encircling (kettling) the crowd of protesters was not in accordance with generally accepted police practices and principles.
   a. MPD did not engage in a differentiated approach, instead indiscriminately detaining all individuals within the containment area.
   b. MPD conducted their encirclement on a known residential street, rather than directing (or allowing) the crowd to march to a safer location for the kettling maneuver, *creating* a public safety concern and a foreseeable likelihood of violence and property damage.
   c. MPD did not give the crowd audible warnings to disperse, nor did they give audible notifications that the crowd was under arrest and that force would be used if they did not submit to arrest.
2. Lt. Horos' and Officer Crisman's actions of deploying OC spray were not in accordance with generally accepted police practices and principles.
   a. Neither Lt. Horos nor Officer Crisman provided verbal warnings, nor time to comply with directions, before deploying OC spray.
   b. Lt. Horos' second deployment of OC spray, as captured on cell phone video, was against an individual walking away from the police line, not posing an imminent threat to officers or the public.
   c. Officer Crisman's deployment of OC spray was against individuals not posing an imminent threat to officers or the public.
3. MPD's prolonged detention of arrestees, marked by a lack of decontamination for OC spray exposure, refusal to adjust overly tight zip tie restraints, and denial of access to water, bathrooms, or food, deviates from generally accepted police practices and principles.

**This space left intentionally blank.**

4

### 3. Response to Additional Materials

Mr. Fomby opined that I did not consult all materials relevant to the decision-making process at issue in this lawsuit. Since receiving Mr. Fomby's report, I have reviewed all materials cited in Section IV of his report, in which he identifies documents he believes I should have reviewed. After reviewing those documents, my opinion remains unchanged with respect to encircling (kettling) the crowd of protestors; Lt. Horos' and Officer Crisman's actions of deploying OC spray; and MPD's lack of decontamination for OC spray exposure and reported refusal to adjust overly tight zip tie restraints. My opinion is narrowly changed with respect to MPD's provision of water, bathrooms, and food, an issue I do not understand to be in dispute.

### MPD's actions when encircling protesters on Swann Street

First, Mr. Fomby opines that "When conducting a police operation like a mass arrest, a police commander is rarely presented with ideal conditions. Instead, a police commander must balance a number of competing factors. Here, given that the crowd came to be on Swann Street by its own accord and that waiting to conduct the arrest at a different location could have allowed the crowd to enter nearby commercial and business areas, which would have significantly increased the likelihood of property destruction, Commander Glover's decision was consistent with that of a reasonable police commander."[1]

While I concur that a police commander is often not presented with ideal conditions, and competing factors must be balanced, Mr. Fomby's report (and Inspector Glover) fails to do just that. As I noted in my initial report, the statement that the crowd dictated the mass arrest location is unconvincing. For hours before the encirclement on Swann Street occurred, MPD was attempting to direct different crowds to locations advantageous to them for encirclement.[2] A common function of Civil Disturbance Units is to strategically block specific streets in order to guide crowds to march toward, or further away from, specific locations (FEMA, n.d.).

Moreover, MPD was not required to conduct their encirclement maneuver on Swann Street simply because the crowd marched onto Swann Street "of its own accord."[3] As Mr. Fomby points out, a number of competing factors must be weighed. Primary among these factors is the risk of physical violence around or inside individuals' homes, including families and children, or damage to property. The risk of physical violence around or inside residential homes outweighs the risk of property loss from stores. This concern is heightened in a residential area, as residents may feel threatened to the point where they use potentially lethal force to protect themselves from what they perceive as a threat to their homes and the residents within. MPD's own IAD investigation and findings support my conclusions on this matter, as it identified the "tactical improvement opportunity" for MPD members to have detained the crowd away from a

---

[1] 2024.05.14_Goodwin_Rebuttal Expert Report of Spencer Fomby.pdf
[2] Radio Run.mp3
[3] 2024.05.14_Goodwin_Rebuttal Expert Report of Spencer Fomby.pdf

residential street, as it created "an imminent likelihood of violence and a potential to cause significant property damage during [arrests]."[4]

Mr. Fomby states that it was necessary for me to consider alternative locations for the encirclement to assess whether Inspector Glover's decision regarding the location was consistent with generally accepted police principles and practice. Mr. Fomby is wrong. An evaluation of this particular decision is clear whether I, or someone else, can point to a specific alternative location: conducting an encirclement on a residential street under the given conditions was not in accordance with generally accepted police principles and practices, as it did not properly balance the risk of violence toward the families on Swann Street versus the possibility of property damage at a non-residential location (assuming property damage was inevitable—an assumption that I do not think was a foregone conclusion).

Mr. Fomby states that the lack of significant violence or property damage on Swann Street supports the reasonableness of Inspector Glover's decision to conduct the encirclement on Swann Street. This is faulty logic. Reasonable people may disagree about what level of violence constitutes 'significant' violence. But more importantly, this is a form of backward-looking accountability. That is, when assessing the reasonableness of a decision, or whether a decision comports with generally accepted police practices, the ends do not necessarily justify the means. In other words, a favorable result does not automatically legitimize the actions taken to achieve it.

For instance, imagine a situation where a police officer decides to conduct a high-speed chase through a densely populated urban area to apprehend a suspect for an expired registration violation. If, by sheer luck, no one is injured and no property is damaged, one might argue that the decision was reasonable. However, this ignores the inherent risks and potential for serious harm that the chase posed. The reasonableness of the decision should be based on the standards of police conduct and the risks involved at the time the decision was made, not on the fortunate absence of negative outcomes.

Thus, despite Mr. Fomby's assertion, my opinion on this matter has not changed. The decision to conduct the mass arrest on a residential street, rather than waiting to encircle the crowd in a more strategic and safe location (i.e., away from residential homes), is not consistent with generally accepted police principles and practices.

Second, regarding MPD's failure to provide the crowd on Swann Street dispersal warnings, Mr. Fomby states, "Dr. Mourtgos did not take into account whether, and the extent to which, MPD had provided warnings and opportunities to disperse prior to Swann Street." Mr. Fomby is again wrong. As just a few examples, in my initial report I point to:

- Multiple warnings given to a crowd in the area of 17th and D Street at 7:00 p.m.
- A supervisor stating over the radio that a final warning was issued to a group at 16th and I Street at 7:49 p.m.

---

[4] IAD Report.pdf

- At approximately 7:55 p.m., an unidentified officer on the scene of another group asking over the air if they should give warnings, as the group is relatively peaceful. Lt. Horos replies to that officer, "A-firm, if we can get them to disperse and go home, let's try that."

Moreover, Mr. Fomby states that my opinion that warnings to disperse or be arrested after encircling the protesters on Swann Street is flawed because, "Warnings to disperse or be arrested are not necessary or appropriate to give to subjects who are already under arrest." Mr. Fomby either misreads my report or does not understand the point I make in my report regarding this matter. First, Mr. Fomby agrees that generally accepted policing practices encourage police efforts to obtain voluntary compliance with a curfew and that generally accepted police practice requires that best efforts be made to inform the public that a curfew has been instituted. On this, we agree. Yet, Mr. Fomby states that a police commander could not know with certainty whether every person in a crowd had heard curfew warnings previously given. What is the remedy to this that is in alignment with generally accepted police practices? *Provide a dispersal order specifically to the group of individuals that police have encircled.* This is a police commander's best effort to ensure a group of protesters (that they have now seized) are all aware of the curfew order. Yet, this step was not taken by MPD on Swann Street, and I did not observe behavior on the crowd's part at the time of encirclement that would have reasonably prevented this from occurring.

Finally, as I outlined in my initial report, even if one were to accept the premise that a dispersal order should not have been given on Swann Street because MPD had already made the decision to arrest the protesters for curfew violations, they were never informed that they were under arrest nor warned of the potential consequences of resistance (i.e., use of force). There was ample time to make these announcements prior to MPD using force (approximately 15 minutes). Informing people who are being arrested that they are under arrest is a basic concept officers learn while in training, and the absence of this notification is not in line with generally accepted police principles and practices. Instead, demonstrators were suddenly faced with a police line forcibly moving them, without any prior warning, naturally leading to heightened emotions due to anger or fear. Mr. Fomby, while disagreeing with my opinion regarding the use of a dispersal order on Swann Street (see above), does not mention that MPD did not inform those in the crowd that they were under arrest and what type of force would be used if arrest was resisted. Mr. Fomby also does not engage with scientific literature that indicates de-escalation produces better outcomes and minimizes injuries (Engel et al., 2022; Todak & March, 2020).

Accordingly, even after reviewing the additional materials provided to me, my previous opinion regarding the lack of a dispersal order on Swann Street, the failure to notify the crowd that they were under arrest, and the failure to inform them that force would be used if they did not submit to arrest, remains unchanged.

## OC Spray

Mr. Fomby finds Lt. Horos' and Officer Crisman's use of OC Spray reasonable. Mr. Fomby's main point of contention with my opinion on these matters appears to be that I did not review the officers' statements as to why they used force. He states that my analysis is "inconsistent with how a reasonable police commander would evaluate the reasonableness of…the decision to use force." He goes on to say, "[E]ven though Lieutenant Horos and Officer Crisman testified extensively about their decision to use force on Swann Street, Dr. Mourtgos did not review or

consider their testimony." Again, Mr. Fomby is wrong. As noted and cited numerous times in my initial report, I reviewed and relied upon Lieutenant Horos' and Officer Crisman's statements regarding their use of OC Spray, which were obtained during the IAD investigation and provided in the IAD report. Moreover, Mr. Fomby's opinion on Lt. Horos' and Officer Crisman's use of OC Spray does not engage with the empirically supported use-of-force analytical framework of assessing a subject's ability, opportunity, and intention to cause harm to determine risk versus imminent threat (Krajewski et al., 2023; Stoughton et al., 2021).

Perhaps Mr. Fomby did not adequately review my initial report; however, this is fairly clear from statements I wrote, such as, "Lt. Horos stated that he deployed OC spray because the individual was in an elevated position and almost behind the police line. Lt. Horos states that he felt the individual was a danger to officers and to public safety" and "Officer Crisman reports that he did not know the owner of that residence was voluntarily letting protesters into his house and he believed the house was being burglarized," to name just two.

Regardless, since receiving Mr. Fomby's report, I have reviewed Lieutenant Horos' and Officer Crisman's deposition testimony, which was not previously available to me. Upon review, their additional statements did not provide information that changes my opinions on their use of OC Spray, as neither Lt. Horos nor Officer Crisman provided verbal warnings or time to comply with directions before deploying OC spray. Lt. Horos' second deployment of OC spray, as captured on cell phone video, was against an individual walking away from the police line, not posing an imminent threat to officers or the public. Additionally, Officer Crisman's deployment of OC spray was against individuals not posing an imminent threat to officers or the public.

## Detention of Arrestees

In my original report, I opined that MPD's refusal to adjust overly tight zip tie restraints deviates from generally accepted police practices and principles. After reviewing additional materials and reviewing Mr. Fomby's report, my opinion remains unchanged. I have not reviewed any new information that refutes Plaintiff Pearlmutter's report that their requests for flex-cuff adjustment were denied. MPD policy mandates prompt attention to complaints that flex-cuffs are too tight. Should the zip ties be found too tight, the officer is required to remove them and replace them with a new pair, applied properly. If Pearlmutter requested adjustment, and attention was not given, this would be against MPD policy as well as generally accepted police principles and practices, as outlined in my initial report. While Mr. Fomby correctly indicates that MPD does have policies and procedures to address arrestees' complaints of flex-cuffs being too tight, this does not necessarily mean that those policies and procedures were adhered to. If Pearlmutter's statement regarding the flex-cuffs is in dispute, the trier of fact (i.e., jury) will decide what the evidence points to. However, if the tightness of the flex-cuffs was not promptly checked, then this would not be in accordance with generally accepted police principles and practices. If complaints of flex-cuff tightness were promptly evaluated and appropriately addressed, then this would be in accordance with generally accepted police principles and practices.

In my original report, I also opined that MPD's lack of decontamination for OC spray exposure deviates from generally accepted police practices and principles. After reviewing additional materials and Mr. Fomby's report, my opinion remains unchanged. Regarding decontamination efforts for those who were exposed to OC Spray, Mr. Fomby writes, "Dr. Mourtgos does not cite

any materials showing that any Plaintiff made such a request [to have their eyes flushed with water], nor does Dr. Mourtgos cite any materials suggesting that the MPD officers handling processing were aware that Plaintiffs had been exposed to pepper spray."[5] First, MPD policy does not require a request to be made for officers to ensure that treatment is provided to those exposed to OC Spray; it requires that it be provided. The policy states (emphasis added), "Subjects in police custody who have been affected by OC Spray *shall*: Be given an opportunity for washing and flushing the affected areas with cold water within 20 minutes of being sprayed, or as soon as practicable."[6] Moreover, it is generally accepted police practice to provide medical attention to those on whom officers use force.

For instance, consider a scenario where officers deploy rubber bullets during a crowd control situation, injuring several individuals. Even if none of the injured explicitly request medical help due to shock or incapacitation, it remains the officers' duty and responsibility to ensure that medical assistance is provided promptly. Generally accepted police principles, practices, and ethical standards mandate that officers take proactive steps to address injuries caused by their actions, ensuring care is given without waiting for a formal request from those affected.

Further, numerous officers, including on-scene management (e.g., Lt. Horos), knew that OC Spray was deployed against protesters. Even if, for some reason, medical attention could not be provided on scene, it was MPD's responsibility to ensure the processing center fulfilled that responsibility. Thus, after reviewing the additional material provided, my opinions regarding the lack of medical attention being provided as a result of OC Spray exposure have not changed.

Mr. Fomby did have access to information that was not available to me at the time I drafted my initial report regarding the processing of arrestees (i.e., provision of food, water, restrooms, etc.). This additional information includes statements from Commander Haines of MPD, intake logs, arrestee food and restroom logs, and additional plaintiff depositions. Based on this additional information, it appears to no longer be in dispute that arrestees were provided food, water, and access to restrooms during their processing. This new information leads me to revise my opinion on this point and conclude that MPD's provision of water, bathrooms, and food to arrestees was in accordance with generally accepted police practices and principles.

---

[5] 2024.05.14_Goodwin_Rebuttal Expert Report of Spencer Fomby.pdf
[6] DC_2021-cv-00806-00003683.pdf

### 4. Supplemental Report Opinion Consolidation

The opinions below are those after reviewing the additional materials provided to me. My opinions remain largely unchanged. I continue to retain the right to revise, amend, or supplement these opinions if additional information emerges that necessitates the expansion, inclusion, or modification of them.

My opinions are as follows:

1. MPD's actions when encircling (kettling) the crowd of protesters was not in accordance with generally accepted police practices and principles.
   a. MPD did not engage in a differentiated approach, instead indiscriminately detaining all individuals within the containment area.
   b. MPD conducted their encirclement on a known residential street, rather than directing (or allowing) the crowd to march to a safer location for the kettling maneuver, *creating* a public safety concern and a foreseeable likelihood of violence and property damage.
   c. MPD did not give the crowd audible warnings to disperse, nor did they give audible notifications that the crowd was under arrest and that force would be used if they did not submit to arrest.
2. Lt. Horos' and Officer Crisman's actions of deploying OC spray were not in accordance with generally accepted police practices and principles.
   a. Neither Lt. Horos nor Officer Crisman provided verbal warnings, nor time to comply with directions, before deploying OC spray.
   b. Lt. Horos' second deployment of OC spray, as captured on cell phone video, was against an individual walking away from the police line, not posing an imminent threat to officers or the public.
   c. Officer Crisman's deployment of OC spray was against individuals not posing an imminent threat to officers or the public.
3. MPD's lack of decontamination for OC spray exposure and reported refusal to adjust overly tight zip tie restraints deviates from generally accepted police practices and principles. MPD's provision of water, bathrooms, and food to arrestees are in accordance with generally accepted police practices and principles.

## 5. Submission

This report constitutes my supplemental report on the June 1st, 2020, interaction between Pamela Goodwin et al. and members of the District of Columbia Metropolitan Police Department (MPD). My report is based on a review of materials received to date. Should any subsequent information cause me to expand, add, or revise my opinions, I reserve the right to revise, supplement, or amend this report accordingly.

Respectfully submitted,

Scott M. Mourtgos

June 10, 2024

11

## 6. External References

Engel, R. S., Corsaro, N., Isaza, G. T., & McManus, H. D. (2022). Assessing the impact of de-escalation training on police behavior: Reducing police use of force in the Louisville, KY Metro Police Department. *Criminology & Public Policy*, *21*(2), 199–233. https://doi.org/10.1111/1745-9133.12574

FEMA. (n.d.). *Field Force Operations* (FFO SG 10.0 CH1; pp. 1–133). FEMA.

Krajewski, A. T., Worrall, J. L., & Scales, R. M. (2023). Threat Dynamics and Police Use of Force. *Journal of Research in Crime and Delinquency*, 00224278231194711. https://doi.org/10.1177/00224278231194711

Stoughton, S. W., Noble, J. J., & Alpert, G. P. (2021). *Evaluating police uses of force.* NYU Press.

Todak, N., & March, M. (2020). De-escalation in policing. In *Critical issues in policing: Contemporary readings* (pp. 398–415).

## 7.  Appendix: Materials Provided

The following table represents the materials that were provided for my review.

| File Name | Bates Number |
|---|---|
| SOD Events 1600-0000 Tr. at 174–75.pdf | DC_2021-cv-00806-00018360 |
| PL_0000983.mp4 | |
| PL_0000501.mp4 | |
| PL_0000259.mov | |
| Pamela Goodwin Deposition Transcript.pdf | |
| Newsham, Chief Peter.pdf | |
| MPD Prop Damage 5.31-6.1.pdf | DC_2021-cv-00806-00006626 |
| MPD Injuries 5.31-6.1.pdf | DC_2021-cv-00806-00006625 |
| Mejia, Lieutenant Carlos.pdf | |
| Male Log DC_2021-cv-00806-00000869.pdf | DC_2021-cv-00806-00000869 |
| Lane, Allison Deposition Transcript 84.pdf | |
| Intakes Book.pdf | DC_2021-cv-00806-00021165 |
| Haines, Commander John.pdf | |
| Female Log DC_2021-cv-00806-00000888.pdf | DC_2021-cv-00806-00000888 |
| DC_2021-cv-00806-00018235.MP4 | |
| DC_2021-cv-00806-00018226.MP4 | |
| Crisman, James.pdf | |
| 2020.6.3 Email DC_2021-cv-00806-00005673.pdf | DC_2021-cv-00806-00005673 |
| 1211 RELMAN Horos Deposition.pdf | |
| 0228 DC OAG Troper.pdf | |
| 0216 DC OAG Surio.pdf | |
| 0208 DC OAG Pearlmutter.pdf | |
| 0205 DC OAG Lazo.pdf | |
| 0116 DC OAG Remick.pdf | |
| 6.1 NOC email re 5.31 in DC.pdf | DC_2021-cv-00806-00007327 |
| 5.31 USPP 2230 SitRep; 6.1.pdf | DC_2021-cv-00806-00014559 |
| 5.31 USPP 1830 SitRep.pdf | DC_2021-cv-00806-00014566 |
| 5.30 MPD 0400 SitRep.pdf | DC_2021-cv-00806-00006289 |
| 5.30 MPD 0200 SitRep.pdf | DC_2021-cv-00806-00006296 |
| 2024.05.14_Goodwin_Rebuttal Expert Report of Spencer Fomby.pdf | |