# EXHIBIT 101

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____
                               :
IN THE MATTER OF:              :
                               :
PAMELA GOODWIN, et al.,        :
                               :
        Plaintiffs             :
                               :
    v.                         : Civil Action No.
                               : 1:21-cv-00806 (BAH)
DISTRICT OF COLUMBIA,          :
et al.,                        :
                               :
        Defendants             :
                               :
_____:

            Monday,
            April 29, 2024

            Via Videoconference


DEPOSITION OF:

            SCOTT MOURTGOS

called for examination by Counsel for the
Defendants, pursuant to Notice of Deposition,
when were present on behalf of the respective
parties:

APPEARANCES:

On Behalf of Plaintiffs:

REBECCA LIVENGOOD, ESQ.
ELLORA ISRANI, ESQ.
NICHOLAS ABBOTT, ESQ.
Relman Colfax, PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
202-728-1888
rlivengood@relmanlaw.com
nabbott@relmanlaw.com

On Behalf of Defendants:

RICHARD SOBIECKI, ESQ.
MARCUS ISRAEL, ESQ.
AMANDA PESCOVITZ, ESQ.
GREG KETCHAM-COLWILL, ESQ.
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
marcus.ireland@dc.gov

CONTENTS

WITNESS                DIRECT CROSS REDIRECT RECROSS

Scott M. Mourtgos        6     289    306

EXHIBIT NO.                                        PAGE

1      Witness's Expert Report of . . . . . . . . . 9
       Scott M. Mourtgos, Ph.D.
2      Retention Agreement, Bates . . . . . . . . .16
       stamped PL0001702
3      Invoice dated 2-1-2024 . . . . . . . . . .17
4      Invoice, Bates stamped PL0001677 . . . . .17
5      Screenshot DC_2021-cv-00806. . . . . . . . 181
       -00018227
6      Body-worn camera footage . . . . . . . . 182
       of Scott Schmoeller
7      IAD Report . . . . . . . . . . . . . . 208
8      Cell phone footage, . . . . . . . . . . 226
       Bates PL_0000325
9      Body-worn camera footage of  . . . . . . 229
       Officer Jeffrey Buchanan,
       Bates stamped 14244
10     Body-worn camera footage of. . . . . . . 229
       Anthony Coleman, stamped 14245

1    we'll go through each page of the opinions, and

2    again, I want you to point out for me, please,

3    where you discuss uses of force --

4          A      Sure.

5          Q      -- against the Plaintiffs.  And

6    specifically --

7                 (Simultaneous speaking.)

8          A      And you just want to --

9          Q      -- I don't -- I apologize.  I don't

10   mean generally, like against the crowd.  I mean

11   Pamela Goodwin.  Let's start with Pamela Goodwin.

12                MS. LIVENGOOD:  Object to form.

13                MR. SOBIECKI:  Where --

14                MS. LIVENGOOD:  What is the question?

15                MR. SOBIECKI:  Where in his report

16   does he discuss a use of force against Pamela

17   Goodwin?

18                MS. LIVENGOOD:  He has answered this

19   question.

20                MR. SOBIECKI:  No.  He's equivocated.

21   He says it's within some other language.  So if

22   it's a no, we can move on.  I just want a yes or

1      no.

2                    THE WITNESS:  Well, to be clear, what

3      I'm saying is that I don't specifically say this

4      force was used explicitly against Pamela Goodwin.

5      I believe what I said, and I -- I'll repeat, is

6      that OC spray was used.  Multiple people were

7      exposed to it because that's what happens when OC

8      spray is used in a crowd environment.  And I

9      believe all of the -- all of the Plaintiffs

10     described being affected by that OC spray.

11                   Now, as far as who specifically used

12     the OC spray that affected those individuals, no,

13     that is not discussed in my report because I

14     can't determine that based off of the materials I

15     reviewed.

16                   BY MR. SOBIECKI:

17         Q     Okay.  So yes.  I think we're on the

18     same page in that OC spray was used.  Individuals

19     were exposed to OC spray.  What I'm asking is,

20     again, not whether she claims it happened.  My

21     question is solely concerned with the opinions

22     you're offering in your report and whether you

1    are offering any opinions with regard to Ms.

2    Goodwin being exposed to OC spray.  And I'm

3    hearing the answer is no.  Is that correct?

4              MS. LIVENGOOD:  Objection.  Misstates

5    testimony.

6              THE WITNESS:  Again, I'm not

7    specifically offering an opinion about specific

8    OC spray used against specifically Pamela Goodwin

9    or any of the other Plaintiffs.  However, they

10   all report being exposed.  So, if one of the OC

11   spray incidences that is talked about in my

12   report was the one that exposed them to it, then

13   yes, tangentially, that would be fair.  But I

14   can't say that specifically based off the

15   materials I reviewed.

16             BY MR. SOBIECKI:

17        Q    Have review -- have you -- excuse me.

18   Have you reviewed a deposition transcript of any

19   Plaintiff?

20        A    No, just the interrogatory responses.

21        Q    And you only reviewed a few

22   interrogatory responses, correct?

1           A     Yeah.   The ones listed in the appendix

2     are the ones that I've reviewed.

3                 MR. SOBIECKI:   Could you go to page 17

4     at the bottom, Marcus?   If you can zoom in.

5                 BY MR. SOBIECKI:

6           Q     So I'm going to direct your attention,

7     page 17 of your report, footnote 25.   You cite

8     the redact to the complaint, Mr. Pearlmutter's

9     ROG responses,  Plaintiff Remick's ROG responses,

10    Ms. Surio's ROG responses.   Those are the only

11    Plaintiffs' ROG reposes that you reviewed, right?

12          A     I -- I don't know if those are all the

13    ones that are listed in that footnote.   If those

14    are the only ones that are listed in the

15    appendix, then yes, those are the only ones I've

16    reviewed.

17          Q     Okay.   So, again, I don't want to --

18    the answer you just gave to Ms. Goodwin, you

19    would give that same answer with regard to --

20    okay.   Strike that.   With respect to whether

21    you're offering any opinions against use of force

22    against Pamela Goodwin, the answer would be the

1    same for  Allison Lane, Priyanka Surio, Jenny

2    Lazo, Jesse Pearlmutter, Osea Remick, and Eliana

3    Troper, correct?

4         A    Correct.

5         Q    Are you offering any opinions on the

6    District's enforcement of the curfew on June 1st,

7    2020?

8              MS. LIVENGOOD:  Object to form.

9              THE WITNESS:  No, not specifically.

10   No.  Obviously, the enforcement of the curfew is

11   part and parcel to what occurred and decisions

12   that were made during that time.  But as far as

13   the legal basis or anything like that, no, I'm

14   not offering an opinion on the curfew.

15             BY MR. SOBIECKI:

16        Q    Okay.  Fair enough.  Apart from what

17   happened on Swann Street, you're not offering any

18   opinions on the District's enforcement of the

19   curfew on June 1st, 2020, right?

20             MS. LIVENGOOD:  Object to form.

21             THE WITNESS:  Correct.

22             BY MR. SOBIECKI:

1        Q      Okay.  Are you at all familiar with

2    the District's First Amendment Assemblies Act?

3        A      Yes.

4        Q      What do -- what do you know about the

5    District's First Amendment Assemblies Act?

6        A      I reviewed it during part of my

7    process here in evaluating this case.  That was

8    the first time I had read it, so I certainly am

9    not an expert on it by any means, as far as the -

10   - the history of it as well as the legal

11   components of it.  But I have reviewed it as part

12   of this case.

13       Q      Is that in one of your appendixes?

14       A      I believe so.

15       Q      Okay.  Let's go to page 33.  All

16   right.  So I'll -- I'll show you page 33.

17              MR. SOBIECKI:  We can scroll to the

18   bottom here, Marcus.  These are all attachments.

19   Let's go to the next page.  So let's go -- let's

20   give him a time -- let's go to the bottom of page

21   34 and get to the bottom.  All right.  Stop.

22              BY MR. SOBIECKI:

1    way.

2    Q    Okay.  I'm sorry.  I'm going to have

3    to drill down here.  Which specifically?  Which

4    specific elements of the First Amendment

5    Assemblies Act are you referring to that are

6    incorporated into MPD policies?

7    A    There's a lot of discussion about

8    dispersal warnings or warnings given.  There's

9    discussion about, I believe, arrests as well as

10   encirclement and dispersing First Amendment

11   assemblies.  All of that is incorporated into

12   their policies.

13   Q    Was the gathering on Swann Street at

14   approximately 9:00 p.m. on June 1st, 2020, a

15   First Amendment assembly?

16             MS. LIVENGOOD:  Objection.

17             You can answer.

18             THE WITNESS:  Yes.  Yes.

19             BY MR. SOBIECKI:

20   Q    Why -- why do you say that?

21   A    It was a gathering of people in a

22   public space conveying a message, on this

109

1    particular case a social issue.  That's a First

2    Amendment assembly.

3         Q    MPD had probable cause to arrest

4    everyone on Swann Street, correct?

5              MS. LIVENGOOD:  Object.

6              You can answer.

7              THE WITNESS:  So they had probable

8    cause to arrest individuals that were violating

9    the -- the curfew.  And -- and why I say that is

10   because there were exemptions within that curfew

11   order.  But by and large, right, if they are

12   violating the curfew order, there is probable

13   cause to arrest for that.

14             BY MR. SOBIECKI:

15        Q    You're not offering any opinions in

16   this case as to whether MPD had probable cause to

17   arrest anyone, right?

18        A    No.

19             MR. SOBIECKI:  Okay.  If you could go

20   to page 6, please, Marcus.

21             BY MR. SOBIECKI:

22        Q    I want to talk a little now about your

1   methodology.  So, here in the Methodology

2   section, you used the term, generally accepted

3   principles.  Right?

4        A    Yes.

5        Q    Can you explain to me what you mean by

6   generally accepted principles?

7        A    Sure.  So, in policing, you know,

8   there are widely known concepts and theories that

9   are relied upon across the field.  You know, for

10  example, you know, preservation of life -- that

11  would be considered a generally accepted

12  principle.  De-escalation -- that would be

13  considered a generally accepted principle.

14  That's what I'm referring to.

15       Q    How about generally accepted

16  practices?

17       A    You know -- you know, as I put in my

18  report, it refers to actual protocols,

19  techniques, and procedures that are widely known

20  and relied upon in the field.  So, you know,

21  across policing, there are generally accepted

22  ways of conducting (audio interference) stops.

1    happened on May 30th and May 31st when policing

2    on June 1st, 2020?

3        A    I think it's reasonable for MPD to

4    take into account what happened the previous two

5    nights for planning for June 1st as well as

6    moving forward.  However, when it comes to

7    specific uses of force, one needs to evaluate it

8    from what was occurring at that time.

9        Q    What is your understanding, if any, as

10   to why Mayor Bowser implemented a curfew on June

11   1st, 2020?

12            MS. LIVENGOOD:  Object to form.

13            THE WITNESS:  Same answer as for the

14   31st.  I -- I wasn't present for those

15   conversations.  Again, I can only assume that

16   it's because of the civil disturbance.

17            BY MR. SOBIECKI:

18        Q    Yeah.  Again, I'm not -- I'm not

19   asking whether you were present or if you -- if

20   you know, like whether you spoke to her.  I'm

21   just wondering if you have any understanding as

22   to why the curfew was implemented on June 1st,

1    2020.

2              THE WITNESS:  Again, my assumption is

3    because of a civil disturbance to try to lighten

4    the impact of what was going on.

5              BY MR. SOBIECKI:

6         Q    And you're not offering any opinion as

7    to the appropriateness of implementing a curfew

8    on June 1st, 2020, are you?

9         A    No, I am not.

10             MR. SOBIECKI:  Court's indulgence.

11             (Pause.)

12             MR. SOBIECKI:  All right, let's go

13   ahead.  Okay, let's go to page 14, Marcus, the

14   bottom of page 14.

15             BY MR. SOBIECKI:

16        Q    So I'm on page 14 of your report.

17   Five lines up from the bottom you write that the

18   Assistant Chief of Homeland Security Bureau

19   directed MPD to begin making announcements for

20   the crowd to disperse at 7:01 p.m.  Do you see

21   that?

22        A    I do.

1      Q    Do you know if any announcements were

2  made about the curfew prior to 7 p.m.?

3      A    If I remember correctly, the IAD

4  report references announcements being made in the

5  media, as well as some sort of self-notification

6  service earlier in the day.  But for the

7  materials I gathered when it comes to

8  specifically police giving warnings, that was the

9  first.

10     Q    Okay.  Prior to 7 p.m., I kind of want

11  to exhaust your knowledge.  What is your

12  understanding of the ways in which the District

13  notified individuals that a curfew would go into

14  effect at 7 p.m. on June 1st, 2020?

15          MS. LIVENGOOD:  Object to form.

16          THE WITNESS:  Yes, from my

17  understanding from reading the materials that

18  were provided to me, it was talked about in the

19  media, as well as some sort of cell phone

20  notification system.  I don't know whether it was

21  an emergency service system or some other kind of

22  system, but I believe it was some kind of cell

1    phone notification system.

2              BY MR. SOBIECKI:

3        Q    All right, so now we talk about in

4    your report, the LRAD warning at 7 o'clock.  I

5    want to talk about what happened after that.

6    Other than using the LRAD, do you know if MPD

7    made announcements about the curfew by any other

8    method after 7 p.m.?

9        A    I don't know specifically about

10   method.  I know that there were other

11   announcements given to different groups besides

12   the one that we're talking about on Swann Street

13   after 7 p.m. at various points.  Whether they

14   used an LRAD or some other means, I don't know.

15       Q    Did you include that fact in your

16   report that MPD gave warnings after 7 p.m. to

17   disperse?

18             MS. LIVENGOOD:  Object to form.

19             THE WITNESS:  Yes.

20             BY MR. SOBIECKI:

21       Q    Okay.  Are you aware of officers after

22   7 -- well.  Do you know if after 7 p.m. MPD

1    officers in the downtown area repeatedly gave

2    warnings using the PA system of their car

3    concerning the curfew?

4              MS. LIVENGOOD:  Object to form.

5              THE WITNESS:  Again, I don't know

6    about actual platforms that were or were not

7    used.  I do know warnings were given to other

8    groups of individuals between 7 and when this

9    occurred on Swann Street.

10              BY MR. SOBIECKI:

11        Q     If Lieutenant Mejia testified that

12    officers provided multiple warnings using the PA

13    systems of their cruisers in the downtown area

14    after 7 p.m., would that fact be relevant to your

15    analysis?

16        A     Yes.

17        Q     So in your report, we're at 14, page

18    14.  We're discussing what happened at 7:01 p.m.

19    Do you see that?

20        A     I do.

21              MR. SOBIECKI:  And then, Marcus, if we

22    can go over to page 15.

1          BY MR. SOBIECKI:

2          Q    The first full paragraph of 15 goes

3     right to 8:30 p.m.  Do you see that?

4          A    Yes.

5          Q    Why don't you discuss anything that

6     happened between 7 o'clock and 8:30 p.m?

7          A    I was asked to review the incident

8     that occurred on Swann Street.  Eight thirty is

9     really when that started coming together.  I do

10    make mention throughout my report in other places

11    of things that occurred between that intervening

12    time period with other groups, as well as other

13    incidents.

14         Q    Okay.  But in this section of your

15    report, page 14, heading 5A, Factual Basis for

16    the Opinion, you don't discuss any warnings about

17    the curfew being provided between 7:00 and 8:30

18    p.m., do you?

19         A    I discuss it in my report.  In that

20    particular portion that we're looking at right

21    now, obviously, it's not directly there, but it

22    is in my report.

1          Q     Okay, it's not prior.  We agreed it's

2     not prior to this point that you discuss it,

3     right?

4          A     Correct.

5          Q     So if it's discussed, it would be

6     after this portion of the report, right?

7          A     Yes.

8          Q     What is your understanding as to MPD's

9     approach to enforcing the curfew on June 1st,

10    2020?

11               MS. LIVENGOOD:  Object to form.

12               THE WITNESS:  Yes, I'm sorry.  I don't

13    understand the question.

14               BY MR. SOBIECKI:

15         Q     Okay.  Was it your understanding that

16    MPD's approach was to arrest anyone and everyone

17    on the street after 7 p.m. without a warning?

18         A     I did not evaluate that.  I don't

19    know.  I didn't assess that.

20         Q     So you don't know whether MPD's plan

21    was to arrest individuals only after they refused

22    to disperse, right?

132

```
1           A      Sorry, I'm having a hard time

2      following that question.

3           Q      I'll move on.  All right, let's go to

4      the top of page 15, please.  I want to understand

5      some of this.  At the very top of page 15, and I

6      can go back to page 14, but we're referring to

7      the group at 16th and H Street, Northwest, who

8      had been given the above-mentioned warnings,

9      began marching northbound in the 1500 block of

10     14th Street, Northwest.

11                 What do you mean by marching

12     northbound in the 1500 block?

13          A      So would come -- those directions

14     would come either from the dispatch recordings or

15     the IAD report.  I, admittedly, am not super

16     familiar with the layout of Washington, D.C., so

17     when it comes to the geography of these streets,

18     I'm going to be at a loss if you keep asking me

19     questions about those.

20          Q      Okay, well, I might ask a few.  Do you

21     know how far the 1500 block of 14th Street is

22     from 16th and H, Northwest?
```

1          A     I do not.

2          Q     And similarly, do you know the cross

3     street on the 1500 block of 14th Street?

4          A     I do not.

5          Q     All right, so it says here they're

6     marching northbound.  Do you know where the

7     curfew violators went after the 1500 block of

8     14th Street, Northwest?

9          A     So, if you listen to the dispatch

10    recordings, you can kind of follow it step-by-

11    step over the next hour and a half.  My report is

12    already very, very long and I did not include

13    that step-by-step process.

14         Q     Okay.  Do you know the closest Metro

15    stop to the 1500 block of 14th Street, Northwest?

16         A     I do not.

17         Q     Do you know if the Metro was operating

18    on June 1st, 2020 between 7 and 11 p.m.?

19              MS. LIVENGOOD:  Objection, this is

20    totally outside the scope of the document, his

21    report.  But you're welcome to answer.

22              THE WITNESS:  I don't know.

1        BY MR. SOBIECKI:

2        Q     Okay.  As the crowd marched north on

3    14th Street, do you know if individuals in that

4    crowd vandalized any property?

5        A     I know that there were reports of

6    vandalism.  I believe spray painting, if I'm

7    remembering correctly.

8        Q     Well, if individuals in that crowd

9    were vandalizing property, as they headed north

10   on 14th Street, would that fact be relevant to

11   your analysis?

12       A     Yes.

13       Q     And do you know if the 1500 block of

14   14th Street to the 1800 block primarily business,

15   residential, a mix?  Do you have any idea?

16       A     I do not.

17       Q     Okay, so now I'm in the second

18   paragraph of page 15, second sentence.  One group

19   was north of the area of 14th Street, Northwest,

20   and S Street, Northwest.  The other group was

21   south of this location.  And then you say -- hold

22   on, let me make sure I read this.

1          I guess what you're saying here is

2    we're at 14th and F, Northwest.  There's two

3    groups of individuals, one north of S Street and

4    one south and then the group north marched north.

5    Is that right?

6          A     They marched on Swann Street.  I'd

7    have to look at a map to know whether that's

8    north or south.  I mean is the part where it's --

9    again, I write this in my report.  It is unclear

10   to me whether these two groups actually merged or

11   not.  It's difficult understanding what exactly

12   happened there when you listen to the dispatch

13   tapes.  You know, one group is estimated to be a

14   thousand.  The other is estimated to be 200.

15   Ended up being about 200 on Swann Street, so

16   that's why I'm unclear whether those two merged

17   together or not.  But that's what I --

18         Q     I apologize.  Your understanding is

19   the group that was north of 14th Street and S

20   went from there to Swann Street, right?

21         A     Yes.

22         Q     Do you know how they got there, what

1    route they took?

2         A    Again, you can listen to that step-by-

3    step on the dispatch.  I did not line that out in

4    my report.

5         Q    Why not?

6         A    Again, my report is already very long.

7    And the route that they took didn't seem

8    extremely relevant to what occurred -- what's --

9    what occurred on Swann Street started occurring.

10        Q    Okay, put aside extremely relevant.

11   Was it relevant at all to your analysis what

12   route the group took from 14th and S to when they

13   reached Swann Street?

14        A    It's relevant in the sense that you

15   understand what's going on.  It's not relevant in

16   that it didn't have an effect on what occurred in

17   the opinions that I'm rendering.

18        Q    Well, one of the opinions you're

19   rendering is the location of the encirclement

20   route.

21        A    Yes.

22        Q    So wouldn't other locations, other

1    possibilities for the encirclement prior to Swann

2    Street be relevant to your analysis?

3        A    It would be, but that's not what I

4    understood you asking there.  What I understood

5    you asking and what I was answering is it doesn't

6    matter whether they approached Swann Street from

7    the north or the south.  They got to Swann

8    Street.

9        Q    Okay, and your opinion is that Swann

10   Street was a poor choice to conduct an

11   encirclement, right?

12       A    Yes.

13       Q    So what I'm trying to understand is

14   why is it not relevant, the other option, to

15   conduct the encirclement before the group went to

16   Swann Street?

17            MS. LIVENGOOD:  Objection, misstates

18   prior testimony.

19            THE WITNESS:  Knowing what the other

20   options were available for the commanders on

21   scene certainly is relevant to them in making

22   their decision.  I think the point that I'm

1    making in my report is that they choice to do the

2    encirclement on a resident street when really

3    they should have been trying to do it in a

4    different location instead on a restricted -- or

5    constricted residential area.  They know the

6    layout of that city obviously much better than I

7    do, so as far as what their other options were it

8    would be up to them to determine on scene while

9    this is occurring.  What I can tell you is that

10   they did choose to do it on a very small,

11   constricted residential street which, again, is

12   outside of general practice in my opinion.

13              BY MR. SOBIECKI:

14       Q    You just referred to Swann Street as

15   a small, residential street, right?

16       A    Constricted, yes.

17       Q    Apology, you just referred to Swann

18   Street as a small, constricted residential

19   street, right?

20       A    Yes.

21       Q    Do you have any idea how far it is

22   from 14th Street to 15th Street down Swann?

1        A    I don't and when I say constricted,

2    I'm not referring to the length of it.  I'm

3    referring to it they are trapped in narrow, and

4    again, of course, we can disagree on the

5    definition of narrow, but a narrow, residential

6    street where both sides are lines with people's

7    homes.

8        Q    But you don't have any idea how long

9    Swann Street is to 14th and 15th Street, right?

10            MS. LIVENGOOD:  Objection, mistakes

11    his testimony.

12            THE WITNESS:  I do not know.  I do not

13    have the measurement, no.

14            BY MR. SOBIECKI:

15        Q    Or any approximation?

16        A    No.

17        Q    Is it longer than a football field?

18    Do you have any idea?

19        A    I wouldn't be able to say.

20        Q    Going back to this second paragraph

21    15, again, I want to circle back.  You didn't

22    include where the group went from 14th and S

1    until they reached Swann Street because that

2    route was not relevant to your analysis, right?

3        A    That route wasn't relevant to my

4    analysis when assessing where the actual

5    encirclement took place, as well as what occurred

6    on Swann Street.

7        Q    So you didn't consider what other

8    options there were for the encirclement prior to

9    Swann Street, correct?

10           MS. LIVENGOOD:  Object to form.

11           THE WITNESS:  So that particular

12    question is not my role.  That would have been

13    the role of the commanders on scene at that point

14    to determine a better place than a residential

15    street, which is a point I try to make in my

16    report.

17           BY MR. SOBIECKI:

18        Q    Yes, I'm just trying to nail down kind

19    of what opinions you're offering and the basis

20    for your opinions.  So you didn't take into

21    account other options for the encirclement prior

22    to the group reaching Swann Street, right?

144

```
 1    well as the dispatch tape, it sounds like the
 2    crowd, the bulk of it entered from 15th Street.
 3         Q    Did you review any BWC showing the
 4    curfew violators march on to Swann Street?
 5         A    I don't recall viewing any of that.
 6    I don't recall that, no.
 7         Q    Okay.  So the time period I'm talking
 8    about is 7 p.m. to arrival on Swann Street.  Are
 9    you with me?
10         A    Yes, so approximately between 7 and
11    8:45.
12         Q    Yes, we can use that.  Between 7 and
13    8:45, did anything stop the curfew violators from
14    dispersing and going home that night?
15              MS. LIVENGOOD:  Object to form.
16              THE WITNESS:  So certainly at any
17    time, any of those individuals that were marching
18    could have decided to go home.  There were
19    reports of people trying to go home, but a lot of
20    the streets were shut down and they couldn't find
21    their way out.  But regardless, what you're
22    saying is correct in that in that hour and 45
```

1    minutes, people could have chosen to go home if

2    they wanted to.

3                    BY MR. SOBIECKI:

4        Q       And are you aware that individuals in

5    that group between 7 and 8:45 did, in fact, leave

6    the area and go home?

7        A       Are you saying they did or did not?

8        Q       Did.

9        A       I don't know.

10       Q       Okay.  If one of the plaintiffs

11   testified that individuals in that group

12   dispersed and went home during that time period,

13   would that be relevant to your analysis?

14       A       Yes.

15       Q       If someone knew that the curfew --

16   again, between 7 and 8 -- well, strike that.

17                    If someone knew that the curfew was in

18   effect, that person heard a warning from the

19   police that they needed to disperse, and ignored

20   that order to disperse, would MPD have been

21   justified in arresting that person?

22                    MS. LIVENGOOD:  Object to the form.

1          THE WITNESS:  They would have had

2     probable cause to arrest, yes.

3          BY MR. SOBIECKI:

4     Q     Are you offering any opinion -- strike

5     that.  We're talking about 7 to 8:45 and we're

6     talking about this group of individuals marching

7     and eventually ending up on Swann Street.  Is it

8     relevant to your analysis whether individuals in

9     that group knew they were being ordered to

10    disperse and go home?

11    A     Yes.

12    Q     So if MPD was providing repeated

13    warnings to that group that they needed to

14    disperse and go home, would that be relevant to

15    your analysis?

16    A     It would be from the materials that

17    have been provided to me.  I don't have any

18    information regarding that happening during that

19    hour and 45 minutes.

20         MR. SOBIECKI:  Okay.  So I'm now on

21    page 15.  Could we go down to the third full

22    paragraph, please, Marcus?

147

1              BY MR. SOBIECKI:

2          Q      So in this paragraph, you're

3    discussing Lieutenant Horos and then a Lieutenant

4    Harrington.  Do you see that?

5          A      I do.

6          Q      You reviewed the deposition transcript

7    of Harrington, correct?

8          A      I did.  And now that I've read it, I

9    believe it's Captain Harrington.  I may have

10   gotten the ranks wrong.

11         Q      That's where I'm going.  I wasn't

12   going to give you grief about it, but that was

13   just an innocent mistake in your report, right?

14   It should be Captain Harrington, right?

15         A      I should be Captain Harrington.  I

16   think he's referred to as Lieutenant in some of

17   the reports though, but I could be wrong.

18         Q      Okay.  You refer in this paragraph to

19   both -- I'm going to use Captain Harrington.  You

20   refer both to Lieutenant Horos and Captain

21   Harrington as being supervisors on the scene.

22   Why do you believe that they were both acting as

1    going to ask for a redo on exhibits.  Exhibit 9

2    will be BWC's Officer Jeffrey Buchanan, Bates

3    ending in 00014244.

4                    (Whereupon, the above-referred to

5    document was marked as Exhibit No. 9 for

6    identification.)

7                    MR. SOBIECKI:  And then Exhibit 10

8    will be Anthony Coleman.

9                    (Whereupon, the above-referred to

10   document was marked as Exhibit No. 10 for

11   identification.)

12                   MR. SOBIECKI:  But first up we have

13   Exhibit 9.  Jeffrey Buchanan, BWC, man on top of

14   car, and we're going to play this.  And again,

15   I'll worry into you, Dr. Mourtgos, we are behind

16   the line, right next to Lieutenant Horos.  And

17   what I'm looking for you to look for, it seemed a

18   man in a yellow mask reached forward and strike a

19   shield with his left hand.  All right, Marcus,

20   you can just play it.

21                   (Video played.)

22                   BY MR. SOBIECKI:

230

1          Q     Did you catch it that time, sir?

2     Right before he was pepper-sprayed?

3          A     I didn't.  You'd have to play it

4     again.

5          Q     Okay, we will.

6                MR. SOBIECKI:  If you can just go

7     back.

8                (Video played.)

9                MR. SOBIECKI:  Let me do it one more

10    time.  I shouldn't have paused it.

11               (Video played.)

12               BY MR. SOBIECKI:

13         Q     Any better on that one?

14         A     Yeah, I can see his arm coming out and

15    it looks like it makes contact with the shield.

16    I can't tell if it's a strike, or trying to pull

17    the shield down, or something else.

18               To be fair, I mean, if he struck an

19    officer's shield, then that officer certainly

20    would be within policy and within general

21    principles to use force to defend himself.

22               I think one of the important things to

1    recognize here that when we're talking

2    specifically about the OC Spray, Lieutenant Horos

3    never mixed status or reason for his use of the

4    OC Spray.

5             So, it's unclear to me that even if a

6    strike did occur, that Lieutenant Horos saw that.

7        Q    Let's go to Exhibit 10, BWC of Anthony

8    Coleman.  And that is bates -- I'll do it

9    again -- 14245.

10            But before we play it, just to that

11   point, Doctor, as you mentioned earlier, you

12   assess uses of force based on information

13   available to the reasonable officer at the time.

14   Right?

15       A    Sure, and that goes both ways, in that

16   if Lieutenant Horos did not observe it, he can't

17   post it back to go back and use that as a

18   justification.  Right?

19            Just like if he did observe, then he

20   could use it as a justification.  I don't recall

21   seeing in his report his mentioning that.

22       Q    To be fair, you didn't review his

 1              MR. SOBIECKI:  So, let me just re-ask

 2       my question, because I have multiple other angles

 3       of this.

 4              BY MR. SOBIECKI:

 5          Q    You're not offering any opinions

 6       regarding the use of OC Spray against that

 7       gentleman in the video, right?

 8              MS. LIVENGOOD:  Object to form.

 9              THE WITNESS:  No.  No, I have None,

10       sir, of any of the videos regarding OC Spray on

11       this particular individual.

12              MR. SOBIECKI:  Where does this video

13       start, Marcus?  Can you go back to the very

14       beginning of this?

15              (No audible response.)

16              MR. SOBIECKI:  Yeah, it's a clip.

17       Just the beginning of the clip.  No, play it.

18              (Video played.)

19              MR. SOBIECKI:  All right.  Let's go

20       now to, let's call it the third deployment of

21       pepper spray by Lieutenant Horos, okay?

22              Just for our purposes, first one guy

1    in the car, second one right there.  Now, let's

2    go to the third one.

3                Can we get the cell phone footage --

4    Exhibit 8 -- please?  But before you play, I have

5    some questions.

6                BY MR. SOBIECKI:

7        Q    Dr. Mourtgos, if someone is throwing

8    objects at a police officer, does that

9    demonstrate the ability, opportunity, and

10   intention to pose an imminent threat of harm?

11               MS. LIVENGOOD:  Object to form.

12               THE WITNESS:  Yes.

13               MR. SOBIECKI:  Okay.  I'm sorry,

14   Marcus.  Can we go to the report, page 25,

15   please?

16               BY MR. SOBIECKI:

17       Q    All right, so, when we're discussing

18   the third deployment, this is the one where you

19   say -- I'm in the middle of the first full

20   paragraph -- Lieutenant Horos deploys his OC

21   Spray at an individual who is approximately five

22   to ten yards away, and who is backing away from

1    the police line holding a cardboard sign in front

2    of him.  Do you see that?

3         A    I do.

4         Q    Okay.  If there is an individual

5    behind him throwing objects at the police, would

6    that fact be relevant to your analysis?

7              MS. LIVENGOOD:  Object to form.

8              THE WITNESS:  It depends on the

9    context.  I mean, obviously, it's a

10   consideration.  But you have to take into account

11   how close are they, when did the throwing of the

12   object occur, etc.

13             BY MR. SOBIECKI:

14        Q    But your report doesn't discuss any

15   throwing of objects from behind this individual,

16   does it?

17        A    From the video I reviewed, I didn't

18   see anybody in direct proximity to this

19   individual who was sprayed doing it.

20        Q    Okay.

21             MR. SOBIECKI:  All right, I'm going to

22   have two videos on this.  First, we're going to

248

```
 1    people to disperse and sees that they are not

 2    dispersing.  Right?

 3                MS. LIVENGOOD:  Object to form.

 4                THE WITNESS:  That one I'm not quite

 5    sure I can say yes or no to.  I mean, clearly, we

 6    have established that warnings were given between

 7    7:00 and 8:30, or 8:45, but I don't know which

 8    members of the group heard or did not hear.

 9                MR. SOBIECKI:  Okay, well, let me turn

10    this into a hypothetical here.  You're an expert.

11                In my hypothetical, Officer Crisman

12    knows this group of individuals is in violation

13    of curfew and is refusing to disperse.  He knows

14    this group of individuals is vandalizing

15    property.

16                He knows this individual is throwing

17    objects at the police, and he knows that

18    individuals in this group are attempting to break

19    into homes on Swann Street.  All right?  So,

20    those are the facts he has in his possession.

21    You with me?

22                MS. LIVENGOOD:  In this hypothetical.
```

249

1          MR. SOBIECKI:  My hypothetical.

2          THE WITNESS:  Yes.

3          MR. SOBIECKI:  All right.

4          BY MR. SOBIECKI:

5     Q     Officer Crisman sees people going into

6  a residence on Swann Street.  Okay?  My

7  hypothetical.

8     A     Yes.  Yeah.

9     Q     He deploys his pepper spray to prevent

10 additional people from entering that residence.

11 Okay?  Would that be a reasonable use of pepper

12 spray under the circumstances?

13          MS. LIVENGOOD:  Object to form.  You

14 can answer.

15          THE WITNESS:  It depends.  The issue

16 that I bring up in my report is that I might have

17 a different opinion if the OC Spray had been used

18 against the individuals directly up against the

19 door going into the home.

20          From what I observed in the videos, is

21 Officer Crisman uses the OC Spray against

22 individuals down on the sidewalk and who did not

250

```
 1    pose an immediate threat to getting into that
 2    home, whether he believed that that burglary was
 3    occurring or not.
 4              BY MR. SOBIECKI:
 5        Q    Well, would Officer Crisman be
 6    justified in attempting to prevent additional
 7    people from entering into the home?
 8              MS. LIVENGOOD:  Object to form.
 9              THE WITNESS:  There would be certain
10    actions that would be justified in that, yes.
11              BY MR. SOBIECKI:
12        Q    I guess what I'm trying to understand
13    is it seems like your opinion is that he would
14    have been justified pepper spraying individuals
15    closer to the door to prevent them from entering
16    the home, but he was not justified in preventing
17    individuals on the sidewalk from entering the
18    home.  Do I have that right?
19              MS. LIVENGOOD:  Objection.  Misstates
20    testimony.
21              MR. SOBIECKI:  Well, yeah, I'm asking
22    if I have that right.
```

1          THE WITNESS:  No.  You're only half-

2     right.  So, if I was assessing his use of pepper

3     spray on individuals that were clearly trying to

4     enter the home, up on the doorsteps, up against

5     the door, and he had a reasonable belief that

6     these individuals were committing a burglary, my

7     opinion would be that that is a use of force that

8     falls within generally accepted practices.

9          However, from what I observed, he uses

10    pepper spray against individuals that are down on

11    the sidewalk, don't show an immediate threat of

12    going into that house, and in fact, the use of

13    his OC Spray actually, ironically, prompts them

14    to run up the stairs into the house.

15          BY MR. SOBIECKI:

16     Q     You're not disputing that individuals

17    on Swann Street were trying to break into

18    residences, are you?

19          MS. LIVENGOOD:  Object to form.

20          THE WITNESS:  I don't have enough

21    information to render an opinion on whether they

22    were or not.

```
1              BY MR. SOBIECKI:

2        Q    Well, you're aware that individuals on

3   Swann Street called 911 to report attempted

4   break-ins, right?

5        A    I'm aware of that.  I'm also aware of

6   other statements that said that it wasn't

7   occurring.  I think it's a disputed fact.  Again,

8   I don't have enough information to be able to

9   have a definitive opinion on that.

10       Q    Well, I'm sorry, what is the disputed

11  fact?

12       A    That whether people were or were not

13  trying to burglarize the home.

14       Q    Well, I think Mr. Doohey's home --

15  right? -- I think we can agree Mr. Doohey allowed

16  people to enter his home.  Right?

17            MS. LIVENGOOD:  It's Mr. Dubey.  I

18  believe Dubey.

19            MR. SOBIECKI:  Sorry, Dubey.  Rahul

20  Dubey.

21            THE WITNESS:  Yes.

22            BY MR. SOBIECKI:
```