## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PAMELA GOODWIN, *et al.*,

        *Plaintiffs*,

v.

DISTRICT OF COLUMBIA, *et al.*;

        *Defendants*.

Case No. 1:21-cv-00806 (BAH)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### *Curfew Background*

1.      On May 25, 2020, a Minneapolis police officer murdered George Floyd, a Black man, by pressing his knee into Mr. Floyd's neck as Mr. Floyd repeatedly gasped that he could not breathe. George Floyd's murder sparked worldwide protests, including protests in Washington, D.C. Polls estimate that between 15 million and 26 million people participated in demonstrations in the summer of 2020, making it the largest participatory protest movement in United States history. *See* Larry Buchanan et al., *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. TIMES (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

2.      On the night of May 30, 2020, widespread protests took place in the District of Columbia. Hundreds of protestors gathered at the White House, and some eventually marched through the streets, chanting "I can't breathe," "Black Lives Matter," and other similar phrases. *See* David Smith, *George Floyd: protestors clash with Secret Service as unrest comes to the*

1

*White House*, THE GUARDIAN (May 30, 2020), https://www.theguardian.com/us-news/2020/may/30/protest-washington-dc-george-floyd-white-house-trump.

3.      Protests carried on throughout the city late into the night of May 30 and the morning of May 31. *See* Ex. 1, 5.30 MPD 0200 SitRep; Ex. 2, 5.30 MPD 0400 SitRep.

4.      On May 31, 2020, District of Columbia Mayor Muriel Bowser instituted a curfew order that would go into effect at 11 p.m. Ex. 3, May 31 Order, at 2.

5.      On the night of May 31, protestors gathered near Lafayette Square chanting "Hands up! Don't shoot!" and other similar phrases. *See* Stephanie Mencimer, *I've Lived in DC for 3 Decades and Covered Dozens of Protests. This One Is Profoundly Different.*, MOTHER JONES (June 5, 2020), https://www.motherjones.com/politics/2020/06/ive-lived-in-dc-for-3-decades-and-covered-dozens-of-protests-this-one-is-profoundly-different/.

6.      On June 1, 2020, the Mayor of the District of Columbia issued another order ("June 1 Order"), imposing a curfew beginning at 7 p.m. and ending at 6 a.m., to last from the evening of June 1 to the morning of June 3. Ex. 4, June 1 Order, at 2.

7.      The June 1 Order states, "During the hours of the curfew, no person, other than persons designated by the Mayor, shall walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District." Ex. 4 at 2. The curfew exempted "[e]ssential workers, including healthcare personnel and working media with their outlet-issued credentials, when engaged in essential functions, including travel to and from their essential work; and Individuals who are voting and participating in election activities, including poll workers, volunteers, and individuals exercising their right to vote." *Id.*

8.      On June 1, 2020, consistent with the June 1 Order, Metropolitan Police Department (MPD) Chief Peter Newsham issued an Executive Order instructing officers on how to enforce the curfew. *See* Ex. 5, EO-20-032.

9.      EO-20-032 instructs that MPD officers must provide a warning before arresting a person for violating the curfew:

> When practical, members who observe individuals in violation of the curfew shall provide a **warning** advising individuals that they are in violation of the curfew, and if they remain on public space, are subject to arrest (e.g., "A citywide curfew is in effect from 7:00 pm tonight until 6:00 am tomorrow. You are in violation of the curfew. If you remain on public space, you are subject to arrest.").

Ex. 5 at 1 (emphasis in original).

10.      EO-20-032 further states, "When the decision is made to arrest, the SOD detail commander or district watch commander, as appropriate, shall determine whether the arrest will be custodial or non-custodial (61-D)." Ex. 5 at 1.

11.      A custodial arrest involves "seiz[ing] an individual in response to a violation of the law" and taking them to a police station for processing. Ex. 6, Non-Custodial Arrests Training, at 5. A non-custodial arrest involves issuing the person a Field Arrest Citation (called a PD 61-D form) instructing them to pay a fine or appear in court. *Id.* at 5–6; *see also* Ex. 7, Newsham Dep. Tr., at 88:4–89:1.

12.      EO-20-032 allowed only four exemptions: (1) essential workers while they are going to and from work (the EO provides a non-exhaustive list of categories of businesses whose workers are essential, including "Social Services/Community Organizations," "Transportation and Logistics," and "Food and Household Products and Services"); (2) people voting and participating in election activities; (3) "[i]ndividuals engaged in essential functions including engaging in an activity or performing a task essential to an individual's own health or safety or to

the health or safety of the individual's family or household members or individuals under their care (including pets and pet walking)"; and (4) people experiencing homelessness. Ex. 5 at 1–2.

13.    MPD did not provide any training to officers on how to enforce the June 1 Order, including training on when to issue warnings, when or whether to make arrests, and when or how to determine whether an arrest should be custodial or non-custodial. *See* Ex. 7 at 89:6–11, 90:5–16, 95:3–6, 95:13–18; Ex. 8, Carroll 30(b)(6) Dep. Tr. (Part 1), at 75:8–77:14, 78:21–79:3, 82:19–83:2, 100:12–19; Ex. 9, Carroll Dep. Tr., at 127:22–128:12; Ex. 10, Edwards 30(b)(6) Dep. Tr., at 120:20–121:7.


### *The Metropolitan Police Department and First Amendment Assemblies*

14.    The District of Columbia Metropolitan Police Department (MPD) "is the primary law enforcement agency for the District of Columbia." *See* MPD, About Us, https://mpdc.dc.gov/page/about-mpd.

15.    On June 1, 2020, the Chief of MPD was Peter Newsham. *See* MPD, Peter Newsham (2016-2020), https://mpdc.dc.gov/biography/peter-newsham-2016-2020. Prior to his role as Chief, Newsham was an Assistant Chief at MPD. *See* MPD, Peter Newsham (2016-2020), https://mpdc.dc.gov/biography/peter-newsham-2016-2020.

16.    Under D.C. law, "[t]he Chief of Police is the chief executive officer of the Metropolitan Police Department," D.C. Mun. Regs. tit. 6 § 800.1, and he is given "authority to plan and prescribe departmental policy," *id.* § 800.16.

17.    This includes "tak[ing] any measures that will insure prompt and vigorous enforcement of all criminal statutes, laws, regulations, and ordinances, the enforcement of which come properly within the scope of the police function and power." D.C. Mun. Regs. tit. 6 § 800.2.

18.     As Chief, Newsham directly supervised Assistant Chief Jeffery Carroll, who was the head of the Homeland Security Bureau in June of 2020. *See* Ex. 7 at 23:22–25:1; Ex. 9 at 16:21–17:6; Ex. 11, MPD Org Chart, at 1. Carroll directly supervised Commander Robert Glover, who was serving as the head of the Special Operations Division. *See* Ex. 11 at 5; Ex. 12, Glover Dep. Tr., at 28:5–29:10; Ex. 9 at 21:9–22:12.

19.     Under the MPD Standard Operating Procedure (SOP) governing "Handling First Amendment Assemblies and Mass Demonstrations" in effect in June 2020, Newsham was the incident commander for First Amendment Assemblies unless he designated someone else for that role. *See* Ex. 13, SOP 16-01, at 3–4 (Chief of Police or his designee shall serve as the "incident commander at scenes of First Amendment Assemblies.").

20.     D.C. law defines a First Amendment assembly as "a demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political social, or religious views." D.C. Code § 5-331.02(2). SOP 16-01 "sets forth the policy and procedures for all members carrying out the mission of the MPD when interacting with" First Amendment assemblies. Ex. 13 at 2.

21.     SOP 16-10 applies to all First Amendment assemblies and mass demonstrations, including "violent civil disturbances." Ex. 13 at 7. The SOP applies to planned and unplanned assemblies, and assemblies that include "violent" and/or "non-violent civil disobedience." *Id.* at 4–7; *see also* Ex. 8 at 107:5–20.

22.     On June 1, 2020, Glover was serving as the incident commander on Swann Street. *See* Ex.12 at 70:15–17; Ex. 9 at 104:18–105:21.

23.     As incident commander, Glover had the authority to order encirclement of groups of people and to order mass arrests for curfew violations. *See* Ex. 12 at 70:18–21, 71:5–72:1,

137:11–18, 138:10–17; Ex. 7 at 114:4–17, 128:13–129:8, 140:21–141:6. Encirclement is the practice of forming police lines to create a complete perimeter around a group. Ex. 12 at 77:21–78:16; Ex. 7 at 47:8–14.

24.    As incident commander, Glover had the authority to determine what force, if any, would be used on Swann Street. Ex. 7 at 163:22–164:9. Newsham had the authority to intervene and override Glover. *Id.* at 163:7–16.

25.    As incident commander, Glover also had the authority to determine what munitions, if any, would be used on Swann Street. Ex. 12 at 199:8–12. This authority to authorize munitions as needed was given to Glover by Newsham. *Id.* at 199:15–200:5. Only two MPD officials besides Newsham—Glover and Carroll—had the power to authorize the use of munitions. *Id.* at 200:4–21.

26.    If the incident commander determines it is necessary to disperse a First Amendment assembly, he must first ensure that "[a]t least one warning . . . and, absent exigent circumstances, a total of three warnings" to disperse are issued. Ex. 13 at 19. "The issuance of warnings shall be of such amplification (i.e., through the use of an amplification device) and repetition that they are reasonably calculated to be heard by the entire assemblage." *Id.*

27.    If the incident commander determines that a mass arrest is warranted, "[s]uch an arrest may only occur after an order to disperse has been clearly communicated in a manner that is reasonably calculated to be heard by each of the persons in the group and a reasonable opportunity to disperse has been afforded . . . ." Ex. 13 at 20. Prior to ordering a mass arrest, the incident commander must consider, *inter alia*, whether the people to be arrested have caused injuries or property damage and whether the mass arrest will cause more injuries or property damage than alternative action. *Id.* at Attachment H, at 1.

***Protest Background***

28.     On June 1, 2020, Plaintiffs Pamela Goodwin, Allison Lane, Jenny Lazo, Jesse

Pearlmutter, and Priyanka Surio, alongside other demonstrators, convened in the District of

Columbia to participate in protests against police brutality. Each Plaintiff was present for at least

one of two demonstrations that would later merge into a collective march.

29.     Plaintiffs Goodwin, Lane, Lazo, Pearlmutter, and Surio were separately present at

the protest near the White House, where demonstrators were peacefully chanting, marching, and

expressing their grief and outrage regarding the murder of George Floyd and police violence writ

large. Ex. 14, Goodwin Dep. Tr., at 35:5–10, 44:9–15; Ex. 15, Lane Dep. Tr., at 50:3–52:9; Ex.

16, Lazo Dep. Tr. at 54:11–56:7, 186:14–187:2; Ex. 17, Pearlmutter Dep. Tr., at 67:7–69:5,

71:14–72:8, 75:13–16; Ex. 18, Surio Dep. Tr., at 124:4–19, 126:11–17, 128:7–129:5, 131:6–

132:4.

30.     Remick and Troper separately attended a vigil for Tony McDade, a Black

transgender man killed by police officers in Florida, in Dupont Circle. The vigil was a peaceful

gathering to mourn and raise awareness for Mr. McDade. Remick and Troper then marched

separately with other protestors toward the White House demonstration. Ex. 19, Remick Dep.

Tr., at 30:11–32:1, 32:17–33:1, 34:12–35:1; Ex. 20, Troper Dep. Tr., at 154:19–156:14.

31.     Around 7:00 p.m., warnings to disperse were issued via a long-range acoustic

device (LRAD) located at 17th Street and D Street. *See* Ex. 21, Radio Run Tr., at 69:20–70:2;

Ex. 22, IAD Report, at 2.

32.     Not everyone near Lafayette Park heard these warnings. Of the Plaintiffs, only

Lane recalls hearing warnings near the White House that a curfew was in place and that the

crowd should disperse. *See* Ex. 15 at 53:5–21.[1] Goodwin, who was also near the White House, recalls hearing warnings to disperse, but not that a curfew was in place. *See* Ex. 14 at 44:16–45:3, 45:15–46:1. Lazo, Pearlmutter, and Surio do not recall hearing any warnings about either the curfew or dispersal when they were near the White House. *See* Ex. 16 at 56:9–22, 69:13–20; Ex. 17 at 88:20–89:9; Ex. 18 at 133:22–134:3.

33.    Later in the evening, at the intersection of 16th and I Streets, MPD issued dispersal orders to a large crowd. Ex. 21 at 116:19–117:1. The issuance of dispersal orders was successful and the crowd at that location dispersed. *Id.*

34.    As protestors left the area of the White House, Plaintiffs moved with groups of protestors headed north, ultimately onto 14th Street heading north. Goodwin followed the group that ended up on Swann Street as it moved up 14th Street and then back down 15th Street. *See* Ex. 14 at 46:18–21, 48:5–8. She was unaware of the curfew and intended to stay with the group until she felt like going home. *Id.* at 50:7–9, 51:7–52:6, 56:1–8.

35.    Lane stayed with the group for safety reasons, following the crowd up 14th Street toward her home in Columbia Heights. Ex. 15 at 57:22–58:9, 64:20–65:17. However, she was prevented by MPD officers at 14th and Belmont Streets from moving further north. *Id.* at 55:18–57:7, 59:5–60:21. After the warnings given near the White House, Lane did not hear any further warnings that a curfew was in place. *Id.* at 189:20–190:16.

36.    Lazo followed the crowd north on 14th Street. *See* Ex. 16 at 59:3–7, 68:22–69:5. While walking up 14th Street, Lazo did not hear MPD give any warnings that a curfew was in place or order the marchers to go home. *Id.* at 187:20–188:6.

---

[1] Plaintiff Allison Lane could not ultimately go home because MPD officers were blocking her path up 14th Street. *See* Ex. 15 at 55:18–57:7, 59:5–60:21, 65:4–17.

37.    Pearlmutter walked with the group north up 14th Street toward his home in Columbia Heights. *See* Ex. 17 at 79:22–80:5, 84:22–85:17. While walking up 14th Street, Pearlmutter did not hear MPD give any warnings to disperse. *Id.* at 88:20–89:9.

38.    Surio followed the crowd up 14th Street, intending eventually to get back to her car and drive home. However, as the group marched MPD officers blocked several streets, preventing Surio from reaching her car. *See* Ex. 18 at 133:7–21, 135:10–141:13, 142:14–143:11, 145:7–146:18. Nevertheless, she tried to stay with the part of the group whose path she thought would get her as close to her car as possible. *See id.* at 148:2–19, 149:10–21.

39.    Remick stayed with the group marching north on 14th Street. *See* Ex. 19 at 33:8–14, 36:17–22. Although Remick was generally aware that there was a curfew in place, they did not hear any warnings about the curfew or orders to disperse as the crowd marched. *See id.* at 35:19–36:6, 47:7–11, 50:18–51:1.

40.    Troper followed the crowd north up 14th Street toward her home in Dupont Circle. She also needed to move west to go home but was deterred from doing so because MPD officers had blocked off streets and were guiding the protestors north. *See* Ex. 20 at 157:11–159:6, 181:9–20, 192:19–193:15.

41.    At least one other protestor with the group was trying to return to his car to go home but was prevented from doing so when he was detained on Swann Street. Ex. 22 at 21–22. That protestor, who was near the White House earlier in the day, also did not hear warnings given over the LRAD. *Id.* at 21.

42.    Plaintiffs remained peaceful and did not engage in or see other protestors engage in any activities that could possibly pose a threat to the safety of any person or property aside from isolated instances of water bottles being thrown. Ex. 14 at 50:10–51:6, 62:21–63:3; Ex. 15

at 83:2–84:11; Ex. 16 at 85:1–10, 89:3–21, 186:14–187:2; Ex. 17 at 101:6–102:3, 178:18–20;

Ex. 18 at 131:6–132:4; Ex. 19 at 38:13–39:1; Ex. 20 at 101:10–102:11.

***MPD's Decision to Encircle and Arrest Protestors***

43.    Prior to 8:40 p.m., Glover[2] gave instructions to encircle the group of protestors.[3]

He said, "We'll pick side streets. We'll pinch them at the narrowest point," Ex. 21 at 150:4–7,

and then said, "So when we get them into a narrow block, that's where we're going to execute

the encirclement." *Id.* at 151:19–152:2.

44.    Glover testified that when he gave this order, he "made a decision that we were

going to go and start making arrests." Ex. 12 at 164:2–165:9.

45.    At this time, the group of protestors, including Plaintiffs, was marching north on

14th Street. *See* Ex. 21 at 151:19–152:10.

46.    On July 9, 2020, Glover was interviewed by an investigator with MPD's Internal

Affairs Division (IAD). Ex. 22 at 35. The IAD report summarized Glover's reason for

conducting the arrest by saying, "[a]fter learning an MPD cruiser was destroyed, and witnessing

multiple acts of vandalism and destruction of property were committed [*sic*], the Incident

---

[2] On June 1, 2020, Commander Robert Glover used the call sign "Cruiser 50" on the radio. Ex. 12 at 163:21–164:1.

[3] The record contains two sources of recorded, contemporaneous statements by officers: (1) the recording of the Special Operations Division (SOD) radio channel, a transcript of which is Ex. 21; and (2) body-worn camera (BWC) footage. The radio transcript contains no time stamps. *See generally* Ex. 21. The BWC footage does contain time stamps, and when the radio is audible on officers' BWC footage, it is possible to determine the time of a given radio transmission through the BWC time stamp. No BWC footage produced in discovery includes the audio from the SOD channel when Glover gave the arrest order (the portion captured in Ex. 21 at 150:4–152:2), but Captain Daniel Harrington's BWC *does* capture the transmission shortly after that. At 8:40 p.m., Harrington's BWC captures someone saying over the radio, "You have Columbia and 14th?" and someone responding, "Yes, sir. We're here." Ex. 59, Harrington BWC 1, at 20:40:14. On the transcript of the radio recording, that exchange appears shortly after the arrest order. *See* Ex. 21 at 154:10–11 (exchange on Harrington BWC); *id.* at 150:4–152:2 (arrest order).

Commander, Glover, authorized the mass arrest of the curfew violators, based on probable cause that they were in a public space, in violation of the curfew order." *Id.* at 4; *see also id.* at 35–37.

47.    With respect to vandalism, Glover made clear in his deposition that spray painting was not a serious offense and not the reason he ordered the arrest of the protestors. Ex. 12 at 132:18–133:12, 162:16–163:8.

48.    And at the time Glover made the decision to arrest, no property damage more serious than spray painting had occurred or been reported contemporaneously over the radio. *See* Ex. 21 at 148:6–151:18.[4] Police did report spray painting by some members of the group, *id.* at 149:11–13, suggesting that they were watching and reporting on conduct by the protestors.

49.    The IAD report itself identifies two instances of property damage on 14th Street, both of which occurred long before the protests that day. *See* Ex. 24, IAD Report Att. 2 (front glass door window at El Centro club "destroyed/damaged/vandalized" at 2:42 p.m., hours before 7 p.m., when the protestors arrested on Swann Street marched up 14th Street); Ex. 25, IAD Report Att. 3 (front glass door to Trader Joe's damaged between 2:01–4:43 a.m. on June 1, more than 16 hours before protestors marched up 14th Street).

50.    With respect to the purported destruction of an MPD cruiser, the police car in question was not destroyed until *after* the crowd that was arrested on Swann Street was fully encircled.

---

[4] MPD was following several groups throughout the city. There are no radio transmissions about any property damage more serious than spray painting by the group that was ultimately arrested on Swann Street during the march north on 14th Street prior to page 148 of the radio run recording transcript. Ex. 21 at 148:3. Plaintiffs cite this portion of the radio run transmission immediately before the arrest decision, because in this cited portion, the discussion on the radio run recording begins to focus on the group on 14th Street instead of other groups gathering around the city.

51.    Glover told the IAD investigator that he learned of a police car being set on fire by hearing about it over the radio. *See* Ex. 22 at 36.

52.    He likewise testified that the police car fire played a role in his decision to conduct the arrest. Ex. 12 at 74:11–75:2.

53.    The radio run recording itself makes clear that the decision to arrest was made, and the crowd was fully encircled and unable to leave, before the police car fire was announced. Just after 9:05 p.m., Captain Daniel Harrington arrived at the police line at 15th Street and Swann Street. *See* Ex. 59, Harrington BWC 1, at 21:03:49–21:05:51. The body-worn camera (BWC) footage shows that the police line on 15th Street was closed by that time, and Harrington testified that when he arrived, the encirclement on Swann Street was complete and people within the encirclement could not leave. Ex. 26, Harrington Dep. Tr. at 154:13–155:6.

54.    The moment when Harrington's BWC footage shows him approaching the line on 15th Street corresponds to 177:11–14 in the radio run transcript: in Harrington's BWC footage time-stamped 21:05:43, the radio channel is audible, and a voice says, "We also need to clear 14th Street. Got a whole bunch of motorcycles and other individuals going up behind the 54 mountain bike." *See* Ex. 59 at 21:05:43; *see also* Ex. 21 at 177:11–14.

55.    The decision to arrest had been made, and shortly after that, the officers on the scene at Swann Street began coordinating with the Narcotics and Special Investigations Division (NSID), the MPD unit in charge of mass arrest logistics, Ex. 27, High Volume Arrest and Processing After Action – June 2020 Events at 1, telling NSID, "we're going to be making mass arrests, 1400 Block of Swann. Approximately 100." Ex. 21 at 180:2–4.

56. Glover then announced over the radio that the group on Swann Street was "completely surrounded," Ex. 21 at 184:10–11. Glover reiterated, "The crowd is surrounded and they do not have an avenue to escape." *Id.* at 184:20–22.

57. The police car fire was not announced over the radio until *after* Glover made that transmission. *See* Ex. 21 at 188:5–7.

58. The contemporaneously filed police report likewise says the police car was set on fire at about 9:20 p.m., about twenty minutes after the group had been completely encircled on Swann Street, several blocks away. *See* Ex. 28, IAD Report Att. 4, at 2.[5]

59. The police car was in the 2400 block of 14th Street, *see* Ex. 28 at 4, near the intersection of 14th Street and Euclid Avenue, several blocks away from Swann Street between 14th and 15th Streets. *See* Ex. 31, 14th Street Area Map.

60. The police car on fire is visible in BWC footage. Ex. 60, Torres BWC. At 9:24 p.m., an officer is seen getting out of his police car, and a police car across the street is on fire. *See id.* at 21:24:08; *see also id.* at 21:23:18–32. In that same video, at 9:23 p.m., a sign for "GCS Sigal" is visible across the street from the burning police car. *Id.* at 21:23:24–28.

61. BWC footage for another officer shows this same intersection at 8:51 p.m., before the group was fully encircled, and the car is not on fire. *See* Ex. 61, Lucas BWC, at 20:51:25 (saying they are going to 14th and Clifton); *id.* at 20:51:27–20:51:53 (riding on 14th Street toward Clifton, with no police car on fire); *id.* at 20:51:50 (same "GCS Sigal" sign visible at the corner of 14th Street and Clifton Avenue); *id.* at 20:51:50–20:52:18 (no car fire visible).

---

[5] The IAD report also says the car fire took place the following day, on June 2, 2020. Several deponents testified that this was an error, and BWC footage confirms that the car fire took place on June 1, 2020.

62.     At that time, when the car was not on fire, the footage shows that no protestors were still in the area, and according to contemporaneous radio playing during the BWC footage, the group of protestors were already heading southwest on Florida Avenue, well south of that location. Ex. 60 at 20:51:39 ("They're coming down Florida, 15th and Florida.")

63.     At 8:58 p.m., BWC footage looking northward toward this intersection does not show any signs of a car on fire. Ex. 59 at 20:58:30.

64.     Years later during his deposition, Glover identified new reasons for the arrest that he had not told to the IAD investigator. Glover testified that in addition to the police car fire, the decision to encircle was based on: "the totality of the circumstances and the violence of the group itself endangering those that were lawfully conducting their lives in the District of Columbia such as the restaurant patrons that were out; by them firing aerial fireworks into these sidewalk cafes; the breaking of Metro bus pavilion glass; the fire and felony destruction of the police car. So it was not just the fact that they were in clear violation of the curfew. It was the other behaviors and conduct coupled with that." Ex. 12 at 74:17–75:1.

65.     No evidence supports Glover's account of protestors shooting fireworks into "sidewalk cafes," which Glover described as "pretty busy," in spite of the curfew. Ex. 12 at 150:21–151:10. Glover recalled that the curfew would not prevent people from eating out at restaurants because "they were conducting commerce on a closed area. So technically they were not on public space," *id.* at 151:8–10, and people would be allowed to dine out at restaurants because "food would be one of the essential services," *id.* at 151:11–14.

66.     The curfew does not contain a carve-out for dining in at restaurants. Ex. 4 at 2. BWC footage from officers on 14th Street shows boarded up storefronts and no restaurants with sidewalk cafes opened. *See, e.g.*, Ex. 100, Green BWC, at 24:15:39–21:16:39; Ex. 62, 14th and

Rhode Island Video; Ex. 63, 14th and Riggs Video. The crowded sidewalk cafe scene Glover

describes did not exist on 14th Street on June 1, 2020.

67.     With respect to protestors shooting fireworks, there is no contemporaneous

evidence that suggests this happened. During Glover's IAD interview in the summer of 2020, he

did not mention fireworks or shooting anything into cafes. *See* Ex. 22 at 35–37.

68.     And although Glover was actively communicating by radio, he did not mention

fireworks or damage to glass at a bus stop during the march. Ex. 21 at 148:3–165:6 (radio run

transcript from first mention of group moving north on 14th Street through the time the group

turned off of 14th Street onto Florida Avenue).

69.     Lieutenant Shane Lamond was walking with the group on the march up 14th

Street, Ex. 23, Lamond Dep. Tr., at 54:11–13, and reporting on the group's activities over the

radio, Ex. 21 at 160:2–3, 163:1–3, 165:12–13, using the call sign Intel-1, Ex. 23 at 41:2–4.

Lamond did not mention fireworks or damage to Metro property over the radio, Ex. 21 at 148:3–

165:6 (radio run transcript from first mention of group moving north on 14th Street through the

time the group turned off of 14th Street onto Florida Avenue), and he testified that he did not

recall seeing anyone shoot fireworks into sidewalk cafes during the march. Ex. 23 at 67:10–20.

Lamond testified that he would have reported the breaking of glass on a bus stop over the radio if

he had seen that activity. *Id.* at 67:1–68:5.


***Encirclement on Swann Street***

70.     After Glover gave the order to encircle and arrest the protestors, MPD officers

reported that the group was approaching 14th Street and Belmont Street. Ex. 21 at 152:8–9.

Glover ordered Lieutenant Carlos Mejia and Lieutenant Andrew Horos[6] to establish police lines parallel to the group along the east and west. *Id.* at 152:15–18. Glover had already positioned a platoon a few blocks north of that intersection at 14th Street and Columbia Road, *id.* at 135:9–11, which formed a line to block the group from moving north of that intersection, *id.* at 153:17–154:12. Glover gave this order for the purpose of encircling and arresting the group on 14th Street. Ex. 12 at 164:2–21.

71.    As the group moved north, Glover told Harrington, "Let's try to circle them right there at 14th and Clifton," Ex. 21 at 156:1–2, which is a block north of the intersection with Belmont Street, *see* Ex. 31. Harrington subsequently reported to Glover that he was with a platoon at 14th Street and Irving Street, and that the police line would move south to cut the group off before the group could move further north on 14th Street. Ex. 21 at 158:1–10; *see also* Ex. 59 at 20:44:30–20:45:30 (Harrington coordinating heavy police presence at 14th and Irving).

72.    As Plaintiffs and other demonstrators approached 14th and Belmont Streets, MPD officers in police cars swarmed the area, speeding up 14th Street toward the rear of the group, almost hitting demonstrators. Ex. 20 at 92:11–94:11; Ex. 17 at 92:12–92:16; Ex. 15 at 69:21–70:10. At this point, the bulk of the group turned southward to face the police cars and started chanting. Ex. 17 at 92:12–92:22; Ex. 64, 14th and Belmont Video. The bulk of the protestors formed a line and held their hands up in the air or linked arms with each other. *See* Ex. 64.

73.    After the police vehicles formed a line around 14th Street and Belmont Street, MPD officers did not issue any warnings or dispersal orders. Ex. 17 at 88:20–89:9; Ex. 16 187:20–188:7; Ex. 19 at 46:18–47:11.

---

[6] On June 1, 2020, Lieutenant Carlos Mejia's call sign was 8701. Ex. 29, Mejia Dep. Tr., at 23:12–24:1. Lieutenant Andrew Horos's call sign was 8600. Ex. 30, Horos Dep. Tr., at 162:2–4.

74.     After a few minutes, the group began heading southbound on 14th Street. Ex. 21 at 159:10–160:3; Ex. 65, Lazo Video, at 0:00–2:00. The majority of the group then turned west on Florida Avenue. Ex. 65 at 2:00–5:30. Protestors marched peacefully and were chanting during the time they were walking on Florida Avenue. *Id.*

75.     Upon reaching the intersection of Florida Avenue and 15th Street, police cars blocked streets at that intersection, and the group moved south. Ex. 65 at 5:30; Ex. 15 at 90:16–93:13. The presence of police in this area blocking those routes prevented Lane from returning to her home north of that area at 3827 14th Street. *Id.* at 87:18–88:1, 95:7–20, 193:21–196:6.

76.     Protestors marched peacefully and were chanting during the time they were walking southbound on 15th Street. Ex. 65 at 5:30–13:00.

77.     As the protestors marched southbound on 15th Street, Glover announced over the radio, "We're going to set up 15th Street as a pinch cordon . . . Next, narrowest intersection, form a line on the south side of that intersection." Ex. 21 at 169:11–21. Another speaker responded, "We can try and do it at S," *id.* at 170:18–19, just south of Swann Street, *see* Ex. 31.

78.     The police line that formed across 15th Street at the intersection with S Street blocked the group from moving further south. Ex. 66, Terry BWC, at 20:59:04; Ex. 65 at 13:00–13:30. As protestors encountered the police line as they walked south, they raised their hands up and began chanting, "Hands up, don't shoot." Ex. 65 at 13:00–13:30; Ex. 66 at 21:00:13–21:00:43.

79.     After a few minutes, most protestors turned back north on 15th Street and then turned east on Swann Street. Ex. 66 at 21:03:14–21:03:50.

80.     As protestors turned on to Swann Street, Lieutenant John Terry, commander of CDU platoon 24, instructed the MPD officers who formed the line at 15th Street and S Street to

"pinch them at Swann . . . as soon as they turn that corner . . . Push them into Swann Street." Ex. 66 at 21:03:44–21:03:54; *see also* Ex. 31.

81.     After an MPD officer reported over the radio that the group was heading east on Swann, Glover ordered CDU platoon 54 to form a line at 14th Street and Swann Street at the west side of intersection. Ex. 21 at 174:21–175:4; Ex. 12 at 188:18–189:1. After CDU 54 reported that a line had been formed at that location, Glover ordered Harrington to "close off 15th and Swann." Ex. 21 at 176:10–11.

82.     Once the line was formed at 14th Street and Swann Street, the crowd turned around and headed back west on Swann Street toward the intersection with 15th Street. Ex. 21 at 176:8–10.

83.     On the 15th Street side, MPD officers followed the group north, and by 21:05:22 had formed a line at the east side of the intersection of 15th Street and Swann Street. Ex. 66 at 21:04:44–21:05:44. At the same time, officers carrying riot shields reinforced the line. Ex. 67, Quarles BWC, at 21:05:05–21:05:35.

84.     Glover set up an incident command post on the 1800 block of 14th Street around 9:00 p.m. *See* Ex. 12 at 216:16–217:3; Ex. 22 at 5. The 1800 block of 14th Street runs from the intersection of 14th and S Streets, at its south end, past Swann Street, up to the intersection of 14th and T Streets, at its north end. *See* Ex. 31.

85.     Glover ordered MPD officers to block alleys within the 1400 block of Swann Street that would allow protestors to leave the area. Ex. 12 at 194:2–194:19.

86.     At about 9:11 p.m., Horos and Glover discussed moving the lines in from the 14th and 15th Street ends of Swann Street toward the middle of the block. Ex. 71, Horos BWC, at 21:11:15. For several minutes, Horos wandered around the 14th Street side, discussing with other

officers which line to move in and how many officers they would need to do this. *Id.* at
21:11:00–21:18:00.

87.    At 9:18 p.m., Horos moved to the 15th Street side. Ex. 71 at 21:18:00. He
wandered around the 15th Street side for several minutes, asking how long it would take for
additional platoons to arrive so that they could move the lines in. Ex. 71 at 21:18:00–21:29:00.

88.    As the police line formed at 15th Street and Swann Street, protestors inside the
encirclement stood in place, held their hands up in the air, and began chanting, "Hands up, don't
shoot" and "George Floyd." Ex. 67 at 21:05:21–21:06:21.

89.    After the police lines formed, encircled protestors at the intersection of 15th and
Swann Streets chanted, "Let us leave!" Ex. 68, Meyer BWC 1, at 21:16:24–21:16:49; Ex. 65 at
28:36–28:50.

90.    Goodwin asked MPD officers near 14th Street if she could leave. MPD officers
did not let her pass and did not respond to her request. Ex. 14 at 64:3–65:22.

91.    While the group was encircled on Swann Street and before police lines moved in
on the group, MPD officers did not issue any orders to disperse. Ex. 67 at 21:05:21–21:29:35;
Ex. 68 at 21:05:05–21:29:35; Ex. 22 at 4 ("An order to disperse was not voiced by MPD
members in the 1400 block of Swann Street, Northwest."); Ex. 12 at 218:4–7.

92.    At 9:23 p.m., Lieutenant Ryan Small, commander of CDU platoon 54,
approached a group of people gathered outside the police lines on the east side of 14th Street. Ex.
70, Small BWC, at 21:23:36. Another MPD officer informed Small that members of the group
were "concerned about their friends, they want their friends to be able to leave peacefully." *Id.* at
21:23:36–21:23:48. A woman in this group informed Small that she knew people inside the
encirclement and requested that the protestors be given an opportunity to disperse voluntarily,

which she thought they would do. *Id.* at 21:24:36–21:24:56. Small informed the group that she was violating the curfew and could be subject to arrest, but he did not take any action to disperse the group. *Id.* at 21:24:40–21:25:40. The woman offered to speak with a few of the protest leaders to facilitate people voluntarily going home. *Id.* at 21:26:06–21:26:36.

93.     At 9:26 p.m., Small approached Glover and Carroll, who were located near the intersection of 14th Street and Swann Street. Ex. 70 at 21:26:50. Small informed Glover and Carroll that he had a conversation with a woman "who knows several of the organizers and thinks that she can get them to disperse if they're given the opportunity." Glover responded, "No, they're under arrest." *Id.* at 21:26:50–21:27:15. Small shouted to officers near the group, "No dice," but did not take any action to arrest or disperse the group. *Id.* at 21:28:15.

94.     At 9:27 p.m., next to the 15th Street police line, Harrington asked Horos, "Have we given them warnings?" Horos replied, "No we're locking them up." Harrington responded, "Well, I mean, we have to give them . . ." and then trailed off. Ex. 71 at 21:27:35–21:27:45.

95.     At 9:27 p.m., another MPD officer informed Horos, "They're starting to try doors on the block." Ex. 71 at 21:27:55. A couple minutes later, at 21:29:30, another MPD officer told Horos, "They're trying to kick in doors on the block." Ex. 71.

96.     Between the time the police line formed at 15th Street and Swann Street and 9:29 p.m., video footage shows the crowd at that intersection remaining peaceful and does not show any instances of violence. Ex. 67 at 21:05:21–21:29:36; Ex. 68 at 21:05:04–21:29:34. Video footage from inside the police lines also shows that protestors remained peaceful during this period. Ex. 65 at 16:30–41:40.

97.     During this period, a resident of one of the homes in the 1400 block of Swann Street came out and began speaking with protestors, offering them water, phone chargers, and bathroom access. Ex. 65 at 34:38–35:20.

**MPD's Use of Force Against Protestors**

98.     While the crowd was encircled on Swann Street, Glover announced on the radio, "There ought to be no munitions deployment on Swann Street. We have this group completely surrounded. It'll be mechanical force only and 40 millimeter exact. No other munitions are authorized." Ex. 21 at 184:9–13. He continued, "I need all the munitions team to acknowledge. The only thing authorized at Swann Street is mechanical force and 40 millimeter exact impact. No other munitions are to be deployed. The crowd is surrounded and they do not have an avenue to escape." *Id.* at 184:16–22. Another officer asked, "The only thing we have is a 46. Is 46 authorized?"[7] *Id.* at 185:4–5. Glover responded, "We cannot use munitions, Tony. The crowd is encircled. The rules are, we have to give them an escape route if we use munitions." *Id.* at 185:6–9. He continued, "If you have to for defense, that's fine. But let me know if you have to use it. I don't want this crowd surging the lines." *Id.* at 185:13–15. Tony acknowledged, "The only reason we do, we got a rush, sir." *Id.* at 185:16–17.

99.     MPD General Orders provide that "members shall issue a warning before OC spray is going to be used . . . and permit a reasonable period of time to allow compliance, when feasible." Ex. 33, Less Lethal Weapons General Order, at 4.

100.    Because oleoresin capsicum (OC) spray is an "inflammatory agent" that "causes an almost immediate swelling of the eyes and breathing passages and intense burning," it should

---

[7] "46" refers to an OC spray dispenser. Ex. 34, Carroll 30(b)(6) Dep. Tr. (Part 2), at 134:8–17.

only be used "to subdue an active resister engaged in uncooperative and non-compliant behavior." *Id.* at 3–4.

101.    As the police lines prepared to move into the 1400 block of Swann Street, Officer James Crisman told Officer Brian Stacks, commander of CDU platoon 62, that the officers were "probably going to have to spray them." Ex. 72, Stacks BWC, at 21:11:06–21:11:08. Crisman continued, "No, I am serious. Last time that's what we did, and it took them out." *Id.* at 21:11:08–21:11:21.

102.    Less than a minute before the 15th Street police line moved, Crisman offered to Harrington, "If you'd like, I can go in there with pepper spray. No, really. If they break through." Harrington replied, "I don't think we're authorized yet." Crisman suggested, "If there's a rush." Harrington said, "oh yeah, yeah, yeah." Ex. 73, Harrington BWC 2, at 21:28:51–21:29:01.

103.    At 9:29:20 p.m., Horos communicated the order for the 15th Street police line to move east. Ex. 71 at 21:29:20.

104.    Horos does not recall whether he alone decided to march the 15th Street police line eastward or whether the decision was made in consultation with Glover. Ex. 30, Horos Dep. Tr., at 204:18–22.

105.    Around the same time, Carroll gave the order for the 14th Street police line to move west into the 1400 block of Swann Street. Ex. 9 at 190:6–8.

106.    Defendants offered differing explanations for the decisions to advance the 14th and 15th Street police lines. Carroll testified that the order was given to ensure that protestors trapped on Swann Street could not exit the block using side alleys and to begin the mass-arrest process. Ex. 9 at 190:18–191:3, 192:14–19; 202:16–17.

107.    Horos testified that the 15th Street police line advanced to begin the arrest process and to prevent burglaries by protestors kicking doors on Swann Street. Ex. 30 at 199:20–200:12. But according to Carroll, reports that protestors were kicking doors on Swann Street did not play a role in the decision to move the police lines. Ex. 9 at 202:9–13.

108.    Horos testified that he did not actually see any protestors kicking doors on Swann Street. Ex. 30 at 192:10–12.

109.    No plaintiff testified that they did see protestors kicking doors on Swann Street, and Goodwin, Lazo, Pearlmutter, and Troper testified that they specifically did not. Ex. 14 at 75:6–13; Ex. 16 at 116:19–117:6; Ex. 17 at 180:17–181:1; Ex. 20 at 110:12–15.

110.    No BWC footage of officers at the lines on Swann Street or footage taken by protestors inside the police lines shows anyone kicking down doors to break into residences.

111.    The officers on the 15th Street line were from Civil Disturbance Unit platoons. Ex. 22 at 7; Ex. 26 at 27:16, 35:7–9. They wore riot gear, including helmets with face shields and black full-body protective coveralls. Ex. 65 at 40:04; Ex. 20 at 185:8–186:1; Ex. 18 at 73:17–74:1. They carried batons or large riot shields. Ex. 22 at 7; Ex. 65 at 39:20, 40:52. Police used the shields and batons to shove protestors while advancing. Ex. 74, 15th and Swann Overhead Video, at 0:00–0:54.

112.    MPD training and practices provide that, when an armed police line advances, officers on the line will use shields, batons, and other force to facilitate the line's movement. Ex. 34, Carroll 30(b)(6) Dep. Tr. (Part 2), at 100:8–102:11; Ex. 35, Quarles Dep. Tr., at 74:25–75:9, 75:18–22; Ex. 26 at 180:20–181:13.

113.    Horos gave the order for the 15th Street police line to advance. Ex. 71 at 21:29:20. Without warning or order to disperse, the 15th Street police line began chanting "move

back" and marching eastward against the crowded protestors. Ex. 65 at 41:36–41:42; Ex. 19 at 58:7–12; Ex. 17 at 139:22–140:5; Ex. 18 at 179:19–180:4.

114.    As the 15th Street police line advanced, Surio struggled to move back as crowds of protestors were funneled into the narrow area between cars parked on both sides of Swann Street. Ex. 18 at 181:16–22; Ex. 74 at 0:06–0:14. About ten seconds after the police line began advancing, Officer Steven Quarles raised his shield and struck Surio on her left side. Ex. 67 at 21:29:45–21:29:47; Ex. 74 at 0:04. Trying to maintain her balance, Surio continued to back away from the police line. *Id.* at 0:04–0:07; Ex. 18 at 182:21–183:2. Another officer swung his shield downward, hitting Surio around her left shoulder and knocking her into a parked car and onto the ground. Ex. 74 at 0:08–0:13; Ex. 75, Buchanan BWC, at 21:29:49–21:29:50.

115.    When the 15th Street police line began moving, Remick, too, struggled to move back. Ex. 19 at 57:14–16, 58:4–15, 59:18–20; Ex. 76, Salavatov BWC, at 21:29:46–21:30:03; Ex. 77, Koroma BWC, at 21:30:04–21:30:14. Remick tried to turn and walk away from the police, but Officer Benjamin Celano struck Remick in the back and shoulder area several times using a baton held horizontally with two hands. Ex. 78, Celano BWC, at 21:29:59–21:30:11; Ex. 76 at 21:30:03–21:30:09; Ex. 77 at 21:30:04–21:30:12.

116.    Clear of the crowd of people, Remick walked away from the advancing police line. Ex. 77 at 21:30:16–21:30:44. Slowed by another retreating protestor, Remick had difficulty moving between a parked vehicle and the signpost and tree that lined the street. Ex. 78 at 21:30:26–21:30:35. Celano struck Remick several times in the back and shoulders using a baton held horizontally with two hands before Remick was able to get free of the signpost and tree and step off the curb into the street. Ex. 19 at 58:13–15; Ex. 78 at 21:30:35–21:30:51; Ex. 76 at 21:30:44–21:30:50.

117.    As Remick continued to walk away from police, Officer Joshua Anderson struck Remick in the left arm using a baton held horizontally with two hands. Ex. 79, Anderson BWC, at 21:30:47–21:30:52; Ex. 78 at 21:30:47–21:30:52. As Remick regained balance, Stacks shoved Remick forcefully using two hands. Ex. 19 at 58:19–21; Ex. 77 at 21:30:50–21:30:53; Ex. 72 at 21:30:50–21:30:53; Ex. 79 at 21:30:50–21:30:53. Another protestor helped prevent Remick from falling. Ex. 19 at 58:21–22; Ex. 72 at 21:20:51–21:20:53. The baton strikes caused bruising around Remick's neck and shoulders. Ex. 19 at 101:10–13.

118.    Shortly after the 15th Street police line began moving, a masked protestor stood on a parked car on the western side of Swann Street. Ex. 74 at 0:00–0:06. The protestor held a cellphone, filming the police line. *Id.* As the police line approached the car, the protestor continued to film. *Id.* at 0:06–0:20; Ex. 71 at 21:29:51–21:30:02. Next to the car, a police officer pushed protestors backward using a shield. Ex. 74 at 0:19–0:23. The protestor leaned toward the officer, still raising the cell phone. *Id.* at 0:21–0:23; Ex. 71 at 21:30:02–21:30:06. At 9:30:05 p.m., without warning, Horos sprayed OC toward the yellow-masked protestor, and the protestor ran east on Swann Street. Ex. 74 at 0:23–0:26; Ex. 71 at 21:30:06–21:30:08.

119.    In his IAD interview, Horos testified that he next sprayed OC at a person who was preparing to throw an object. Ex. 81, Horos IAD Interview, at 2:26–2:56. A cell phone video depicts the person whom Horos claimed to have targeted. Ex. 80, Swann Kettle Video, at 0:59. The person—standing in the street one-and-a-half to two car lengths away from Horos—threw a plastic water bottle and immediately moved west on Swann. *Id.* at 0:59–1:00. Horos indicated in his IAD interview that this person was ten-to-twelve feet away, "too far" to be affected by OC spray. Ex. 81 at 2:56–3:06.

120.    Between Horos and the location from which the bottle-throwing individual had fled, a group of approximately ten protestors were backpedaling from the police, in compliance with commands to "move back." Ex. 74 at 0:26–0:29. At 9:30:12 p.m., again without warning, Horos sprayed OC at the backpedaling group in two bursts, sweeping from left to right. *Id.* at 0:28–0:31; Ex. 82, Rosenthal BWC 1, at 21:30:11–21:30:15. As Horos sprayed, Officer Jeffery Buchanan shouted, "Get them, get them, get them." Ex. 82 at 21:30:11–21:30:12. Horos gave no warning before spraying the group, nor had police issued any command with which the group was not complying. *Id.* at 21:30:10–21:30:11.

121.    Surio and Remick were in the area that Horos sprayed. Ex. 82 at 21:30:11–21:30:16 (Surio); Ex. 74 at 0:29 (Remick).

122.    On Swann Street's northern sidewalk, Gregory Altman stopped backing away from the 15th Street police line and began walking back toward it shouting, "We are peaceful." Ex. 82 at 21:30:36–21:30:39; Ex. 84, Crisman Spray Video, at 0:11–0:14. When Altman reached the police line, Buchanan shoved Altman with a shield. Ex. 82 at 21:30:35–21:30:42; Ex. 75 at 21:30:35–21:30:42; Ex. 85, Coleman BWC 1, at 21:30:35–21:30:42; Ex. 84 at 0:11–0:14. Altman again advanced toward the line, and at 9:30:40 p.m., without warning, Horos sprayed OC in Altman's face. Ex. 82 at 21:30:38–21:30:41; Ex. 75 at 21:30:40–21:30:41; Ex. 85 at 21:30:40–21:30:41. Buchanan shouted, "You picked the wrong one." Ex. 75 at 21:30:44–21:30:45.

123.    Before the police line began moving, a resident at 1461 Swann Street had opened his door and allowed protestors to enter. Ex. 21 at 213:5–13. Protestors continued to enter this home as the police line advanced, seeking safety from the officers' physical force and OC spray. Ex. 65 at 41:52–42:10. Troper, Lazo, and Lane all entered this home. Ex. 20 at 117:18–118:5; Ex. 16 at 126:12–14; Ex. 15 at 111:3–6, 116:4–13.

124.    As people entered 1461 Swann Street, the resident was "outside on his front porch yelling get in the house and . . . waving people into his home." Ex. 15 at 116:9–11; *see also* Ex. 82 at 21:30:43–21:30:50 (depicting resident in a white shirt at the top of his steps, helping people inside); Ex. 58, Boland BWC, at 21:30:45–21:31:53 (same). Approximately thirty seconds after the 15th Street police line began moving, an officer in the line pointed towards 1461 Swann Street and said, "He's letting them in. That guy is letting them in." Ex. 86, Mazanec BWC, at 01:30:01–01:30:06 (GMT).[8] The resident remained outside his door, helping people enter until no one was left on his steps. Ex. 87, Drozdt BWC, at 21:30:43–21:30:59.

125.    After Horos's spray, Altman staggered several steps away from the police line, stopping on the sidewalk below 1461 Swann Street. Ex. 68 at 21:30:40–21:30:45. Altman hunched over, holding his face. *Id.* Pearlmutter and other protestors surrounded Altman, trying to assist him. *Id.*; Ex. 80 at 1:31–1:34. Altman, Pearlmutter, and several people around them were standing at a distance from the police line, not moving toward the house or toward the police line. Ex. 68 at 21:30:40–21:30:44. Nevertheless, Crisman, charged ahead of the police line and, without giving a verbal warning, sprayed OC spray at Pearlmutter and the others gathered on the sidewalk. Ex. 89, Crisman IAD interview, at 12:07–12:21; Ex. 68 at 21:30:43–21:30:47; Ex. 88, Niewenhouse BWC, at 21:30:43–21:30:47; Ex. 82 at 21:30:43–21:30:47; Ex. 67 at 21:30:43–21:30:47; Ex. 84 at 0:21–0:24. Ex. 80 at 1:30–1:35.

126.    In his deposition, Crisman claimed that he had used the OC spray "to stop two individuals from going up the stairs" into 1461 Swann Street. Ex. 37, Crisman Dep. Tr., at 196:12–13. In his IAD interview, Crisman suggested that he had targeted a group of about ten

---

[8] As Defendants acknowledge, Dkt. 83-79 at 11 n.5, the BWC for certain officers is stamped in Greenwich Mean Time (GMT), which was four hours ahead of Eastern Daylight Time on June 1, 2020.

protestors who were "on the sidewalk, getting ready to go up the stairs." Ex. 89 at 12:51–12:56.
And just minutes after using OC spray on Swann, Crisman said he "sprayed down the house,"
Ex. 90, Crisman BWC, at 21:44:19–21:44:22, because he was concerned that "they were all
going in so [he] had to stop them somehow," *id.* at 21:45:38–21:45:44.

127.    At the time that Crisman sprayed the group standing on the sidewalk, there was
another group of protestors standing at the top of the staircase entering 1461 Swann Street. Ex.
32 at 25. Yet Crisman did not spray the individuals who were actually entering the house, instead
spraying only the group on the sidewalk. *Id.*

128.    BWC recordings show that the protestors gathered on the sidewalk below 1461
Swann Street whom Crisman sprayed were neither trying to enter any house nor refusing to
move back—they were several feet from the police line when Crisman sprayed the group with
OC spray. Ex. 82 at 21:30:43–21:30:47; Ex. 88 at 21:30:20–21:30:47; Ex. 68 at 21:30:25–
21:30:47; Ex. 67 at 21:30:43–21:30:48.

129.    When Crisman sprayed the group on the sidewalk in front of 1461 Swann Street,
this actually caused several people to flee up the stairs into the house, with the homeowner's
permission, to escape the effects of the OC spray. Ex. 32 at 25.

130.    Crisman's BWC was not recording at the time that he deployed OC spray. Ex. 90
(begins at 21:34:07). Crisman turned on his BWC approximately four minutes after he deployed
OC spray. *Id.* Crisman was later disciplined for failing to timely turn on his BWC on the night of
June 1, 2020. Ex. 37 at 96:4–97:20.

131.    Protestors inside 1461 Swann Street, including Lazo, Troper, and Lane, breathed
Crisman's OC spray. *See, e.g.*, Ex. 65 at 43:16–44:16.

132.    Goodwin also felt the effects of the officers' OC spray. Ex. 14 at 78:20–79:3, 79:17–19. While the police lines were advancing, a resident of a basement apartment invited Goodwin inside for safety. *Id.* at 67:8–12.

133.    Crisman's use of OC spray caused Goodwin to experience a long-lasting, painful burning sensation on her face and irritation in her eyes. Ex. 14 at 78:20–79:3, 79:17–80:4. Goodwin was prescribed medication by a physician for skin spots and irritation caused by the OC spray. *Id.* at 80:5–16.

134.    Crisman's use of OC spray caused Lane to experience skin irritation, coughing, and difficulty breathing that continued through the following day, June 2nd. Ex. 15 at 160:1–21.

135.    Crisman's use of OC spray caused Lazo to experience "difficulty breathing and burning on her skin, especially around her mouth and eyes" that continued into the following day. Ex. 16 at 153:6–154:8. Lazo also experienced coughing symptoms that lasted over a month. *Id.* at 155:14–156:5.

136.    Crisman's use of OC spray caused Pearlmutter to experience difficulty breathing and burning in his eyes, mouth, and skin. Ex. 17 at 254:10–21. The burning sensation in Pearlmutter's eyes and on his skin worsened when he showered after his arrest. *Id.* at 255:3–10. The symptoms continued for another twelve to twenty-four hours. *Id.* at 255:10–11.

137.    Crisman's use of OC spray caused Troper to experience difficulty breathing that continued for about six days. Ex. 20 at 44:2–15. Defendants' use of OC spray also caused Troper to experience severe eye pain for several days. *Id.* at 50:6–51:14.

138.    Horos's use of OC spray caused Remick to experience eye and lung irritation that continued for several days. Ex. 19 at 102:16–20.

139.    Horos's use of OC spray caused Surio to experience difficulty breathing and burning on her skin that continued for about two days. Ex. 18 at 295:22–296:9. Surio described the pain as being a six or seven on a scale to ten. *Id.* at 297:17–18. Surio was unable to wear contact lenses for about one week because of the burning sensation in her eyes. *Id.* at 296:16–297:1. Surio was prescribed different contacts because of her ongoing eye irritation. *Id.* at 304:13–305:13. Defendants use of OC spray also caused Surio to experience chronic sinus infections. *Id.* at 301:8–11, 301:15–19, 302:2–14.

140.    Lane, Lazo, and Troper remained in the home at 1461 Swann Street until the expiration of the curfew at 6:00 a.m. on June 2, 2020. Ex. 15 at 135:10–13, 154:1–3; Ex. 16 at 151:5–9; Ex. 20 at 118:11–18.

141.    Goodwin remained in another home on Swann Street for several hours until a resident escorted her to an Uber by walking her through the back door and the alley behind the house. Ex. 14 at 69:5–10. Police in the alley greeted Goodwin and the resident and did not attempt to stop them from leaving. *Id.* at 69:10–70:10.

### *MPD's Selective Enforcement of the Curfew*

142.    The decision to make mass arrests on Swann Street was "a command-level decision." Ex. 7 at 84:15–17.

143.    Individual officers on the scene of Swann Street did not have discretion regarding whether to make arrests. Ex. 7 at 84:15–17; Ex. 35 at 93:24–94:2.

144.    Glover was in touch with Carroll and Newsham throughout the evening of June 1, 2020, keeping him appraised of the goings-on on Swann Street, both before and after Carroll arrived at Swann Street. *See* Ex. 9 at 141:3-9. Phone logs show that Glover, Carroll, and

Newsham were in contact throughout the evening of June 1 leading into the early morning of June 2. Newsham called Carroll three times after the curfew went into effect on June 1, at 7:06 p.m., 7:10 p.m., and 7:14 p.m. Carroll then called Glover twice, at 7:19 p.m. and 7:30 p.m. A minute later, Carroll called Newsham at 7:31 p.m., and then called Glover back at 7:32 p.m. Newsham called Carroll seven times between 7:36 p.m. and 9:39 p.m., the window during which protestors were corralled onto Swann Street, where Carroll was on the scene by approximately 9:00 p.m. Glover called Carroll at 9:53 p.m. Newsham called Carroll at 10:35 p.m., and Glover called Carroll at 10:37 p.m., as the arrests were being effected. Carroll and Newsham spoke three more times, at 10:42 p.m., 10:44 p.m., and 11:02 p.m. Carroll called Glover at 11:12 p.m., and then spoke to Newsham twice more, at 12:38 a.m. and 1:19 a.m. on June 2. Ex. 38, MPD Call Log at 1, 3–6, 9, 11 (calls among Newsham, Carroll, and Glover highlighted); Ex. 7 at 14:19–15:1 (testimony indicating Newsham's phone number); Ex. 9 Carroll Dep. Tr. at 13:9–13 (testimony indicating Carroll's phone number); Ex. 12 at 16:14–16 (testimony indicating Glover's phone number).

145.    Newsham was on the MPD radio channel on which the events on Swann Street were being discussed and heard the decisions made by Glover in real time. *See* Ex. 7 at 113:1–8, 126:2–18, 149:10–20.

146.    Newsham testified that he knew of the arrest in time to intervene and could have intervened in real-time, but he did not intervene because he approved of the decision. Ex. 7 at 138:12–139:2, 140:21–141:6.

147.    Between the time the curfew went into effect at 7:00 p.m. and the curfew was lifted at 6:00 a.m., 278 people were placed under arrest by MPD and charged with a Curfew

Violation, according to aggregate data produced by Defendants. Ex. 39, Arrest Records Spreadsheet; *see also* Decl. of S. Ogundare at ¶ 8(a).

148.    A curfew violation is a misdemeanor offense. Ex. 12. at 75:15–16; *see also* Ex. 4 at 3; Ex. 40, Remick PD251, at 1 (charging Remick with violating D.C. Code § 2-1543(a)(2)).

149.    Of the 278 people charged with a Curfew Violation, at least 245 of the people arrested were involved in protests. *See* Ex. 39 (rows highlighted in green); *see also* Decl. of S. Ogundare at ¶ 8(b).

150.    197 arrests took place at the 1400 or 1500 block of Swann Street. *See* Ex. 39 ("Arrest Location Block Address" column); Decl. of S. Ogundare at ¶ 8(b).

151.    Another 45 arrests took place at the 1600 block of I Street or the 800 block of 16th Street in front of the White House beginning at 7:47 p.m., *see* Ex. 39; Decl. of S. Ogundare at ¶ 8(b), a location of another significant protest that evening. Ex. 12 at 106:19–107:3. Glover was involved in ordering the arrest of protestors at this location. Ex. 21 at 125:3–13. This mass arrest took over an hour to complete and required substantial use of MPD's resources, including five patrol wagons and between three and five transport vehicles. Ex. 27 at 3.

152.    Three arrests took place at the 2700 block of Pennsylvania Avenue around 8:00 p.m., Ex. 39; Decl. of S. Ogundare at ¶ 8(b), at which time an officer reported over the radio that "members of the Anarchist Groups." Ex. 21 at 136:2–5. Glover instructed a civil disturbance unit to respond to that location. *Id.* at 136:6–14. The arrest reports state that there was a police line at this location and that MPD gave three warnings to leave the area consistent with the First Amendment Assemblies Act, Ex. 41, 2700 Penn Arrest Reports, at 1, confirming that the individuals gathered at this location were protesting.

153.    For the remaining 33 arrests, there is no evidence that Glover, Newsham, or any other senior MPD command official had any involvement in or contemporaneous knowledge of those arrests. *See generally* Ex. 21.

154.    For 26 of those 33 remaining arrests, MPD officers suspected the individuals of other criminal activity aside from a curfew violation. *See* Ex. 39 (rows highlighted in orange); *see also* Decl. of S. Ogundare at ¶¶ 8(c)-(d).

155.    For 19 of the arrests for which MPD suspected other criminal activity, the "Public Narrative" associated with each arrest indicates that MPD suspected the individuals of burglary, theft, illegal firearm possession, or another serious crime. *See* Ex. 39 ("Public Narrative" column); Decl. of S. Ogundare at ¶ 8(c).

156.    For two of the arrests for which MPD suspected other criminal activity (*i.e.* those with "3200 Block of P Street NW" listed as the arrest location), BWC shows the arrest of these men on the 3200 block of P Street. *See* Ex. 91, Bray BWC, at 21:27:43–21:29:07. After the arrest, the officer took a phone call in which he described the arrest, saying that the group was arrested because they were suspected of breaking into stores. *See id.* at 21:36:50–21:37:12 ("they tried to break in to the liquor store . . . [we] just stopped three curfew violators getting ready to do some damage"); 21:37:27–21:38:08 (relaying that workers who were boarding up stores on Wisconsin told the police that three people were trying to break into buildings).

157.    For four of the arrests for which MPD suspected other criminal activity (*i.e.* those with "1400 Block of L Street" listed as the arrest location), the arrest report states that officers found that one of the individuals was carrying brass knuckles. Ex. 42, 1400 L Street Arrest Reports, at 1. The arrest report also states, "CDU #32 responded to assist with stopping curfew

violators that had separated themselves from larger groups," suggesting that the people arrested were participating in a protest. *Id.*

158.    For one of the arrests for which MPD suspected other criminal activity (*i.e.* that with "Unit Block of Dupont Circle NW" listed as the arrest location), the person was not only violating the curfew, but he also attempted to elude police when they approached, and he resisted arrest. See Ex. 43, Dupont Circle Arrest Report, at 1 ("he was given a verbal warning by Cruiser 12 to make his way home to his place of residence and [told] that he was in violation of the Citywide Curfew order . . . As the undersigned officer approached [him] he then began to run northbound in the 1200 Blk of Connecticut Ave NW trying to elude officers. The undersigned Officer gave chase and performed a take down in front of 21 DuPont Cir NW to stop [him] from continuing to flee. Following the take down, [the arrestee] was actively resisting arrest by flailing his arms, twisting his body around, and trying to tuck his hands underneath his body to avoid being placed in handcuffs.").

159.    There are seven arrests for which there is not sufficient information to determine whether the individuals subject to arrest were protesting or suspected of criminal activity aside from the curfew: two arrests at the 1000 block of Constitution Avenue around 9:00 p.m., two arrests at the 1400 block of Rhode Island Avenue around 10:35 p.m., and three arrests at 2700/2800 block of Dumbarton Street around 11:00 PM. *See* Ex. 39 (highlighted in yellow); *see also* Decl. of S. Ogundare at ¶ 8(e). For at least four of these arrests, the individuals were given warnings before being placed under arrest.

160.    For the Constitution Avenue arrests, Defendants have not produced any BWC footage or arrest records related to these arrests. The Public Narrative for these arrests does not contain any details from which it is possible to tell whether the arrested individuals were

protesting or suspected of engaging in other criminal activity. *See* Ex. 39. The Public Narrative does state that the individuals were arrested only after they "refused to obey curfew orders." *Id.*

161.    For the Rhode Island Avenue arrests, Defendants have not produced any BWC footage related to these arrests. The arrest report states that these individuals were stopped and given "multiple warnings . . . to disperse and go home." Ex. 44, Rhode Island Avenue Arrest Reports, at 1. The individuals were arrested only after leaving and returning to the same location. *Id.*

162.    For the Dumbarton Street arrests, Defendants have not produced any BWC footage related to these arrests. As the arrest report details, MPD officers arrested these three people only in response to a report by a "concerned citizen" that "three black males" were on the street. See Ex. 45, Dumbarton Street Arrest Reports, at 1. The arrest report does not contain any information on whether the individuals were protesting or suspected of engaging in other criminal activity. *Id.*[9]

163.    To facilitate the encirclement and mass arrest on Swann Street, MPD deployed six Civil Disturbance Unit platoons, which contained between 193 and 198 MPD officers in total. Ex. 22 at 5–7. In addition, 56 officers from the Narcotics and Special Investigations Division (NSID) were dispatched to the scene to facilitate the mass arrest. Ex. 27 at 3–4 (noting that there were 56 NSID transport personnel deployed on June 1 and that "[a]ll transportation assets were used" to conduct the mass arrest on Swann Street).

---

[9] The disparity between the information police received and the information contained in the BWC footage reflected in ¶ 156, *supra*, and the arrest report for that arrest—*see* Ex. 54, 3200 P Street Arrest Reports (no mention of suspected criminal activity aside from curfew violation)— suggests that the tip police received may have contained information about suspected unlawful conduct that was not included in the arrest report.

164.    MPD officers had a presence on Swann Street until 2:37 a.m., Ex. 27 at 4, over five and a half hours after MPD officers formed the encirclement on Swann Street.

165.    MPD did not arrest all individuals who were outside in violation of the curfew. Ex. 8 at 83:3–9; 134:20–22.

166.    In the 30(b)(6) deposition on this topic on behalf of Defendant District of Columbia, Carroll stated that he is unaware of any information that anyone was arrested for a curfew violation between May 31 and June 2 solely because they were outside in violation of the curfew. Ex. 8 at 141:18–142:7.

167.    MPD officers did not arrest individuals in the vicinity of the 1400 block of Swann Street who were not protesting. Shortly after the formation of the kettle, individuals not involved in the protest gathered outside of the kettle at the corner of 15th Street and Swann Street, in apparent violation of the curfew. Ex. 59, at 21:06:13; Ex. 92, Non-Protestors Near Swann Street Video 1, at 0:00, 1:40.

168.    Over the next 30 minutes, more individuals amassed outside the kettle at the corner of 15th Street and Swann Street. Ex. 71 at 21:21:34; Ex. 66, at 21:13:14, 21:16:49; Ex. 73 at 21:16:33–21:17:04; Ex. 93, Non-Protestors Near Swann Street Video 2 (video from outside kettle at 9:23 p.m.); Ex. 94, Non-Protestors Near Swann Street Video 3; Ex. 95, Non-Protestors Near Swann Street Video 4; Ex. 46, Non-Protestors Near Swann Street Photo 1; Ex. 47, Non-Protestors Near Swann Street Photo 2. At 9:16 p.m., over two dozen individuals were outside the kettle at the north side of this intersection and approximately a dozen were outside the kettle at the south side of this intersection. Ex. 73 at 21:16:33–21:17:04.

169.    After MPD began conducting arrests of protestors inside the kettle, a significant number of individuals remained outside at the corner of 15th Street and Swann Street. Ex. 96,

Non-Protestors Near Swann Street Video 5; Ex. 48, Non-Protestors Near Swann Street Photo 3;

Ex. 73 at 21:41:28–21:41:48, 21:48:34–21:49:19; Ex. 90 at 21:46:38–21:46:48; Ex. 66 at

21:46:19–21:46:49.

170.    Hours after arrests began, individuals remained outside at the corner of 15th

Street and Swann Street and were not placed under arrest or given warnings to disperse. Ex. 69,

Meyer BWC 2, at 00:07:34–00:08:15; Ex. 83, Rosenthal BWC 2, at 00:29:51–00:30:05; Ex. 97,

Kelemen BWC, at 03:22:54–03:23:00 (GMT); Ex. 98, McCaw BWC, at 03:23:03 (GMT).

171.    Around 2:20 a.m., after MPD finished arresting all the protestors that had been

encircled on Swann Street, a small group of individuals remained outside within feet of a group

of several MPD officers, including multiple supervising officers in white shirts. Ex. 99, Coleman

BWC 2. Two individuals stood outside eating pizza for several minutes, *id.* at 06:18:16–06:24:31

GMT (2:18:16–2:24:31 EDT), while five other individuals stood outside on the sidewalk, *id.* at

06:24:31–06:24:39 GMT (2:24:31–2:24:39 EDT). MPD did not place any of these individuals

under arrest, attempt to discern whether they were violating the curfew, or warn them to leave.

172.    There is no evidence that MPD officers at any time attempted to arrest the

individuals who were outside past curfew outside of the police lines at the intersection of 15th

Street and Swann Street.

173.    There is no evidence showing that MPD officers attempted to determine whether

the individuals who were outside past curfew outside of the police lines at the intersection of

15th Street and Swann Street were eligible for any of the exemptions to the curfew.

174.    Shortly after the formation of the kettle, individuals not involved in the protest

also gathered outside of the kettle at the corner of 14th Street and Swann Street, in apparent

violation of the curfew. At 9:23 p.m., BWC footage shows a group of over a dozen people

gathered outside the police lines on the east side of 14th Street. Ex. 70 at 21:23:36. Though

Glover and Carroll were across the street from this group, they took no action to arrest them or

determine whether a curfew exception applied to them. *Id.* at 21:26:50–21:27:16.

175.    In testimony offered on behalf of the District of Columbia, Carroll stated that he

did not know whether members of this group fell into an exception to the curfew. Ex. 8 at 193:2–

194:14, 197:10–22. The District, likewise, did not have any information about whether members

of the group that was encircled fell into an exception to the curfew. *Id.* at 198:1–198:9.

176.    Other footage shows MPD not enforcing the curfew against individuals outside

after curfew. At 9:16 p.m., MPD Officer Kamau Green observed a cyclist outside past curfew

near 14th Street and R Streets. Ex. 100 at 21:16:00. Green gave the cyclist directions around the

encirclement. *Id.* Green did not warn the cyclist of the curfew, attempt to arrest the cyclist,

determine whether the cyclist was eligible for any of the exemptions to the curfew, or inquire

whether the cyclist was attempting to go home. *Id.* Multiple groups of pedestrians walked past

Green and other MPD officers, and no officer attempted to arrest the pedestrians or determine

whether they were eligible for any of the exemptions to the curfew. *Id.* at 21:15:54–21:16:25.

177.    Just after 9:00 p.m., MPD Officer Harmandeep Singh was at the intersection of

14th Street and Church Street. Singh observed multiple groups of pedestrians walking

northbound on 14th Street in apparent violation of the curfew. Ex. 101, Singh BWC 1, at

01:06:20–01:07:00 GMT (21:06:30–21:07:00 EDT). One pedestrian who stopped at the corner of

14th Street and Church Street to speak with the officers expressed sympathy for the MPD, telling

them, "You guys have got your freaking hands full." *Id.* at 01:06:51–01:07:16 GMT (21:06:51–

21:07:16 EDT). Singh did not attempt to arrest any of the individuals outside after curfew or

determine whether they were eligible for any of the exemptions to the curfew.

178.    Around 3:00 a.m. on the morning of June 2, 2020, while the curfew was still in effect, MPD officers issued 61-D Field Arrest Citation forms to four people in a vehicle for violating the curfew. A commanding officer approached the individuals in the vehicle and told them, "You're all curfew violators . . . You have one option, you provide us with an ID and we'll write you a ticket for a curfew violator or we arrest you for a curfew violation, you choose." Ex. 102, 51st Street BWC, at 06:49:26–06:49:56 GMT (02:49:26–02:49:56 EDT).[10] The individuals did not appear to be protesting. *Id.* The officers then issued 61-D citations to the individuals in the car. *See* Ex. 49, 51st Street Incident Report 1; Ex. 50, 51st Street Incident Report 2; Ex. 51, 51st Street Incident Report 3.

***Arrest and Transport of Plaintiffs***

179.    After waiting on Swann Street for hours without access to food and water, Remick was placed under arrest. Ex. 19 at 67:7–67:13. Remick was placed in flex cuffs (or "zip tie"), which were uncomfortable. *Id.* at 69:3–69:9. Remick was placed in a police car, and they were eventually taken to a large facility. *Id.* at 69:22–71:21.

180.    During the period of detention and transportation, Remick's hands were "really tightly ziptied" behind their back. Ex. 19 at 71:21–22. After arriving at the facility, Remick was kept in zip ties for a long period of time. *Id.* at 72:1–73:12.

181.    Remick was eventually released after many hours at the facility. *Id.* at 72:9–74:21. MPD's records do not record when Remick existed the facility. Ex. 52, Mass Processing Intake Books.

---

[10] As Defendants acknowledge, Dkt. 83-79 at 11 n.5, the BWC for certain officers is stamped in Greenwich Mean Time (GMT), which was four hours ahead of Eastern Daylight Time on June 1, 2020. *See* Ex. 49 at 1 (indicating the arrest took place around 3:00 a.m.).

182.    Pearlmutter was detained on Swann Street for a few hours. Ex. 17 at 163:14–163:19. When Pearlmutter was eventually placed under arrest, MPD officers confiscated the bandana he had been using as a makeshift mask after his other mask had been contaminated by OC spray. *Id.* at 164:9–166:19. Pearlmutter was not provided with another mask to protect himself from the spread of COVID-19, despite making a request for one and being put in a van with other protestors. *Id.* at 166:17–167:15.

183.    Upon being placed under arrest, Pearlmutter was placed in zip tie restraints. Ex. 17 at 186:22–187:5. Pearlmutter was kept in zip ties for several hours, until some time in the morning close to sunrise. *Id.* at 210:5–16.

184.    While waiting inside a bus to be processed at the MPD facility, Pearlmutter made a request to MPD officers to adjust the zip ties. Ex. 17 at 208:5–209:8. MPD officers denied those requests. *Id.* After Pearlmutter was taken off the bus to have his mugshot taken, Pearlmutter asked a supervising officer to adjust the zip ties. *Id.* at 209:19–210:3. Pearlmutter's zip ties were eventually adjusted. *Id.* at 251:13–16.

185.    Pearlmutter was eventually released at 8:20 a.m., Ex. 52 at 2, over 11 hours after the formation of the encirclement on Swann Street.

186.    Plaintiff Surio was detained on Swann Street for several hours. Ex. 18 at 193:22–194:2. Surio was transported to a police facility 30 to 45 minutes away from Swann Street. *Id.* at 203:6–17.

187.    Surio was placed in tight zip ties, which caused her pain. Ex. 18 at 207:4–13. When Surio complained that the zip ties were too tight and asked that they be loosened, MPD officers denied her request to adjust them. *Id.*

188.    After arrival at the facility, Surio was processed at 4:20 a.m., more than seven hours after the detention on Swann Street began. Ex. 104, Davis BWC, at 04:19:56–04:20:06. While being patted down by an MPD officer, Surio told the officer that she had suffered painful bruises on her arms, rib, and leg. *Id.* at 04:20:11–04:21:16.

189.    Surio was subsequently transported to the hospital to receive medical care. Ex. 18 at 221:6–225:10.

190.    Surio was next taken back to the police facility, Ex. 18 at 237:6–14, and eventually released at 9:24 a.m., Ex. 52 at 6, over 12 hours after the formation of the encirclement on Swann Street.

191.    In August 2020, the Commander of NSID wrote a memorandum identifying several shortcomings with MPD's high volume arrest and processing practices, including specifically MPD's handling of the mass arrest on Swann Street. Ex. 27. The report noted several "critical issues" resulting in slow transportation and processing for mass arrests, including insufficient transportation capacity, poor training, and a lack of holding area capacity. *Id.* at 5–8.

192.    Prior to June 1, 2020, Glover was aware of MPD's difficulty processing mass arrests, including MPD's lack of transportation capacity, Ex. 53, Haines 30(b)(6) Dep. Tr. at 83:6–14, 184:3–17.

***Chief Newsham's Endorsement of Glover's Arrest Order***

193.    After the arrests were made, Carroll debriefed Newsham and told Newsham "everything that happened," including the bases for the arrest decision. *See* Ex. 7 at 135:18– 136:13, 175:16–176:11. Based on that conversation, Newsham concluded that MPD officers had acted within departmental policy and there were "no issues with the operation." *Id.* at 176:3–11.

194.    On the morning of June 3, 2020, Newsham and Mayor Bowser held a press conference at which they discussed the mass arrests and use of force on Swann Street on the night of June 1. Newsham stated that officers on Swann Street deployed pepper spray, D.C. Mayor's Office, *Mayor Bowser Holds Media Availability, 6/3/20* (June 3, 2020), https://www.youtube.com/watch?v=qQAmZuREL2Y at 3:05, and that 194 arrests were made on Swann Street, *id.* at 5:09. Newsham endorsed the use of a mass arrest on Swann Street, stating that the arrests were "effective in ramping down the level of violence" in the District. *Id.* at 19:10–19:50. Newsham justified the arrests because "projectiles were being thrown and cars were being thrown and cars were being burned." *Id.* at 19:25–19:30.

195.    During the press conference, neither Newsham nor Bowser distanced themselves from or otherwise criticized the mass arrest, use of pepper spray, or any other conduct by MPD officers on Swann Street on the night of June 1. *See generally id.*

196.    In his deposition testimony, Newsham confirmed that the arrests were conducted in line with MPD policy. Ex. 7 at 149:21–150:3.

Dated: September 27, 2024

Respectfully submitted,

/s/ Rebecca Livengood
Rebecca Livengood [DCD Bar ID: 1674010]
Jennifer Klar [DCD Bar ID: 479629]
Nicholas Abbott [DCD Bar ID: 90010173]
Ellora Israni [DCD Bar ID: 1740904]
RELMAN COLFAX, PLLC
1225 19th St NW, Suite 600
Washington, DC 20036
Tel: 202-728-1888
Fax: 202-728-0848
rlivengood@relmanlaw.com
jklar@relmanlaw.com
nabbott@relmanlaw.com
eisrani@relmanlaw.com

*Attorneys for Plaintiffs*