# EXHIBIT 8

Carroll, Jeffrey

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

PAMELA GOODWIN, et al.,          :

    Plaintiffs,                  :

    v.                           :    Civil Action No.

DISTRICT OF COLUMBIA, et al.,:    1:21-cv-00806-BAH

    Defendants.                  :

_____

Friday, March 8, 2024

Washington, D.C.

       30(b)(6) Deposition of JEFFERY CARROLL,

witness herein, called for examination by counsel

for the Plaintiffs in the above-entitled matter,

pursuant to notice, the witness being duly sworn by

Barbara J. Moore, a Notary Public in and for the

District of Columbia, taken at the offices of

RELMAN COLFAX, PLLC, 1225 19th Street, N.W., Suite

600, Washington, D.C., commencing at 1:10 p.m., and

the proceedings being taken down by Stenotype by

BARBARA MOORE, CRR, RMR, and transcribed under her

direction.

Carroll, Jeffrey

2

```
 1    APPEARANCES:

 2

 3            On Behalf of the Plaintiffs:

 4                 NICHOLAS ABBOTT, ESQ.

 5                 REBECCA LIVENGOOD, ESQ.

 6                 GABRIEL DIAZ, ESQ.

 7                 RELMAN COLFAX, PLLC

 8                 1225 19th Street, N.W., Suite 600

 9                 Washington, D.C.  20036

10                 nabbott@relmanlaw.com

11                 rlivengood@relmanlaw.com

12

13            On behalf of the Defendants:

14                 RICHARD SOBIECKI, ESQ.

15                 OFFICE OF THE ATTORNEY GENERAL

16                 400 6th Street, N.W.

17                 Washington, D.C.  20001

18                 richard.sobiecki@dc.gov

19

20

21

22
```

Carroll, Jeffrey

3

1                    TABLE OF CONTENTS

2    WITNESS                                    PAGE

3    JEFFERY CARROLL

4    By Attorney Diaz                             4

5

6                       EXHIBITS

7    EXHIBIT        DESCRIPTION                  PAGE

8
     Exhibit 140  Notice to Take (30)(b)(6)       8
9                 Deposition

10   Exhibit 141  Text messages                  71

11   Exhibit 142  Email thread                  183

12

13   (Exhibits retained by counsel)

14

15

16

17

18

19

20

21

22

Carroll, Jeffrey

74

1  from an 11 p.m. curfew to a 7 p.m. curfew?

2       **A.     Not that I'm aware of, no.  I don't**

3  **recall anything specifically about that.**

4       Q.     Do you have any information that MPD

5  was consulted on that at all?

6       **A.     Not that I know of.**

7       Q.     So effectively all you know from the

8  MPD's perspective is that you received this order,

9  it's up to you to figure out how to implement it?

10      **A.     Yes.**

11      Q.     How to enforce it?

12      **A.     Exactly.**

13      Q.     So what MPD did to enforce it was, I

14  think you said, create an executive order; correct?

15      **A.     Yes.**

16      Q.     So I'm going to direct you now then

17  to -- so to Tab Number 3, which has been previously

18  marked as Exhibit 106.

19      **A.     Okay.**

20      Q.     Do you see this is a three-page

21  document?  Correct?

22      **A.     Yes.**

Carroll, Jeffrey

75

1       Q.      And the first page of this is an

2   email to attach for review EO-20-322?

3       **A.      Yes.**

4       Q.      And then the next two pages are the

5   executive order related to the June 1 incident;

6   correct?

7       **A.      Yes.**

8       Q.      Now, this executive order, does this

9   represent, I guess, the totality of written policy

10  from MPD regarding how to enforce the June 1

11  curfew?

12      **A.      Yes, this is the order that -- the**

13  **guidance that was provided to our members related**

14  **to this curfew on these dates.**

15      Q.      Mentally going back to our earlier

16  conversations about how these things are

17  distributed, what information do you have about how

18  this executive order was distributed to officers?

19      **A.      Sure.  It's like we talked about**

20  **earlier.  You can see in the beginning of the**

21  **exhibit, there was an email that was sent out to**

22  **the Policy and Standards Branch to all the members.**

Carroll, Jeffrey

76

1        Usually there would also be a teletype that

2   comes out separate and apart from this saying, Hey,

3   Executive Order 123 has been issued, check your

4   online directives and a copy has been emailed.

5        This would be kind of the subsequent email

6   I talked about coming from the policy folks to the

7   members, and it says here it's kind of what it is.

8   It says ensure it's in compliance with order

9   10-1000 and then there's an actual attachment to

10  the email so the member could open it on their

11  phone or computer or whatever and they can see it

12  as well and read.

13       Q.    And the attachment would be the

14  order?

15       A.    Yes, the attachment would be the

16  executive order.

17       Q.    And so do you have any information

18  regarding -- do you have any information about

19  whether there was any additional training provided

20  by this in any form?

21       A.    Not to my knowledge there was none.

22       Q.    Not even during roll call briefings

Carroll, Jeffrey

77

1    or anything like that, as far as you know?

2          **A.      Not to my knowledge.  This got**

3    **email -- emailed out, according to this, it got**

4    **sent at 11:22 p.m. on June 1.**

5          Q.    So with something like this, the

6    order is that the officer would see this, would

7    read it, and based on what's in the four corners of

8    the document they should understand what they're

9    supposed to do based on it?

10                  ATTORNEY SOBIECKI:  Object to

11            form.

12                  THE WITNESS:  Yes, they would read

13            the document.  They would interpret the

14            information and they would execute it.

15    BY ATTORNEY DIAZ:

16          Q.    Okay.  So I want to walk through a

17    little bit of the specifics of this.

18          So one of the things, one of the directives

19    that comes through this executive order is that

20    officers are to -- if they see somebody out during

21    curfew, they're supposed to first provide a warning

22    advising the individuals that they are in violation

Carroll, Jeffrey

78

1    of the curfew.  And if they remain on a public

2    space, that they're subject to arrest; correct?

3         A.    No, it says "when practical."

4         Q.    Practical, yes.

5         A.    Doesn't mean they have to.  It means

6    when practical they are to.

7         Q.    Okay.  That's correct.  So with

8    respect to the modifier "when practical," what

9    guidance is provided to officers about

10   understanding sort of what that means?

11        A.    Sure.  So it means it says, "When

12   practical, members who observe individuals in

13   violation of the curfew shall provide a warning

14   advising the individuals that they are in violation

15   of the curfew.  And if they remain on public space,

16   are subject to arrest.  For example, the city-wide

17   curfew is in effect from 7 p.m. tonight until

18   6 a.m. tomorrow.  You are in violation of the

19   curfew.  If you remain on public space, you are

20   subject to arrest."

21            And then the order goes into if a decision

22   is made to arrest, it's up to the SOD detail

Carroll, Jeffrey

79

1    **commander or incident commander or the district**

2    **watch commander to determine should it be custodial**

3    **or noncustodial arrest.**

4        Q.    I want to focus on the first of

5    those two paragraphs that you read.

6        **A.    Sure.**

7        Q.    So I just want to understand what

8    guidance, if any, police had regarding the

9    circumstances under which they're expected to try

10   to give this sort of warning or where it's

11   considered okay and within policy to not follow the

12   warning or to not give the warning.

13       **A.    Sure.  There's really no more**

14   **specific detail than what I read; I read you the**

15   **actual language from the policy.  So it just gives**

16   **the qualifier "when practical."  It talks about the**

17   **warning.  It gives an example.  It doesn't say that**

18   **you have to give that exact warning, but it gives**

19   **you an example of what that warning would be.**

20       **Then it talks about in that period after**

21   **the decision to arrest.  Later on in the order it**

22   **does also provide examples of exemptions of**

Carroll, Jeffrey

80

1    **individuals who might be out past the curfew that**

2    **might be exempt from the curfew regulations, and it**

3    **outlines who they are, and there's another little**

4    **chart that provides essential businesses.**

5         Q.    Okay.  But still sticking to that

6    first paragraph.

7         **A.    Sure.**

8         Q.    I'm just trying to understand, just

9    to be clear on what I'm trying to do.  What I'm

10   trying to do is kind of break down the different

11   parts to make sure I understand sort of where the

12   sort of room for interpretation is.  Okay?

13        **A.    Sure.**

14        Q.    Okay.  So sticking with the -- so

15   when you -- within that first paragraph you

16   mentioned that there's an example of a warning that

17   they might give; correct?

18        **A.    Yes.**

19        Q.    But that's an example of a warning

20   that an officer would give if they were to give a

21   warning; correct?

22        **A.    That's correct.**

Carroll, Jeffrey

81

1          Q.      Okay.  So what I'm trying to
2     understand is the circumstances that would dictate
3     when it is okay to give a warning versus not give a
4     warning.

5          **A.      Sure.**

6          Q.      To say it another way, when -- under
7     what circumstances an officer would be forgiven for
8     not giving a warning despite being told to give one
9     when practical.

10         **A.      I think what I understand what**
11    **you're trying to say.  Police officers have**
12    **discretion in general, and I think in my last**
13    **deposition I think I talked about this a little**
14    **bit.**

15         **In this case you have to take into**
16    **consideration the actions of the individuals that**
17    **you're seeing.  The person just walked out of the**
18    **corner store and the officers are right there.  Had**
19    **the officers been with that person, following them**
20    **for multiple blocks?  Have they been given**
21    **warnings, you know, via wireless emergency alert?**
22    **Are they aware that the police officers are there?**

Carroll, Jeffrey

82

1    The activity of the individuals or the group they

2    are a part of.

3         Things like are they destroying windows,

4    are they trying to set a police car on fire.  All

5    those things you have to take and look at the

6    totality of the circumstances, you know, when

7    you're going to apply that.

8         Also, the resources that are available.

9    You have to have the appropriate resources if

10   you're going to make an arrest, and what is the

11   overall outcome.  What are we trying to accomplish.

12   Looking at all that.

13        Members have to take those into

14   consideration anytime that they enforce a

15   regulation or law.  Those are some of the things

16   that I would expect members to look at the

17   available factors and to make that determination of

18   when it's practical and when it's not.

19        Q.    Okay.  What, if any, guidance did

20   officers receive regarding what factors to consider

21   or how to consider those factors in terms of

22   executing this executive order?

Carroll, Jeffrey

83

1          **A.      There's nothing specific to that in**
2   **this executive order.**

3          Q.      Hearing you talk, it seems pretty,
4   obvious that there's not an expectation from MPD
5   that an officer will arrest anybody that's outside
6   after curfew; correct?

7          **A.      I don't think it's reasonable to**
8   **assume, because there are so many exemptions as**
9   **well.**

10         Q.      Now, in a scenario in which an
11  officer, according this, according to executive
12  order, in a scenario in which the officer is not
13  sort of immediately moving to an arrest, that
14  officer is expected to notify the person who they
15  see out of the existence of a curfew?

16                  ATTORNEY DIAZ:  Objection.

17                  THE WITNESS:  Say it again, I'm
18          sorry.

19    BY ATTORNEY DIAZ:

20         Q.      This is directing an officer, who is
21  assuming the officer is not arresting a person they
22  see out after curfew, the officer is to give a

Carroll, Jeffrey

84

1    warning advising them of the existence of the

2    curfew and that they're out after the curfew time;

3    correct?

4            A.    I don't see where it specifically

5    says that.  It says "when practical."  I don't know

6    that they necessarily would have to give them a

7    warning.  I think it would be reasonable to expect

8    that, but it depends on like how many people are

9    outside.

10           If there's 400 people outside standing

11   there, it wouldn't be reasonable for the officer to

12   go up to each and every person.  So it just

13   depends; right.  If there's a one-off, if an

14   officer saw a person standing there, I think it

15   would be reasonable to go there and say, There is a

16   curfew, are you aware?  The person would say I'm

17   aware, but I'm a nurse, I'm going to the hospital

18   I'm waiting for the bus, I'm waiting for an Uber to

19   come pick me up.

20           It would be a conversation.  It wouldn't be

21   a conversation, a warning, but there would be an

22   interaction to determine; right.  If they were

Carroll, Jeffrey

99

1    could provide them advice over the telephone or

2    over-the-radio chat channel, or they can respond to

3    the scene and provide them more additional guidance

4    as related to the scene as well.

5        So it's kind of ways that you're unsure of

6    or you're not sure what to do to get additional

7    guidance.  And the same thing when a sergeant comes

8    to the scene and they're unsure or unclear, they

9    would then reach out to the watch commander and

10   seek guidance and provide them the facts and

11   circumstances.  The same thing, right.  They

12   provide guidance or response to the scene and make

13   a determination.  Guide them in the appropriate

14   direction.

15       Q.    So then the decision is effectively

16   like a case-by-case ad hoc kind of thing?

17              ATTORNEY SOBIECKI:  Object to

18         form.

19              THE WITNESS:  I mean, it is

20         discretion, yes.  So it does depend on

21         the variables within each incident.

22

Carroll, Jeffrey

100

1      BY ATTORNEY DIAZ:

2          Q.    Okay.  And then when we're referring

3    back to this executive order -- it feels like it's

4    been a while since we talked about it, referring

5    back to this executive order -- what I'm

6    understanding you to be saying is that the same

7    discretion that an officer has to arrest or not

8    arrest, as long as it's a crime for which or

9    violation for which discretion exists, that same

10   discretion applies to this executive order?

11         **A.    Yes, that sounds accurate.**

12         Q.    And I guess close the loop.  There's

13   no -- officers did not receive any specific

14   guidance on how to exercise that discretion?

15         **A.    No, nothing additional than what's**

16   **actually written in the executive order, to my**

17   **knowledge.  This is the only instruction guidance,**

18   **additional information they received outside of**

19   **that they read the actual mayor's words.**

20         Q.    I think we've established that

21   that's the only one, the only policy.  Was there

22   any other executive order related to other sort

Carroll, Jeffrey

101

1    of -- let me withdraw and rephrase that question.

2           We've talked about how June 1 is not the

3    only night in this series of nights that there was

4    a curfew in place; correct?

5           **A.    Yes.**

6           Q.    And we talked -- you mentioned that

7    this was one of the nights in which people were out

8    protesting after George Floyd was killed, but that

9    also lasted many nights; right?

10          **A.    Yes, protesting and also some people**

11   **were engaging in criminal activity.**

12          Q.    Okay.

13          **A.    Yes.**

14          Q.    Now, was there any other guidance

15   for enforcing curfews in that sort of period of

16   time?  Do you follow my question?

17          **A.    I think so.  I mean, the only other**

18   **thing -- this is from my memory, this is what I**

19   **remember.  The only other thing is the additional**

20   **executive orders that related to those days of the**

21   **curfew.  What I mean by that is this curfew**

22   **executive order is specific to June 1, June 1 and**

Carroll, Jeffrey

106

1          A.      I would say that's definitely part

2     of it.

3          Q.      Now, this policy covered the

4     protests or covered the protests upon which this

5     lawsuit is based; correct?

6          A.      They covered protests that occurred

7     that were First Amendment in nature.  I would argue

8     that the one that we're talking about specifically

9     on Swann Street was not a First Amendment

10    demonstration.

11         Q.      Tell me why.

12         A.      Because the individuals that were

13    involved were involved in activity outside of the

14    First Amendment.  They were in violation of the law

15    that we spoke about, the mayor's order of the

16    curfew violation.

17              Outside of that, the group of individuals

18    had multiple warnings, they had police officers

19    that followed them.  They had individuals that

20    observed the group destroying property.  There was

21    communications received related to trying to, I

22    believe it was set a police car on fire in the

Carroll, Jeffrey

107

1    **area.**

2    **So that is not peaceful activity.  That's**

3    **criminal activity that's outside the First**

4    **Amendment.**

5        Q.    Okay.  So as we talked about,

6    however, this policy covers more than just First

7    Amendment activity?

8        **A.    It does.**

9        Q.    Actually, the policy itself

10   contemplates groups of people actually committing

11   crimes; right?

12              ATTORNEY SOBIECKI:  Object to

13         form.

14              THE WITNESS:  It does talk about

15         parts of that, yes.

16   BY ATTORNEY DIAZ:

17       Q.    So the fact that those people are

18   committing crimes would not necessarily put them

19   outside the purview of this policy?

20       **A.    Not that alone.**

21       Q.    Similarly, when we're talking about

22   a curfew from the mayor, right, that's just --

Carroll, Jeffrey

108

1   that's something that the mayor enacted as part of

2   her -- as part of her -- effectively like a public

3   safety emergency issue; correct?

4                  ATTORNEY SOBIECKI:  Object to

5           form.

6                  THE WITNESS:  I believe the

7           underlying mayor's order does reference a

8           public safety emergency.

9     BY ATTORNEY DIAZ:

10        Q.    And the standard operating procedure

11   similarly contemplates scenarios in which police

12   are operating pursuant to a declared public safety

13   emergency; correct?

14                 ATTORNEY SOBIECKI:  Object to

15          form.

16                 THE WITNESS:  I don't know if it

17          talks about a public safety emergency in

18          this standard operating procedure.  I

19          don't recall that.

20    BY ATTORNEY DIAZ:

21        Q.    Let's look at page 9 of 23 together.

22        **A.    Sure.**

Carroll, Jeffrey

133

1    **protected classes or exceptions that are laid out**

2    **in the executive order.**

3         Q.    And so one thing I should actually

4    clarify, because I think we've been a little bit

5    loose with our language probably because of me.

6         You are obviously here as an MPD

7    representative; right?

8         A.    Yes.

9         Q.    So when we're talking about -- when

10   we've been saying "Actions protected by the First

11   Amendment," what we're really talking about is they

12   fall within the purview of the First Amendment

13   Assemblies Act?

14        A.    Yes.

15        Q.    You're not giving us constitutional

16   law?

17        A.    No.

18        Q.    So, that said, you mentioned the

19   totality of the circumstances of everything that

20   officers or MPD members had reported seeing people

21   on the street doing; correct?

22        A.    Yes, the reported information that

Carroll, Jeffrey

134

1    **came back.**

2         Q.    So it wasn't, for example, just the

3    fact that they were out after curfew that subjected

4    them to arrest in this case; right?

5                   ATTORNEY SOBIECKI:  Object to

6              form.  Misstates prior testimony.

7                   THE WITNESS:  That solely would

8              subject them to arrest based on the

9              executive order, but they were doing way

10             more than that.

11   BY ATTORNEY DIAZ:

12        Q.    So it could subject them to arrest,

13   but what I'm asking you is -- well, it could

14   subject them to arrest, but clearly the executive

15   order contemplates the exercise of discretion?

16        **A.    Yes, we talked about the discretion,**

17   **yes.**

18                  ATTORNEY SOBIECKI:  Object to

19             form.

20        Q.    Not everybody who was out after

21   curfew was arrested; right?

22        **A.    That's correct.**

Carroll, Jeffrey

135

1            ATTORNEY SOBIECKI:  Object to

2        form.

3        Q.    So in this case, just the fact of

4   them being out after curfew would not have been or

5   was not sufficient for -- to support the decision

6   to arrest the group.  It was that plus other

7   things; correct?

8            ATTORNEY SOBIECKI:  Object to

9        form.

10           THE WITNESS:  No, that was

11       sufficient to subject them to arrest.

12       The executive order lays out the

13       exceptions to the law solely -- like I

14       said, you can use discretion, yes, but

15       being out outside past curfew, not having

16       one of those exceptions does subject them

17       to being lawfully arrested.

18   BY ATTORNEY DIAZ:

19       Q.    It made it so that you could have

20   exercised the discretion to arrest them just for

21   being out of a curfew, correct, is what I'm hearing

22   you say.

Carroll, Jeffrey

140

1    BY ATTORNEY DIAZ:

2         Q.    Do you have any specific -- as you

3    sit here today, do you have any specific knowledge

4    of anybody who was arrested for only a curfew

5    violation without the allegation that they had done

6    something in addition to that?

7                   ATTORNEY SOBIECKI:  Objection.

8         Exceeds the scope of the notice.

9                   You can answer it if you have

10        personal knowledge.

11                  THE WITNESS:  That night or any

12        time a curfew has been in effect?

13    BY ATTORNEY DIAZ:

14        Q.    Let's start with the night of

15    June 1.

16        **A.    I can't specifically say.  The other**

17    **nights, yes.**

18        Q.    Tell me about the other nights.

19        **A.    January 6 there was an insurrection**

20    **at the United States Capitol.  There were**

21    **individuals that were out past curfew, and they**

22    **were arrested for violation of curfew.**

Carroll, Jeffrey

141

1    **Approximately 30 to 35-ish.**

2           Q.     So people that you say were arrested

3    for violation of the curfew were not people who are

4    suspected in having participated in the, what we'll

5    call the insurrection?

6           **A.     I would say that some people would**

7    **say at some point they were engaged in a First**

8    **Amendment demonstration.  Some people would say**

9    **they were engaged in an insurrection.  It's hard to**

10   **characterize that.**

11          Q.     What I mean is the people you

12   referred to on January 6 --

13          **A.     Yes.**

14          Q.     -- they were not arrested because

15   there was also independent suspicion that they had

16   participated in the events at the Capitol?

17          **A.     Yes.  Because of the curfew, yes.**

18          Q.     So do you have any information that

19   anybody, I guess, from let's say May 31 to June 2

20   of 2020, during those days when there was a curfew

21   in place after George Floyd was killed, do you have

22   any information about anybody who was arrested in

Carroll, Jeffrey

142

1    that period of time for just a curfew violation as

2    you sit here today?

3                        ATTORNEY SOBIECKI:  Objection to

4             form.  Exceeds the scope.

5                        You can answer.

6                        THE WITNESS:  As I sit here today,

7             I don't know.

8      BY ATTORNEY DIAZ:

9         Q.    You mentioned that the people who

10    were ultimately arrested on Swann Street were given

11    multiple warnings.  Is that correct?

12         A.    I think I did say that, yes.

13         Q.    Can you tell me what your basis is

14    for that and what the warnings you understand that

15    were given.

16         A.    Sure.  So the direction, what was

17    put out was as I mentioned, the group on Swann

18    Street there were flanked by police officers as

19    they traveled throughout.  We also used PAs

20    throughout the districts, cases of what we call an

21    LRAD or a long-range acoustical device where

22    warnings were given.

Carroll, Jeffrey

143

1          **The District pushed out wireless emergency**

2     **alerts across the city.  Those are the alerts that**

3     **go to wireless devices and cell phones notifying**

4     **folks of the curfew as well as press conferences**

5     **and information that was pushed out about -- from**

6     **media outlets in relation to the curfews.**

7          Q.    So I want to tease that apart.  What

8     I'm hearing are two different types of

9     notification.  So the one type of notification is a

10    general notification about the existence of a

11    curfew.  That might be your press conference, your

12    phone push notifications, things like that; right?

13         **A.    Yes.**

14              ATTORNEY SOBIECKI:  Object to

15         form.

16         Q.    And that to me is separate from an

17    actual, like, on-the-street warning given to

18    somebody, for example, similar to what we saw in

19    that executive order; right?

20              ATTORNEY SOBIECKI:  Object to

21         form.

22              THE WITNESS:  I think one you

Carroll, Jeffrey

192

1       Q.      Specifically, the group of people

2    that you mentioned were marching up 14th Street

3    that police had been monitoring?

4       **A.      Yes, that happened earlier, yes.**

5       Q.      And, again, there were other people

6    that were not part of that group who were out after

7    curfew in the area?

8                    ATTORNEY SOBIECKI:  Object to

9            form.

10                   THE WITNESS:  I'm sure there were

11           some that were out.

12    BY ATTORNEY DIAZ:

13       Q.      You don't have any specific

14    recollection of individual people out?

15                   ATTORNEY SOBIECKI:  Object to

16           form.  Asked and answered.

17                   THE WITNESS:  I'm pretty sure the

18           last time in my deposition the attorney

19           asked me a question about other

20           individuals that were standing on

21           14th Street, say, they said something

22           about the union organizer or something.

Carroll, Jeffrey

193

1        BY ATTORNEY DIAZ:

2            Q.     And you remember being shown video

3        footage of being up there?

4            **A.     Yeah, that's what she was asking**

5        **about.  There was some people.  I don't remember if**

6        **it was a lady or a man, but there was a person had**

7        **asked her -- had said something to another official**

8        **about knowing an organizer or something to that**

9        **effect.**

10           Q.     And so you know what I'm talking

11       about when I say that, when I refer to that.  We

12       don't have to replay the video?

13           **A.     No.**

14           Q.     So as far as your understanding,

15       those people that were outside the group, the one

16       that you mentioned was an organizer, they were not

17       within the group that had been marching on

18       14th Street?

19                  ATTORNEY SOBIECKI:  Object to

20           form.

21                  THE WITNESS:  I don't know if they

22           were in the group.  I don't know.

Carroll, Jeffrey

194

1      BY ATTORNEY DIAZ:

2          Q.    Could you explain why you did not

3    decide to arrest those people?

4                ATTORNEY SOBIECKI:  Objection.

5          Asked and answered.

6                THE WITNESS:  Sure.  There was a

7          lot of factors that went into the

8          decision to make those arrests.  Is there

9          probable cause to arrest those people

10         that were outside that we're talking

11         about on 14th Street?  There might have

12         been one of the exceptions to the curfew

13         violation.  I don't know that.

14               But at that time, with the limited

15         resources that we did have, we know that

16         the group that we had on Swann Street had

17         been engaged in activity, criminal

18         activity above and beyond the curfew

19         violation.

20               We had seen the escalation of the

21         violence.  We talked about the

22         destruction of property related to, I

Carroll, Jeffrey

195

1    believe it was the window and then the

2    police car.  I believe it was they threw

3    it and tried to set it on fire and the

4    escalation of the group.

5         So based on the resources that we

6    had, the factors taken into consideration

7    and with that group and what we had seen

8    on prior days, we determined that there

9    was probable cause to make arrests of all

10   those individuals in that group for being

11   out past the curfew.

12        We talked about the warning

13   factors earlier, and I won't get into

14   that.  The wireless emergency alerts.

15   There was a whole host of factors that go

16   into that.

17        With that, we made a decision to

18   arrest those individuals, but in any

19   situation you have a limited amount of

20   resources.  We knew what that group was

21   doing, we knew the behavior that that

22   group had engaged in.  So we made those

Carroll, Jeffrey

196

1    arrests.

2         With our resources around there,

3    you know, I don't know the exact number

4    of individuals off the top of my head

5    that were arrested on Swann Street, but

6    once you make an arrest, you're

7    responsible for the custody and the

8    well-being of the individuals that you

9    have under arrest.

10        And so a little bit of a situation

11   because those folks, although they're

12   inside police lines, we also have to get

13   them handcuffed and secured, and things

14   can happen.  So we have to have resources

15   there to also watch the well-being of

16   those individuals that are there and then

17   get the other resources as far as the

18   transportation.

19        So we can't start trying to run

20   off and arrest every person that's out

21   there.  We have to evaluate, and we

22   talked about the factors earlier related

Carroll, Jeffrey

197

1        to discretion with that.

2            But no, we didn't arrest every

3        single person that's out there that was

4        there.  We have to evaluate what we have,

5        and we have to look at the resources that

6        are available and the conduct of the

7        individuals and overlay that with the

8        assurance that we do have that probable

9        cause that we're talking about.

10           The person standing behind me that

11       may or may not know that a protest

12       person, they may have been a nurse going

13       to the hospital.  There could have been a

14       hundred of those exceptions.  I don't

15       know.  Maybe they weren't.  That's

16       possible too.

17   BY ATTORNEY DIAZ:

18       Q.    And just to be clear, you have no

19   indication whatsoever that that person -- to use

20   the example of one that you said -- they might know

21   an organizer was within an accepted group?

22       **A.    I don't know who they were.**

Carroll, Jeffrey

198

1       Q.      And similarly, you-all didn't

2   check -- you-all didn't sort of check with every

3   single person within the encirclement to see

4   whether they were within an accepted group;

5   correct?

6       **A.      It would stand to reason that they**

7   **weren't inside the accepted group.  They went up,**

8   **they went down.  They broke windows, they set a**

9   **police car on fire.**

10      Q.      Some people in the group?

11      **A.      We can't establish who it was.  We**

12  **didn't have probable cause to establish that, like**

13  **we talked about earlier.**

14      Q.      You're saying that some -- let me

15  take a step back.

16      **A.      Yes.**

17      Q.      The information that police had was

18  that some people had -- certainly not everybody who

19  was ultimately arrested on Swann was even accused

20  of having committed any kinds of crimes, right?

21      **A.      Yes, every person.**

22      Q.      Besides curfew?

Carroll, Jeffrey

199

1           **A.       Are you saying specifically the**
2   **destruction of property?**
3           Q.       Yes.
4           **A.       No, we couldn't establish probable**
5   **cause.   That's why we didn't charge anyone with**
6   **that.**
7           Q.       Now, the information -- can we take
8   two minutes.
9                         (Discussion held off the
10                  record.)
11                        (Recess taken from 4:31 p.m.
12                  to 4:34 p.m.)
13      BY ATTORNEY DIAZ:
14          Q.       So we talked about how, according to
15  police, some subset of the people who were
16  ultimately arrested on Swann Street had engaged in
17  acts of vandalism on 14th Street; correct?
18                        ATTORNEY SOBIECKI:  Object to
19              form.  Misstates prior testimony.
20                        THE WITNESS:  Yes.  There's
21              indications that individuals had
22              destroyed a window, and then I believe

Carroll, Jeffrey

203

1    this group; correct?

2                ATTORNEY SOBIECKI:  Object to

3           form.

4                THE WITNESS:  It was a

5           consideration.  It was not the catalyst

6           for making a determination.  It doesn't

7           establish probable cause for the curfew

8           violation.

9      Q.    It was part of it?

10     **A.    Yes, it's a factor.**

11     Q.    And so your information regarding

12   this police car was, again, that came from police

13   officers?

14     **A.    Yes.**

15     Q.    And how did you learn about that?

16     **A.    I'm pretty sure it was also voiced**

17   **over the radio.  That's my recollection.**

18     Q.    And for either of these -- so right

19   now we've talked about breaking windows and we

20   talked about vandalization of a police car.

21     **A.    Yes.**

22     Q.    Other than those two categories, is

Carroll, Jeffrey

204

1    there another category of destruction of property

2    that you attributed or that MPD has attributed to

3    the group of protesters who were ultimately

4    arrested on Swann Street?

5                     ATTORNEY SOBIECKI:  Object to

6          form.  Exceeds the scope.

7          Q.     As far as you know.

8          **A.     Those are the only two things that I**

9    **know that I can recall at this point.**

10         Q.     Okay.  And as far as you know -- I

11   think you may have said this at the beginning --

12   but as far as you know, were any specific lookouts

13   or descriptions for the individuals who police

14   believe to have been responsible for these acts of

15   vandalism voiced over the radio?

16         **A.     Not that I can recall.**

17         Q.     Do you have any information

18   regarding which specific police officers

19   witnessed -- let's start with the windows.

20         **A.     I don't specifically recall, but I**

21   **believe during my deposition I was asked about the**

22   **windows in the car and a specific person.  I just**

Carroll, Jeffrey

205

1    can't remember who it was.  So I can't specifically

2    say who it was, but I do know that was also some of

3    the questions during my last deposition.  I don't

4    remember how I answered.

5           Q.    Did I just hear you say "windows to

6    the car"?

7           A.    Windows in the car.

8           Q.    Windows in the car?

9           A.    Sorry, my voice is kind of cutting

10   out on me now.  She's enjoying it.

11          Q.    Okay.  And so going back -- I think

12   that I just wanted to clear that up.  It might make

13   sense, I think, to break now.  I wanted to go to

14   4:45, this is probably far enough, and then we'll

15   reconvene Tuesday afternoon and we'll finish it

16   then.  We'll send a Zoom link to you.

17                         (Proceedings adjourned at

18                    4:40 p.m.)

19

20

21

22