# EXHIBIT 12

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


PAMELA GOODWIN, et al.,          :

    Plaintiffs,                  :

    v.                           :    Civil Action No.

DISTRICT OF COLUMBIA, et al.,:    1:21-cv-00806-BAH

    Defendants.                  :

_____

Friday, February 16, 2024

Washington, D.C.

Deposition of ROBERT THOMAS GLOVER, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by Barbara J. Moore, a Notary Public in and for the District of Columbia, taken at the offices of RELMAN COLFAX, PLLC, 1225 19th Street, N.W., Suite 600, Washington, D.C., commencing at 10:00 a.m., and the proceedings being taken down by Stenotype by BARBARA MOORE, CRR, RMR, and transcribed under her direction.

Glover, Robert Thomas                                February 16, 2024

2

```
1    APPEARANCES:

2

3            On Behalf of the Plaintiffs:

4                NICHOLAS ABBOTT, ESQ.

5                REBECCA LIVENGOOD, ESQ.

6                RELMAN COLFAX, PLLC

7                1225 19th Street, N.W., Suite 600

8                Washington, D.C.  20036

9                nabbott@relmanlaw.com

10               rlivengood@relmanlaw.com

11

12           On behalf of the Defendants:

13               RICHARD SOBIECKI, ESQ.

14               OFFICE OF THE ATTORNEY GENERAL

15               400 6th Street, N.W.

16               Washington, D.C.  20001

17               richard.sobiecki@dc.gov

18

19

20

21

22
```

Glover, Robert Thomas                              February 16, 2024

3

1                          TABLE OF CONTENTS

2     WITNESS                                        PAGE

3     ROBERT THOMAS GLOVER

4     By Attorney Livengood                              4

5     By Attorney Sobiecki                             303

6                            EXHIBITS

7     EXHIBIT        DESCRIPTION                      PAGE

8

9     Exhibit 92    Document Bates-stamped             46
                    D.C._21-cv-0080600015670
10                  through -72

11    Exhibit 93    Audiotape                         160

12    Exhibit 94    Audiotape                         182

13    Exhibit 95    Videotape                         239

14    Exhibit 95A   Letter dated June 4, 2022         245

15    Exhibit 96    Standard Operating Procedures     251

16    Exhibit 97    Document Bates-stamped -10050     255
                    to -10052
17
      Exhibit 98    Memorandum                        266
18
      Exhibit 99    Document Bates-stamped -04525     275
19                  to -04637

20    Exhibit 100   Memorandum                        279

21    Exhibit 101   Memorandum                        290

22

Glover, Robert Thomas                        February 16, 2024

13

1    MPD?

2           A.      Yes.   Through the government with

3    employees.

4           Q.      Okay.   Were any of those related

5    to -- I'm sorry.   Let me try -- so four human

6    resources through -- that came up through the

7    arbitration process?

8           A.      Yes.

9           Q.      Did you serve as an expert in any

10   other cases in which you were deposed?

11          A.      No.

12          Q.      Okay.   So the rest were cases in

13   which you were either a witness or a party?

14          A.      Yes.

15          Q.      Okay.   In what cases were you a

16   party?

17          A.      A couple.   A couple lawsuits.   I

18   don't remember all of them.   And I don't remember

19   the formal court-assigned document number.

20          Q.      Okay.   What do you remember about

21   them?

22          A.      I'm trying to remember.   I know one

Glover, Robert Thomas                              February 16, 2024

14

1    was regards to a protest or a First Amendment

2    activity.  And the other ones I don't recall.  They

3    were over and done with before they got too far,

4    and I just don't recall all the circumstances.

5          Q.    Okay.  You mentioned that there was

6    a tort case.  Do you recall that one?

7          A.    Well, I call it, I guess, a civil

8    action.  In my mind I call it tort.

9          Q.    Was that the protest case that you

10   were involved in?

11         A.    I believe so, yes.

12         Q.    And do you remember about when that

13   was?

14         A.    I don't recall the date.  Somewhere

15   when I was assigned to SOD, so it had to be

16   somewhere after 2008.

17         Q.    Okay.  Do you know, was it before

18   2020, do you know?

19         A.    Yes.

20         Q.    Do you know if it was like before

21   2015?

22         A.    I don't remember the exact date.

Glover, Robert Thomas                                    February 16, 2024

15

1          Q.     Okay.  And was your role in the

2   events giving rise to that case in your capacity as

3   an officer with SOD?

4          **A.     Yes.**

5          Q.     And you don't remember what the

6   disposition of that case was?

7          **A.     No.**

8          Q.     Okay.  Do you remember any of the

9   parties' names?

10         **A.     I don't.  And I'm trying to remember**

11  **what date.  It was the second one, but I'm not even**

12  **sure if I was actually a named defendant in it or**

13  **not, and it stemmed also from a period of time from**

14  **the summer of 2020, but I can't give it an exact**

15  **date.  And I'm not even sure of the disposition of**

16  **that case.**

17         Q.     And you are deposed in that case?

18         **A.     I wasn't.  Actually was I?  I was**

19  **deposed in that case.**

20         Q.     And in the four cases where you

21  served as an expert, did any of those involve race

22  discrimination allegations?

Glover, Robert Thomas                                February 16, 2024

16

1          **A.**    **No.**

2          Q.    Did any involve protest activity?

3          **A.**    **No.**

4          Q.    What about mass demonstration

5    activity?

6          **A.**    **No.**

7          Q.    Okay.  When you were working for

8    MPD, did you use a cell phone in connection with

9    your work?

10          **A.**    **I did.**

11          Q.    And was that assigned by the

12    department?

13          **A.**    **It was.**

14          Q.    Do you remember what the phone

15    number was for that phone?

16          **A.**    **(202)497-1162.**

17          Q.    And did you use that phone to send

18    text messages connected with work?

19          **A.**    **I did.**

20          Q.    Did you have any practice with

21    respect to retain text messages on that phone?

22                    ATTORNEY SOBIECKI:  Object to the

Glover, Robert Thomas                                February 16, 2024

17

1          form.

2                    THE WITNESS:  No.

3      BY ATTORNEY LIVENGOOD:

4          Q.    Did you ever delete text messages on

5    the phone?

6          **A.    Yes.**

7          Q.    How often?

8          **A.    When they got full.**

9          Q.    Did you regularly delete text

10   messages on that phone?

11         **A.    Yes.**

12         Q.    Why did you delete text messages on

13   that phone?

14                    ATTORNEY SOBIECKI:  Objection.

15            Asked and answered.

16                    You can answer.

17                    THE WITNESS:  That one kind of

18            threw me, I apologize.  I just deleted

19            them.  I knew that they were on the file,

20            something like that, and didn't give it a

21            second thought.

22

Glover, Robert Thomas                                February 16, 2024

27

1                    THE WITNESS:  I don't remember if

2          any of them were there or not.

3      BY ATTORNEY LIVENGOOD:

4          Q.    Okay.  When you were commander, were

5   you assigned to a particular unit?

6          A.    **I was a commander of the Special**

7   **Operations Division.**

8          Q.    When you were a lieutenant, did you

9   spend any time with the Special Operations

10  Division?

11         A.    **Yes.**

12         Q.    How long were you with the Special

13  Operations Division as a lieutenant?

14         A.    **March of 2008.**

15         Q.    Until April of 2016?

16         A.    **Yes, ma'am.**

17         Q.    Okay.  So you were with SOD for a

18  long time before you retired?

19         A.    **Yes, ma'am.**

20         Q.    In your role as an inspector with

21  SOD and -- I'm sorry, were you an inspector with

22  SOD and the Inaugural Task Force from May of 2020

Glover, Robert Thomas                              February 16, 2024

28

1    until January of 2021?

2          A.    Yes.

3          Q.    Both?

4          A.    Yes.

5          Q.    Okay.  What did your job

6    responsibilities in that role entail?

7          A.    Within SOD?

8          Q.    As an inspector.

9          A.    As an inspector?

10         Q.    Yes.

11         A.    First, as a member of the senior

12   executive command staff, the duties were assigned

13   to us by the chief of police, but I was charged

14   with the daily operations of both the Inaugural

15   Task Force and Special Operations Division.

16         I was in that role because of an injury to

17   the commander that was normally the commander of

18   SOD.  So normally I would have just been -- under

19   the circumstance, I would have just been assigned

20   to the Inaugural Task Force.

21         Q.    Who was the commander?

22         A.    Commander Guillermo Rivera.

Glover, Robert Thomas                                    February 16, 2024

29

1          Q.      When was Commander Rivera injured?

2          **A.      Early spring of 2020.  I don't**

3  **remember the exact date.**

4          Q.      So on June 1 of 2020, you were

5  operating as the director of the daily operations

6  of the Special Operations Division?

7          **A.      Yes.**

8          Q.      No one else was assigned -- was in

9  the role of commander of SOD at that time?

10         **A.      Not at that time.**

11         Q.      So you mentioned participating in

12 the senior executive command staff, the daily

13 operations of SOD.  Did you have any other roles in

14 your time as inspector of SOD in the Inaugural Task

15 Force?

16         **A.      Served as the citywide -- we call**

17 **them the night hawk or duty officer.  That was done**

18 **as a rotational basis.**

19         **Also, covered the spot for the SOD**

20 **commander on the Use of Force Review Board.  And I**

21 **didn't serve on an adverse action hearing panel**

22 **during that period.  That's pretty much it.**

Glover, Robert Thomas                    February 16, 2024

30

1          Q.      Did you serve on an adverse action

2    hearing panel at any other time?

3          A.      Yes.

4          Q.      When was that?

5          A.      I wanted to say that was 2017, 2016

6    I got promoted to captain.

7          Q.      In your role in the adverse action

8    hearing panel, did you review any conduct related

9    to mass assemblies?

10          A.      No.

11          Q.      Did you review any conduct related

12    to race discrimination?

13          A.      No.

14          Q.      When you were the inspector from May

15    of '20 to January of 2021, who did you supervise?

16          A.      Theoretically, everyone assigned to

17    the Special Operations Division.

18          Q.      Okay.  Who reported directly to you?

19          A.      The captains at the time were my two

20    immediate subordinates.

21          Q.      And who were they?

22          A.      Captain Michelle Caron, and I'm

Glover, Robert Thomas                          February 16, 2024

69

1          **A.      Yes.**

2          Q.      And have you received any training

3    about when to order encirclement?

4          **A.      I have.**

5          Q.      What training is that?

6          **A.      It's part of the CDU training block.**

7          Q.      Do you remember specifically which

8    training it was?

9          **A.      All through my career.  So as a**

10   **recruit, I was CDU member from being a recruit in**

11   **1994 all the way until I retired.**

12         Q.      Okay.  Am I understanding correctly

13   that all MPD officers receive CDU training?

14         **A.      I'm not the best person to answer**

15   **that.**

16         Q.      That's, fair enough.

17         **A.      At one time the premise was trying**

18   **to get everyone CDU-certified.  But when I first**

19   **came on, there was a limited number of people that**

20   **were CDU-certified.**

21         Q.      But you've received CDU training?

22         **A.      Yes, ma'am, I have.**

Glover, Robert Thomas                              February 16, 2024

70

1          Q.      And who is authorized to order

2    encirclement?

3          A.      **Normally it would be the designated**

4    **incident commander or event commander.**

5          Q.      You say "normally."  Are there any

6    other times when it would be someone other than the

7    designated incident commander?

8                       ATTORNEY SOBIECKI:  Objection.

9            Calls for speculation.

10         Q.      If you know.

11         A.      **There could be a situation where,**

12   **again, a CDU official, a sergeant, would have to**

13   **make that immediate decision based upon what was**

14   **occurring at that moment in time.**

15         Q.      Am I understanding correctly that

16   you were the incident commander on June 1, 2020?

17         A.      **I was.**

18         Q.      When you gave the order to encircle

19   on Swann Street, was that in your capacity as

20   incident commander?

21         A.      **It was.**

22         Q.      And do incident commanders receive

Glover, Robert Thomas                                    February 16, 2024

71

1    any different training on when to order

2    encirclement?  Sorry, separate from the CDU

3    training you've already described.

4            **A.      No.**

5            Q.      When an incident commander -- when

6    you authorized the encirclement on June 1, 2020, as

7    incident commander, did you need to clear that

8    decision with anyone above you in the MPD chain of

9    command?

10           **A.      No.**

11           Q.      Why not?

12                   ATTORNEY SOBIECKI:  Object to

13              form.

14                   THE WITNESS:  Again, I was the

15              designated incident commander.  The

16              premise and design of an incident

17              commander is they are empowered to carry

18              out their duties and responsibilities as

19              such.

20         BY ATTORNEY LIVENGOOD:

21           Q.      Okay.  And that includes ordering

22    encirclement, if appropriate?

Glover, Robert Thomas                                February 16, 2024

72

1          **A.      Yes.**

2          Q.      How do you know when it's

3   appropriate to order encirclement?

4                   ATTORNEY SOBIECKI:  Object to

5          form.

6                   THE WITNESS:  Are you in general,

7          or are you specifically on June 1?

8   BY ATTORNEY LIVENGOOD:

9          Q.      If you know.  If you can answer in

10  general, we can start there.

11         **A.      Certainly it would have to be the**

12  **majority of the persons involved that were involved**

13  **in criminal behavior giving immediate rise to**

14  **substantial property damage, endangering of life**

15  **safety, both of their own and others, and physical**

16  **injury.**

17         **So that would be my general answer.  And I**

18  **need to add that weighing what the offense would be**

19  **charged.**

20         Q.      What do you mean by that?

21         **A.      Are they going to be felony arrests,**

22  **or are they going to be misdemeanor arrests.  Are**

Glover, Robert Thomas                                    February 16, 2024

73

1    the misdemeanor arrests for assaultive behavior or

2    is it property damage.  There's tolerances of each

3    individualized incident commander based upon the

4    totality of circumstances.

5          Q.     And what do you mean by "tolerances

6    of each individual incident commander"?

7          A.     You do receive risk management

8    training, and part of the premise of risk

9    management is simply is the juice worth the

10   squeeze, and you have to assess that continuously.

11         Q.     On June 1 when you ordered the

12   encirclement, what was that based on?

13         A.     Number one, it was not a First

14   Amendment assembly.  Secondly, every person who was

15   out after the curfew established by the mayor's

16   executive order and broadcasted and publicized

17   widely to the public through various social

18   platforms, news media and alerts, they were subject

19   to immediate arrest after the curfew was in place.

20   So they were already in violation of the law at the

21   time.  Or excuse me, the mayor's curfew.

22         Q.     Okay.  And those were the two

Glover, Robert Thomas                                February 16, 2024

74

1   reasons.  It was not a First Amendment assembly,

2   they were in violation of a curfew?

3                   ATTORNEY SOBIECKI:  Object.

4        Q.     Was there a third reason?

5                   ATTORNEY SOBIECKI:  You can

6           answer.

7                   THE WITNESS:  I think with the

8           objection you were saying something, and

9           I didn't hear your last statement.

10   BY ATTORNEY LIVENGOOD:

11       Q.     Understood.  When I asked what the

12   decision to encircle on June 1 was based on, you

13   said -- I understood you to say it was not a First

14   Amendment assembly, and the people marching were

15   violating curfew.

16       Did I understand that correctly?

17       A.     Coupled with the totality of the

18   circumstances and the violence of the group itself

19   endangering those that were lawfully conducting

20   their lives in the District of Columbia such as the

21   restaurant patrons that were out; by them firing

22   aerial fireworks into these sidewalk cafes; the

Glover, Robert Thomas                                February 16, 2024

75

1    breaking of Metro bus pavilion glass; the fire and

2    felony destruction of the police car.  So it was

3    not just the fact that they were in clear violation

4    of the curfew.  It was the other behaviors and

5    conduct coupled with that.

6            Additionally, this group was just one

7    subset of the citywide activities, illegal

8    activities that were occurring that night.

9        Q.    So we'll certainly get into that.  I

10   just want to make sure that I'm understanding.  For

11   the curfew violation, what was the charge for

12   violating the curfew?  When people were arrested,

13   what were they charged with?

14       A.    A violation of the curfew.

15       Q.    Is that a felony or a misdemeanor?

16       A.    It would be a misdemeanor.

17            ATTORNEY SOBIECKI:  I'm going to

18         object to the extent it calls for a legal

19         conclusion.

20       Q.    I understood you to be saying that

21   one of the assessments you made in order to

22   determine whether to encircle a group is to

Glover, Robert Thomas                           February 16, 2024

76

1    determine whether people had committed felonies or

2    misdemeanors; is that right?

3         **A.      Yes.**

4         Q.    And so was part of your role as an

5    inspector in determining what you saw was a felony

6    or form?

7                   ATTORNEY SOBIECKI:  Object to

8           form.

9                   THE WITNESS:  Yes, there was

10          felony activity, riotous activity

11          occurring.

12    BY ATTORNEY LIVENGOOD:

13         Q.    I guess I'm asking the questions a

14    little bit a step back from that.  You in your role

15    as an inspector with MPD, part of your job was

16    distinguishing between whether what you were seeing

17    was felonious or a misdemeanor conduct; is that

18    right?

19                  ATTORNEY SOBIECKI:  Objection.  I

20          was just unclear whether you meant that

21          night or just in general as an inspector.

22          Go ahead.

Glover, Robert Thomas                                    February 16, 2024

77

1                    THE WITNESS:  In general, that

2              would be one of my responsibilities about

3              observing the circumstances.

4      BY ATTORNEY LIVENGOOD:

5          Q.    And that night, did you make a

6  determination of whether conduct you were seeing

7  constituted a felony or a misdemeanor?

8          A.    **I was witnessing felony behavior and**

9  **criminal acts, yes.**

10         Q.    But the curfew violation is a

11  misdemeanor; is that right?

12         A.    **Yes.**

13                  ATTORNEY LIVENGOOD:  Let's take a

14             break.  Why don't we come back at 11:20.

15                      (Recess taken from 11:12

16             a.m. to 11:29 a.m.)

17     BY ATTORNEY LIVENGOOD:

18         Q.    So we've been talking about

19  encirclement; is that right?

20         A.    **Yes.**

21         Q.    Okay.  And can you tell me, what is

22  encirclement?

Glover, Robert Thomas                    February 16, 2024

78

1          A.      In general?  You would have a number

2    of persons that have reached an assessment of where

3    their activity is longer peaceful or lawful, and

4    that would be the majority of those individuals.

5    And then a decision would be made to use the

6    requisite numbers of officers coupled with your

7    terrain features such as building lines or

8    fountains or something that's already there.  So

9    that's what I would describe as encirclement.

10          If it's truly nothing you can tie into,

11    then it could be nothing but police officers to

12    establish that.

13          Q.      Okay.  And when you say "to

14    establish that," do you mean perimeter that

15    encloses the group?

16          A.      Yes.

17          Q.      Okay.  After that perimeter is

18    established, is there another term for when the

19    police lines move in to narrow the enclosure?

20          A.      Again, that's going to be

21    incident-dependent or event-dependent.  Again, it

22    also depends on the number of officers that you

Glover, Robert Thomas                                    February 16, 2024

79

1    have and the environment that you are working with

2    them.  For example, January 6 when we enclosed the

3    rioters there, we had to use the fountain as part

4    of that line.  So it really depends.  It's going to

5    depend on the number of officers that you have and

6    the area you're working in.

7         Q.    So I just want to make sure I'm

8    asking clearly.  Once the line is established, as

9    part of that encirclement, does the line ever move

10   in to make the area of encirclement smaller?

11              ATTORNEY SOBIECKI:  Object to

12        form.  Calls for speculation.

13              THE WITNESS:  There could be.

14   BY ATTORNEY LIVENGOOD:

15        Q.    Is there a term for that when the

16   lines move in?

17        A.    No.  You would just individualize

18   the movement of your formations that are

19   establishing the lines.  You may tell, for example,

20   using north, south, east, and west we may determine

21   your north needs to come in a little tighter.  You

22   may determine that the west needs to come in a

Glover, Robert Thomas                                    February 16, 2024

105

1    Amendment assembly.

2            Q.      Did this cover your conduct on

3    June 1, 2020?

4            A.      No.

5            Q.      Why not?

6            A.      The conduct -- let me bifurcate my

7    answer and I apologize, but there needs to be a

8    clear line of distinction.  What occurred in

9    Lafayette Park prior to curfew was a First

10   Amendment assembly.  After the curfew went into

11   play and became effective, anybody that was out

12   after that curfew was subject to arrest.  That not

13   First Amendment-protected activity.

14           So again, to the extent that this would

15   apply, it would become a guideline, and it would

16   become a baseline of what things were already in

17   place or not in place.  But, again, everything

18   prior to the curfew going into effect, certainly we

19   handled that as a First Amendment assembly.  We

20   took no measures to disrupt that.  It was only

21   after the group was in clear violation of the

22   curfew that we took the actions and I directed the

Glover, Robert Thomas                              February 16, 2024

106

1    **actions that we took.**

2         Q.    Okay.  So I want to make sure I'm

3    understanding.  So you said prior to 7 p.m., the

4    group was treated as a First Amendment assembly?

5         **A.    Yes.**

6         Q.    And after 7 p.m., the group was not

7    treated as a First Amendment assembly.  Is that

8    right?

9              ATTORNEY SOBIECKI:  Objection,

10        vague.

11        Q.    Protesters who were out on the

12   street were not treated as a First Amendment

13   assembly after 7 p.m.; is that right?

14        **A.    Do you mean the persons that were in**

15   **violation of the curfew out on the street after**

16   **7 p.m. were not being treated as a First Amendment**

17   **assembly?  And we made the very first for the**

18   **curfew on Foggy Bottom prior to Swann Street.**

19        Q.    How do you know that people out

20   after 7 p.m. on June 1, 2020, were not treated as a

21   First Amendment assembly?

22        **A.    Because we gave advice and warnings**

Glover, Robert Thomas                                February 16, 2024

107

1    **down on 16th Street well before curfew advising**

2    **the folks that at 7 p.m. they would be in violation**

3    **of the curfew and that they were subject to arrest.**

4            Q.     Okay.  But how do you know that you

5    then did not treat people as though they were part

6    of a First Amendment assembly after 7 p.m.?

7                      ATTORNEY SOBIECKI:  Object to

8                form.

9                      THE WITNESS:  Again, they were

10               already in violation of the law at that

11               point.  They were not conducting

12               themselves in accordance with the law to

13               start with, and they were subject to

14               arrest.

15                     Had we treated them like a normal

16               First Amendment assembly, we conduct --

17               on my time we conducted many, many

18               marches well into the morning hours

19               safely.  We would help facilitate that to

20               keep them safe.

21                     This one it was my hope that --

22               again, curfew is not something that is

Glover, Robert Thomas                                    February 16, 2024

108

1          violence.  It is a misdemeanor.  It would

2          be the equivalent of a misdemeanor.

3          Again, it was my hope that if we did show

4          some restraint and allowed them to

5          proceed out that they would ultimately

6          disperse as they passed points of the

7          Metro, taxis, Ubers, hotels, wherever

8          they were going to go.

9              However, that was not the case.

10          As they proceeded, they became more

11          violent, and they started to exhibit

12          riotous behavior.  And it was a majority

13          of the crowd, and I determined that that

14          conduct could no longer be left

15          unaddressed and subsequently resulting in

16          an arrest.

17     BY ATTORNEY LIVENGOOD:

18          Q.    Okay.  Let's pause on the riotous

19     behavior.  Just on being out past curfew, did the

20     fact of being out past curfew make the gathering --

21     make gatherings outside in D.C. on June 1, 2020,

22     not First Amendment assemblies?

Glover, Robert Thomas                              February 16, 2024

130

1    in a negative way.  So my experience told me that

2    we needed to do something that still allowed the

3    crowd to peacefully assemble and still accomplish

4    what that was intended, for but then allow that to

5    go until nightfall or prior to nightfall to allow

6    them to leave in plenty of time.  But darkness for

7    criminals is something they capitalize on.  Again,

8    that's the reason why I encouraged it to be a

9    little earlier that night.

10        Q.      And after you communicated that to

11   Assistant Chief Carroll, you weren't part of

12   subsequent conversations?

13        A.      No.

14        Q.      Did you have any responsibilities

15   for communicating information about the curfew to

16   people you were supervising?

17        A.      Yes.

18        Q.      What were those responsibilities?

19        A.      So when CDU was reporting, I made

20   sure that the captains were aware, and then as we

21   held the CDU roll calls, each one of the platoons

22   would have a roll call.  Our CD coordinator also

Glover, Robert Thomas                    February 16, 2024

131

1    made sure that they communicated with the platoon

2    lieutenants and sergeants when they were called in

3    to let them know that there was a curfew in effect.

4    So that got pushed down through the CDU umbrella of

5    officials.

6           And then, of course, the departments were

7    also receiving the alerts through the alert system.

8    And every officer that had a body-worn camera was

9    issued a phone, so I know that they were getting

10   those orders.

11          Q.    Did you receive any guidance about

12   when to arrest people who were violating the

13   curfew?

14          A.    No.  Other than it had to be after 7

15   p.m., and that we were to try and do the warnings

16   as best as we could, and we started that warning

17   process well before curfew.  We used the long-range

18   acoustical device, the LRAD on 16th Street, down

19   on 16th Street towards Lafayette Park, and I

20   believe we started that somewhere around 6:30,

21   about a half hour in advance.  And I believe we

22   even communicated after 7:00.

Glover, Robert Thomas                                    February 16, 2024

132

1           And then the first group that started to

2    march west as a group, they started to destroy

3    property along their path.  And we made the

4    decision to go ahead and lock up those individuals.

5    As I recall, it was somewhere in the mid-20s range

6    that we locked up over there along E Street, Foggy

7    Bottom.

8           Q.    Did you personally see that group

9    destroy property?

10          A.    No.  I was advised what was going

11   on.  I did ultimately make it over there, but that

12   was after the group had been stopped.

13          Q.    And you said that you gave warnings

14   about the curfew before 7 p.m.  Did you receive any

15   guidance on how to make the decision about whether

16   to arrest for people who were out after 7 p.m.?

17          A.    No.

18          Q.    Did you give any guidance to people

19   you were supervising about how to make the decision

20   to arrest for people out after 7 p.m.?

21               ATTORNEY SOBIECKI:  Objection.

22          Lack of foundation.

Glover, Robert Thomas                                    February 16, 2024

133

1           THE WITNESS:  We talked with the
2       SOD.  I talked to my captains and the
3       lieutenants, and they pushed forward
4       down.  The intent, again, was not to
5       over-escalate things.  Again, through
6       good deployment locations and high
7       visibility and constructive presence, we
8       were hoping that that would be enough of
9       a deterrence.  That I was going to
10      tolerate low-level property damage such
11      as tagging or spray painting, something
12      that we can easily fix on the back end.
13              And, again, the mindset for myself
14      was recognizing the social cause at hand
15      and not to inflame this here in the city
16      more than necessary.  But to deter things
17      from escalating, we held back our
18      positions, we did not encroach up on the
19      crowds in Lafayette Park.
20              Again, it was a totality of the
21      circumstances.  And as they did begin to
22      march out of Lafayette Park, as I can

Glover, Robert Thomas                          February 16, 2024

134

1            articulate the one group started to

2            destroy property, and it was not such

3            that it was -- I hate to use the term

4            "casual," such as spray painting or

5            something that could be taken off with a

6            power washer and starting to light trash

7            cans on fire, made the decision to go

8            ahead and have that group stopped and

9            arrested for the curfews.

10     BY ATTORNEY LIVENGOOD:

11        Q.    And that was the group that was

12   arrested in Foggy Bottom; right?

13        **A.    Yes.**

14        Q.    Okay.  And so you mentioned you were

15   in Lafayette Square that day.

16        **A.    I was not inside Lafayette Square.**

17   **I was in the general area.  I was rotating quite a**

18   **bit that night.**

19        Q.    When were you in the area of

20   Lafayette Square on June 1, 2020?

21        **A.    Again, I can't give you an exact**

22   **time.  I stayed up along the H and I corridor north**

Glover, Robert Thomas                              February 16, 2024

135

1  of the north curb line of H Street.  I was up and

2  down 16th Street.  I was up and down

3  17th Street.  I was up and down 15th Street.  I

4  was driving around quite a bit and trying to

5  continuously assess how the evening was going to

6  go.  Meaning that, are we properly placed, are we

7  prepared, are we clear on what our intent is?  That

8  was something I tried to do that night.

9          So like I say, I wasn't with the group

10 that -- the first group that was arrested.  I was

11 not with that group, but I did respond over there

12 when that happened.

13         Q.    Do you remember what time that was

14 when you responded over there?

15         A.    I want to say that was somewhere

16 maybe 7:30, quarter to 8:00, give or take.  Again,

17 I'm trying to recall it.  I don't have the log with

18 me.

19         Q.    I understand.  Okay.  And I know you

20 mentioned your discussions with the SOD captains

21 about the curfew.  Other than those discussions and

22 other than the fact of the curfew, are you aware of

Glover, Robert Thomas                          February 16, 2024

136

1    any guidance MPD gave officers about how to make

2    the decision of whether to arrest someone for a

3    curfew violation?

4         A.    Again, it was -- you witness an

5    individualized situation and it's something that

6    you can safely do with the resources that you have,

7    meaning that you witness a crime, nothing was to

8    deter that.  Again, that was an individualized

9    criminal actor versus a group situation.

10        Again, our CDU structure understands that,

11   you know, its commander's intent, which would have

12   been the incident commander, and that would have

13   been me.

14        Q.    And your intent was -- what was your

15   intent with respect to whether to arrest people

16   only because of a curfew violation?

17        A.    It was coupled with other conduct

18   that night.  And, again, lighting trash cans on

19   fire is a -- by the first group, as I recall they

20   also destroyed a couple Metro stops going that way

21   too.  Again, that was conduct coupled with the

22   curfew.  And, again, it was not casual in nature,

Glover, Robert Thomas                              February 16, 2024

137

1    meaning it's not something we can dispatch the DPW

2    crew out to remove.  Once you start seeing stuff

3    being lit on fire, crowd dynamics escalate very

4    quickly.

5            So again, that first group's behavior

6    coupled with the curfew, it was my decision to go

7    ahead and make those arrests.  Again, that was

8    based upon that group.

9        Q.    I want to make sure that we're

10   saying the same thing.  You said that the officers

11   understand the intent of the commander.  Other than

12   through that general understanding, are you aware

13   of any guidance MPD gave officers about how to make

14   the decision of whether to arrest on the basis of

15   the curfew violations?

16       A.    It was going to be from my call or

17   somebody of higher authority of me if I was not

18   immediately available.

19       Q.    And how was that communicated?

20       A.    Again, CDU when they are deployed,

21   the baseline premise is this is your assignment.

22   Any change of assignment has to come from competent

Glover, Robert Thomas                                    February 16, 2024

138

1    authority unless you individualize that you need to

2    take immediate police action.

3           Again, I can sit here and give you a

4    thousand examples of why they have to take

5    individualized actions.  I don't think it would

6    prove anything, but those lieutenants and sergeants

7    or even an individualized officer, if they witness

8    a crime and they can make the arrest, they make the

9    arrest.

10          Q.     Understood.  But other than those

11   individual incidents of law-breaking, the direction

12   was that you would make the decision about what to

13   arrest?

14          A.     Yes.

15          Q.     Was that by virtue of your role as

16   incident commander?

17          A.     Yes.

18          Q.     When did you become incident

19   commander on June 1?

20          A.     When the detail started.  So I

21   forget what time I came in the city that day.  I

22   want to say it was in -- back somewhere 2:00 or

1   **3:00 in the afternoon.**

2           Q.      Okay.  All right.  And do you know

3   Shane Lamond?

4           **A.      I do.**

5           Q.      Did he have -- did you work with him

6   at all on either the first, second, or third day of

7   protests that we've been talking about?

8                       ATTORNEY SOBIECKI:  Object to

9           form.

10                      THE WITNESS:  In what manner do

11          you mean, work with?

12      BY ATTORNEY LIVENGOOD:

13          Q.      Was he -- do you know whether he was

14  actively working on those days?

15          **A.      Yes.**

16          Q.      And did you interact with him at

17  all?

18          **A.      Yes.**

19          Q.      In what capacity?

20          **A.      He was the intelligence**

21  **lieutenant -- was the intelligence unit lieutenant,**

22  **and his -- himself and other assigned to that unit**

Glover, Robert Thomas                    February 16, 2024

149

1   previous night; is that right?

2        A.    Yes.  Because of, again, the

3   constraints I spoke to earlier, staffing concerns,

4   ability to still provide timely 911 services to our

5   residents.  We didn't want to -- and I say "we," my

6   approach to this was I didn't want this stuff going

7   further than where we had a bulk of our resources

8   positioned.

9        And, again, these were resources that were

10  literally made up of officers when they are not on

11  patrol.  They could be station officers, cell block

12  officers, commanders, things like that.  So as you

13  can see from the seriousness of this, we used every

14  sworn body that was full duty that we can use.

15  That was the strategy going into this third night.

16       Q.    Okay.  And earlier you mentioned

17  that some of the factors in deciding to arrest the

18  crowd that had been marching up 14th and then was

19  on Swann Street -- let me make sure I'm

20  understanding.

21       One, you said was shooting fireworks into

22  restaurants; is that right?

Glover, Robert Thomas                          February 16, 2024

150

1         **A.        The sidewalk cafes, yes.**

2         Q.      Sidewalk cafes, yes.  Two was

3    breaking the glass at bus stop enclosures; is that

4    right?

5         **A.        Yes.**

6         Q.      And then you mentioned a burning

7    car; is that right?

8         **A.        A burning police car.**

9         Q.      So starting with the shooting

10   fireworks into sidewalk cafes, did you personally

11   see any marcher on 14th shoot a firework into a

12   cafe?

13        **A.        I could not identify the individual**

14   **within the crowd itself, but they were coming from**

15   **inside the crowd.  Curfew violators going from the**

16   **crowd into the sidewalk cafes.**

17        Q.      That was something you saw

18   personally?

19        **A.        Yes.**

20        Q.      Where was that?

21        **A.        That was going up 14th Street.**

22   **There is a bunch of sidewalk cafes that start**

Glover, Robert Thomas                    February 16, 2024

151

1    around, what is that, S, S, T area going up that

2    way.  And I forget the name of the establishment

3    right on the corner, Busboys and Poets, but there's

4    one well-known restaurant right on the corner that

5    was pretty busy on their sidewalk cafe that night.

6          Q.    And it was busy in spite of the

7    curfew?

8          A.    Again, it was the allowances.  They

9    were conducting commerce on a closed area.  So they

10   technically were not on public space.

11         Q.    So your understanding of the curfew

12   was that people were allowed to be at restaurants?

13         A.    Obtaining essential services, yes,

14   and food would be one of the essential services.

15         Q.    Okay.  Was it the El Centro Club?

16         A.    I know it's one right on the corner,

17   and I can't remember the cross street going up.

18   But it's right on the corner.  Kind of has a

19   diagonal entrance that kind of comes out to

20   southwest of 14th Street, the base of

21   14th Street, and their sidewalk enclosure went

22   north on 14th Street.

Glover, Robert Thomas                                   February 16, 2024

152

1          Q.      What was the cross street?

2          A.      I want to say S or T.

3          Q.      And you saw someone shoot a firework

4     into that sidewalk cafe?

5          A.      It was multiple fireworks coming out

6     of the crowd going into that sidewalk cafe.

7          Q.      Where were you at that point?

8          A.      I was towards the rear down 14th

9     Street, probably about maybe a block behind the

10    group.

11         Q.      What time was that?

12         A.      That must have been approximately

13    8:30-ish, somewhere around there.  Again, I was

14    driving and I wasn't necessarily looking at my

15    watch, but I know it was after -- after 7:00, and

16    I'm estimating 8:30-ish.

17         Q.      Okay.  So you were in the car behind

18    the group on 14th Street?

19         A.      Yes.

20         Q.      Did you see any uniformed officers

21    in front of you?

22         A.      Not -- well, there was some

Glover, Robert Thomas                                    February 16, 2024

161

1    mean --

2           A.       Lieutenant Mejia.

3           Q.       And where were you at this point?

4           A.       Somewhere back on 14th Street at

5    that point.

6           Q.       And when you said, "Keep giving us

7    blocks, we'll pinch them at the narrowest point,"

8    what did you mean by that?

9           A.       I was going to pick an area up on

10   14th Street to come off north down 14th Street at

11   the narrowest spot that we can have building lines

12   to minimize the number of officers I would have

13   needed.

14          Q.       Okay.  And what was the purpose of

15   cutting them off?

16          A.       Again, denying them area access up

17   to the commercial area higher up on 14th Street.

18          Q.       Okay.  Where would they have gone?

19          A.       I'm sorry?

20          Q.       What was the plan for where they

21   would go next?

22                   ATTORNEY SOBIECKI:  Object to

Glover, Robert Thomas                          February 16, 2024

162

1                    form.

2                         THE WITNESS:  Ultimately, we could

3                    have stopped them and they would have

4                    remained peaceful, we would have let them

5                    stand there.  But, you know, at that

6                    point we would have -- I would have

7                    stopped them right there on 14th Street

8                    and continued to assess.

9                         And as this played out, the

10                   circumstances continued to build, with

11                   the police car being lit on fire, yeah.

12        BY ATTORNEY LIVENGOOD:

13             Q.    So at this point you had not made

14        the decision to address?

15             **A.    No.**

16             Q.    And you heard they mentioned that

17        people who were marching were engaged in spray

18        painting at 14th and U?

19             **A.    Yes.**

20             Q.    Would that have been -- would you

21        have arrested them for that reason?

22                         ATTORNEY SOBIECKI:  Objection.

Glover, Robert Thomas                                    February 16, 2024

163

1          Speculation.

2               THE WITNESS:  As I answered

3          before, I think spray painting alone in

4          my mind would have been casual enough

5          that we could have abated that without

6          too much cause later.  So spray painting

7          alone was not the catalyst for the

8          decision.

9               ATTORNEY LIVENGOOD:  Okay.  So

10         that went until 2:09:20.  Can you keep

11         playing for 2:10:34.

12                    (Audiotape played)

13     BY ATTORNEY LIVENGOOD:

14         Q.    Where the person just said "a mass

15     arrest," did you hear that?

16         A.    I did.

17         Q.    Was that referring to the arrest in

18     Foggy Bottom that you described earlier?

19         A.    Yes, ma'am.

20                    (Audiotape played)

21         Q.    And am I understanding correctly

22     that you were CDU 50?

Glover, Robert Thomas                                    February 16, 2024

164

1        A.        Cruiser 50.

2        Q.        And when you said, "Let's think

3   about this concept and the need to establish an

4   east flanking movement and a west flanking

5   movement," what did you mean?

6        **A.        Parallel east and west based upon**

7   **the northbound direction of the crowd.  So**

8   **resources would have been available east and west,**

9   **and it would come to a situation north on**

10  **14th Street where 14th Street was narrowest,**

11  **where between two building lines versus an open**

12  **parking lot or something like that, that's where**

13  **ultimately I would have made a decision up on**

14  **14th street to do so.**

15       Q.        And when you said, "We'll encircle

16  them, that's where we're going to encircle them,"

17  did you hear that?

18       A.        I did.

19       Q.        At that point had you made the

20  decision to arrest?

21       **A.        I was moving in that mind, yes.**

22       Q.        Based on what?

Glover, Robert Thomas                                    February 16, 2024

165

1          A.      So right there the police car was on

2      fire at that time, as I recall.  And again, just

3      because I would encircle them at that point, I

4      would have continued to assess.  But the benefit of

5      the doubt of them remaining peaceful was removed.

6              And this was beyond casual.  This was

7      beyond minor.  And at that point, everything

8      building up to that point, I made a decision that

9      we were going to go and start making arrests.

10          Q.     So you had made -- you did make the

11     decision at this point to do the arrests?

12          A.      Yes, that's where my mind was going,

13     yes.

14          Q.      And you said the police car was on

15     fire at that time.  How did you know that?

16          A.      Remember, I didn't know it was a

17     police car at the time, but at that point you could

18     see the smoke coming up.  And you could tell that

19     there was a car on fire.  I think we may have -- I

20     want to say I want to think we actually got a 911

21     call about that as well.

22              So I don't remember how all that came

Glover, Robert Thomas                                    February 16, 2024

166

1    together, but at that point, 14th Street would

2    have only had to establish if we were able to get

3    it between blocks on 14th Street, we only had to

4    use the north and south and have the minimal

5    resources, and that's the reason I was leaning

6    toward making the arrests up on 14th Street as

7    well.  The area logistics was also playing into

8    that decision too.

9          Q.    Okay.  Was there a moment when you

10   decided to do the arrest?

11         A.    Again, totality of circumstances.

12   It was my professional opinion that this group was

13   no longer peaceful.  Their behavior, their conduct

14   went beyond the tolerances that I believe were

15   safe.

16         That section of 14th Street also has a

17   number of apartment buildings that were occupied at

18   the time.  And so we started getting into the

19   residential area as well with the apartment

20   buildings.

21         Again, I articulated prior that once fires

22   started getting set, it changes crowd dynamics.

Glover, Robert Thomas                                February 16, 2024

167

```
 1    Again, I'm going to say that the totality of the
 2    circumstances was my tipping point right then and
 3    there in that area that we needed to make the
 4    arrests.
 5           Q.    You mentioned there was smoke.  Is
 6    that something you saw personally?
 7           A.    I was still on 14th Street at that
 8    point, so yes.
 9           Q.    And you mentioned you thought there
10    was a 911 call; is that right?
11           A.    I remember something about a 911
12    call, and I think I was also listening to the 3D
13    radio channel at the time.  So as we were moving
14    through different patrol districts, I kept one
15    radio on our operational channel, and I was also
16    listening to the patrol district channel too,
17    because patrol was handling certain things too.
18           Again, it's a careful balancing act, a lot
19    to take in and a lot to decide upon.  But, again, I
20    made the decision in that area to go ahead and make
21    the arrest.
22           Q.    And so you believe that you heard
```

Glover, Robert Thomas                          February 16, 2024

168

1   about the burning police car over the 3D radio

2   channel?

3        A.    As I recall.  I know it came across

4   the radio, and I don't remember whether it came

5   across through our operational zone or whether it

6   came across the 3D zone.  But I do remember there

7   was a report of a car on fire.  I didn't know it

8   was a police car until I actually passed it myself

9   while on 14th Street.

10                    (Audiotape played)

11        Q.    Is Andy there Andy Horos?

12        A.    Yes, Lieutenant Horos.

13                    (Audiotape played)

14        Q.    And when you said, "I'm more worried

15   about them getting up to Columbia Heights," is that

16   for the reason that we discussed earlier?

17        A.    Yes.

18                    (Audiotape played)

19        Q.    Was that Lieutenant Lamond who said

20   that?

21        A.    I believe so, yes.

22        Q.    Because he's the intel call sign?

Glover, Robert Thomas                                February 16, 2024

169

1           **A.      Yes.**

2                     ATTORNEY LIVENGOOD:  Go to

3              2:13:50, please.

4                          (Audiotape played)

5           Q.     When you said, "We'll encircle

6      them," at that point, that was for the purpose of

7      arresting?

8           **A.      Yes.**

9           Q.     When you made the decision to

10     arrest, did you have to -- I'm sorry, I think you

11     testified about this earlier.  You didn't need to

12     confirm that information with anyone who supervised

13     you, correct?

14          **A.      Correct.**

15          Q.     Why not?

16          **A.      I was the incident commander.**

17          Q.     So as incident commander you had

18     that authority?

19          **A.      Yes.**

20          Q.     I know you said you didn't have to.

21     Did you, in fact, make the decision to arrest with

22     anyone besides you?

Glover, Robert Thomas                                    February 16, 2024

170

1          **A.      Yes.**

2          Q.     When you made the decision to

3    arrest, could you have decided whether or not to

4    take people into custody?

5                      ATTORNEY SOBIECKI:  Object to

6            form.

7                      THE WITNESS:  Ultimately, yes.

8      BY ATTORNEY LIVENGOOD:

9          Q.     So you could have chosen to issue

10   citations rather than take them into custody.  Am I

11   understanding that correctly?

12         **A.      That's a different question.**

13         Q.     Okay.  Help me understand.

14         **A.      If the arrests were to be made, they**

15   **were going to be custodial arrests.  There was no**

16   **means or mechanisms to issue anything citation-wise**

17   **then.  So it would have been custodial arrest.**

18         Q.     What do you mean by there was no

19   means to issue anything citation-wise that night?

20         **A.      These would have been custodial**

21   **arrests.  That would not have been a citation on**

22   **the scene.**

Glover, Robert Thomas                    February 16, 2024

171

1          Q.     Why not?

2          A.     Again, this was a curfew.  The means

3    to enforce the curfew was summary arrest, meaning

4    summary in the sense that we stop you, you're going

5    to be locked up.

6          Q.     And how did you know that?

7          A.     There's no means to do curfew

8    otherwise.  There was no citations.  It is subject

9    to arrest, and they were going to be arrested.

10   Physically arrested, taken into custody.

11         Q.     Were you told that?

12               ATTORNEY SOBIECKI:  Object to

13          form.

14               THE WITNESS:  So as rare as the

15          curfew in this type of situation is, the

16          purpose of the curfew is to remove people

17          from the streets in the District of

18          Columbia after 7 p.m.

19               So the curfew would have been

20          custodial, taken them into physical

21          custody and that's what we were prepared

22          to do.

Glover, Robert Thomas                                    February 16, 2024

172

1    BY ATTORNEY LIVENGOOD:

2        Q.    Are there offenses for which you can

3    give citations?

4        **A.    There are.**

5        Q.    And you said that for those offenses

6    there's a mechanism for giving citations.

7            Did I understand that correctly?

8        **A.    Yes.  I would say 99.9 percent you**

9    **take them into physical custody and you take them**

10   **back to the station to process them, and Pretrial**

11   **Services determines if they are citation-eligible**

12   **or not.**

13       Q.    Are there offenses for which an

14   officer can just issue a citation on the street

15   without taking someone into custody?

16                ATTORNEY SOBIECKI:  Object to

17           form.

18                THE WITNESS:  Example would be

19           personal quantities of marijuana.

20   BY ATTORNEY LIVENGOOD:

21       Q.    Okay.  And so if an officer finds

22   some personal quantities of marijuana, the officer

Glover, Robert Thomas                                February 16, 2024

175

```
1                 They still have to be returned to an
2                 appropriate authority or guardian at that
3                 point.  So no, a police officer is not
4                 going to come up to a juvenile on the
5                 corner, you're in violation of curfew,
6                 here is a piece of paper, that's not how
7                 that works.
8        BY ATTORNEY LIVENGOOD:
9            Q.    Instead, the officer is instructed
10   to take the juvenile in and to take them with the
11   officer to bring them back to a parent or guardian
12   in the first instance?
13           A.    Correct.
14           Q.    So after you made -- in making the
15   decision to arrest here, you didn't have the option
16   of not taking people into custody -- sorry.
17               Once you made the decision to arrest, you
18   had to take people into custody; is that right?
19                 ATTORNEY SOBIECKI:  Object to
20            form.
21                 THE WITNESS:  Yes, custodial
22            arrest.
```

Glover, Robert Thomas                    February 16, 2024

176

1    BY ATTORNEY LIVENGOOD:

2        Q.    Other than what we have discussed so

3    far, is there any other -- was there any other

4    basis for your decision to arrest this group on

5    14th Street?

6                    ATTORNEY SOBIECKI:  Object to

7            form.

8                    THE WITNESS:  Certainly, we

9            treated them equally is what we treated

10           the group on E Street that we locked up.

11           They were personally taken into custody

12           down on E Street as well.  Again, similar

13           conduct, not the same size, but similar

14           conduct.

15                   So, again, being equitable in

16           this, we didn't have another option down

17           on E Street.  They were going to be

18           custodial arrests there, and there were

19           going to be custodial arrests here.

20   BY ATTORNEY LIVENGOOD:

21       Q.    But the conduct for which you

22   were -- you decided to arrest, it wasn't the

Glover, Robert Thomas                                February 16, 2024

177

1    conduct on E Street that led to you arrest the

2    protesters on 14th Street; right?

3          A.     No, I said "similar in nature."

4    Again, escalating conduct.

5          Q.     Okay.  Is there any escalating

6    conduct by the marchers on 14th Street that led

7    to your decision on arrest that we have not

8    discussed yet?

9          A.     No.

10         Q.     Do you recall that at some point the

11   group that had been going north on 14th Street

12   turned around and started coming back?

13         A.     Yes.

14         Q.     Do you recall why that was?

15         A.     I have no idea, because we had not

16   established the line fully and completely.  There

17   was a constructive presence up at the top of the

18   hill, but there was no, what I would describe as a

19   360 perimeter at that point.

20               ATTORNEY LIVENGOOD:  Can you go to

21          2:15:53, please.

22                    (Audiotape played)

Glover, Robert Thomas                                    February 16, 2024

187

1    investigations.

2           And more importantly, it does not -- we're

3    not operating with a dispatcher.  So we weren't

4    having anybody mark the physical real time

5    timestamp.

6           Q.    I think we may have a way to orient

7    ourselves coming up with the body camera footage.

8    I want to make sure that I'm understanding.

9           So the point is well-taken, and it has been

10   our experience as well that the compressed file

11   means that the amount of time that passes on the

12   recording is not the same as the amount of time

13   that's passing in real time; is that right?

14          A.    Yes.

15          Q.    In your experience, does it cut out

16   any communications that would otherwise be on that

17   channel?

18          A.    No.  It's my understanding when you

19   request something from one particular time, start

20   time to a particular end time, they capture

21   everything that's been recorded within that block

22   of time, but when you receive the file, it is

Glover, Robert Thomas                              February 16, 2024

188

1    compressed for the length of that file.

2         Without a dispatcher, it's even more

3    disorienting in the sense that there's no --

4    there's a convoluted way to do it, as you said with

5    the body-worn camera, but was something that we had

6    to acknowledge in our investigations separate to

7    this matter, but something that we had to account

8    for in our investigations in general.

9         Q.    Got it.  And so the concern,

10   obviously we talked about is that the time doesn't

11   match real time.  There's no concern about the

12   order, is there?  Everything still happened in the

13   order in which they happened?

14        A.    That is correct.

15             ATTORNEY LIVENGOOD:  Let's go to

16        2:28:20 on this recording.

17                  (Audiotape played)

18        Q.    Am I understanding correctly that

19   the group has turned on to Swann Street from

20   15th Street and you are directing the CDU unit to

21   come down from 14th Street to set up a line and

22   14th and Swann?

Glover, Robert Thomas                              February 16, 2024

189

1          A.      Yes.

2                          (Audiotape played)

3          Q.      Who said that, do you know?

4          A.      I don't.

5          Q.      Okay.   I didn't hear a call sign

6     there, did you?

7          A.      No, I did not.

8          Q.      Did that communication influence

9     your conduct at all?

10         A.      If anything, it confirmed my

11    decision.

12         Q.      Okay.   But did it change your

13    behavior after that at all?

14         A.      No.

15                 ATTORNEY LIVENGOOD:   Could you

16          please go to 2:29:50.

17                        (Audiotape played)

18         Q.      And that was Captain Harrington who

19    you were telling to get to 15th and Swann?

20         A.      Yes, ma'am.

21         Q.      And this is at 2:30:30 on

22    Plaintiffs' 93, the radio run.   This is where I

Glover, Robert Thomas                                    February 16, 2024

190

1    think I can figure out what time it is by looking

2    at the body-worn camera footage.

3          I'm going to show you what has been

4    previously marked as Plaintiffs' Exhibit 83.  And

5    we're going to go to 9:00, about 9:00 on the body

6    camera.

7          Before I do that, Commander, do you see at

8    the upper right-hand side of the screen the numbers

9    here?

10         A.    I do.

11         Q.    Where it says 20:56:26?

12         A.    Yes.

13         Q.    Is that the time stamp?

14         A.    Yes.

15         Q.    Have you reviewed body-worn camera

16   before?

17         A.    I have.

18         Q.    Is that timestamp in the upper

19   right-hand corner similar to other body-worn camera

20   footage that you've reviewed from MPD?

21         A.    Yes.

22         Q.    You've made the distinction with the

Glover, Robert Thomas                               February 16, 2024

193

1          Q.     This is at 2:31:57.

2                        (Audiotape played)

3          Q.     I think we need to go back to 2:29.

4     Starting at Exhibit 93 at 2:29:15.

5                        (Audiotape played)

6          Q.     Commander, did you hear that?

7          **A.     Yes.**

8          Q.     And was that the same audio that we

9     had heard on the body-worn camera footage that we

10    just watched?

11         **A.     Yes.**

12         Q.     So at this point in the audio we're

13    at 9:04 p.m. and 50 seconds, about?

14         **A.     Yes.**

15         Q.     Okay.  And let's actually go back to

16    body-worn camera footage, so this is

17    Plaintiff's 83.

18         And let me ask.  Was it your understanding

19    that as Captain Harrington was running down Swann

20    Street to 15th and Swann, that it was to

21    establish that a police line was established at

22    15th and Swann; is that right?

Glover, Robert Thomas                              February 16, 2024

194

1          **A.      Yes.**

2          Q.      And when a police line was

3   established at 15th and Swann, were the

4   protesters on Swann Street encircled?

5          **A.      Not at that moment and time, no.  I**

6   **don't think we had everything closed from the**

7   **14th Street side, yet.**

8          Q.      So your understanding is that the

9   line was established at 15th and Swann and had

10  not yet been established at 14th and Swann?

11         **A.      Not entirely, no.  Because, as I**

12  **recall, I was at 14th and Swann on the east side**

13  **trying to coordinate additional units to cover the**

14  **alleyways north and south on Swann Street and in**

15  **the vacant lot that sits on the corner of**

16  **14th and Swann.**

17         **So I was trying to direct resources into**

18  **those alleyways to keep those alleyways from**

19  **becoming involved in this.**

20                  ATTORNEY LIVENGOOD:  Okay.  Why

21              don't we then actually go back to

22              Plaintiffs' 93.  Can you please play from

Glover, Robert Thomas                                February 16, 2024

195

1           2:32:29.

2                          (Audiotape played)

3           Q.      Commander, was the group completely

4    encircled on Swann Street?

5           **A.      Except the alleyways, and we were**

6    **trying to get them out of the alleyways.**

7           Q.      The people in the alleyways, were

8    they able to leave at that time?

9           **A.      No.**

10          Q.      Why not?

11          **A.      Because they were still being held**

12   **within the perimeter, they were still part of the**

13   **group that we were encircling.  We cleared the**

14   **alleyways and used Swann Street as our primary**

15   **encirclement area.**

16          Q.      So at this point nobody was able to

17   leave the encirclement?  Was anyone able to enter

18   the encirclement?

19          **A.      No.**

20                  ATTORNEY LIVENGOOD:  Please go to

21          2:36:50.

22                  So this is Plaintiffs' 93 at

Glover, Robert Thomas                                    February 16, 2024

198

1          A.      Yes.

2          Q.      And moving the crowd forward with

3    the baton is another version of mechanical force?

4          A.      Yes.

5          Q.      Are officers trained on how to move

6    a crowd forward with a shield?

7          A.      Yes.

8          Q.      What are officers told about how to

9    move a crowd forward with a shield?

10          **A.      Two hands on the shield, level as**

11    **best as possible.  And if you're physically moving**

12    **the crowd, you want to give loud verbal commands,**

13    **move back, move back or whatever direction you are**

14    **trying to tell the crowd at the time.**

15          Q.      And if the crowd isn't moving, what

16    are officers instructed to do?

17          **A.      They are authorized to forcibly move**

18    **the crowd as directed.**

19          Q.      By "forcibly move," do you mean push

20    the crowd with a shield?

21          **A.      Yes.  They can make physical**

22    **contact, and they can use the shield as a push**

Glover, Robert Thomas                              February 16, 2024

199

1    **mechanism or a push tool.**

2         Q.    And the same with a baton?

3         A.    **That is correct.**

4         Q.    And that use of mechanical force is

5    in compliance with your understanding of department

6    policy?

7         A.    **Yes.**

8         Q.    And when you were giving the

9    authorization about munitions, did you have the

10   authority to determine what munitions could be used

11   on Swann Street?

12        A.    **Yes.**

13        Q.    Why did you have that authority?

14        A.    **I'm sorry?**

15        Q.    Well, what was the source of the

16   authority, as far as you know?

17        A.    **It was granted to me by the chief of**

18   **police.**

19        Q.    How do you know that?

20        A.    **I was told that.**

21        Q.    Could you tell me what the chief of

22   police said?

Glover, Robert Thomas                                    February 16, 2024

200

1       A.      I was given -- so the way chemical

2   munitions are authorized in the agency is by the

3   directive of the chief of police for their

4   designee.  I was one of the two designees granted

5   permission, authority to deploy chemical munitions.

6       Q.      Was that specific to June 1 of 2020?

7       A.      No.  That authority was vested down

8   to me the day before.  It would have been the

9   31st.

10      Q.      How long did that authority continue

11  for?

12      A.      That authority continued through

13  operations clean through January 6.

14      Q.      Was that written anywhere?

15      A.      No.

16      Q.      How was it communicated to you?

17      A.      It was verbally told to me by

18  Assistant Chief Carroll that I had been one of the

19  two designees.

20      Q.      Who was the other one deputy?

21      A.      Assistant Chief Carroll.

22                      (Audiotape played)

Glover, Robert Thomas                                    February 16, 2024

201

1          Q.      Do you know who you were talking at

2    that point?

3          A.      **Sergeant Anthony Aliado.**

4          Q.      What did Sergeant Aliado ask you?

5          A.      **He advised me that the only tool**

6    **they had at their immediate disposal was an MK-46**

7    **we can then --**

8          Q.      You mentioned three sizes of OC

9    earlier.  Is that the largest?

10         A.      **It is the largest.**

11         Q.      What did you tell him when using an

12   MK-46?

13         A.      **I told him at that moment in time**

14   **that we cannot use munitions.**

15         Q.      And is MK-46 considered munitions?

16         A.      **Yes.**

17         Q.      Is an MK99 covered munitions?

18         A.      **Yes.**

19         Q.      What about an MK-4?

20         A.      **MK-4 is not only considered one of**

21   **those munitions.  It's an individualized use of**

22   **force.**

Glover, Robert Thomas                              February 16, 2024

215

1    we've been listening to?

2          **A.      It is, ma'am.**

3          Q.      Did you -- let's look at the IAD

4    report, which is tab 51 in your binder.  It's

5    previously been introduced as Plaintiffs' 36.

6          **A.      Did you say 51?**

7          Q.      I'm sorry.  It's tab 51 in your

8    binder, yeah.

9          Have you ever seen this IAD report?

10         **A.      Yeah.**

11         Q.      Do you see here, I believe there's

12   another error in this form.  Do you see the first

13   paragraph here on the Bates ending -346, it says

14   Agent Gary Ciapa of the Internal Affairs Division,

15   IAD, investigated the use of force by, and then it

16   lists a number of people and it says which occurred

17   on May 14, 2019, but then do you see below in each

18   paragraph that the use of force -- the specific

19   instances of use of force occurred June 1, 2020.

20         Do you see that?

21         **A.      I do.**

22         Q.      Reviewing this, do you understand

Glover, Robert Thomas                                February 16, 2024

216

1    this to be the IAD report concerning the Swann

2    Street events of June 1, 2020?

3            **A.      I have to review it.**

4            Q.      Take your time.

5            **A.      I don't see addresses on this cover**

6    **sheet.**

7            Q.      Take your time to review it and just

8    let me know when you're done.

9            **A.      (Witness complies with request.)**

10   **Okay.**

11           Q.      Do you see -- now that you've had a

12   chance to look at it, does this appear to you to be

13   the IAD report for the June 1, 2020, Swann Street

14   incident?

15           **A.      Yes.**

16           Q.      Okay.  And looking at page 5 of the

17   report, which is Bates number -353, do you see here

18   on the fourth paragraph, beginning at approximately

19   2100 hours, the second sentence there says,

20   "Inspector Glover sent up the incident command post

21   in the 1800 block of 14th Street NW"?

22           **A.      I do.**

Glover, Robert Thomas                                    February 16, 2024

217

1          Q.      What does that mean?

2          **A.      That's where I was physically**

3    **located at.**

4          Q.      Was anyone else with you there?

5          **A.      Not at that moment, no.**

6          Q.      Over the course of the evening, was

7    Assistant Chief Caroll there as well?

8          **A.      Yes, he relieved me.**

9          Q.      While you and Assistant Chief Caroll

10   both were on the scene, who was in charge?

11         **A.      I still was.**

12         Q.      Why is that?

13         **A.      Because I was still the incident**

14   **commander.  He did not relieve me of my command on**

15   **that incident.  It wasn't until we were apprised of**

16   **yet another group trying to burn the bank over at**

17   **North Capitol and E Street that he said, "You go**

18   **handle, I'll stay here and finish this up."  So at**

19   **that point, he relieved me.**

20         Q.      And at that point then did Caroll

21   become the incident commander on Swann Street?

22         **A.      Yes.**

Glover, Robert Thomas                        February 16, 2024

218

1      Q.      But until that point you were the

2  incident commander?

3      A.      Yes.

4      Q.      After people were encircled on Swann

5  Street, was there any warning given telling them to

6  disperse?

7      A.      No.

8      Q.      Why was there no warning given to

9  them?

10     **A.      Again, they were in violation of the**

11 **established curfew that had been publicized through**

12 **various means.  They were in clear violation.  It**

13 **was two and some hours after the curfew went into**

14 **effect.**

15     **There's nothing in the curfew that required**

16 **warnings.  There's nothing that required warnings**

17 **to be given.  And, again, through my career I can**

18 **only remember a time after 9/11 and then again on**

19 **January 6 that we dealt with a curfew facing civil**

20 **unrest.**

21     Q.      Who made the decision not to issue a

22 warning?

Glover, Robert Thomas                    February 16, 2024

219

```
1              ATTORNEY SOBIECKI:  Object to

2          form.

3              THE WITNESS:  There was no need.

4          So there was no decision that needed to

5          be made.  There was no requirement to

6          make it.

7    BY ATTORNEY LIVENGOOD:

8         Q.    You were not required to issue a

9    warning, so there was no decision not to issue a

10   warning?

11        A.    Correct.  It was to effect the

12   arrest.

13        Q.    Okay.  Turning to page 7 of the IAD

14   report ending Bates number -355.  At the end of

15   that first paragraph do you see, "Glover did

16   authorize the use of OC spray for the defense of

17   MPD members"?

18        A.    Yes.

19        Q.    Do you remember that?

20        A.    That was the communication I gave

21   Sergeant Aliado in the alleyway at the time.  So

22   that was what we listened to prior during my
```

Glover, Robert Thomas                    February 16, 2024

224

1    does that refresh your recollection?

2          A.    It does.

3          Q.    Did you order the CDU platoon units

4    to move forward?

5          A.    I ordered the ones at 14th and

6    Swann to move westbound past the one alleyway that

7    cuts to the north closer to 14th Street to better

8    preserve the perimeter and the cordon, the

9    encirclement, from allowing anybody on Swann Street

10   to get back up into that alleyway to the north.

11         Furthermore, I also pushed them a little

12   bit west to make sure that we had -- there's a

13   south connection that comes in behind the empty

14   fence lot.  And, as I recall, there's a small

15   narrower alleyway footpath that comes off of Swann

16   Street that cuts down behind that business and lot

17   that I pushed them past those points.

18         Again, we were out of resources at that

19   moment in time, so I had to use my building

20   features and terrain features to the best I could

21   to make sure that we were still accomplishing what

22   we wanted to accomplish.

Glover, Robert Thomas                                February 16, 2024

225

1          Q.      So you ordered the CDU platoon units

2     at 14th and Swann to move west; is that right?

3          **A.      Only to the alleyway past the**

4     **alleyway westbound.**

5          Q.      And that was to, as you're saying,

6     to ensure that the encirclement formation was

7     effective.  Is that right?

8          **A.      Yes.**

9          Q.      Was that based on behavior of the

10    crowd at all?

11         **A.      No.  It was based on the resources**

12    **that I had on hand that were immediately available**

13    **to me to use.**

14         Q.      Did you order CDU platoon units from

15    15th and Swann to move east on Swann?

16         **A.      So, no.  I was not over on**

17    **15th Street.  And it would not be something I**

18    **would do blindly at that point either.  I was only**

19    **able to see 14th and Swann looking westbound.  I**

20    **didn't have Captain Harrington's side push in, that**

21    **I recall, because I couldn't see.  So I had to rely**

22    **on Captain Harrington's assessment for the west**

Glover, Robert Thomas                                February 16, 2024

226

1    **side of things.**

2          Q.     So do you know whether anyone

3    directed the CDU platoon units on the 15th Street

4    side to move east on Swann Street?

5          **A.     Again, I believe it was after I was**

6    **relieved from this incident to respond to the other**

7    **incident at North Capitol and E area, so I don't**

8    **recall hearing any directives for platoons to come**

9    **west while I was on the scene.**

10         Q.     To come east?

11         **A.     I'm sorry, yes.  You are correct, to**

12   **come east.**

13         Q.     Okay.  I live in that neighborhood.

14         Okay.  So at the time -- as far as you

15   recall at the time that you left Swann Street, the

16   CDU units had not moved east on Swann Street from

17   15th and Swann?

18         **A.     Correct.**

19         Q.     You mentioned, you think -- am I

20   understanding correctly that you said Captain

21   Harrington may have given the order to move east

22   from 15th and Swann?

Glover, Robert Thomas                                  February 16, 2024

227

1              ATTORNEY SOBIECKI:  Object to

2         form.

3              THE WITNESS:  At some point,

4         again, I was relieved from that incident

5         and tasked by Chief Caroll to go over to

6         the other incident.  Again, the incident

7         over at North Capitol and E were all in

8         the same radio channel, so I was able to

9         still listen to some extent, but my focus

10        then was directed to the incident at

11        North Capitol and E.

12   BY ATTORNEY LIVENGOOD:

13        Q.    Okay.  Did you see any members of

14   the CDU platoons use their shields to push the

15   crowd back as they advanced?

16        **A.    No.  Not in contact with the crowd**

17   **at that point in time before I left.**

18        Q.    Okay.  And that was the only CDU

19   line that you saw was the 14th and Swann line?

20        **A.    Yes.**

21        Q.    Okay.  And you did not see that CDU

22   line contact the crowd with their shields?