# EXHIBIT 23

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

PAMELA GOODWIN, et al.,        :

   Plaintiffs,                 :

   v.                          :    Civil Action No.

DISTRICT OF COLUMBIA, et al.,: 1:21-cv-00806-BAH

   Defendants.                 :

_____

Monday, March 11, 2024

Washington, D.C.

Deposition of SHANE LAMOND, witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by Barbara J. Moore, a Notary Public in and for the District of Columbia, taken at the offices of RELMAN COLFAX, PLLC, 1225 19th Street, N.W., Suite 600, Washington, D.C., commencing at 12:10 p.m., and the proceedings being taken down by Stenotype by BARBARA MOORE, CRR, RMR, and transcribed under her direction.

2

1  APPEARANCES:

2

3          On Behalf of the Plaintiffs:

4              NICHOLAS ABBOTT, ESQ.

5              REBECCA LIVENGOOD, ESQ.

6              GABRIEL DIAZ, ESQ.

7              RELMAN COLFAX, PLLC

8              1225 19th Street, N.W., Suite 600

9              Washington, D.C.  20036

10             nabbott@relmanlaw.com

11             rlivengood@relmanlaw.com

12

13         On behalf of the Defendants:

14             RICHARD SOBIECKI, ESQ.

15             OFFICE OF THE ATTORNEY GENERAL

16             400 6th Street, N.W.

17             Washington, D.C.  20001

18             richard.sobiecki@dc.gov

19

20

21

22

3

1                    TABLE OF CONTENTS

2    WITNESS                                              PAGE

3    SHANE BRIAN LAMOND

4    By Attorney Livengood                                   4

5    By Attorney Sobiecki                                  162

6


7                         EXHIBITS

8    EXHIBIT         DESCRIPTION                          PAGE

9
     Exhibit 143   Document Bates-stamped Bates             36
10                 Number ending -7099 through
                   -8103
11
     Exhibit 144   Text messages                            41
12
     Exhibit 145   Text messages                            48
13
     Exhibit 146   Video                                    65
14
     Exhibit 148   Video                                    99
15
     Exhibit 149   Video                                   118
16
     Exhibit 150   Video                                   120
17
     Exhibit 36    IAD Report                              124
18
     Exhibit 151   Call records                            149
19

20

21

22

40

1   on?

2          **A.      No, I don't.  I don't remember.**

3          Q.      Would you have been on -- were you

4   on multiple channels or only one channels that day?

5                  ATTORNEY SOBIECKI:  Objection.

6          Asked and answered.

7                  THE WITNESS:  That day I don't

8          know.  Yeah, I don't know.

9      BY ATTORNEY LIVENGOOD:

10         Q.      Can you say whether you were more

11  frequently on 1 channels or multiple channels when

12  you were out with a mass demonstration?

13                 ATTORNEY SOBIECKI:  Objection.

14         Asked and answered.

15         Q.      You can answer that.

16         **A.      I would have been on the primary**

17  **channel which everybody is on for a demonstration.**

18         Q.      I don't think you answered.  I want

19  to make sure I'm understanding.

20         When you were on primary channel, would it

21  be -- did there come a point for you to be on

22  several channels?

                                                                    41

1       A.    No, we stick with one channel.

2       Q.    And your call sign on the radio was

3  Intel 1; is that right?

4       A.    Yes, that's correct.

5       Q.    Do you recall communicating by text

6  on June 1?

7       A.    I don't specifically remember.

8       Q.    Fair enough.  Can I ask you to turn

9  to Tab 24.  This will be Plaintiff's Exhibit 144.

10                  (Exhibit 144 was marked for

11                   identification.)

12      Q.    And it was produced without Bates

13 numbers.  So it is a document containing texts sent

14 to Chief Carroll's phone.  Take a minute to review

15 and look up when you're done.

16      A.    (Witness complies with request.)

17            ATTORNEY SOBIECKI:  I would

18        request that this exhibit be marked

19        Confidential because it has PII,

20        personally identifiable information.

21      Q.    You don't have to read the whole

22 thing.  The part I'm going to ask about runs from

42

1   the first page to the fifth page.

2          **A.     Okay.**

3          Q.     Okay.  Do you see at the top of the

4   second page there's a text that says it's from

5   Shane Lamond, Re Ernie sent to me, no time listed,

6   but we will check or sources?

7          Do you see that?

8          **A.     I do.**

9          Q.     Do you know who that is?

10         **A.     No, I knew a couple of Ernies.  I**

11  **don't know specifically who that is.**

12         Q.     Do you know whether it was someone

13  within MPD?

14         **A.     I do not believe so.**

15         Q.     You don't believe?

16         **A.     No.**

17         Q.     You don't have any understanding of

18  who it is?

19                ATTORNEY SOBIECKI:  Objection.

20         Asked and answered.

21                THE WITNESS:  No.

22

1    A.    I don't specifically remember.

2    Q.    What is a sitrep?

3    **A.    It was a situation report.  The JOCC**

4    **is getting all this information by radio and**

5    **different sources, and they compile it and put it**

6    **in a report.**

7    Q.    And other than the sitreps, do you

8    recall receiving information from JOCC in any way

9    when you were out in the field?

10   **A.    I don't remember.**

11   Q.    Okay.  Other than by radio, do you

12   recall receiving any information from anyone within

13   MPD when you were out in the field on June 1, 2020?

14              ATTORNEY SOBIECKI:  Object to

15         form.

16              THE WITNESS:  The text message

17         that you showed, I was on that chain, and

18         so I was getting information that way.

19   BY ATTORNEY LIVENGOOD:

20   Q.    The text messages and radio?

21   **A.    Yes.**

22   Q.    Do you recall whether you

54

1  communicated by cell phone with anyone within MPD
2  on June 1?
3       A.   I don't remember specifically.
4       Q.   Am I understanding correctly that
5  you were saying you don't remember whether
6  information contained within the sitreps affected
7  your behavior when you were out in the field on
8  June 1, 2020?
9       A.   No.  That's correct, I don't
10 remember.
11      Q.   On June 1 when you saw illegal
12 activity, did you report that over the radio?
13      A.   Yes, I did.
14      Q.   Okay.  And you mentioned that the
15 first place on 14th Street, you remember being at
16 14th and R; is that right?
17      A.   In that vicinity.
18      Q.   And you didn't remember exactly
19 where you were before that; is that right?
20      A.   That's correct.
21      Q.   Do you know what an LRAD is?
22      A.   Yes, I do.

1      Q.    It's a long-range acoustic device;
2  is that correct?
3      **A.    Yes.**
4      Q.    Do you recall hearing any curfew
5  warnings issued over the LRAD on June 1, 2020?
6      **A.    Yes, on June 1 I did.**
7      Q.    Where were you?
8      **A.    I couldn't say exactly where it was,**
9  **but I do remember hearing an announcement being**
10 **made.**
11     Q.    How do you know?
12     **A.    I remember, like, hearing them.**
13     Q.    Okay.  But not where you were?
14     **A.    That's correct, yes.**
15     Q.    Do you remember what time it was
16 that you heard them?
17     **A.    No, I don't.**
18     Q.    Do you remember whether the
19 announcements were announcing that the curfew was
20 about to begin or it had already begun?
21     **A.    I couldn't say what the exact**
22 **message was.**

1    it from minute 1:55 through 2.
2                      (Video played).
3         Q.    We're going to stop it at
4    2:41 there.
5         So am I understanding correctly that in the
6    IAD interview you recall the seeing graffiti during
7    the march up 14th Street?
8         **A.    Yes.**
9         Q.    And do you recall -- so while you
10   were marching on 14th Street, you saw people
11   engaging in vandalism; is that right?
12        **A.    Yes, that's correct.**
13        Q.    And that's in the form of graffiti?
14        **A.    Right.**
15        Q.    Was there any other kind of
16   vandalism you saw on the march up 14th Street?
17        **A.    Further up 14th Street, yes.**
18   **Witnessed -- somebody smashed the windows to a MPD**
19   **cruiser and set it on fire.**
20        Q.    We'll get to that.  Before that, did
21   you see anybody breaking any windows?
22        **A.    Not that I remember windows being**

1   **broken.  I specifically remember the graffiti, the**
2   **spray paint.**
3        Q.    If you had seen people break
4   windows, would you have announced it over the
5   radio?
6              ATTORNEY SOBIECKI:  Objection.
7         Calls for speculation.
8              THE WITNESS:  Yes.
9     BY ATTORNEY LIVENGOOD:
10       Q.    Do you recall seeing anyone who was
11  marching set off fireworks?
12       **A.    I don't specifically remember.**
13       Q.    Okay.  And can you recall seeing
14  anyone who was marching break glass on a bus stop?
15       **A.    I know I've seen glass being broken,**
16  **but I don't know if it was this, on this occasion.**
17       Q.    Okay.  But in your time with MPD at
18  some point you saw someone break glass?
19       **A.    Those days, but I can't say**
20  **specifically or definitively that it was June 1.**
21       Q.    Okay.  You've seen someone break
22  glass on a bus stop.  Is that something you would

1  have been asked over the radio?
2              ATTORNEY SOBIECKI:  Object to
3        form.
4              THE WITNESS:  If I could have,
5        yes.  Absolutely.
6     BY ATTORNEY LIVENGOOD:
7        Q.    And you didn't -- I'm sorry.  You
8  were -- we discussed you were interviewed by Agent
9  Ciapa about the events on June 1; right?
10       **A.    Yes.**
11       Q.    I can start with that interview in
12 July of 2020.  Does that sound accurate?
13       **A.    Sounds accurate.**
14       Q.    Okay.  And you didn't mention anyone
15 breaking windows on a bus stop during that
16 interview; is that right?
17       **A.    Not that I recall.**
18       Q.    Okay.  And you didn't mention anyone
19 setting off fireworks during the interview with
20 Agent Ciapa; is that right?
21       **A.    Not that I recall.**
22       Q.    How dense was the crowd when you

69

```
 1   were walking up 14th Street?
 2                  ATTORNEY SOBIECKI:  Object to
 3          form.
 4                  THE WITNESS:  As I recall, it was
 5          pretty dense.  It was a tight-packed
 6          group.
 7       BY ATTORNEY LIVENGOOD:
 8          Q.    Do you recall how many people were
 9   in the march?
10          A.    I think I said on there 150 to 200.
11   That's to the best of my recollection.
12          Q.    Okay.  Before you got to the point
13   where you saw the burning, where you saw the police
14   car hit, is there anything else that you recall
15   from that march up 14th Street?
16          A.    Nothing specific.
17          Q.    Did you hear political chanting as
18   you were marching up?
19          A.    I'm sure they were.
20          Q.    Do you recall what they said?
21          A.    No, I don't recall exactly what they
22   said.
```

```
 1              June 1 incident.  I'm sorry.  You're
 2              limiting his testimony to any
 3              investigations regarding the June 1
 4              incident?
 5                       ATTORNEY SOBIECKI:  Yes.
 6     BY ATTORNEY LIVENGOOD:
 7         Q.    Okay.  At any time -- so then not
 8    just prior to July.  At any time other than this
 9    investigation, did you provide testimony in
10    connection with an IAD investigation into the
11    June 1, 2020 event?
12         A.    No.
13         Q.    Okay.  And let me just ask, and
14    Rich, you can direct him as you want to.
15              Prior to June 1, 2020, had you ever been
16    interviewed in connection with a IAD investigation
17    into your conduct?
18                       ATTORNEY SOBIECKI:  I'm going to
19              instruct you not to answer that on Fifth
20              Amendment grounds.  So you have a choice
21              to either follow my instruction or you
22              can disregard my question.
```

```
 1                THE WITNESS:  On the advice of
 2           counsel, I'm going to assert my Fifth
 3           Amendment.
 4      BY ATTORNEY LIVENGOOD:
 5           Q.   Okay.  Prior to June 1 of 2020, were
 6      you ever disciplined for conduct involving giving
 7      favorable treatment to a white supremacist?
 8                ATTORNEY SOBIECKI:  I'll instruct
 9           you not to answer.
10                THE WITNESS:  On the advice of
11           counsel I'll assert my Fifth Amendment.
12      BY ATTORNEY LIVENGOOD:
13           Q.   And two more.  Prior to June 1 of
14      2020, were you ever investigated by MPD for any
15      conduct involving a white supremacist group?
16                ATTORNEY SOBIECKI:  I'll instruct
17           you not to answer.
18                THE WITNESS:  On the advice of
19           counsel, I'm going to assert my Fifth
20           Amendment.
21      BY ATTORNEY LIVENGOOD:
22           Q.   Okay.  Actually, just a couple more.
```

1            Prior to June 1, 2020 -- so that question
2    was about being investigated.  This is about being
3    disciplined.  Prior to June 1, 2020, were you ever
4    disciplined for any conduct involving a white
5    supremacist group?
6                    ATTORNEY SOBIECKI:  I'm going to
7            instruct you not to answer.
8                    THE WITNESS:  On the advice of
9            counsel, I'm going to assert my Fifth
10           Amendment.
11       BY ATTORNEY LIVENGOOD:
12           Q.    Prior to June 1, 2020, were you ever
13   disciplined for making statements that were
14   untruthful?
15                   ATTORNEY SOBIECKI:  Direct you not
16           to answer.
17                   THE WITNESS:  On the advice of
18           counsel, I'm going to assert my Fifth
19           Amendment.
20       BY ATTORNEY LIVENGOOD:
21           Q.    Prior to June 1 of 2020, were you
22   ever involved with a group espousing one group

144

1　versus another group?
2　　　　　　ATTORNEY SOBIECKI:  I'm going to
3　　　instruct you the same.
4　　　　　　THE WITNESS:  On the advice of
5　　　counsel, I'm going to assert my Fifth
6　　　Amendment.
7　BY ATTORNEY LIVENGOOD:
8　　Q.　Going back to your time on Swann
9　Street on June 1 of 2020, I know you mentioned in
10　the march up 14th Street you were not aware of any
11　other plainclothes-ed officers who were in the
12　crowd; is that right?
13　　**A.　That's correct.**
14　　Q.　Did that change at any time on
15　June 1, 2020?  At any point did you become aware of
16　plainclothes-ed officers in the crowd?
17　　**A.　Not that I recall.**
18　　Q.　When you were on Swann Street on
19　that evening, are you aware of any plainclothes-ed
20　officers who were in the crowd?
21　　**A.　Not that I'm aware of, no.**
22　　Q.　Okay.  And at any time from when you

1  began marching on 14th Street on June 1, did you

2  encounter anyone who you supervised?

3        A.    Not that I remember.

4        Q.    Okay.  So after you were in the

5  crowd standing on the sidewalk as we've been

6  discussing, what happened next?

7        **A.    When MPD started to make arrests,**

8  **I -- I actually was down in the basement of one of**

9  **the -- I shouldn't say the basement.  There were**

10 **steps down from the sidewalk, not inside somebody's**

11 **home, but outside of it.**

12       **Some MPD officers saw a couple of us down**

13 **there.  I covertly showed them my badge.  They**

14 **brought me up, and then I was one they took through**

15 **the police line.  And then once we were out of**

16 **sight they released me and I went to look for**

17 **another group.**

18       Q.    When you said that there were a

19 couple of us down there, what do you mean?

20       **A.    There were a couple of individuals**

21 **who were in the group on Swann Street who were down**

22 **in this -- I don't know now to describe it, but**