# EXHIBIT 32

**Expert Report of Scott M. Mourtgos, Ph.D.**

Date of report: March 14, 2024

The plaintiffs' counsel has engaged me to examine an interaction that took place on June 1st, 2020, between Pamela Goodwin et al. and members of the District of Columbia Metropolitan Police Department (MPD). This report reflects the information available up to the present date. If any additional information emerges that necessitates the expansion, inclusion, or modification of my opinions, I retain the right to revise, amend, or supplement this report accordingly.

## Contents

1. *Background and Qualifications*................................................................3
   Policing ....................................................................................3
   Academic ...................................................................................4

2. *Compensation* ..........................................................................6

3. *Methodology* ...........................................................................6
   Materials Received .........................................................................7

4. *Analytic Framework* ....................................................................9
   Adherence to Tactics .......................................................................9
   Creating Time ..............................................................................10
   Re-assessing Threat .........................................................................10
   De-escalation ..............................................................................11
   Risk Versus Imminent Threat ................................................................12

5. *Evidence Review and Opinion*...........................................................14

   **5A. Factual Bases for Opinion** .........................................................14
   Overview of the June 1st, 2020 Incident .....................................................14

   **5B. Opinions** ........................................................................17
   The Decision to Encircle ("Kettle") the Crowd, Not Provide Warning(s), and Arrest ...........17
   The Decision to Use Force..................................................................23
   Detention and Processing of Protesters .....................................................26

6. *Opinion Consolidation*.................................................................28

7. *Submission* ...........................................................................30

8. *External References* ..................................................................31

9. *Appendix: Materials Provided* .........................................................33

10. *Appendix: Additional Materials Not Cited in Reference List*............................36

11. *List of Additional Appended Materials*................................................37

**This space left intentionally blank.**

## 1. Background and Qualifications

My opinions are derived, in part, from my training, professional experience, education, and academic research. I provide a comprehensive overview of my background and qualifications in the curriculum vitae enclosed with this report. In addition to that information, I have included relevant details pertaining to my review and evaluation in this particular case.

### Policing

I am currently employed as a Deputy Chief of Police with a large metropolitan police department. Within the agency, I have served as a police officer, including first-line, mid-management, and executive leadership positions relevant to evaluating police operations. I first entered law enforcement in 2005. I have served in multiple assignments and ranks as a police officer, providing a broad understanding and expertise in the field of professional law enforcement. From 2005 to 2013, I served in the role of patrol officer, public order unit officer, undercover narcotics detective, bike unit officer, special victims unit detective, community intelligence unit detective, and field training officer. As part of my responsibilities as a field training officer, I was responsible for teaching and evaluating the agency's new officers (both with and without previous law enforcement experience) on their performance in the area of use of force and other police tactics. This responsibility included both classroom-based and field-based training and evaluation. I also taught police recruits about constitutional policing, including its nexus with use of force and search and seizure, in multiple classes at the agency's preservice academy and another state-certified regional police academy.

Beginning in 2013, I was promoted to sergeant (first-line supervisor). I worked as a patrol sergeant, bike unit sergeant, and professional standards sergeant through 2018. As a patrol sergeant and bike unit sergeant, I was responsible for evaluating officer performance, including evaluation in the area of use of force. This evaluation consisted of on-scene supervision and review of written and body-worn camera (BWC) documentation of use of force incidents. As a professional standards sergeant, I oversaw the agency's policy and procedure manual, with the responsibility of modernizing practices to reflect contemporary best practices and legal standards, including use of force policy and procedures. Further, while working as a patrol sergeant, I served a secondary duty as the agency's Field Training Officer (FTO) program manager. In this capacity, my duties included overseeing FTO's instruction of policing principles, and evaluations of, police recruits.

Beginning in 2018, I served as a Lieutenant (mid-management). I served as a Watch Commander, the Support Division Assistant Commander, and the Investigations Assistant Division Commander. As a Watch Commander, I was responsible for all field operations during assigned shifts. As the Support Division Assistant Commander, I oversaw the agency's national accreditation process, achieving the agency's first accreditation through CALEA. Further, I developed and implemented the agency's first Early Identification and Intervention Program, which included monitoring officer behaviors such as use of force and complaints, and established the agency's first Audit Unit, conducting internal audits on various processes and practices, including use of force reviews. As the Investigations Division Assistant Commander, I oversaw

dozens of Officer Involved Critical Incidents, preparing investigative reports of officers' use of deadly force for review by the District Attorney's Office.

Beginning in 2020, I served as a Captain (executive-level commander), specifically as the agency's Training Division Commander. As the Training Division Commander, I oversaw all in-service training for the agency, including use of force, search and seizure, procedural justice, constitutional policing, de-escalation, supervisor training, and more. Further, I served as the agency's Academy Director, overseeing the agency's satellite POST academy. In this capacity, I was responsible for managing police academy training for police recruits and sworn lateral hires, again including use of force, search and seizure, procedural justice, constitutional policing, de-escalation, and more. Beginning in 2021 (through the present), I served as a Deputy Chief, overseeing one of the agency's two Field Operations Bureaus. In this role, I managed patrol divisions, the international airport division, and the crime analysis and data section. My responsibilities included establishing performance standards and systems of accountability, including reviewing incidents of use of force and officer performance and behavior. Further, I was responsible for overseeing, developing, and implementing tactical plans for emergencies and special events.

In addition to my basic law enforcement officer certification, I have attended the FBI National Academy, as well as obtained FEMA Incident Command System (ICS) advanced certification; Leadership in Police Organizations certification from the International Association of Chiefs of Police (IACP); Fair and Impartial Policing Trainer certification; Force Science Analyst certification through the Force Science Institute; and Integrating Communications, Assessment, and Tactics (ICAT) certification from the Police Executive Research Forum (PERF). I maintain membership in the International Association of Chiefs of Police (IACP) and the Major Cities Chiefs Association (MCCA).

Finally, I have received numerous honors during my professional policing career. I provide a select few relevant in my capacity as an expert witness. In 2016, I was appointed to the *President's Task Force on 21st Century Policing Rank and File Forum* in Washington, DC. In 2020 (through the present), I was selected as a *National Institute of Justice (NIJ) LEADS Scholar*, a prestigious fellowship given to police practitioners who use scientific research to inform evidence-based policing methods. In 2022 (through the present), I was appointed to the *Police Executive Research Forum's (PERF) Research Advisory Board*. Additionally, I will be inducted into the George Mason University Center for Evidence-Based Crime Policy's Evidence-Based Policing Hall of Fame in June of 2024. This award recognizes innovative law enforcement practitioners who have been central to institutionalizing evidence-based policing practices, furthering high-quality police scholarship, and advancing significant reforms in policing by utilizing science in their decision making.

**Academic**

As a scholar, I have researched policing since 2013, beginning with my master's studies at the University of North Dakota. I earned my Master of Forensic Psychology degree in 2016 and my Ph.D. in Political Science at the University of Utah in 2024. I also have a Bachelor of Science in Criminal Justice, with an emphasis in law enforcement, from Weber State University (2004) and a graduate certificate in criminal justice education from the University of Virginia (2021). I

4

currently serve as an Associate Instructor at the University of Utah in the Department of Political Science and at Kent State University in the Department of Sociology and Criminology. I am an incoming Assistant Professor of Criminology and Criminal Justice at the University of South Carolina (fall 2024).

I conduct empirical, quantitative studies of policing, with a specific focus on procedure, policy, and personnel. Amongst other subjects, I have investigated body-worn cameras, police K9s, police use-of-force, police personnel, and sexual assault investigations and training. I have published over twenty academic pieces in journals, books, and special collections. In addition, I have published numerous non-peer-reviewed reports for law enforcement agencies, legislators, and professional outlets. My studies have been published in some of the most prestigious peer-reviewed criminology and public administration journals, including *Criminology, Justice Quarterly, Journal of Criminal Justice, Public Administration Review, Criminology & Public Policy,* and the *Journal of Experimental Criminology.* My research recently received an award from the American Society of Criminology, Division of Policing. My research is widely relied upon, having been cited by scholars in the top journals of criminology and criminal justice across such journals as *Criminology, Journal of Quantitative Criminology, Journal of Experimental Criminology, Police Quarterly, Criminology & Public Policy, Justice Quarterly, Crime & Delinquency,* and *Journal of Criminal Justice.* As of the date of this report, my research has been cited 463 times by other researchers,[1] and I have an h-index of 11[2] and an i10 index of 12.[3]

I am also an active member of relevant academic associations, including the *American Society of Criminology,* the *Academy of Criminal Justice Science,* and the *American Society of Evidence-Based Policing.* I regularly attend the annual meetings of these associations to present new and upcoming research to my academic peers. I also serve on the editorial board of the peer-reviewed journals *Journal of Criminal Justice* and *Police Practice & Research: An International Journal.* In that role, I am called upon to evaluate unpublished research, including its design, methods, and contribution, and eventually help judge whether it is suitable for publication.

In addition to my research, my role as an Associate Instructor at the University of Utah in the Department of Political Science and Kent State University in the Department of Sociology and Criminology has teaching responsibilities. In these roles, I have been responsible for developing coursework and teaching Introduction to Criminal Jurisprudence, Justice Administration, Statistical Packages for Public Policy, Public Policy Statistics, and Contemporary Issues in Policing.

My academic service includes reaching outside traditional academic institutions. I hold an appointment to the *Police Executive Research Forum's (PERF) Research Advisory Board,* where I provide both a practitioner law enforcement perspective and an academic research perspective to the organization. Further, I am a member of the *Policing Accountability and Policy Evaluation Research (PAPER) Lab* located at the University of Utah and University of South Carolina, and an affiliate of the *Police Staffing Observatory* at Michigan State University.

---

[1] Google Scholar: https://scholar.google.com/citations?user=ypvpo1gAAAAJ&hl=en
[2] h-index of 11 equates to 11 published articles with at least 11 citations each.
[3] i10 index measures how many published articles have at least 10 citations.

As a policing expert, I have been retained by plaintiff and defense counsel in civil cases. I have worked with attorneys in at least four states on these types of cases. In addition to my retained consulting work, I have informally consulted on dozens of cases with attorneys on matters involving police practice across civil, criminal, and administrative contexts, Finally, I have consulted with legislators in Utah on police practice and policy, including on topics such as police misconduct, hiring practices, retaining qualified personnel, and use-of-force policy. I have assisted in negotiating bills for members of the Utah legislature that have made significant policy and legal changes in police training, misconduct, and use of force.

## 2. Compensation

Fees include a non-refundable retainer check of $5,000 for case review. Charges for all time spent on a case, including research, reading documents, preparing affidavits, reports, consultations, and travel from door-to-door are billed at a rate of $385 per hour.

There is a $2500 charge for deposition, conference, site inspection, or trial testimony that lasts four hours or less. There is an additional $2500 fee for each additional four-hour (or less) block of deposition or trial testimony. Payment for the deposition is due three (3) days prior to the scheduled date. If compensation has not been received in this time frame, it is assumed that counsel chooses not to proceed with the deposition.

A thorough case preparation and analysis will be completed prior to trial and billed at a rate of $385 per hour. I will reserve the agreed-upon trial day and travel to the trial site, plus all travel expenses as outlined, for each day or portion of a day testifying. Any standby days awaiting trial will be assessed at $3080 per day. If I attend the trial but am not called to testify on that day, the fee of $3080 per day will be assessed for the day(s) while waiting to testify. Repeat trips to trial will be billed similarly. All fees incurred in connection with testifying—including preparation fees, standby fees, travel expenses, or other outstanding case fees—will be billed. During travel, all expenses incurred including airfare, hotel, meals, and parking and other miscellaneous expenses will be charged to the client. All air travel will be with an airline of my selection. The testimony/trial fee of $2500 will be charged if the case is settled, otherwise dismissed, or rescheduled within 72 hours (excluding Saturday and Sunday) of scheduled testimony.

## 3. Methodology

I use a consistent methodology to ensure my reviews and resulting opinions are consistent. My process begins with a comprehensive review of the provided materials. This material review establishes my understanding of the facts of the case, which are then compared to the professional and generally accepted principles and practices in policing as of the date of the incident in question. "Generally accepted principles" refer to those concepts and theories widely known, acknowledged, and relied upon in the field. "Generally accepted practices" refers to those protocols, techniques, and procedures that are widely known, acknowledged, and relied upon in the professional field. A principle or practice is generally accepted when well-educated, well-trained, and experienced professionals agree it is a conventional, customary, and reasonable standard.

6

While there is no single, universal standard for establishing generally accepted police practices, it does not follow that there are no generally accepted practices. In fact, many widely accepted principles and practices in policing are commonly used to evaluate the actions of law enforcement officers. These principles and practices are based on various sources, including court decisions, professional associations, and agency policies, among others. Generally accepted principles and practices in policing reflect technical and specialized knowledge in the law enforcement field. A principle or practice can be generally accepted without necessarily being universally adopted, nor must it rise to the level of a long-established, empirically validated best practice.

Generally accepted principles and practices may be, but are not necessarily, reflected in Department of Justice consent decrees, publications by professional associations (such as the International Association of Chiefs of Police, the Police Executive Research Forum, the National Police Foundation, etc.), in well-promulgated agency policies, and reputable training materials. Other institutions that may be relevant include academic institutions that research policing, as well as government agencies that regulate and oversee the law enforcement profession, such as the Department of Justice. These institutions often guide best practices and standards for law enforcement agencies, which can help to inform an understanding of generally accepted police practices.

To identify and apply the applicable generally accepted principles and practices in policing, I rely on my knowledge, skill, experience, training, and education in law enforcement. This includes work as a criminology, public policy, and policing scholar and author; my knowledge of historical and contemporary law enforcement standards and methods; and relevant professional and academic literature. I employ a similar methodology when I conduct professional evaluations of police officers or agencies as a consultant; when conducting research on, with, or for police agencies and governmental entities such as cities, counties, and states, and when tasked with creating model legislation and policy, and when writing for reputable academic publishers. The methodology I applied, in this case, is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

**Materials Received**

Before developing my opinions in this report, I reviewed the materials listed in the appendix provided by the retaining attorneys' office[4]. I consistently update my understanding of policing topics through reviews of newly published research or previously published research I become aware of during my professional activities. In addition to the reviewed materials list, I consult published research on areas of topical concern, and this report includes a reference section for materials cited within the text.

The scope of my review was restricted to focusing on the MPD's actions and interaction with Ms. Goodwin and other plaintiffs on the day in question. Therefore, my material review focused on that interaction, such as video evidence, reporting, testimony, or other evidence relevant to my analysis, as well as policy and training materials that inform the reasonableness of reviewed officer actions. My report references specific files that provide substantiation or evidence for the opinion. I provide a list of materials reviewed in the appendix to this report.

---

[4] I attempt to identify documents by their internal reference and/or title when possible.

**This space left intentionally blank.**

### 4. Analytic Framework

In my opinions below, I evaluate a range of police operational and tactical issues. Police officers must manage a wide variety of risks, and they use tactics to do so. Police tactics are "a sequence of moves that limit a subject's ability to inflict harm and [that] advance the ability of the officer to conclude the situation in the safest and least intrusive way" (Noble & Alpert, 2020). Across the US, police officers tend to agree with the goals of these tactics and "are rather conservative in their force options relative to citizen resistance" (Paoline & Terrill, 2011, p. 178). There is no way to guarantee safety, so generally accepted police tactics help "officers to protect themselves and community members by reducing risks, mitigating the likelihood that risks will become threats, and preventing threats from manifesting into harms" (Stoughton et al., 2021, p. 155).

The most basic rendition of relevant police tactics includes communicating reasonably to delay a violent encounter, increasing time to plan, bringing more resources on the scene, and thoughtfully considering other tactics that could achieve law enforcement goals while maintaining officer, bystander, and suspect safety. These are not advanced tactics. They are commonly taught at police academies throughout the country and are used successfully daily in police encounters. These tactics have evolved, and police have been taught versions of these tactics in academy settings in the US for nearly a century (Ragsdale, 1929; Sloan III & Paoline III, 2021).

Proper use of police tactics does not guarantee success, but adherence to the basic principles of police tactics can "save lives, prevent injuries, and resolve dynamic tactical situations" (Noble & Alpert, 2020, p. 357). Notably, proper tactics are not a guarantee of safety – for the officer, bystanders, or subjects. Because the situations police respond to are dynamic and resist a checklist-like approach, police officers are taught to constantly balance risk, threat, and safety and to prioritize their actions based on how that balance shifts for an encounter. For analysis purposes, the question is not whether an officer picked the single best tactic at any moment but *whether their tactics fell within a spectrum of options that would be considered reasonable under the circumstances.*

As a threshold matter, the operative facts when evaluating police tactics and decisions are those of which a reasonable officer on the scene would have been aware. In other words, these inquiries should be approached through the lens of the reasonable officer on the scene. This framework is reflected in generally accepted police practices and principles.

### Adherence to Tactics

Throughout modern policing, its practitioners have come to rely on basic tactics because they can safely resolve most, but not all, of the situations that police officers will encounter. Tactics are the method of transmitting safe practices to newer officers, so those officers will not get themselves or others unnecessarily injured or killed. For example, there are tactics for dealing with high-risk traffic stops, active shooter situations, suspicious subjects, large crowds, and subjects of diminished capacity. Reasonable tactics are taught throughout a police career but can also be set out in court cases, agency policy documents, research items, and published standards from national professional policing organizations.

9

Officers who use unsound tactics risk creating or contributing to a danger that otherwise would not exist (Garrett & Stoughton, 2017). Examples of unsound tactics include "acting too hastily without waiting for backup," which can lead to the officer engaging in "provocative acts that cause the suspect to respond in a way that leaves the officer no reasonable alternative other than to use force in self-defense" (Noble & Alpert, 2020, pp. 348–349). Other forms of tactics that are accepted within generally accepted police practice are creating time, re-assessing threats throughout a situation, understanding the imminent threat, targeting subjects appropriately so as not to enhance the risk of death or serious bodily injury, and using de-escalatory techniques to increase time in the situation and safely accomplish law enforcement's goals.

**Creating Time**

Time is the most critical concept that officers use to create safety in potentially violent encounters. Officers use time to create safety in potentially violent encounters, which can reduce the need to use force at all, confer the ability to use lower levels of force to safely resolve the situation, and improve decision-making by reducing perceptual distortions (Engel & Smith, 2009; Klinger & Brunson, 2009). Time is a critical element of police tactics, as the relationship between distance and danger is a baseline, empirically validated concept taught across policing (Sandel et al., 2021). Many tactics are explicitly designed to increase the time available to the officer. More time to react at the most basic level allows for better decision-making, more resources to arrive on the scene, and for resistant or assaultive suspects to cease or reduce their volatility.

Many tactics are explicitly designed to increase the time available to the officer. When officers fail to use reasonable tactics, one result can be a collapse of time available, for example, by remaining too close to a suspect armed with a sharp object, thereby creating a need for the officer to use force to defend himself. In the alternative, where good tactics were used, the officer creates distance between himself and the armed subject and uses cover to create barriers between both, thereby increasing the time the officer has to make decisions. For these reasons (Stoughton et al., 2021, p. 158):

> "[o]fficer-created jeopardy . . . includes the actions of officers who, without sound justification, willingly fail to take advantage of available tactical concepts like distance, cover, and concealment . . . , willingly abandon tactically advantageous positions by moving into disadvantaged positions without justification, or act precipitously on their own without waiting for available assistance from other officers."

**Re-assessing Threat**

It is well understood within policing that officers must continuously re-assess a situation to select from their many discretionary options. Primary among those options is to take no action, especially when a subject has shown no aggressive intentions toward the officers or others. However, as police are required to respond to dynamic, fluid situations (*Graham v. Connor*, 1989), generally accepted police practice requires that officers continually re-assess the threat level they are presented with and respond to those changes with their reasonable tactics.

**De-escalation**

De-escalation is a well-accepted police tactic and describes concerted efforts to "stabilize potentially violent interactions to produce better outcomes, minimize injuries, and reduce the risk of death" (Todak & March, 2020, p. 402). It is generally accepted within policing that officers must, wherever possible, attempt to de-escalate situations to preserve the lives and safety of those they contact. On that point, the *National Consensus Policy and Discussion Paper on Use of Force* (International Association of Chiefs of Police, 2020) define "de-escalation" in the following way:

> Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary. De-escalation may include the use of such techniques as command presence, advisements, warnings, verbal persuasion, and tactical repositioning.

These de-escalatory efforts substantially reduce the likelihood of police force and injury to both officers and subjects. Recent experimental research (Engel et al., 2022) showed that de-escalation training in the Louisville Metro Police Department caused reductions in use-of-force (-28.1%), citizen injuries (-26.3%), and officer injuries (-30.0%).

The *National Consensus* provides the generally accepted practice that "whenever possible and appropriate, officers should utilize de-escalation techniques consistent with their training before resorting to using force or to reduce the need for force." This is a powerful norm. Note that the *National Consensus Policy and Discussion Paper on Use of Force* (International Association of Chiefs of Police, 2020) place limits on the demand for de-escalation: "de-escalation will not always be appropriate and officers should not place themselves or others in danger by delaying the use of less-lethal or even deadly force where warranted." In some situations, such as when officers initially approached a situation without notice of impending aggression or violence and suddenly encountered an unexpected threat, de-escalation was never an option because de-escalation requires *time*.

De-escalation does not simply mean interpersonal communication but also reflects the need to stabilize the situation, context, and environment they are confronting. The general demand for de-escalation is intimately related to the safety that more time buys for officers and those they interact with. In some situations, such as active shooter scenarios, police legitimately have no de-escalatory options and must respond lethally and immediately to a situation. In many cases, however, police do have time, and even in dynamic and violent situations, it is widely accepted that officers should seek to stabilize the situation until more officers can respond to assist. This is the concept of tactical restraint (Stoughton et al., 2021, pp. 172–173):

> "Tactical restraint serves as a reminder that aggressing—that is, moving toward the subject—is not always the safest or most appropriate option. In some situations, advancing toward the subject is tactically sound. In many others, though, it will be preferable for officers to maintain a position that provides at least some tactical advantage rather than forsake that advantage by moving out of that position. Consider a simplified example: an officer interacting with a wheelchair-bound paraplegic who is aggressively wielding a knife in an otherwise empty parking lot. One need not have the tactical

instincts of Napoleon to appreciate that an officer who rushes in to apprehend the subject risks putting themselves into a dangerous situation, one in which they could be cut or stabbed. Aggressing in that situation is likely to be considered officer-created jeopardy; the officer would be better served by keeping some distance away from the knife-wielding subject."

**Risk Versus Imminent Threat**

Police officers are only allowed to use force when necessary to protect certain government interests, such as officer safety and the apprehension of criminal suspects. In studies of police using force, the primary driver of police decisions to use force is suspect resistance and threat levels (Alpert & Dunham, 2004; Bolger, 2015; Tillyer, 2022), though scholars recognize a host of contributing factors (Alpert & MacDonald, 2001; Garner et al., 2002; Terrill & Reisig, 2003). The use of force is justified when there is an imminent threat, meaning that the subject has the ability, opportunity, and intention to cause harm (Stoughton et al., 2021). This threat must be real or reasonably perceived to be real. When addressing the threat, officers must continuously re-assess the situation to ensure that the use of force is still justified. "Ability" refers to the subject's capacity to cause the identified harm through some explicitly identified means or mechanism. "Opportunity" refers to the subject's proximity to the potential target in light of the specific harm at issue. "Apparent intent" refers to the subject's perceived mental state, their apparent desire to cause the specific, identified harm.

Importantly, this formulation has been verified empirically in a sample of 11,597 use-of-force reports drawn from 87 agencies between 2014 and 2018 (Krajewski et al., 2023). The study clearly demonstrates that each of the "inputs" of threat (ability, opportunity, and intent) were statistically significantly related to force levels, and that those inputs were interactive, meaning that when taken together they were predictive of the level of force used (see also, McLean et al., 2023).

Critical to this concept is that intent "may be properly articulated through a combination of multiple factors even if no individual factor is sufficient on its own. [M]erely holding a tire iron is not in and of itself indicative of the intent to cause harm. Nor is walking toward an officer. Nor is failing to obey an officer's commands. However, walking toward an officer while holding a tire iron and ignoring the officer's commands to stop or drop the weapon can be, in combination, indicative of the individual's intent" (Stoughton et al., 2021, p. 35). While it is important for officers to respond to imminent threats, they do not have to wait until the threat has fully manifested into an attack. By the time an attack occurs, it may be too late for the officer to prevent the harm. Instead, officers must use their training and judgment to anticipate and respond to potential threats before they escalate. This requires constant situational awareness, the ability to quickly assess and react to changing circumstances, and appropriate use of generally accepted police tactics. It is also important for officers to communicate with each other and coordinate their actions to effectively manage the situation and protect the public and themselves.

However, the presence of just one of the threat factors does not justify force, nor does the mere possibility that such a factor may appear, without present evidence to substantiate that possibility (see, e.g., Stoughton et al., 2021, pp. 36–37). Where all three elements (ability, opportunity, and intent) are present, officers are taught that threat exists, and use-of-force is one primary method

12

of responding to threat. However, when all three are not present, the officer is in "risk" territory, and is expected to use generally accepted tactics to ameliorate that risk. In other words, generally accepted police practice expects force to meet threats, and tactics to meet risks.

While it may be wise, in many cases, for officers to mitigate risk in various ways, the lack of imminent danger to a governmental interest makes it inappropriate to use force at that point. Consider again the example of a motorist using a tire iron to change a tire; as the motorist is changing the tire, they have the physical ability and opportunity to attack the officer with the tire iron, which means that there is some risk to the officer. The officer could step farther away from the motorist (creating distance) or could move to a position that keeps part of a vehicle between them and the motorist (using a physical obstacle to increase the amount of time it would take for the motorist to reach them), but the officer would not be justified in using force at that point because there was no perceptible intent to harm. Although there was some risk, there was no apparent intent to cause harm, and therefore there was no threat. And with no threat, there was no governmental interest at stake, and no justification for using force. The same is true in other situations; the fact that someone is capable of causing harm, has the opportunity to cause harm, or has the intent to cause harm does not justify a use of force: all three factors must be present.

Ultimately, the general principle is to avoid force when possible. Generally accepted police practice requires that agencies develop and enforce policy to guide officers in determinations of proportionality, with most agencies adopting some version of "use of force continuum" to do so (Garner et al., 1995; McLean et al., 2023; Mourtgos et al., 2021). These continuums generally link the level of force used by an officer to the resistance and threat posed by subjects. For example, a generally accepted practice is that potentially lethal threats can be met with deadly police force, or any lower level of force capable of achieving the desired governmental goal. In this way, for example, someone who poses an *immediate* threat to an officer's life can be met with *immediate* lethal force, but as circumstances change and a subject no longer poses such an immediate threat, officers must recalibrate their response. Alternatively, as a previously cooperative subject suddenly poses an immediate threat, officers are allowed to adjust their level of force upwards.

Officers are taught that the key to determining the threat level of a subject is what the Supreme Court (*Graham v. Connor*, 1989) refers to as the "facts and circumstances of each particular case." Officers learn that the relevant facts and circumstances are the so-called "*Graham* factors," laid out by the Court, which include 1) the severity of the underlying crime, 2) whether the subject poses an *immediate* threat to officers or others, and 3) the resistance level of the subject. All three factors are explicitly taught to officers and embedded into generally accepted police practice.

In general, the principle of proportionality means officers must calibrate their response based on the resistance or non-compliance they encounter. Officers are taught to carefully adjust their force levels to the level of threat posed by the subject. This requires distinguishing between the nature and severity of the threat posed by the subject's actions, which is distinct from the subject's behavior. This principle is one of force proportionality (Stoughton et al., 2021, p. 52): "it is not the suspect's behavior itself that drives proportionality analysis, it is the extent to which the suspect's behavior threatens a governmental interest. Reviewers can assess the severity of a

threat by considering subject characteristics, officer characteristics, encounter characteristics, and environmental factors."

## 5. Evidence Review and Opinion

As a matter of police practice, it is generally accepted that assessing an officer's decisions requires reviewing the facts and circumstances as they would have appeared to a reasonable officer on the scene. The following description of events summarizes the facts as they appear in the materials I reviewed and includes information that a reasonable officer would have been aware of. Information that a reasonable officer on the scene would not have been aware of at the time, including information discovered after the incident, is relevant only to the limited extent that it can help assess the reasonableness of the officer's perceptions and conclusions before and during the use of force.[5] For that reason, such information is generally excluded from this report.

### 5A. Factual Bases for Opinion

### Overview of the June 1st, 2020 Incident

The incident under review occurred on Monday, June 1st, 2020, where large-scale demonstrations occurred in the District of Columbia. In response, the MPD activated its Civil Disturbance Units (CDU) for crowd control management.

Washington DC mayor, Muriel Bowser, implemented a curfew for the District of Columbia for June 1st, 2020, beginning at 7:00 p.m. and ending at 6:00 a.m. June 2nd, 2020. The curfew order outlined that during the listed hours, "no person, other than persons designated by the Mayor, shall walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District." Exemptions were made for essential workers (including healthcare personnel and working media) and individuals who were voting or participating in election activities. Exemptions were also provided for travel to hospitals and urgent care facilities. The order outlined that any person violating the curfew may be subject to a criminal fine of up to $300 or imprisonment for not more than 10 days.[6]

According to MPD, at approximately 6:45 p.m. the United States Park Police dispersed a crowd from Lafayette Square (a park directly north of the White House), to erect a barricade around the park. That group then gathered in the area of 16th and H Street, Northwest. At 7:01 p.m., the Assistant Chief of the Homeland Security Bureau directed MPD to begin making announcements for that crowd to disperse, as the curfew order was in effect. Warnings were given via a Long Range Acoustic Device (LRAD) by MPD, stating that individuals who remained on the street in violation of the curfew order would be subject to arrest.[7] According to Lieutenant Mejia, the

---

[5] For example, the reasonableness of an officer's claim that a suspect was armed can be enhanced if it is later discovered that the suspect had a weapon in their possession. However, this credibility can be undermined if it is later revealed that the suspect was unarmed at the time of the incident. In some cases, new information that was not available to the officer at the time of the incident can still impact questions about the reasonableness of the officer's perceptions, decisions, and conclusions. However, this new information is not dispositive: a suspect who is unarmed might still behave in a way that appears threatening, just as a suspect who is armed may not use their weapon against the officer at all.

[6] Att. 1.pdf

[7] Att. 51.pdf; IAD Report.pdf

group at 16th and H Street, Northwest who had been given the above-mentioned warnings began marching northbound in the 1500 block of 14th Street, Northwest. That crowd was estimated to be about 1,000 individuals in size.[8]

At approximately 8:30 p.m., MPD was trying to get two groups of protesters to merge so that arrests for violation of the curfew order could be made. One group was north of the area of 14th Street, Northwest and S Street, Northwest; the other group was south of this location. The group north of this area eventually marched onto Swann Street, Northwest between 15th Street, Northwest and 14th Street, Northwest at approximately 8:45 p.m.[9] This group of demonstrators was estimated to be approximately 200 strong.[10]

MPD encircled ("kettled") this group, blocking them on Swann Street, Northwest, between 14th Street, Northwest and 15th Street, Northwest. Alleyways running parallel to Swann Street were also blocked such that those encircled could not escape. Cruiser 50 (Inspector Robert Glover) authorized mass arrests of the individuals surrounded by MPD.[11]

Upon encirclement, warnings to disperse or face arrest were not given. Lt. Horos was asked by Lt. Harrington, another supervisor on scene, if they (MPD) were going to give the group warnings to disperse.[12] Lt. Horos' response was, "No, we're going to lock them up." The other supervisor responds, "Well I mean, we've gotta give them...". (Please note, this response is difficult to hear on body camera and may not be exactly accurate. However, it appears from the footage that Lt. Harrington was questioning the decision to not provide warnings before effecting arrests. Lt. Harrington confirms that he did not hear any dispersal warnings given on Swann Street)[13,14]

Inspector Glover, the incident commander,[15] using the call sign Cruiser 50,[16] announces over the radio that there are to be no munitions deployed on Swann Street. Since the group is completely surrounded, only mechanical force was to be used. Inspector Glover then announces that he needs all of his munition teams to acknowledge only mechanical force and 40mm Exact Impact rounds as the crowd is surrounded and does not have a means of escape. An MPD member identifying themselves as 3601 tells Inspector Glover over the radio that they are in the alley and only have 46 (MK-46 OC Spray Dispenser) and asks if 46 is authorized. Inspector Glover responds that OC spray is approved if they have to use it for self-defense, but he doesn't want the crowd to surge the lines (ostensibly worried that the use of OC spray on the crowd would agitate/panic them and they would rush MPD's line of officers). Sergeant Anthony Aliado responds that the only reason they would need to use it (OC spray) is if the line got rushed.[17]

---

[8] IAD Report.pdf
[9] I believe the group that marched onto Swann Street was the group north of this location. However, it is difficult to be certain based on the dispatch recording.
[10] Radio Run.mp3; IAD Report.pdf
[11] IAD Report.pdf; Radio Run.mp3
[12] Harrington Deposition at 170-171.
[13] Horos BWC.mp4, approximately 22:04 timestamp
[14] Harrington Deposition at 174.
[15] Glover Deposition at 70.
[16] Glover Deposition at 163-64.
[17] Radio Run.mp3, Glover Deposition at 200-01.

Approximately 15 minutes after the crowd had been encircled on Swann Street, Lt. Horos states on the radio that the protestors are starting to try the doors on the block, and they (MPD) are ready to move in. Inspector Glover then ordered the line on 14th Street to push the protesters towards 15th Street. Approximately one minute and twenty seconds later, Lt. Horos states on the radio that protestors are starting to kick in doors on the block and begins to give orders for the MPD line on the 15th Street side to move in. The MPD line begins to push the protest line east on Swann Street, while giving repeated orders to "move back." Mechanical force is used by MPD, meaning shields and batons were used to physically push protestors back, decreasing the space available to them between 15th Street and 14th Street on Swann Street.[18]

As the line that Lt. Horos is directing begins to move eastbound on Swann Street, they approach a parked vehicle on the north side of the street. One protestor is standing on top of the vehicle with a cell phone recording the actions of MPD. Lt. Horos deploys OC spray at this individual, after which he gives an order to "get down." The individual who was sprayed left the vehicle and moved back into the crowd. Shortly thereafter, Lt. Horos deployed OC spray into the crowd at least once more, targeting an individual who was approximately 5-10 yards away and backing away from the police line while holding a cardboard sign in front of him.[19,20]

Around the same time, Officer Crisman reports seeing approximately 20 curfew violators run inside 1461 Swann Street. Officer Crisman reports that he believed the individuals were committing a burglary. Officer Crisman reports that there were approximately 10 people gathered on the sidewalk adjacent to the steps leading up to 1461 Swann Street, and they appeared to be attempting to gain entry into the house. Officer Crisman deployed OC spray from his MK-9 at the individuals on the sidewalk at the bottom of the stairs. This resulted in those individuals fleeing up the stairs and into 1461 Swann Street, as the MPD line continued to move past that house.[21]

Not long after, MPD stopped moving their lines in, and began arresting protestors for curfew violations, several at a time.[22] Following arrest, protesters were processed on scene via photographing, confiscation of their belongings, and restrained with zip ties. Protestors were then transported to police facilities for further processing.[23]

According to plaintiffs, adequate food and water were not provided at the processing facilities, with at one time officers bringing three small cups of water to a room with approximately forty people in it. Plaintiffs also report being denied regular bathroom breaks, with one of the protestors urinating on herself because officers refused to allow her to go to the bathroom.[24]

Plaintiff Remick reports that from the time of arrest around 10:00 p.m. until release around 6:00 a.m., MPD failed to provide access to food, water, or a bathroom. Plaintiff Surio reports denial to

---

[18] Horos BWC.mp4; Radio Run.mp3
[19] Horos BWC.mp4; Cellphone Footage.mp4
[20] There is some confusion between the IAD report and Lt. Horos' statement regarding whether he deployed OC spray two or three times. I will discuss this in more detail in the section below, which focuses on my opinion concerning the use of OC spray.
[21] IAD Report.pdf; Quarles BWC.mp4
[22] Quarles BWC.mp4
[23] IAD Report.pdf; 39 – Redacted Amended Complaint v1 (4853-4289-8695).pdf
[24] 39 – Redacted Amended Complaint v1 (4853-4289-8695).pdf

food while in custody until approximately 10:00 a.m. Plaintiff Pearlmutter reports that MPD denied requests for food and water, and that food was not distributed to protestors. All of these plaintiffs report being left in zip-tie restraints for prolonged periods.[25]

While MPD placed protestors under custodial arrest, MPD did not arrest (or attempt to place under arrest) at least some individuals who were in violation of the curfew and who were not participating in protests. Footage from the 1400 block of Swann Street NW shows individuals outside the kettle who appear to be violating the curfew, and police do not take any steps to enforce the curfew against these individuals.[26] In addition, MPD issued at least one 61-D (a non-custodial arrest form) to a person violating the curfew who, based on the incident report, did not appear to be participating in a protest.[27]

## 5B. Opinions

### The Decision to Encircle ("Kettle") the Crowd, Not Provide Warning(s), and Arrest

Law enforcement agencies are faced with the difficult task of balancing two critical objectives when overseeing protests. On one hand, they must safeguard the fundamental rights to free speech and assembly as enshrined in the Constitution. On the other, they must ensure the safety and security of the public. A key tenet of generally accepted police practice and principles is applying proportional and impartial strategies and tactics to accomplish both imperatives (Maguire, 2022).

When law enforcement approaches an entire protest as a potential threat, it risks unintentionally pushing peaceful protesters to align with more extreme members against the police. Generally accepted police practices and principles suggest that law enforcement should direct their efforts towards individuals whose violent and destructive conduct requires immediate attention, rather than treating the entire crowd as culpable. The indiscriminate detention of all individuals within a crowd, as seen in tactics like encirclement, deviates from these principles, leading to unwarranted seizures. By adopting a precise approach that refrains from unjustly penalizing or imposing excessive restrictions on the whole assembly, the police are more likely to avert escalations and maintain a peaceful dynamic with the crowd (Maguire & Oakley, 2020).

Generally accepted police practices and principles advise that arrests be used judiciously and when alternative options are not viable. Police are encouraged to support those who participate peacefully and within legal boundaries, while intervening with individuals committing acts of violence, vandalism, or other significant offenses. This approach aims to uphold constitutional compliance and the perceived legitimacy of law enforcement and minimize the potential for widespread non-compliance. Police must distinguish between the nature and severity of the threat posed by individuals' actions, taking into account the severity of the underlying crime (in this case, a minor crime: violation of a curfew order) and whether there is an immediate threat being posed. At the time of encircling the crowd, I did not observe any violence or significant property damage being committed in the videos I have reviewed. Indiscriminate detention of

---

[25] 39 – Redacted Amended Complaint v1 (4853-4289-8695).pdf; 2023.11.3 Jesse Pearlmutter Answers to Defs' First Rogs.pdf; 2023.11.3 Osea Remick Answers to Defs' First Rogs.pdf; 2023.11.3 Priyanka Surio Answers to Defs' First Rogs.pdf
[26] DC_2021-cv-00806-00018223, starting at 0:38:30.
[27] DC_2021-cv-00806-00016711.

non-violent protesters is generally discouraged, as it may provoke further unrest. The decisions regarding what behaviors will prompt arrests or force are critical, often serving as the pivot point that determines the intensity of the interaction between the police and the public (Maguire & Oakley, 2020). That is, the decisions and tactics used by the police often shape the protesters' decisions and tactics, and changes in both are driven by an iterative process (Gillham & Noakes, 2007).

While containment tactics may be warranted under specific conditions, their unjustified application can excessively restrict movement, endanger individuals within the crowd, trap bystanders, heighten risks for law enforcement officers, and infringe upon the civil liberties of all involved—both protesters and non-participants. The tactic of "kettling," which involves detaining people en masse within confined areas for extended periods without provisions for basic needs, is broadly criticized. As previously stated, generally accepted police practice and principles advocate for a tailored approach to crowd control. This approach aims to limit the impact of police actions to those actively participating in violent behavior, destruction of property, or committing other serious offenses (Maguire & Oakley, 2020).

One of the primary issues with the use of encirclement (or kettling) is the indiscriminate detention of all individuals within it. Just because a crowd formed earlier to protest, does not mean that every person who may be in the area when the encirclement is enacted should be corralled and seized (DLG, 2023).

The use of encirclement is also inadvisable in the reviewed circumstance as an encirclement technique was used on individuals who may not have known that a curfew had been put into place, were attempting to comply with the curfew, or who were exempt from the curfew order.

> *Ms. Kamera Holmes reports that she was attempting to go home after the dispersal order given near the White House at 7:00 p.m. However, the National Guard was blocking streets and her ride could not get to her. As, Ms. Holmes tried to find a way out of the city, she ended up with the crowd that was encircled on Swann Street. Ms. Holmes reports that she was arrested because should could not leave the city with all of the streets blocked off, and proper notification was not given on Swann Street.[28]*

> *Similarly, Mr. Patrick Green dispersed from the White House, and was attempting several different streets to get to his vehicle because the streets he needed to use to go home were blocked. At approximately 7:20 p.m. Mr. Green spoke with an officer about whether he was in violation of the curfew if he was trying to get to his vehicle. The officer advised Mr. Green to hurry and get to his vehicle and leave the city. Several individuals Mr. Green was with said they parked where Mr. Green had parked, and if he stayed with them they would end up back at Dupont Circle, which is where his car was. Mr. Green followed those individuals, who ended up on Swann Street and was encircled by MPD. Mr. Green told the officers his vehicle was down the street and "pleaded" to leave. MPD denied those requests and Mr. Green was arrested.[29]*

> *Finally, one social media video that was reviewed by IAD describes OC spray being deployed on protesters. An unidentified male in the crowd stated, "Hey! I'm a member of the press!" As the*

---

[28] Att. 49.pdf
[29] Att. 31.pdf; It should be noted that Mr. Green spoke favorably of the MPD's conduct during the arrest procedure. This lends weight to his remarks, as it doesn't seem that Mr. Green's intent is merely to register grievances against the MPD.

> *MPD line approached this individual's position, the male again stated he was a member of the press and that he was trying to move back and comply with the officer's orders. The video was jostled, and the male can be heard yelling "Ow! Ow! Fuck!" The male then coughs and is heard saying "thank you" near the end.*[30]

Lt. Mejia recognized the impropriety of indiscriminate seizure when he reported that "[s]ome reporters and attorneys were given the option to leave the group that was being placed under arrest."[31] Reporters were exempt from the curfew order and should not have been detained or seized in the first place.[32] It is unclear why attorneys were allowed to leave, but not others like Ms. Holmes or Mr. Green (see above examples). Attorneys were not specifically listed as exempt from the curfew order.[33] This suggests a possible lack of objectiveness to the speech content of the protesters who were not given the option to disperse and leave without arrest.

MPD failed to follow the generally accepted police practice and principle of giving warnings to a crowd before making arrests.[34] It is generally accepted police practice to issue clearly audible warnings before taking enforcement action. These warnings need to be given in such a way that the crowd can hear them, and that are understandable. It is a generally accepted police practice and principle to inform people what is going to happen if they do not disperse or follow other directions the police are giving, especially if the police are planning to make mass arrests or use less-lethal weapons (Maguire, 2022). The above three examples are why providing warnings is a generally accepted police practice. Not only does providing warnings allow an opportunity to de-escalate a crowd, but it also ensures that people who are trying to comply with the law, are unaware of a curfew, or are exempt from the curfew (e.g., a member of the press) are not seized.

These communications are a critical aspect of proper de-escalation tactics. As outlined earlier, the *National Consensus Policy and Discussion Paper on Use of Force* (International Association of Chiefs of Police, 2020) states that police should communicate verbally "in an attempt to stabilize the situation and reduce the immediacy of the threat." The use of warnings is in accordance with the general principle to avoid force when possible, allowing individuals in the crowd an opportunity to either disperse peacefully or comply with directions from the police. A common policy during First Amendment assemblies is to verbally persuade organizers or participants to disperse of their own accord before issuing official dispersal warnings.[35] This is a de-escalation tactic aimed at reducing confrontation and the potential need for force. When these informal communication attempts fail, it is general police practice to issue official dispersal warnings for the reasons listed above. Indeed, MPD policy states that dispersal orders should be given when a significant number or percentage of the crowd is engaging in unlawful disorderly conduct (in this case, MPD's reports indicate that they determined the entire crowd was in violation of the curfew order, which they deemed unlawful disorderly conduct[36]), or a public safety emergency has been declared by the mayor. The policy further states that absent exigent circumstances,

---

[30] Att 62.pdf; I have not reviewed this video so it is unknown if the member of the media was saying thank you for being let out of the crowd by officers or for some other reason.
[31] IAD Report.pdf
[32] Att. 1.pdf
[33] Att. 1.pdf
[34] Att. 51.pdf; Horos BWC.mp4
[35] First_Amendment_Assemblies.pdf
[36] IAD Report.pdf

there shall be at least three warnings to disperse given. Even if exigent circumstances exist, MPD policy still requires at least one dispersal warning. Officers are required to give participants a reasonable amount of time to disperse.[37]

The IAD report justifies the lack of a dispersal warning by stating that other methods were used earlier in the day, such as the Emergency Alert System, cell phone notifications (at 4:41 p.m., well before this incident), and the local media.[38] None of these methods matches the efficacy of the expected and generally accepted police practice of issuing warnings directly to a crowd, on-site, at the time of police interaction.

MPD is aware of the generally accepted police practice and principle of providing warnings to crowds. Multiple warnings were given to a crowd in the area of 17th and D Street at 7:00 p.m. when the curfew went into effect, stating that if the crowd remained on the street in violation of the curfew they were subject to arrest.[39] On the police radio, a supervisor stated that a final warning was issued to a group at 16th and I Street at 7:49 p.m. before arrests were made. At approximately 7:55 p.m., an unidentified officer on the scene of another group asks over the air if they should give warnings, as the group is relatively peaceful. Lt. Horos replies to that officer, "A-firm, if we can get them to disperse and go home, let's try that."[40] Moreover, MPD's training emphasizes the need to provide clear and concise warnings in crowd control situations, with three audio examples of warnings provided.[41] Finally, the First Amendment Assemblies Act of 2004 requires MPD to issue at least one clearly audible and understandable order to disperse with an amplification device if MPD determines that a First Amendment assembly should be dispersed. Multiple dispersal warnings are required if there is no imminent danger of personal injury or significant property damage.[42]

Upon encirclement, warnings to disperse or be arrested were not given.[43] Lt. Horos was asked by Lt. Harrington if they (MPD) were going to give the group warnings to disperse. Lt. Horos' response was, "No, we're going to lock them up." Lt. Harrington responded, "Well I mean, we've gotta give them…". (Please note, this response is difficult to hear on body camera and may not be exactly accurate. However, it appears from the footage that Lt. Harrington was questioning the decision to not provide warnings before effecting arrests.)[44] MPD did not begin using force on the crowd until approximately 15 minutes after they were encircled, leaving ample time to provide warnings. The failure to do so not only deviates from generally accepted police practices but also contradicts the fundamental principle of using de-escalation to avoid the use of force.

As further described below, MPD failed to adhere to generally accepted police practices by not adequately reassessing the situation. Based upon examination the case documents, it is evident that the MPD had resolved to surround, detain, and arrest the protesters prior to the execution of this plan with the specific group in question. Discussions about the strategy to encircle groups, using terminology like "boxing," "pinching," and "encircling," were taking place for over an hour

---

[37] DC_2021-cv-00806-00003683.pdf
[38] IAD Report.pdf
[39] Att. 51.pdf
[40] Radio Run.mp3
[41] Riot Control Agents and the Extended Impact Weapon Training.pptx
[42] first_amendment_act.pdf
[43] Att. 51.pdf
[44] Horos BWC.mp4, approximately 22:04 timestamp

before the actual containment of the crowd occurred. Roughly an hour before this event, Inspector Glover broadcasted the intention to make widespread arrests for curfew violations over the police radio. The communications from the police radio detail various groups marching around the city, with law enforcement maneuvering to position their personnel in anticipation of corralling one or more groups to carry out mass arrests.[45]

Once the presence and location of the group in question began to be monitored, Cruiser 50 was attempting to allow the group to merge with another group, so that both groups could be encircled at once. Given the estimated numbers of the two groups broadcasted over the radio, it is unclear whether this merger actually occurred. Regardless, MPD successfully encircled the group in question on Swann Street, Northwest, between 14th Street, Northwest and 15th Street, Northwest. This encirclement (or "kettling") was done with the intent of arresting the entire crowd for curfew violations.[46]

MPD decided to conduct its encirclement on a residential street. MPD knows the geography of their city. It is unlikely that MPD did not know that Swann Street was a residential street. And even if for some reason they did not know this, officers monitoring the crowd march onto Swann Street could see that it was a residential street. MPD knew that the crowd was protesting police brutality and would likely be unfriendly to police intervention. MPD knew or should have known that corralling a group of emotionally charged individuals into a small space could cause anger and/or panic, and in a confined residential space, could increase the risk of a violent interaction. When considering that there was no immediate threat to the safety of the officers or others, there was no active resistance exhibited by the subjects attempting to evade or escape, and the mildness of the involved crime they planned on making arrests for (a curfew violation), the MPD's strategy showed a conscious and voluntary omission of the obligation to employ appropriate caution to prevent foreseeable violence and/or significant property damage.  That is, MPD failed to meet generally accepted police practices by not utilizing the available time to reassess the situation and strategically engage in a more appropriate manner. This oversight diminished their ability to safely achieve their goals with minimal force and reduce risk to bystanders and property.

While Inspector Glover made a statement that the crowd dictated the location, that justification is unconvincing.[47] For hours before the encirclement on Swann Street occurred, MPD was attempting to direct different crowds to locations advantageous to them for encirclement.[48] A common function of Civil Disturbance Units is to strategically block specific streets in order to guide crowds to march toward, or further away from, specific locations (FEMA, n.d.). Moreover, MPD was not *required* to conduct their encirclement maneuver on Swann Street. That is, even if one were to accept the idea that MPD had no control over the direction of the crowd, they could have waited until the crowd walked to another, more appropriate location, where the crowd would not be corralled into a confined residential street, putting residents' property and safety at an elevated risk. By deciding to conduct their encirclement on a confined residential street, MPD was *creating* a public safety concern for Swann Street's residents, rather than waiting to encircle the crowd in a more strategic and safe location (i.e., away from residential homes). It is

---

[45] Radio Run.mp3
[46] Radio Run.mp3
[47] Att. 52.pdf
[48] Radio Run.mp3

a reasonable expectation for police agencies to foresee possible panic during an encirclement maneuver, and that this panic on a residential street may result in violence and property damage. Indeed, the IAD report identified the "tactical improvement opportunity" for MPD members to have detained the crowd away from a residential street, as it created "an imminent likelihood of violence and a potential to cause significant property damage during [arrests]."[49]

The difficulties in policing protests are often magnified when the demonstration centers on police actions, as was the case in this scenario. Following an incident involving police action that draws public scrutiny, there may be a decrease in the protesters' willingness to engage constructively and peacefully with law enforcement. Officers may find themselves feeling defensive and less inclined to open dialogue, which is a natural human response but not a reasonable professional response. Protesters voicing concerns about police behavior, whether perceived or real, might expect negative treatment and could even provoke officers in hopes of documenting such behavior. Although frustration by police is understandable on a personal level, it's during these exact situations that maintaining a high standard of professionalism and sound judgment is crucial. Actions and decisions should be steered by generally accepted police practices and principles, especially in such charged environments.

### Justification Discrepancies

MPD's IAD report, in part, uses acts of vandalism as part of their justification for encircling the group in question and making arrests. The report states that the front window of Trader Joe's (1914 14th Street, Northwest) and the front door of El Centro Night Club (1819 14th Street, Northwest) were vandalized. While the IAD report clarifies that the El Centro Night Club vandalism occurred earlier in the afternoon (event time: 14:03; report time: 14:42),[50] one reading the IAD report could easily be left with the impression that the vandalism at Trader Joe's occurred during this particular march. It is important to note, however, that according to the police report, the Trader Joe vandalism also occurred earlier in the day (event time between 02:01 and 04:43; report time 05:23).[51] It is unreasonable to rely on either of these incidents to justify the encirclement of an entire crowd several hours after the incidents occurred.

Further, the IAD report goes on to report Lieutenant Lamond observing a small group of individuals approaching an unoccupied MPD vehicle in the 2400 Block of 14th Street, Northwest, and breaking the vehicle windows. Subsequently, another small group of individuals approached the vehicle and set the MPD vehicle on fire.[52] Again, from reading the IAD report, one could mistakenly infer that this arson occurred during the march leading up to the kettling and arrests. However, this arson did not occur until approximately 9:20 p.m., after the protesters at the heart of this case had been surrounded on Swann Street.[53]

---

[49] IAD Report.pdf
[50] Att. 2.pdf
[51] Att. 3.pdf
[52] IAD Report.pdf
[53] Att. 4.pdf; IAD Report.pdf

These discrepancies in the chronology of events are important to note, as they undermine part of the justification for MPD's actions against the crowd in question: "After learning an MPD cruiser was destroyed, and witnessing multiple acts of vandalism and destruction of property were committed, the Incident Commander, Inspector Glover, authorized the mass arrest of the curfew violators…".[54]

**The Decision to Use Force**

A cornerstone of generally accepted police practice and principles is evaluating an officer's use of force through an objectively reasonable standard. This standard requires officers to assess each situation based on the totality of the circumstances, considering what a reasonably prudent officer would do under similar conditions. This assessment relies on the information known to the officer at the time the force was used and does not involve hindsight analysis of unknown circumstances.

The totality of the circumstances encompasses a range of factors, including the immediate threat to the safety of the officer or others, the active resistance exhibited by the subject's attempt to evade or escape, and the severity of the involved crime(s).

*Mechanical Force*

Mechanical force in this context consists of two levels. Level 1 mechanical force includes the use of tools or weapons, to include riot baton, ASP, or riot shield. Level 2 mechanical force includes extended impact weapons, less lethal munitions, and other less lethal rounds.[55] Both types of mechanical force were authorized by Inspector Glover for use on Swann Street.[56] From my review of the provided material, it appears that Level 1 mechanical force was used on Swann Street.[57]

It is generally accepted police practice that officers provide warning to subjects before force is used.[58] When taking enforcement actions, there should be no surprises to a crowd; they should be clearly informed of the impending consequences if they fail to disperse or, as in this situation, refuse to comply with an arrest. (Maguire, 2022). The footage I reviewed depicted a protest that was predominantly peaceful. While there were instances of protesters speaking harshly to police officers, there was no evidence of violence. Peaceful demonstrators suddenly faced with a police line forcibly moving them, without any prior warning, naturally led to heightened emotions due to anger or fear. This reaction was exacerbated by the lack of an announcement informing them of their arrest and outlining the potential consequences of resistance. Although the MPD did issue commands to "move back," these did not come with explanations that the protesters were being arrested or with warnings about the repercussions of non-compliance prior to the application of mechanical force.[59] This contradicts the generally accepted police practice of de-

---

[54] IAD Report.pdf
[55] DC_2021-cv-00806-00001574.pptx
[56] IAD Report.pdf
[57] Per MPD's training material (Riot Control Agents and the Extended Impact Weapon Training.pptx), OC spray is classified as a separate use of force category, distinct from either level of mechanical force.
[58] DC_2021-cv-00806-00001574.pptx; Riot Control Agents and the Extended Impact Weapon Training.pptx
[59] Horos BWC.mp4

escalation through communication and warnings, further emphasized by MPD policy which mandates the use of such tactics to attempt to defuse situations.[60]

The police lines moving in precipitated the use of mechanical force. If MPD planned on following generally accepted police practice, there was ample time to inform the crowd prior to the initial movement of MPD lines from the 14th Street side of Swann Street that those in the crowd were under arrest and what type of force would be used if arrest was resisted. There was also ample time for MPD to give those same warnings from the 15th Street side of Swann Street before the circumstances that preceded the use of mechanical force. Accordingly, MPD failed to utilize the well-accepted police practice and principle of using time as a resource, thus missing an opportunity to potentially de-escalate the encounter before force was used.

### OC Spray

Although deployment of OC spray in a crowd control environment may be reasonable in some circumstances, widely accepted police practice generally discourages it, as it can contaminate people who are not involved and who it is not objectively reasonable to be used on.[61]

As outlined previously, as the line that Lt. Horos is directing begins pushing the crowd eastbound on Swann Street, the MPD officers approach a parked vehicle on the north side of the street. One protestor is standing on top of the vehicle with his arm extended holding a cell phone recording the actions of the MPD. Lt. Horos deploys OC spray at this individual.[62] It is generally accepted police practice to provide a warning of the use of OC spray before it is applied, especially in a situation involving a crowd as there is a high likelihood of exposure to surrounding people.[63] Lt. Horos stated that he deployed OC spray because the individual was in an elevated position and almost behind the police line. Lt. Horos states that he felt the individual was a danger to officers and to public safety.[64] While it is unreasonable to expect officers in crowd control gear to climb on the car to remove an individual, the individual did not demonstrate the ability, opportunity, and intention to pose an imminent threat of harm. Therefore, nothing should have precluded Lt. Horos from issuing a warning before using OC spray. However, Lt. Horos (who appears to be talking on a cell phone in one hand while holding the OC spray dispenser in his other hand),[65] did not provide the warning of "get down" until after the deployment of OC spray. Further, there was no warning of impending OC spray deployment if the individual did not comply.[66]

Lt. Horos deploys OC spray at least one additional time shortly after spraying the individual on the vehicle. In the case synopsis, Lt. Horos is described as observing an individual charging toward the police line with clenched fists and adopting an aggressive posture after he deployed OC spray against the individual on top of the car. This individual approached the police line and made contact with an officer's shield. The officer responded by pushing the individual back with

---

[60] DC_2021-cv-00806-00003683.pdf
[61] Control_Devices_and_Techniques.pdf
[62] Horos BWC.mp4; Cellphone Footage.mp4
[63] Control_Devices_and_Techniques.pdf; National Consensus Policy and Discussion Paper on Use of Force (International Association of Chiefs of Police, 2020)
[64] IAD Report.pdf
[65] Cellphone Footage.mp4
[66] Horos BWC.mp4

the shield, but the individual did not comply with further commands to retreat. The case synopsis notes that Lt. Horos then deployed a one-second burst of OC spray to the individual's face, causing them to retreat from the police line. However, the report then relays that a follow-up interview was conducted with Lt. Horos on July 30th, 2020, and Lt. Horos relayed the following. Lt. Horos reports that after he deployed OC against the individual on top of the car, he observed an individual running toward the police line with an object in his hand. Lt. Horos reports that the individual appeared to be getting ready to throw an object at the police line. Lt. Horos reports deploying a one-second burst of OC spray at the individual who was approximately twelve feet away. Lt. Horos stated that he did not think he made contact with the individual due to his distance, and the individual eventually retreated back into the crowd.[67]

Based on the above, it is unclear whether Lt. Horos deployed his OC spray two additional times following the deployment against the individual on top of the car, or if these accounts refer to two different recollections of one additional OC deployment. In either scenario, Lt. Horos' body-worn camera had fallen to the ground by this time.[68] However, cell phone footage from above captures at least one additional OC deployment by Lt. Horos. Lt. Horos deploys his OC spray at an individual who is approximately 5-10 yards away and who is backing away from the police line holding a cardboard sign in front of him. There are no other protesters directly between this individual and Lt. Horos when he deploys his OC spray. Further, I did not observe anyone in the immediate vicinity of this protester approaching the police line. In fact, the protesters immediately surrounding the sprayed individual are also backing away from the police line.[69] The circumstances shown in the video do not align with generally accepted police practice and principles when deploying OC spray, as there was no imminent threat from the subject.

Shortly thereafter, Officer Crisman reports using OC spray against approximately ten people on the sidewalk below the steps leading up to 1461 Swann Street. Officer Crisman reports that he heard what sounded like doors being kicked in, although he does not report seeing this occur. Officer Crisman then observed approximately 20 individuals run inside 1461 Swann Street. At that time, Officer Crisman reports that he did not know the owner of that residence was voluntarily letting protesters into his house and he believed the house was being burglarized.[70] Despite this explanation, Officer Crisman chose to use OC spray on those on the sidewalk, not on the people ascending the steps to the house he thought was being broken into. Video review confirms that Officer Crisman used OC spray on individuals on the sidewalk, and not on those entering the house.[71] The individuals on the sidewalk did not demonstrate the ability, opportunity, and intention to pose an imminent threat of harm. If Officer Crisman perceived an imminent threat, it would be more logical for Officer Crisman to have deployed his OC spray at the individuals about to gain entry to the home rather than individuals on the sidewalk, assuming the intention was to prevent a burglary. Ironically, spraying the individuals on the sidewalk prompted them to flee up the stairs and into the home. The officers did not pursue them or

---

[67] IAD Report.pdf
[68] Horos BWC.mp4
[69] Cellphone Footage.mp4
[70] IAD Report.pdf
[71] Quarles BWC.mp4

attempt to block entry into the house they suspected was being burglarized, instead moving past the property.[72]

Similar to Lt. Horos, from the video I viewed, it does not appear that Officer Crisman gave a warning before deploying OC spray, as would be expected under generally accepted police practice and principles.[73] In his report, Officer Crisman appears to rely on the repeated commands of officers on the line to "move back" as a warning.[74] However, a warning of impending use of OC spray should have been given. Moreover, there was ample time to provide that warning before use, given that the individuals Officer Crisman deployed OC spray against were not actively entering the house, or even on the stairs leading up to the house, thus not posing an imminent threat. Rather, they were standing on the sidewalk next to the house.[75]

**Detention and Processing of Protesters**

After MPD stopped moving their lines in, they began arresting protestors for curfew violations, several at a time.[76] Following arrest, protesters were processed on scene via photographing, confiscation of their belongings, and restrained with zip ties. Protestors were then transported to police facilities for further processing.[77]

According to plaintiffs, adequate food and water were not provided at the processing facilities, with at one time officers bringing three small cups of water to a room with approximately forty people in it. Plaintiffs also report being denied regular bathroom breaks, with one of the protesters urinating on herself because officers refused to allow her to go to the bathroom.[78]

Plaintiff Pearlmutter reports that from the time of arrest around 10:00 p.m. until release around 6:00 a.m., MPD failed to provide sufficient access to food, water, or a bathroom. Pearlmutter states that he observed other arrestees request food and be denied, although there was a large bag of sandwiches in the detention center being unused. Pearlmutter reports also witnessing others request the use of a bathroom but being denied or severely delayed. Further, Pearlmutter states that he made multiple requests to have his zip tie restraints adjusted and was explicitly denied. It was only upon being transported to, and waiting outside, the detention center several hours after the arrests on Swann Street that the zip tie restraints were adjusted (indicating that they, indeed, needed to be adjusted).[79]

Plaintiff Remick reports not having access to food, water, or a restroom from the time of his arrest around 2:00 a.m. until their release around 6:00 a.m.[80]

---

[72] Quarles BWC.mp4
[73] Quarles BWC.mp4
[74] It should be noted here that in the IAD Report's synopsis of events and Officer Crisman's interview (Att. 28.pdf) it appears that he is relying on the commands of officers on the line to "move back." However, in the IAD Report's summary of Officer Crisman's interview it contradicts these other two narratives and states that Officer Crisman "voiced a warning to the crowd to move back prior to his deployment." None of these three narratives suggest that Officer Crisman gave a warning of impending use of OC spray before its use.
[75] Quarles BWC.mp4
[76] Quarles BWC.mp4
[77] IAD Report.pdf; 39 – Redacted Amended Complaint v1 (4853-4289-8695).pdf
[78] 39 – Redacted Amended Complaint v1 (4853-4289-8695).pdf
[79] 2023.11.3 Jesse Pearlmutter Answers to Defs' First Rogs.pdf
[80] 2023.11.3 Osea Remick Answers to Defs' First Rogs.pdf

Plaintiff Surio reports denial to food and water while in custody until approximately 10:30 a.m, while making requests several times following arrest, after 11:00 p.m., and before release at approximately 10:30 a.m. Surio was transported to a hospital for injuries, and was continued to be denied water while at the hospital by officers, finally receiving water from medical staff after a medical assessment.[81]

Mass arrests require significant resources, which is why law enforcement often chooses to handle processing on-site, reducing the duration of detention to just a few hours. While it's not inherently incorrect to transport detainees to another location for processing, police departments conducting mass arrests must plan appropriately. They are obligated to ensure humane treatment of detainees, including providing water, restroom facilities, and food, especially if processing and detention are prolonged. Plaintiffs' reports of being held for eight to ten hours without adequate water, food, and restroom access do not align with generally accepted police practices and principles. MPD policy requires officers to adequately care for arrestees and make them as comfortable as possible, and it outlines a process for providing them food.[82]

Additionally, while the use of zip ties for arrest and transportation is standard, keeping individuals restrained in this manner for an excessive amount of time is not consistent with generally accepted police practices and principles. If officers determine that the continued use of zip ties is necessary, it is a generally accepted police practice to ensure they are not applied too tightly to avoid causing injury. Recognizing the potential for injury with using flex-cuffs, MPD policy mandates that officers ensure applied flex-cuffs are not too tight. Further, officers are mandated to give prompt attention to complaints that flex-cuffs are too tight. Should the zip ties be found too tight, the officer is required to remove them and replace them with a new pair, applied properly.[83] Plaintiff Pearlmutter reports that their requests for adjustment were denied. Ultimately, an officer examined and adjusted Pearlmutter's zip ties several hours later, indicating that an adjustment was necessary from the start.[84]

Finally, all three plaintiffs were exposed to OC spray. Common practice among agencies requires officers to summon medical personnel to decontaminate individuals exposed to OC spray.[85] However, even in the absence of medical personnel for decontamination, it is a generally accepted police practice—and an MPD policy—to allow individuals exposed to OC spray the opportunity to wash and/or flush affected areas with cold water within 20 minutes of exposure, or as soon as practicable. Furthermore, individuals who report continued effects from OC spray after having flushed the affected areas, per MPD policy, should be transported to a hospital for medical treatment.[86] According to the documents I have reviewed, none of the plaintiffs discussed above were given the opportunity to flush the areas affected by OC spray with cold water, nor were they provided with medical attention for their OC exposure.[87]

---

[81] 2023.11.3 Priyanka Surio Answers to Defs' First Rogs.pdf
[82] DC_2021-cv-00806-00003683.pdf
[83] DC_2021-cv-00806-00003683.pdf
[84] 2023.11.3 Jesse Pearlmutter Answers to Defs' First Rogs.pdf
[85] Control_Devices_and_Techniques.pdf
[86] DC_2021-cv-00806-00003683.pdf
[87] Plaintiff Surio was transported to the hospital for medical attention related to other injuries.

### 6. Opinion Consolidation

I hold the opinions below to a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training, and experience in law enforcement; my knowledge and research as a policing scholar; my knowledge of law enforcement standards, analysis, and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of the relevant actions, policies, and procedures; and my understanding of the facts of this case based upon a comprehensive review of the materials listed herein. My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay jurors are unaware or frequently have misconceptions. My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

My opinions, as collected in this report, are as follows:

1. MPD's actions when encircling (kettling) the crowd of protesters was not in accordance with generally accepted police practices and principles.
    a. MPD did not engage in a differentiated approach, instead indiscriminately detaining all individuals within the containment area.
    b. MPD conducted their encirclement on a known residential street, rather than directing (or allowing) the crowd to march to a safer location for the kettling maneuver, *creating* a public safety concern and a foreseeable likelihood of violence and property damage.
    c. MPD did not give the crowd audible warnings to disperse, nor did they give audible notifications that the crowd was under arrest and that force would be used if they did not submit to arrest.
2. Lt. Horos' and Officer Crisman's actions of deploying OC spray were not in accordance with generally accepted police practices and principles.
    a. Neither Lt. Horos nor Officer Crisman provided verbal warnings, nor time to comply with directions, before deploying OC spray.
    b. Lt. Horos' second deployment of OC spray, as captured on cell phone video, was against an individual walking away from the police line, not posing an imminent threat to officers or the public.
    c. Officer Crisman's deployment of OC spray was against individuals not posing an imminent threat to officers or the public.
3. MPD's prolonged detention of arrestees, marked by a lack of decontamination for OC spray exposure, refusal to adjust overly tight zip tie restraints, and denial of access to water, bathrooms, or food, deviates from generally accepted police practices and principles.

**This space left intentionally blank.**

## 7. Submission

This report constitutes my report on the June 1st, 2020, interaction between Pamela Goodwin et al. and members of the District of Columbia Metropolitan Police Department (MPD). My report is based on a review of materials received to date. Should any subsequent information cause me to expand, add, or revise my opinions, I reserve the right to revise, supplement, or amend this report accordingly.

Respectfully submitted,

Scott M. Mourtgos

March 14, 2024

## 8. External References

Alpert, G. P., & Dunham, R. G. (2004). *Understanding police use of force: Officers, suspects, and reciprocity.* Cambridge Univ. Press.

Alpert, G. P., & MacDonald, J. M. (2001). Police use of force: An analysis of organizational characteristics. *Justice Quarterly, 18*(2), 393–409.

Bolger, P. C. (2015). Just Following Orders: A Meta-Analysis of the Correlates of American Police Officer Use of Force Decisions. *American Journal of Criminal Justice, 40*(3), 466–492. https://doi.org/10.1007/s12103-014-9278-y

DLG. (2023, January 26). *"Kettling" and Keeping the Peace.* DLG Learning Center. https://dlglearningcenter.com/kettling-and-keeping-the-peace/

Engel, R. S., Corsaro, N., Isaza, G. T., & McManus, H. D. (2022). Assessing the impact of de-escalation training on police behavior: Reducing police use of force in the Louisville, KY Metro Police Department. *Criminology & Public Policy, 21*(2), 199–233. https://doi.org/10.1111/1745-9133.12574

Engel, R. S., & Smith, M. R. (2009). Perceptual distortion and reasonableness during police shootings: Law, legitimacy, and future research. *Criminology and Public Policy, 8*, 141–151.

FEMA. (n.d.). *Field Force Operations* (FFO SG 10.0 CH1; pp. 1–133). FEMA.

Garner, J. H., Maxwell, C. D., & Heraux, C. G. (2002). Characteristics associated with the prevalence and severity of force used by the police. *Justice Quarterly, 19*(4), 705–746.

Garner, J. H., Schade, T., Hepburn, J., & Buchanan, J. (1995). Measuring the continuum of force used by and against the police. *Criminal Justice Review, 20*(2), 146–168.

Garrett, B., & Stoughton, S. (2017). A tactical fourth amendment. *Va. L. Rev., 103*, 211.

Gillham, P., & Noakes, J. (2007). "More Than A March in a Circle": Transgressive Protests and the Limits of Negotiated Management. *Mobilization: An International Quarterly, 12*(4), 341–357. https://doi.org/10.17813/maiq.12.4.j10822802t7n0t34

Graham v. Connor, 490 US ___ (Supreme Court 1989).

International Association of Chiefs of Police. (2020). *National Consensus Policy and Discussion Paper on Use of Force.* https://www.theiacp.org/resources/document/national-consensus-policy-and-discussion-paper-on-use-of-force

Klinger, D. A., & Brunson, R. K. (2009). Police officers' perceptual distortions during lethal force situations: Informing the reasonableness standard*. *Criminology & Public Policy, 8*(1), 117–140. https://doi.org/10.1111/j.1745-9133.2009.00537.x

Krajewski, A. T., Worrall, J. L., & Scales, R. M. (2023). Threat Dynamics and Police Use of Force. *Journal of Research in Crime and Delinquency*, 00224278231194711. https://doi.org/10.1177/00224278231194711

Maguire, E. R. (2022). *The Role of the U.S. GOvernmnet in the Law Enforcement Response to Protests* (pp. 1–19). Niskanen Center.

Maguire, E. R., & Oakley, M. (2020). *Policing Protests: Lessons from the Occupy Movement, Ferguson & Beyond—A Guide for Police* (pp. 1–83). Harry Frank Guggenheim Foundation.

McLean, K., Alikhan, A., & Alpert, G. P. (2023). Re-examining the Use of Force Continuum: Why Resistance is Not the Only Driver of Use of Force Decisions. *Police Quarterly, 26*(1), 85–110. https://doi.org/10.1177/10986111211066353

Mourtgos, S. M., Adams, I. T., & Baty, S. R. (2021). Challenging the Ordinality of Police Use-of-Force Policy. *Criminal Justice Policy Review, 33*(2), 119–147. https://doi.org/10.1177/08874034211038346

Noble, J. J., & Alpert, G. P. (2020). State Created Danger. In R. G. Dunham, G. P. Alpert, & K. D. McLean (Eds.), *Critical Issues in Policing: Contemporary Readings, Eighth Edition* (8th ed., pp. 346–360). Waveland Press.

Paoline, E. A., & Terrill, W. (2011). Listen to me! Police officers' views of appropriate use of force. *Journal of Crime and Justice*, *34*(3), 178–189. https://doi.org/10.1080/0735648X.2011.609740

Ragsdale, G. T. (1929). The police training school. *The Annals of the American Academy of Political and Social Science*, *146*(1), 170–176.

Sandel, W. L., Martaindale, M. H., & Blair, J. P. (2021). A scientific examination of the 21-foot rule. *Police Practice and Research*, *22*(3), 1314–1329. https://doi.org/10.1080/15614263.2020.1772785

Sloan III, J. J., & Paoline III, E. A. (2021). "They Need More Training!" A National Level Analysis of Police Academy Basic Training Priorities. *Police Quarterly*, 10986111211013311. https://doi.org/10.1177/10986111211013311

Stoughton, S. W., Noble, J. J., & Alpert, G. P. (2021). *Evaluating Police Uses of Force*. NYU Press.

Terrill, W., & Reisig, M. D. (2003). Neighborhood context and police use of force. *Journal of Research in Crime and Delinquency*, *40*(3), 291–321.

Tillyer, R. (2022). Unpacking Sequential Actions Within Use of Force Incidents. *Police Quarterly*, *25*(2), 10986111211049549. https://doi.org/10.1177/10986111211049549

## 9. Appendix: Materials Provided

The following table represents the materials that were provided for my review.

| File Name | Bates Number |
|---|---|
| Att. 1.pdf | DC_2021-cv-00806-00000001 |
| Att. 2.pdf | DC_2021-cv-00806-00000001 |
| Att. 3.pdf | DC_2021-cv-00806-00000001 |
| Att. 4.pdf | DC_2021-cv-00806-00000001 |
| Att. 5.pdf | DC_2021-cv-00806-00000001 |
| Att. 6.pdf | DC_2021-cv-00806-00000001 |
| Att. 7.pdf | DC_2021-cv-00806-00000001 |
| Att. 8.pdf | DC_2021-cv-00806-00000001 |
| Att. 9.pdf | DC_2021-cv-00806-00000001 |
| Att. 10.pdf | DC_2021-cv-00806-00000001 |
| Att. 11.pdf | DC_2021-cv-00806-00000001 |
| Att. 12.pdf | DC_2021-cv-00806-00000001 |
| Att. 13.pdf | DC_2021-cv-00806-00000421 |
| Att. 14.pdf | DC_2021-cv-00806-00000421 |
| Att. 15.pdf | DC_2021-cv-00806-00000421 |
| Att. 16.pdf | DC_2021-cv-00806-00000421 |
| Att. 17.pdf | DC_2021-cv-00806-00000421 |
| Att. 18.pdf | DC_2021-cv-00806-00000421 |
| Att. 19.pdf | DC_2021-cv-00806-00000421 |
| Att. 20.pdf | DC_2021-cv-00806-00000421 |
| Att. 21.pdf | DC_2021-cv-00806-00000421 |
| Att. 22.pdf | DC_2021-cv-00806-00000421 |
| Att. 23.pdf | DC_2021-cv-00806-00000421 |
| Att. 24.pdf | DC_2021-cv-00806-00000478 |
| Att. 25.pdf | DC_2021-cv-00806-00000478 |
| Att. 26.pdf | DC_2021-cv-00806-00000478 |
| Att. 27.pdf | DC_2021-cv-00806-00000478 |
| Att. 28.pdf | DC_2021-cv-00806-00000478 |
| Att. 29.pdf | DC_2021-cv-00806-00000478 |
| Att. 30.pdf | DC_2021-cv-00806-00000478 |
| Att. 31.pdf | DC_2021-cv-00806-00000478 |
| Att. 32.pdf | DC_2021-cv-00806-00000478 |
| Att. 33.pdf | DC_2021-cv-00806-00000478 |
| Att. 34.pdf | DC_2021-cv-00806-00000478 |
| Att. 35.pdf | DC_2021-cv-00806-00000478 |
| Att. 36.pdf | DC_2021-cv-00806-00000478 |
| Att. 37.pdf | DC_2021-cv-00806-00000478 |

| | |
|---|---|
| Att. 38.pdf | DC_2021-cv-00806-00000478 |
| Att. 39.pdf | DC_2021-cv-00806-00000523 |
| Att. 40.pdf | DC_2021-cv-00806-00000523 |
| Att. 41.pdf | DC_2021-cv-00806-00000523 |
| Att. 42.pdf | DC_2021-cv-00806-00000523 |
| Att. 43.pdf | DC_2021-cv-00806-00000523 |
| Att. 44.pdf | DC_2021-cv-00806-00000523 |
| Att. 45.pdf | DC_2021-cv-00806-00000523 |
| Att. 46.pdf | DC_2021-cv-00806-00000523 |
| Att. 47.pdf | DC_2021-cv-00806-00000523 |
| Att. 48.pdf | DC_2021-cv-00806-00000523 |
| Att. 49.pdf | DC_2021-cv-00806-00000523 |
| Att. 50.pdf | DC_2021-cv-00806-00000523 |
| Att. 51.pdf | DC_2021-cv-00806-00000523 |
| Att. 52.pdf | DC_2021-cv-00806-00000523 |
| Att. 53.pdf | DC_2021-cv-00806-00000523 |
| Att. 54.pdf | DC_2021-cv-00806-00000523 |
| Att. 55.pdf | DC_2021-cv-00806-00000523 |
| Att. 56.pdf | DC_2021-cv-00806-00000523 |
| Att. 57.pdf | DC_2021-cv-00806-00000190 |
| Att. 58.pdf | DC_2021-cv-00806-00000190 |
| Att. 59.pdf | DC_2021-cv-00806-00000190 |
| Att. 60.pdf | DC_2021-cv-00806-00000190 |
| Att. 61.pdf | DC_2021-cv-00806-00000190 |
| Att. 62.pdf | DC_2021-cv-00806-00000190 |
| IAD Report.pdf | DC_2021-cv-00806-00000346 |
| Riot Control Agents and the Extended Impact Weapon Training.pptx | DC_2021-cv-00806-00001573 |
| First Amendment Assemblies & Mass Demonstrations Training.pptx | DC_2021-cv-00806-00015672 |
| DC_2021-cv-00806-00001574.pptx | DC_2021-cv-00806-00001574 |
| Radio Run.mp3 | DC_2021-cv-00806-00000345 |
| Quarles BWC.mp4 | DC_2021-cv-00806-00011646 |
| Mejia BWC.mp4 | DC_2021-cv-00806-00004422 |
| Horos BWC.mp4 | DC_2021-cv-00806-00005599 |
| Crisman BWC.mp4 | DC_2021-cv-00806-00005601 |
| Cellphone Footage.mp4 | PL_0000325 |
| 39 - Redacted Amended Complaint v1 (4853-4289-8695).pdf | |
| 2023.11.3 Jesse Pearlmutter Answers to Defs' First Rogs.pdf | |
| 2023.11.3 Osea Remick Answers to Defs' First Rogs.pdf | |

| | |
|---|---|
| 2023.11.3 Priyanka Surio Answers to Defs' First Rogs.pdf | |
| DC_2021-cv-00806-00003683.pdf | DC_2021-cv-00806-00003683 |
| Harrington Deposition | |
| Glover Deposition | |
| DC_2021-cv-00806-00018223.mp4 | |
| Incident Report - DC_2021-cv-00806-00016711.pdf | |

## 10. Appendix: Additional Materials Not Cited in Reference List

The following table represents additional material relied upon as part of my report that were not provided to me and is not listed in the reference section.

| File Name |
| --- |
| Control_Devices_and_Techniques.pdf |
| First_Amendment_Assemblies.pdf |

**11. List of Additional Appended Materials**

- CV
- Listing of Retained Cases with Testimony

# Scott M. Mourtgos, Ph.D.

Assistant Professor (incoming), Dept. of Criminology & Criminal Justice
University of South Carolina

 smourtgos@gmail.com ⊕ smourtgos.netlify.app | *Updated:* Mar. 13, 2024

## Education

### UNIVERSITY OF UTAH

*Department of Political Science*, Ph.D.                                               2024

### UNIVERSITY OF NORTH DAKOTA

*Department of Psychology*, Masters of Forensic Psychology                2016

### WEBER STATE UNIVERSITY

*Department of Criminal Justice*, Bachelor of Science in Criminal Justice     2004

    *Summa Cum Laude*

### GRADUATE CERTIFICATE IN CRIMINAL JUSTICE EDUCATION

*University of Virginia*                                                              2021

## Academic Positions

Assistant Professor (*incoming*) | University of South Carolina              2024->

### ACADEMIC AFFILIATIONS

PAPER Lab | University of Utah & University of South Carolina        2023-Present

Affiliate | Police Staffing Observatory | Michigan State University     2023-Present

GRAIL Lab | Purdue University                                           2023-Present

LEADS Scholar | National Institute of Justice                           2020-Present

## Relevant Past Employment

### POLICE OFFICER

Deputy Chief of Police | Salt Lake City Police Department: Field Operations Bureau; Data and Crime Analysis Section; International Airport Operations          2021-2024

Captain | Salt Lake City Police Department: Training Division/Academy Director 2020-2021

Lieutenant | Salt Lake City Police Department: Investigations Division; MCCA Intelligence
Commander; Support Division                                                    2018-2020

Sergeant | Salt Lake City Police Department: Patrol; Professional Standards; Bikes; Field
Training Program                                                               2013-2018

Detective | Salt Lake City Police Department: Narcotics; Special Victims Unit; Fusion Squad;
Community Intelligence                                                         2007-2013

Officer | Salt Lake City Police Department: Patrol Officer; Field Training Officer; Public Order
Unit                                                                          2005-2007

### UNIVERSITY WORK

Associate Instructor | University of Utah                                      2022-2023

Associate Instructor | Kent State University                              2022-Present

Graduate Assistant | University of Utah                                        2019-2023

## Publications

### PEER REVIEWED JOURNAL ARTICLES

From Google Scholar Profile: Total citations 465, h-index 11, i10-index 12.

(1) **Scott M. Mourtgos**, Ian T. Adams, & Justin Nix. (2024). "Staffing Levels are the Most Important Factor Influencing Police Response Times." *Policing: A Journal of Policy and Practice, 18*. Journal or Post-Print

(2) Justin Nix, Jessica Huff, Scott E. Wolfe, David C. Pyrooz, & **Scott M. Mourtgos**. (2024). "When police pull back: Neighborhood-level effects of de-policing on violent and property crime." *Criminology*. Journal - Open Access or Preprint

(3) Kaylyn Schiff, Daniel Schiff, Ian Adams, Josh McCrain, & **Scott M. Mourtgos**. (2023). "Institutional Factors Driving Citizen Perceptions of AI in Government: Evidence from a Survey Experiment on Policing." *Public Administration Review 0(0)*. Journal - Open Access or Pre-registration

(4) Ian T. Adams, **Scott M. Mourtgos**, & Justin Nix. (2023). "Police Turnover in Large US Policing Agencies Following the George Floyd Protests." *Journal of Criminal Justice, 88*, 102105. Journal or Preprint

(5) Michael Sierra-Arevalo, Justin Nix, & **Scott M. Mourtgos**. (2023). "The 'War on Cops,' retaliatory violence, and the murder of George Floyd." *Criminology, 61(3)*, 389-420. Journal or Preprint

(6) Ian Adams, **Scott M. Mourtgos**, Kyle McLean, & Geoffrey Alpert. (2023). "Defanged." *Journal of Experimental Criminology, 0(0)*. Journal or Preprint

(7) Ian Adams, **Scott M. Mourtgos**, Christopher Simon, & Nicholas Lovrich. (2023). "If the Face Fits: Predicting Future Promotions from Police Cadets' Facial Traits." *Journal of Experimental Criminology, 0(0)*. Journal or Preprint

(8) **Scott Mourtgos**, Ian Adams, & Justin Nix. (2022). "Elevated Police Turnover following the Summer of George Floyd Protests: A Synthetic Control Study." *Criminology & Public Policy, 21(1)*, 9-33. Journal or Preprint

(9) **Scott Mourtgos**, Ian Adams, & Sam Baty. (2022). "Challenging the Ordinality of Police Use-of-Force Policy." *Criminal Justice Policy Review, 33(2)*, 119-147. Journal or Preprint

(10) Justin Nix, Tara Richards, **Scott Mourtgos**, & Ian Adams. (2021). "Comparing 911 and Emergency Hotline Calls for Domestic Violence in Seven Cities: What Happened When People Started Staying Home Due to COVID-19?" *Criminology & Public Policy, 20(3)*, 573-591. Journal or Preprint

(11) **Scott Mourtgos**, Ian Adams, & Sharon Mastracci (2021). "Improving Victim Retention and Police-Victim Interactions in Rape Investigations: A Longitudinal Assessment of a Brief Training." *Journal of Criminal Justice, 74*, 101-118. Journal or Preprint

(12) **Scott Mourtgos** & Ian Adams. (2021). "COVID-19 vaccine program eliminates law enforcement workforce infections: A Bayesian Structural Time Series Analysis." *Police Practice and Research, 22(5)*, 1557–1565. Journal or Postprint

(13) **Scott Mourtgos** & Ian Adams, Justin Nix, & Tara Richards (2021). "Mandatory Sexual Assault Kit Testing Policies and Arrest Trends: A Natural Experiment." *Justice Evaluation Journal, 22(5)*, 145-162. Journal or Postprint

(14) Sharon Mastracci & **Scott Mourtgos.** (2021). "The ethics of emotional labor in public service: The case of children's services forensic interviewers. *Human Service Organizations: Management, Leadership & Government 45(3)*, 260-272. Journal

(15) Ian Adams, **Scott Mourtgos**, & Sharon Mastracci. (2021). "High-Stakes Administrative Discretion: What Drives Body-Worn Camera Activations?" *Public Administration Review, 81(4)*, 691-703. Journal or Preprint

(16) **Scott Mourtgos** & Ian Adams (2020). "Assessing Public Perceptions of Police Use-of-Force: Legal Reasonableness and Community Standards." *Justice Quarterly, 37(5)*, 869–899. Journal

(17) **Scott Mourtgos,** Roger Mayer, Richard Wise, & Holly O'Rourke. (2020). "The overlooked perspective of police trust in the public: Measurement and effects on police job behaviors. *Criminal Justice Policy Review, 31(5)*, 639-672. Journal

(18) **Scott Mourtgos** & Ian Adams (2019). "The rhetoric of de-policing: Evaluating open-ended survey responses from police officers with machine learning-based structural topic modeling." *Journal of Criminal Justice, 64*, 61-73. Journal

(19) **Scott Mourtgos** & Ian Adams. (2019). "The Effect of Prosecutorial Actions on Deterrence: A County-Level Analysis." *Criminal Justice Policy Review, 31(4)*, 479-499. Journal

(20) **Scott Mourtgos,** Richard Wise, & Thomas Petros. (2018). "The consequences of restricting police arrest authority: Less deterrence and more crime. *Policing: An International Journal, 41(2)*, 233-246. Journal

## BOOK CHAPTERS

(21) Richard Wise, Roger Mayer, **Scott Mourtgos**, & Holly O-Rourke. (2024). A new direction in police-public trust research: Exploring trust from both perspectives. In *A Research Agenda for Trust* (pp. 147-159). Edward Elgar Publishing. Book Chapter

(22) **Scott Mourtgos** & Ian Adams. (2023). Police Proactivity in an Era of Pandemic and Protest. In M. Deflem (Ed.), *Crime and Social Control in Pandemic Times (Sociology of Crime, Law and Deviance, Vol. 28).* Emerald Publishing, pp. 207-224. Book Chapter

(23) **Scott Mourtgos**, Ian Adams, & Sharon Mastracci. (2021). Improving Victim Retention and Officer Response in Rape Investigations. In E. Arble & B. Arnetz (Eds.), *Interventions, Training, and Technologies for Improved Police Well-Being and Performance.* IGI Global, pp. 55-71. Book Chapter

## STUDY PRE-REGISTRATIONS

Ian Adams, Daniel Schiff, Kaylyn Schiff, Josh McCrain, & **Scott Mourtgos**. "Police executives attitudes' towards civilian review boards." Registered at OSF.

Daniel Schiff, Kaylyn Schiff, Ian Adams, **Scott Mourtgos**, & Josh McCrain. "Citizen attitudes towards internal and external applications of artifical intelligence in policing." Registered at OSF.

## Teaching

ASSOCIATE INSTRUCTOR                                             UNIVERSITY OF UTAH

Microeconomic Applications and Public Policy Statistics (PUBPL 6000)

Summer 2023

Introduction to Criminal Jurisprudence (POLS 3220)

Spring 2023

Statistical Packages for Public Policy (PUBPL 6002)

Fall 2023
Fall 2022

ASSOCIATE INSTRUCTOR                                             KENT STATE UNIVERSITY

Issues in Police Work (CRIM 56904)

Spring 2024
Summer 2023

Justice Administration (CRIM 66767)

Fall 2023

Fall 2022

## Grant Activity

Josh McCrain, **Scott M. Mourtgos (co-PI)**, & Ian Adams. (2022). "Policing Policy, Reforms, and Human Capital." University of Utah, Research Incentive Seed Grant. $26,796. *Funded*.

## Selected Honors

| | |
|---|---|
| Graduate Research Fellowship, University of Utah | 2023-2024 |
| Summer Research Fellowship, University of Utah Department of Political Science | 2023 |
| American Society of Criminology, Division of Policing Outstanding Student Article Award | 2022 |
| American Society of Criminology, Best Paper Award for "Later Career" Scholars | 2022 |
| Major Brent R. Taylor Endowed Fellowship | 2022 |
| Academy of Criminal Justice Sciences (ACJS) Doctoral Summit Fellowship | 2022 |
| University of Utah Political Science Department Best Graduate Student Paper Award (with Ian Adams and Sam Baty) | 2022 |
| FBI National Academy – Session 280 | 2021 |
| Earl and Elies Skidmore Endowed Graduate Fellowship | 2021 |
| National Institute of Justice (NIJ) LEADS Scholars Fellowship | 2020 |
| Police Star Commendation – Salt Lake City Police Department | 2017 |
| Appointed to the President's Task Force on 21st Century Policing Rank and File Forum | 2016 |
| Law Enforcement Professional of the Year – Salt Lake County Children's Justice Center | 2012 |
| Chief's Unit of the Year Award – Salt Lake City Police Department | 2010 |
| Meritorious Unit Citation – Salt Lake City Police Department | 2007 |
| Blue Shirt Award – Salt Lake City Police Department Police Academy | 2006 |
| Director's List – Utah Peace Officer Standards and Training Academy | 2005 |

## Professional and Public Facing Communication

### Invited Publications

**Scott Mourtgos**. (June, 2023). "Bayesian Inference in Criminological Research." *Police Forum: Academy of Criminal Justice Science (ACJS) - Police Section, 32(1)*, 7-16. Article

### Invited Academic Talks

"Bleeding Edge News: Big Data Insights at the Intersection of Media Narratives, Public Opinion, and Police Use of Force." Department of Criminology and Criminal Justice, University of South Carolina. March 20, 2023.

PUBLIC AND PRACTITIONER CRIMINOLOGY

Ian Adams, Justin Nix, & **Scott Mourtgos** (2023, May 15). "Stretched Thin." *City Journal*. Link

Ian Adams, Justin Nix, & **Scott M. Mourtgos**. February 2023. "Memphis police numbers dropped by nearly a quarter in recent years - were staffing shortages a factor in the killing of Tyre Nichols?" *The Conversation*. Available online.

**Scott Mourtgos**. February 2023. "Police Trust in the Public." *American Society of Evidence-Based Policing*, Research Brief.

**Scott Mourtgos**, Ian Adams, & Justin Nix. August 2022. "Linking the Workforce Crisis, Crime, and Response Time." *Police Chief Magazine*. Available online.

**Scott Mourtgos**, Ian Adams, & Sam Baty. November 2021. "Police use-of-force policies should be replaced by those based more closely on legal principles." London School of Economics, Phelan US Centre. Available online.

Justin Nix, Ian Adams, & **Scott Mourtgos**. Autumn, 2021. "Arresting the Recruitment Crisis." *City Journal*, 344, 4-5. Available online.

**Scott Mourtgos**, Ian Adams, Justin Nix, Tara Richards. 2020. "Code-R Kit Mandatory Testing Experiment." Research Brief for Agency Command Staff. Salt Lake City Police Department.

**Scott Mourtgos**. 2021. "SLCPD Resignations," *Legislative Brief*. Utah State Legislature.

**Scott Mourtgos**. 2021. "Effect of COVID-19 Vaccines at SLCPD." *Research Brief for Multiple Government Agencies*. Utah Department of Public Safety; Salt Lake County Health Department; Salt Lake City Police Department.

**Scott Mourtgos**. 2020. "Officer Retention in 2020." *Research Brief for Agency Presentation*. Salt Lake City Police Department.

**Scott Mourtgos** & Ian Adams. 2020. "First Responder Sexual Assault Training: An Evaluation." *Research Brief for Agency Presentation*. Salt Lake City Police Department.

**Scott Mourtgos**. 2017. "Identifying students exposed to violence or trauma." *In A training manual for school administrators and school resource officers*. Salt Lake City, UT.

CONFERENCE RESEARCH PRESENTATIONS

*American Society of Criminology*. Philadelphia, PA. November 2023.

*Invited Panelist*: "Can Policing in America be Fixed?"
*Invited Roundtable Discussant*: "Addressing the Global Police Staffing Challenge: A Discussion of Ongoing Research, Challenges, Opportunities, and Resources." *Sponsored by the ASC Division of Policing*.

*International Association of Chiefs of Police*. San Diego, CA. October 2023.

*Invited Presentation*: "Turnover in Large U.S. Policing Agencies Following the George Floyd Protests." *IACP Research Advisory Committee-Police Research Advancement Section Symposium*.

*Invited Presentation*: "Police Turnover Post-Floyd." *NIJ Law Enforcement Advancing Data and Science (LEADS) Scholars Summer Session.*

*Invited Roundtable Panelist*: "Learning from a new generation of police 'pracademics': The NIJ Law Enforcement Advancing Data and Science (LEADS) Scholars program." *National Institute of Justice Research Conference.* Arlington, VA. May 2023.

*American Society of Evidence-Based Policing.* Las Vegas, NV. May 2023.

"De-fanged: The effects of K9 unit removal on officer and suspect safety."
"Officer perceptions of hot spots policing."

*Academy of Criminal Justice Sciences.* National Harbor, MD. March 2023.

"Police turnover: Further empirical evidence of a growing police workforce crisis in the US."
"De-Fanged."
"Predicting police promotions: An experimental reproduction."

"Effects of police killings on media coverage." *Southern Political Science Association.* St. Pete Beach, FL. January 2023.

*American Society of Criminology.* Atlanta, GA. November 2022.

*Invited Roundtable Panelist*: "Police executives on today's critical issues: Linking research to practice."
"The 'war on cops' and the murder of George Floyd."
"Assessing the feasibility and impact of using the violent criminal apprehension program in sexual assault kit initiative projects."
"What explains law enforcement elites' support for civilian reviews boards?"
"Citizen attitudes towards internal and external applications of artificial intelligence in policing."

"The social construction of news and effects on public opinion regarding police use-of-force." *Academy of Criminal Justice Sciences.* Las Vegas, NV. March 2022.

*Midwest Political Science Association.* Chicago, IL. April 2022.

"Arrested (policy) development: Explaining change in police executives support for civilian review boards."
"Citizen perceptions of artificial intelligence use in policing."

*American Society of Criminology.* Chicago, IL. November 2021.

"Elevated police turnover following the summer of George Floyd protests: A synthetic control study."
"911 and domestic violence service emergency hotline calls before and during COVID-19."
"Domestic violence emergency hotline calls before and during COVID-19: How might these data inform victim service agencies and coordinated community response?"

"First responder sexual assault training." *International Association of Chiefs of Police.* New Orleans, LA. October 2020.

*Academy of Criminal Justice Sciences.* San Antonio, TX. March 2020. (conference canceled due to COVID-19 pandemic)

"Assessing public perceptions of police use-of-force: Legal reasonableness and community standards."

"Body-worn camera activations: Demographic, attitudinal, and job function predictors."

"Police-public trust: Time to look at the whole picture." *Behavioral Science & Policy Association.* Washington, DC. January 2020.

"The (non)linearity of use-of-force continuums: Effects on officer injuries." *Western Association of Criminal Justice.*, Coeur d'Alene, ID. October 2019.

"Police-community trust: The overlooked perspective of police trust in the public and its effects on policing." *Academy of Management.* Atlanta, GA. August 2017.

GUEST LECTURES, PANELS, & WORKSHOPS

Annual Policing Policy Workshop. University of Utah. Salt Lake City, UT. February 23-24, 2024

*Presenter.* Command Voice: Changes in Police Executive Attitudes to Oversight Following Public and Peer Information.
*Discussant.* Timely intelligence enhances criminal investigations: Investigators' ratings of ballistics imaging across three cities.

Panelist. (September 2023). "Police Reform/Policing after George Floyd." Invited panelist at the NAACP Tri-State (Idaho-Nevada-Utah) 2023 Conference, Salt Lake City, UT.

Guest Lecturer. (April 2023). "Text Analytics in Social Science." Invited lecturer event, POLS 6002: Advanced Quantitative Methods, University of Utah.

Guest Speaker. (March 2023). "Public Opinion and Police Use of Force." Invited research presentation, (First) Annual Policing Policy Workshop, University of Utah.

Guest Lecturer. (March 2023). "Researching Police: Methods and Challenges." Invited lecturer event, CRJU 711: Policing Policy and Problems, University of South Carolina.

Guest Lecturer. (March 2023). "Keys to Success in Criminology Doctoral Studies: Strategies and Skills for Doctoral Candidates." Invited lecturer event, CRJU 801: Professional Development in Criminology and Criminal Justice, University of South Carolina.

Guest Lecturer. (March 2023). "Sexual Assault Investigation and Policy." Invited lecturer event, CRJU 314: Criminal Law, University of South Carolina.

Guest Speaker. (September 2022). "What explains law enforcement elites' support for civilian reviews boards?" Invited research presentation, Political Science Research Colloquium, University of Utah.

Guest Lecturer. (April 2022). "Text Analytics and Bayesian Modeling." Invited lecturer event, POLS 6002: Advanced Quantitative Methods, University of Utah.

Panelist. (September 2021). "Police Use-of-Force Reform: Problems, Policies, and Practices." Invited panelist at the Hinckley Institute of Politics, University of Utah.

Panelist. (2021, September). "Police Use-of-Force Reform: Problems, Policies, and Practices." *Invited panelist at the Hinckley Institute of Politics, University of Utah.*

Guest Lecturer. (September 2021). "Sexual Assault Investigation and Policy." Invited lecturer event, POLS 3220: Introduction to Criminal Jurisprudence, University of Utah.

Guest Speaker. (March 2021). "Utah's Use of Parole: Effects on Violent Crime." Invited research presentation, Political Research Colloquium, University of Utah.

Guest Speaker. (October 2020). "A Random Forest Approach to Predicting US Public Opinion on Punitiveness in the Criminal Courts System." Invited research presentation, Political Research Colloquium, University of Utah, with Ian T. Adams.

Panelist. (October 2020). "Publishing as a Graduate Student." Invited panelist in The Hidden Curriculum workshop, University of Utah.

Guest Lecturer. (October 2020). "Investigating Homicides and Officer Involved Critical Incidents: A Practitioner's Perspective." Invited lecturer event, POLS 3220: Introduction to Criminal Jurisprudence, University of Utah.

Guest Speaker. (March 2020). "Assessing Public Perceptions of Police Use-of-Force: Legal Reasonableness and Community Standards." Invited research presentation, Political Research Colloquium, University of Utah, with Ian T. Adams.

Guest Lecturer. (November 2019). "Policy, Policing, & Prisons." Invited lecturer event, POLS 3320: Introduction to Public Policy and Analysis, University of Utah. November 14, 2019, with Ian T. Adams.

Guest Speaker. (July 2017). "Title IX Sexual Assault Investigations." Invited presentation, Westminster College, Salt Lake City, UT.

Guest Speaker. (May 2016). "Child Interviews for First Responders." Invited presentation, Utah Children's Justice Symposium/Utah Prosecution Council Domestic Violence Conference, Snowbird, UT.

Guest Speaker. (March 2016). "Analysis of the Impact of Jail Restrictions on Offender Behavior in Salt Lake City." Invited research presentation, Salt Lake City Police Department Week 35 CompStat Assembly, Salt Lake City, UT.

Guest Speaker. (2017, July). "Title IX Sexual Assault Investigations." *Invited presentation, Westminster College, Salt Lake City, UT.*

Guest Speaker. (2016, May). "Child Interviews for First Responders." *Invited presentation, Utah Children's Justice Symposium/Utah Prosecution Council Domestic Violence Conference, Snowbird, UT.*

## Service

### Editorial Boards

Police Practice & Research: An International Journal          2023-Present
Journal of Criminal Justice          2021-Present

MANUSCRIPT REVIEWS (AD-HOC)

> Criminology
> Journal of Experimental Criminology
> Criminology & Public Policy
> Policy Studies Journal
> Justice Quarterly
> Journal of Criminal Justice
> European Journal of Criminology
> Policing & Society
> Police Practice & Research: An International Journal
> Policing: A Journal of Policy and Practice
> Victims and Offenders
> PLOS One
> Crime, Law and Social Change
> Administrative Theory & Praxis
> American Psychology-Law Society Annual Conference, 2017
> Gender Issues

GRANT REVIEWS (AD-HOC)

> Grant Peer Reviewer. (2021). Body-Worn Camera Policy and Implementation Program to Support Law Enforcement Agencies. On behalf of the Bureau of Justice Assistance. Grant reference BJA-2021-131001.

> Grant Lead Technical Reviewer, (2020). Research and Evaluation in Safety, Health, and Wellness in the Criminal Justice System. On behalf of the National Institute of Justice. Grant reference NIJ-2020-17296.

> Grant Peer Reviewer, (2020). Preventing School Violence: BJA's STOP School Violence Program. On behalf of the Bureau of Justice Assistance. Grant reference BJA-2020-17312.

OTHER PROFESSIONAL SERVICE

> Daniels Fund Ethics Initiative Law Enforcement Program Representative          2021-Present

COMMUNITY SERVICE

> Court Appointed Special Advocate (CASA) for Utah's Office of Guardian ad Litem 2014-2015

> Youth Baseball and Soccer Coach, Various Local Recreational Leagues          2008-2020


## Societal/Professional Memberships

*Academy of Criminal Justice Sciences | American Society of Evidence-Based Policing | American Society of Criminology | Western Association of Criminal Justice | FBI National Academy Associates | Major Cities Chiefs Association (MCCA) | International Association of Chiefs of Police (IACP)*

## Praxis

### CONSULTANCIES

*National Institute of Justice*

Promotions in Law Enforcement: High-Priority Needs for Improving the Process to Identify and Select the Next Generation of Police Leaders, Expert Workshop          2024

*U.S. Bureau of Justice Statistics*

BJS Expert Panel on Law Enforcement Surveys and LEMAS (Law Enforcement Management and Administrative Statistics) Redesign          2023

*U.S. Department of Justice, Office on Violence Against Women*

National Protocol for Sexual Assault Medical Forensic Examinations, 3rd Edition Update 2023

*Bureau of Justice Statistics*

Law Enforcement Core Statistics (LECS) Program          2023

*Bureau of Justice Statistics*

LEMAS Supplement Expert Panel: Developing a National Snapshot of Law Enforcement In-Service Training          2021-2022

### BOARD POSITIONS

*Police Executive Research Forum (PERF)*

Research Advisory Board          2022-Present

*Salt Lake County Children's Justice Center*

Board of Advisors          2019-2021

*Salt Lake Area Family Justice Center Partners Council*

Board of Advisors          2019-2020

*Salt Lake Area Non-Fatal Strangulation Steering Committee*

Board of Advisors          2019-2020

### POLICY AND LEGISLATION

Criminal Records Expungement Task Force. 2023-2024. Utah State Legislature, on behalf of the Salt Lake City Police Department.

Criminal Justice Data Management Task Force, SB150. 2022-2023. Utah State Legislature, on behalf of the Utah Chiefs of Police Association.

Utah Legislature, Law Enforcement and Criminal Justice Interim Committee. 2022-2023. On behalf of the Salt Lake City Police Department.

Law Enforcement Technology Workgroup. 2022-2023. Utah State Legislature, on behalf of the Salt Lake City Police Department.

## Academic & Professional Media (selected)

Noriega, D. & Dujanovic, D. (2024, February 21). *The Dave & Dujanovic Show*. In Hour 2: Crime Reduction in the Ballpark Neighborhood. KSL News Radio.

Tucker, John H. (2023, September 17). "Can A.I. solve rape cases? To find out, a Cleveland professor programmed a computer to analyze thousands of police reports." *Cleveland.com*. Link

Smith, P. A. (2023, July 24). "Police say dogs help solve crimes. Little evidence supports that." *Undark Magazine*. Link

Unruh, J. (2023, May 26). "Lack of officers hampering Wichita police department's morale-building and community policing efforts." *Wichita Journalism Collaborative*. Link

Arquette, R. (2023, May 17). *The Rod Arquette Show*. In Hour 3: Problems retaining police officers. Link

Conley, A. (2023, March 21). "Staffing woes continue to plague Omaha Police Department." *Omaha World-Herald*. Link

Kaste, M. (2023, March 18). "Police didn't get defunded but many large departments are shrinking." *NPR* Link

Williams, M. (2023, February 8). "State of the Union: What experts have said about Biden's proposed reforms on policing, guns and taxes - 8 essential reads." *The Conversation*. Link

Reavy, P. (2022, October 10). "Salt Lake City introduces 3rd phase of crime reduction plan." *KSL News*. Link

Miller, J. (2022, February 25). "Salt Lake City officers used more force in 2021 - but less than expected, department report finds." *The Salt Lake Tribune*. Link

Key Considerations for Investigations of Sexual Assault Cases. (2022, February 4). *Just Science Podcast. Forensic Technology Center of Excellence, a Program of the National Institute of Justice*. Link

Rivera, D. (2021, November 10). "COVID risk: Do department policies protect Utah law enforcement and the public?" *KSL News*. Link

Harkins, P. (2021, October 18). Shooting not to Kill. This Utah Case Fuels a Debate that Frustrates Police. *Salt Lake Tribune*. Link

Lehman, C. F. (2021, July 13). "Why Cops Are Quitting." *City Journal*. Link

Payne, D. (2021, July 11). "Sharp Increase in Police Resignations after Black Lives Matter Protests in 2020: Study." *Just the News*. Link

Ridderbusch, K. (2021, June 21). "Metro Atlanta Police Grapple with Mental Health amid Violence, Stress and Scrutiny." *WABE – Atlanta NPR*. Link

Mourtgos, S. M. (2021, February 5). "Don't Forget the Good with the Bad and the Ugly: Topic Modeling a Policing Commission Listening Session." *Post at personal website.* Link

Mourtgos, S. M. (2021, January 19). "Fleeing Police: Evaluating and Forecasting Police Turnover." *Post at Police Practice & Research: An International Journal website.* Link

Mourtgos, S. M. (2020, December 7). "Policing in a Pandemic: How Pracademics and Data can Help." *Post at Police Practice & Research: An International Journal website.* Link

Mourtgos, S. M. (2020, December 2). "Explaining Federal Crime Control Policy with Punctuated Equilibrium Theory." *Post at personal website.* Link

Mourtgos, S. M. (2020, August 20). "Police Twitter Rhetoric post-George Floyd: Difference by Party in the US Senate." *Post at personal website.* Link

Pantazi, A. (2020, September 11). Jacksonville prosecutors will seek longer sentences for felony gun charges. Will it stop crime? *The Florida Times-Union.* Link

Race, Policing & Protests: Recent Relevant Research. (July, 2020). *Crime and Justice Research Alliance Newsletter.* Link

Trust Between Police and the Public. (2019, June 25). *KSL Voices of Reason Podcast.*

A First Responder's Introduction to Sexual Assault. (2018, April). *Utah Peace Officer Standards and Training in-service online course.*

## Graduate Student Positions

| | |
|---|---|
| Research Assistant, Dr. Josh McCrain \| University of Utah | 2022 - 2023 |
| Research Assistant, Dr. Matthew Burbank \| University of Utah | 2021 - 2022 |
| Research Assistant, Dr. Matthew Burbank \| University of Utah | 2020 - 2021 |
| Teaching Assistant, Dr. Stephen Nelson \| University of Utah | 2020 |
| Teaching Assistant, Dr. James M. Curry \| University of Utah | 2019 |
| Research Assistant, Dr. Sharon Mastracci \| University of Utah | 2018 – 2019 |
| Teaching Assistant, Dr. Morgan Lyon Cotti \| University of Utah | 2018 – 2019 |

## Professional Experience

### Bureau Commander - Deputy Chief

*Field Operations Bureau/Data and Crime Analysis Section, Salt Lake City Police Department*   2021-Present

### Division Commander - Captain

*Training Division/Academy Director, Salt Lake City Police Department*   2020-2021

COVID-19 Pandemic Incident Commander

*Auxiliary Assignment, Salt Lake City Police Department*                     2020-2021

Acting Division Commander - Acting Captain

*Investigations Division, Salt Lake City Police Department*                     2020

Assistant Division Commander - Lieutenant

*Investigations Division, Salt Lake City Police Department*                     2019-2020

Major Cities Chiefs Association Intelligence Commmander

*Auxiliary Assignment, Salt Lake City Police Department*                     2019-2020

Assistant Division Commander - Lieutenant

*Support Division, Salt Lake City Police Department*                     2018-2019

Watch Commander - Lieutenant

*Salt Lake City Police Department*                     2018

Shift Supervisor - Sergeant

*Salt Lake City Police Department*                     2013-2018

> Patrol
> Bikes
> Professional Standards

Police Officer/Detective

*Salt Lake City Police Department*                     2005-2013

> Patrol
> Narcotics
> Bikes
> Special Victims Unit
> Community Intelligence Unit
> Field Training
> Public Order Unit

High School Law Enforcement Teacher | Salt Lake City School District     2011-2012

Police Academy Instructor | Weber State University Police Academy & Salt Lake City Police Academy     2010-Present

Child Forensic Interviewing Instructor | State of Utah Attorney General's Office & Salt Lake County Children's Justice Center     2013-2018

**Selected Professional Training & Certifications**

Applied Criminology and Data Course (NIJ), 2022/2023 Cohort
FBI National Academy - Session 280
Incident Command System (ICS) Advanced Certification: ICS 100, 200, 300, 400; NIMS 700 –
Federal Emergency Management Agency (FEMA)
Mid-Management Certificate – Utah POST
Leadership in Police Organizations - International Association of Chiefs of Police (IACP)
Fair and Impartial Policing Trainer – Fair and Impartial Policing
Force Science Analyst – Force Science Institute
Exploring & Evaluating Police Response Course (IACP)
Integrating Communications, Assessment, and Tactics (ICAT) - Police Executive Research
Forum (PERF)
Secret Security Clearance - FBI
Child Abduction Response Team – United States Department of Justice
Instructor Development - Federal Bureau of Investigation
Child Forensic Interviewing – National Institute of Child Health & Human Development
Crisis Intervention Team (CIT) - State of Utah Division Substance Abuse and Mental Health
Undercover Operations – Washington State Criminal Justice Training Commission
STATIC-99 Sex Offender Actuarial Risk Assessment Instrument
Peace Officer Certification – Utah POST

**References**

Academic and professional references available upon request. Please send corrections, requests,
and concerns to smourtgos@gmail.com.

# Listing of Retained Cases with Testimony

## Scott M. Mourtgos

### March 11, 2024

**Expert Witness Cases**

I have been retained as an expert witness in 4 cases since 2022, across 4 states. Below, I list the cases in which I have testified (either at deposition, trial, or grand jury).

### Cases with Testimony

| Case Name | Retaining Firm | Format | Date |
|---|---|---|---|
| Anthony Sims v. City of Seattle, et al. | Seattle City Attorney's Office | Deposition | March 09, 2023 |
| Mikaela Dyett v. Royce Zah, et al. | Office of Attorney General of Georgia | Deposition | July 11, 2023 |