# EXHIBIT 37

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

PAMELA GOODWIN, et al.,        :

   Plaintiffs,                 :

   v.                          :   Civil Action No. 1:21-cv-00806-BAH

DISTRICT OF COLUMBIA, et al.,  :

   Defendants.                 :

_____

Tuesday, January 16, 2024

Held Remotely

Deposition of JAMES CRISMAN, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by Barbara J. Moore, a Notary Public in and for the District of Columbia, taken at the offices of RELMAN COLFAX, PLLC, 1225 19th Street, N.W., Suite 600, Washington, D.C., commencing at 10:00 a.m., and the proceedings being taken down by Stenotype by BARBARA MOORE, CRR, RMR, and transcribed under her direction.

                                                                    2

1    APPEARANCES:

2

3         On Behalf of the Plaintiffs:

4              NICHOLAS ABBOTT, ESQ.

5              REBECCA LIVENGOOD, ESQ.

6              RELMAN COLFAX, PLLC

7              1225 19th Street, N.W., Suite 600

8              Washington, D.C.  20036

9              nabbott@relmanlaw.com

10             rlivengood@relmanlaw.com

11

12        On behalf of the Defendants:

13             RICHARD SOBIECKI, ESQ.

14             OFFICE OF THE ATTORNEY GENERAL

15             400 6th Street, N.W.

16             Washington, D.C.  20001

17             richard.sobiecki@dc.gov

18

19

20

21

22

```
1                       TABLE OF CONTENTS

2    WITNESS                                              PAGE

3    JAMES ANTHONY CRISMAN

4    By Attorney Abbott                                      4

5

6                           EXHIBITS

7    EXHIBIT         DESCRIPTION                          PAGE

8
     Exhibit 54    Memorandum                               31
9
     Exhibit 55    Memorandum                               32
10
     Exhibit 56    Preliminary Report Form -- Use           39
11                 Of Force Incident

12   Exhibit 57    Condensed Investigative Report           48
                   Form
13
     Exhibit 58    Condensed Investigative Report           53
14                 Form

15   Exhibit 59    Training History Report                  89

16   Exhibit 60    PowerPoint                              139

17   Exhibit 61    Standard Operating Procedures           158

18   Exhibit 62    Standard Operating Procedures           165

19   Exhibit 63    Email                                   201

20   Exhibit 64    Audiotape                               206

21   Exhibit 65    Video                                   212

22   Exhibit 66    Condensed Investigative Report          214
```

```
 1        Q.    Ignore --
 2        A.    Going lights and sirens.  Going
 3   lights and sirens, you would turn on your body-worn
 4   camera.
 5        Q.    Okay.  When you're responding to a
 6   civil disturbance, are you required to turn your
 7   body-worn camera on?
 8        A.    I try to turn mine on when I get
 9   there, yes.
10        Q.    Any reason you wouldn't turn on your
11   body-worn camera.
12        A.    Sure.
13        Q.    What would that be?
14        A.    If I forgot.
15        Q.    Any other reason?
16        A.    No, there would be no reason for you
17   not to unless you were unable to.
18        Q.    And why would you be unable to?
19        A.    Maybe if I was standing and somebody
20   jumped me from behind, I couldn't turn on my
21   camera.  I would be fighting.  So primarily, if you
22   didn't turn your body-worn camera on, it's because
```

1  **you either forgot to or you tried to and it wasn't**

2  **activated.  There have been officers who try to,**

3  **you got to hit it twice to turn it on.  Good luck.**

4          Q.     Have you ever been asked about a

5  specific time your body-worn camera was not turned

6  on?

7                 ATTORNEY SOBIECKI:  Object to

8          form.

9                 THE WITNESS:  Yes.

10  BY ATTORNEY ABBOTT:

11         Q.     And when was that?

12         **A.     This one.**

13         Q.     Any other times?

14         **A.     I wish I could tell you no, but I**

15  **don't know.  Probably something else out there.  I**

16  **don't know.**

17         Q.     What discipline does an officer face

18  for failure to turn on a body-worn camera when

19  they're supposed to?

20                ATTORNEY SOBIECKI:  Object to

21         form.

22                THE WITNESS:  So for the first

1          offense it's just now consultations.
2          They just tell you, Hey, do this.  Your
3          second offense is like a 750.  And I
4          don't even know what the third offense is
5          now.
6     BY ATTORNEY ABBOTT:
7          Q.    What's a 750?
8          **A.    750 is basically a documentation**
9     **that you were in violation of the department's**
10    **general orders.**
11         Q.    For the first offense you said it's
12    a consultation.  Does that result in any
13    documentation?
14         **A.    I don't believe so.  But that's**
15    **changed, though, since 2020 and now.  Today's --**
16    **it's a consultation for me.  For me for 2020, the**
17    **first offense was a 750.**
18         Q.    And so that I understand, you would
19    be talking about June 1, 2020?
20         **A.    Uh-huh.**
21         Q.    That was your first offense?
22         **A.    I believe so.  There could have been**

1  **one beforehand for like a test shot.  But for the**

2  **actual offense where, you know, I was doing some**

3  **kind of police force, that was the first, yes.**

4          Q.    A failure to complete a test shot

5  doesn't -- does that count as a first offense?

6                ATTORNEY SOBIECKI:  Object to

7           form.

8                THE WITNESS:  I think so.  It's

9           all part of it.

10    BY ATTORNEY ABBOTT:

11          Q.    We talked about in 2018 the finding

12  of a body-worn camera violation.  Did that count as

13  a first offense?

14          A.    I don't know because of that

15  **commander's conference.  It could be.  I don't want**

16  **to say it was or it wasn't.  It's documented.**

17          Q.    But the violation of June 1, 2020,

18  was treated as a first offense?

19          A.    **Yeah, definitely a first offense.**

20          Q.    You said for a third offense, do you

21  know what the discipline the officer faces was?

22          A.    **No.**

131

1    incident happened?
2         A.   That was that week and prior events
3    that we've gone to where you could smell it in the
4    air.
5         Q.   And Sergeant Thau?
6         A.   Yes.
7         Q.   What's his full name?
8         A.   Daniel Thau.
9         Q.   And do you have any reason to
10   believe that the protesters on June 1, 2020, had
11   chlorine?
12        A.   Yes.
13        Q.   And what was that based on?
14        A.   Based upon once you start throwing
15   water bottles, I treat a heavy water bottle as a
16   hazardous item, that they could hurt somebody.
17        Q.   Is that how you think of water
18   bottles through the present?
19        A.   Yes, I always let people know that
20   water bottles can contain some form of chemical
21   inside of it that can ultimately -- short-term
22   blindness.

132

1      Q.    And any other instances aside from
2  one involving Sergeant Thau in which you were
3  familiar with chlorine being used in that way?
4      **A.    Multiple times throughout 2020.**
5      Q.    Anything else?  Did you witness it
6  being used?
7      **A.    You could smell it, yes.  You could**
8  **smell it, absolutely.  You smell chlorine.  It's a**
9  **very distinct odor.**
10     Q.    And you said you don't remember the
11 date of that Sergeant Thau incident; is that right?
12     **A.    No.  I think it was the night prior.**
13 **They are all running, it's all the same.**
14     Q.    The night prior to June 1?
15     **A.    Yes.**
16     Q.    And do you recall any instances of
17 chlorine being used on June 1?
18     **A.    For that day, I think earlier in the**
19 **day, around noontime, I believe.  I think.  Because**
20 **all those days, they're all the same there.**
21     Q.    Do you recall where in the District
22 that happened?

133

```
1         A.    Downtown, somewhere downtown.
2         Q.    Do you recall smelling chlorine on
3    June 1?
4         A.    I can't recall.  Some time during
5    that weekend.
6         Q.    Do you recall smelling chlorine when
7    you were in the vicinity of Swann Street on that
8    day?
9         A.    Not that I recall that day, no.
10                  ATTORNEY ABBOTT:  So we've been
11           going for -- we can go off the record.
12                  (Discussion held off the
13             record.)
14                  (Recess taken from 12:33
15             p.m. to 1:17 p.m.)
16    BY ATTORNEY ABBOTT:
17        Q.    And before the break we were talking
18   about the permissible justifications for the use of
19   OC spray.  Are you permitted to use OC spray to
20   distract the people?
21                  ATTORNEY SOBIECKI:  Object to
22             form.
```

1                THE WITNESS:  I don't know what
2         you mean by that.  It's a word that we
3         use to distract, disorient.  What do you
4         mean?
5    BY ATTORNEY ABBOTT:
6         Q.    In what context does MPD use the
7    word?
8         **A.    So if somebody was doing something**
9    **where pepper spray was allowed to be utilized, the**
10   **term that you would use is you're trying to**
11   **distract them from stopping what they were doing.**
12   **So if they were breaking a window and you're**
13   **utilizing pepper spray to stop them, you're**
14   **distracting them from doing what they were doing.**
15        **So when you say "distract," it's a term**
16   **that we -- actually, it's like a buzz term.  So --**
17   **but the other distract is, hey, look, over here**
18   **while this is happening.  No.  No.**
19        Q.    Are there -- what are the limits for
20   the authorization of OC spray?
21                ATTORNEY SOBIECKI:  Object.
22                THE WITNESS:  That's more of a

```
1       A.      That part I don't know.
2       Q.      How did you know they were arrested?
3       A.      What do you mean?
4       Q.      Correct me if I'm wrong.  You said
5  that they were arrested at that point.
6       A.      At that point in time we were told
7  that the mass arrest was taking place, yes.
8       Q.      And so they were arrested before the
9  police line moved in?
10      A.      Yes.
11      Q.      Did you witness any notification to
12 the protesters that they were under arrest?
13      A.      I wasn't there for that.  I wasn't
14 on that front line, so...
15      Q.      And did you see the behavior change
16 at all after the police line moved forward?
17      A.      Once again, their actions changed
18 first, then the police line moved forward.
19      Q.      You see anyone entering any homes
20 before the police line moved forward?
21      A.      They were entering the homes before
22 the police line moved forward.
```

1    Q.    And you witnessed them entering
2  homes before that?
3    A.    Yes.
4    Q.    What was your response to -- or what
5  did you do in response to people entering homes?
6    **A.    Basically I went up to stop and I**
7  **used OC force.**
8    Q.    And was that before or after the
9  police line moved forward?
10   **A.    I used it after the police line**
11 **moved forward, because I jumped in front of the**
12 **police line to stop two individuals from going up**
13 **the stairs.**
14   Q.    And what was your intent -- what did
15 you intend to achieve by using OC spray?
16   **A.    To distract them, disperse them from**
17 **entering that dwelling.**
18   Q.    Were you?
19   **A.    I believe so.  Because at that point**
20 **when I sprayed them it also got in my eyes.**
21   Q.    Were you successful in stopping them
22 from entering the home?

```
1          A.    I don't know.
2          Q.    And who authorized the use of OC
3    spray on Swann Street?
4          A.    For me, I used it.
5          Q.    Did anyone authorize you to use it?
6                ATTORNEY SOBIECKI:  Object to
7          form.
8                THE WITNESS:  I had authorization
9          throughout the whole weekend to use it.
10         However, for that moment I used OC spray.
11         With the unit that I'm in, we're given a
12         little bit more leeway for determining
13         without someone dictating whether we can
14         use it.
15    BY ATTORNEY ABBOTT:
16         Q.    What is that understanding based off
17   of?
18         A.    Just a guidance level through
19   Inspector Glover.
20         Q.    And is that training or a policy
21   document?
22         A.    No.  Officers can use pepper spray.
```

200

1  burglary?
2             ATTORNEY SOBIECKI:  Object to
3        form.  Calls for a legal conclusion.
4             THE WITNESS:  If they were placed
5        under arrest and someone allowed them to
6        escape arrest?  I believe something would
7        be done with that homeowner.
8   BY ATTORNEY ABBOTT:
9        Q.   In this instance a homeowner
10  allowing protesters into their home, you said --
11       A.   Is this -- do we know this for sure?
12       Q.   Let's look back.  You said something
13  needed to be done about that.  What do you mean by
14  that?
15       A.   I think the department would look
16  into that.  I'm sure they would investigate it.
17       Q.   Did you think that something should
18  be done about that at the scene?
19       A.   I couldn't.  I was pepper sprayed
20  myself.  At that point in time the officer grabbed
21  me because objects were still being thrown at us,
22  and I was behind a tree trying to figure out if I

1    could see again.  And at that point in time it was
2    over.
3         Q.    Did you make any effort to determine
4    whether -- confirm whether a burglary was ongoing?
5         A.    I didn't.
6         Q.    Did you consider that a homeowner
7    may have been letting them into their homes
8    voluntarily?
9         A.    No.
10        Q.    Did you contribute to a use of force
11   report about the events of that day?
12        A.    I would say yes, because I was asked
13   about it.  So that would be contributing.
14        Q.    Let's flip to Tab 14, which I'll
15   designate as Exhibit 63.
16                    (Exhibit 63 was marked for
17              identification.)
18        Q.    Tab 14.
19        A.    Oh.
20        Q.    Do you recall sending this email?
21        A.    What did I send?
22        Q.    You can flip through the

202

1   attachments.
2           A.    I sent this.
3           Q.    It shows that you're in the From
4   line on the first page.  Do you recall sending this
5   email?
6           A.    I don't know what I'm saying, sorry.
7   I don't mean to be rude.
8           Q.    Do you recall sending it?
9           A.    No.
10          Q.    Do you know what this attachment is?
11          A.    Assembly for demonstrations
12  reportable.
13          Q.    Do you recall making any
14  contributions to this report?
15          A.    I don't.
16          Q.    Did you write any of this report?
17          A.    No.
18          Q.    Did you make any revisions to this
19  report?
20          A.    No.
21          Q.    Do you know why you're sending a
22  copy of this report to Andrew Horos?