# EXHIBIT 53

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------------X

PAMELA GOODWIN, et al.,             :

        Plaintiffs,          :

   v.                               : Civil Action No.

DISTRICT OF COLUMBIA, et al.,       : 1:21cv00806BAH

        Defendants.          :

---------------------------------X


Deposition of COMMANDER JOHN HAINES

CONDUCTED REMOTELY

Tuesday, March 5, 2024

10:01 a.m.


Job No.: 55153

Pages: 1 - 201

Reported by: Danielle Davis, CCR, CVR

2

1       Deposition of COMMANDER JOHN HAINES, conducted

2  virtually.

15       Pursuant to agreement, before Danielle Davis,

16  Certified Court Reporter and Notary Public in and

17  for the State of Maryland.

3

1            A P P E A R A N C E S

2

3     ON BEHALF OF PLAINTIFFS

4         NICHOLAS ABBOTT, ESQUIRE

5         RELMAN COLFAX, PPL

6         1225 19TH Street, N.W., Suite 600

7         Washington, D.C.  20036

8         Nabbott@relmanlaw.com

9

10    ON BEHALF OF DEFENDANTS

11        RICHARD SOBIECKI, ESQUIRE

12        OFFICE OF THE ATTORNEY GENERAL

13        400 6th Street, N.W.

14        Washington, D.C.  20001

15        Richard.sobiecki@dc.gov

16

17  ALSO PRESENT:

18  Teresa Quon

19  Marcus Ireland

20

21

22

4

1                C O N T E N T S

2    EXAMINATION OF COMMANDER JOHN HAINES         PAGE

3        By Mr. Abbott                              5

4        By Mr. Sobiecki                          196

5

6                  E X H I B I T S

7          (Attached to transcript.)

8    PLAINTIFFS' Deposition Exhibit               PAGE

9    PLAINTIFFS' Deposition Exhibit 113            12

10   PLAINTIFFS' Deposition Exhibit 27             30

11   PLAINTIFFS' Deposition Exhibit 105            60

12   PLAINTIFFS' Deposition Exhibit 114            69

13   PLAINTIFFS' Deposition Exhibit 115            80

14   PLAINTIFFS' Deposition Exhibit 116            90

15   PLAINTIFFS' Deposition Exhibit 117            97

16   PLAINTIFFS' Deposition Exhibit 118           108

17   PLAINTIFFS' Deposition Exhibit 119           131

18   PLAINTIFFS' Deposition Exhibit 120           133

19   PLAINTIFFS' Deposition Exhibit 121           134

20   PLAINTIFFS' Deposition Exhibit 122           162

21   PLAINTIFFS' Deposition Exhibit 123           176

22   PLAINTIFFS' Deposition Exhibit 124           180

40

1  to shelter?

2      A.   Limited, yes.

3      Q.   Limited how so?

4      A.   Well, the New York Avenue location, it's
5  fairly small.  I think it only houses somewhere in
6  the vicinity of 35 maximum prisoners or arrestees
7  within the cells.  There really isn't a real good
8  location for shelter.  If we're talking hundreds of
9  people, it doesn't have the size.  And I can't speak
10 much to the E Street location.  I've never
11 participated in an event or anything that's going on
12 there.

13     Q.   You said that the Tactical village --
14 sorry, back up.

15          You said the Tactical village at the
16 Academy was selected; is that right?

17     A.   Yes.  That was the main building, yes.

18     Q.   And so there are multiple buildings at the
19 academy?

20     A.   Yes.

21     Q.   Do you know how many buildings there are?

22     A.   More than three.

1    Q.   Which buildings were used as the
2  processing center?
3    **A.   So we used the Tactical village as the**
4  **main processing holding facility.  We had the**
5  **auditorium or the gym of the main police academy as**
6  **an overflow location.  And then, essentially, the**
7  **parking lot -- the upper parking lot of the academy,**
8  **it has solar panels that cover the parking spaces,**
9  **which would, you know, offer some sort of shelter as**
10 **well.**
11   Q.   We'll come back to the processing center.
12        You said that you were involved in a
13 mass arrest at 16th and I Street, around 54
14 arrestees; is that right?
15   **A.   I believe that's where it was in the**
16 **number, correct.**
17   Q.   Do you know about what time that mass
18 arrest started?
19   **A.   It was -- so I believe the curfew went**
20 **into effect at 1900 hours, so it was just after 1900**
21 **hours.**
22   Q.   And who directed you to go there.

1    A.   Specifically?  I don't recall.  It would have been the incident commander at that location.

3    Q.   Do you know who the incident commander was?

5    A.   It was probably Robert Glover.

6    Q.   And do you recall how long it took to conduct that mass arrest?

8         MR. SOBIECKI:  Object to form.

9         WITNESS:  Specifically, no.  I believe it was a little over three hours, but I have it in my after-action report.

12        MR. ABBOTT:  When were you called to Swann Street again?

14   A.   I don't recall the specific time.  I believe it was a little after 9:00 or sometime after 09:00.

17   Q.   And who directed you to go there again?

18   A.   Again, it would have been the incident commander, and I believe it would have been Robert Glover.

21   Q.   Did you go directly there?

22   A.   Yes.

1    Q.   Was the processing of arrestees from 16th
2    and I Street still going on at that point in time?
3    **A.   Yes.**
4    Q.   Was it close to finishing?
5    **A.   I do not know because I wasn't at the**
6    **processing center.**
7    Q.   Had all the arrestees been transported
8    from 16th and I to the processing center at that
9    point in time?
10   **A.   Yes.  We had completed that operation of**
11   **transportation from there.**
12   Q.   Okay.  What happened when you went to
13   Swann Street?
14   **A.   When I first arrived at the scene, I**
15   **assessed the scene, started calling -- determining**
16   **what transportation vehicles and units we needed and**
17   **how we were going to start setting up for the**
18   **transportation of the individuals who were placed**
19   **under arrest there.**
20   Q.   Do you have any role in the decision to
21   conduct an arrest?
22   **A.   No, none.**

1      Q.   And do you know what the reasons for that
2 delay were?
3      A.   Specifics -- again, other than what's been
4 passed on to me secondhand, second, third, fourth
5 hand, whatever it may be --
6      Q.   And what's been passed on to you?
7      A.   A lot of it were transportation issues,
8 searching issues, the ability to be able to process
9 large amounts of people.  One of them was the
10 facility.  At that time, they were using the
11 facility at 500 New York Avenue.  That facility was
12 deemed not to be large enough to be able to handle
13 that, and that's part of what really led into the
14 decision to moving the entire process to the Police
15 Academy.
16     Q.   And who did you hear about those issues
17 from?
18     A.   From my people who still worked at NSID,
19 mostly.  There was a review internally, you know,
20 leading up to -- we were actually preparing for --
21 we had started preparing for the January 2021
22 inauguration about a year in advance.  And when we

1  talked about the training and the mass arrests and
2  transportation, we have been conducting regular
3  training and going through our procedures,
4  anticipating that we might have similar issues
5  around that inauguration.
6      Q.   It's my understanding that at the time,
7  Inspector Glover was in charge of MPD operations for
8  the inauguration; is that right?
9      A.   I believe so.
10     Q.   Did you have discussions with him prior to
11 June 1, 2020, about challenges associated with
12 processing mass arrests?
13     A.   I'm sure I did.  I don't recall anything
14 specifically.
15     Q.   Was he aware of the challenges associated
16 with processing mass arrests?
17     A.   Yes.  I mean, we were having regular -- at
18 that point we were meeting to discuss the upcoming
19 inauguration.  And, again, I don't recall the
20 specifics, but there were issues that were brought
21 up and challenges from the previous inauguration,
22 specifically to high-volume prisoner processing and

1  transportation, that we were working on addressing

2  within my division address.

3       Q.   You said improvements had been made since

4  June 27 -- since January 2017; is that right?

5       A.   Yes, sir.

6       Q.   What sort of improvements?

7       A.   The biggest one was the processing center

8  itself, how it worked, where it was located, the

9  ability to house and keep people, procedures in the

10 actual transportation piece on how that was done to

11 try to speed up the process of getting arrestees off

12 the scene into the processing center.

13      Q.   We'll come back to some of those issues.

14 For now, I want to focus in on transportation on the

15 night of June 1, 2020.  And we're going to go to

16 page 3, where it says, "NSID Transport Vehicles."

17 You see the vehicles listed next to that?

18      A.   Yes, sir.

19      Q.   Were those the vehicles that were used to

20 transport arrestees from Swann Street to the

21 processing center?

22      A.   Yes.  Along with additional vehicles on

1  **misdemeanor, they are required to be restrained.**

2  Q.  So when it's here with regard to any

3  person who's held in custody by the MPD, and it's

4  referring here to -- exclusively to arrestees, when

5  it says that they'll only be subject to those

6  restraints only to the extent reasonably necessary,

7  that means that --

8  **A.  Reasonably necessary to get them to the**

9  **processing facility.**

10  Q.  Okay.

11  **A.  We're not going to not have people**

12  **handcuffed and being placed in -- with other people**

13  **in the back of transportation vehicles, or if we're**

14  **in the open parking lot at the processing center,**

15  **until they can be secured, they have to be**

16  **restrained.**

17  Q.  Okay.  We'll get back to the use of

18  restraints at the processing facility.

19          Who made the decision regarding what

20  restraints should be used on June 1st?

21  **A.  It was part of our policy.  We use flex**

22  **cuffs.  That's our procedure for mass arrest.**

1  Q.  And were those flex cuffs double loop or
2  single loop?
3  **A.  Double.  Well, I don't know how you mean**
4  **that.  So it's one piece and there's two loops, one**
5  **for each hand.**
6  Q.  Okay.  In your words, how tightly should
7  officers apply flex cuffs?
8  **A.  In order to ensure they can't slip out of**
9  **them?  Typically, we use the two-finger rule.  If**
10 **you can slip two fingers underneath or between the**
11 **wrist and the flex cuff, then that's sufficient.  It**
12 **should not be tighter than that.**
13 Q.  Okay.  And do officers receive training on
14 how tightly to apply flex cuffs consistent with that
15 standard?
16 **A.  Yes.**
17 Q.  What sort of training do they receive?
18 **A.  Again, as part of the SOD CDU training,**
19 **but, specifically, we trained our members at NSID --**
20 **we went through these procedures.**
21 Q.  What are MPD officers or MPD members
22 directed to do if an arrestee complains about the

1    tightness of the flex cuffs?

2        **A.   Inspect them, take a look.  And there are**

3    **times when even a handcuff, you get it on the bone**

4    **that's on the wrist.  Or typically we use what we**

5    **call the two-finger test.  If you can slide your two**

6    **fingers underneath, between the wrist and the flex**

7    **cuff, then they're deemed not to be too tight.**

8              **And if they are found to be too**

9    **tight, they would be either adjusted, cut off, and**

10   **another pair put on.**

11       Q.   And does that apply any time an arrestee

12   complains about the tightness of flux cuffs?

13       **A.   Assuming it can be safely done, yes.**

14       Q.   Any circumstances in which it couldn't

15   safely be done?

16              MR. SOBIECKI:  Object to form.

17              WITNESS:  If there were some kind of

18   environmental or outside safety concern.  You know,

19   if we're in a fire, trying to move through a fire,

20   we're not going to stop to cut the flex cuffs off.

21   BY MR. ABBOTT:

22       Q.   To your knowledge, did any of those

1  circumstances apply on June 1, 2020?

2       **A.   Do you mean, specifically, were any**

3  **adjusted or cut off and reapplied?**

4       Q.   Any of the circumstances in which an

5  officer could not respond to a complaint about flex

6  cuffs being too tight?

7       **A.   Not that I'm aware.**

8       Q.   Does MPD have a policy regarding the

9  maximum time an arrestee may remain in handcuffs or

10 flex cuffs?

11      **A.   No.**

12      Q.   Can an arrestee be held in flex cuffs

13 indefinitely --

14           MR. SOBIECKI:  Object to form.

15 BY MR. SOBIECKI:

16      Q.   According to MPD policy?

17      **A.   Until which time they're into a secure**

18 **facility or secure -- however long that may take.**

19      Q.   Are arrestees kept in flex cuffs for a

20 longer period of time when they are part of a

21 high-volume arrest compared to when they are subject

22 to an arrest outside the high-volume context?

1                MR. SOBIECKI:  Object to form,
2    exceeds the scope.
3                WITNESS:  They were.
4    BY MR. ABBOTT:
5        Q.   Even though that was a mass arrest?
6                MR. SOBIECKI:  Same objection.
7                WITNESS:  Yes, sir.  I think we
8    completed the whole process, start to finish, in a
9    little over three hours.
10   BY MR. ABBOTT:
11       Q.   We talked previously about -- I know that
12   you were not in charge of NSID at this time, but
13   that you're familiar with difficulties faced around
14   mass arrests during the presidential inauguration in
15   2017, to your knowledge were these the issues you
16   raised here regarding transportation applicable in
17   that context as well?
18               MR. SOBIECKI:  Objection, exceeds the
19   scope.  You can answer.
20               WITNESS:  I'm sorry.  They had -- at
21   that time for transportation they had the DC public
22   school buses that they were utilizing.  So they

```
1   didn't have quite the concerns I had here.
2   BY MR. ABBOTT:
3        Q.   Prior to June 1, 2020, had you raised
4   concerns regarding the lack of transportation
5   capacity with anyone else at MPD?
6        A.   I know I had discussed it, yes.
7        Q.   And who did you discuss that with?
8        A.   Members of my staff and probably my boss
9   at the time.
10       Q.   And that was Assistant Chief Contee?
11       A.   Yes, sir.  Again, I don't remember the
12  specifics of when or where, but I'm sure there was
13  probably a conversation.
14       Q.   How about with Inspector Glover in
15  relation to planning for the inauguration?
16       A.   Yes.  He and I had had those concerns in
17  discussion.
18       Q.   Prior to June 1, 2020?
19       A.   Yes, sir.
20       Q.   At the end of this second bullet on page
21  5, where it says "arrestees not having access to
22  food, water, shelter, and personal hygiene
```

1  facilities," is that in reference to the arrestees
2  from Swann Street?
3       A.   Yes.  Actually at the location of Swann
4  Street, after -- specifically with the people who
5  needed to use facilities on Swann Street and because
6  it's just so much time getting people off scene, we
7  started using a trailer with Porta Potties strapped
8  to the trailer after this event, so we could bring a
9  Porta Potty to the scene, to make sure that we had
10 bathroom facilities for people who we couldn't move
11 off the scene immediately.
12      Q.   Back to the first bullet, under
13 "Transportation."  You say the maximum number of
14 arrestees that can be transported at one time is
15 100.  Does that include the capacity from the buses,
16 from the Marshall service and other services?
17      A.   No, because I couldn't rely on those
18 assets for the future events.
19      Q.   Okay.  But on the night of June 1st, were
20 you able to transport more than 100 people at a
21 time?
22      A.   Well, technically, no, because we couldn't