**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PAMELA GOODWIN**, *et al.*, | |
|     **Plaintiffs,** | |
|     **v.** | **Civil Action No. 1:21-cv-00806-BAH** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
|     **Defendants.** | |

**DEFENDANTS' REPLY IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 1

    I.    Plaintiffs Cannot Amend Their Complaint Through Summary Judgment
Briefing. ................................................................................................................ 1

    II.    Plaintiffs' First Amendment Claims Cannot Survive Summary Judgment. ........... 1

        A.    Cmdr. Glover Did Not Violate Plaintiffs' First Amendment Rights. ......... 2

        B.    Chief Newsham Did Not Violate Plaintiffs' First Amendment
Rights. ...................................................................................................... 16

        C.    The District Is Not Liable For Any First Amendment Violations. ........... 17

        D.    Plaintiffs Cannot Maintain a Retaliatory Use of Excessive Force
Claim Against Any Defendant. ................................................................. 18

    III.    Plaintiffs' FAAA Claim Cannot Survive Summary Judgment. ........................... 18

    IV.    Plaintiffs' Fourth Amendment Claims Cannot Survive Summary
Judgment. ........................................................................................................... 19

        A.    No Subordinate of Cmdr. Glover or Lt. Horos Used Excessive
Force Against Remick and Surio. ............................................................. 19

        B.    Lt. Horos's Use of Pepper Spray Was Not Excessive. ............................. 20

        C.    Plaintiffs' Excessive Force Claim Against Officer Crisman Cannot
Survive Summary Judgment. .................................................................... 22

    V.    Plaintiffs' Assault and Battery Claims Cannot Survive Summary
Judgment. ........................................................................................................... 25

CONCLUSION ................................................................................................................ 25

## INTRODUCTION

In their opposition, Plaintiffs abandoned many of their claims and failed to rely on several opinions of their own expert witness. Defendants are entitled to summary judgment on the remaining claims.

## ARGUMENT

### I.    Plaintiffs Cannot Amend Their Complaint Through Summary Judgment Briefing.

"It is well-established that a party may not amend its complaint or broaden its claims through summary judgment briefing." *Bean v. Perdue*, 316 F. Supp. 3d 220, 226 (D.D.C. 2018). Therefore, the Court should not permit Surio, Pearlmutter, and Remick to add claims at this stage of the litigation. Surio alleged in the Complaint [77] that Officer Quarles used force against her that was excessive and constituted assault and battery, Compl. ¶¶ 24, 52, 65, 112, 122, but she has abandoned those claims, *see* Pls.' Ex. 57. Her attempt to recast those claims against Lt. Horos, Cmdr. Glover, and the District should be rejected. *See id.* Pearlmutter alleged in the Complaint that Lt. Horos used force against him that was excessive and constituted assault and battery, Compl. ¶¶ 21, 58, 112, 122, but he has abandoned those claims, *see* Pls.' Ex. 57. His attempt to recast those claims against Officer Crisman and the District should be rejected. *See id.* Remick did not allege in the Complaint that any Individual Defendant used force against them that was excessive or that constituted assault and battery. Compl. ¶¶ 64, 112, 122. Their attempt to assert those claims now against Lt. Horos, Cmdr. Glover, and the District should be rejected. *See* Pls.' Ex. 57.

### II.    Plaintiffs' First Amendment Claims Cannot Survive Summary Judgment.

Plaintiffs assert claims for retaliatory arrest, selective enforcement, retaliatory adverse conditions of confinement, and retaliatory use of excessive force against Cmdr. Glover. Based on a supervisory theory of liability, Plaintiffs assert that Chief Newsham is individually

responsible for Cmdr. Glover's allegedly retaliatory arrest, selective enforcement, and retaliatory adverse conditions of confinement violations.  Plaintiffs assert that the District is liable for those same violations because Chief Newsham ratified Cmdr. Glover's actions.  Finally, Plaintiffs assert claims for retaliatory use of excessive force against Lt. Horos, Cmdr. Glover, and Officer Crisman.  *See* Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. [84] (Pls.' Opp'n) at 7–27; Pls.' Ex. 57.  As explained below, Plaintiffs have failed to identify record evidence that creates a genuine dispute as to a material fact for each of those claims.

## A.    Cmdr. Glover Did Not Violate Plaintiffs' First Amendment Rights.

### 1.    Cmdr. Glover Did Not Arrest Plaintiffs in Retaliation for Their Speech.

Plaintiffs agree with Defendants that their arrests were supported by probable cause.  *See* Pls.' Opp'n at 9–10; Pls.' Resp. to Defs.' Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. [84-2] (Pls.' SUMF Resp.) ¶ 114.  Plaintiffs also agree that, as a result, their retaliatory arrest claim cannot survive summary judgment unless the *Nieves* [*v. Bartlett*, 587 U.S. 391, 398 (2019)] exception applies to their claim.  *See* Pls.' Opp'n at 9–10.  Plaintiffs further agree that, even if there is a genuine dispute as to whether the *Nieves* exception applies (there is not), their retaliatory arrest claim cannot survive summary judgment unless they adduce evidence that Cmdr. Glover's decision to arrest them was caused by his retaliatory motive, *i.e.*, their arrests would not have occurred *but for* his retaliatory motive.  *See id*. at 15–16.  Plaintiffs have failed to identify a genuine dispute as to a material fact on either count.

#### a.    Plaintiffs Were Not Treated Differently Than Similarly Situated Individuals.

The *Nieves* exception is a "narrow qualification" to the rule that probable cause defeats a retaliatory arrest claim "for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."  587 U.S. at 406.  To invoke it, a plaintiff

must present "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407.[1] The Supreme Court's reference to "typical" enforcement implies a backwards looking analysis that focuses on how the law was enforced *prior* to a plaintiff's arrest. *See, e.g.*, *Gonzalez*, 144 S. Ct. at 1667. Here, Plaintiffs contend that "[D]efendants 'only enforced the curfew against, and thus arrested for curfew infractions, individuals who participated in the June 1 protest.'" *Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 173–74 (D.D.C. 2022) (quoting Am. Compl. ¶ 99). Plaintiffs must therefore show that, at the time the decision was made to arrest them, Defendants had not "typically" enforced a curfew against similarly situated individuals.

Before the Court can conduct a comparison between Plaintiffs and similarly situated individuals, it must determine to whom the similarly situated individuals are being compared. Plaintiffs were not seven individuals out after curfew at different times in different locations of the city. Plaintiffs arrived on Swann Street as part of a larger group of people; they had been a part of that group for an extended period of time. Pls.' Statement of Material Facts in Supp. of Pls.' Opp'n to Defs.' Mot. for Summ. J. [84-1] (Pls.' SUMF) ¶¶ 34–40, 45, 74–83; Pls.' SUMF Resp. ¶¶ 98–115. While the size of the group was fluid, it numbered between at least 300 and 1,000 during the two hours after the curfew went into effect and before the group's arrival on Swann Street. Pls.' SUMF Resp. ¶¶ 53, 57. It is undisputed that members of the group were

---

[1]    While Plaintiffs cite *Gonzalez v. Trevino*, 144 S.Ct. 1663, 1667 (2024), for the proposition that they need not identify specific comparators, *see* Pls.' Opp'n at 9, *Gonzalez* was decided in 2024. It therefore cannot be relied on to establish the contours of the *Nieves* exception in 2020. *See City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 13 (2021) (noting that caselaw decided after relevant events is of no use qualified immunity's clearly established law inquiry). Instead, as explained below, *Gonzalez* demonstrates that there was, at a minimum, uncertainty in 2020 as to whether the *Nieves* exception required "virtually identical and identifiable comparators" when proving that similarly situated individuals were treated differently. *See Gonzalez*, 144 S.Ct. at 1667.

spray painting property and throwing water bottles at police officers as the group traversed the city. *Id.* ¶¶ 58–59, 99. And it cannot be reasonably disputed that MPD officers attempted to have the group disperse prior to the group's arrival on Swann Street. *Id.* ¶¶ 102–111, 115. It is undisputed that MPD officers provided dozens of warnings to disperse within a few blocks of Swann Street for more than an hour prior to the encirclement of Plaintiffs. *Id.* ¶¶ 45–48; *see also id.* ¶ 66. It is also undisputed that at least two Plaintiffs did in fact hear those warnings to disperse. *Id.* ¶¶ 55–56, 68. The decision to encircle the group that Plaintiffs were with was not made until approximately 8:40 p.m. Defs.' SUMF Resp. ¶ 43.

Accordingly, the appropriate question under *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023), which the Parties agree sets the appropriate standard for determining whether individuals are similarly situated, *see* Pls.' Opp'n at 10, is not whether the curfew was only enforced against individuals who protested on June 1 (which is not true, in any event). Rather, the appropriate question is whether the curfew was only enforced against (a) individuals who protested on June 1 *and* who were also walking around the city as part of a group of several hundred people for more than an hour after curfew—while (b) members otherwise similar groups who had not protested that day were permitted to go about their business after the curfew took effect. Plaintiffs have not identified any evidence that would allow a fact finder to answer that question in the affirmative.

In attempting to manufacture a disputed material fact, Plaintiffs repeatedly refer in their opposition to "large groups" that "violated the curfew to the same extent" as Plaintiffs. *See, e.g.*, Pls.' Opp'n at 11. The evidence purportedly supporting that claim is found in paragraphs 167–177 of Plaintiffs' Statement of Undisputed Material Facts, *id.* at 11, but the cited evidence does not support Plaintiffs' characterization.

- Paragraph 167 reflects 15th and Swann Streets after 9 p.m.  Exhibit 59 shows three to five individuals at that location.  Exhibit 92 shows at most a dozen individuals at an undefined time in the same area.

- Paragraph 168 reflects 15th and Swann Streets after 9 p.m.  Exhibits 71, 66, and 73 show the same approximately one dozen individuals as Exhibit 92.  Exhibit 93 shows only a handful of people.  Exhibits 94 and 95 show no more than a dozen people.  Exhibit 46 shows only a handful of people.  Exhibits 47 and 73 show at most two dozen people.

- Paragraph 169 reflects 15th and Swann Streets after 9 p.m.  Exhibit 96 shows less than a dozen people.  Exhibits 48, 73, 90, and 66 show the same scene and depict no more than two dozen individuals.

- Paragraph 170 reflects 15th and Swann Streets after midnight.  Exhibits 69, 83, 97, and 98 show the same scene and depict no more than a dozen individuals.

- Paragraph 171 reflects 15th and Swann Streets after 2 a.m.  Exhibit 99 shows two individuals together and five other individuals who appear to be separate.

- Paragraph 174 reflects 14th and Swann Streets after 9:20 p.m.  Exhibit 70 shows approximately a dozen individuals, several of whom appear to be members of the media.

- Paragraph 176 reflects 14th and R Streets after 9 p.m.  Exhibit 100 shows a handful of individuals walking by themselves and then one group of three people who appear to be walking together.

- Paragraph 177 reflects 14th and Church Streets after 9 p.m.  Exhibit 101 shows officers placing police tape across the window of a business that had been smashed, and while they are doing that, two groups of two people pass by, two groups of three people pass by, and six individuals who are walking in somewhat close proximity to each other but do not appear to be all together pass by.

To summarize, Plaintiffs' exhibits reflect that approximately two dozen individuals congregated near 15th and Swann Streets after 9:06 p.m., which was the same time as when MPD officers were focused on encircling individuals on Swann Street.  *See* Pls.' SUMF ¶¶ 167–69.  There is no evidence that those individuals arrived together; no evidence that those individuals spray painted anything; no evidence that those individuals threw any objects at police officers; no evidence that those individuals refused to disperse (while those individuals were not ordered to disperse, they complied with orders to move back, *see, e.g.*, Pls.' Ex. 59 at 21:06:15–

25); no evidence that Cmdr. Glover was aware that they were there; no evidence that more than a dozen individuals remained there past 10 p.m., *see* Pls.' Exs. 69, 83, 97–98; and no evidence that any of those individuals had *not* engaged in any protest activity on June 1, *i.e.*, there is no evidence that they were "non-protestors." In fact, one exhibit shows an individual on a bike approaching an officer, speaking aggressively to the officer, being told to disperse, and then complying with the direction to disperse. Pls.' Ex. 73 at 21:16:00–40.

Plaintiffs' exhibits also show that approximately one dozen individuals had congregated near 14th and Swann Streets as of 9:23 p.m., which was where Cmdr. Glover was located. Pls.' Ex. 70 at 21:23:50–21:24:05. Notably, one of those individuals states that she had recently been a part of the group on Swann Street, which indicates that she was *not* a "non-protestor" and separated from the large group, *i.e.*, dispersed—there is no evidence she was arrested. *Id.* Like the individuals near 15th and Swann Streets, there is no evidence that any of the individuals on the 14th Street side of Swann Street spray painted property or threw objects at police officers. Discovery is closed; if Plaintiffs have no evidence at this point, they cannot proceed to trial.

In terms of enforcement, Plaintiffs do not dispute that MPD made at least 278 arrests for curfew violations on June 1. Pls.' SUMF Resp. ¶ 51; Pls.' SUMF ¶ 147. While Plaintiffs speculate that "[b]ased on the location and time of [those] arrests, it is evident that 245 of those arrested—88%—were involved in protest activities," Pls.' Opp'n at 14, the evidence they cite does not support that conclusion, especially if it is meant to imply that those individuals were engaged in protest activity after 7 p.m., Defs.' SUMF Resp. ¶¶ 149–152. As an initial matter, Plaintiffs' argument should not be interpreted to mean that Cmdr. Glover made several decisions to arrest individuals; he made two decisions to arrest.

Cmdr. Glover's first decision to effect a high-volume arrest concerned a group of

approximately 200-300 people that were located near 16th and Eye Streets. Pls. SUMF Resp. ¶¶ 49–51. Cmdr. Glover made the decision to begin initiating a high-volume arrest in the hope that the group would disperse, and his goal was successful in part. *Id*. Most individuals that were part of that group dispersed, and it was only the approximately 50 individuals who refused to disperse that were arrested. *Id*. While it may be reasonably inferred that *some* of those individuals had engaged in protest activity prior to 7 p.m., Plaintiffs identify no evidence to support their claim that *all* of those individuals had engaged in protest activity prior to 7 p.m., and they certainly have not identified any evidence to support a claim that any individuals were engaged in protest activity close in time to their arrests. Defs.' SUMF Resp. ¶ 151. Notably, if Plaintiffs are correct that all 200–300 members of the group located near 16th and Eye Streets had been engaged in protest activity on June 1, it undercuts their argument that Cmdr. Glover indiscriminately targeted protestors for arrest, and instead supports the conclusion that curfew enforcement was focused on large groups of individuals who refused to disperse.

Cmdr. Glover's second decision to conduct a high-volume arrest, as necessary, resulted in the arrest of approximately 200 individuals on Swann Street. That decision was made around 8:40 p.m. Pls.' SUMF ¶ 43. Again, Plaintiffs have identified no evidence that all of the individuals arrested on Swann Street had engaged in protest activity prior to 7 p.m. Although it is undisputed that some of them did, it is demonstrably untrue that all individuals arrested on Swann Street had engaged in protest activity after 7 p.m.[2] As explained above, evidence cited by Plaintiffs shows that individuals who were part of the group that ultimately ended up on Swann

---

[2] For example, none of the Plaintiffs claim that they were engaged in protest activity after 7 p.m. Pls.' SUMF ¶¶ 34–40. Goodwin, Lane, Surio, and Troper were headed home. *Id*. ¶¶ 34–35, 37, 40; Pls.' Ex. 14 at 46:7–47:18, 51:7–14, 51:18–21; Pls.' Ex. 15 at 65:14–17; Pls.' Ex. 20 at 158:17–19.

Street and who dispersed were not arrested.  *See* Pls.' Ex. 70 at 21:23:50–21:24:05.

As to the other, approximately 40 individuals who were arrested for violating the curfew, Plaintiffs argue that there is no evidence that those individuals had *not* engaged in protest activity on June 1.  Pls.' SUMF Resp. ¶¶ 30–35.  But that is not Defendants' burden.  Plaintiffs alleged that the curfew was *only* enforced against individuals who engaged in protest activity on June 1. *See Goodwin*, 579 F. Supp. 3d at 173–74.  In response, Defendants have identified approximately 40 arrests for curfew violations where there is no evidence that the arresting officers had any knowledge of whether the individuals arrested had engaged in protest activity on June 1.  Absent evidence to the contrary, Plaintiffs cannot rely on those arrests to support their claim that only protestors were arrested for violating the curfew.

As Plaintiffs acknowledge, when comparing individuals who were arrested with those who were not arrested to assess whether they were similarly situated, several factors to consider are "general deterrence value," "the Government's enforcement priorities," and "the Government's overall enforcement plan."  Pls.' Opp'n at 10 (citing *Frederick Douglass*, 82 F.4th at 1138).  Plaintiffs then argue that the deterrence value associated with the arrests made and the arrests not made would have been the same.  *Id*. at 11.  Plaintiffs base that argument on the claim that all identified individuals were part of "large" groups, were purportedly peaceful, and were in the same general location.  *Id*. at 11–12.  They also claim that whether all identified individuals received warnings to disperse is a disputed material fact.  *Id*. at 13.

It should be self-evident that, when enforcing a curfew meant to keep as many people as possible off the street in order to curb violence and vandalism, police officers would consider groups of *several hundred people* moving around the city as a cohesive whole—and whose members were spray painting property, throwing objects at police, and refusing orders to

disperse—a different enforcement priority than, for example, two individuals standing on a corner eating pizza, *see* Pls.' SUMF ¶ 171, or approximately two dozen people who had independently gathered near 15th and Swann Streets to observe what was happening, *see id*. ¶ 168. Further, given that MPD was already in the process of conducting a mass arrest on Swann Street that required the attention of a significant number of officers, it should also be self-evident why law enforcement resources would not (indeed, could not) be immediately redirected to arrest every single person who was outside.

Next, Plaintiffs argue that Cmdr. Glover's statements concerning why he ordered the arrest of individuals on Swann Street are relevant. Pls.' Opp'n at 13–14. They clearly are not. As explained in *Nieves*, "the statements and motivations of the particular arresting officer are 'irrelevant' at this stage." 587 U.S. at 407. The inquiry is purely "objective." *Id*. And the objective facts show that the comparator individuals identified by Plaintiffs were not similarly situated to Plaintiffs because they were not part of groups of several hundred people, among other differences, as explained above. Further, there is no evidence that Cmdr. Glover sought to arrest anyone, regardless of whether they had engaged in protest activity on June 1, who was not part of a group that was several hundred people strong.

Finally, Plaintiffs' attempt to establish that similarly situated individuals were treated differently should fail because they identify no evidence as to what "typical" enforcement of a curfew looks like in the District. *See Nieves*, 587 U.S. at 406. According to Plaintiffs, the decision to arrest them was made around 8:40 p.m. But all the examples of non-arrested individuals cited by Plaintiffs as comparators were present outside after 9 p.m. Thus, the Court has no evidence before it as to what constituted "typical" enforcement prior to Plaintiffs' arrests.

**b.** **Plaintiffs' Speech Was Not the Cause of Their Arrests.**

Plaintiffs argue that Cmdr. Glover's retaliatory intent in ordering their arrests is demonstrated by (1) his disparate treatment of similarly situated individuals; (2) his purportedly different explanations as to why he ordered the arrests; and (3) the adverse conditions of Plaintiffs' confinement.  Pls.' Opp'n at 16–17.  None of the evidence cited in support of those arguments creates a genuine dispute as to a material fact.

First, as explained above, Cmdr. Glover did not treat similarly situated individuals differently.  *See supra* at 2–9.

Second, Plaintiffs' claim that Cmdr. Glover "gave shifting and incredible explanations about the facts," Pls.' Opp'n at 16, is not true and misrepresents the evidence that claim is based on.  *See* Defs.' SUMF Resp. ¶¶ 46–63.  According to the IAD Report, "[Commander] Glover authorized the arrest of the curfew violators based on probable cause that they were in violation of the Mayor's Order."  Defs.' Ex. 4 at 36.  It also states that "several windows were broken," "[s]everal individuals from the group began to spray paint vehicles and buildings," that "[t]he group was heading towards the Target store, which was looted the night before," and that "[s]everal individuals from the group were throwing rocks, bricks, and water bottles."  *Id*. at 36. Plaintiffs do not dispute the spray painting, the throwing of water bottles,[3] or that the group was headed towards Target, and as to the breaking of windows and throwing of rocks and bricks, they only dispute whether it can be proven that the individuals who engaged in those acts were in the

---

[3]     While Plaintiffs attempt to minimize the throwing of water bottles, it was common on May 31 and June 1, 2020, for individuals to fill bottles with chlorine and throw them at officers, which resulted in at least one officer being hospitalized.  Defs.' Ex. 106 at 129:15–132:20.

same group as them.  *See* Pls.' SUMF Resp. ¶¶ 59–60, 99, 220.[4]  In a separate section of the IAD report, the author notes that the Swann Street arrests were "based on probable cause that they were on public space, in violation of the curfew order," and also notes that the arrests were authorized after Cmdr. Glover "learn[ed] an MPD cruiser was destroyed."  *Id*. at 4.  But the IAD report never describes the destruction of the police cruiser as the reason for the arrests.  *Id*. at 4, 35.  And those statements are true.  At approximately 8:40 p.m., as recorded in evidence relied on by Plaintiffs, it was broadcast over the radio that individuals on 14th Street had smashed a police cruiser.  Defs.' SUMF Resp. ¶¶ 48–54.  While Cmdr. Glover had made the decision to encircle the group minutes before that happened, he had not definitively decided to arrest them—the same approach he took earlier in the night.  *Id*.  As for the police cruiser on fire on 14th Street, Plaintiffs note that it had not happened as of 8:58 p.m., which is true, and they do not dispute that it was reported as being on fire at 9:17 p.m. (which means it was obviously set on fire before then).  *Id*.  However, they incorrectly claim that the 14th Street side of Swann Street was encircled by 9:05 p.m.  *Id*.  It was clearly not, as there was a radio transmission at that time saying, "[w]e also need to clear 14th Street."  *Id*.  The 14th Street side was not closed until 9:12 p.m.  *Id*.  The decision to begin effecting the arrests occurred at 9:28 p.m.  *Id*. ¶ 88.

Third, Plaintiffs' claim that Cmdr. Glover "was aware that mass arrests result in longer detention times, and he knew that MPD's difficulty processing mass arrests included a lack of transportation capacity," Pls.' Opp'n at 17, mischaracterizes the evidence cited.  Cmdr. Haines

---

[4]    As to the setting off of fireworks and breaking of the Metro bus pavilion glass, Plaintiffs misrepresent the record evidence.  *See* Pls.' Opp'n 16–17.  It was reported over the radio that night that individuals were setting off fireworks, Defs.' SUMF Resp. ¶ 64, and contrary to Plaintiffs' assertion, Lt. Lamond did not testify that fireworks were not set off, he testified he did not "specifically remember" it happening, *id*. ¶ 69.  At best, Plaintiffs have identified a lack of documentary evidence regarding the fireworks and the Metro bus pavilion, but they cannot claim to have proof that those events did not actually happen, as they do.  Pls.' Opp'n at 16–17.

testified only that he and Cmdr. Glover had discussed "challenges associated with processing mass arrests," generally, at some point between January 2017 and June 1, 2020.  Defs.' Ex. 116 at 81:11–84:14.  And Plaintiffs conveniently omit the context of that testimony.  Cmdr. Haines was discussing how, in response to the 2017 inauguration, MPD worked to improve its high-volume prisoner processing and that several improvements had already been implemented.  *Id*. That testimony in no way supports the inference that Cmdr. Glover knew how long it would take to process prisoners on June 1, 2020.  The other testimony cited only reflects that Cmdr. Haines and Cmdr. Glover had discussed concerns regarding transportation capacity for high-volume arrests because they were working to resolve the concerns.  Further, Cmdr. Haines testified that he did not discuss any "technical issues related to processing" of prisoners with Cmdr. Glover because "they wouldn't be [Glover's] concern."  *Id*. at 168:19–69:19.

Plaintiffs also cite an after action report concerning the processing of Swann Street prisoners that was circulated on August 25, 2020.  Pls.' Opp'n at 17 (citing Pls.' Ex. 27).  Rather than support their claim, it undermines it.  First, the after action report does not reference Cmdr. Glover or suggest that he had any awareness of how Swann Street arrestees would be processed or the conditions of their confinement.  *See* Pls.' Ex. 27.  Second, the after action report clearly shows that MPD had been working and intended to continue to work to *reduce* the time it took to process arrestees and to *improve* the conditions under which they were detained.  *Id*.  That report contradicts Plaintiffs' claim that the amount of time it took to process them was caused by animus towards their protest activity as opposed to difficulties inherent in processing a large number of people at the same time.

Given that Cmdr. Glover had probable cause to arrest Plaintiffs, that he only considered arresting two groups of individuals that consisted of several hundred people, that he provided

Plaintiffs with ample opportunity to disperse prior to their arrests, and that he did not order the arrest of individuals who had been a part of Plaintiffs' group but had dispersed, there are no *material* facts that could support an inference that the decision to arrest Plaintiffs was caused by a retaliatory motive.

  **c.**  **Cmdr. Glover Is Entitled to Qualified Immunity as to Any Retaliatory Arrest.**

  It is "[Plaintiffs'] burden to show that the particular right in question—narrowly described to fit the factual pattern confronting the officers[ ]—was clearly established." *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015). "[T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Stevenson v. District of Columbia*, 639 F. Supp. 3d 117, 130 (D.D.C. 2022). "The focus is on whether the officer had fair notice that her conduct was unlawful." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

  Plaintiffs have not shown that it was clearly established in June 2020 that the *Nieves* exception could be satisfied, in the specific context of curfew enforcement, without evidence of virtually identical comparators. Pls.' Opp'n at 21–22. Plaintiffs cite only *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 47 (D.D.C. 2021), aff'd sub nom., *Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023), but the specific context of that case bears no resemblance to the facts here. In *BLM D.C.*, the plaintiffs alleged that law enforcement, without provocation and without probable cause, violently attacked protestors solely because of their message. 544 F. Supp. 3d at 46. The court first rejected the proposition that the applicable right was the "right to be free from retaliation for protected speech" because it "draws the question at too high a level of generality." *Id*. at 47. Instead, the court explained that "[t]he appropriately tailored question is whether a peaceful protestor has the right to be free from government violence in retaliation for

the message of their protest." *Id*.  Here, Plaintiffs argue that the applicable right is that

retaliatory enforcement of a law is unconstitutional.  Pls.' Opp'n at 22.  But that framing also

draws the question as too high a level of generality.  The "factual pattern" confronting Cmdr.

Glover was how to enforce the curfew against similarly situated individuals, and Cmdr. Glover

was entitled to "fair notice" as to the legal standard for determining who was similarly situated.

In other words, if arresting a mob of 300 people on curfew violations while passing on peaceful

groups of 3 or 6 or even 10 was going to be later construed in federal court as evidence of

retaliatory motive, Cmdr. Glover was entitled to know that in advance.  No case law in existence

before June 1, 2020—at least none of which Defendants are aware or has been identified by

Plaintiffs—provided any such guidance.  As confirmed in *Gonzalez*, it was uncertain in June

2020 whether only individuals who were "virtually identical" to each other were similarly

situated or whether the scope of that legal standard was broader.  *See Gonzalez*, 144 S.Ct. at

1667.  For that reason, Cmdr. Glover is entitled to qualified immunity.

### 2.    Cmdr. Glover Did Not Selectively Enforce the Curfew and Is Also Entitled to Qualified Immunity.

As Plaintiffs acknowledge, their selective enforcement claim turns on the same similarly

situated analysis as their retaliatory arrest claim.  *See* Pls.' Opp'n at 20–21.  Because, as

explained above, *see supra* at 2–9, Plaintiffs have failed to identify any similarly situated

individuals who were treated differently than they were treated, their selective enforcement claim

against Cmdr. Glover cannot survive summary judgment.

Further, as previously conceded by Plaintiffs, it was not clearly established in June 2020

that a selective enforcement claim was viable under the First Amendment.  *See* Defs.' Mem. of

P. & A. in Support of Defs.' Mot. for Summ. J. [83-1] (Defs.' Mem.) at 19–20.  Plaintiffs'

attempt to avoid the consequences of their prior position by arguing that *Frederick Douglass*, 82

F.4th at 1136, concerned only pleading standards, and "did not alter the longstanding principles governing police conduct," Pls.' Opp'n at 23. Not so. The issue in *Frederick Douglass* was whether a selective enforcement claim could be brought under the First Amendment in addition to under the Fifth Amendment as an equal protection challenge. 82 F.4th at 1143. The D.C. Circuit held that it could. *Id*. But it also noted that the two claims required different burdens of proof: a selective enforcement claim under the Fifth Amendment required a showing of purposeful discrimination while a selective enforcement claim under the First Amendment did not. *Id*. at 1147. That difference obviously impacts whether a defendant had "fair notice" as to whether his conduct was unconstitutional. Prior to *Frederick Douglass*, a defendant did not have fair notice that he could be held liable for selective enforcement where he was *not* "motivated by invidious discrimination." *See id*.

Plaintiffs then attempt to argue that the specific context in which they assert their selective enforcement claim is irrelevant to the qualified immunity analysis because the only question is whether "Defendants in fact enforced the law differently among similarly situated groups." Pls.' Opp'n at 23–24. Plaintiffs again define the right at too high a level of generality. *See Stevenson*, 639 F. Supp. 3d at 130. Plaintiffs must identify authority clearly establishing that Cmdr. Glover should have been on notice that it was unconstitutional for him to enforce the curfew against groups of several hundred people while not enforcing it against individuals and small groups, and they have failed to do so. *See* Pls.' Opp'n at 22–24.

### 3. Cmdr. Glover Could Not Have Retaliated Against Plaintiffs Through Their Conditions of Confinement Because He Had No Involvement in the Processing of Arrestees.

As an initial matter, although *all* Plaintiffs purport to assert a claim based on the conditions of their confinement, *see* Pls.' Ex. 57, Goodwin, Lane, Lazo, and Troper were not taken into custody, and Plaintiffs do not even attempt to identify facts that would support such a

claim.  *See* Pls.' Opp'n at 17 (citing Pls.' SUMF ¶¶ 180, 181, 183, 185, 187 and 190, which only

concern Pearlmutter, Remick, and Surio).  Defendants are entitled to summary judgment on

those claims.  As to Pearlmutter, Remick, and Surio, as explained *supra* at 15–16, their

characterization of Cmdr. Glover's awareness and involvement in the processing and

confinement of arrestees is wildly inaccurate when compared to the cited evidence and cannot

defeat Defendants' motion for summary judgment.

### B.    Chief Newsham Did Not Violate Plaintiffs' First Amendment Rights.

Plaintiffs argue that Chief Newsham is personally liable for Cmdr. Glover's alleged

violations of their First Amendment rights as Cmdr. Glover's supervisor.  *See* Pls.' Opp'n at 18–

19.  Supervisory liability requires a plaintiff to establish "a high degree of fault."  *Elkins v.

District of Columbia*, 610 F. Supp. 2d 52, 64 (D.D.C. 2009).  "Mere negligence is not enough."

*Id*.  For example, a supervisor "who merely fails to detect and prevent a subordinate's

misconduct . . . cannot be liable for that misconduct."  *Int'l Action Ctr. v. United States*, 365 F.3d

20, 28 (D.C. Cir. 2004).  "The supervisor must know about the conduct and facilitate, approve,

or condone it, or turn a blind eye for fear of what he might see."  *Id*.  Plaintiffs identify

absolutely no evidence that would support a finding that Chief Newsham was aware that

Plaintiffs' arrests were caused by a retaliatory motive or selective enforcement, nor is there any

evidence that Chief Newsham was aware of Plaintiffs' conditions of confinement.

Chief Newsham testified that, based on his conversations with Assistant Chief Carroll,

his understanding was that the group marching on 14th Street was warned to disperse because

they were in violation of the curfew and that they failed to disperse.  Defs.' Ex. 12 at 103:6–

104:16.  His understanding was also that the reason the individuals on Swann Street were

arrested was because they were in violation of the curfew.  Defs.' Ex. 117 at 126:12–127:7; *see

id*. at 141:7–20.  His approval was not necessary to conduct those arrests.  *Id*. at 129:1–3.  And,

in the context of a discussion about whether individual officers had discretion to make arrests for curfew violations, Chief Newsham noted that with respect to Swann Street "there was no discretion for the individual officers" because it "was a command-level decision" to make those arrests, *i.e.*, it was Cmdr. Glover's decision. Defs.' Ex. 12 at 83:12–84:17. Plaintiffs somehow read that testimony as demonstrating not only Chief Newsham's knowledge of overall curfew arrests in the District but as also demonstrating his knowledge as to why those arrests were made. *See* Pls.' Opp'n at 19. "Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute." *Indep. Settlement Servs., LLC v. Lewis*, 296 F. Supp. 3d 194, 196–97 (D.D.C. 2018). Plaintiffs have identified no evidence in the record that would support a finding that Chief Newsham had any reason to know that the arrests on Swann Street were retaliatory or the result of selective enforcement.

### C.    The District Is Not Liable For Any First Amendment Violations.

With regard to municipal liability, as explained in Defendants' motion, Chief Newsham was not the final policymaker with regard to the curfew. *See* Defs.' Mem. at 22–24. Even assuming that Chief Newsham was the final policymaker, municipal liability can only exist if he "approve[d] a subordinate's decision *and the basis for it*." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis added). "[T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where . . . the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale." *Id*. at 130. As explained above, Chief Newsham's undisputed testimony is that he understood Cmdr. Glover's decision to arrest Plaintiffs to have been based on their violation of the curfew. No evidence exists to suggest that Chief Newsham was aware of any alternative basis for the arrests, and there is no evidence that he was aware of

any arrestee's conditions of confinement.  Therefore, he could not have ratified any

unconstitutional conduct.

> **D.** **Plaintiffs Cannot Maintain a Retaliatory Use of Excessive Force Claim Against Any Defendant.**

As Plaintiffs acknowledge, their attempt to assert a retaliatory use of excessive force

claim is duplicative of their Fourth Amendment excessive force claim.  *See* Pls.' Opp'n at 19–20;

*Lash v. Lemke*, 971 F. Supp. 2d 85, 98 (D.D.C. 2013) (holding that because plaintiff "was not

subjected to excessive force in the course of his arrest" his "allegation that he was subjected to

excessive force in retaliation for his exercise of his First Amendment rights also fails").

Therefore, for the same reasons that Plaintiffs' Fourth Amendment excessive force claim cannot

survive summary judgment, *see infra* at 19–25, their First Amendment retaliatory use of

excessive force claim cannot survive summary judgment.

## III.    **Plaintiffs' FAAA Claim Cannot Survive Summary Judgment.**

Plaintiffs purport to assert their First Amendment Assemblies Act (FAAA) claim against

all Defendants, *see* Pls.' Ex. 57, but their FAAA cannot withstand summary judgment against

any Defendant.

First, Plaintiffs argue that they can assert a claim against the Individual Defendants

because "[t]he individual defendants have duties under the statute, and there is at minimum a

dispute of fact as to whether they violated them."  Pls.' Opp'n at 31.  Plaintiffs miss the point.

Whether the FAAA imposes *duties* on MPD officers is an entirely separate question from

whether the FAAA imposes individual *liability* on MPD officers.  The FAAA operates just like

the Americans with Disabilities Act, which creates liability for "employers," but does not impose

liability on employees, even though employers obviously only act through their employees.  *See*

*Amariglio v. Nat'l R.R. Passenger Corp.*, 941 F. Supp. 173, 178 (D.D.C. 1996).

Second, Plaintiffs argue that the District violated the FAAA because "MPD did not comply with § 5-331.07(e)(1)–(2) on June 1, 2020." Pls.' Opp'n at 29. In arguing that the provisions of subsection (e) applied when Plaintiffs were arrested, Plaintiffs conveniently omit key language from that subsection. Subsection (e) only applies to "a *lawful* First Amendment assembly." D.C. Code § 5-331.07(e). That is why Plaintiffs' myopic focus on whether the individuals on Swann Street constituted a First Amendment assembly under the FAAA is a red herring, and why Plaintiffs' complete failure to address *Tinius v. District of Columbia*, 77 F.4th 691 (D.C. Cir. 2023), is fatal to their claim. *See* Pls.' Opp'n at 28–29. *Tinius* held that the June 1 Curfew Order "did not require police to give curfew violators an opportunity to avoid arrest by agreeing to disperse." 77 F.4th at 706. But Plaintiffs argue that Defendants *did* have to issue orders to disperse. Pls.' Opp'n at 28–29. Those positions cannot be reconciled. The point that Plaintiffs seem to miss is that the June 1 Curfew Order was not a time, place, and manner restriction, although it operated as such. The June 1 Curfew Order made it a crime for anyone to be in public (with limited exceptions). Defs.' Ex. 13. As a result, it made *all* First Amendment assemblies unlawful, rendering the requirements of Section 5-331.07(e) moot. No other conclusion is possible under *Tinius*.

## IV.    Plaintiffs' Fourth Amendment Claims Cannot Survive Summary Judgment.

### A.    No Subordinate of Cmdr. Glover or Lt. Horos Used Excessive Force Against Remick and Surio.

Remick and Surio purport to assert a claim for excessive force against Cmdr. Glover and Lt. Horos under a supervisory theory of liability based on the fact that the line of officers at 15th and Swann Streets moved towards them. Pls.' Opp'n at 39–42. Remick and Surio must therefore prove that (1) a subordinate of Cmdr. Glover and Lt. Horos used excessive force and

(2) Cmdr. Glover and Lt. Horos each approved or turned a blind eye to the excessive force.  *Int'l Action Ctr.*, 365 F.3d at 28.  They have identified no factual support for either proposition.

It is well-established that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The officers on 15th Street moved towards Remick and Surio at a "half-step" while loudly and repeatedly ordering them to "move back."  Pls.' SUMF Resp. ¶¶ 138, 148.  Remick and Surio refused to comply with the order to move back, despite ample time and opportunity to do so.  *See* Defs.' Exs. 79, 84–86; Defs.' SUMF Resp. ¶¶ 114–17.  Walking slowly towards Remick and Surio was not excessive and neither was using a shield to achieve compliance.  It was also not clearly established that either use of force was excessive.

### B.    Lt. Horos's Use of Pepper Spray Was Not Excessive.

Remick and Surio also advance an excessive force claim against Lt. Horos for his second deployment of pepper spray.  Pls.' Opp'n at 34, 39–42.  No factual support exists for that claim.

Lt. Horos's second deployment of pepper spray is captured in multiple videos.  Defs.' SUMF ¶¶ 171–72; Defs.' SUMF Resp. ¶¶ 119–20.  Immediately before the deployment, projectiles are being thrown at MPD officers, and several curfew violators are actively resisting MPD officers' attempt to move the line forward despite repeated orders to move back.  Defs.' SUMF Resp. ¶¶ 119–20.  One of those projectiles hits the shield of an officer standing near Lt. Horos.  Pls.' SUMF Resp. ¶ 171.  In response, Lt. Horos deploys a short burst of pepper spray in the direction from which the projectiles are being thrown.  Defs.' SUMF ¶ 172; Defs.' SUMF Resp. ¶ 120.  Immediately after that deployment of pepper spray, another projectile is thrown at MPD officers.  Defs.' SUMF Resp. ¶ 119.  Plainly, this was more than the "general disorder" or "mere obstinance" that does not justify the use of pepper spray.  *See* Pls.' Opp'n at 41.  Lt.

Horos's deployment of pepper spray was objectively reasonable. *Laney v. City of St. Louis*, 56 F.4th 1153, 1156 (8th Cir. 2023).

Plaintiffs attempt to create a disputed fact by mischaracterizing the record, claiming that Lt. Horos "did not spray toward the individual who had thrown" the projectile. Pls.' SUMF Resp. ¶ 172. The video footage cited by both Parties tells a different story. Defs.' SUMF ¶¶ 171–72; Defs.' SUMF Resp. ¶¶ 119–20. To be sure, curfew violators who were not throwing projectiles were also in the vicinity of Lt. Horos's deployment, but that does not render the deployment unreasonable. *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) ("A threat to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee."). Nor does it deprive Lt. Horos of qualified immunity. *See Wilkins v. District of Columbia*, Civil Action No. 17-884, 2020 WL 58116591, at *8 (D.D.C. Sept. 30, 2020). The cases Plaintiffs cite to the contrary are inapposite because the defendant officers in those cases did not deploy pepper spray at individuals bombarding police officers with projectiles. *See* Pls.' Opp'n at 42.

Even if their claim were not foreclosed by the reasonableness of Lt. Horos's use of pepper spray and his entitlement to qualified immunity, Surio and Remick cannot prove that they were impacted by Lt. Horos's conduct. It is undisputed that Surio was not directly sprayed with pepper spray. Pls.' SUMF Resp. ¶ 152. No BWC footage supports a finding that Surio was in the same area as Lt. Horos when he deployed pepper spray. Defs.' SUMF Resp. ¶ 121. The same goes for Remick. Remick did not see any MPD officer deploy pepper spray. Pls.' SUMF Resp. ¶ 159. And BWC footage disproves that they were in the area where Lt. Horos used pepper spray. Defs.' SUMF Resp. ¶ 121. During Lt. Horos's deployment, Remick was standing several yards directly south of Lt. Horos as he sprayed towards the east. *Id.* That is, Remick was

90 degrees removed from the direction in which Lt. Horos was spraying. *Id.* There is no indication in the video footage that Remick noticed or felt the effects of this deployment of pepper spray. *Id.* Finally, it is undisputed that neither Surio nor Remick sought medical attention for the effects of pepper spray. Pls.' SUMF Resp. ¶¶ 153, 160. Because Surio and Remick have no evidence they were affected by Lt. Horos's second deployment of pepper spray, Lt. Horos is entitled to summary judgment.

### C.     Plaintiffs' Excessive Force Claim Against Officer Crisman Cannot Survive Summary Judgment.

Pearlmutter, Goodwin, Lane, Lazo, and Troper assert an excessive force claim against Officer Crisman based on his use of pepper spray on Swann Street. Their claim is without merit.

As explained in Defendants' motion, Officer Crisman reasonably believed that the individuals at whom he deployed pepper spray were about to enter a residence (1461 Swann Street) illegally. Defs.' Mem. at 38–39. Myriad undisputed facts support that conclusion. Before the police line at 15th Street started to advance, Officer Crisman heard what he believed from experience to be doors being kicked in on Swann Street. Pls.' SUMF Resp. ¶ 127. Other officers at the intersection of 15th Street and Swann Street, including Lt. Horos, observed curfew violators attempting to break into residences and kicking doors. *Id.*; Defs.' SUMF Resp. ¶ 95. During the same time period, multiple residents of Swann Street called 911 to report attempted break-ins. Pls.' SUMF Resp. ¶ 128. After the police line at 15th Street began to advance, Officer Crisman saw many individuals rushing into 1461 Swann Street. Pls.' SUMF Resp. ¶ 177. Officer Crisman later stated that, as he was approaching the residence: he did not hear anyone inviting the curfew violators to enter; the resident did not make himself known to Officer Crisman or other officers; he believed a burglary was being committed; and individuals at the bottom of the steps to the residence were not complying with orders to move back and were

getting ready to go up the stairs.  Defs.' SUMF Resp. ¶ 125.  He testified to those real-time perceptions as well.  Pls.' SUMF Resp. ¶¶ 176–80.  Because Officer Crisman's belief that the individuals he pepper sprayed were about to illegally enter 1461 Swann Street, his deployment of pepper spray was a reasonable attempt to protect the safety of those entering the residence and any residents inside.  *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *see also Laney*, 56 F.4th at 1156.

Plaintiffs' arguments to the contrary amount to nothing more than Monday morning quarterbacking.  Defs.' SUMF Resp. ¶ 125.  Plaintiffs argue that the individuals pepper sprayed were not yet on the steps to the residence.  Pls.' Opp'n at 34.  True, but other curfew violators had been rushing into the residence for at least 40 seconds prior to Officer Crisman's deployment, and individuals were continuing to enter the residence immediately prior to and during the deployment.  Defs.' SUMF Resp. ¶ 129.  Curfew violators who came so near to that residence and did *not* enter it were the exception rather than the rule.  *Id.* ¶ 125.  Even if that were not the case, the individuals' proximity to a residence that many other were entering is enough to support Officer Crisman's "split-second decision[ ]" in "circumstances that [were] tense, uncertain, and rapidly evolving."  *See Graham*, 490 U.S. at 396

Plaintiffs' other arguments are also unavailing.  That Officer Crisman did not spray individuals who were already on the steps, Pls.' Opp'n at 34—which would have required aiming pepper spray toward the residence's open door—only further supports the reasonableness of the deployment.  Plaintiffs' contention that the individuals sprayed were complying with officers' orders to move back is contradicted by their own observation that the individuals were "standing."  Pls.' Opp'n at 37.  Although the individuals were standing several feet from the

police line, they were not moving back despite continuing to be ordered to do so.  Defs.' SUMF

Resp. ¶ 128.  The line did not halt its advance until it was beyond where the individuals were

standing at the time of Officer Crisman's deployment.  *Id.*

Even if Officer Crisman's deployment of pepper spray was not objectively reasonable (it

was), he is entitled to qualified immunity because it was not clearly established that pepper spray

could not be used to prevent unrestrained arrestees from illegally entering a private residence.

*Wilkins*, 2020 WL 58116591, at *8.  The cases cited by Plaintiffs are inapposite because they did

not involve a reasonable belief on the part of the defendant police officer that the plaintiff was

about to commit a serious crime that endangered public safety.  *See* Pls.' Opp'n at 39.

Further, even if their claim were not foreclosed by the reasonableness of Officer

Crisman's use of force and his entitlement to qualified immunity, Goodwin, Lane, Lazo, and

Troper cannot prove that they were affected this deployment.

Goodwin testified that she was pepper sprayed by an MPD officer in the police line on

the east end of Swann Street, near 14th Street.[5]  Defs.' SUMF ¶ 182.  Officer Crisman was just

four row houses from 15th Street when he deployed pepper spray outside of 1461 Swann Street.

Defs.' SUMF Resp. ¶ 132.  It is undisputed that Goodwin never entered 1461 Swann Street, *id.*,

and there is no evidence that she was anywhere near that residence when Officer Crisman

deployed pepper spray.  Goodwin is not visible in any of the BWC footage or other videos

depicting Officer Crisman's pepper spray deployment.  *Id.*  Nor can that BWC footage be

---

[5]     It is undisputed that no officer on the east end of Swann Street or in the 14th Street police
line deployed pepper spray on Swann Street.  Defs.' SUMF Resp. ¶ 132; *see also* Pls.' Opp'n at
36 n.13.  Plaintiffs argue that Officer Crisman's deployment took place closer to 14th Street than
Lt. Horos's.  Pls.' Opp'n at 36 n.13.  That is true—by a matter of "several steps," *see* Pls.'
SUMF ¶ 125—but immaterial.  Goodwin did not see Lt. Horos's deployment, Defs.' SUMF
Resp. ¶ 132, and therefore her testimony that she was sprayed near 14th Street cannot be
construed as a statement concerning where Officer Crisman was in relation to Lt. Horos.

squared with Goodwin's testimony that no one was within two house-lengths of her when she was sprayed (near 14th Street). *Id.*

Lane, Lazo, and Troper are not visible in any of the BWC footage or other videos depicting Officer Crisman's pepper spray deployment either. *Id.* Lazo and Troper testified that they were already inside 1461 Swann Street when they were allegedly exposed to pepper spray. Defs.' SUMF Resp. ¶ 131. Lane testified that she did not see the officer who deployed the pepper spray to which she was allegedly exposed. *Id.* The resident of 1461 Swann Street who let curfew violators enter, who was outside on the steps of the residence during the deployment—and thus closer to the spray deployed by Officer Crisman than any Plaintiff—did not display symptoms or effects of pepper spray exposure in the immediate aftermath of the deployment. *Id.* The only evidence that Goodwin, Lane, and Troper felt the effects of pepper spray is their own testimony. *Id.* ¶¶ 132–34, 37. Accordingly, summary judgment should be granted in favor of Officer Crisman. *See* Defs.' Mem. 36 n.4.

### V. **Plaintiffs' Assault and Battery Claims Cannot Survive Summary Judgment.**

As explained in Defendants' motion, Lt. Horos and Officer Crisman are protected under District law by a qualified privilege to use reasonable force to effect an arrest. *See* Defs.' Mem. at 42–44. Plaintiffs purport to dispute Lt. Horos's and Officer Crisman's subjective belief that their deployments of pepper spray were necessary and appropriate, but the video evidence is completely consistent with their explanations of their deployments. Defs.' SUMF Resp. ¶¶ 101–02, 108–10, 120, 126–29. Plaintiffs' attempt to dispute the objective reasonableness of the deployments fails for the reasons stated above with respect to Plaintiffs' Fourth Amendment claims.

### CONCLUSION

The Court should grant summary judgment in favor of Defendants.

Date: November 7, 2024.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*

MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*

HONEY MORTION [1019878]
Assistant Chief, Equity Section

*/s/ Richard P. Sobiecki*

RICHARD P. SOBIECKI [500163]
GREGORY KETCHAM-COLWILL [1632660]
AMANDA C. PESCOVITZ [1735780]
MARCUS D. IRELAND [90005124]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 805-7512
Email: richard.sobiecki@dc.gov

*Counsel for Defendants*