UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAMELA GOODWIN, *et al.*,

    *Plaintiffs*,

v.

DISTRICT OF COLUMBIA, *et al.*,

    *Defendants*.

Case No. 1:21-cv-00806 (BAH)

## PLAINTIFFS' SUR-REPLY TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Although Plaintiffs dispute much of Defendants' Reply in Support of their Motion for Summary Judgment (Dkt. 87) ("Def. Reply"), the instant sur-reply is limited to addressing issues raised for the first time in the Reply. None of Defendants' new arguments have any merit, and their motion must be denied.

**I.    Defendants' New Argument that Plaintiffs' Summary Judgment Opposition Broadened Their Claims is Wrong.**

In their reply, Defendants newly argue that Plaintiffs have impermissibly broadened their claims—in particular, that Plaintiffs Surio and Remick are asserting Fourth Amendment/Assault and Battery claims against Defendants Horos, Glover, and District of Columbia, and Plaintiff Pearlmutter is asserting Fourth Amendment/Assault and Battery claims against Defendants Crisman and the District of Columbia for the first time.[1] Not so. Defendants' argument mischaracterizes the Complaint, Plaintiff's Opposition, and the relevant law.

---

[1] Plaintiffs assert their assault and battery claim, but not their Fourth Amendment claim, against the District of Columbia because D.C. tort law provides for vicarious liability. Dkt. 84-61 at 2; *District of Columbia v. White*, 442 A.2d 159, 162 n.7 (D.C. 1982).

1

Plaintiffs raise no new claims in their summary judgment opposition. In the operative complaint, Dkt. 66-3, "All Plaintiffs" assert both the Fourth Amendment (Count I) and the Assault and Battery (Count III) claims against "All Defendants," *id.* at 26, 29. As routinely happens, discovery has allowed Plaintiffs to refine their legal theories and pursue these claims against only the specific Defendant-Officers who used excessive force against each Plaintiff. *See* Dkt. 84-61. Plaintiffs' Opposition does not broaden their claims; it narrows them.

Summary judgment briefing regularly offers "alternative legal characterization[s]" of existing claims. *Doe v. District of Columbia*, No. 1:19-CV-01173, 2023 WL 3558038, at *7 (D.D.C. Feb. 14, 2023) (citing *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808–09 (7th Cir. 2014)). This makes sense because discovery will, by definition, test and clarify a Plaintiff's case. So long as the complaint provides fair notice of the allegations, "new characterization[s]" of the allegations are not an "unfair surprise" to Defendants. *Whitaker*, 772 F.3d at 809.[2]

Plaintiffs' Opposition merely clarifies their claims. For example, the Complaint alleged that Plaintiffs Surio and Remick were each pushed by several officers, including unnamed Doe officers, *id.* ¶¶ 64, 65; as supervisors Defendants Horos and Glover are liable for these uses of force, *id.* ¶¶ 110, 123; and these uses of force were done pursuant to District policy, *id.* ¶¶ 111, 124. Through discovery, Plaintiffs uncovered that the officers who pushed Surio and Remick were trained to do so in the course of moving a police line in—which Horos and/or Glover ordered them to do. Pls.' Opp., Dkt. 84, at 40–41. Plaintiffs' summary judgment opposition thus clarifies that the fault for the mechanical force used against Surio and Remick lies purely with

---

[2] The single case that Defendants cite in support of their argument, *Bean v. Purdue*, 316 F. Supp. 3d 220 (D.D.C. 2018), relies entirely on *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68 (D.D.C. 2007), which in turn relies entirely on *Shanahan v. City of Chicago*, 82 F.3d 776 (7th Cir. 1996)—which was abrogated by *Whitaker*.

2

the officer who ordered the lines to be moved in and thus such force to be used, *i.e.*, Horos and/or Glover.

Similarly, Plaintiff Pearlmutter alleged in the Complaint that he was pepper sprayed, Dkt. 66-3 ¶¶ 58, 112, 122. "Upon information and belief," *id.* ¶ 58, the Complaint alleged which officer sprayed which Plaintiffs—at the time, Pearlmutter believed he was hit by Horos—but Pearlmutter alleged his Fourth Amendment and assault and battery claims against "all Defendants," *id.* at 26, 29. As such, Defendants "had fair notice of what this suit was about," *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023 (7th Cir. 2018)—the use of OC spray against Pearlmutter by Defendants. Officer Crisman knew he had used OC spray, and defense counsel was in possession of BWC footage showing Officer Crisman spraying Pearlmutter, which they produced in discovery. *See* Dkt. 84-1 ¶ 125 (citing BWC footage). This "new characterization"—that Crisman rather than Horos sprayed Pearlmutter—poses no "unfair surprise" to Defendants. *Whitaker*, 772 F.3d at 809.

II. **Defendants' New Arguments About Plaintiffs' First Amendment Claims Highlight Disputes of Fact that Preclude Summary Judgment and Misstate the Law on Qualified Immunity.**

A. <u>Disputes of Fact About Similarly Situated Arrestees Preclude Summary Judgment on Plaintiffs' First Amendment Claims.</u>

Much of Defendants' reply raises new arguments about whether Plaintiffs were sufficiently similarly situated to other curfew violators who were not arrested.[3] Whether comparators are sufficiently similarly situated is a question of fact for the jury. *See Wheeler v.*

---

[3] Defendants also cite new evidence purportedly in support of arguments they raised in their original motion. Specifically, with respect to the relative crowd size, Defendants newly contend that "Plaintiffs' exhibits reflect that approximately two dozen" people were outside the kettle at 15th and Swann Streets after 9:06 p.m. This is inaccurate—the exhibits Plaintiffs cite show at least 35 people outside the kettle at 15th and Swann Streets by 9:16 p.m., *see* Pl. Ex. 73, and at least 40 people there by 9:46 p.m., *see* Pl. Ex. 66, 90.

*Georgetown Univ. Hosp.*, 812 F.3d 1109 (D.C. Cir. 2016); *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005). And since, at summary judgment, all inferences must be drawn in favor of the non-moving party, *see Rodway v. U.S. Dep't of Agric.*, 482 F.2d 722, 727 (D.C. Cir. 1973); *Nat. Res. Def. Council, Inc. v. Jamison*, 787 F. Supp. 231, 237 (D.D.C. 1990), the competing inferences Defendants offer cannot supplant Plaintiffs' reasonable inferences. *See also, e.g.*, *Moore v. District of Columbia*, 79 F. Supp. 3d 121, 127 (D.D.C. 2015); *Coles v. City of Chicago*, 361 F. Supp. 2d 740, 741–42 (N.D. Ill. 2005) ("When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment.").

The *Nieves* test requires only "objective evidence that [the plaintiff] was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407. There is abundant evidence that Plaintiffs were similarly situated to people who were not engaging in protected speech and were not arrested.

Defendants' primary new arguments are that: (1) the comparator groups included protestors, Def. Reply, Dkt. 87, at 6-7; (2) MPD didn't have the resources to arrest the comparators, *id.* at 9; and (3) Plaintiffs' statistical analysis is inaccurate, *id.* at 7-8.[4] None of these arguments avails.

---

[4] Defendants also newly assert an argument that was addressed by implication in Plaintiffs' opposition: that the comparators are not similar because they were not walking around and were not throwing water bottles and spray painting, Def. Reply, Dkt. 87, at 4-5. There is no evidence in the record as to whether the comparators adjacent to the encirclement were walking around. And while Defendants say it should be "self-evident" that police officers would arrest groups of several hundred people walking around and spray painting and would not arrest groups of people standing nearby, Def. Reply at 8-9, they cite nothing to support this, and this assertion is inconsistent with Cmdr. Glover's testimony that he arrested the group not because they were walking en masse and spray painting, but because of behavior he said he observed, including shooting fireworks into crowded sidewalk cafes and breaking bus stop windows, *see* PSMF ¶ 46, 64 (an account that has no support in fact, Pl. Opp., Dkt. 84, at 16-17).[4] Indeed, Cmdr. Glover specifically *disclaimed* spray painting as a reason for conducting arrests on the night of June 1, Pl. Opp. at 17. Cmdr. Glover's testimony is relevant to the *Nieves* comparator analysis not

With regard to whether some of the non-arrested comparators were protestors, ample evidence shows that these comparator groups were not protesting while they stood near Swann Street, when police declined to arrest them—they are visible are on video, not holding signs, not chanting, and not engaging in any visible protest activity, Pl. Opp. Ex. 70, at 21:23:38–21:25:38; and Defendants uniformly testified they did not know what these groups of people were doing outside past curfew, Pl. Opp. Ex. 8 at 193:14–22; 197:10–16; Pl. Opp. Ex. 12, at 243:3–18, and so had not identified them as protestors.

Defendants also say it should be "self-evident" that the police could not redirect resources to arrest the groups outside of the kettle on Swann Street, but BWC footage shows hundreds of law enforcement officers on the scene at Swann Street, including many officers walking around outside the police lines, *see, e.g.*, Pl. Opp. Ex. 73 at 21:17 and 21:38. No officer testified that they declined to arrest people outside of the kettle because they lacked the resources to do so. A reasonable juror could readily infer that Defendants' new argument about resources is pretextual, rather than a legitimate law enforcement consideration.

With regard to the new statistical arguments, Defendants (1) contend that not all arrestees Plaintiffs identify as protesters were in fact protestors; (2) inaccurately describe the arrest statistics Plaintiffs cite.[5] Neither new argument entitles Defendants to summary judgment. First, Defendants argue that not everyone arrested near 16th and Eye Street or on Swann Street was protesting after 7 p.m., Def. Reply at 7, but there is ample evidence that these groups *were*

---

because it is evidence of his subjective motivation, but because it sheds light on the "relevant prosecutorial factors" that determine whether a comparator is similarly situated. *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1138 (D.C. Cir. 2023). This is wholly consistent with the objective assessment of comparators *Nieves* calls for. Where Cmdr. Glover did not cite, or where he specifically denied, a purported reason for an arrest, a jury could conclude that it was not a relevant prosecutorial factor distinguishing the groups.

[5] These statistics are evidence of how MPD "typically" enforced the curfew, and so they are relevant whether or not Cmdr. Glover made all the arrest decisions.

protesting after 7 p.m.—BWC footage shows many people in the vicinity standing as a cohesive group, holding signs, and chanting. *See, e.g.*, Ex. 1 (Officer Terry BWC, 19:17:15, 19:17:45-19:20:00); Ex. 2 (Officer Jenkins BWC, 00:05:25-00:05:50). And Defendants argue that not everyone arrested on Swann Street was protesting after 7 p.m., in part because several Plaintiffs testified they were attempting to go home as they walked with the march up 14th Street. It is clear from the record that the crowd arrested on Swann Street was engaged in expressive protest activity as people walked up 14th Street and then were corralled onto Swann Street. While Defendants have produced no BWC footage from 14th Street, ample BWC footage from Swann Street shows the group that was arrested chanting and holding signs related to the "Black Lives Matter" movement and opposing police violence, Ex. 3, Officer Salavatov BWC, at 21:26:50-28:05, and Plaintiffs testified that they heard protest chants while they were encircled on Swann Street. *See* Ex. 4 (Lane Dep. Tr. at 106:1–5); Ex. 5 (Pearlmutter Dep. Tr. at 128:4–129:13). When Plaintiffs were walking home with the group who was marching, they were treated as part of a group of protestors.

Next, Defendants rely on inaccurate statements of fact in describing statistical evidence of curfew arrestees. Defendants say there is no information that for approximately 40 arrestees, Def. Reply at 8. This is incorrect. Plaintiffs identify 7 people about whom no information is known, Pl. SMF ¶¶ 159–62; for all other 271 arrestees, they were either protesting (245 people), Pl. SMF ¶¶ 149–52, or were suspected of committing another crime (26 people), Pl. SMF ¶¶ 154–58. People who were suspected of committing another crime are not relevant for the analysis of whether the curfew was enforced similarly among protestors and non-protestors who were violating *only* the curfew. The arrests with no information—3% of arrests—make up the greatest number of people who could possibly have been arrested under the curfew without

engaging in protest activity or unrelated criminal activity. Plaintiffs do not bear the burden of showing that the curfew was enforced *only* against protestors; under *Nieves*, they must show a genuine issue of fact as to whether they were arrested while others similarly situated individuals not engaged in protest activity were not,[6] *Nieves*, 587 U.S. at 407. The overwhelming statistical evidence readily demonstrates such an issue of fact.

> B. <u>Disputes of Fact About Commander Glover's Motives Preclude Summary Judgment on Plaintiffs' First Amendment Retaliation Claim.</u>

Defendants' reply concerning Cmdr. Glover's motives relies on Defendants drawing differing inferences from the facts—for example, Defendants acknowledge that the IAD report says that arrests were made after Cmdr. Glover "learn[ed] the MPD cruiser was destroyed," but Defendants contend that this was not a statement that the cruiser destruction was a reason for the arrest. Def. Reply at 11. A reasonable juror could readily agree with Plaintiffs' characterization. Because, as discussed above, competing inferences must be resolved in favor of the non-moving party, Defendants' inference does not entitle them to summary judgment.

Defendants also suggest for the first time in reply that Cmdr. Glover's decision to encircle the group arrested on Swann Street was not a decision to arrest. Ample record evidence shows the opposite. Cmdr. Glover testified, "At that point, everything building up to that point, I made a decision that we were going to go and start making arrests." Glover Dep. Tr. at 165:6-9. Deputy Chief Carroll testified, "Encirclement can't be done without making an arrest. So there's things that have to go into place before you can encircle so you can make an arrest." Ex. 6, Carroll Dep. Tr. at 134:14–20. *See also, e.g., id.* at 156:9-156:16 (Q: "Am I understanding the

---

[6] Similarly, Plaintiffs' selective enforcement claim requires an assessment of "whether the plaintiffs were similarly situated to any individual against whom the . . . ordinance was not enforced." *Frederick Douglass*, 82 F.4th at 1139.

purpose of encirclement is to arrest; is that right?" A: "Yes." Q: "So that decision was the same decision?" A: "Yes.").

### C. Commander Glover is Not Entitled to Qualified Immunity for the Retaliatory Arrest or Selective Enforcement of the Curfew.

*1. Retaliatory Arrest*

Defendants argue for the first time in reply that they are entitled to qualified immunity unless it was clear that the *Nieves* exception could be satisfied "without evidence of virtually identical comparators." Def. Reply at 13. This is wrong for two reasons—first, it *was* clearly established by *Nieves* itself that "virtually identical" comparators are not necessary; *Nieves* requires only "otherwise similarly situated individuals not engaged in the same sort of protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019). The concept of "virtually identical comparators" emerged in *Gonzalez v. Trevino*, 602 U.S. --, 144 S. Ct. 1663 (2024), when the Fifth Circuit applied the *Nieves* test incorrectly by requiring "virtually identical comparators," and the Supreme Court rejected this interpretation. *See Gonzalez*, 144 S. Ct. at 1667. Qualified immunity does not require the Supreme Court to reject all possible misinterpretations in order to make the law it *has* established clear. *Nieves* spoke clearly to this issue before the instant arrests took place.

Second, qualified immunity concerns what *conduct* is prohibited, not which standard the Court will apply to evaluate that conduct. As the Supreme Court has explained, an "officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on" the "formulation of the controlling standard." *Saucier v. Katz*, 533 U.S. 194, 202–03 (2001). *See also, e.g.*, *Hopper v. Plummer*, 887 F.3d 744, 755–56 (6th Cir. 2018) ("a defendant is not entitled to qualified immunity simply because the courts have not agreed upon the precise formulation of the applicable standard. Rather, the relevant question under the clearly established

8

prong is whether defendants had notice that their *conduct* was unlawful in the situation they confronted."); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 676 (9th Cir. 2021) (same). This is particularly so where the standard, determining who is similarly situated, is a fact-intensive inquiry incapable of precise, *ex ante* description. *See Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1139 (D.D.C. 2023) ("The [similarly situated] factors vary and cannot be reduced to a singular list . . . [d]etermining whether a plaintiff is similarly situated to those not prosecuted will be a fact-intensive and case-specific comparative inquiry.").

    2. *Selective Enforcement*

Defendants also contend in reply for the first time that "[p]rior to *Frederick Douglass*, a defendant did not have fair notice that he could be held liable for selective enforcement where he was not 'motivated by invidious discrimination.'" Def. Reply at 15 (quoting *Frederick Douglass*, 82 F.4th at 1147). But several appellate courts have rejected the idea that for the law to be clearly established, a defendant must be on notice not just of the prohibited conduct, but also of the requisite mental state. As the Ninth Circuit explained, "because the clearly established law prong focuses objectively on whether it would be clear that the defendant's conduct violated the Constitution, lack of notice regarding the mental state required to establish liability has no bearing on the analysis." *Sandoval*, 985 F.3d at 675 (citing *Horton by Horton v. City of Santa Maria*, 915 F.3d 592 (9th Cir. 2019)). The court noted it was "not aware of a single case in which we have examined the defendant's mental state in assessing the clearly established law prong of qualified immunity." *Id.* And the Sixth and Seventh Circuits have both rejected the precise argument Defendants make here, refusing to "accept the . . . 'dubious proposition that, at the time the officers acted, they were on notice only that they could not have a reckless or malicious intent and that, as long as they acted without such an intent, they could apply any

9

degree of force they chose.'" *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018) (quoting *Kingsley v. Hendrickson*, 801 F.3d 828, 832–33 (7th Cir. 2015) (per curiam)).

With regard to the underlying conduct, as the D.C. Circuit recognized in *Frederick Douglass*, it has long been established that selective enforcement based on First Amendment activity is prohibited. *See Frederick Douglass*, 82 F.4th at 1140–41 (citing, *e.g.*, *Cox v. Louisiana*, 379 U.S. 536, 557 (1965); *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002); *Wayte v. United States*, 470 U.S. 598 (1985); *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)). Indeed, the D.C. Circuit noted that the District's argument there that intentional discrimination was required to make out a First Amendment selective enforcement claim was "at odds with Supreme Court and circuit precedent, which recognize that a plaintiff may bring a selective enforcement claim under the First Amendment for a violation of free speech rights. Such claims are distinct from equal protection claims and do not require a plaintiff to demonstrate intentional discrimination." *Id.* at 1143. Indeed, the Court cited the Supreme Court's recognition in 2015 that "[v]iewpoint discrimination violates the First Amendment, 'regardless of the government's benign motive . . . or lack of animus toward the ideas contained in the regulated speech.'" *Id.* at 1145 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015)). And in *Frederick Douglass* itself, the Court did not dismiss the case on the ground of qualified immunity. As such, it was clearly established prior to *Frederick Douglas* that officers who engage in selective enforcement based on First Amendment activity violate the law.

### III. Defendants' New Arguments Regarding the First Amendment Assemblies Act Rely on Misstatements of Law and Do Not Entitle Them to Summary Judgment.

Defendants advance two new arguments against liability under the First Amendment Assemblies Act. First, Defendants now argue that "[w]hether the FAAA imposes *duties* on MPD officers is an entirely separate question from whether the FAAA imposes *liability* on MPD

10

officers." Def. Reply at 18.[7] This is contrary to axiomatic tort law, which holds that liability arises where a defendant's breach of a duty proximately causes a plaintiff's injury. *See, e.g.*, *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1038 (D.C. 2014). Defendants give no explanation for departing from well-established tort law in favor of an analogy to an unrelated federal statute; *Amariglio v. Nat'l R.R. Passenger Corp.*, 941 F. Supp. 173, 178 (D.D.C. 1996), the only case Defendants cite, is an Americans with Disabilities Act case that turns on the definition of "employer" in that statute; it has no relevance here.

Second, with respect to liability overall, Defendants newly contend that section (e) of the statute "only applies to 'a *lawful* First Amendment assembly.'" D.C. Code § 5-331.07(e).[8] This is wrong in two ways. First, Defendants quote the wrong version of the statute—the version of the FAAA in effect in 2020 did not say "lawful First Amendment assembly"; it said merely "a First Amendment assembly, or any part thereof." D.C. Code § 5-331.07(e) (effective until April 20, 2023). As Plaintiffs explained in their opposition, "First Amendment assembly" under that version of the statute was defined to include expressive gatherings that violate valid time, place, and manner restrictions. *See* Pl. Opp. at 28. Next, section (e) of the new version of the FAAA, which Defendants quote, is *also* not limited to "lawful First Amendment assemblies"; the new statute requires warnings and an opportunity to disperse "[i]f the MPD determines that a lawful First Amendment assembly, *any other public assembly, riot, or part thereof*, should be dispersed," D.C. Code § 5-331.07(e) (effective April 21, 2023), (e)(1)-(2) (emphasis added).

---

[7] In their original motion, Defendants argued that "the FAAA's standards for dispersal orders, does not impose any specific duties on any specific individual; it extends to 'MPD' . . . not 'officers' . . . ." Def. MSJ, Dkt. 83, at 28.

[8] In their original motion, Defendants contended that the FAAA applies only to "First Amendment assemblies," citing D.C. Code § 5-331.07(a).

11

Plaintiffs do not contest that *Tinius v. District of Columbia*, 77 F.4th 691 (D.C. Cir. 2023) held the curfew to be lawful; the FAAA required warnings and an opportunity to disperse anyway.

**IV.      Defendants' Reply Regarding Plaintiffs' Fourth Amendment Claims Is Based on Misunderstandings of Law.**

Defendants' Reply quibbles with Plaintiffs' interpretation of BWC footage, but these disputes of fact Defendants identify plainly preclude summary judgment. *See Coles*, 361 F. Supp. 2d at 741–42.

Defendants argue that Plaintiffs "cannot prove that they were impacted" by individual officers' conduct, Def. Reply at 21—in particular, that Plaintiffs Remick and Surio cannot prove that they were hit by Lieutenant Horos's pepper spray, *id.*, and that Plaintiffs Goodwin, Lane, Lazo, and Troper cannot prove that they were hit by Officer Crisman's pepper spray, *id.* at 24–25. But the argument that Plaintiffs, the non-moving party, must "prove" they were hit by Horos and Crisman's OC spray reflects a misunderstanding of parties' burdens at summary judgment.

Defendants, not Plaintiffs, bear the burden of proving that no reasonable factfinder could conclude that Plaintiffs were hit with OC spray. *See Rodway*, 482 F.2d at 727. Plaintiffs, on the other hand, "need only present sufficient evidence from which the court can infer the existence" of their theory in order to defeat Defendants' motion. *Jamison*, 787 F. Supp. at 237. *See also Rodway*, 482 F.2d at 727 (non-moving party is "entitled to the benefit of all favorable inferences that may be drawn from the evidence").

Defendants have not carried their burden. The record contains ample evidence that Horos deployed OC spray in the vicinity of Remick and Surio, Dkt. 84-1 ¶¶ 120–21; that Crisman deployed OC spray in the vicinity of Goodwin, Lane, Lazo, and Troper, *id.* ¶¶ 125–32; and that Remick, Surio, Goodwin, Lane, Lazo, and Troper suffered the effects of OC spray, *id.* ¶¶ 133–39, such that a reasonable inference may be drawn that the Plaintiffs were hit by these respective

officers' sprays. Defendants infer that Plaintiffs were not close enough to feel the OC spray of these respective officers, *see* Dkt. 87-1 (Defs.' Response to Pls.' SMF) ¶¶ 121, 125, 131–32,[9] but in doing so do not disprove the factual bases for Plaintiffs' claims.

With regard to Remick and Surio's conduct, Defendants likewise interpret the evidence differently than Plaintiffs do, and contend that their interpretation is better than Plaintiffs', but do not present competing evidence showing that Plaintiffs' interpretation is so unreasonable so as to defeat all genuine issues of material fact. Plaintiffs cite BWC for the proposition that Remick and Surio were attempting to comply with orders to "move back" when they were pepper sprayed, while Defendants interpret the same BWC as depicting these Plaintiffs not complying. *Compare* Dkt. 84-1 at ¶¶ 114 – 17, *with* Dkt. 87-1 ¶¶ 114–17. Defendants' quibbling demonstrates several issues of fact precluding summary judgment on these claims.

Finally, Defendants also take issue with Plaintiffs relying on their own testimony to support their claims. *See* Dkt. 87-1 ¶¶ 133–39. Defendants' argument represents a clear misunderstanding of law. The summary judgment standard "requires [the court] to credit [the non-movant's] version of events," even if "uncorroborated" or "directly contradictory" to other testimony. *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016). "Corroboration goes to credibility, a question for the jury, not the district court. Perhaps a jury will disbelieve [Plaintiffs] because [their] testimony was uncorroborated, but at this stage of litigation, the district court must believe

---

[9] Defendants' additional new argument that Lane, Lazo, and Troper, who sheltered at 1461 Swann Street, could not possibly have felt Crisman's pepper spray because "[t]he resident of 1461 Swann Street . . . did not display symptoms or effects of pepper spray in the immediate aftermath of the deployment," Def. Reply at 25, is neither here nor there. The only evidence Defendants cite in support of this argument is a single body-worn camera (BWC) video, in which they conclude that the homeowner "exhibits no symptom of pepper spray exposure." Dkt. 87-1 ¶ 131. Defendants cite no evidence where the homeowner actually stated that he did not feel the effects of pepper spray and fail to account for the fact that Crisman sprayed a group of the protestors on the sidewalk (including Plaintiffs) as opposed to the homeowner standing at the top of the stairs.

[their] testimony and must not make credibility determinations." *Id.* (cleaned up). *See also Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).

Defendants' Reply comes down to, "believe us, not them." That is not the standard for summary judgment.

Date: December 3, 2024                                         Respectfully submitted,

/s/ Rebecca Livengood
Rebecca Livengood [DCD Bar ID: 1674010]
Jennifer Klar [DCD Bar ID: 479629]
Ellora Israni [DCD Bar ID: 1740904]
RELMAN COLFAX PLLC
1225 19th St NW, Suite 600
Washington, DC 20036
Tel: 202-728-1888
Fax: 202-728-0848
rlivengood@relmanlaw.com
jklar@relmanlaw.com
eisrani@relmanlaw.com

*Attorneys for Plaintiffs*