**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PAMELA GOODWIN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>Defendants. | Civil Action No. 21-806 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

In the wake of the May 25, 2020, murder of George Floyd at the hands of a Minneapolis police officer, millions of Americans nationwide participated in demonstrations against police violence and misconduct.  The seven individual plaintiffs in this case—Pamela Goodwin, Allison Lane, Jenny Lazo, Jesse Pearlmutter, Osea Remick, Priyanka Surio, and Eliana Troper—filed the instant lawsuit against the District of Columbia ("District") and officers of the Metropolitan Police Department ("MPD"), including former Chief Peter Newsham, Commander Robert Glover, Lieutenants Andrew Horos and Carlos Mejia, Officers James Crisman and Steven Quarles, and fifty yet-to-be-identified John Doe MPD Officers ("Doe Officers"), for alleged violations of their First and Fourth Amendment rights, pursuant to 42 U.S.C. § 1983, common law assault and battery, and negligence *per se* under the D.C. Code, stemming from their arrests in the District during one such protest, on June 1, 2020.  Second Am. Compl. ("SAC") ¶¶ 1, 108-31, ECF No. 77.[1]  An overarching theme throughout the claims asserted is that defendants unlawfully retaliated

---

[1]    Although eight plaintiffs are listed in some parts of the Second Amended Complaint, *see, e.g.*, ECF No. 77 ¶ 1, former plaintiff Sebastian Medina-Tayac was dismissed from this lawsuit with prejudice in February 2024, pursuant to a stipulation of the parties, Stipulation of Dismissal of Pl. Sebastian Medina-Tayac, ECF No. 64; Min. Order (Feb. 9, 2024).

against plaintiffs due to their participation in the protests against police misconduct. *See, e.g.*, *id.* ¶ 6.

Defendants now move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on each of plaintiffs' claims. Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 83; *see also* Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem."), ECF No. 83-1. For the reasons explained below, defendants' motion for summary judgment is granted in part and denied in part. Specifically, summary judgment is denied as to the Fourth Amendment excessive force claims brought by plaintiffs Goodwin, Lane, and Pearlmutter against defendant Crisman; the First Amendment retaliation by use of excessive force claims brought by the same three plaintiffs against Crisman; the common law assault and battery claims brought by plaintiffs Goodwin, Lane, Pearlmutter, Lazo, and Troper against both Crisman and the District of Columbia; and the negligence *per se* claim brought by all plaintiffs against all defendants, and is granted on all other claims.

## I.    BACKGROUND

The facts underlying plaintiffs' claims from the original complaint and first amended complaint have been outlined in two previous opinions. *See Goodwin v. District of Columbia (Goodwin I)*, No. 21-cv-806 (BAH), 2021 WL 1978795, at *1-3 (D.D.C. May 18, 2021) (original complaint); *Goodwin v. District of Columbia (Goodwin II)*, 579 F. Supp. 3d 159, 163-67 (D.D.C. 2022) (first amended complaint). Summarized below is the factual and procedural background relevant to the pending motion, as alleged in plaintiffs' second amended complaint and the evidence proffered by the parties, following nearly eighteen months of discovery. *See* Defs.' Mem.; Pls.' Mem. of L. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n"), ECF No. 84; Defs.' Reply in Supp. of their Mot. for Summ. J. ("Defs.' Reply"), ECF No. 87; Pls.' Sur-Reply to Defs.'

Mot. for Summ. J. ("Pls.' Surreply"), ECF No. 89; Defs.' Sur-Sur-Reply in Supp. of their Mot. for Summ. J. ("Defs.' Surreply"), ECF No. 91.

### A.    Factual Background

#### 1.    *The D.C. Protests and the June 1, 2020, Curfew*

Protests began in the District on May 29, 2020, Defs.' Statement of Undisputed Facts in Supp. of Mot. for Summ. J. ("Defs.' SUMF") ¶ 3, ECF No. 83-79, and continued on May 30 and into the early morning of May 31, Pls.' Statement of Material Facts in Supp. of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Pls.' SUMF") ¶¶ 2-3, ECF No. 84-1.[2]   Although most of the protests during this period remained peaceful, some individuals engaged in acts such as vandalism, looting, arson, and violent attacks against law enforcement officers.  Defs.' SUMF ¶ 4.  In response, on May 31, 2020, Mayor Muriel Bowser issued an order establishing a District-wide curfew from 11:00 PM that night until 6:00 AM the next morning.  *Id.* ¶¶ 7-8; *see also* Defs.' Mem., Ex. 3, COVID-19 Public Emergency and Declaration of a Second Public Emergency – District-wide Curfew ("May 31 Curfew Order"), ECF No. 83-5.  Significant property damage, vandalism, looting, and arson again occurred in multiple areas of downtown D.C. the night of May 31, Defs.' SUMF ¶¶ 12, 15-16; *see also* Defs.' Mem., Ex. 13, Continuation of District-wide Curfew during COVID-19 Public Emergency and Second Public Emergency ("June 1 Curfew Order") at 1-2, ECF No. 83-15 (describing some of the damage suffered), prompting Mayor Bowser to declare another curfew on June 1, to begin at an earlier time from 7:00 PM to 6:00 AM the next morning, Defs.' SUMF ¶ 13; June 1 Curfew Order.[3]   This order exempted from the curfew only "[e]ssential

---

[2]    Unless otherwise noted, cited facts submitted by the parties are undisputed.

[3]    The June 1 Curfew Order identifies illegal activities occurring "at multiple locations throughout the city," including in "Northeast DC, upper Northwest DC stretching to Georgetown, and . . . the Golden Triangle Business Improvement District, Downtown DC Business Improvement District, and Mount Vernon Triangle Community Improvement District."  June 1 Curfew Order at 1-2.

workers . . . when engaged in essential functions, including travel to and from their essential work," "[i]ndividuals who are voting and participating in election activities, including poll workers, volunteers, and individuals exercising their right to vote," and anyone "travel[ing] to a hospital or urgent care facility." June 1 Curfew Order at 2. The same day, Chief Newsham issued an Executive Order to MPD personnel with additional information and directives about enforcing the curfew. Pls.' SUMF ¶ 8; *see also* Pls.' Opp'n, Ex. 5, Executive Order ("June 1 MPD EO"), ECF No. 84-9.

### 2. *The June 1, 2020, Protests and the Plaintiffs' Involvement*

On June 1, 2020, the seven plaintiffs were present separately at protests in the District against police violence and misconduct. Pls.' SUMF ¶¶ 28-30. Plaintiffs Allison Lane, Jenny Lazo, Jesse Pearlmutter, and Priyanka Surio each individually participated in a demonstration near the White House, *id.* ¶ 29, while plaintiff Pamela Goodwin was present at that location, *id.*, but "didn't join" the protest, Defs.' Mem., Ex. 53, Dep. of Pamela Goodwin ("Goodwin Dep.") at 36:6-17, ECF No. 83-53; *see also id.* at 34:16-35:13, 51:15-52:6, 75:14-19, 91:22-92:15, 104:3-8; Defs.' SUMF ¶ 75. Plaintiffs Remick and Troper, meanwhile, separately attended a vigil at Dupont Circle for Tony McDade, a Black transgender man fatally shot on May 27, 2020, by police in Tallahassee, Florida, and then marched with other vigil attendees to join the demonstration near the White House. Pls.' SUMF ¶ 30.

As the 7:00 PM curfew drew near, MPD officers used a long-range acoustic device ("LRAD") to announce that the citywide curfew would take effect at 7:00 PM and that anyone remaining on the streets past that time would be subject to arrest. Defs.' SUMF ¶ 36. The first announcement was made at 6:42 PM at the intersection of 14th Street and H Street NW, which is about a block away from the White House and Lafayette Park. *Id.* Three minutes later, the U.S.

Park Police dispersed a crowd of people from Lafayette Park, immediately to the north of the White House. *Id.* ¶ 37. Between 6:53 PM and 7:00 PM, MPD officers near Lafayette Park made additional announcements, using an LRAD, about the curfew. *Id.* ¶ 45. Between 7:01 PM and 7:20 PM, MPD officers at the intersection of 17th Street and Pennsylvania Avenue NW, which is close to the White House, made at least 21 announcements, using an LRAD, that the citywide curfew was now in effect and that those still protesting in the area were now in violation of the curfew and could be subject to arrest. *Id.* ¶¶ 46-47. Additional curfew warnings were made to individuals near the intersection of 15th Street and H Street NW. *Id.* ¶ 48.

Shortly after 7:47 PM, MPD officers made the decision to encircle and arrest a group of 200-300 individuals near 16th Street NW and I Street NW for violating the curfew. *Id.* ¶¶ 49-50. Approximately 50 individuals who failed to disperse were arrested. *Id.* ¶ 51. Additional curfew warnings were then issued at the intersection of Vermont Avenue, 15th Street, and K Street NW at approximately 8:15 PM. *Id.* ¶ 54. Of the plaintiffs in this case, only Lane and Goodwin recalled hearing the warnings to disperse issued while plaintiffs were in the vicinity of the White House, and only Lane additionally remembered hearing that a curfew was in place. Pls.' SUMF ¶ 32.

Sometime after the curfew began, a large group of individuals, including all seven plaintiffs, left the area of the White House and began walking north on 14th Street NW. Defs.' SUMF ¶ 57; Pls.' SUMF ¶¶ 34-40. The exact size of this group is unclear. One law enforcement officer estimated this group had "over a thousand" people, Pls.' Opp'n, Ex. 21, Tr. of Radio Transmissions ("Tr. of Law Enforcement Radio Run") at 141:20-22, ECF No. 84-25, while plaintiff Troper estimated the size to be "at least 450" people and "potentially" could have been as many as a thousand, Defs.' Mem., Ex. 59, Dep. of Eliana Troper ("Troper Dep.") at 174:5-14, ECF No. 83-58. While plaintiffs remained peaceful, Pls.' SUMF ¶ 42, law enforcement officers

monitoring the group reported that some other individuals were spray painting property, Defs.'
SUMF ¶ 58; Pls.' Resp. to Defs.' Statement of Undisputed Material Facts in Supp. of Mot. for
Summ. J. ("Pls.' Resp. to Defs.' SUMF") ¶ 58, ECF No. 84-2, and throughout the evening, some
people intermittently threw water bottles at law enforcement officers, *see, e.g.*, Pls.' Opp'n, Ex.
17, Dep. of Jesse Pearlmutter ("Pearlmutter Dep.") at 99:3-12, ECF No. 84-21.[4]  As the group
walked north on 14th Street, the parties dispute whether additional announcements were made to
the group informing them that they were violating the curfew and directing them to disperse.  *See*
Defs.' SUMF ¶ 66 (asserting that such announcements were made by Lieutenant Mejia over his
police cruiser's public address system); Pls.' Resp. to Defs.' SUMF ¶ 66 (disputing this statement);
Defs.' Mem., Ex. 44, Dep. of Lieutenant Carlos Mejia ("Mejia Dep.") at 151:22-155:4, 158:1-11,
ECF No. 83-45; Pls.' SUMF ¶¶ 37, 39 (establishing, without dispute from defendants, that
plaintiffs Pearlmutter and Remick did not hear any orders to disperse while on 14th Street); *id.* ¶ 73
(claiming that no such orders were given at the intersection of 14th and Belmont Streets); Defs.'
Resp. to Pls.' Statement of Material Facts in Supp. of Pls.' Opp'n to Defs.' Mot. for Summ. J.
("Defs.' Resp. to Pls.' SUMF") ¶ 73, ECF No. 87-1 (disputing plaintiffs' claim without providing
evidence that such orders *were* given at the intersection of 14th and Belmont Streets).

This large group walking north on 14th Street reached the intersection of 14th and Belmont
Streets NW at approximately 8:40 PM.  Defs.' SUMF ¶ 97.  At some time shortly before the group
reached this intersection, Commander Glover instructed MPD officers to encircle the group, saying
that, "we'll pick side streets" and "pinch them at the narrowest point," and that "when we get them
into a narrow block, that's where we're going to execute the encirclement."  Pls.' SUMF ¶ 43.

---

[4]      Other property damage, including at least two broken store windows and a police cruiser set on fire, was
reported along 14th Street NW on the night of June 1, Defs.' SUMF ¶¶ 60-65, but the parties dispute whether any of
this damage could be attributed to anyone in the group of people with plaintiffs, *see* Pls.' Resp. to Defs.' SUMF ¶¶
60-65.

Glover later explained that "just because I would encircle them at that point, I would have continued to assess" the situation, Pls.' Opp'n, Ex. 12, Dep. of Robert Thomas Glover ("Glover Dep.") at 165:2-4, ECF No. 84-16, but he also stated that he was "moving in that mind" to arrest the group, *id.* at 164:19-21, and that at that time, "I made a decision that we were going to go and start making arrests," *id.* at 165:7-9.

Upon reaching the intersection of 14th and Belmont Streets NW, individuals in the group formed a line across 14th Street as MPD vehicles approached the group from the south. Defs.' SUMF ¶¶ 97-98. Members of the group chanted and yelled, *id.* ¶ 99, and some threw water bottles at the approaching MPD vehicles, Pearlmutter Dep. at 99:3-12. The group next started moving south on 14th Street towards the intersection with Florida Avenue NW. Defs.' SUMF ¶ 100.[5] At that intersection, the majority of the group turned west onto Florida Avenue. Pls.' SUMF ¶ 74. At the intersection of Florida Avenue and 15th Street NW, where law enforcement vehicles blocked W Street westbound and 15th Street northbound, the group turned and started walking south on 15th Street. Pls.' SUMF ¶ 75; Defs.' Resp. to Pls.' SUMF ¶ 75. MPD officers formed a line across 15th Street at the intersection with S Street to block the group from moving further south. Pls.' SUMF ¶ 78. When the group encountered the police line, members raised their hands and chanted "hands up, don't shoot." *Id.* Most of the group then turned around and walked north on 15th Street, before turning east onto Swann Street NW. *Id.* ¶ 79.

As the group walked north and then turned onto Swann Street, MPD Lieutenant Terry instructed the officers who had formed the line blocking the group at the intersection of 15th and S

---

[5] Three plaintiffs claim they originally joined the group walking north in order to return home but that they were "prevented," Pls.' SUMF ¶ 35 (plaintiff Lane); *see also id.* ¶ 38 (plaintiff Surio), or "deterred," *id.* ¶ 40 (plaintiff Troper), from doing so by MPD officers, and thus stayed with the group that ended up on Swann Street, *id.* ¶¶ 35, 38, 40. Defendants dispute that any of the plaintiffs ever attempted to leave the group or were actually prevented or deterred from doing so and returning home. Defs.' Resp. to Pls.' SUMF ¶¶ 35, 38, 40.

Streets to follow the group and "pinch them at Swann . . . as soon as they turn that corner . . . Push them into Swann Street." *Id.* ¶ 80 (quoting Pls.' Opp'n, Ex. 66, Lieutenant Terry Body-Worn Camera Footage ("Terry BWC") at 21:03:49–21:04:14, ECF No. 84-62).[6]  Once the group turned onto Swann Street, Glover instructed officers to form a line across Swann Street on the west side of the intersection with 14th Street, blocking the group from leaving Swann Street in that direction. *Id.* ¶ 81.  This line of law enforcement officers was established at approximately 9:00 PM.  Defs.' SUMF ¶ 120.  As soon as the line of officers at 14th Street was established, Glover then ordered the officers on 15th Street to "close off 15th and Swann."  Pls.' SUMF ¶ 81 (quoting Tr. of Law Enforcement Radio Run at 176:10-11).  The line on 15th Street was established by 9:05 PM and reinforced by additional MPD officers carrying riot shields.  *Id.* ¶ 83.  Other law enforcement officers blocked off alleyways leading to and from Swann Street based on reports that some members of the now-encircled group were attempting to use these alleyways to depart the area. Defs.' SUMF ¶ 121; *see also* Tr. of Law Enforcement Radio Run at 176:15-20, 177:8-179:2; Glover Dep. at 194:2-19.

### 3.    *The Events on Swann Street*

Once the law enforcement lines were established and the group of protesters were encircled on the block of Swann Street NW between 14th and 15th Streets, MPD issued no further orders to disperse to the group, Pls.' SUMF ¶ 91, nor allowed the encircled individuals to leave, *id.* ¶¶ 90, 92-93, since the police viewed them as "under arrest," *id.* ¶ 93 (quoting Commander Glover as captured in Pls.' Opp'n, Ex. 70, Lieutenant Ryan Small Body-Worn Camera Footage ("Small BWC") at 21:26:50-21:27:15, ECF No. 84-62).  Lieutenant Horos began discussing with Commander Glover and MPD Assistant Chief Jeffrey Carroll which police line to advance along

---

[6]    All of plaintiffs' video exhibits are accessible online at a link provided in the document at ECF No. 84-62.

Swann Street to effectuate the arrests of the encircled group. *See* Pls.' Opp'n, Ex. 71, Lieutenant Andrew Horos Body-Worn Camera Footage ("Horos BWC") at 21:13:00-26, 21:14:18-28, ECF No. 84-62; Defs.' Resp. to Pls.' SUMF ¶ 86 (describing the video and explaining to whom Lieutenant Horos is speaking).[7] During this time period, some law enforcement officers, including Horos and Crisman, described seeing and hearing some members of the encircled group kicking the doors of houses lining Swann Street, Defs.' SUMF ¶ 127; *see also* Pls.' Opp'n, Ex. 86, Mazanec Body-Worn Camera Footage ("Mazanec BWC") at 21:29:15-21:29:18, ECF No. 84-62 (radio audio saying, "they're trying to kick in doors on the block"), and some members of the group were indisputably witnessed knocking on doors on both sides of Swann Street, Defs.' SUMF ¶ 130. While some residents of Swann Street reported that individuals were trying to break into their homes, *id.* ¶ 128, one resident, Rahul Dubey, allowed a number of members of the encircled group to take refuge and enter his house, *see, e.g.*, *id.* ¶ 227; Pls.' Opp'n, Ex. 15, Dep. of Allison Lane ("Lane Dep.") at 115:16-116:13, ECF No. 84-19. Upon seeing people entering the house, some officers yelled out that "they're breaking into a house," but other officers responded that Mr. Dubey was "letting them in." Mazanec BWC at 21:29:55-21:30:04.

Shortly before 9:30 PM, the police lines on both sides of the encircled block of Swann Street were ordered to move forward. *See* Pls.' SUMF ¶¶ 103, 105-06; Defs.' Resp. to Pls.' SUMF ¶¶ 103, 105-06. Lieutenant Horos gave the order for the 15th Street line to advance, Pls.' SUMF ¶ 113, and Assistant Chief Carroll believed he was the one who gave the order for the 14th Street line to advance, *see* Pls.' Opp'n, Ex. 9, Dep. of Jeffrey Carroll ("Carroll Dep.") at 190:6-8, ECF No. 84-13.

---

[7] This tactic is sometimes referring to as "closing the kettle," with the "kettle" referring to the confinement of the group by encircling them with law enforcement officers. *See, e.g.*, Defs.' Mem., Ex. 55, Dep. of Osea Remick ("Remick Dep.") at 54:16-20, ECF No. 83-55; Troper Dep. at 117:21-118:5, 119:16-22.

As the police line at 15th Street started to move forward along the block, officers loudly and repeatedly ordered the encircled group to "move back."  Defs.' SUMF ¶ 138; *see also, e.g.*, Pls.' Opp'n, Ex. 67, Officer Steven Quarles Body-Worn Camera Footage ("Quarles BWC") at 21:29:33, ECF No. 84-62 (officers starting the instruction).  At the time the police line started to move forward, members of the encircled group were standing immediately in front of the police line.  *See, e.g.*, Quarles BWC at 21:29:33.  While most members of the encircled group complied with the order to move back, some did not.  Defs.' SUMF ¶ 139.  Some individuals attempted to stand their ground and came into contact with the police line, while others moved forward to initiate contact with officers and tried to prevent their advance.  *See, e.g.*, Pls.' Opp'n, Ex. 74, 15th and Swann Overhead Video at 0:01-0:27, ECF No. 84-62.  Plastic water bottles were also intermittently thrown at the line of officers.  *See id.*  As the officers advanced, the efforts of some members of the group to move backwards were impeded by parked cars, other people, and other obstacles on the street.  *See, e.g.*, *id.*  Nonetheless, officers continued to advance forward and used riot shields and batons held horizontally between both hands to push individuals backwards, including plaintiffs Surio and Remick.  Defs.' SUMF ¶¶ 151, 156; 15th and Swann Overhead Video at 0:01-0:27; Pls.' Opp'n, Ex. 79, Anderson Body-Worn Camera Footage ("Anderson BWC") at 21:30:45-21:30:53, ECF No. 84-62 (showing individuals being pushed with batons); Quarles BWC at 21:29:45-21:29:47 (same with riot shields).  One person climbed on top of a parked car, where he remained for several seconds.  15th and Swann Overhead Video at 0:01-0:22.  Upon reaching this location, Lieutenant Horos, who was walking behind the front line of officers, sprayed pepper spray at this individual, who then retreated off the roof of the car.  *Id.* at 0:23-0:26; Defs.' SUMF ¶¶ 167-68.  A few seconds later, a thrown water bottle hit the shield of the officer in front of Horos, and he sprayed pepper spray at the people closest to the police line, though these

people had disengaged from physical contact with the police line and were standing a few feet back from the officers. 15th and Swann Overhead Video at 0:27-0:31; *see also* Defs.' SUMF ¶ 172; Pls.' Resp. to Defs' SUMF ¶ 172 (not disputing that a water bottle was thrown and hit an officer's shield immediately prior to Horos's deployment of pepper spray).

Shortly thereafter, one individual moved toward the police line with his fists clenched while yelling loudly and was pepper sprayed by Horos. Defs.' SUMF ¶¶ 173-74; *see also* Pls.' Opp'n, Ex. 88, Niewenhouse Body-Worn Camera Footage ("Niewenhouse BWC") at 21:30:35-21:30:40, ECF No. 84-62.[8] This individual stumbled backwards several feet from the police line and bent over, where he was surrounded on the sidewalk by a small group of people. Niewenhouse BWC at 21:30:40-21:30:42; Pls.' Opp'n, Ex. 68, Meyer Body-Worn Camera Footage ("Meyer BWC") at 21:30:37-21:30:42, ECF No. 84-62. Visible directly behind this group in body-worn camera footage are people walking up the stairs and entering Mr. Dubey's house. Meyer BWC at 21:30:41-21:30:43; *see also* Defs.' SUMF ¶ 177 (describing defendant Crisman observing people entering a residence during this period). While the group around the individual who had been pepper sprayed and others were standing on the sidewalk, Officer Crisman ran out from behind the line of law enforcement officers and deployed pepper spray toward the people on the sidewalk. Meyer BWC at 21:30:44-21:30:47.

During the time the law enforcement officers were advancing along Swann Street, plaintiffs Lane, Lazo, and Troper entered Mr. Dubey's house, Defs.' SUMF ¶¶ 187, 191, 194, where they remained until the curfew was lifted the next morning, Pls.' SUMF ¶ 140. Goodwin entered the basement apartment of a different resident of Swann Street, Defs.' SUMF ¶ 184, and left the area

---

[8]     Plaintiffs do not raise any claims related to this deployment of pepper spray by Horos, or the one directed against the individual on the car roof, only claiming that Horos's second deployment of pepper spray constituted excessive force. Pls.' Opp'n at 37 n.16.

by Uber later that night after a Swann Street resident escorted her to the car through a back alley,
Pls.' SUMF ¶ 141.  These four plaintiffs (Lane, Lazo, Troper, and Goodwin) were not taken into
custody by MPD.  *See id.* ¶ 140; Defs.' SUMF ¶¶ 187, 191, 194.

### 4.    *The Arrests and Confinement*

After MPD closed the "kettle" on Swann Street, 197 people were arrested, Pls.' SUMF
¶ 150, including plaintiffs Remick, Pearlmutter, and Surio, *id.* ¶¶ 179, 182, 186; *see also* SAC
¶ 72.  All three plaintiffs waited on Swann Street, without access to food or water, for multiple
hours while MPD officers completed making arrests and prepared to transport the arrestees.  Pls.'
SUMF ¶¶ 179, 182, 186.[9]  As these three plaintiffs were taken into custody, they were placed in
flex cuffs, called "zip ties," to secure their hands.  *Id.* ¶¶ 179, 183, 187.  Each plaintiff provided
deposition testimony that the flex cuffs were uncomfortably tight.  *Id.* ¶¶ 180, 184, 187.  Remick
did not ask for their flex cuffs to be loosened, Pls.' Opp'n, Ex. 19, Dep. of Osea Remick ("Remick
Dep.") at 69:8-12, ECF No. 84-23, while Pearlmutter's were "eventually adjusted," Pls.' SUMF
¶ 184, and Surio's request for her flex cuffs to be loosened was denied, Pls.' Opp'n, Ex. 18, Dep.
of Priyanka Surio ("Surio Dep.") at 207:4-13, ECF No. 84-22.[10]

After being taken into custody, each plaintiff was eventually transported from Swann Street
to the Metropolitan Police Academy, which was being used as the MPD's high-volume prisoner
processing center.  Defs.' SUMF ¶¶ 205, 208; Pls.' SUMF ¶¶ 179, 184, 188.  During processing,
bathrooms were available to the arrestees upon request, Defs.' SUMF ¶ 210, and food and water
were available once the arrestees were placed in a holding room, *id.* ¶ 211.  Surio was processed

---

[9]    Plaintiffs are unclear whether this period without access to food or water spanned the hours spent on Swann
Street while being encircled prior to being taken into custody.  *See, e.g.*, Pls.' SUMF ¶ 179; Defs.' Resp. to Pls.'
SUMF ¶ 179.

[10]    Remick uses "they/them" pronouns, *see, e.g.*, Pls.' SUMF ¶ 39, a preference respected in this
Memorandum Opinion.

at the facility at 4:20 a.m., during which processing she told an officer she had suffered painful bruises on multiple parts of her body, and she was subsequently transported to the hospital to receive medical care.  Pls.' SUMF ¶¶ 188-89.  Pearlmutter was released from custody at 8:20 AM on June 2, 2020, *id.* ¶ 185, and Surio was released at 9:24 AM after returning to the facility from the hospital, *id.* ¶ 190.  Records do not show what time Remick was released.  *Id.* ¶ 181.

### B.    Procedural History

The initial complaint commencing this lawsuit was filed on March 25, 2021.  *See* Compl., ECF No. 1.  Before any responsive pleading was filed, plaintiffs sought, pursuant to Federal Rule of Civil Procedure 26(d)(1), expedited discovery from the District to enable plaintiffs to identify certain John Doe officers in advance of the expiration, on June 1, 2021, of the statute of limitations for any assault and battery claims.  *See* Pls.' Mot. for Leave to Conduct Limited Expedited Discovery for the Purpose of Identifying "John Doe" Defs., ECF No. 11.  This motion was granted on May 18, 2021, and the District was ordered to produce, on an expedited basis, any use of force reports filed by MPD officers or complaints filed against MPD officers for actions taken on the 1400 block of Swann Street NW on June 1, 2020.  *See* Order, ECF No. 15; *Goodwin I*, 2021 WL 1978795.

The day after plaintiffs' motion for expedited discovery was granted, defendants moved for partial dismissal of the complaint, *see* Defs.' Partial Mot. to Dismiss, ECF No. 17, which motion was denied as moot after plaintiffs filed their first amended complaint, ECF No. 18; Min. Order (June 28, 2021).  Defendants again moved for partial dismissal of the amended complaint, *see* Defs.' Partial Mot. to Dismiss the First Am. Compl., ECF No. 24, and this motion was denied, *see* Order, ECF No. 40; *Goodwin II*, 579 F.Supp.3d 159.  After initially consenting to mediation, *see* Meet & Confer Statement, ECF No. 42; Min. Orders (Feb. 8, 2022; Apr. 4, 2022), the parties then proceeded to discovery, *see* Joint Status Report, ECF No. 48; Min. Order (Aug. 31, 2022),

which closed on March 14, 2024, *see* Min. Order (Feb. 22, 2024).  Plaintiffs thereafter moved for leave to file the second amended complaint, Pls.' Mot. for Leave to Amend Compl., ECF No. 66, in order to clarify the First Amendment claims brought in the case, Pls.' Statement of P. & A. in Supp. of Pls.' Mot. for Leave to Amend the Compl., ECF No. 66-1, which motion was granted over defendants' opposition, Min. Order (May 13, 2024); *see also* Defs.' Opp'n to Pls.' Mot. for Leave to Amend the Compl., ECF No. 70.

Thereafter, defendants filed a motion for summary judgment on all claims raised by plaintiffs in the second amended complaint.  Defs.' Mot.  After extensive briefing, this motion is now ripe for consideration.  *See* Defs.' Mem.; Pls.' Opp'n; Defs.' Reply; Pls.' Surreply; Defs.' Surreply.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 entitles a party to summary judgment "only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (citation omitted); *see also* Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (quoting *Hairston v. Vance-Cooks*, 773 F.3d 266, 271 (D.C. Cir. 2014)).  The party moving for summary judgment bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation

or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015); Fed. R. Civ. P. 56(c), (e)(2)–(3). In evaluating the motion, the Court is required to consider only the materials explicitly cited by the parties but may, on its own accord, consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This process is guided by the general principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), and "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (alteration in original accepted and citation omitted). At this stage, courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks, citations omitted), because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). Therefore, considerations such as whether testimony or evidence is uncorroborated is immaterial for the purposes of summary judgment, since "[c]orroboration goes to credibility," which is "a question for the jury [at trial]," not the district court." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016).

Still, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements to defeat summary judgment, *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (citing

*Sierra Club v. EPA*, 292 F.3d 895, 898-99 (D.C. Cir. 2002)); *see also* Fed. R. Civ. P. 56(e). If the parties "tell two different stories" and "one . . . is blatantly contradicted by the record, so that no reasonable jury could believe it," courts "should not adopt that version of the facts." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). In particular, "when a nonmovant's account of the facts is 'utterly discredited' by the clear evidence provided by a videorecording," courts should "'view the facts in the light depicted by' the video record." *Id.* (alteration accepted) (quoting *Scott*, 550 U.S. at 380-81).

## III.    DISCUSSION

Defendants move for summary judgment on each of the four claims raised by plaintiffs: (1) that defendants Crisman, Horos, and Glover violated plaintiffs' Fourth Amendment rights through the use of excessive force against them, SAC ¶¶ 108-14; Pls.' Opp'n, Ex. 57, Pls.' Claims ("Pls.' Claims Chart"), ECF No. 84-61; (2) that defendants District of Columbia, Newsham, Glover, Crisman, and Horos violated plaintiffs' First Amendment rights by retaliating against them and selectively enforcing the June 1, 2020, curfew against them because of their exercise of protected speech and assembly rights, SAC ¶¶ 115-20; Pls.' Opp'n at 7 n.1 (clarifying the First Amendment claims advanced); Pls.' Claims Chart; (3) that defendants District of Columbia, Crisman, and Horos are liable for common law assault and battery against plaintiffs, SAC ¶¶ 121-24; Pls.' Claims Chart; and (4) that all defendants committed negligence *per se* by violating the District's First Amendment Assemblies Act ("FAAA"), D.C. Code §§ 5-331.07(e)(1), (e)(2), SAC ¶¶ 125-31; Pls.' Opp'n at 27-30 (advancing negligence *per se* claims based only on these two provisions); Pls.' Claims Chart. Each claim is addressed *seriatim*.

### A.    Fourth Amendment Excessive Force Claims

During the time when the MPD lines were advancing along Swann Street to effectuate the arrests of the encircled, or "kettled," group, plaintiffs claim that defendants Crisman, Horos, and Glover used excessive force against them, in violation of the Fourth Amendment right to be free from unreasonable seizures.  SAC ¶¶ 108-14; Pls.' Opp'n at 31-42.[11]  Specifically, plaintiffs Goodwin, Lane, Lazo, Troper, and Pearlmutter allege that defendant Crisman deployed pepper spray against them; plaintiffs Remick and Surio allege that defendant Horos deployed pepper spray against them; and plaintiffs Remick and Surio allege that defendants Horos and Glover are liable for the use of police shields and batons against them during the time MPD officers were closing the "kettle" on Swann Street to effectuate the arrests, all in violation of the Fourth Amendment.  *See* Pls.' Opp'n at 31.[12]  The Fourth Amendment claim against each defendant by each plaintiff is evaluated following review of the applicable legal principles.

### 1. *Applicable Legal Principles*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures," U.S. Const. amend. IV, which protection encapsulates claims that law enforcement officers "used excessive force . . . in the course of an arrest," *Graham v. Connor*, 490 U.S. 386, 395 (1989).  To evaluate an excessive force claim, a court must first

---

[11]    As plaintiffs concede, defendants District of Columbia, Newsham, Mejia, and Quarles are entitled to summary judgment as to all Fourth Amendment claims, since plaintiffs do not advance any such claims against these four defendants.  Pls.' Opp'n at 32 n.11.

[12]    In reply, defendants argue that plaintiffs Surio, Pearlmutter, and Remick have improperly attempted to "add claims at this stage of the litigation" through clarifications offered, in plaintiffs' opposition, to the scope of the Fourth Amendment claims raised, *see* Pls.' Opp'n at 31, and that these claims should be denied on that basis.  Defs.' Reply at 1.  This argument is rejected as a basis for denial of the Fourth Amendment claims.  The Second Amended Complaint sufficiently put defendants on notice that the Fourth Amendment claim was brought by "All Plaintiffs vs. All Defendants," SAC at 26, and described the violations alleged as including "using pepper spray and other physical force," *id.* ¶ 112.  Although plaintiff Pearlmutter may have misidentified which officer allegedly used pepper spray against him, *see id.* (describing his claim as against defendant Horos), defendants were additionally on notice that defendant Crisman's use of pepper spray would be challenged, *see id.*  As to plaintiffs Surio and Remick's Fourth Amendment claims against defendants Horos and Glover, these two defendants will be granted summary judgment on the merits of these claims, *see infra*, and thus these defendants are not prejudiced by proceeding to consider the merits.

determine whether a seizure took place.  *See, e.g.*, *McGovern v. George Wash. Univ.*, 245 F. Supp. 3d 167, 188 (D.D.C. 2017) ("The Fourth Amendment . . . protects individuals against the use of excessive force *by officers effecting a seizure*." (emphasis supplied) (citing *Graham*, 490 U.S. at 388)); *Campbell v. District of Columbia*, 245 F. Supp. 3d 78, 89 (D.D.C. 2017) ("A violation of the Fourth Amendment . . . requires an individual to have been 'seized.'" (citation omitted)); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 259 (S.D. Ohio 2021) (recognizing the question "[h]as there been a seizure?" is a "threshold question" when evaluating Fourth Amendment excessive force claims).  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted); *see also Torres v. Madrid*, 592 U.S. 306, 309 (2021) ("The application of physical force to the body of a person with intent to restrain is a seizure.").

If a seizure did occur, courts next consider whether "the force used to carry out that seizure was objectively unreasonable." *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 193 (D.D.C. 2015) (citing *Graham*, 490 U.S. at 395; *Scott*, 550 U.S. at 381).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)), and requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," *id.* at 396 (citation omitted).  Excessive force may be found "if 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' is

weightier than 'the countervailing governmental interests at stake.'" *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting *Graham*, 490 U.S. at 396).

Even if found to have violated the Fourth Amendment, a law enforcement officer may still be protected from liability by the qualified immunity doctrine, which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Corrigan v. Glover*, 254 F. Supp. 3d 184, 193 (D.D.C. 2017) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). As a result, whether qualified immunity applies to shield a law enforcement officer from liability "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt*, 565 U.S. at 546 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

Evaluation of a law enforcement officer's claim to qualified immunity requires a two-pronged inquiry to determine "(1) whether the facts in the record show the officers' conduct violated a constitutional right, and if so, (2) whether the constitutional right was clearly established at the time of the incident." *Corrigan v. District of Columbia*, 841 F.3d 1022, 1029 (D.C. Cir. 2016) (citation omitted). To determine whether a right was clearly established at the time of the challenged action, courts in this circuit look to decisions of the Supreme Court, D.C. Circuit, or "cases . . . exhibiting a consensus view" of other federal circuit courts. *Lash*, 786 F.3d at 7 (citation omitted). The "'clearly established law' should not be defined at a high level of generality," *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (internal quotation marks omitted) (quoting *Ashcroft*

*v. al-Kidd*, 563 U.S. 731, 742 (2011)), but rather "must be 'particularized' to the facts of the case," *id.* (quoting *Anderson*, 483 U.S. at 640). Any legal precedent relied on "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation omitted). The facts of such a precedent do not have to be "directly on point," *id.* at 64 (quoting *al-Kidd*, 563 U.S. at 741), but must generally involve "an officer acting under similar circumstances," *id.* (quoting *White*, 580 U.S. at 79), in order to "place the lawfulness of the particular [challenged action] 'beyond debate,'" *id.* (quoting *al-Kidd*, 563 U.S. at 741).

### 2.    *Pepper Spray Claims against Defendant Crisman*

As the police lines advanced down Swann Street, defendant Crisman deployed pepper spray on a group of individuals standing on the sidewalk in front of 1461 Swann Street, the home of Rahul Dubey, Defs.' SUMF ¶ 227, at approximately 9:30 PM. *See, e.g.*, Pls.' SUMF ¶ 125; Defs.' Resp. to Pls.' SUMF ¶ 125 (not disputing that the individuals sprayed were standing on the sidewalk outside this house). At the time the spray was deployed, other members of the encircled group were entering the house, Defs.' SUMF ¶ 177; Meyer BWC at 21:30:41-21:30:43, at the invitation of Mr. Dubey, *see, e.g.*, Defs.' SUMF ¶ 227; Lane Dep. at 115:16-116:13. Plaintiffs Goodwin, Lane, Pearlmutter, Lazo, and Troper each claim they suffered the effects of Crisman's deployment of pepper spray, Pls.' Opp'n at 31, and that this use of pepper spray constituted unreasonable force. For the reasons explained below, summary judgment is denied to defendant Crisman on this claim as to plaintiffs Goodwin, Lane, and Pearlmutter, but granted as to plaintiffs Lazo and Troper.

### a.    **Plaintiffs Goodwin, Lane, and Pearlmutter**

Goodwin, Lane, and Pearlmutter each allege they were directly sprayed by defendant Crisman's deployment of pepper spray, which was directed at a small group assisting another individual who had been pepper sprayed by Lieutenant Horos. *See, e.g.*, Defs.' SUMF ¶ 182 (describing plaintiff Goodwin's testimony that she was directly sprayed); SAC ¶ 112; Lane Dep. at 110:3-4, 110:18-21; Pls.' SUMF ¶ 125; Defs.' Resp. to Pls.' SUMF ¶ 125 (not disputing that Pearlmutter was in the group directly sprayed by Crisman). This use of pepper spray against these plaintiffs, who each testified about feeling the ill effects of the spray, was a direct "application of physical force to the body" of the individuals directly sprayed "with intent to restrain" their movements and therefore constitutes a seizure. *Torres*, 592 U.S. at 309; *see also, e.g.*, *Ferris v. District of Columbia*, No. 23-cv-481-RCL, 2023 WL 8697854, at *10 (D.D.C. Dec. 15, 2023) ("[T]he Fourth Amendment's regulation of seizure by physical force addresses use of force to apprehend individuals.").[13] The circumstances further demonstrate an objective intent to restrain these individuals, since the decision to close the kettle on Swann Street was made to effectuate arrests, rather than disperse the group, *see, e.g.*, Pls.' SUMF ¶ 55; Defs.' Resp. to Pls.' SUMF ¶ 55; Defs.' Mem., Ex. 43, Dep. of Lieutenant Andrew Horos ("Horos Dep.") at 188:19–189:3, ECF No. 83-44 (stating that the decision to "form police lines" was made to "prevent [the encircled group] from moving" and to effectuate arrests); *id.* at 200:8–12, and Commander Glover had already stated that members of the encircled group were not free to leave, because they were "under arrest," Small BWC at 21:26:50-21:27:15. Indeed, defendant Crisman testified about his personal intent to restrain the protesters by using pepper spray, though he stated that he was trying to "stop

---

[13]     Defendants argue that Crisman is entitled to summary judgment as to Goodwin and Lane because "[t]he only evidence that [they] felt the effects of pepper spray is their own testimony." Defs.' Reply at 25 (citing Defs.' SUMF ¶¶ 132-34, 37). As plaintiffs correctly point out, determinations about the credibility of plaintiffs' testimony are the province of the jury, not the Court. Pls.' Surreply at 13-14. "[A]t this stage of litigation, the district court must believe [plaintiffs'] testimony and must not make credibility determinations." *Robinson*, 818 F.3d at 9 (cleaned up) (quoting *Liberty Lobby*, 477 U.S. at 255).

two individuals from going up the stairs" into Mr. Dubey's home and deployed the pepper spray because he felt he "had to stop them somehow." Pls.' SUMF ¶ 126 (citations omitted). Whatever the specific focus for defendant Crisman's use of the pepper spray, in examining whether an officer had an intent to restrain for the purposes of determining whether a Fourth Amendment seizure occurred, "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain," and courts "rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Torres*, 592 U.S. at 317 (emphasis in original).

At the summary judgment stage, the next step of the inquiry is to determine whether the evidence, viewed in the light most favorable to the plaintiffs, as the non-moving party, demonstrates that a constitutional violation occurred. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ("[A] court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001))); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 58 (1st Cir. 2008) ("[I]n the context of the defendants' assertion of qualified immunity, we address . . . first . . . whether the proffered facts, taken in the light most favorable to the plaintiffs, demonstrate a constitutional violation."). Here, material disputes exist as to whether defendant Crisman's use of pepper spray in this scenario was reasonable. First, before the MPD lines began advancing along Swann Street, Crisman responded to a fellow MPD officer's inquiry whether reinforcements were being sent, saying that MPD officers were "probably going to have to spray" the encircled group, and further stating "I am serious. Last time that's what we did, and it took them out. So if they start, we're going in and pepper spraying, I mean, that's the only way." Pls.' Opp'n, Ex. 72, Stacks Body-Worn Camera Footage ("Stacks BWC") at 21:11:00–21:11:19, ECF No. 84-62. Right before the police line began to move, Crisman offered to another officer, "If you'd like, I can go in there with

pepper spray. No, really. If they break through." Pls.' SUMF ¶ 102. When the other officer noted that use of pepper spray might not be "authorized yet," Crisman replied, "If there's a rush." *Id.* Each of these statements, while couched in language anticipating resistance from the encircled group, could allow a reasonable jury to draw the inference that defendant Crisman was primed to use pepper spray, no matter the situation he encountered—in other words, that he had an itchy spray finger.

Furthermore, other evidence shows that at least some officers were aware, before Crisman deployed his pepper spray, that the protesters entering Mr. Dubey's house were not breaking in, but rather were being "let[] in." Mazanec BWC at 21:29:58–21:30:04. In fact, as some officers began to exclaim that protesters were breaking into the house, other officers quickly and audibly corrected them. *Id.* What exactly defendant Crisman knew at this time is unclear, since his body-worn camera was not turned on until four minutes after he engaged in the challenged use of pepper spray, a violation of MPD policy for which he was later disciplined. Pls.' SUMF ¶ 130. Considering Crisman's previous statements about using pepper spray and the fact that other officers in the MPD line had audibly stated that those entering Mr. Dubey's house were not breaking in, as well as the fact that Crisman's body-worn camera was turned off, a reasonable jury could question Crisman's credibility and testimony about why he deployed the pepper spray and what he knew or reasonably should have known about the protesters entering Mr. Dubey's house at the time.

Finally, the video footage of Crisman's use of pepper spray supports the existence of a material dispute about the circumstances. This video shows people walking up the stairs and going inside a house, ushered by a man in a white shirt at the top of the steps, directly behind the group of people sprayed by Crisman. *See* Meyer BWC at 21:30:37-21:30:49. No individual in the group

directly sprayed by Crisman appears to be making any effort to walk toward or enter the house, or otherwise resist the officers, flee, or pose any immediate threat to any person at the time the spray was deployed.  *See id.* at 21:30:43–21:30:49 (showing Crisman spraying a small group of protesters standing on the sidewalk huddled around an individual recovering from a previous deployment of pepper spray by Horos).  Based on this record, a reasonable jury could find that defendant Crisman deployed pepper spray against protesters who were in violation of the curfew but otherwise posed no apparent immediate danger to law enforcement officers or other individuals, and who were not actively resisting arrest or fleeing, and that his actions could not have been motivated by a reasonable-but-mistaken belief that the protesters entering Mr. Dubey's house were doing so illegally.  If a reasonable jury resolved the disputes of fact in plaintiffs' favor in this manner, that same reasonable jury could then conclude that none of the *Graham* factors, *see* 490 U.S. at 396, supported defendant Crisman's use of force: that plaintiffs had committed only a non-violent misdemeanor, posed no immediate threat to safety, and were not actively resisting or fleeing arrest, making the deployment of pepper spray against them an unconstitutional use of excessive force.  *See id.*

The next question is whether the constitutional right at issue was clearly established at the time of the alleged violation.  Although the D.C. Circuit has never directly ruled on the matter, other courts of appeal have "clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *see also Davis v. Clifford*, 825 F.3d 1131, 1137 (10th Cir. 2016) (citing *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008), for the proposition that it was "clearly established that the use of force against an arrestee who committed a petty misdemeanor, posed no threat to others, and

did not resist arrest was unlawful").  Other circuits have also extended similar holdings more specifically to the use of pepper spray against such nonviolent misdemeanants.  *See, e.g.*, *Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir. 2017) ("[O]fficers justified in using '*some* force' against noncompliant suspects posing non-immediate safety threats may act unreasonably by pepper spraying them without warning." (emphasis in original)); *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 914 n.6 (E.D. Mo. 2020) ("After *Tatum*, . . . a reasonable officer would know that pepper sp[r]aying a non-fleeing, non-resisting individual suspected or held for non-violent misdemeanors is unreasonable."), *aff'd* 23 F.4th 1065 (8th Cir. 2022); *Wright v. City of Euclid*, 962 F.3d 852, 871 (6th Cir. 2020) ("The right to be free from being pepper sprayed when a suspect is not actively resisting arrest was . . . clearly established" at the time of an incident in 2016. (citing *Coffey v. Carroll*, 933 F.3d 577, 589 (6th Cir. 2019), and *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017))); *Young v. County of Los Angeles*, 655 F.3d 1156, 1168 (9th Cir. 2011) (finding that use "of pepper spray . . . would . . . constitute an excessive response to a suspect's commission of a misdemeanor and disobedience of a police order" where they "otherwise pose[d] no threat to the officer or others"); *Asociacion de Periodistas*, 529 F.3d at 60-61 (finding that when, "without provocation, the defendants beat and applied pepper spray into the faces of the non-threatening plaintiffs," the action was unreasonable).  Although the application of qualified immunity is a close question in this circumstance, the prevalence of persuasive caselaw from other federal circuit courts clearly holding that using force such as pepper spray on non-violent, non-resisting, and non-fleeing misdemeanants is unreasonable is sufficient to demonstrate that the constitutional right at issue in this claim was clearly established at the time the alleged violation occurred.

Defendants resist this conclusion, reframing the qualified immunity question as whether the law was "clearly established that pepper spray could not be used to prevent unrestrained

arrestees from illegally entering a private residence." Defs.' Reply at 24. This reframing of the issue is premised on the reasonableness of Crisman's belief that the people entering Mr. Dubey's home were doing so illegally, *see id.* at 22-24, but this premise reflects a material dispute. Based on the specific circumstances here, a jury could find that Crisman could not have reasonably believed that the people entering the house were doing so illegally, since other officers on the scene promptly recognized and alerted other officers that the homeowner was permitting entrance into his house. Given this material disputed fact, Crisman is not entitled to summary judgment on the excessive force claim raised by plaintiffs Goodwin, Lane, and Pearlmutter. To be clear, the denial of qualified immunity to Crisman does not mean that plaintiffs' version of the facts is accepted nor that Crisman's version is rejected. Rather, when confronted with disputed facts bearing on whether qualified immunity is triggered, summary judgment must be denied, since "it is the jury's role, not [the Court's], to decide whose version of facts is correct." *Smith v. Ray*, 781 F.3d 95, 106 (4th Cir. 2015); *see also Iyoha*, 927 F.3d at 565.

### b. *Plaintiffs Lazo and Troper*

Plaintiffs Lazo and Troper, who were among the individuals who safely made their way into Mr. Dubey's house, fail to establish that defendant Crisman effectuated a seizure against them, and thus their Fourth Amendment claims fail. Recall that establishing a seizure took place requires showing that an officer, "by means of physical force or show of authority, terminates or restrains [the] freedom of movement [of the plaintiff] through means intentionally applied." *Brendlin*, 551 U.S. at 254 (internal quotation marks and citation omitted; cleaned up). Here, the evidence shows that neither Lazo nor Troper were directly sprayed by Crisman, but rather that both plaintiffs experienced second-hand exposure to the spray while inside Mr. Dubey's house. *See* Defs.' Mem., Ex. 60, Dep. of Jenny Lazo ("Lazo Dep.") at 127:11-129:9, ECF No. 83-59 (noting she had never

been exposed to pepper spray before entering Mr. Dubey's house and describing seeing other protesters come into the house looking like they had been sprayed with "something"); Pls.' Opp'n, Ex. 65, Lazo Video at 41:47-43:40, ECF No. 84-62 (showing Lazo entering Mr. Dubey's house and not being impacted by pepper spray for more than a minute after entering; at 43:04, someone says, "oh my god, they're being maced," in reference to new protesters entering the house, after which those already in the house begin to experience the effects); Troper Dep. at 187:11-13 (saying "I was in the house" at the point MPD officers deployed pepper spray); *see id.* at 117:18-118:5 (describing that she entered the house a "few seconds after the MPD officers started closing the kettle").

In general, "the secondhand inhalation of pepper spray by persons who were not the intended targets of the discharge does not typically give rise to a constitutional claim." *Gutierrez v. City of New York*, No. 13 Civ. 3502 (JGK), 2015 WL 5559498, at *8 (S.D.N.Y. Sept. 21, 2015) (citing *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1105 (8th Cir. 2004), and *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 687 (M.D. Pa. 2010)); *see also Croke v. County of Suffolk*, No. 19-cv-4124 (DLI) (PK), 2021 WL 4311000, at *7 (E.D.N.Y. Sept. 21, 2021) (finding that an excessive force claim failed because "there is no admissible evidence that he was the direct target of the use of any force" (citing *Gutierrez*, 2015 WL 5559498, at *8)); *McNair v. Ponte*, No. 17 Civ. 2976 (AT) (GWG), 2020 WL 3402815, at *4 (S.D.N.Y. June 18, 2020) (granting summary judgment where a plaintiff "was not the intended subject of [the] use of the spray and any contact the spray had with [the plaintiff] was accidental"); *Palumbo v. Testa*, Civil Action No. 14-40051-TSH, 2015 WL 3397862, at *5 (D. Mass. May 26, 2015) ("If the officers knew that because of plaintiff's close proximity to [the target of the spray] she would be effected, that is, if they also *intended* to expose her to the pepper spray . . ., then she was seized by the officers for Fourth

Amendment purposes. However, if [plaintiff] was not an intended target of the officers, then the fact that she suffered secondary exposure to the pepper spray would not constitute a seizure for Fourth Amendment purposes." (emphasis in original)); *Hatley v. Bowden*, No. 5:13-cv-765-FL, 2014 WL 860538, at *3 (E.D.N.C. Mar. 5, 2014) ("Where plaintiff . . . was not the intended object of the pepper spray she was not seized within the meaning of the Fourth Amendment."); *Burbridge v. City of St. Louis, Missouri*, 430 F. Supp. 3d 595, 612-13 (D. Mo. 2019) (holding that a claim based on a "pepper spray blast [that] affected [plaintiff] by proximity . . . describe[d] negligence, and negligently-inflicted harm is 'categorically' insufficient to support a[n] . . . excessive force claim." (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), and *Lawyer*, 361 F.3d at 1105)). Crisman's use of pepper spray indisputably took place outside the house, Meyer BWC at 21:30:43–21:30:49, and was directed at the small group of people positioned on the sidewalk at some distance from the front door of Mr. Dubey's house, *see id*. at 21:30:43–21:30:49.  No evidence suggests that the individuals inside the house were targeted to be sprayed or part of the same group of people as those targeted outside the house.  *Cf. Pluma v. City of New York*, No. 13 Civ. 2017 (LAP), 2015 WL 1623828, at *4-5 (S.D.N.Y. Mar. 31, 2015) (holding that an allegation that officers "intentionally targeted a group of people, which included Plaintiff," with pepper spray was sufficient to state a Fourth Amendment claim, since the plaintiff was one of a "specifically intended and known target of police force").  Therefore, the evidence provides no basis to find that plaintiffs Lazo and Troper were seized by Crisman's use of pepper spray, meaning that defendant Crisman is entitled to summary judgment as to these two plaintiffs.

### 3.    *Pepper Spray Claims against Defendant Horos*

Defendant Horos is entitled to summary judgment on the excessive force claim against him for his use of pepper spray on multiple grounds.  First, plaintiffs explicitly acknowledge that

Remick and Surio "were not in the direct line of OC spray" but instead were "affected" by the spray. Pls.' Opp'n at 37. This description classifies Remick and Surio's exposure to Horos's use of pepper spray as "secondhand," meaning that these plaintiffs were not seized by defendant Horos, and thus cannot maintain a Fourth Amendment claim against him. *See supra*, Part III.A.2.b.

Even were the evidence sufficient to support a finding that Remick and Surio had been seized by defendant Horos's use of pepper spray, this defendant would be entitled to qualified immunity. The question of the objective reasonableness of an officer's use of force is analyzed "from the perspective 'of a reasonable officer on the scene,'" in recognition that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (quoting *Graham*, 490 U.S. at 396-97). Here, the undisputed facts establish that, immediately before Horos's deployment of pepper spray in a manner allegedly in violation of plaintiffs' rights, "several curfew violators continued to refuse to comply with the order to move back." Defs.' SUMF ¶ 170; Pls.' Resp. to Defs.' SUMF ¶ 170. Video of the incident also shows that some protesters were actively pushing back against the advancing police line, 15th and Swann Overhead Video at 0:01-0:27, including one member of the group who ran forward to shove an advancing officer backwards, *id.* at 0:25-0:27. Also during this period, plastic water bottles were being thrown at the advancing officers. *Id.* at 0:01-0:27; Defs.' SUMF ¶ 171; Pls.' Resp. to Defs.' SUMF ¶ 171.

Considering the *Graham* factors, *see* 490 U.S. at 396, in these circumstances Horos's deployment of pepper spray was objectively reasonable. A reasonable officer in Horos's situation could have easily determined that (1) the crowd in front of the police line was resisting, given that one person in the crowd had rushed an officer, others were throwing plastic water bottles, and

29

officers had been met with physical resistance forcing them to push people backwards to advance down Swann Street; (2) further escalation was possible, given the tense nature of the situation, thereby posing an immediate threat to the safety of officers; and (3) the failures to comply with orders to move back and the efforts of some affirmatively to block the police line amounted to resisting arrest.  Although the group may not have been physically engaged with the police line at the exact moment Horos deployed the spray, *see* Pls.' Opp'n at 38, they had been only seconds before—the exact kind of "split-second judgment[]" in a "tense, uncertain, and rapidly evolving" circumstance that courts allow reasonable officers on the scene to make without post-hoc second-guessing. *Plumhoff*, 572 U.S. at 775.  Plaintiffs' reliance on caselaw holding that the use of pepper spray was unreasonable when the suspect was "not actively resisting arrest," Pls.' Opp'n at 38-39 (quoting *Wright*, 962 F.3d at 871), is therefore not applicable in this situation, where members of the encircled group had been refusing to comply with law enforcement orders to move back and actively engaged in resisting the police line only moments before Horos deployed the spray.  Since the use of pepper spray was objectively reasonable in these circumstances, defendant Horos is entitled to qualified immunity and summary judgment in his favor on this claim.

### 4.    *Riot Shield and Baton Claims against Defendants Horos and Glover*

Defendants Horos and Glover are also entitled to summary judgment on the excessive force claims related to the use of police shields and batons to close the MPD kettle on Swann Street.  *See* Pls.' Opp'n at 39-42.  Specifically, plaintiff Remick alleges they were "gratuitously and forcefully" struck with a baton, and plaintiff Surio alleges she was "struck by two police shields."  *Id.* at 40.  Neither plaintiff alleges that these direct uses of force were carried out by defendants Horos or Glover.  Since either Horos or Glover decided to direct the police lines to move forward, and Horos actually gave the order to the line on the 15th Street side of the block, plaintiffs claim these two

defendants are liable for the allegedly excessive uses of force against the two plaintiffs by officers effectuating these defendants' orders. *See* Pls.' Opp'n at 39-40. While the claims against Horos and Glover rest on a theory of supervisory liability, *see id.* at 40, this aspect of the claims is not reached, because the underlying uses of force were not excessive.

The video evidence does not support Remick's characterization of police actions in the face of the advancing police line or the amount of force used against Remick. As the MPD lines advanced and officers directed the protesters to move back, Remick stood next to a parked car, with their hands on the car, refusing to move backwards. Pls.' Opp'n, Ex. 76, Salavatov Body-Worn Camera Footage ("Salavatov BWC") at 21:59:56-21:30:13, ECF No. 84-62 (plaintiff Remick is seen wearing a dark baseball cap and dark mask, *see* Defs.' Resp. to Pls.' SUMF ¶ 115). In response, an officer approaches and pushes Remick backwards, using a baton held horizontally between both hands to push against Remick. *Id.* at 21:30:04-21:30:09. Later, plaintiff Remick was walking near the line of officers and was pushed backwards twice by different officers holding batons horizontally between both hands. Anderson BWC at 21:30:45-21:30:53. As shown in the videos, none of these pushes could be fairly characterized as "strikes" with the baton, much less "gratuitous[]" or "forceful[]" strikes. To be sure, the officers did extend the batons toward and make contact with Remick to move Remick backwards, but the videos show Remick was only moved backwards gradually by each push, demonstrating that the force applied was not particularly "forceful[]." Further supporting this finding is the fact that the extent of the injuries alleged from the contact were, according to Remick, bruises that did not require medical attention. Pls.' SUMF ¶ 117; Remick Dep. at 102:7-12 (acknowledging that Remick sought no medical attention). "While injuries are not a precondition to section 1983 liability, their absence can suggest a lesser degree of force when that force is of the type likely to cause injuries." *Felarca v.*

*Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) (citations omitted). "We would generally expect injuries from a forceful use of baton blows," *id.* (citation omitted), and yet Remick did not "suffer[] injuries from defendants' blows that required medical treatment," *id.*; *see* Remick Dep. at 102:7-12, allowing the inference that "even if the force used was of a type that is generally intrusive, the amount of force applied here was minimal," *Felarca*, 891 F.3d at 817, which inference is confirmed by the clear video evidence.

The D.C. Circuit has recognized, in the Fourth Amendment context, that "[n]ot every push or shove . . . violates . . . constitutional rights." *Johnson v. District of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.)). Remick cites to no cases establishing, at the time this event took place, a rule that this type of relatively mild force was excessive to effectuate the arrest of noncompliant individuals. *See* Pls.' Opp'n at 40-42. Instead, plaintiffs rely on easily distinguishable cases, *id.* at 41, such as *Rudder*, 666 F.3d 790, which involved an incident where officers "beat" the plaintiffs with a baton despite compliance with the officers' orders, *id.* at 795. Here, officers did not "beat" Remick with batons, and Remick was not compliant with orders to move backwards. Plaintiffs are correct that "a police officer must have some justification for the quantum of force he uses," Pls.' Opp'n at 42 (quoting *Johnson v. District of Columbia*, 528 F.3d at 977), but incorrect that the officers here did not have justification for the force used, or that the force applied to Remick in this instance violated any clearly established rights.

The same is true of plaintiff Surio's claim involving the same coming together of the MPD police line with the protesters previously described in analyzing defendant Horos's use of pepper spray. *See supra*, Part III.A.3. Surio alleges she was struck two times by officers using riot shields, and that this use of force against her was excessive. Pls.' Opp'n at 40 (citing Pls.' SUMF ¶ 114).

Plaintiffs assert generally that "the protestors were not posing a danger to officers or to the public or resisting arrest," *id.* at 41, but video of the incident shows that members of the group of which Surio was a part were not complying with the instructions to move back, *see* 15th and Swann Overhead Video at 0:01-0:15, and some in that group initiated contact with officers and actively resisted the forward movement of the police line, *see id.* In these circumstances, the use of riot shields to protect officers from, and simultaneously push backwards, resisting individuals as the police line moved forward, was not excessive use of force, particularly where the videos cited by plaintiffs do not show any officer swinging a riot shield at any member of the group or otherwise using force not commensurate with the goal to advance the police line in the face of resistance from the protesters. *See id.*; Quarles BWC at 21:29:45–21:29:47; Pls.' Opp'n, Ex. 75, Buchanan Body-Worn Camera Footage ("Buchanan BWC") at 21:29:49-21:49:50, ECF No. 84-62.

On this point, in fact, Surio's own concessions in this case undermine her claim that the use of the riot shields to push her backwards amounted to use of excessive force. Officer Quarles was the first officer whose riot shield made contact with Surio. Pls.' SUMF ¶ 114 (citing Quarles BWC at 21:29:45-21:29:47). Plaintiffs, however, "do not oppose" granting summary judgment to Officer Quarles on their Fourth Amendment claims, Pls.' Opp'n at 32 n.11, suggesting they do not view this contact as excessive force, *see* Defs.' Resp. to Pls.' SUMF ¶ 114. Nothing about the second contact made with Surio substantially differs from the first, *see* Buchanan BWC at 21:29:49–21:49:50 (showing officers pushing protesters backwards with their shields), and nitpicking between the exact amount of force applied behind each push would risk second-guessing the officers' "split-second judgment[]—[made] in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," *Plumhoff*, 572 U.S. at 775, with the prohibited benefit of "the 20/20 vision of hindsight" instead

of "from the perspective of a reasonable officer on the scene," *Graham*, 490 U.S. at 396 (citation omitted).

For these reasons, summary judgment must be granted to defendants Horos and Glover as to this claim of excessive force.

### B.    First Amendment Retaliation and Selective Enforcement Claims

Plaintiffs claim four separate violations of their First Amendment rights by some combination of defendants, claiming that, due to plaintiffs' engagement in First Amendment protected activity: (1) defendants District of Columbia, Newsham, and Glover retaliated against all plaintiffs by arresting them; (2) these same three defendants retaliated against all plaintiffs by subjecting them to adverse conditions of confinement post-arrest; (3) the same three defendants selectively enforced the curfew against all plaintiffs by arresting and subjecting them to adverse conditions of confinement post-arrest; and (4) defendants Crisman, Horos, and Glover retaliated against plaintiffs by using excessive force against them.

As an initial matter, the undisputed facts of this case show that plaintiffs Goodwin, Lane, Lazo, and Troper were not arrested or confined by MPD on June 1, 2020. *See* Pls.' SUMF ¶ 140 ("Lane, Lazo, and Troper remained in the home at 1461 Swann Street until the expiration of the curfew at 6:00 a.m. on June 2, 2020."); *id.* ¶ 141 ("Goodwin remained in another home on Swann Street for several hours until a resident escorted her to an Uber," at which point "[p]olice . . . greeted Goodwin and the resident and did not attempt to stop them from leaving."); *see also* Goodwin Dep. at 67:8-70:20 (describing taking shelter in an apartment on Swann Street and then leaving to catch an Uber home); Lane Dep. at 115:16-117:2, 154:1-155:13 (describing taking shelter in Mr. Dubey's house on Swann Street and then leaving the house at 7:00 AM the next morning, at which time the police were present but did not speak to her); Troper Dep. at 117:18-

119:13 (describing entering Mr. Dubey's home a "few second after the MPD officers started closing the kettle" and leaving "after the curfew" the next morning, at which time she did not "recall seeing any officers"); SAC ¶ 60 ("Plaintiffs Goodwin, Lane, Lazo, and Troper were among the group of protesters who took shelter in homes on Swann Street" "until the next day."); Defs.' Reply at 15-16.  Therefore, defendants are entitled to summary judgment as to these four plaintiffs on the first three claimed First Amendment violations, which allege retaliatory arrest and confinement.[14]

Plaintiffs' remaining First Amendment claims are discussed next.

### 1.    *Retaliatory Arrest Claim*

"'As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (alteration accepted) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman*, 547 U.S. at 256 (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283-84 (1977))).  To prevail on a retaliation claim, a plaintiff must generally demonstrate (1) that the plaintiff "engaged in conduct protected under the First Amendment"; (2) that the defendant "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and (3) "a causal link between the exercise of a constitutional right and the adverse action taken against [the plaintiff]." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation omitted); *see also Nieves*, 587 U.S. at 398 ("To prevail on such

---

[14]    Additionally, defendants Mejia and Quarles are granted summary judgment as to all First Amendment claims, since plaintiffs do not advance any such claims against them.  Pls.' Opp'n at 8 n.2.

a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" (quoting *Hartman*, 547 U.S. at 259)).

When the alleged retaliatory action is an arrest, probable cause to make the arrest "generally defeat[s] a retaliatory arrest claim." *Nieves*, 587 U.S. at 406. The Supreme Court in *Nieves* recognized a "narrow" exception to this rule, however, allowing such claims to proceed where the plaintiff can show that officers with probable cause to make an arrest nevertheless "typically exercise their discretion not to do so." *Id.* To make this showing, the plaintiff must produce "objective evidence" that the arrest took place in such circumstances. *Id.* at 407; *see also Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024).[15] Here, plaintiffs rely on two types of evidence to argue that MPD officers typically exercised discretion not to arrest curfew violators despite having probable cause to do so. First, they suggest defendants did not arrest similarly situated groups of individuals who were violating the curfew but not protesting. Pls.' Opp'n at 9-14. Second, they present arrest data showing "nearly all of the 278 people arrested for violating the curfew were either protesting or, unlike Plaintiffs, suspected of committing other criminal offenses aside from violating the curfew." *Id.* at 9-10; *see also id.* at 14. In this case, neither type of evidence is sufficient to satisfy the *Nieves* exception.

---

[15] Defendants' argument that plaintiffs may not rely on *Gonzalez*, which was decided in 2024, after the events at issue, to defeat application of qualified immunity, *see, e.g.*, Defs.' Reply at 3 n.1, is unavailing. To be sure, qualified immunity requires addressing the question whether it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *City of Tahlequah v. Bond*, 595 U.S. 9, 13 (2021) (per curiam) (quoting *Wesby*, 583 U.S. at 63), and plaintiffs cannot rely on a decision issued after the events they challenge to show that courts had clearly established that a specific action by law enforcement officers was unreasonable, *see, e.g., id.* (noting that a case "decided after the shooting at issue . . . is of no use in the clearly established inquiry" (citing *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam))). *Gonzalez*, however, did not address whether specific officer conduct was unlawful or unreasonable, but merely clarified the type of evidence plaintiffs may offer to support a claim of retaliatory arrest subject to the rule in *Nieves*. *See generally Gonzalez*, 602 U.S. 653. As plaintiffs persuasively assert, "qualified immunity concerns what *conduct* is prohibited, not which standard the Court will apply to evaluate that conduct," Pls.' Surreply at 8 (emphasis in original) (citing *Saucier*, 553 U.S. at 202-03, and *Hopper v. Plummer*, 887 F.3d 744, 755-56 (6th Cir. 2018)), and since *Gonzalez* addressed only the evidentiary standard applicable to retaliatory arrest claims covered by *Nieves*, this binding precedent not only is appropriately relied upon here but must be followed as apposite.

> **a.    Other Identified Curfew Violators Were Not Similarly Situated to Plaintiffs**

Plaintiffs rely on the standard for determining whether individuals are similarly situated used in selective prosecution claims to evaluate the comparators offered in this case. Pls.' Opp'n at 10. "Individuals 'are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.'" *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1137 (D.C. Cir. 2023) (quoting *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000)). In the context of selective prosecution claims, factors to be considered in identifying similarly situated comparators include "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985), and citing *Beverly Health & Rehab. Servs. v. Feinstein*, 103 F.3d 151, 153 (D.C. Cir. 1996)).

Plaintiffs identify two groups of "other individuals who also violated the curfew but were not participants in the protests against police brutality on June 1, 2020," as allegedly similarly situated to the group arrested on Swann Street. Pls.' Opp'n at 10 (quoting *Goodwin II*, 579 F. Supp. 3d at 173). First, plaintiffs point to "non-protesting groups" who "gathered outside the police lines" on 14th and 15th streets "from about 9 p.m. until after 2 a.m." but were not arrested. *Id.* at 11. According to plaintiffs, such individuals numbered approximately forty on the 15th Street side of Swann Street, and "at least" twelve on the 14th Street side. *Id.* Second, "several groups and individuals were out walking" on 14th Street but "MPD officers saw and interacted with . . . without giving them warnings or arresting them." *Id.* at 12.

The record does not support a finding that either of these proffered comparator groups were similarly situated to plaintiffs in this case for several reasons. First, as defendants point out,

plaintiffs offer no evidence to establish, or even suggest, that any of the individuals in the comparator groups identified by plaintiffs "were 'non-protestors,'" meaning they had not engaged in protests on June 1. Defs.' Reply at 6. For instance, defendants identify, *see id.*, one member of the purported "non-protesting group[]," Pls.' Opp'n at 11, who watched and filmed the law enforcement action from outside the police line on the 14th Street side of Swann Street and told officers that "we were walking with" the group encircled on Swann Street. Small BWC at 21:23:59-21:24:03. Although plaintiffs suggest that law enforcement officers were unsure about whether the individuals in these groups were protesters and thus did not identify them as such, *see* Pls.' Surreply at 5, at least this one individual readily identified herself as a former member of the group to law enforcement officers near Swann Street, as the uncontroverted video demonstrates, and the language used—"*we* were walking with them," Small BWC at 21:23:59-21:24:03 (emphasis supplied)—suggests she was not the only one. The lack of evidence establishing that the individuals in the proffered comparator groups were non-protesters, combined with evidence that some of those same individuals self-identified as belonging to the protester group, undermines their value for the purposes of satisfying the *Nieves* exception.

Second, plaintiffs' arguments about the proffered comparator groups fail to consider critical context, thereby missing the proverbial forest for the trees. Certainly, MPD did not arrest every single person on the street post-curfew and had their attention focused on, and hands full with, the hundreds of people in the large group tracked from around the White House all the way to Swann Street. As defendants persuasively argue, even if some members of the proffered comparator groups were non-protesters, "[p]laintiffs were not seven individuals out after curfew at different times in different locations of the city." Defs.' Reply at 3. Nor were they in a group of forty or twelve people, who stayed in one place to watch the ongoing law enforcement action

on Swann Street. *See, e.g.*, Pls.' Opp'n at 11 (noting that the groups near Swann Street stayed in that location throughout the duration of the evening); Small BWC at 21:23:35–21:26:25 (showing a small group of individuals on the 14th Street side of Swann Street watching and filming the ongoing law enforcement action). All seven plaintiffs were part of a group of "at least 300 [to] 1,000" individuals, Defs.' Reply at 3, many of whom had been at protests near the White House before the beginning of the curfew, Defs.' SUMF ¶ 57; Pls.' SUMF ¶¶ 34-40. From MPD's perspective, instead of dispersing at the start of the curfew as directed by law enforcement near the White House, *see* Defs.' SUMF ¶¶ 36-37, 45-47, many members of this large group walked roughly two miles through the District, *see* Walking Directions from 14th and H Streets NW to 14th and Belmont Streets NW to 15th and S Streets NW, Google Maps, https://perma.cc/WD3J-83J8. Even putting aside any other actions that members of this group may have taken (such as spray painting, *see, e.g.*, Pls.' SUMF ¶ 48, or throwing water bottles at law enforcement, *see, e.g.*, Pearlmutter Dep. at 99:3-12), a mobile group "of *several hundred people* moving around the city" clearly represented an entirely "different enforcement priority" than small groups of people standing in one place or individuals walking on 14th Street. Defs.' Reply at 8-9 (emphasis in original).

This difference is even more stark when considered in the fuller context of the events that precipitated issuance of the June 1 Curfew Order. Significant property damage, vandalism, looting, and arson had occurred in the District on the two previous nights. *See* Defs.' SUMF ¶¶ 4, 12, 15-16; June 1 Curfew Order. Based on previous damage that had occurred in commercial areas of the District, as the large group including plaintiffs moved further north on 14th Street, Commander Glover became concerned that the group might be heading to the commercial area around the Target at 3100 14th Street NW. Defs.' SUMF ¶ 222; *see also* Glover Dep. at 158:5-

161:17.  Whether such concern was reasonable, *see* Pls.' Resp. to Defs.' SUMF ¶ 220 (disputing the reasonableness of Commander Glover's concern), the combination of the size and mobility of the group posed unique challenges for MPD's enforcement priorities that led to the decision to devote significant law enforcement resources to address this large group and culminated in the arrests, *see* Defs.' Reply at 9 ("[G]iven that MPD was already in the process of conducting a mass arrest on Swann Street that required the attention of a significant number of officers, it should also be self-evident why law enforcement resources would not (indeed, could not) be immediately redirected to arrest every single person who was outside.").  As defendants persuasively explain, the facts of the day show that "curfew enforcement was focused on large groups of individuals who refused to disperse."  *Id.* at 7.  As the D.C. Circuit recognized in *Frederick Douglass Foundation*, the government's "enforcement priorities" and the "relationship" of two groups to the government's "overall enforcement plan" are crucial data points for evaluating potential comparators, 82 F.4th at 1137 (citation omitted).  Here, the evidence is insufficient to support a finding that any of the individuals or much smaller groups suggested as comparators by plaintiffs were similarly situated to the group encircled on Swann Street.[16]

> **b.      Plaintiffs' Arrest Data Does Not Satisfy the *Nieves* Exception**

---

[16]      Plaintiffs argue that the question "[w]hether comparators are sufficiently similarly situated is a question of fact for the jury."  Pls.' Surreply at 3-4.  To support their argument, plaintiffs cite *Wheeler v. Georgetown University Hospital*, 812 F.3d 1109 (D.C. Cir. 2016), and *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), both of which involve Title VII employment discrimination claims.  The rules applicable in the employment discrimination context, however, are of limited utility in this situation, where the Supreme Court has made clear that the *Nieves* exception is "narrow," *Nieves*, 587 U.S. at 406, and "slim," *Gonzalez*, 602 U.S. at 658, accompanied by the caution that satisfying the exception requires clearing "a very high bar" that might require "comparably powerful evidence" to the "example . . . of a police officer arresting a vocal critic for jaywalking," *id.* at 666 (Alito, J., concurring).  Courts have the responsibility of ensuring this high bar is applied in determining the sufficiency of comparators just as, in the analogous context of claims of selective prosecution, "*courts* must assess" the question whether "a plaintiff is similarly situated to a person against whom the law was not enforced across the relevant prosecutorial factors." *Frederick Douglass Found.*, 82 F.4th at 1137 (emphasis supplied).  While the jury would have to determine whether the proffered comparators were similarly situated if this claim proceeded to trial, the Court must also evaluate the evidence to determine whether the evidence offered entitles plaintiffs to reach that stage.  On this record, the evidence does not support that determination.

The arrest data offered by plaintiffs is insufficient to satisfy plaintiffs' burden to meet the high bar of the *Nieves* exception for similar reasons. Plaintiffs argue that 88% of those arrested for curfew violations on June 1, 2020, "were involved in protest activities." Pls.' Opp'n at 14 (citing Pls.' SUMF ¶¶ 149-52). Defendants point out, however, that even were this number accepted as true, "[s]everal . . . other individuals who were arrested for violating the curfew were clearly not protesting or engaged in any other expressive activity when arrested." Defs.' Mem. at 14 (citation omitted); *see also* Pls.' SUMF ¶ 154; Defs.' Resp. to Pls.' SUMF ¶ 154.[17] Data showing that arrests of both protesters and non-protesters were made *on the same day* that plaintiffs were arrested is a far cry from the type of retaliatory arrest evidence presented in *Gonzalez*, where the evidence suggested that no one had been arrested in the same county for the conduct at issue for roughly a decade. 602 U.S. at 657, 659. In *Nieves*, the Court used jaywalking as an example of a crime that is "endemic but rarely results in arrest." 587 U.S. at 407. The data presented by plaintiffs in the instant case shows that at least six and maybe more non-protesting curfew violators were arrested in one day. While certainly fewer arrests for curfew violations of non-protesting than protesting individuals were made, again, context matters, and law enforcement's focus was on a mobile group of hundreds of individuals moving through the city, when, in MPD's view, this group had failed to disperse in compliance with the curfew and directions to do so. This arrest data evidence falls short of satisfying the demanding *Nieves* exception.[18] Defendants are therefore entitled to summary judgment on plaintiffs' retaliatory arrest claim.

---

[17]    Defendants point out that plaintiffs likely overcounted the number of people arrested who were engaged in protest-related activities, since plaintiffs' method of counting assumes that all individuals arrested as part of the two large groups arrested on June 1—the group at 16th and I Streets and the group at Swann Street—participated in protests, *see* Defs.' Reply at 7, when the undisputed facts establish, for example, that at least one of the plaintiffs in this case engaged in no First Amendment activity that day, *see* Defs.' SUMF ¶ 75 ("Plaintiff Goodwin was not engaged in First Amendment activity or protests at any time on June 1, 2020."); Pls.' Resp. to Defs.' SUMF ¶ 75.

[18]    Although defendants urge that the temporary nature of the curfew means, as a matter of law, that arrests for curfew violations could never fit within the *Nieves* exception, since "there is no historical record that could support a

## 2.    *Retaliatory Confinement Claim*

Plaintiffs next assert a distinct First Amendment retaliation claim against defendants Glover, Newsham, and the District of Columbia for the conditions of their confinement post-arrest. *See* Pls.' Opp'n at 14-15.  According to plaintiffs, the decision by Glover to take them into custody "subject[ed] them to the adverse conditions of confinement that were the necessary consequence of a mass custodial arrest." Pls.' Opp'n at 15.  Plaintiffs Remick, Pearlmutter, and Surio describe specific challenging conditions they faced while in custody, including lack of access to food or water, *see* Pls.' SUMF ¶ 179, lack of bathroom facilities, *see* Pls.' Resp. to Defs.' SUMF ¶ 210, and the tightness of the flex cuffs on their wrists while in custody, *see* Pls.' SUMF ¶¶ 179-80, 183-84, 187.  At no time, however, do they allege or provide evidence that any of these conditions were imposed specifically because of their First Amendment protected activities.  Instead, plaintiffs argue that defendant Glover's decision to "arrest[]" plaintiffs and "choos[e] to take them into custody" was retaliatory, because he knew they would face these conditions as the "necessary consequence of a mass custodial arrest." Pls.' Opp'n at 15.

As an initial matter, the assertion that the post-arrest conditions plaintiffs faced were a "necessary consequence" of the decision to proceed with the mass arrest of the people encircled on Swann Street undermines, rather than bolsters, plaintiffs' claim that the imposition of these conditions was retaliatory, by implicitly conceding that similar conditions of confinement would have been experienced by any such large group of arrestees regardless of the reason for their arrest.

More problematically, however, as formulated, this claim appears to be simply a variation of plaintiffs' challenge to the decision to arrest them.  Retaliatory arrest and retaliatory confinement claims may be brought as separate challenges to actions by law enforcement, for

---

finding as to what 'typical' enforcement looked like," Defs.' Mem. at 14, this issue need not be reached, and defendants' challenge to plaintiffs' First Amendment retaliatory arrest claim is resolved on alternative grounds.

example, by alleging an arrest in retaliation for protected speech and, further, after arrest, being denied access to food and water or bathroom facilities also in retaliation for protected speech. In such a scenario, the plaintiffs would have stated two separate retaliation claims, based on two separate alleged retaliatory actions against them. That is not the allegation here, however. Instead, plaintiffs have claimed that they were arrested in retaliation for their protected speech, and that, due to the size of the group arrested, their conditions of confinement were adverse *because they were arrested*. Put another way, plaintiffs' claim of retaliatory conditions of confinement is not a separate instance of retaliation but is best understood as challenging the decision to arrest, since both claims allege that the *retaliation* happened when the decision to arrest the plaintiffs was made. Plaintiffs are therefore incorrect that the requirements of *Nieves* would not apply to this claim of retaliatory conditions of confinement. *See* Pls.' Opp'n at 14-15.

As previously reviewed, plaintiffs have not presented sufficient evidence to satisfy the *Nieves* exception, *see supra*, Part III.B.1., and therefore defendants are entitled to summary judgment on this claim.

### 3. Selective Enforcement Claims

To prevail on their selective enforcement claims, plaintiffs must satisfy two elements: (1) they were "similarly situated in material respects to other individuals against whom the law was not enforced," and (2) "the selective enforcement infringed a constitutional right." *Frederick Douglass Found.*, 82 F.4th at 1136. As plaintiffs acknowledge, "the comparator analysis" for the first element "is similar" to that applied to analyze claims of retaliation. Pls.' Opp'n at 20.

As already discussed, the record in this case is insufficient to support a finding that the comparators proffered by plaintiffs were similarly situated to the group encircled on Swann Street,

*see supra*, Part III.B.1.a, and thus plaintiffs cannot maintain their selective enforcement claims against any defendant.

### 4.    *Retaliatory Use of Excessive Force Claims*

As both parties recognize, plaintiffs' claims that defendants Crisman, Horos, and Glover retaliated against them for exercising their First Amendment rights by using excessive force rest largely on their claims of excessive force. *See* Defs.' Reply at 18; Pls.' Opp'n at 19-20. Where plaintiffs have failed to show that they could succeed on a claim of excessive force, they also cannot succeed on a claim of First Amendment retaliation through the use of excessive force. *See, e.g.*, *Lash v. Lemke*, 971 F. Supp. 2d 85, 98 (D.D.C. 2013). Since defendants Horos and Glover are entitled to summary judgment on the excessive force claims against them, *see supra*, Parts III.A.3, 4, summary judgment must also be granted to these defendants as to plaintiffs' claims of First Amendment retaliation by use of excessive force.

For the same reason, defendant Crisman is entitled to summary judgment on this claim as to plaintiffs Lazo and Troper. *See supra*, Part III.A.2.b. Summary judgment is not proper, however, as to the First Amendment retaliation by use of excessive force claims raised against Crisman by plaintiffs Goodwin, Lane, and Pearlmutter. *See supra*, Part III.A.2.a. Defendant Crisman does not contest the first prong of this retaliation claim, namely, that these plaintiffs "engaged in conduct protected under the First Amendment," *Aref*, 833 F.3d at 258. *See* Defs.' Reply at 18 (claiming only that excessive force was not used). As to the second prong—that the defendant "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," *Aref*, 833 F.3d at 258—the claims of excessive force advanced by these plaintiffs against Crisman raise a triable issue of fact, as previously explained, *see supra*, Part III.A.2.a. The evidence previously reviewed about Crisman's discussion of the use

of pepper spray before the police lines began to move in, failure to turn on his body camera, and questions about what he reasonably should have known about whether the people entering Mr. Dubey's house were doing so legally, *see id.*, also establish a triable fact about whether there was a "causal link" between plaintiffs' exercise of their First Amendment rights and the allegedly excessive use of force, by creating a material dispute about Crisman's intent in directly using the pepper spray against these three plaintiffs.

### C.    Common Law Assault and Battery Claims

Plaintiffs raise common law assault and battery claims against defendants Crisman and Horos, which "mirror[]" their Fourth Amendment excessive force claims, Pls.' Opp'n at 42, and additionally seek to hold the District of Columbia liable under the theory of respondeat superior, *id.* at 43 (citing *District of Columbia v. White*, 442 A.2d 159, 162 n.7 (D.C. 1982)).[19]  Under D.C. law, assault and battery are the "parallel common-law claims" to excessive force claims under the Fourth Amendment.  *Tinius v. Choi*, 77 F.4th 691, 706 (D.C. Cir. 2023).  "Like federal law, D.C. law grants police officers 'a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the officer reasonably believes to be necessary.'"  *Bowrin v. District of Columbia*, No. 23-cv-2421 (BAH), 2023 WL 9000494, at *4 (D.D.C. Dec. 28, 2023) (quoting *Tinius*, 77 F.4th at 706).  The test to determine whether this qualified privilege shields an officer from liability for assault and battery "is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in

---

[19]    Summary judgment is granted to defendants Newsham, Glover, Mejia, and Quarles as to all assault and battery claims, since plaintiffs do not advance any such claims against these defendants.  *See* Pls.' Opp'n at 42-43 (outlining the claims against Horos, Crisman, and the District of Columbia and omitting the other defendants); Pls.' Claims Chart (listing only Horos, Crisman, and the District of Columbia as defendants for the assault and battery claims).

the same situation." *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009). "As under the Fourth Amendment, the 'reasonableness of a particular [use] of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20-20 vision of hindsight." *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 68 (D.D.C. 2018) (alteration in original) (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003)). The operation of this standard "is similar to the excessive force standard applied in the Section 1983 context." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 28 (D.D.C. 2011) (quoting *Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998) (citing *Etheredge v. District of Columbia*, 635 A.2d 908, 915 n.10 (D.C. 1993))).

In his deposition, defendant Horos testified to his subjective rationale for believing that his use of force was justified, explaining that, at the time, "[i]ndividuals were running into the shields, and were throwing projectiles, I don't know . . . whether it was rock or filled water bottles," prompting him to deploy pepper spray on "one individual in front of that police line shortly after that." Horos Dep. at 221:16-222:5. Moreover, his use of force was reasonable in light of the circumstances encountered at the time, including protesters refusing to comply with the order to move back and actively resisting the police line, including at least one individual running forward to make contact with an officer, and throwing plastic water bottles at the officers, one of which hit an officer's shield immediately before Horos deployed his pepper spray. *See supra*, Part III.A.3 (describing this scene). Accordingly, both defendants Horos and the District of Columbia are entitled to summary judgment on the assault and battery claims resulting from Horos's deployment of pepper spray.

On the other hand, neither defendants Crisman nor the District of Columbia are entitled to summary judgment as to any of the five plaintiffs—Goodwin, Lane, Pearlmutter, Lazo, and

Troper—who raise assault and battery claims against these two defendants for Crisman's deployment of pepper spray. Unlike establishing a Fourth Amendment constitutional violation, *see supra*, Part III.A.2.b., proving assault and battery does not require plaintiffs to prove they were "seized" by the defendant against whom the claims are raised. Instead, a defendant may be found liable if "(a) he acts intending to cause a harmful or offensive contact with the person of the other *or a third person*," and "(b) a harmful contact with the person of the other *directly or indirectly* results." Restatement (Second) of Torts § 13 (Am. L. Inst. 1965) (emphasis supplied); *see also Chinn*, 839 A.2d at 706 (looking to the Restatement to help define the circumstances under which a law enforcement officer can be held liable for battery); *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (defining battery using the Restatement definition). There is no dispute that Crisman intentionally deployed his pepper spray, and that in doing so he intended to cause contact with the individuals directly sprayed. Furthermore, sufficient evidence in the record supports a finding that all five plaintiffs raising claims against Crisman were affected by his spray, either directly or indirectly. Defs.' SUMF ¶ 182 (Goodwin); SAC ¶ 112; Lane Dep. at 110:3-4, 110:18-21; Pls.' SUMF ¶ 125; Defs.' Resp. to Pls.' SUMF ¶ 125 (not disputing that Pearlmutter was in the group directly sprayed by Crisman); Lazo Dep. at 127:11-129:9; Lazo Video at 41:47-43:40; Troper Dep. at 187:11-13. The material dispute about whether Crisman's use of the spray was reasonable under the circumstances, *see supra*, Parts III.A.2.a., III.B.4., forestalls his entitlement to the protection of D.C.'s qualified privilege at this stage of the litigation, and thus summary judgment would be improper. Instead, the question of determining the reasonableness of Crisman's use of pepper spray, and thus whether the spray's direct and indirect contact with all five plaintiffs at issue was "harmful or offensive," must be left to a jury. As the District is "liable for the torts of its police officers acting under the scope of their employment" "[u]nder the doctrine

of respondeat superior," *White*, 442 A.2d at 162 n.7 (citation omitted), summary judgment must also be denied to the District.

### D.    Negligence *Per Se* Claim

In a normal negligence action, District of Columbia law establishes that the plaintiff bears the burden to prove "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Iacangelo v. Georgetown Univ.*, 595 F. Supp. 2d 87, 91 (D.D.C. 2009) (quoting *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 577 (D.C. 1996)).  Negligence *per se*, however, "represents a 'slight variation on this general rule,'" *id.* (alteration accepted) (citing *McNeil Pharm.*, 686 A.2d at 578), whereby "an unexplained violation" of "a particular statutory or regulatory standard" that is "enacted to . . . prevent the type of accident that occurred" is found to "render[] the defendant negligent as a matter of law," *Sibert-Dean v. WMATA*, 721 F.3d 699, 702 (D.C. Cir. 2013) (alterations accepted) (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 557 (D.C. Cir. 1993)).  Under D.C. law, application of the negligence *per se* doctrine is only proper if (1) "the statute is meant to promote safety," (2) "the plaintiff is a member of the class [of people] to be protected by the statute," and (3) "the defendant is a person upon whom the statute imposes specific duties." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039 (D.C. 2014) (citation omitted).  Upon satisfaction of these requirements for application of the negligence *per se* doctrine, the plaintiff must still prove that the defendant's negligence caused the claimed injury.  *See, e.g.*, Restatement (Second) of Torts § 288B(1) cmt. b (Am. L. Inst. 1965) (The application of negligence *per se* "means that the violation becomes conclusive on the issue of the actor's departure from the standard of conduct required of a reasonable man, and so, without more, is negligence.  Such negligence makes the actor subject to liability . . . but it does not necessarily make him liable.  His

conduct must still be a legal cause of the harm to the plaintiff."); *Doe v. De Amigos, LLC*, No. 11-cv-1755 (ABJ), 2014 WL 12785495, at *2 n.1 (D.D.C. Jan. 23, 2014) (noting that, in a negligence *per se* claim, "causation would ordinarily remain a question of fact for the jury" (citing *Jarrett v. Woodward Bros., Inc.*, 751 A.2d 972, 987 n.25 (D.C. 2000))).[20]

Here, plaintiffs base their negligence *per se* claim on defendants' alleged violations of provisions of the District's First Amendment Assemblies Act ("FAAA"), D.C. Code § 5-331.01–.17 (2020). The FAAA codifies District policy that "persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways . . . and to engage in First Amendment assembly near the object of their protest . . . subject to reasonable restrictions designed to protect public safety, persons, and property." *Ochs v. District of Columbia*, 258 A.3d 169, 171 (D.C. 2021) (quoting D.C. Code § 5-331.03); *see also Enten v. District of Columbia*, 675 F. Supp. 2d 42, 49 (D.D.C. 2009) ("[T]he policy underlying the First Amendment Assemblies Act is to permit persons to 'organize' and participate in First Amendment assemblies 'near the object of their protest.'"); *Dukore v. District of Columbia*, 799 F.3d 1137, 1139 (D.C. Cir. 2015) (cautioning that, under the FAAA, "assemblies and protests may be subject to 'reasonable time, place, and manner restrictions'" (citing D.C. Code § 5-331.04(b))).[21] Plaintiffs allege that defendants violated two FAAA provisions requiring MPD,

---

[20]     Here, proving that defendants' alleged violations of the FAAA were the cause of any injuries suffered by plaintiffs may be established by plaintiffs showing that they would have dispersed had they been given the warnings they allege were required, but the current record on this point is unclear at best.

[21]     The FAAA's scope has several important limitations, including that provisions of this local law that impose requirements and restrictions on MPD do not impose duties on other law enforcement agencies, *Ochs*, 258 A.3d at 172 (interpreting D.C. Code §§ 5-331.07(b)(1), (d)(1)); *see also* D.C. Code §§ 5-331.07(e)(1), (2) (2020) (imposing duties specifically on MPD), and further applies only to events that occur "on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia," D.C. Code § 5-331.03 (2020), and not events that happen on federal property, such as the U.S. Capitol or other federal grounds in the District, *see Christmann v. District of Columbia*, No. 22-cv-2189 (BAH), 2024 WL 216726, at *9 (D.D.C. Jan 20, 2024).

upon "determin[ing] that a First Amendment assembly, or part thereof, should be dispersed," (1) to "issue at least one clearly audible and understandable order to disperse using an amplification system or device" and "provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal," D.C. Code § 5-331.07(e)(1) (2020), and (2) "[e]xcept where there is imminent danger of personal injury or significant damage to property," to "issue multiple dispersal orders" informing "persons of the route or routes by which they may disperse and . . . that refusal to disperse will subject them to arrest," *id.* § (e)(2).[22]

Defendants seek summary judgment on this claim on three grounds, contending that the FAAA did not apply to plaintiffs because the Mayor's June 1 Curfew Order lawfully prohibited First Amendment assemblies in the District during the times the curfew was in effect, Defs.' Mem at 27, and imposed no specific duties on the individual defendants, *id.* at 28; and, in any event, the defendants complied with the statutory obligations, *id.* at 29. These arguments are unavailing to entitle defendants to summary judgment.

### 1. *The Scope of the FAAA*

Defendants first argue that, since the protections of the FAAA only apply to "First Amendment assemblies," and the curfew lawfully prohibited all public First Amendment activity during the times covered by the order, the protest in which plaintiffs participated *could not* have been a First Amendment assembly. Defs.' Mem. at 27. In other words, during the time the curfew was in place, the protections of the FAAA could not apply to any gathering in the District. The plain text of the statute, however, forecloses this cramped reading of the FAAA.

---

[22]     In reply, defendants quote from the wrong version of the FAAA, citing text from the amended version of the law that became effective in April 2023, *see* Defs.' Reply at 19, almost three years after the events at issue in this lawsuit, *see* Pls.' Surreply at 11.

As plaintiffs correctly point out, "[t]he version of the FAAA in effect at the time defined a First Amendment assembly as 'a demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views.'" Pls.' Opp'n at 28 (quoting D.C. Code § 5-331.02(1) (2020)). Nothing in the text of this definition requires that an assembly comply with any applicable time, place, and manner restrictions to qualify as a "First Amendment assembly" and thus trigger the protections of the FAAA. Instead, the sole limitations imposed are the type of gathering and its purpose; the assembly must be "a demonstration, rally, parade, march, picket line, or other similar gathering," and it must be "for the purpose of . . . expressing . . . political, social, or religious views." D.C. Code § 5-331.02(1) (2020).

Moreover, section seven of the law, which establishes requirements for "[p]olice handling and response to First Amendment assemblies," *id.* § 5-331.07 (2020), addresses, in part, MPD's response to "a First Amendment assembly" where "participants . . . fail to comply with reasonable time, place, and manner restrictions" and directs the MPD, "where probable cause to issue a citation or to arrest is present," to "first seek to enforce the [time, place, and manner] restrictions through voluntary compliance and then seek, as appropriate, to enforce the restrictions by issuing citations to, or by arresting, the specific non-compliant persons," *id.* § 5-331.07(b)(1) (2020). This provision explicitly anticipates that some First Amendment assemblies covered by the FAAA might not comply with valid time, place, and manner regulations, making clear that the definition of "First Amendment assembly" does not depend on compliance with such restrictions.

Relevant to this discussion is that, in *Tinius*, 77 F.4th at 699, the D.C. Circuit held that the Mayor's June 1 Curfew Order was "a constitutionally valid time, place, and manner restriction that gave fair notice of the prohibited conduct." Defendants point to the statement in *Tinius* that the

June 1 Curfew Order "did not require police to give curfew violators an opportunity to avoid arrest by agreeing to disperse," Defs.' Reply at 19 (quoting *Tinius*, 77 F.4th at 706), as dispositive of the issue in this case. *Tinius* is inapposite in this context, however, because that case involved only a challenge to the Curfew Order, the text of which does not require dispersal orders, as the *Tinius* decision notes, and makes no reference to the FAAA, let alone suspends those statutory requirements, if such unilateral suspension by the Mayor were even allowable. *See generally* 77 F.4th 691.

Defendants insist that "any attempt to reconcile the FAAA with the June 1 [C]urfew [Order] . . . would lead to nonsensical results," such that the imposition of the curfew must mean that gatherings violating the curfew were not protected by the FAAA. Defs.' Mem. at 27. This approach to reconciling conflicts, if any exist, between the FAAA and the Curfew Order is exactly backwards. The FAAA is the duly enacted law of the District, and defendants identify no authority that allows the Mayor to suspend its application or supersede its authority, even in times of emergency. In fact, the FAAA contains a specific provision that allows the MPD to issue a general dispersal order to a First Amendment assembly when "[a] public safety emergency has been declared by the Mayor that is not based solely on the fact that the First Amendment assembly is occurring, and the Chief of Police determines that the public safety concerns that prompted the declaration require that the First Amendment assembly be dispersed." D.C. Code §§ 5-331.07(d), (d)(3) (2020). The fact that the FAAA specifically addressed how it may be applied during a public emergency declared by the Mayor further undercuts the suggestion that such an emergency declaration would suspend operation of the FAAA or otherwise alter its scope. Instead, the rules and protections of the FAAA continued to apply to covered First Amendment assemblies during the June 1 curfew.

Here, defendants do not contest that plaintiffs were part of a "demonstration, rally, . . . march, . . . or similar gathering" on June 1, 2020, that was for the purpose of expressing "political [or] social . . . views," and the record amply supports such a finding, *see, e.g.*, Pls.' SUMF ¶¶ 29-30; *id.* ¶ 78 (describing protesters chanting "hands up, don't shoot"); Quarles BWC at 21:07:55 (video and audio of protesters doing the same while encircled on Swann Street), meaning that defendants have failed to demonstrate that plaintiffs' conduct on that date fell outside the protections of the FAAA.

### 2.    *The Duties Imposed by the FAAA*

Defendants next argue that the individual defendants are entitled to summary judgment because the FAAA provisions allegedly violated do not "apply to them or the conduct in which they are alleged to have engaged." Defs.' Mem. at 28. On defendants' reading of the FAAA provisions relied on by plaintiffs, the fact that the text only states that "MPD" must issue the required dispersal orders means that no specific duties are placed on individual "'officers,' or a specific subset of them," meaning these provisions cannot support a claim of negligence *per se* against the individual defendants. *Id.* This blinkered approach to construing the FAAA is unpersuasive.

According to the plain text of the statute, the "provisions of [the FAAA] are intended to protect persons who are exercising First Amendment rights in the District of Columbia, and the standards for police conduct set forth in this title *may be relied upon by such persons in any action alleging violations of statutory or common law rights*." D.C. Code § 5-331.17 (2020) (emphasis supplied). As another Judge on this Court has found in a similar case alleging negligence *per se* under the FAAA, "[t]he plain meaning of the text is that the FAAA's standards may be relied on in '*any* action,' including actions against individual officers, not just against MPD itself." *Ferris*,

2023 WL 8697854, at *18 (emphasis in original) (citing *Sharps v. United States*, 246 A.3d 1141, 1149 (D.C. 2021) ("We will give effect to the plain meaning of a statute when the language is unambiguous and does not produce an absurd result.")).   The FAAA provisions relied on by plaintiffs establish a "police standard" requiring the issuance of dispersal warnings before participants in a First Amendment assembly are arrested, which standard, under the FAAA's own directions on the law's construction, "may be relied upon" in plaintiffs' suit against the individual defendants.

As plaintiffs contend, *see* Pls.' Opp'n at 31, this reading of the FAAA is consistent with previous applications of the negligence *per se* doctrine by D.C. courts.   For instance, in *Jarrett v. Woodward Brothers, Inc.*, 751 A.2d 972, the D.C. Court of Appeals considered a claim of negligence *per se* based on the D.C. Alcoholic Beverage Control Act, D.C. Code § 25-121(b), which prohibited a person holding a liquor license from allowing "on the licensed premises the consumption of alcoholic beverages . . . by any person under the age of 21 years, by any intoxicated person, . . . or any person who appears to be intoxicated." *Id.* at 977 (quoting D.C. Code § 25-121(b)).   Although the plain text of the statute imposed a duty only on the holder of the license, the court found that the specific duties imposed by the statute also applied to the establishment owner's "agents." *Id.* at 986.   In the instant case, extending the statutory duties imposed on MPD to individual officers as agents of the MPD makes particular sense, since the MPD only acts through agents, and reading the FAAA as not applying its duties to the officers "handling and respon[ding] to First Amendment assemblies," D.C. Code § 5-331.07 (2020), would dramatically diminish the law's protections, in contravention of the law's intended broad scope, *see, e.g.*, *id.* § 5-331.17; *id.* § 5-331.03 (declaring the "public policy of the District of Columbia that persons and groups have a right to organize and participate in peaceful First Amendment assemblies" subject

to reasonable restrictions); *id.* § 5-331.07(a) ("The MPD's handling of, and response to, all First Amendment assemblies shall be designed and implemented to carry out the District policy on First Amendment assemblies.").

In reply, defendants attempt to recast this argument, suggesting that the issue is not that the FAAA imposes no specific *duties* on the individual defendants, but rather that the FAAA does not impose "individual *liability* on MPD officers." Defs.' Reply at 18 (emphasis in original). This argument similarly misses the mark, since plaintiffs do not assert that defendants' liability arises from the FAAA, but instead from common law tort theories, with the requirements of the FAAA simply establishing the duty of care, pursuant to the tort doctrine of negligence *per se*. *See* Pls.' Surreply at 11.

### 3. *Defendants' Compliance with the Duties Imposed by the FAAA*

Defendants finally assert that summary judgment is warranted because "ample warnings and opportunities to disperse" were provided "at or around 7 p.m. and before Plaintiffs were encircled on Swann Street." Defs.' Mem. at 29 (citation omitted). Plaintiffs counter that warnings issued "in another part of the District" nearly two hours before the group was encircled on Swann Street were not sufficient to comply with the FAAA's requirements. Pls.' Opp'n at 29-30. The facts as to whether defendants fully complied with their statutory duties under the FAAA are murky, and this is fatal to defendants being entitled to summary judgment here.

Plaintiffs were indisputably present near the White House at various times on the evening of June 1 when dispersal orders were issued. *See supra*, Part I.A.2. The record is unclear, however, about (1) precisely where each plaintiff was located as well as where other protesters were congregating, (2) the overall size of the group of protesters, and (3) even whether those protesting in Lafayette Park and other areas surrounding the White House could properly be considered one

cohesive group. Such information would be probative in assessing whether the curfew announcements and dispersal orders issued at three locations at different times—14th Street and H Street NW, Defs.' SUMF ¶ 36; 17th Street and Pennsylvania Avenue NW, *id.* ¶¶ 46-47; and 15th Street and H Street NW, *id.* ¶ 48—were sufficient to comply with the dispersal order obligations imposed by the FAAA, *see* D.C. Code §§ 5-331.07(e)(1), (2), as to any group that ultimately ended up on Swann Street. Further compounding the murkiness of the situation, the record also does not identify when exactly the group walking north on 14th Street left the area around the White House, *see supra*, Part I.A.2, making it impossible to conclusively determine whether the group had already departed when additional warnings were issued near Lafayette Park at approximately 8:15 PM, *see id.* Since the parties dispute whether such warnings were made to the group that walked along 14th Street and agree no warnings were delivered at Swann Street, *see* Defs.' SUMF ¶ 66; Pls.' Resp. to Defs.' SUMF ¶ 66; Mejia Dep. at 151:22-155:4, 158:1-11; Pls.' SUMF ¶¶ 37, 39 (establishing, without dispute from defendants, that plaintiffs Pearlmutter and Remick did not hear any orders to disperse while on 14th Street); *id.* ¶ 73 (claiming no such orders were given at the intersection of 14th Street and Belmont Street); Defs.' Resp. to Pls.' SUMF ¶ 73 (disputing plaintiffs' claim but not providing evidence that such orders *were* given at the intersection of 14th Street and Belmont Street); Pls.' SUMF ¶ 91; Defs.' Resp. to Pls.' SUMF ¶ 91 (establishing without dispute that no dispersal orders were given on Swann Street), the record is unclear as to whether *sufficient* dispersal orders were issued to comply with the FAAA for all plaintiffs and those who ended up on Swann Street. Furthermore, while the parties do not dispute that plaintiffs were part of a large group that walked roughly two miles through downtown D.C. after the June 1 curfew began, *see supra*, Parts I.A.2, III.B.1.a., the record shows that "[t]he identity of the group [that walked up 14th Street] was fluid with people joining and leaving as the night continued,"

Defs.' Mem. at 5 (citing Defs.' SUMF ¶ 221), with the result that the large group, including all seven plaintiffs, that marched north on 14th Street and ended up "kettled" on Swann Street may not have been entirely the same group (or a subgroup) of any group or groups that protested near the White House.  Given the potential differences in the two groups, dispersal warnings provided to any group or groups near the White House may not satisfy the requirements of the FAAA as to the group that ended up on Swann Street.[23]   Since these material facts are disputed and not otherwise clear from the record, summary judgment is not proper on this basis, and defendants' motion for summary judgment is denied as to plaintiffs' negligence *per se* claim.

## IV.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment, ECF No. 83, is denied as to (1) the Fourth Amendment excessive force claims brought by plaintiffs Pamela Goodwin, Allison Lane, and Jesse Pearlmutter against defendant James Crisman; (2) the First Amendment retaliation by use of excessive force claims brought by the same three plaintiffs against Crisman; (3) the common law assault and battery claims brought by plaintiffs Goodwin, Lane, Pearlmutter, Jenny Lazo, and Eliana Troper against defendants Crisman and the District of Columbia for Crisman's use of pepper spray; and (4) the negligence *per se* claim brought by all plaintiffs against all defendants, and plaintiffs may proceed to trial on these claims.  Defendants are entitled to summary judgment as to all other claims.

---

[23]     If the group or groups near the White House were close enough to hear the curfew warnings and dispersal orders and were generally the same as the group that ended up on Swann Street, a reasonable jury could find that MPD satisfied its duties by issuing warnings near the White House "when the MPD determine[d] that [the] First Amendment assembly . . . should be dispersed," D.C. Code § 5-331.07(e)(1) (2020), even if everyone in the group claims not to have heard or understood the public announcements.

The parties are directed to file, by March 18, 2025, a joint status report advising the Court whether the parties request referral for mediation, or alternatively proposing three dates for trial, as described in the accompanying order.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  February 27, 2025

_____
**BERYL A. HOWELL**
United States District Judge